```
1   UNITED STATES OF AMERICA
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                        20 Cr. 160 (MKV)

5   LISA GIANNELLI,

6               Defendants.
                                         Trial
7   ------------------------------x
                                         New York, N.Y.
8                                        April 28, 2022
                                         9:35 a.m.
9   Before:

10

11                  HON. MARY KAY VYSKOCIL,

12                                       District Judge
                                         -and a jury-

13                      APPEARANCES

14  DAMIAN WILLIAMS
        United States Attorney for the
15      Southern District of New York
    BY:  SARAH MORTIZAVI
16       BENJAMIN GIANFORTI
         Assistant United States Attorneys
17
    FASULO, BRAVERMAN & DiMAGGIO, LLP
18      Attorneys for Defendant Giannelli
    BY:  LOUIS V. FASULO
19

20

21

22

23

24

25
```

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning, everyone.  Is there anything

3    we need to discuss before we bring our jurors out?

4           MR. FASULO:  There is, actually, Judge, a small -- are

5    the jurors ready, because it's not a --

6           THE COURT:  They are ready, but that's okay.

7           MR. FASULO:  It's a very brief concern.

8           In the last trial, I had a conversation with the U.S.

9    attorney about the way they're introducing text messages back

10   and forth between parties where the witness isn't a party to

11   the text message, and it doesn't relate to that witness'

12   testimony, unless, of course, that witness used it in their

13   investigation and relied on it.  And I understand they used the

14   methodology because the witness was on the witness stand.  They

15   had some --

16          THE COURT:  Mr. Fasulo, when you're speaking, you can

17   take your mask off.

18          MR. FASULO:  This would be better.

19          Whether the witness was -- let me get back.

20          THE COURT:  I'm sorry.  Let me interrupt you.  Let's

21   get appearances on the record.

22          MR. FASULO:  I'm sorry.

23          THE COURT:  Ms. Dempsey isn't here today, so let me

24   ask, starting with the government, can we please have your

25   appearances for the record?

1                    MS. MORTAZAVI:  Good morning, your Honor.

2            Sarah Mortizavi and Ben Gianforti for the government.

3  We also have Karline Jung from out office at counsel table, and

4  Special Agents Tim Bergen and Bruce Turpin with the FBI.

5                    THE COURT:  Good morning.

6                    MR. FASULO:  Good morning, your Honor.

7            Louis Fasulo, along with Sean McCabe, my paralegal,

8  and Ms. Lisa Giannelli, the defendant, sitting at counsel

9  table.

10                   THE COURT:  Good morning, Ms. Giannelli.

11                   MR. FASULO:  Judge, I have a brief issue.  I would

12  like to address the Court.

13                   THE COURT:  Sure.

14                   MR. FASULO:  During the course of the last trial, it

15  came to counsel's attention that the government had used

16  witnesses that would read what was stipulated to by both

17  parties into evidence, even though those witnesses were

18  unrelated to the stipulated testimony.

19            And it's our feeling that if you have a witness, for

20  example, an expert or somebody who's testifying about a certain

21  area, and they are to be judged as to the credibility and the

22  usefulness of what they're giving in that area, to have the

23  witness then go into an area which they're not really related

24  to but just for convenience's sake, read part of a transcript

25  that has been admitted by stipulation into evidence, it's not

4

1   part of their investigation, it doesn't go into anything that

2   they have been testifying about, it gives the jury a wrong

3   impression as to what the value of that testimony is.

4          The documents speak for itself.  The evidence speaks

5   for itself.  I understand the jury -- the government wants to

6   get it in front of the jury.  In most trials, the government

7   would read it in themselves because there would be small

8   snippets.  In this case, unfortunately, there are larger

9   snippets.  So I'm willing to be flexible in this area, and I

10  understand the struggle.

11         But I did tell the government I anticipate, if they're

12  going to have a witness just read ad nauseam all of the e-mails

13  between parties that this witness wasn't a part of or didn't

14  use in their particular investigation, that it could give the

15  jury the wrong impression as to the value of that testimony as

16  seen through that witness' eyes; meaning if that witness is

17  very credible, they could put more weight onto that testimony

18  versus just the nature of the words themselves, the texts

19  themselves, et cetera.

20         THE COURT:  What are you asking me?  Or are you just

21  calling to my attention?

22         MR. FASULO:  I'm calling it to your attention.  And we

23  discussed with the government that my preferred -- I think the

24  government can read it in.  That's within their purview.  They

25  can ask questions about it.  But I think to have a witness who

5

may be perceived in a certain light by the jury reading it in

when it doesn't have anything to do with that witness'

testimony, and it's not part of that witness' investigation, I

think is not proper.

THE COURT:  So your contention is it's not proper for

them to do that?

MR. FASULO:  Unless it relates to the testimony.  If

it relates to the testimony, it absolutely is.  If the witness

knows about the text message and affected what they're

testifying to, it's relevant.  But just to have the witness

read in somebody else's testimony because it existed is, one,

duplicitous, and the words speak for themselves.

THE COURT:  All right.  Let me hear from Ms. Mortizavi

first.

MS. MORTAZAVI:  Yes, your Honor.  There is some

documentary evidence here, and much of it involves discussions

between coconspirators, which means none of our witnesses are

going to be parties to those communications.  That shouldn't

prevent anyone from reading it into the record, whether it's

the government, whether it's a witness, whether it's an expert

witness.  They should be entitled to read in whatever is in

evidence.  It's properly before the jury.

We will make clear, for example, with agents who are

being called for a limited purpose because they have

involvement for perhaps one day or two days of a search that

1    occurred as part of this case that they did not otherwise have

2    any involvement.  They will not be opining on what they're

3    reading.  It's simply to present it to the jury in a particular

4    manner which is to not have government counsel read it.

5              THE COURT:  All right.  Look.  Is this issue going to

6    come up with respect to the first witness?

7              MR. FASULO:  Yes.

8              THE COURT:  All right.

9              MR. FASULO:  I understand that, and the Court will

10   make its ruling.  I ask the Court to give an instruction to the

11   jury that the fact that it's being read by that witness is a

12   way of getting it into evidence.  You know, that witness is --

13   what I'm saying is that witness' credibility doesn't go to the

14   underlying nature of what was being said.

15             THE COURT:  Correct.  I want to move along because you

16   should have told me ahead of time you had this issue because I

17   told the jurors we would try to start promptly.  They're here.

18   They're ready to go.  They've been very punctual.

19             The reality is if something -- you can sit,

20   Ms. Mortazavi.  If something is stipulated to, it can come into

21   evidence.  It is evidence, and it can be read to the jury at

22   any point in time.  You are correct, Mr. Fasulo, it's not tied

23   to the witness, and you're free to point that out during

24   cross-examination.  If the parties want to stipulate to a brief

25   instruction that I would give, I'm happy to do that.  And I can

1   clearly tell the jury when Ms. Mortazavi says, I have something

2   I want to offer.

3            I don't really recall witnesses reading somebody

4   else's transcript.  I recall you playing them.  But let's see

5   how it goes.  But the reality is if there's no objection to

6   evidence, it can come in.

7            MR. FASULO:  Very well.

8            THE COURT:  All right.  Anything else that we need to

9   talk about?

10           MS. MORTAZAVI:  Nothing from the government.

11           MR. FASULO:  Nothing from the defense.

12           THE COURT:  All right.  Thank you.  All right.  So can

13   we please bring our jurors in?

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning to our jurors, and thank you

3    so very much for being here so punctually.

4          Just so you realize -- you're all a little confused --

5    we were standing for you.  We do that each time the jury enters

6    and leaves the courtroom out of a sign of our respect for you

7    and our thanks to you for enabling our jury system to work the

8    way it's supposed to work.

9          So in a few moments, we're going to begin the trial in

10   this case.  I just want to remind you of a few things before we

11   get going:

12         First, I remind you that you are under the oath that

13   you took as jurors.  That oath obligates you to keep an open

14   mind and not to discuss this case or issues involving the case

15   with anyone, and that includes close family members, friends.

16   You're not to do any research on the Internet about the case.

17   If you should happen to hear or read anything about the case or

18   issues related to the case, I'd ask you to please bring that to

19   the attention of my courtroom deputy.

20         I hope you've all met Mr. Lee, who's standing in today

21   for Ms. Dempsey, who had a longtime preexisting engagement.

22         All right?  So with that, as I said, in a few moments

23   we're going to begin the trial with opening statements from

24   counsel.  But I just want to remind you about, or give you some

25   new information about what to expect and about a few principles

1    of law that you should keep in mind during the trial.  I will

2    give you detailed instructions at the close of the case, but

3    these are just some preliminary matters.

4           So as I told you yesterday, each day we will begin at

5    around 9:30 or 10:00.  I'll let you know that at the end of

6    each day what time we'll be starting the following day.  As we

7    told you, and as we did this morning, we'll provide a light

8    breakfast for anyone who gets here early, that will be in room

9    9A, starting at 8:30 each morning if you arrive early enough to

10   enjoy it.  Ms. Dempsey showed you where that is, and I think

11   some of you found your way to the room this morning.

12          That room is also where you will eat lunch so that you

13   can distance from one another, if you choose to do so, eating

14   at the courthouse as opposed to trying to eat outside

15   somewhere.

16          As I told you yesterday, I think we'll take a short

17   break each morning for people to use the restroom, stretch,

18   break, that sort of thing.  We'll take lunch each day from

19   around 12:30 or so to 1:15.  We'll be a bit flexible depending

20   where we're at with a particular witness' testimony in terms of

21   the exact time of the lunch break, but that's roughly what it

22   will be.

23          I think you might have seen yesterday or the earlier

24   days when you were here waiting to be called for a particular

25   trial, if you have to go out and buy food, you're not going to

1    have a whole lot of time to come and sit and have lunch.  So

2    you might want to think about bringing lunch with you each day.

3    But, obviously, that's up to all of you.

4            Then, again, we'll take another stretch break each

5    afternoon.  We'll try to conclude testimony by 4:30 or 5:00 at

6    the very latest each day so that we can get you on your way.  I

7    should tell you too that tomorrow we're going to conclude at

8    3:00 p.m.  It's Friday afternoon.  Somebody had a preexisting

9    commitment, and it's just, I think, easier for all of you, with

10   the start of the weekend, to conclude a little bit early.  So

11   we'll be doing that tomorrow.

12           So we're going to start our trial with opening

13   statements from the parties.  First, you'll hear from the

14   government, and thereafter, you will hear from the defendant.

15           This is an opportunity for the lawyers to give you a

16   sense of what they think the evidence will be at trial and what

17   they think you should expect to learn and find out during the

18   presentation of evidence.

19           After opening statements, the government will present

20   its evidence.  It will call witnesses one at a time.  They'll

21   come up here to the witness stand next to the bench.  They'll

22   be sworn, and they will present testimony to you.  After that,

23   defense counsel will have the opportunity to ask questions of

24   the government's witnesses, and that is called

25   cross-examination.  The government might then have some

1    follow-up questions.  That is called redirect.  And if the

2    defense wishes, it may have recross of each witness until any

3    given witness is finished testifying.

4         After the government calls its last witness, it will

5    rest its case, and the defense will then have a chance to call

6    witnesses.  But I want to remind you that the defendant has no

7    burden to call any witness or to present any evidence

8    whatsoever.  The burden at this trial in a criminal case is

9    always and exclusively on the government to prove beyond a

10   reasonable doubt that the defendant is guilty of the crime with

11   which she has been charged.  Now, having said that, of course,

12   the defendant may call witnesses, if she wishes to do so.

13        After the evidentiary record is complete, there will

14   be an opportunity for the lawyers to make closing arguments to

15   you.  That's their opportunity to argue to you about what they

16   believe the evidence has shown and how they think you ought to

17   render a verdict in this case.

18        After that, I will give you the detailed instructions

19   on the law that I have been telling you you will receive.  And

20   you will then retire to the jury room in the back and

21   deliberate until you reach a verdict.  All right?

22        So as I mentioned yesterday, in our system of justice

23   here in America, judges and juries have separate roles.  My job

24   is to instruct you on the law, and as I just said, I will

25   largely do that at the end of the case.

1          Your job as jurors is to decide all of the fact issues

2    of this case based solely on the evidence presented in this

3    courtroom during the trial.  You are the only triers of the

4    fact issues, and your decision will control the verdict that

5    will be rendered here.  I want to just remind you again, please

6    do not take anything that I say or do during this trial as an

7    indication of what your verdict should be.  You should pay

8    close attention to all of the evidence at trial.

9          The evidence will come in in three different general

10   categories.  The first category, as I mentioned to you, is

11   testimony from the witnesses who are called by the parties,

12   with one exception that I'll talk to you about later.  All of

13   the witnesses are going to testify, as I said, from this

14   witness stand here.  Testimony given by a witness under oath is

15   evidence that you may consider in reaching your decision.

16         The second category of evidence consists of documents

17   and exhibits that are formally received into evidence during a

18   trial.

19         And the third category of evidence is stipulations

20   between the parties, stipulations or agreements between the

21   parties.  If the parties stipulate to certain facts or to what

22   a witness would say if the witness were to come here and

23   testify but doesn't, that stipulation is evidence.

24         Now, there are other things that are going to happen

25   during the trial that are not evidence.  So I want to just make

1    clear to you that a question asked by a lawyer before the

2    witness answers is not evidence, and any statements made by

3    counsel, including opening statements and closing arguments to

4    you, are not evidence.  Anything that I exclude during the

5    trial or that I strike from the record or that I tell you not

6    to consider is not evidence.

7         Finally, and this is very, very important, anything

8    that you see or you hear or you read outside of this courtroom

9    is not evidence.  Your verdict in this case must be based

10   solely on the evidence that's received in this courtroom.

11        Now, in this case, we're going to permit you -- I see

12   you all already have your notepads, so you already know this.

13   We're permitting you to take notes during the trial.  If you

14   want to take notes, you're free to do so.  You're not obligated

15   to take notes, though, people absorb information differently.

16   If it would be help for you to take notes, but don't feel

17   obligated to take notes just because other people are doing

18   that.

19        If you do take notes, please be sure that taking your

20   notes doesn't interfere with your listening to the witness on

21   the witness stand or considering all of the evidence that's

22   presented in this case.

23        Also, if you do take notes, please do not discuss your

24   notes with anyone during the trial or even during

25   deliberations.  When you leave at the end of the day, please

1    leave your notebooks on your chairs at breaks, first of all,

2    and then in the jury room at the end of each day.  It will be

3    there for you when you come back the next day.  Do not take

4    your notebooks home with you, please.

5          If you take notes, those notes are to be used solely

6    to assist you, and your notes are not a substitute for your

7    recollection of the evidence that you hear in this case.

8          In addition, the fact that a particular juror has

9    taken notes does not entitle that juror's view to any greater

10   weight than the views of any other juror when you go back to

11   deliberate.  And, again, as I said before, you may not show

12   your notes to any other juror during deliberation.  They are

13   your personal notes for your own reference.

14         If during the deliberations you have any doubt as to

15   what the testimony was, you'll be permitted to ask that the

16   official trial transcript, which is being taken by our court

17   reporters who are sitting right here in front of the witness

18   stand and transcribed each day into a printed volume, you'll

19   have the right to request that those transcripts be made

20   available to you and read allowed to refresh your recollection

21   about what the testimony was.  So I thank you for that.

22         Now I just, again, remind you from this point on,

23   until you retire to deliberate on your verdict, it is your

24   duty, your sworn duty, not to discuss this case and not to

25   remain in the presence of any other people who maybe discussing

1    the case.

2            This rule about discussing the case with others

3    includes discussions, even with members of your own families

4    when you go home each day and with your friends.  If at any

5    time during the course of the trial any person attempts to talk

6    to you or communicate with you about the case, either in or out

7    of the courthouse, please immediately report that attempt to me

8    through our courtroom deputies; today Mr. Lee, on all other

9    days, Ms. Dempsey

10           Let me explain to you that the attorneys and the

11   defendant in this case are not supposed to speak to you either.

12   Even if you happen to see them in the hallway, they are not

13   permitted to speak with you, even to offer a friendly greeting.

14   So if you happen to see one of them outside of this courtroom

15   on your way in or your way out, they will, and they should,

16   ignore you.  Please don't take offense at that.  They are

17   simply acting properly by doing so.

18           Just as you may not have any in-person communications

19   about the case, you shouldn't communicate with anyone by cell

20   phone, through e-mail, BlackBerry, if those still exist,

21   iPhones, text messaging, Twitter, any blog or website, any

22   Internet chatroom or any other social networking websites like

23   Facebook, Instagram, YouTube, some of the others people

24   mentioned that I never even heard of.

25           Also, you can't use any of these tools to post.

1          Information about the case on the Internet during the

2     trial.  I remind you to please do not do any research or make

3     any investigation on your own about any matters relating to

4     this case or this type of case.  That means, for example, you

5     shouldn't consult reference works, dictionaries, Wikipedia,

6     don't search the Internet, websites, blogs, or use any other

7     electronic tools to obtain any information about this case or

8     the subject matters involved in the case.  Don't research about

9     parties to the case or anyone else who may be involved.

10         You must decide this case based only on the evidence

11    that is presented in this courtroom and my instructions to you

12    at the close about the law.  It would be improper for you to

13    supplement that information on your own.

14         All right.  With these preliminary instructions, then,

15    we'll now start the trial, and we'll hear from the government

16    with its opening statement.

17         MR. GIANFORTI:  Thank you, your Honor.  Good morning.

18         THE COURT:  Mr. Gianforti, please.

19         MR. GIANFORTI:  Good morning.

20         For almost 20 years, Lisa Giannelli, the defendant,

21    sold unsafe, unapproved, and unlawful drugs to corrupt

22    racehorse trainers to help them win races for money.  She sold

23    them doping drugs, and she helped them not get caught when they

24    used those drugs on their horses.

25         How?  By selling them drugs that wouldn't show up on

1    the drug tests that are administered by the state agencies that

2    regulate horseracing.  Ladies and gentlemen, the defendant

3    wasn't just in the doping business, she was in the deception

4    business too.

5         For nearly two decades, the defendant who was also

6    known as Lisa Ranger by her customers, sold huge amounts of

7    drugs to dishonest racehorse trainers.  Those drugs included

8    performance enhancing drugs that trainers injected into their

9    horses to push them beyond their natural abilities.  Drugs to

10   make them race faster.  Make them race longer.  Drugs to make

11   them run through pain and through injury.  The trainers did

12   this in clear violation of state horse racing rules, but they

13   did it in way.  Why?  Because fast horses win money.

14        But the defendant's drugs also had something extra.

15   They were designed to be untestable on state drug tests.  State

16   agencies put these tests in place for a reason.  They know

17   there's a temptation to cheat in horseracing because so much

18   money is on the line.  So the authorities put in place drug

19   tests to catch trainers who violate the sport's antidoping

20   rules.

21        The defendant helped corrupt trainers get around those

22   rules by selling untestable performance enhancing drugs,

23   because not getting caught wasn't just important to the

24   trainers, it was extremely important to the defendant herself.

25   Getting caught by a government agency could have serious

1    consequences, including what the defendant wanted to avoid the

2    most:  The authorities shutting her down.

3          Over the course of this trial, you're going to hear

4    about the huge lengths the defendant went to to avoid getting

5    caught by the authorities.  You'll hear about drug labels

6    designed to throw the authorities off the defendant's trail.

7    You'll hear about drugs designed to be untestable.  And you'll

8    hear about the defendant's lies and deceit.  By selling these

9    illegal drugs and telling these lies, the defendant committed a

10   federal crime, and that's why we're here today.

11         In this opening statement, I'm going to do two things.

12   First, I'm going talk to you about what the evidence at this

13   trial is going to show, and then I'll talk to you about how we

14   expect the evidence will prove our case.  So let's start with

15   what we expect the evidence will show over the next several

16   days.

17         The world of professional horseracing is highly

18   competitive, and for the winners, highly lucrative.  So there's

19   huge temptation for racehorse winners to win races however they

20   can, including through fraud because that's what doping

21   racehorses really amounts to:  Fraud.

22         To protect against this sort of cheating, each state

23   has an agency that enforces rules designed to prevent the use

24   of performance enhancing drugs in racehorses.  Those rules

25   include outright bans on some substances, as well as

1    restrictions on giving drugs to horses on a race day.  To

2    enforce these rules, state racing authorities drug test horses

3    to make sure no banned substances are in their system.

4           That's where the defendant came in.  The defendant

5    sold drugs that were designed to get around antidoping rules.

6    She did that through a company called Equestology.  And you'll

7    learn Equestology was nothing more than an illegal doping

8    factory that made money by helping dishonest trainers defraud

9    state racing authorities.

10          The defendant was Equestology's main salesperson.  She

11   was also involved in running the business day-to-day along with

12   a corrupt veterinarian.  This vet created the untestable drugs

13   and the defendant sold them.  Over the years, Equestology took

14   in millions of dollars in revenue, and the defendant took home

15   six figures a year in sales commissions.  All that money came

16   from helping corrupt trainers avoid getting caught for

17   violating the antidoping rules.

18          During this trial, you're also going to learn about

19   some of the performance enhancing drugs that Equestology made

20   and the defendant sold.  The untestable drugs at the heart of

21   the defendant's business.  For example, there were drugs that

22   boosted a horse's red blood cell count, which helps with

23   endurance.  These are known as blood builders.  They had names

24   like BB3.  BB stands for blood builder.  There were drugs that

25   increased a horse's testosterone to unnatural levels.  This

1    helps with strength.  There were drugs that prevented a horse

2    from feeling pain so they could run through injuries.  These

3    drugs were designed to help horses race better.  These drugs

4    were also designed to not show up on drug tests, even when

5    those tests were administered within hours of a race.

6           This was an insurance policy to keep the defendant and

7    the crooked trainers who used her drugs from getting caught by

8    the state racing authorities.  But, ladies and gentlemen, the

9    defendant wasn't just worried about the state racing

10   authorities.  She was also worried about drug regulators, state

11   agencies and federal agencies like the Food and Drug

12   Administration or FDA, which administers all drugs, including

13   drugs intended for animals, just like you can't go out and sell

14   unapproved drugs for humans, you can't go out and sell

15   unapproved drugs for animals.  There are federal laws and

16   regulations that govern how drugs can be manufactured and sold.

17   Those laws are there to keep the consumers of those drugs safe,

18   whether they be humans or animals.

19          In order to ensure the safety of a given drug, the FDA

20   must approve it before it is sold.  The drug has to be

21   manufactured in a facility, registered with the FDA.  The drugs

22   have to have labels that contain important information to

23   ensure the drug is used safely and that the manufacturer can be

24   traced if something goes wrong.  And perhaps, most obviously,

25   the FDA requires a prescription drug be sold only when there's

1    a valid prescription from a doctor or a vet.

2           Did the defendant's drugs follow any of these rules?

3    No.  Not one.  The defendant's entire business model was

4    premised on selling unapproved untestable performance enhancing

5    drugs without a prescription.  And if a regulator stumbled upon

6    a bottle of one of the defendant's drugs, no problem.  Because

7    the defendant's name, Equestology's name, and Equestology's

8    address were nowhere to be found on that bottle.

9           What you will learn is that if a drug violates any of

10   the FDA rules I just described, it is considered to be

11   misbranded or adulterated.  These are legal terms that you'll

12   come to understand.  It's a federal crime to sell misbranded

13   and adulterated drugs, especially if you do it while trying to

14   mislead the authorities.  That's exactly what the defendant did

15   for nearly two decades.

16          So how did the defendant keep her illegal doping

17   business going for all these years?  First, she hid behind the

18   corrupt vet's medical license.  To anyone who asked,

19   Equestology was a company ran by a legitimate vet.  In reality,

20   the vet was only a vet on paper, and Equestology was nothing

21   more than that a doping mill.

22          You'll learn the vet behind Equestology didn't

23   actually practice as a vet, and the defendant knew it.  She

24   knew he didn't examine horses.  She knew he didn't keep track

25   of patient files.  She knew he didn't diagnose actual medical

1    conditions.  She knew he didn't write actual prescriptions.

2    This vet was in the doping business, not the medical business.

3         Instead, you'll learn that the defendant used the

4    corrupt vet's license as cover for selling unapproved

5    performance enhancing drugs to racehorse trainers looking to

6    dope their horses, and also used the vet's license to order

7    prescription drugs in bulk from various suppliers so she could

8    sell them to horse trainers who had never even spoken to a vet.

9    And if the authorities came sniffing around, the defendant

10   could always say, don't ask me.  The vet told me it was okay.

11        You'll also learn the defendant was very careful about

12   who she sold to.  Remember, this wasn't a normal legal business

13   that could operate out in the open.  The defendant only wanted

14   to sell the horse trainers who wouldn't snitch.  In other

15   words, the defendant wouldn't sell to honest racehorse trainers

16   who might turn her into the authorities.

17        Finally, you'll learn that when the hammer almost came

18   down on the defendant, she lied to the authorities to save her

19   skin.  In 2011, the state of Delaware investigated the

20   defendant after she sold a racehorse trainer a drug that was

21   not approved by the FDA.  And when her back was up against the

22   wall, what did she do?  She lied through her teeth.  She

23   claimed that she didn't sell drugs for the corrupt vet.  She

24   said she just delivered veterinarian supplies for him.  She

25   said she was basically a UPS driver.

1          During this trial, you'll learn just how far from that

2     truth that really was.  But that time, ladies and gentlemen,

3     the defendant's lies worked.  She got out of trouble and went

4     right back to business as usual:  The business of helping

5     corrupt trainers defraud state racing authorities by illegally

6     doping their racehorses.  So that's what the evidence will

7     show.

8          Now, let's talk about how we'll prove the defendant is

9     guilty beyond a reasonable doubt.  You're going to see the

10    drugs that the defendant sold.  You'll see some of the actual

11    drugs here in the courtroom, and you'll see photographs of the

12    hundreds of vials of drugs that were confiscated from the

13    defendant and the warehouse where Equestology were stored.

14    You'll see the name Equestology was nowhere to be found on a

15    customized label slapped on the defendant's drugs.  That way it

16    was harder, if not impossible, to trace those drugs back to the

17    defendant.

18          You're also going to see the defendant's text messages

19    and e-mails.  She took orders from customers this way.  This is

20    also how she communicated with others at Equestology about the

21    huge amounts of products she needed to keep pumping out drugs

22    to her buyers.  You'll see the money Equestology was making,

23    millions of dollars, and the money the defendant personally

24    collected in sales commissions.

25          You'll hear from expert witnesses who explained to you

1   how the drugs the defendants sold can enhance a horse's

2   performance and how the FDA regulates drugs sold in the

3   United States.  You'll also hear from firsthand witnesses about

4   how the defendant's illegal doping business worked, including

5   the secrecy of the defendant's sale's tactics.  You'll hear

6   about the custom-made performance enhancing drugs the defendant

7   offered for sale.  You'll hear the buyers didn't need

8   prescriptions for any drug if they wanted it.  As long as you

9   were willing to pay and you kept your mouth shut, the defendant

10  would sell to you.

11          Let me be clear:  The defendant's buyers broke the law

12  and committed crimes.  You're going hear from some of them.

13  These trainers gave their horses the illegal performance

14  enhancing drugs to win races and win money, and they tried to

15  hide it from state racing authorities.

16          Some of these witnesses have pled guilty to committing

17  federal crimes as a result of their conduct.  When these former

18  clients testify, you should scrutinize their testimony and ask

19  how it fits in with all the other evidence in the case,

20  including the drugs, the text messages, the documents, and

21  perhaps, most importantly, ladies and gentlemen, the wiretap

22  recordings.

23          The investigation of this case involved the use of a

24  wire trap on the defendant's phone, so you're going to hear the

25  defendant herself in her own words when she thought the

1    authorities weren't listening.  Her own words when she was

2    talking to one of her dishonest buyers.  Her own words when she

3    was talking to the corrupt vet.  What you'll hear is she knew

4    full well Equestology was an illegal doping factory, and that

5    she needed to keep a low profile only sell the trusted clients

6    and avoid getting caught.  Why?  Because if she got caught, it

7    would all come crashing down.

8            Ladies and gentlemen, I'm about to sit down.  But

9    before I do, I'd like to ask you do three things during this

10   trial:

11           First, please pay close attention to the testimony and

12   the exhibits.  Second, please listen carefully to and follow

13   the Court's instructions on the law.  And third, please use

14   your common sense to evaluate the evidence, the same common

15   sense you use in your everyday lives.  If you do those three

16   things, you'll reach the only verdict that is consistent with

17   the evidence:  That the defendant is guilty beyond a reasonable

18   doubt, thank you.

19           THE COURT:  Thank you, Mr. Gianforti.

20           Mr. Fasulo.

21           MR. FASULO:  Thank you, your Honor.

22           So you just heard the government tell you what they

23   believe the evidence is going to show you.  You're role however

24   is to listen to the evidence.  Your role is to assess the

25   evidence, and your role is to come to a verdict at the end of

1    this case.  Nothing I say or Mr. Gianforti says is evidence.

2    You'll hear the evidence, you'll see the evidence, you'll see

3    hundreds of pieces of evidence during the course of this trial,

4    a lot of testimony, we embrace that.  And you'll see the

5    evidence and make your own judgments of this case.

6           I agree with them.  One thing I agree clearly, I want

7    you to keep an open mind.  I want you to use your commonsense

8    and your life experiences.  And I want you to be fair, and I

9    want to you listen to the judge's instruction, and I want you

10   to render a verdict, a fair and just verdict, and one which we

11   believe at the end of the case when we come back to you would

12   be one of not guilty.

13          Let me tell you what this case is about and what it's

14   not about.  This case is about one person, and I'd ask my

15   client, Ms. Giannelli, to please stand.

16          The case is about Lisa Giannelli.  And as the judge

17   told you in the case, the government has the burden of proof.

18   The government is the one who must prove this case beyond a

19   reasonable doubt.  And as Ms. Giannelli stands there right now,

20   she's to be presumed not guilty.  Not guilty.  And that

21   presumption will go with you after you hear the judge's charge,

22   into the jury room, until and unless your verdict is

23   different -- Ms. Giannelli you may sit.

24          The defense has no burden in this case, but in this

25   case you will hear from Ms. Giannelli.  So I ask you, after you

1    hear all the government's testimony, to keep an open mind, and

2    to know that there's more coming.  And she will tell you what

3    she did, why she did what she did, what she knew, and what the

4    government's evidence really means.  We're not hiding from it;

5    we embrace it.

6          What this case is not about:  This case is about one

7    thing.  One charge in the indictment.  It's whether or not

8    Lisa Giannelli, as the judge will instruct you, broke a federal

9    law which has to do with misbranding, adulteration of drugs,

10   entering into a conspiracy with the intent to defraud the

11   racing commission.  The judge will give you a more clear

12   description of that at the end of the case, but that's what

13   this case is about.

14         It's not about whether or not we like performance

15   enhancing drugs.  It's not about whether or not we like horse

16   racing or we like animals to be subjected to the giving of

17   drugs.  It's not about a vet who had his own motives that were

18   not shared with Ms. Giannelli.  And it's not about Dr. Fishman,

19   the vet who you'll hear a lot about in this case.  It's about

20   Lisa Giannelli.

21         In sports winning, winning, is the ultimate goal.

22   Whether you're going for the Stanley Cup like the Rangers or

23   whether you're in a boxing match, or whether you're in a

24   gymnastics performance in the Olympics.  Athletes want to win.

25         In the world of horse racing and dog racing and

1    thoroughbreds and standardbreds, we rely on people to care for

2    those animals because they don't have choices.  They don't

3    decide they're going to be a racehorse.  Owners who buy horses

4    decide whether they're going to race those horses.  And in

5    fact, they race those horses, owners have trainers, have

6    groomsmen, have staffs that help to train and optimize the

7    performance of those horses.

8           Horse racing, boxing, extreme sports, they're all part

9    of a culture.  It's not whether or not we like those sports or

10   whether we condone those activities.  But it is part of

11   American's culture.  People do engage and enjoy those sports.

12   Horseracing is a sport and in its purest form.

13          How it's manipulated and why it's manipulated go to

14   the people in that sport.  They are charged with certain

15   responsibilities and have certain roles, to adhere to the rules

16   of those sports.

17          A boxing trainer has the opportunity to buy weighted

18   gloves to train their boxers so that their arms get stronger

19   and their punch is harder.  Boxing trainer is not allowed to

20   put a weighted glove into a boxing ring on a fight if, in fact,

21   the fight doesn't call for that weight of that glove.  He makes

22   that judgment.  There are rules.  There are rules.  And in

23   sports, everybody needs to follow the rules.

24          Lisa Ranger, married name, Lisa Giannelli, her

25   unmarried name, and Lisa Voshell, her newly married name, not

an a/k/a, not a deception, that's who she is during the various

parts of her life.  We'll address her in this case as

Lisa Giannelli because during this investigation, most of the

time she was known as Lisa Giannelli or Lisa Ranger.  She's

more recently married, as you'll find out.

What I'm telling you, ladies and gentlemen of the

jury, is optimizing performance winning is part of the sport,

and we accept that, and Lisa accepted that.  But Lisa also knew

a lot about the sport.  She grew up in the horse world.  She

grew up being a groomsperson.  She was a trainer at some point.

She worked with horses her entire life.

At some point, she met Dr. Fishman who was a vet, who

went around to examine and perform veterinary duties at various

farms.  During her relationship with Dr. Fishman, her

professional relationship, he engaged her, he had a faltering

practice.  He was faltering because he was selling to the wrong

people.  He was not making money.  He had no office management

skills.  He was a mess.  Lisa is not a mess.  Lisa is

organized.  Lisa is a hard working individual.  Lisa has worked

since she came out of high school.  She learned everything she

knew from people around her.  And she worked hard.  Dr. Fishman

saw that.  He engaged her about 18 years ago to work with him.

In the beginning, there was one role for Lisa, and she

did drive with Dr. Fishman and go to different places, and she

seemed like she was learning more of the industry as she went

1   from farm to farm.  As the job developed, she began working out

2   of Delaware, which is her home, and she would fulfill orders

3   for medications that the doctor knew and prescribed for horses,

4   as Lisa understood it.

5        How did she know that?  Because every day at the end

6   of the day, Lisa would put in -- not at the end of the day.

7   When orders were put in, Lisa would put into a system, an

8   online system that she had called Avimark.  You'll learn about

9   it during the course of this trial.  In that system, she could

10  put who was asking for medications, what they were asking for,

11  what was sold, what were the prices, and how many were going to

12  be sent to that location.

13       So the government is right.  She did fulfill orders.

14  But who knew about those orders, and why did she fulfill those

15  orders?  Because she had on her desk a number of licenses from

16  Dr. Fishman.  A licensed vet in a number of states.  And she

17  knew Dr. Fishman had access to that same system on a daily

18  basis.  And as an employer, Dr. Fishman, he would review that

19  Avimark system.  And at no time you'll learn did Dr. Fishman

20  ever tell Lisa Giannelli that she was doing anything wrong and

21  fulfilling those prescriptions.

22       What else will you learn?  You will learn through the

23  wiretaps, through the conversations that were had, that

24  trainers would call Lisa, owners would call Lisa, and ask her

25  about different medications.  And just like in any medical

1    office, sometimes the receptionist knows a little bit about

2    what you're getting, and a heads up whether you should take it

3    with water, don't take it before you eat your meals, but she

4    was clear:  She was not the vet, she was not the doctor, that

5    the doctor was Dr. Fishman.  And if they had questions dealing

6    with the medical care of their animal, their horse, they needed

7    to talk to Dr. Fishman.

8          You will hear her say that, not only in the courtroom

9    here, but you will hear it in the conversations that she had

10   over the course of this investigation.

11         What was her job?  Her job was to work under

12   Dr. Fishman.  Work under Dr. Fishman.  Who did she sell to?

13   Before she came on, she learned Dr. Fishman had clients that

14   didn't pay.  The industry was filled with degenerates.  Filled

15   with people that would put orders into the doctor's office, ask

16   for certain prescriptions, and not pay on their prescriptions.

17   And she will tell you the mechanism she put in place to ensure

18   that Dr. Fishman would deal with people that would at least pay

19   their bills on a regular basis.

20         You'll also see that she inventoried items.  She

21   didn't create items.  She didn't create labels.  She didn't

22   create the compounds that were being sold.  She received them.

23   She received them from three sources, mostly from vendors,

24   other places, other producers of these drugs -- just like we

25   get our drugs, they come from different pharmaceutical

1    companies.  And they would be sent to Lisa.  They would then be

2    packed and sent out.  That was one way.

3          Second, she would receive those drugs from Florida

4    where Dr. Fishman was because Lisa was in Delaware.

5    Dr. Fishman and his operation of compounding and creating the

6    medications, he was in Florida running a whole separate entity.

7    Lisa would receive certain things from Dr. Fishman's Florida

8    operation, and she would then distribute it to the customers

9    and clients that she had on a list.  That was the second one.

10          And the third is she would receive it from compounding

11   companies.  They would come to her.  She'd report in on the

12   Avimark system what it was, and she'd send it out for delivery.

13          That's what Lisa did.  She kept the doctor in order.

14   She made sure people got their materials.  She sought to save

15   them money on shipping so if they were ordering two, sometimes

16   they'd order one more of the item so they'd get free shipping,

17   and the doctor was aware of that.

18          Let's talk about the vet's role here too because we're

19   familiar with vets.  Many of us from our own animals or people

20   we know who have animals.  These are horse veterinarians.

21   Right?  There are stables, barns of a number of horses, right?

22   And in those barns, there are needs of all the horses.  So

23   there's a different regulation and requirement for the vet as

24   it relates to both farm animals -- horses on farms, horses at

25   the track, and individual animals that they have to actually

1    examine.  And you'll hear about that during the course of this

2    trial.

3            Lisa understood that the vet was doing his job, that

4    Fishman was doing his job, and she was fulfilling the orders.

5    You will see that during the course of the testimony.  You'll

6    see Lisa's relationship with the doctor for over 16 to 18

7    years.

8            And what the case is going to come down to, ladies and

9    gentlemen:  Intent.  Intent.  At the end of the day, the issue

10   that you must judge in this particular case is what was Lisa

11   Giannelli's intent?  What was she thinking?  Why did she do

12   what she did?  What did she do?  What are these conversations

13   about?  And what did they mean?  And who knows that?  The party

14   to the conversation:  Lisa Giannelli.  And she will tell you.

15           And at the end of the case, the judge will give you an

16   instruction on the element of intent as it relates to this

17   charge of conspiracy.  And you will find that the government

18   will not be able to prove intent beyond a reasonable doubt.

19   Because you will learn from Lisa who will get up there and

20   testify about her whole life, basically 18 years of her life,

21   her whole working life, that what she did and why she did it,

22   and we're confident that when you listen to her testimony, and

23   if you keep an open mind, and if you look at the quality, the

24   quality of the evidence -- not the quantity of the evidence,

25   the quality of the evidence -- that at the end of this case,

1    you will also say that the government has failed to prove this

2    case against my client, Lisa Ranger.

3            Thank you for your attention.  This is a big case, as

4    every case in this courthouse is.  It means a lot to the

5    government.  It has meaning to the defense.  And it needs your

6    full attention.  It may not be the sexiest case you ever heard

7    about, but let me tell you, there's nothing more important

8    today than this case as far as Lisa Ranger, Lisa Giannelli is

9    concerned.

10           I thank you for your attention.

11           THE COURT:  All right.  Thank you, Mr. Fasulo.

12           All right.  Would the government please call its first

13   witness?

14           MR. GIANFORTI:  Thank you, your Honor.  The government

15   calls Special Agent Kaitlyn Bush.

16           And, your Honor, we talked about this earlier with

17   defense counsel.  We're just going to have certain items

18   brought into the courtroom on a cart, and we'll set them sort

19   of right here on a table if you give us a moment.

20           THE COURT:  For our jurors, if you want to stand, take

21   a stretch break, you're free to do that.  But please don't

22   leave your seats.  The government needs a moment to put some

23   physical evidence in the courtroom that they're going to be

24   using during the examination.

25           MR. GIANFORTI:  One other item, your Honor.  At this

1    point, I think it makes sense to hand out binders of

2    transcripts that will be helpful for the jury to follow along.

3              THE COURT:  That's fine.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    KAITLYN BUSH,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. GIANFORTI:

6    Q.   Good morning.

7    A.   Good morning.

8    Q.   Special agent Bush, where do you work?

9    A.   I work for the Federal Bureau of Investigation.

10   Q.   What is your position there?

11   A.   I am a special agent.

12   Q.   How long have you been a special agent with the FBI?

13   A.   Since July 2017.

14   Q.   During your time at the FBI, have you participated in the

15   execution of search warrants of physical locations?

16   A.   Yes, I have.

17   Q.   Approximately, how many times?

18   A.   Approximately 35.

19   Q.   Directing your attention to March 9th of 2020, did you

20   participate in a search on that date?

21   A.   Yes, I did.

22   Q.   What location did you search?

23   A.   I was at 125 Jennifer Lane in Felton, Delaware.

24   Q.   What is 125 Jennifer Lane in Felton, Delaware?

25   A.   It's a residence.

1   Q.  Who live there?

2   A.  Lisa Gianelli a/k/a "Lisa Ranger".

3   Q.  Prior to the search what steps did you take to prepare?

4   A.  I attended a pre-operations brief with the case team.  I

5   sent out an operations order and I created the team.

6   Q.  Are you familiar with the term "operation plan"?

7   A.  Yes.

8   Q.  What is an operation plan?

9   A.  It's a plan or general piece of paper that gives the

10  location we're going to be searching, who will be there, what

11  we'll be searching for, and the team members.

12  Q.  Was there an operation plan in this case?

13  A.  Yes, there was.

14  Q.  Did you review that operation plan?

15  A.  I did.

16  Q.  All right.  What was the plan for the day of the search of

17  125 Jennifer Lane?

18  A.  The plan that day was to meet at a local troop in Delaware

19  and we did a pre-brief where we assured everybody read the

20  warrant, talked about our plan and approach and then we made

21  our plan to execute the search warrant.

22  Q.  What was your role that day?

23  A.  I was the team leader.

24  Q.  What were your responsibilities as the team leader?

25  A.  I ensured everybody had their role, knew what they were

 1  doing and I ensured everybody read the warrant and knew what

 2  they were looking for.

 3  Q.  Were you responsible for preparing the paperwork?

 4  A.  Yes.

 5  Q.  What kind of paperwork?

 6  A.  I ensured the evidence logs were maintained, as well as the

 7  notes and on-scene paperwork then I assigned other people

 8  different duties that were specific with the paperwork.

 9  Q.  How many agents were on your team that?

10  A.  Day we had approximately 13 agents.

11  Q.  So on March 9, 2020, how did your day begin exactly?

12  A.  We briefed around I think it was some time between 2:00 and

13  2:30 in the morning at the other troops and at four o'clock on

14  the dot we executed the search warrant at 125 Jennifer Lane.

15  Q.  How did the search get executed?

16  A.  At four clock A.M. we stacked up and then we approached the

17  residence at 125 Jennifer Lane.

18  Q.  What happened next?

19  A.  We had the marked police cruiser enter the driveway and

20  throw on his red and blue lights.  And then I knocked on the

21  front door, announced that it was the FBI with a search

22  warrant.

23  Q.  Who, if anyone, came the door?

24  A.  I believe first the gentleman in the residence, Victor,

25  approached the door and opened it.

1  Q.  After he came to the door who, if anyone, did you encounter

2  in the house?

3  A.  We encountered Lisa Gianelli.

4  Q.  All right.  So I am going to show you and just you --

5        MR. GIANFORTI:  Ms. Jung, if you could, Government

6  Exhibit 1001.

7  Q.  Special Agent Bush, do you recognize the individual in this

8  picture?

9  A.  I do.

10 Q.  Who is it?

11 A.  That is Lisa Giannelli.

12       THE COURT:  Is it showing up on the jurors' screen?

13       THE JUROR:  No.

14 A.  This was the photo provided in the operations plan?

15       MR. GIANFORTI:  Your Honor, the government offers

16 Government Exhibit 10001.

17       MR. FASULO:  No objection.

18       THE COURT:  It will be admitted.

19       (Government's Exhibits 10001 received in evidence)

20       THE COURT:  So now it should show on the jurors

21 screens.

22       Are you seeing it?

23       THE JUROR:  Yes.

24       THE COURT:  Thank you.

25 Q.  Special Agent Bush, what happened with Ms. Gianelli after

1   you encountered her?

2   A.  We advised her that there was an arrest warrant for her and

3   that we had a search warrant for the residence and then we

4   conducted the search.

5          THE COURT:  All right.  Please keep your voice up at

6   the end of your answers.  You are fading off a little bit and I

7   think the court reporter may be having difficulty.

8          Thank you.

9   Q.  What happened with the individual who first came to the

10  door?

11  A.  He stayed with another agent while we conducted the search.

12  Q.  What was the first step of the search?

13  A.  The first step of the search, we do a protective sweep of

14  the residence so we can make sure nothing is there that would

15  harm us as well as getting a general overview of what we were

16  going to be searching.

17  Q.  Is that something called a walk-through?

18  A.  Yes.  Initial walk-through.

19  Q.  What happened in this case after the walk-through of the

20  premises?

21  A.  After the walk through we have a designated photographer

22  for the scene and that person will take photos of the residence

23  as we found it prior to us conducting the search.

24  Q.  What happened after that initial set of photographs was

25  taken?

1    A.  After we take initial photographs then we begin the search.

2    The team next will pair off and take a room to conduct

3    themselves and I will ensure everybody is doing their assigned

4    roles.

5    Q.  Could you describe the property at 125 Jennifer Lane,

6    please?

7    A.  Sure.  It's a two-story log cabin type of residence, had a

8    log driveway.  Then off to the right was a secondary structure

9    and the main structure had an attachment, the garage.

10   Q.  Was any document created to record the general layout of

11   the property?

12   A.  Yes.  We had a sketcher that documented the entire scene.

13   Q.  I am showing you a document that's been marked for

14   identification a Government Exhibit 5019.

15           Do you recognize this document?

16   A.  Yes, I do.

17   Q.  What is it?

18   A.  This is the sketch created that day.

19   Q.  Did these sketches fairly and accurately depict the general

20   layout of the premises as you recall them from that day?

21   A.  Yes.

22           MR. GIANFORTI:  Your Honor, the government offers

23   Government Exhibit 5019.

24           MR. FASULO:  No objection.

25           THE COURT:  It will be received.

1          (Government's Exhibits 5019 received in evidence)

2          MR. GIANFORTI:  If you could please publish that for

3   the jury and if you could please turn to the third page of this

4   document initially.

5          (Pause)

6   Q.  Special Agent Bush, what does this sketch depict?

7   A.  This was the main story, the main house, an overview of it.

8   Q.  Could you point out some of the things that you discussed

9   earlier about the general layout of the property just to orient

10  the jury?

11  A.  To the left is the driveway that I was talking about as we

12  approached and went on to the covered front porch.  Then you

13  would walk in the front door and this was the main area, the

14  living room, kitchen.  I think there was a back bedroom and

15  office.  Then to the left there was a garage and the gym.  And

16  then if you took the stone path over to the right that went to

17  that secondary structure I'd previously discussed.

18          MR. GIANFORTI:  All right.  Ms. Jung, could you please

19  turn to the fourth page of this exhibit.

20          Thank you.

21  Q.  Special Agent Bush, could you please explain to the jury

22  what this sketch depicts.

23  A.  This is a more detailed version of that last part of the

24  sketch and it shows the front door where we entered.  There was

25  the living room, the back bedroom and then you would proceed to

1    the left there was a set of stairs that went upstairs and then

2    into the kitchen and there was an office.  And then you proceed

3    over to the garage there was one car parked in the first garage

4    and then in the second garage was more of a gym office area.

5              MR. GIANFORTI:  Ms. Jung, if you could please turn to

6    the fifth page of this exhibit.

7    Q.  Special Agent Bush, what are we looking here?

8    A.  This was the upstairs of the residence.  You can see the

9    steps over to the right there is the steps that you saw when

10   you first entered, and then it went up into the master bedroom,

11   and there was a master bathroom and more of like a rec room

12   with a pool table.

13             MR. GIANFORTI:  All right.  Ms. Jung, if you could go

14   back to the first page of this exhibit please.

15   Q.  What are we looking at here?

16   A.  This was that secondary structure over to the right if you

17   were looking at the front of the house.

18             MR. GIANFORTI:  All right.  Ms. Jung, could you please

19   move to the second page.

20   Q.  Special Agent Bush, what are we looking at here?

21   A.  This was the second floor of the secondary structure.

22   Q.  What were you searching for that day?

23   A.  We were searching for different electronic devices, as well

24   as evidence that would relate Miss Ranger to the house, Ms.

25   Gianelli, as well as we were looking for veterinary medical

1   supplies.

2   Q.   How did know which items to search for?

3   A.   They were all listed in the warrant.

4   Q.   How did the search team actually go about conducting the

5   search?

6   A.   After we did our initial walk-through and took our initial

7   photographs, then we broke off into pairs and everyone took a

8   room and began their search.  If somebody found something that

9   they believed was going to be seized, they would call me over.

10  I would look at it.  If I decided that we were going to be

11  receiving it, we would attempt to take a photograph of the item

12  in place and then after we would take it in place and we would

13  take a close-up of the item and then we would package it and I

14  would voucher it on evidence log.

15  Q.   What types of evidence did you seize?

16  A.   We ceased two computers, one thumb drive, one cellphone,

17  different physical paperwork and a lot of veterinary medical

18  supplies which was in bottles, tubes and boxes.

19  Q.   All right.  I am now going to show you Government Exhibits

20  9119 through 9122 which are in these boxes below the table.

21  Actually, if you could join me.

22        (Pause)

23  Q.   Special Agent Bush, do you recognize the items in

24  Government Exhibit 9119 you through 9122?

25  A.   Yes, I do.

```
 1    Q.  What are they?

 2    A.  They are the electronic devices we seized that day.

 3    Q.  Which are what?

 4    A.  Two computers, cellphone and a thumb drive.

 5         MR. GIANFORTI:  Your Honor, the government moves to

 6    admit Government Exhibits 9119 through 9122.

 7         MR. FASULO:  No objection.

 8         THE COURT:  They'll be received in evidence.

 9         (Government's Exhibits 9119 – 9122 received in

10    evidence)

11         MR. GIANFORTI:  Your Honor, at this time I would ask

12    to read a stipulation in the record.

13         THE COURT:  Have you shown it to Mr. Fasulo?

14         MR. GIANFORTI:  Yes.

15         THE COURT:  All right.  Do you have you an additional

16    copy for the Court?

17         MR. GIANFORTI:  I do.

18         (Pause)

19         MR. GIANFORTI:  Thank you.

20         All right.  This is a trial stipulation captioned

21    United States of America v. Lisa Gianelli, the defendant.  The

22    case number is S6 20 CR 160(MKV), and it reads as follows:

23         It is hereby stipulated and agreed by and among the

24    United States of America, by Damian Williams, United States

25    Attorney for the Southern District of New York, Sarah Mortazavi
```

1    and Benjamin J. Gianforti, Assistant United States Attorneys,

2    of counsel, and Lisa Gianelli, the defendant, by her attorney

3    Louis Fasulo Esquire, that:

4           One, the electronic devices and locations listed in

5    the chart below under Columns A and B are true and accurate

6    reflections of the locations and dates for each respective

7    electronic device was seized.  If called as a witness a

8    representative of Federal Bureau of Investigation would testify

9    that the exhibits listed under Column C.  And the chart below

10   are true and accurate extractions of electronic records from

11   each electronic device listed under Column A.

12          First, an Apple iPhone X which was recovered from Seth

13   Fishman's person on April 1, 2019; and Government Exhibits 401

14   A through 401-GG, 401-I through 401-JJ, 401-L and 401-P and

15   401-Z; an Apple iPhone plus, which was seized from Seth

16   Fishman's person on April 1, 2019; Government Exhibits 402-C

17   through 402-H, Google Pixel 2LX phone, which was seized from

18   Lisa Gianelli's residence at 125 Jennifer Lane, Felton,

19   Delaware on March 9, 2020; government Exhibits 403-A through

20   403-T; an Apple iPhone seized from Rick Dane, Jr.'s person on

21   March 9, 2020, Government Exhibit 404-A, a Samsung Galaxy phone

22   seized from Ross Cohen's residence at 48 County Road 17 Pine

23   Bush, New York on March 9, 2020; Government Exhibits 405-A and

24   405-B; a hard drive seized from Seth Fishman's residence at

25   3565 South Ocean Boulevard, Unit 412, North Highland Beach,

Florida 33487 on or about October 27, 2019; Government Exhibits
500 through 532; an Asis desktop computer seized from Lisa
Gianelli's residence at 125 Jennifer Lane, Felton, Delaware
19943 on March 9, 2020; Government Exhibit 600 through 616, an
Asis computer seized from Lisa Giannelli's residence at 125
Jennifer Lane, Felton, Delaware on March 9, 2020; Government
Exhibit 700through 718; a USB flash drive seized from Lisa
Giannelli's residence at 125 Jennifer Lane, Felton, Delaware on
March 9, 2020; Government Exhibits 800 through 806, an Apple
iPad seized from Seth Fishman's person on or about October 27,
2019, Government Exhibits 900-A through 906 and 908 through
914, a Lenovo computer seized from Seth Fishman's residence at
Unit 412 North Highlands Beach, Florida Unit 412 on or about
October 27, 2019; Government Exhibits 1000 through 1003, 1005
through 129, and 1039 through 1053.  There are a couple
additional parts which we'll read into the record later.

         And finally, it is further stipulated and agreed by
and between the parties that the aforementioned Government
Exhibits in this stipulation which is Government Exhibit 908
may be received in evidence at trial.  It's dated New York, New
York, April 25, 2022 signed Sarah Mortazavi on behalf of the
government and Louis Fasulo on behalf of Lisa Gianelli.

         Your Honor, the government offers Government Exhibit
908 and the exhibits listed there.

         MR. FASULO:  No objection.

1         THE COURT:  Received in evidence.

2         (Government's Exhibits 908 received in evidence)

3         THE COURT:  And as I told you during my opening

4   remarks this morning, stipulations or agreements between the

5   parties are in fact evidence.

6         MR. GIANFORTI:  Ms. Jung, could you please publish

7   Government Exhibit 800 which is in evidence for the jury.

8         (Pause)

9   Q.  Special Agent Bush, this is a file that came off of the

10  flash drive that was seized from Lisa Giannelli's home on March

11  9, 2020.

12        What does this document appear to be

13  A.  It appears to be a petition to change a name for the state

14  of Delaware.

15  Q.  Whose petition?

16  A.  Lisa Marie Ranger to change to "Lisa Marie Gianelli".

17  Q.  What it this documented date?

18  A.  The 4th day of November 2011.

19        MR. GIANFORTI:  Your Honor, at this time the

20  government would ask to read another stipulation which I'll

21  show Mr. Fasulo.

22        THE COURT:  All right.

23        MR. GIANFORTI:  We can provide a copy for the Court.

24        THE COURT:  Please.

25        MR. GIANFORTI:  Government Exhibit 9015.

1              THE COURT:  Thank you.

2              MR. GIANFORTI:  This is another trial stipulation

3    between the United States of America and Lisa Gianelli, the

4    defendant.

5              It is hereby stipulated and agreed by and among the

6    United States of America, by Damian Williams, Assistant United

7    States Attorney, for the Southern District of New York, Sarah

8    Mortazavi and Benjamin Gianforti, Assistant United States

9    Attorneys, of counsel, and Lisa Giannelli, the defendant, by

10   her attorney, Louis Fasulo, Esquire, that:

11             One, if called to testify at trial, law enforcement

12   agents with the Food and Drug Administration and the Federal

13   Bureau of Investigation or the FBI would testify that, A,

14   Government Exhibit 1318 is a true and accurate copy of certain

15   hard copies seized on or about October 27, 2019 during a law

16   enforcement search of a storage unit number 757, located at

17   street address 189 Linton Boulevard, Delray Beach Florida.

18             Two, If called to testify at trial a law enforcement

19   agent with the FBI would testify that, A, Government Exhibits

20   5015 through 5018, 5025 through 5027 and 5031 are true and

21   correct copies of certain hard copy records seized on or about

22   March 9, 2020, during the law enforcement search of a residence

23   located at street address 125 Jennifer Lane, Felton, Delaware.

24             It is further is stipulated and agreed by and between

25   the parties that the aforementioned exhibits and stipulation

1  which is Government Exhibit 9015, may be received in evidence

2  at trial.  That's dated April 25, 2022, New York, New York, and

3  signed by the parties.

4          Your Honor, the government offers Government Exhibit

5  9015 as well as the exhibits listed therein.

6          THE COURT:  All right.  Exhibit 9015 will be admitted

7  into evidence along with the exhibits listed in that exhibit.

8          Mr. Gianforti, if you could find a convenient time for

9  our morning break.

10         MR. GIANFORTI:  I think right now is fine.

11         THE COURT:  All right then.  Ladies and gentlemen,

12  we're going to take roughly a ten to 15-minute break.  Please

13  leave your notepad and the binders at your seats and remember,

14  please, do not discuss the case or the evidence you've heard

15  thus far while you are on break and I'll see you all shortly.

16         (Jury not present)

17         THE COURT:  All right.  Special Agent Bush, I'll

18  remind you, you remain under oath and you may not discuss your

19  testimony either past or to come with anybody during the break,

20  please.

21         THE WITNESS:  Yes.

22         THE COURT:  Thank you.  You may step down.

23         Is there anything -- everyone can be seated for a

24  moment.

25         Anything that we need to discuss at this point outside

1    the presence of the jury?

2              MR. GIANFORTI:  Not from the government, your Honor.

3              MR. FASULO:  Not from the defense.

4              THE COURT:  All right then, everyone have a good brief

5    break and I'll see you back shortly.

6              (Recess)

7              THE COURT:  Please be seated, everyone.

8              We'll have our jurors brought out.

9              (Jury present)

10             MS. MORTAZAVI:  Your Honor, should we ask Special

11   Agent Bush to retake the stand?

12             THE COURT:  Yes, please.

13             (Witness present)

14             THE COURT:  You may be seated, please.

15             All right.  Special Agent Bush, you remain under oath.

16             THE WITNESS:  I understand.

17             THE COURT:  Thank you.

18             Mr. Gianforti.

19             MR. GIANFORTI:  Thank you, your Honor.

20             Ms. Jung, could you please publish for the jury

21   Government Exhibit 5031 which is in evidence.

22             (Pause)

23             MR. GIANFORTI:  And if you could --

24   Q.  Special Agent Bush, what are we looking at here?

25   A.  This appears to be a license from the state of Delaware

1   from Seth Fishman in veterinary medicine.

2           MR. GIANFORTI:  If you could please turn to the second

3   page.

4           (Pause)

5   Q.  Special Agent Bush, same question.  What does this appear

6   to be?

7   A.  Appears to be a license from the state of Delaware for Seth

8   Fishman in veterinary medicine.

9           MR. GIANFORTI:  Turn to the third page.

10  Q.  Special Agent Bush, what does this appear to be?

11  A.  This appears to be a license sense from the state of

12  Indiana for the Veterinary Board for Seth Fishman.

13  Q.  All right. Special Agent Bush, I am going to show you a

14  collection of photographs that have been marked for

15  identification as Government Exhibits 5000 through 5014, 5020

16  through 5024 and 5032 through 5037?

17          MR. GIANFORTI:  And if I may approach, your Honor,

18  I'll give her hard copies of them.

19          THE COURT:  Sure.

20          (Pause)

21  Q.  Special Agent Bush, could you just take a moment to look

22  through those photographs that I just mentioned.  So that's

23  5000 through 5014, 5020 through 5024 and 5032 through 5037.

24  And just look up when you're ready.

25          (Pause)

1   Q.  Special Agent Bush, do you recognize these photographs?

2   A.  I do.

3   Q.  What are they?

4   A.  They are photos taken from the search warrant at 125

5   Jennifer Lane.

6   Q.  Are these fair and accurate depictions of the premises and

7   evidence that was seized on that day?

8   A.  Yes, they are.

9           MR. GIANFORTI:  Your Honor, the government offers

10  Government Exhibit 5000 through 5014, 5020 through 504 and 5032

11  through 5037.

12          MR. FASULO:  No objection.

13          THE COURT:  They are received in evidence.

14          (Government's Exhibits 5000 – 5014, 5020 – 5024 and

15  5032 – 5037 received in evidence)

16  Q.  Special Agent Bush, you mentioned earlier that you seized

17  what appeared to be bottles of a certain kind.  Do you remember

18  saying that?

19  A.  Yes.

20  Q.  Where were those found?

21  A.  Most of the bottles we found were in two cabinets and a

22  refrigerator located in the, it was a garage but sort of used

23  as a gym/office.

24          MR. GIANFORTI:  All right.  Ms. Jung, could you please

25  publish Government Exhibit 5032.

1   Q.   Special Agent Bush, what are we looking at here?

2   A.   This is the garage/gym office I was talking about.  There

3   was a cabinet to the left filled with a bunch of these bottles,

4   tubes and boxes.  The fridge was right there in the middle and

5   right of the fridge is another cabinet.

6           MR. GIANFORTI:  All right.  Ms. Jung, could you please

7   pull up Government Exhibit 5007 and 5008.

8   Q.   Special Agent Bush, what are we looking at here?

9   A.   This was cabinet one and two located in that same area.

10          MR. GIANFORTI:  Your Honor, at this time I would ask

11  to read a stipulation into the record?

12          THE COURT:  Okay.

13          MR. GIANFORTI:  This is Government Exhibit 9011

14  showing to Mr. Fasulo.

15          And if it's all right with you, your Honor, I'll skip

16  some of the preamble.

17          THE COURT:  Fine.

18          MR. GIANFORTI:  This is --

19          THE COURT:  Let me just interrupt for one second what

20  Mr. Gianforti is saying.

21          Each of those stipulations a lead-in language that it

22  is an agreement between the United States Attorney Damian

23  Williams, Ms. Mortazavi and Mr. Gianforti on the one hand and

24  Ms. Gianelli through Mr. Fasulo on the other hand.  But he is

25  not going to read that each time but these are, in fact,

1    binding agreements between the parties which I told you before

2    is evidence.

3           Go ahead.

4           MR. GIANFORTI:  So this trial stipulation reads as

5    follows:

6           In 2019 agents with the Federal Bureau of

7    Investigation conducted judicially authorized wiretap

8    intersections of wire and electronic communications over

9    certain cellular phones.  The contents of each intercepted

10   phone call or electronic message, any incoming and outgoing

11   phone calls were recorded at the time each communication

12   occurred.  Each recording and its associated date was then

13   transferred to a computer system under the custody and control

14   the FBI.

15          Two, the Government Exhibits listed in Schedules A, B,

16   C and D to the stipulation are true and correct copies of the

17   portions of the phone calls that were intercepted pursuant to

18   such judicially authorized wiretaps in a manner described in

19   Paragraph One above.

20          Schedule A lists phone calls intercepted over a

21   cellular phone identified with the telephone number

22   561-270-9286 subscribed to in the name of "Seth Fishman".

23   That's referred to as the "9286" phone.

24          Schedule B lists phone calls intercepted over a

25   cellular phone identified with the telephone number

1   302-222-2220 subscribed in the name of "Lisa Gianelli".  That's

2   referred to as the "2220" phone.

3          Government Exhibits 101-AT through 115-CCT, 117-AT

4   through 143-DT, 160-A through 165-BT and 167-AT through 198-T

5   are true and accurate transcriptions and voice attribution of

6   portions of the intercepted wire communications described in

7   paragraphs one and two above, and are marked to the number

8   assigned to relevant recording, for example, Government Exhibit

9   101-AT is the transcript of a recording contained a Government

10  Exhibit 101-A also included as party of part of each transcript

11  a true and accurate information regarding the time and/or date

12  of the relevant recording and participating phone numbers.

13          (Continued on next page)

14          MR. GIANFORTI:  Four.  Government Exhibit 200 is a

15  true and correct copy of certain electronic messages that were

16  intercepted over the 9286 phone pursuant to the judicially

17  authorized wiretap described in paragraph 1 above.

18          Government exhibits 201 and 202 are true and correct

19  copies of certain electronic messages that were intercepted

20  over the 220 phone pursuant to the judicially authorized

21  wiretap described in paragraph 1 above.

22          It is further stipulated and agreed by and between the

23  parties that the aforementioned government exhibits and the

24  stipulation, which is Government Exhibit 9011 may be received

25  in evidence at trial.  That's dated April 25, 2022, New York,

 1    New York, and signed by the parties.

 2            And the accompanying pages include the schedules, the

 3    tables that I referred to earlier, with the different columns,

 4    which I won't read into the record but are available for you.

 5            Your Honor, the government offers Government Exhibit

 6    9011 and the exhibits listed therein.

 7            THE COURT:  They will be received injection.

 8            (Government's Exhibit 9011 received in evidence)

 9            MR. GIANFORTI:  Thank you.

10            THE COURT:  All right.

11            MR. GIANFORTI:  And for your reference, ladies and

12    gentlemen, we distributed two binders with the transcripts with

13    the T addendum for each of them.

14            Ms. Jung, could you please pull up Government Exhibit

15    139C, as in cat, which is in evidence?

16            Ladies and gentlemen, as you'll see in the transcript

17    before you this is a telephone call intercepted over Seth

18    Fishman's phone between Seth Fishman Lisa Giannelli on June

19    4th, 2019, and you can follow along as the call plays in your

20    notebook.

21            (Audio played)

22            MR. GIANFORTI:  Ms. Jung, if you could now pull up

23    Government Exhibit 168AT?

24            This is a telephone call intercepted over Seth Fishman

25    and Lisa Giannelli on April 30, 2019.

 1              (Audio played)

 2              MR. GIANFORTI:  Ms. Jung, can you please pull up for

 3     the jury Government Exhibit 5021?

 4     BY MR. GIANFORTI:

 5     Q.   Special Agent Bush, what are we looking at here?

 6     A.   This was a Nissan Xterra, which was a vehicle parked inside

 7     of the garage 125 Jennifer lane.

 8              MR. GIANFORTI:  Ms. Jung, can you please pull up

 9     Government Exhibit 534?

10     Q.   Special Agent Bush, what are we looking at here?

11     A.   This appears to be the inside of one of the cabinets.

12     Q.   What is contained in the cabinet?

13     A.   It appears to be boxes of different gauges of syringes.

14              MR. GIANFORTI:  All right.  Ms. Jung, can you please

15     pull up Government Exhibit 5002 and 5003.

16     Q.   What are we looking at here?

17     A.   This is one of the tubes that we seized that I was

18     previously talking about.

19     Q.   Where was it seized if you recall?

20     A.   From inside 125 Jennifer lane.

21     Q.   Okay.  What is this item appear to be called?

22     A.   It appears to be EPM Doublekill.

23     Q.   Could you describe what the logo looked like?

24     A.   It's a horse's head.

25     Q.   All right.  Special Agent Bush, I'm now going to show you

1   what's been marked for identification as Government Exhibit

2   9106, which is a physical exhibit, if you would just join me.

3           Special Agent Bush, do you recognize the exhibit

4   marked as Government Exhibit 9106?

5   A.  Yes, I do.

6   Q.  What is it?

7   A.  That's another EPM Doublekill that we received from

8   125 Jennifer Lane.

9   Q.  How do you know this is the same EPM Doublekill you seized

10  from the house?

11  A.  It's in a box, and on that box is my name and signature.

12          MR. GIANFORTI:  Your Honor, if I may approach the

13  witness with one of the bags of physical exhibits?

14          THE COURT:  Sure.

15          MR. GIANFORTI:  Actually, the government moves to

16  admit Government 9016.

17          THE COURT:  Received in evidence.

18          (Government's Exhibit 1906 received in evidence)

19  Q.  Special Agent Bush, in reviewing the items that you're

20  holding in your hand right now, do you see a prescription label

21  in any of these syringes?

22  A.  No, I do not.

23  Q.  Do you see a doctor name anywhere on those syringes?

24  A.  No, I do not.

25  Q.  Do you see the name Equestology anywhere on those syringes?

1    A.  No, I do not.

2    Q.  Thank you.

3         MR. GIANFORTI:  Ms. Jung, could you please pull up

4    Government Exhibit 5004, 5005, and 5006?

5    Q.  Special Agent Bush, what are we looking at here?

6    A.  Appears to be bottles of the medical supplies we seized

7    from 125 Jennifer Lane.

8    Q.  Is this three angles of the bottle?

9    A.  Yes, I believe so.

10   Q.  What does this item appear to be called?

11   A.  Equitech, PSDS, pain shot DS.

12   Q.  Could you describe what the logo looks like?

13   A.  The horse's head symbol.

14        MR. GIANFORTI:  Ms. Jung, could you zoom in on

15   Government Exhibit 5006, please?

16   Q.  What directions are provided on the dark label that you see

17   here?

18   A.  It says directions, administer 5 to 10 milliliters IM or IV

19   slowly four to six hours prior to strenuous exercise.  Keep

20   refrigerated.

21        MR. GIANFORTI:  If we could zoom in on the label of

22   Government Exhibit 5005?

23   Q.  What does the white label say that you see here?

24   A.  Follow local racing regulations.  Don't use within 24 hours

25   of racing.

1   Q.  Does this label appear to be part of the darker label or a

2   separate label that was put on top of it?

3   A.  It appears to be a separate label.

4   Q.  All right.  And Special Agent Bush, I'm now going to show

5   you what's been marked for identification Government Exhibit

6   9102, which is a physical exhibit, if you can join me at the

7   table.

8           Special Agent Bush, do you recognize what's been

9   marked for identification as Government Exhibit 9102?

10  A.  I do.

11  Q.  What is it?

12  A.  These were other bottles of the veterinary supplies we

13  seized from 125 Jennifer Lane.

14  Q.  How do you know it was the same drugs seized from the

15  residence?

16  A.  My name is on it, and the case number and the address.

17          MR. GIANFORTI:  The government moves to admit

18  government exhibit 1902.

19          MR. FASULO:  No objection.

20          THE COURT:  It will be received.

21          (Government's Exhibit 1902 received in evidence)

22  Q.  Special Agent Bush, in looking at the item that you have in

23  your hand right now, do you see a prescription label on these

24  bottles?

25  A.  No, I do not.

1   Q.  Do you see a doctor name on these bottles?

2   A.  No, I do not.

3   Q.  Do you see the name Equestology?

4   A.  No, I do not.

5   Q.  Thank you.

6           MR. GIANFORTI:  Ms. Jung, can you please pull up

7   Government Exhibit 5011?

8           THE COURT:  Mr. Gianforti, do you want to retrieve

9   these so you don't have broken vials?

10          MR. GIANFORTI:  Yes.

11  Q.  Special Agent Bush, what are we looking at here?

12  A.  This appears to be more of the bottles of veterinary

13  supplies we seized that day.

14  Q.  What is the item right in the middle of the frame appear to

15  be called?

16  A.  RX Bleeder.

17  Q.  I'm now going to hand up to you what's been marked

18  Government Exhibit 9111, if I may, your Honor?

19          THE COURT:  Sure.

20          You can remain seated Special Agent.  Mr. Gianforti

21  can do the work.

22  Q.  Special Agent Bush, do you recognize what's been marked as

23  Government Exhibit 9111?

24  A.  I do.

25  Q.  What is it?

 1   A.   It's a bottle -- a few bottles of the RX bleeder.

 2   Q.   And where are these bottles from?

 3   A.   They are from 125 Jennifer Lane.

 4   Q.   And how do you know that?

 5   A.   My name and initials are on this box.

 6          MR. GIANFORTI:  Your Honor, the government moves to

 7   admit Government Exhibit 9111.

 8          THE COURT:  Mr. Fasulo?

 9          MR. FASULO:  No objection.

10          THE COURT:  It's received into evidence.

11          (Government's Exhibit 9111 received in evidence)

12   Q.   Special Agent Bush, looking at the items you're currently

13   holding, do you see a prescription label on the bottle?

14   A.   I do.

15   Q.   And do you see a doctor's name on that prescription label?

16   A.   I do.

17   Q.   What is that name?

18   A.   Seth Fishman, DVM.

19   Q.   Do you see a particular horse on the prescription label?

20   A.   I do.

21   Q.   What's it called?

22   A.   Delaware Heat.

23   Q.   Do you see the name Equestology anywhere on that label?

24   A.   I do not.

25   Q.   And I'll come grab that from you.

1          MR. GIANFORTI:  Ms. Jung, can you please pull up

2    Government Exhibit 5033?

3    Q.  Special Agent Bush, what are we looking at here?

4    A.  This is a photo of one of the cabinets we identified

5    earlier with bottles and a box of medical supplies, veterinary

6    supplies.

7    Q.  And what does this item appear to be called, the one sort

8    of in the center to the left of the frame?

9    A.  Rapid Equine Solutions.  And it's acetylcysteine.

10   Q.  Acetylcysteine?

11   A.  Yes.

12   Q.  I'm going to show you now what's been marked for

13   identification as Government Exhibit 9110, if I may, your

14   Honor?

15          THE COURT:  Yes.

16   Q.  Special Agent Bush, do you recognize the item that's been

17   marked as Government Exhibit 9110?

18   A.  I do.

19   Q.  What is it?

20   A.  It is a few bottles of the bottle that I just read off the

21   screen.

22   Q.  And how do you know -- do you recognize this?

23   A.  This was seized from 125 Jennifer Lane, and has the address

24   on the box and my names and initials.

25   Q.  And looking at that bottle, or any of the bottles on that

```
 1   box, do you see the name Equestology?

 2   A.   No, I do not.

 3   Q.   Do you see a prescription label?

 4   A.   I do.

 5   Q.   Is there a doctor's name on that prescription label?

 6   A.   There is.  It's Seth Fishman, DVM.

 7   Q.   Do you see a horse's name on that prescription label?

 8   A.   I do.

 9   Q.   What is that horse's name?

10   A.   Delaware Heat.

11   Q.   And to confirm, this is the acetylcysteine that we were

12   looking at before?

13   A.   Correct.

14            THE COURT:  What's the exhibit number?

15            MR. GIANFORTI:  9110.

16            All right.  Ms. Jung, can you please pull up

17   Government Exhibit 5037?  Could you zoom in on those bottles

18   with the blue?  Thank you.

19   Q.   What are we looking at here, Special Agent Bush?

20   A.   These appear to be more bottles of the veterinary medical

21   supplies we seized that day.

22   Q.   Do you see the label on the baggy there?

23   A.   I do.

24   Q.   And do you see four letters in the middle of that label?

25   A.   Yes.
```

1   Q.  What are those four letters?

2   A.  ACTH.

3   Q.  All right.  I'm now going to show you what's marked for

4   identification as Government Exhibit 9117.  If I may approach,

5   your Honor?

6          THE COURT:  Yes.

7   Q.  Special Agent Bush, do you recognize the item marked as

8   Government Exhibit 9117?

9   A.  I do.

10  Q.  What is it?

11  A.  It is a bottle -- multiple bottles of the image I just read

12  from the screen.

13  Q.  And how do you recognize it?

14  A.  From -- we seized it at 125 Jennifer Lane.

15  Q.  How do you know that?

16  A.  The address is on here as well as my name and initials.

17         MR. GIANFORTI:  Your Honor, the government moves to

18  admit Government Exhibit 9117.

19         MR. FASULO:  No objection.

20         THE COURT:  It is received into evidence.

21         (Government's Exhibit 9117 received in evidence)

22  Q.  Special Agent Bush, looking at the tables on these bottles,

23  do you see the name Equestology anywhere?

24  A.  No, I do not.

25  Q.  Do you see a prescription label?

```
 1   A.  I do.

 2   Q.  Do you see a doctor's name on that prescription label?

 3   A.  I do.

 4   Q.  And do you see a horse's, I'm sorry what is the doctor you

 5   see on there?

 6   A.  Seth Fishman DVM.

 7   Q.  Do you see a horse's name on the bottle any?

 8   A.  Yes.  I see Delaware Heat.

 9   Q.  Okay.  Thank you.  I'll come grab that from you.

10           MR. GIANFORTI:  Ms. Jung, can you please pull up

11   Government Exhibit 5036?

12   Q.  Special Agent Bush, what are we looking at here?

13   A.  This appears to be a box of some of the veterinary medical

14   supplies we seized.

15   Q.  And where does it appear this item was seized based on this

16   photo?

17   A.  I believe that was in the fridge.

18   Q.  What does this item appear to be called?

19   A.  It appears to be deslorelin acetate.

20   Q.  Do you see a company name on this box?

21   A.  I do.

22   Q.  What is it?

23   A.  It's SPC, Specialized Performance Compounds.

24   Q.  Do you see a logo?

25   A.  I do.
```

1   Q.  What is that logo?

2   A.  It appears to be a snake over wings, like a hospital

3   symbol.

4   Q.  Special Agent Bush, I'm going to show you what's been

5   marked for identification Government Exhibit 9100.  If I may

6   hand up, your Honor?

7         THE COURT:  Yes.

8   Q.  Special Agent Bush, do you recognize the item marked for

9   identification as Government Exhibit 9100?

10  A.  I do.

11  Q.  What is it?

12  A.  It's three boxes of the box I just read from the screen.

13  Q.  And how do you recognize it?

14  A.  It has my name and initials and the address

15  125 Jennifer Lane on it.

16        MR. GIANFORTI:  Okay.  Your Honor, the government

17  moves to admit Government Exhibit 9100.

18        MR. FASULO:  No objection.

19        THE COURT:  Received.

20        (Government's Exhibit 9100 received in evidence)

21  Q.  Special Agent Bush, looking at these boxes, do you see the

22  name Equestology anywhere?

23  A.  I do not.

24  Q.  Do you see a prescription label?

25  A.  I do not.

1   Q.  Do you see a doctor's name?

2   A.  I do not.

3   Q.  Do you see a horse's name?

4   A.  I do not.

5   Q.  Thank you.  I'll come grab that.

6          MR. GIANFORTI:  Ms. Jung, can you please pull up

7   Government Exhibit 5035?

8   Q.  Special Agent Bush, what are we looking at here?

9   A.  This also appears to be an image from the fridge, the

10  inside of the fridge.  It's two boxes and one bottle of the

11  veterinary supplies.

12  Q.  Do you see the label affixed to what appears to be the

13  shelf of the refrigerator?

14  A.  I do.

15  Q.  What does that label say?

16  A.  It says TB7.

17  Q.  Special Agent Bush, the various drugs that we looked at

18  today, are these all the drugs that were seized on March 9,

19  2020?

20  A.  No, they're not.

21         MR. GIANFORTI:  Your Honor, I would ask to read a

22  stipulation into the record.

23         THE COURT:  You may proceed.

24         MR. GIANFORTI:  This is Government Exhibit 9006, which

25  I'll show to Mr. Fasulo.

1          Once again, I'll skip the preamble.

2          One, if called as a witness at trial, a record

3   custodian for the entity Equestology, Inc., Equestology, and

4   for each of the government exhibits identified below would

5   testify that Government Exhibits 320 through 320E, as in

6   Edward, 323FA through 320FO, as in Oscar, 321A, as in apple

7   through 333C as in cat, 1900 through 1905, and 1907 through

8   1913 are true and correct copies of certain records of

9   Equestology maintained by Equestology and are records of

10  regularly conducted activity with Equestology that were, A,

11  made at or near the time, by or from, information transmitted

12  by someone with knowledge of the information contained therein;

13  B, kept in the course of regularly conducted activities of

14  Equestology; and C, made as a regular practice of the

15  activities of Equestology.  It is further stipulated and agreed

16  by and between the parties that the aforementioned government

17  exhibits in this stipulation, which is Government Exhibit 9006,

18  may be received in evidence at trial.  It's dated April 25,

19  2022, New York, New York, and signed by the parties.

20          Your Honor, the government offers Government Exhibit

21  9006 and all of the exhibits listed therein.

22          THE COURT:  9006 is admitted into evidence as are all

23  of the exhibits listed in 9006.

24          (Government's Exhibit 9006 received in evidence)

25          MR. GIANFORTI:  Ms. Jung, can you please bring up

```
 1   Government Exhibit 332J?  Thank you.
 2   Q.  Special Agent Bush, I'm showing you Government Exhibit 332J
 3   which is in evidence.  It's an e-mail from records --
 4   A.  I don't have it up on my screen.
 5   Q.  Oh, I'm sorry.  All set?
 6   A.  Yes.
 7   Q.  Thank you.  As I said, it's an e-mail from records provided
 8   by Equestology.  Could you please read this e-mail into the
 9   record noting the to and the from and the dates and the like?
10   And please start with the bottom e-mail and read up.
11   A.  This appears to be an e-mail from Seth Fishman with the
12   e-mail address SethFishman@hotmail.com, sent Friday, January 8,
13   2016, at 12:09 p.m. EST, to Courtney Adams with the e-mail
14   address CourtneyAdams8467@Gmail.com, cc Lisa Ranger, which the
15   e-mail address is Equestology@gmail.com and Mary Fox, with the
16   e-mail, Mary.Equestology@gmail.com.  With the subject re,
17   acetol label.
18           And from the bottom up, it says:  Courtney, acetol
19   label new HH, January 16 PDF.  Lisa, please see attached file
20   and let me know if that color is okay with you?  The vial cap
21   will be sapphire blue.  We also changed the horse head logo.
22           On January 8, 2016, at 10:01 a.m., Courtney Adams with
23   an e-mail address of CourtneyAdams8467@Gmail.com wrote -- I
24   think she wrote what I just read.
25   Q.  Just to be clear, Special Agent Bush, are you saying that
```

1    Courtney Adams wrote the e-mail you just read a moment ago?

2                MR. FASULO:  Objection.

3                THE COURT:  Sustained.

4    Q.  So, Special Agent Bush, how does it appear this exchange

5    went back and forth?

6    A.  It appears that Courtney --

7                MR. FASULO:  Objection, Judge.

8                THE COURT:  Sustained, the document is in evidence.

9    Q.  All right.  So please continue reading.

10               THE COURT:  Is this on the screen for the jurors?

11               JUROR:  Yes.

12               THE COURT:  Okay.

13   A.  Above what I just read?

14   Q.  Yes.  Continuing from that middle line you just read.

15   A.  It says it was sent from iPhone.  Looks good to me.  Just

16   called Lisa so we can get done today.  Let's print 200 labels

17   for now and see how sales go.

18   Q.  Thank you.

19               MR. GIANFORTI:  Ms. Jung, can you please pull up

20   Government Exhibit 5010, which is in evidence?

21   Q.  Special Agent Bush, what are we looking at here?

22   A.  This -- were documents that we seized from the

23   Nissan Xterra that was parked in 125 Jennifer Lane's garage.

24               MR. GIANFORTI:  Can you blow up that crumbled piece of

25   paper, Ms. Jung?

1   Q.  What does this appear to be?

2   A.  This appears to be a list of different supplies as well as

3   names.

4   Q.  Do you recognize any of the supplies that are listed here?

5   A.  I do.  They were in some of the photos and cabinets that we

6   searched that day.

7   Q.  Which cabinets are you referring to?

8   A.  The cabinet one and two and the fridge in the middle from

9   the garage jury.

10  Q.  I'm sorry.  And what was in those cabinets?

11  A.  There was the gouges in the box of 18 needles as well as

12  the EPN paste.

13  Q.  So you recognize some of these items from the cabinets?

14  A.  I do.

15          THE COURT:  You seized them from where?

16          THE WITNESS:  From within the cabinets, the garage of

17  125.

18          THE COURT:  The garage, thank you.

19          MR. GIANFORTI:  Can you please blow up the other piece

20  of paper on the seat there?

21  Q.  Special Agent Bush, what does this appear to be?

22  A.  This appears to be a bank transaction receipt.

23  Q.  From which bank?

24  A.  From WSFS bank.

25  Q.  All right.  I'd like to discuss some of the other paperwork

1   that was seized during your search.  I think I'll hand you hard

2   copies of these.

3          I'm handing you what's been marked as

4   Government Exhibit 5018.  I forgot.  I handed you a binder full

5   of documents.

6          Can you look at 5018, which is in evidence?

7          MR. GIANFORTI:  And, Ms. Jung, if you could publish

8   that for the jury?

9   Q.  Special Agent Bush, what does Government Exhibit 5018

10  appear to be?

11  A.  It appears to be a list of supplies of --

12  Q.  Okay.

13  A.  -- medical veterinary supplies.

14         THE COURT:  You need to keep your voice up at the end.

15  You keep trailing off so the transcript is not picking you up,

16  or I'm not hearing you, anyway.  Thank you.

17  Q.  Just keep your voice up, Special Agent Bush.  I know it's

18  hard sometimes.

19         All right.  So looking at the --

20         MR. GIANFORTI:  Actually, Ms. Jung, if you could go to

21  the third page of this document?

22         If you look at the upper left-hand corner of the third

23  page in the table there, what does it say there in green text?

24  A.  It says cabinet one in green text.

25  Q.  And what does it say in the upper right-hand corner in red

1   text underlined?

2   A.  In the upper right in red text underlined, it says doc.

3          MR. GIANFORTI:  Ms. Jung, if you could go to the

4   fourth page?

5   Q.  Special Agent Bush, what does it say in the upper left-hand

6   corner in blue text?

7   A.  It says cabinet two.

8   Q.  And in the upper right-hand corner, what does it say in red

9   bold text?

10  A.  It says doc.

11         MR. GIANFORTI:  Ms. Jung, if you could turn to the

12  last page, the fifth page.

13  Q.  What does it say, Special Agent Bush, in the upper

14  left-hand corner in red text?

15  A.  It says fridge.

16  Q.  What does it say in red text in the upper right-hand

17  corner?

18  A.  It says doc.

19  Q.  Do you see text with BB on the sheet?

20  A.  I do.

21  Q.  Can you please read what that item says?

22  A.  BB3 freezer.

23  Q.  Looking at this document overall, Special Agent Bush, how,

24  if at all, does it relate to the search that you conducted?

25  A.  It appears that it was items in the fridge and the two

1  cabinets that were in the garage of 125 Jennifer Lane.

2          MR. GIANFORTI:  Ms. Jung, can you pull up 5027?

3  Q.  Special Agent Bush, what does this appear to be.

4  A.  It appears to be an Equestology inventory report dated

5  1/1/20.

6  Q.  All right.  And Special Agent Bush, if you start with the

7  first page of this document and you flip to the page that has

8  225 in the lower right-hand corner, could you please do that,

9  look through the document, those two pages, and look up when

10 you're ready?

11         And could you also please flip through the pages

12 starting with 236 and ending in 244?

13         What appears on those pages that I just asked you

14 about?

15 A.  It appears to be a list of medical terminology.

16 Q.  And how many individual items would you estimate are listed

17 on the pages that I just had you look at?

18 A.  I'd say hundreds.

19         MR. GIANFORTI:  And, Ms. Jung, if you could please

20 pull up the page with 205 in the lower right-hand corner?

21 Q.  Special Agent Bush, do you see where it says antibiotic

22 lung repair on this page?

23 A.  I do.

24         MR. GIANFORTI:  All right.  And now let's please turn

25 the page with 209 in the lower right-hand corner, Ms. Jung?

1    Q.  Ms. Bush, do you see in the lower -- I'm sorry.  About

2    two-thirds of the way down the page, do you see where it says

3    bleeding, breathing?

4    A.  I do.

5           MR. GIANFORTI:  Now, Ms. Jung, if you could turn to

6    the page with 212 in the lower right-hand corner?

7    Q.  And, Special Agent Bush, do you see where it says doc in

8    the middle of the page?

9    A.  I do.

10   Q.  What's the first item on that list?

11   A.  It appears to be DBB3.

12          MR. GIANFORTI:  All right.  Ms. Jung, if you could

13   please turn to the page that ends with 213?

14   Q.  All right.  And, Special Agent Bush, do you see in the

15   lower part of the screen there where it says fluids,

16   electrolytes, drench?

17   A.  I do.

18          MR. GIANFORTI:  And, Ms. Jung, if you could turn to

19   the next page of this document?

20   Q.  Can you please read the sixth item on this page?

21   A.  D stomach A, stomach tube, each 40.  126.43.

22          MR. GIANFORTI:  Ms. Jung, could you please turn to the

23   page with 236 in the lower right-hand corner?

24   Q.  Special Agent Bush, do you see where it says syringes,

25   needles in the middle of the page?

1    A.  I do.

2    Q.  Can you please flip through the next few pages of this

3    document?

4          How many, if you had to estimate, how many items would

5    you estimate are listed in this category of syringes, needles?

6    A.  I'd say close to a hundred.

7          MR. GIANFORTI:  All right.  Ms. Jung, if you could

8    please turn to the page with 225 in the lower right-hand

9    corner?

10   Q.  Special Agent Bush, do you see where it says sub-accounts

11   Midwest?

12   A.  I do.

13   Q.  What does this appear to be?

14   A.  It appears to be a list of sub-accounts in the Midwest.

15   Q.  And what do you see listed below sub-accounts in the

16   Midwest?

17   A.  It appears to be names and addresses.

18   Q.  All right.  So if you could start with page 225 and go to

19   236 -- or could you please flip through those pages quickly?

20   How many individuals would you estimate are listed on the pages

21   that I just had you flip through?

22   A.  Hundreds.

23   Q.  All right.  And focusing again on this page with 225 in the

24   lower right-hand corner, do you see about two-thirds of the way

25   down the page where it says FLA -- FLA46083?

1   A.  I do.

2   Q.  Who is the individual listed there?

3   A.  It appears to be Adrienne Hall at 16668 Winners Circle

4   Drive.

5           MR. GIANFORTI:  Ms. Jung, if you could turn to

6   page 230 in the lower right-hand corner?

7   Q.  Do you see about a third of the way down the page, there's

8   an entry listed as DE48576?

9   A.  I do.

10  Q.  Who is listed there?

11  A.  It appears to be Silvio Martin at 2464 Midstate Road,

12  Felton.

13          THE COURT:  Let me ask our jurors, are you able to see

14  the screen?

15          JUROR:  Yes.

16          THE COURT:  Yes.  Okay.  Thank you.

17          MR. GIANFORTI:  Ms. Jung, could you please pull up

18  Government Exhibit 715, which is in evidence?

19  Q.  Special Agent Bush, this is a document that was pulled off

20  of Lisa Giannelli's computer that was seized from the house

21  that's in evidence.  Looking at the very top of this first

22  page, what does this appear to be?

23  A.  It appears to be Equestology AVI client list with phone

24  numbers.

25          THE COURT:  I want to be clear, you're reading from

1    this document, right?

2            THE WITNESS:  Correct.

3            THE COURT:  Thank you.

4    Q.  And if you could flip through Government Exhibit 715, do

5    you have a hard copy of that?

6    A.  Yes, I believe I do.  Actually, I don't think I have it.

7            MR. GIANFORTI:  We will hand up a hard copy.  Can we

8    approach, your Honor?

9            THE COURT:  Yes.

10           MR. GIANFORTI:  Thank you.

11   Q.  And just take a few moments to flip through that and look

12   up when you're ready.

13           Special Agent Bush, how many clients would you

14   estimate are reflected in that document?

15   A.  I would say hundreds.

16   Q.  All right.  So if we could turn to Page 12 of that

17   document, and looking at about two-thirds of the way down the

18   page, do you see a name there associated with an address in

19   Monroe, New Jersey?

20   A.  I do.

21   Q.  What's that name?

22   A.  It appears to be Adrienne Hall.

23   Q.  All right.  If we could turn to Page 19, please.

24           All right.  And about halfway down the page, do you

25   see a name there associated with an address in Felton,

1    Delaware?

2    A.  I do.

3    Q.  What is that name?

4    A.  It appears to be Silvio Martin.

5            MR. GIANFORTI:  All right.  If we could turn back to

6    page 2, Ms. Jung?

7    Q.  Looking two-thirds down the page, do you see a name

8    associated with an address in Otisville, New York?

9    A.  I do.

10   Q.  What is that name?

11   A.  It appears to be Rich Banca.

12           MR. GIANFORTI:  Finally, if we could turn to page 6 of

13   this document?

14   Q.  About halfway down the page, do you see a name there

15   associated with an address in Pine Bush, New York?

16   A.  I do.

17   Q.  What name is that?

18   A.  It appears to be Ross Cohen.

19           MR. GIANFORTI:  Ms. Jung, could you please pull up

20   Government Exhibit 304N, as in Nancy, which is in evidence?

21   And can you please blow that up?  Thank you.

22   Q.  Special Agent Bush, what is Government Exhibit 403N, as in

23   Nancy, appear to be?

24   A.  It appears to be an extraction report from a cell phone.

25   Q.  Okay.  And this, indeed, is a file extracted from

 1    Ms. Giannelli's phone that was seized from her residence.  What

 2    appears to be reflected in this report?

 3    A.  It appears to be a contact card for, 52, Ross Cohen, with

 4    phone Number (914)420-7377, and e-mail address

 5    RCohen1@frontier.com.

 6         MR. GIANFORTI:  Ms. Jung, can you please pull up

 7    Government Exhibit 320FE, F as in Frank, E as in Eric?

 8    Q.  Special Agent Bush, Government Exhibit 320FE is in

 9    evidence.  It was a file obtained from Equestology.  What does

10    this appear to be?

11    A.  It appears to be a text communication.

12    Q.  Who are the parties to this text communication?

13    A.  Looks like Seth AA with phone number (561)270-9286, and

14    Lisa Ranger Cell with number (302)222-2220.

15         MR. GIANFORTI:  All right.  Ms. Jung, can you please

16    blow up the last two lines of this text message exchange?

17    Q.  Special Agent Bush, when was this?  When did this exchange

18    take place?

19    A.  5/19/2016 at 11:26 a.m.

20    Q.  Could you please read this into the record reflecting who

21    was saying what?

22    A.  Lisa Ranger said, propantheline bromide?  Ross Cohen is

23    asking for it.  On 5/19/2016, 11:49 a.m., Seth AA said, have

24    but it tests.

25    Q.  Okay.  Thank you.

1           MR. GIANFORTI:  Ms. Jung, can you please pull up

2   Government Exhibit 332U, as in umbrella?  Can you below that up

3   at the top?

4   Q.  Special Agent Bush, this is another file that was obtained

5   from Equestology.  Could you please read Government Exhibit

6   332U into the record noting the header information as you go?

7   A.  This appears to be from Lisa Ranger with e-mail address

8   Equestology@gmail.com, sent Friday, December 16, 2016, 2:51

9   p.m. EET to Mary Fox with e-mail address

10  Mary.Equestology@gmail.com and Seth Fishman with e-mail address

11  SethFishman@hotmail.com.  The subject that sent before I

12  finished..

13          Sorry.  That e-mail sent before I was done

14  writing..LOL.  Moving forward, I will e-mail orders to you to

15  help minimize orders on both sides.  As a rule, I'm never out

16  of product when I place the order.  I always leave a two- to

17  three-week buffer in place so never am I in a panic for such

18  product.  This is to prevent any half boxes or extra shipping

19  cost.  You've been sending me confirmation of shipment costs,

20  and this is great!  Thank you.

21          For my orders to the 125 Jennifer Lane address,

22  please -- and this is bold and underlined -- always fill box.

23  Either with product I ask for or from the list of extras that I

24  sent on the last e-mail.  I have a large storeroom, so I can

25  take these stable items in bulk.  If nothing else from my extra

1    list is available, ask doc if he has any product for me and I

2    can go in the box to fill it up.

3         Also, please don't ship on a Friday unless I

4    specifically ask.  That way it won't be sitting in a hot

5    freezer, UPS hub.

6         Thank you for all your help, smiley face, Lisa.

7    Q.  Thank you.

8         MR. GIANFORTI:  Ms. Jung, could you please pull up

9    Government Exhibit 329?

10   Q.  All right.  Special Agent Bush, this is in evidence, and

11   it's another file that was obtained from Equestology.  Could

12   you please read this into the record starting with the bottom

13   part of the e-mail chain and reading up?

14   A.  This appears to be a forwarded message.  Starting from the

15   bottom chain under forwarded message, it's from Lisa Ranger

16   with e-mail Equestology@gmail.com; date, Wednesday,

17   February 22, 2017, at 10:29 a.m.  Subject, new order.  To,

18   Mary Fox with e-mail address Mary.Equestology@gmail.com.

19        Hello, I will be needing..as much as you can send..

20   No limit.  Smiley face.  One, EPN paste; two, homeopathic

21   bleeder plus with four stars; three, Folics 5X, 100CC bottles;

22   four, omeprazole, 12 bottles; five, PG-2-Equimax; 6, TB-7; 7,

23   Equizone pentizan; 8, more bleeder pills.  Thanks, Lisa.

24        And the top of the e-mail exchange is from Lisa Ranger

25   with e-mail address Equestology@gmail.com, sent Thursday,

1    February 23rd, 2017,10:42 a.m. EST, to Mary Fox, with e-mail

2    address Mary.Equestology@gmail.com.  Subject, forward, new

3    order.  Did you get this?  Please respond so I know they are

4    going out..Thanks, Lisa.

5    Q.  Thank you.

6         MR. GIANFORTI:  Ms. Jung, could you now please pull up

7    Government Exhibit 319D, as in David?

8    Q.  Special Agent Bush, this is another file obtained from

9    Equestology.  Could you please read Government Exhibit 319D, as

10   in David, into the record?

11   A.  Yes.  This appears to be an e-mail from

12   Equestology@gmail.com.  E-mail address Equestology@gmail.com,

13   sent Wednesday, August 16, 2017, at 9:38 a.m., EDT, to

14   Mary.Equestology@Gmail.com, address Equestology@gmail.com cc

15   SethFishman@hotmail.com with the e-mail address

16   SethFishman@hotmail.com.  Subject, Equestology purchase order.

17   Attachments in parenthesis, AVIPO.TXT in parentheses.  This is

18   just a reminder of what I have on order.  I added another 100

19   EPM to this order.  Things are picking up again.  Also out of

20   the bleeder pills.  50 bags mean 1,500.  Add anything new doc

21   wants to send to me.  Also, really need those labels.  I have

22   not received them for the acetylcysteine nor the iron.  Thanks,

23   Lisa.

24        MR. GIANFORTI:  Your Honor, at this time I ask to read

25   a stipulation into the record?

1              THE COURT:  Sure.

2              MR. GIANFORTI:  All right.  Once again, I'll skip the

3    preamble.

4              If called as a witness at trial, a record custodian

5    for Microsoft Corporation, Microsoft, and for each of

6    Government Exhibits 3401 through 3464 would testify that

7    Government Exhibits 3401 through 3464 are true and correct

8    copies of electronic records including e-mails and their

9    attachments associated with the e-mail account,

10   SethFishman@hotmail.com, made and maintained by Microsoft that

11   were, A, made at or near the time by or from information

12   transmitted by, summoned with knowledge of the information

13   contained therein; B, kept in the course of regularly conducted

14   activities of Microsoft; and C, made as a regular practice of

15   the activities of Microsoft.

16             Two, if called as a witness at trial, a record custody

17   for 1&1 IONOS, and for each of Government Exhibits 3313, 3314,

18   and 3322 through 3326, would testify to Government Exhibits

19   3313 and 3314 and 3322 through 3326 are true and correct copies

20   of electronic records, including e-mails and their attachments

21   associated with the e-mail account Seth@Equestology.com, made

22   and maintained by 1&1 IONOS, that were; A, made at or near the

23   time by or from information transmitted by someone with

24   knowledge of the information contained therein, kept in the

25   course of regularly conducted activities of 1&1 IONOS, and made

1  as a regular practice of the activities of 1&1 IONOS.

2          It is further stipulated and agreed by and between the

3  parties that the aforementioned Government Exhibits in this

4  stipulation, which is Government Exhibit 9005, may be received

5  in evidence at trial, dated April 25th, 2022, New York,

6  New York, and signed by the parties.

7          Your Honor, the government would move to admit

8  Government Exhibit 9005 and all of the exhibits listed therein.

9          MR. FASULO:  No objection.

10          THE COURT:  They're received into evidence, the

11  stipulation and the exhibits listed in the stipulation.

12          (Government's Exhibit 9005 received in evidence)

13          MR. GIANFORTI:  Ms. Jung, can you please bring up

14  Government Exhibit 3460, which is in evidence?

15  Q.  This is an e-mail from Lisa Ranger to Seth Fishman and

16  Mary Fox dated August 26, 2017.  It was obtained from Seth

17  Fishman's Hotmail account.  Could you please read this into the

18  record?

19  A.  From Lisa Ranger to Mary Fox and Seth Fishman, subject,

20  current inventory and projected needs for a -- date  Saturday,

21  August 26, 2017.  11:17:9 a.m.  Attachments, inventory,

22  8.26.17.doc.  Hello.  Attached is what I currently have in

23  stock -- actually, it says sock, but I think in context it

24  meant stock -- to plan accordingly, these reoccurring items are

25  what I need over the course of a year..acetylcysteine, 450

bottles, bleeding pills 325 PKS of 30 pills equals 10K pills

plus.  Homeopathic bleeder plus 900 bottles, Homeogesic, MDP30

bottles.  EPN Doublekill paste, 900 tubes, EQ1@5 silver top,

135 bottles, folic 5X, 600 bottles, iron sucrose, 600 bottles,

power block, 200 bottles.

I will e-mail when these get below the threshold we

discussed.  To avoid issues if expiration allows, next time I

place an order, you can send me what I need for a year.  Also,

see if it can be shipped directly to me to save time, extra

shipping fees, and aggravation.  Thanks, Lisa.

Q.  Thank you.

MR. GIANFORTI:  Ms. Jung, could you now please pull up

Government Exhibit 332G, as in girl and blow up the top?

Q.  Special Agent Bush, this is an e-mail obtained from

Equestology.  I'd like you to read Government Exhibit 332G into

the record, please.

A.  From Lisa Ranger with e-mail address Equestology@gmail.com.

Sent Monday, February 10, 2020, 9 o'clock p.m. EST.  To

Mary Fox with e-mail address Mary.Equestology@gmail.com and

Seth Fishman with e-mail address SethFishman@hotmail.com.

Subject, product..hello.  Do you have an updated list of what

products you'll have available in the near future so I can

update the products in the computer for client billing?  Am I

going to receive any bleeding medicine, either injectable or

paste?  I have nothing here for your clients.  I need

1    information, please..Lisa.

2    Q.   Thank you.

3         MR. GIANFORTI:  All right.  Ms. Jung, if you could

4    please pull up Government Exhibit 201?

5    Q.   Special Agent Bush, these are text messages that were

6    intercepted over the wiretap on Lisa Giannelli.  They're in

7    evidence.  All right?  And if you would, I'll have you start --

8    just give me a moment.  If you could please turn to page 4.?

9    Do you see at the bottom there where it says another order?

10   A.   Yes.

11   Q.   Okay.  Could you please read this into the record?  Let me

12   see how far I want you to go.  Just go through to the end of

13   the document, if you don't mind, noting who it's to, who it's

14   from in terms of the phone numbers and the contacts if you

15   would?

16   A.   Sure.  This first one appears to be an outgoing text

17   message dated 5/9/2019 at 13:37:56, EDT to subscriber

18   Jeffrey Hass, II, from Lisa Giannelli.  The content is another

19   order..please.  Travis Alexander --

20   Q.   If you could read the content -- oh, I'm sorry, and then

21   continue reading from there.

22   A.   After that, it says 6HB bleeder four folic acid.  The next

23   appears to be another outgoing text message from Lisa Giannelli

24   to Jeffrey Hass, II, on 5/9/2019 at 13:40:41 EDT.  And the

25   content is add 3CMPK to Travis Alexander, please.

1          This appears to be an outgoing text from

2   Lisa Giannelli to Jeffrey Hass, II, at 5/9/2019 at 13:43:01 EDT

3   with the content, thx, which in context means thanks, we just

4   landed in Roaton.  Customs now.  Your dad has his phone with

5   him this trip too.

6          The next is an outgoing text from Lisa Giannelli to

7   Jeffrey Hass, II, on 5/9/2019 at 14:44:16 EDT with the content

8   being another order..Robert Bernard, four acetylcysteine three

9   I arginine -- or L-arginine, one P block, one ammonium sulfate,

10  one B12.

11         This appears to be an outgoing text from Lisa

12  Giannelli to Jeffrey Hass, II, on 5/13/2019 at 15:28:51 EDT.

13  And the content is call me, please.  I need you to add

14  something to Eli's order.  The next is an outgoing text message

15  to Lisa Gianelli to Jeffrey Hass, II, on 5/13/2019 at 14:48:52

16  EDT with the content being Ben Roberts, small biomane, two

17  bottles of regumate.  This appears to be an incoming text

18  message from Jeffrey Hass, II, to Lisa Giannelli on 5/14/2019

19  at 13:20:54 EDT with the content being what's BO 2 max?  I

20  couldn't really hear on the phone.

21         The next is an outgoing text from Lisa Giannelli to

22  Jeffrey Hass, II, on 5/13/2019 at 13:24 EDT, with that

23  associated content being its in the cabinet by the fridge

24  bottom shelf second bag in red label.  Please put three of them

25  on the porch.

1          The next is an incoming text from Jeffrey Hass, II, to

2     Lisa Giannelli on 5/14/2019 at 13:26:35 EDT with the content

3     being, okay.  It's out.

4     Q.   Thank you.

5          MR. GIANFORTI:  Ms. Jung, if you could pull up

6     Government Exhibit 202, and if you could please turn to page 3?

7     Q.   Special Agent Bush, I'd like you to read a text message

8     beginning with section 211.  This is dated April 22, 2019, at

9     11:36 EDT.  It appears to be an incoming message from a Jessica

10    Dowse to Lisa Giannelli.  And can you read the content in the

11    record?

12    A.   The content.  K.  I need six Doublekill box of 19 gouge

13    needles, 25 and 35 NML syringes bottle of ace.

14         MR. GIANFORTI:  And if you could turn now to page 5,

15    Ms. Jung?  And if you could blow up section 765?

16    Q.   This is a text message from April 30, 2019, at 13:36 EDT.

17    It appears to be an incoming message from a Rick Dane to

18    Lisa Giannelli, and you can just read this text message into

19    the record.

20    A.   The content is need 10 green, eight bleeder, one pain,

21    please.  That should last me a while.

22         MR. GIANFORTI:  Okay.  Ms. Jung, could you now pull up

23    Government Exhibit 5000?

24         THE COURT:  I'd like you to find a convenient breaking

25    point after you finish this exhibit.

1              MR. GIANFORTI:  Honestly, this is as good a place as

2     any.

3              THE COURT:  All right.  Then, ladies and gentlemen,

4     we're going to adjourn now to take a brief lunch break.  Please

5     leave your notepads and the transcript binders on your seats

6     here.  I remind you, please do not discuss the case or read

7     anything about the case or issues in the case during your

8     break.

9              Special Agent Bush, I remind you you remain under

10    oath.  Please do not discuss your testimony with anyone over

11    the recess.

12             I wish everyone a pleasant lunch break, and I will see

13    you back here at 1:15, please.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury not present)

 2                THE COURT:  All right.  Sir, is there anything we need

 3      to discuss.

 4                MR. FASULO:  Nothing from the defense, Judge.

 5                MS. MORTAZAVI:  Nothing from the government, your

 6      Honor.

 7                THE COURT:  Thank you.  Then, everyone, have a good

 8      lunch break.  I'll see you back here shortly.  You all should

 9      be back a few seconds before, especially if there's anything to

10      talk about.

11                MS. MORTAZAVI:  Great.  Thank you.

12                    (Lunch recess)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                           AFTERNOON SESSION

2                               1:15 P.M.

3            THE COURT:  All right.  We're ready for our jury?

4            MR. GIANFORTI:  Yes, your Honor.

5            MR. FASULO:  Yes.

6            THE COURT:  Thank you.

7            (Jury present)

8            (Witness present).

9            THE COURT:  Please be seated, everyone.

10           Good afternoon.

11           Special Agent Bush, you remain under oath.

12           Mr. Gianforti.

13           MR. GIANFORTI:  Thank you, your Honor.

14           Ms. Jung, could you please publish Government Exhibit

15   5016 which is in evidence.

16           (Pause)

17   Q.  Special Agent Bush, this is a hard copy seized from Ms.

18   Gianelli's residence.  What does it appear to be?

19   A.  It this appears to be an invoice or Equestology.

20   Q.  What is the address?

21   A.  It's 125 Jennifer Lane, Felton, Delaware 19943.

22   Q.  Who is the invoice addressed?

23   A.  To it's for Rick Dane at 1342 Mountain Road, Port Jervis,

24   New York 12771.

25   Q.  What does it appear to be for?
```

1  A.  This appears to be for barn supplies, DEQ-1@5.

2  Q.  And what's the total amount of the invoice?

3  A.  The money?

4  Q.  Yes.

5  A.  4950.

6  Q.  Are you familiar with Port Jervis, New York?

7  A.  Yes.

8  Q.  Which county is that in?

9  A.  I believe it's Orange County.

10          MR. GIANFORTI:  Ms. Jung, could us please pull up

11  Government Exhibit 5017 and turn it to the right.

12          Thank you.

13  Q.  Special Agent Bush, this is another hard copy document

14  seized from Ms. Gianelli's residence.  What does it appear to

15  be?

16  A.  This appears to be a shipping label.

17  Q.  From whom?

18  A.  From Lisa Ranger at Equestology 125 Jennifer Lane, Felton

19  Delaware.

20  Q.  Who is it addressed to?

21  A.  It's shipped to Rick Dane, 1342 Mountain Road, Port Jervis,

22  New York 12771.

23          MR. GIANFORTI:  Thank you.

24          Ms. Jung could you please pull up Government Exhibit

25  5026 which is in evidence.

1           Could I please give Special Agent Bush hard copy

2    records?

3           THE COURT:  Sure.

4           MR. GIANFORTI:  Thank you.

5           (Pause)

6    Q.  So if you could turn to Government Exhibit 5026.

7           Special Agent Bush, what does that appear to be?

8    A.  Appears to be a how-to list of how to order and pull from

9    correct supplies and distributors.

10   Q.  Okay.  Could you please read the instructions under where

11   it says "order comes in"?

12   A.  I can.

13          Number one: order comes in...

14          First see who it is.

15          See what state they live in.

16          Next see what they need.

17          Split into three categories.

18          Merchandise, products compounded items and items Dr.

19   Fishman makes.

20          Look on the account page in the referral section to

21   see what dropship accounts are in place.

22          MR. GIANFORTI:  Thank you.

23          Ms. Jung, could you please turn to the second page of

24   this document.

25   Q.  Could you please read the last bullet point about halfway

1    done the page?

2    A.   Sometimes client needs items from Dr. Fishman.  If I do not

3    have in office then text Mary.  She sill send from down there.

4    You will need client's name and address to give her for

5    shipping.

6    Q.   Could you please read the bolded text that appears before

7    that?

8    A.   Deciding where to pull and how to send takes time.

9         Watch you mistakes, but in context of -- see shipping

10   cost, item costs, learn from mistakes and go forward.

11   Q.   Okay.  Looking at the took document as a whole, does it say

12   anywhere that the person handling the order should ask if the

13   client has a valid prescription --

14        MR. FASULO:  Objection.

15        THE COURT:  Sustained.

16        MR. GIANFORTI:  Turning back to the second page, the

17   page that we're on here.

18        Ms. Jung, if you could pull up that bold text again.

19   Q.   Where the document talks about mistakes, does it indicate

20   that it would be a mistake to not ask a client about a

21   prescription?

22        MR. FASULO:  Objection.

23        THE COURT:  Sustained.  The document is in evidence

24   and it speaks for itself.  It says what it says.  And this

25   witness has no connection with the document, correct?

1              MR. GIANFORTI:  It was part of the search.

2              THE COURT:  You are asking her to read the documents

3    she found.

4              MR. GIANFORTI:  That's right, your Honor.

5              THE COURT:  Okay.

6              MR. GIANFORTI:  Ms. Jung, could you please publish

7    Government Exhibit 319-O, which is in evidence.

8    Q.  Special Agent Bush, this is a document obtained at

9    Equestology.  Would you please read it into the record starting

10   with the lower part with the email chain.

11   A.  On Friday, February 23, 2018 at 1:42 P.M., Seth Fishman

12   with the email address Sethfishman@hotmail.com wrote:

13             Lisa, when have you a chance please send me the

14   current prices we are charging for the stuff I make.

15             Thank you, Seth.

16   Q.  About above that please?

17   A.  From LisaRangerEquestology@GMail.com, sent Friday February

18   23, 2018, at 2:48 P.M. EST to Seth Fishman with the address

19   SethFishman@Hotmail.com, subject reads: Please.  Attachments

20   inventory doc summary.PDF.

21             MR. GIANFORTI:  Could us please publish Government

22   Exhibit 5015 for the jury.

23   Q.  Special Agent Bush, this is in evidence as a hard copy

24   record that was seized from Ms. Gianelli's home.

25             What does that document appear to be?

 1  A.  Appears to be an office supply ordering form.

 2  Q.  Okay.  Below the line where it says "office supply

 3  ordering" what, does that say?

 4  A.  In parenthesis it says case manufactured products pulled

 5  from Shein midwest or A and G.  Then underneath, compound items

 6  Boothwin, rapid equine horses necessities, Wedgewood.  Then

 7  there's three stars that says see shipping cost for minimal

 8  order.  Under that in capitals bold and underlined it says:

 9  Always make sure you get a confirmation.  Then in lower case of

10  order either by email text.

11          MR. GIANFORTI:  Thank you.

12          Could you please go to second page of this document

13  and please blow up Paragraph Three.

14  Q.  Special Agent Bush, could you please read this into the

15  record?

16  A.  Says number (3A and G).  Under that it says will pull from

17  here even if more expensive (judgment call).  If not an

18  established dropship from MW or SCH.  If client lives outside

19  of where dock is licensed, then this is an option.  See product

20  sheet for what they stock.  It's limited.  They will email

21  receipt from book work three dollar shipping cost.

22          MR. GIANFORTI:  Could we please highlight paragraph

23  four.

24  Q.  Special Agent Bush, can you please read this?

25  A.  Number 4, BW equal Boothwin.  My go-to compound company.  I

1   text orders to Geoff, the pharmacist.  Text the amount you need

2   and name of products, also client's and address and also

3   horse's name.  Preshipping over $75, but if charging shipping

4   just make sure you charge it on client side too.  Usually tack

5   on a $15 or $20 -- fee regardless of what compounder charges

6   us.  They will email receipt for book work.

7           MS. MORTAZAVI:  Thank you.

8           And if we go to third page, Ms. Jung, and highlight

9   paragraph 6.

10  Q.  Special Agent Bush, could you please read the first four

11  lines of this into the record?

12  A.  Six WW Wedgewood W, order online at Wedgewood pet RX.com.

13  Go to write a prescription.  Plug in owner's phone number,

14  click on them or if not in system follow prompts for new

15  client, add horse's information, then find product you need.

16  Follow instructions.  I go back to add mark and pull up what I

17  need.  Find code.  Then use that to search for product six

18  times.

19          You can call in order but takes forever... account

20  fish 48 Dr. Fishman Equestology, they will email receipt for

21  back work, watch for states that charge tax, need to charge

22  extra to make up difference.

23          MR. GIANFORTI:  Okay.  Thank you.

24          You can take that down, Ms. Jung.

25  Q.  Special Agent Bush, how long did take you and your team to

1    complete the search of 125 Jennifer Lane?

2    A.   A little less than six hours.

3    Q.   Once the search complete, what happened next?

4    A.   We handed over a copy of the search warrant list of what

5    they had seized from the location and then I took all of the

6    evidence back to the FBI office in Delaware.

7    Q.   What happened at the FBI office in Delaware?

8    A.   We ensured we had all the paperwork and all the photos,

9    reviewed the documents and from there we brought everything

10   back to the New York field office for processing of the

11   evidence.

12   Q.   You mentioned earlier the prepared evidence logs; do you

13   remember that?

14   A.   Yes.

15   Q.   And after the search could you just talk a little bit about

16   the inventory log or evidence log you filled out?

17   A.   We make an evidence log, both physical and electronic for

18   every piece of evidence that we seized, where it was seized and

19   what specific location it was seized in and who found it.  Each

20   piece of evidence we'll fill out a chain of custody which has

21   me and the seizing agent on it.  Then whoever takes custody of

22   it they'll have to sign for it in.

23   Q.   Could you describe a little bit more what you mean by of

24   "chain of custody".

25   A.   Sure.  I have specific piece of paper for each piece of

1    that I seized that gives it a name and a number associated with

2    the piece of evidence and that will stay with that piece of

3    evidence through the course of the investigation.

4    Q.  Special Agent Bush, other than your participation in the

5    search of 125 Jennifer Lane, did you have any further

6    participation in this investigation?

7    A.  No, I didn't.

8            MR. GIANFORTI:  No further questions.

9            THE COURT:  Thank you.

10           Mr. Fasulo, cross?

11           MR. FASULO:  Yes, your Honor.

12   CROSS-EXAMINATION

13   BY MR. FASULO:

14   Q.  Good afternoon, agent.

15   A.  Good afternoon, sir.

16   Q.  At the end of your examination you stated that you had no

17   further dealings with this investigation after the search, the

18   vouchering and, the securing the property and taking it to New

19   York; is that fair to say?

20   A.  That's fair to say.

21   Q.  And so during the course of your testimony here today you

22   were asked to read a number of documents, correct?

23   A.  That's correct.

24   Q.  And other than read those documents, have you had a chance

25   to review those documents before testifying here today?

1  A.  Just during trial prep.

2  Q.  You met with the government and you sat down and talked

3  about some of the questions they were going to ask you, some of

4  documents they would refer to?

5  A.  That's correct.

6      MR. FASULO:  I'd like to draw your attention and ask

7  Ms. Jung if they could pull up Government Exhibit 5027 which

8  was one of the documents read through.

9      (Pause)

10 Q.  Just so the jury is clear and we're clear, this document

11 has approximately 30, I believe about 30 pages of this

12 document.  There's a hard copy in your file?

13 A.  I do have a hard copy.  Let me check.

14 Q.  While you are getting it out maybe we don't need to see the

15 number -- I'll withdraw the question.

16     So this document lists the number of products,

17 correct?

18 A.  I believe it's an inventory report.

19 Q.  What did you understand that to be?

20 A.  Just a list of different medical supplies.

21 Q.  And some of these supplies you were able to take from the

22 home and some of them were not in the home, correct?

23 A.  I don't believe so.

24 Q.  Did you ever crosscheck this list with the actual supplies

25 that were at the home at the time?

1    A.  No, I did not.

2    Q.  When I say "the home", the home in Delaware you were

3    searching on the day of the search?

4    A.  I understand.

5    Q.  In fact, in terms of the names and the usage and the

6    categorization of the items, would it be fair to say they're

7    not really familiar with what these products are or what they

8    do?

9    A.  That would be outside the scope of this.

10   Q.  You wouldn't know if those were vitamins, if these were

11   prescription medications?  You don't know anything about theses

12   products, fair to say?

13   A.  I don't know that.

14   Q.  The answer is, yes, you don't know?

15   A.  That's correct.

16   Q.  I'd to draw yaw your attention to another document you read

17   off of, document 715.  Do you remember looking at this document

18   during direct-examination?

19   A.  I do.

20   Q.  Do you remember seeing a list of names, correct?

21   A.  That's correct.

22   Q.  And I think at some point you indicated that this,

23   according to what you read, it indicated to you it was a client

24   list with phone numbers, correct?

25   A.  That's what it says at the top.

1   Q.  And were you able to ascertain how many clients appeared on

2   this list that you confiscated on the day of your search?

3   A.  Can you repeat the question?

4   Q.  The number of clients that were on this list, do you know

5   how many there were?

6   A.  I don't know how many.  Much I believe I said hundreds.

7   Q.  Would you agree with me it's over 33 pages, correct?

8   A.  I could look.  I am not sure.

9           MR. FASULO:  If you can.

10          (Pause)

11          MR. FASULO:  Ms. Jung, if you could just flip through

12   so we could see that.

13          (Pause)

14   A.  33 page document.

15   Q.  You were asked about some specific names on this list?

16   A.  Yes.

17   Q.  You had no opportunity, nor was it in your role as

18   investigator in this case to contact these individuals that

19   were on this list at any time; is that correct?

20   A.  I do not believe you contacted any of these individuals.

21   Q.  If you do you would have a record of it?

22   A.  I believe so.

23   Q.  Did you have a record of it?

24   A.  No.

25   Q.  In fact, on this list, it not only indicates names of

1   individuals, it indicates, for example, on the first page

2   racing stables, correct?  You'll see in the middle of the

3   first, top of the first page ADD Racing Stables, correct?

4   A.  I see that listed.

5   Q.  But not only individuals but also stables correct?

6   A.  It says last name ADD Racing Stables.  I am not sure I can

7   answer that.

8   Q.  In fact, on the list also is city, correct?

9   A.  There's a list of cities.

10  Q.  There is a list of addresses which have been redacted for

11  purposes of the courtroom, correct?

12  A.  Yes.

13  Q.  And also the state, correct?

14  A.  Yes, it says "stat".

15  Q.  At any time during your investigation did you look at the

16  states where these individuals were and look at the licensing

17  of Dr. Fishman?

18  A.  Can you repeat?

19  Q.  At any time during your investigation did you take a look

20  at the individuals and the states where they were located and

21  look at where Dr. Fishman was actually licensed as a

22  veterinarian?

23  A.  I was not an investigating officer of the case.

24  Q.  So you never did that?

25  A.  That's right.

 1   Q.  Thank you.

 2        I would now like to turn your attention to Exhibit

 3   Number 5018.

 4        Do you remember testifying about this exhibit?

 5   A.  I do.

 6   Q.  And reading off of it?

 7   A.  I do.

 8   Q.  And would it be fair to say that you indicated that there

 9   was on the top it said "supplies", correct?

10   A.  Yes.

11   Q.  And SCH, at any time during your investigation did you

12   understand what "SCH" was?

13   A.  No.

14   Q.  And MW?

15   A.  No.

16   Q.  "A" and "G"?

17   A.  No.

18   Q.  Any of the lines on the first in red there on top were you

19   able to ascertain what those were or why they were there?

20   A.  No.  But I believe I read off other things that --

21   Q.  I am asking you right now on this document.  Do you know

22   any of those acronyms in the first line SCH, MW, AG, BW, RE, W,

23   I think it's HM dot and dock, any of those --

24        THE COURT:  Thank you.

25   Q.  Are you able to tell us now what any of these acronyms are?

1  A.  I believe that I read documents that have those as well on

2  them but from memory and not being a part of the investigation,

3  I'm not sure.

4  Q.  Okay.  So you wouldn't understand what the significance of

5  those names on the top as it relates to any of the numbers

6  underneath are, correct?

7  A.  That's correct.

8         MR. FASULO:  Okay.  Let me now ask you about a couple

9  of items that you talked about during your direct.

10        Can you pull up 901.

11  Q.  You also recovered a number of items from the residence in

12  Delaware, correct?

13  A.  I did.

14  Q.  How did you find the home in Delaware when you went and

15  examined it in terms of organization and in terms of the way

16  the items were being kept?

17  A.  It was very organized.

18  Q.  And were the refrigerators working, if you know?

19  A.  I'm not sure.

20  Q.  Was there anything to indicate that they weren't?

21  A.  No.

22  Q.  Okay.  And in fact, how was Ms. Gianelli when you entered

23  into the home?  Was she cooperative?

24  A.  She was.

25  Q.  During the course of the time, the six hours you were

1    there, did she continue to be cooperative?

2              MR. GIANFORTI:  Objection.

3              THE COURT:  Sustained.

4    Q.  During the time that you were searching and Ms. Gianelli

5    was held in abeyance, where was Ms. Gianelli at that time when

6    you were searching her home?

7    A.  I was the search team leader and there was a different

8    person who was the arresting leader and she had most contact

9    with Ms. Gianelli.  I only told her that we had a search

10   warrant for the residence.

11   Q.  Do you know where they were?

12   A.  I'm not sure.

13   Q.  Were they at the home or away from home?

14             MR. GIANFORTI:  Objection.

15             THE COURT:  Sustained.

16   Q.  Do you know who that agent was?

17   A.  I do.

18   Q.  Who was that agent?

19   A.  That was Special Agent Jennifer Taylor.

20   Q.  "Taylor"?

21   A.  That's correct.

22   Q.  And at any time after your search of the home, did you ever

23   see Ms. Gianelli again that day?

24   A.  I don't believe so.

25   Q.  So I want turn your attention to the first item which is, I

1  think it's 9106.  I am going to hand you 9106, if I may

2  approach?

3          THE COURT:  Sure.

4          MR. FASULO:  Do we have the photo of 9106?

5          THE COURT:  Do you want to publish that to the jury.

6          MR. FASULO:  Yes.

7          (Pause)

8  Q.  Do you remember talking about this item on your

9  direct-examination, 9106?

10 A.  I do.

11 Q.  I think you described the label which I'm turning for you

12 so you can see it, the label there, correct?

13 A.  Yes.

14 Q.  And you described this horse's head, correct?

15 A.  Correct.

16 Q.  And do you know what that label reflects as it relates to

17 this product?

18 A.  I'm sorry?

19 Q.  Do you know anything about why this horse's head is on this

20 product?

21 A.  No.

22 Q.  Okay.  Do you know if it's a label from Equestology or from

23 any other company?

24 A.  I'm not sure.

25 Q.  In fact, you also stated that it is, you don't know what

1    this item is being used for, nor do you understand what the

2    ingredients of this item is; is that fair to say?

3    A.  That's a fair to say.

4    Q.  And in fact, on the back of it there is directions,

5    correct?  Can you see that?

6    A.  Yes.  There is --

7    Q.  Can you see that.

8    A.  I can.

9    Q.  You see there are directions on this packaging, correct?

10   A.  I see that.

11   Q.  And in fact, there are ingredients listed, correct?

12   A.  Yes.

13   Q.  And you as a layperson, as an investigator or FBI agent,

14   you wouldn't know what these ingredients are, correct?

15   A.  I don't know what those ingredients are.

16   Q.  And in fact, you said -- we ask you now about 9102 which I

17   believe is --

18             MR. FASULO:  Do we have a photograph of 9102?

19             I'm going to try to do this this way, judge.

20   Q.  This was another item that you received at the location; is

21   that correct?

22   A.  Yes.

23   Q.  If I'm not right, please, let me know.

24   A.  I do will.

25   Q.  Remember you were testifying about the horse's head here,

1   correct?

2   A.   Yes.

3   Q.   And there is a label on the front of this item, correct?

4   A.   Yes.

5   Q.   And you don't know where that label came from; is that fair

6   to, say?

7   A.   I believe it's, came from the bottle.

8   Q.   Other than it being on the bottle we don't know who labeled

9   it, correct?

10   A.   No, I don't.

11   Q.   You also can see on that --

12          THE COURT:  Can you turn the whole package over?

13   Q.   You also see that in the back of the label -- and if you

14   can't see I'll hand it to you.

15          You see right here there are certain directions.  You

16   also see on this item there are also directions on this

17   packaging, correct?

18   A.   Yes.

19   Q.   And it has specific directions.  Were you able to -- and

20   you don't know anything about this product, fair so say?

21   A.   Correct.

22   Q.   Okay.  And in fact, not only does it have that label but it

23   also has a white label I am going to show you right now?

24          MR. FASULO:  Trying to be efficient, judge.

25          THE COURT:  Don't break them.

1  Q.  You also see this label, correct?

2  A.  I do.

3  Q.  And you don't know who put this label on as well?

4  A.  I do not.

5  Q.  When you went to Lisa Gianelli's house, this was labeled in

6  her one of those closets as it sits here today; is that

7  correct?

8  A.  Yes, I believe so.

9  Q.  The label says specifically if you can see it, "follow

10 local racing regulations", correct?

11 A.  Correct.

12 Q.  "Don't use within 24 hours of racing", correct?

13 A.  I see that.

14 Q.  And this is one of the items that you also recovered at the

15 home?

16 A.  Yes, it is.

17 Q.  For everybody's purpose, agent, it's fair to say that of

18 all the items you recovered you have little contact with those

19 items other than the fact that you recovered them from the

20 home, correct?

21 A.  That's correct.

22 Q.  You didn't do anything further with those items in terms of

23 the investigation; fair to say?

24 A.  Fair to say.

25 Q.  I am not going to show you every item because you wouldn't

 1   know what they were used for, whether medications, vitamins or

 2   what they were?

 3   A.   Correct.

 4   Q.   You wouldn't know where the labels came from, correct?

 5   A.   Correct.

 6   Q.   Now you were also asked about certain medications.  Do you

 7   remember you being asked about Government Exhibit 9117?  Now

 8   these were also recovered at the house in Delaware, correct?

 9   A.   Yes.

10   Q.   And you also see on top there is a name called -- you see a

11   name and then you see an address, pleasant Drive in

12   Pennsylvania.  Do you see that?

13   A.   I do.  That's a little to the side.

14   Q.   Would it be fair to say that you did not do an

15   investigation as to the source or this address at all, correct?

16   A.   No.  I just took these from the home.

17   Q.   Correct.  But you did see on this bottle as you stated that

18   Dr. Fishman's name was listed on these bottles; is that fair to

19   say?

20   A.   That's fair.

21   Q.   If I point directly over here, you can see that?

22   A.   Yes.

23   Q.   And it also had a date that this was prepared, correct?

24   A.   It has the date.  I'm not sure.

25   Q.   Well, it says "prepared 2/11"?

1          THE COURT:  You want to direct her?

2    A.  Yes, I see that.

3    Q.  "Prepared 2/11/2020", correct?

4    A.  Yes.

5    Q.  It has a quantity, correct?

6    A.  Yes.

7    Q.  And it also has an order on the bottom.  I don't know if

8    you can read it from there.  But if I give it to you, maybe you

9    can because -- I am going to give it to you and ask you if you

10   can read it.  Hard for me to maneuver the bottles within the

11   packet and I don't want to open up the evidence bag.  Your eyes

12   are better than mine.

13          (Pause)

14   A.  What part?

15   Q.  The bottom part.

16   A.  The caution?

17   Q.  Yes.

18   A.  Caution, federal law restricts this drug to use by or on

19   the order of a licensed -- they are a just turning with it --

20   veterinarian.

21   Q.  Also on that prescription bottle there's also an RX number;

22   would that be fair to say?

23   A.  Yes.

24   Q.  At some point during your direct-examination you were asked

25   to read a group of text messages.  Do you remember doing that?

1   A.  I do.

2   Q.  And would it be fair to say, agent, that you have no

3   association other than reading those messages, two of those

4   messages?

5   A.  That's correct.

6   Q.  You did nothing in terms of the investigation as to those

7   messages?

8   A.  That's correct.

9   Q.  You did not speak to anybody about the content or the

10  intent of those messages?

11  A.  Correct.

12  Q.  You were used only for the sole purposes of reading what

13  was already entered into evidence?

14  A.  Correct.

15  Q.  And for that purpose?

16  A.  Yes.

17          MR. FASULO:  And finally -- actually, I appreciate

18  your testimony.  Nothing further from this witness judge?

19          THE COURT:  All right.  Thank you.

20          Is there any redirect?

21          MR. GIANFORTI:  Briefly, your Honor.

22          MR. FASULO:  I would like that bag that the agent has,

23  if we can have it shown to the jury.

24          THE COURT:  Sure.  Why don't we do that.  Come and get

25  it, Mr. Fasulo, and hand it to the first juror and if you would

1   all pass it along.  Mr. Fasulo would like you to take a look at

2   this.  This is in evidence.

3          MR. FASULO:  Evidence number 9117 for the record.  I'm

4   going to hand it to Juror No. 1 and ask her to, please, take a

5   look and pass it to the other jurors so they can see it as

6   well.

7          THE COURT:  Just be sure that you don't drop it and

8   break the contents.

9          MR. FASULO:  Nothing further, judge.

10          THE COURT:  Mr. Gianforti, why don't you just give the

11   jurors a moment to take a look at this.

12          MR. GIANFORTI:  Of course, judge.

13          (Jury perusing)

14   REDIRECT EXAMINATION

15   BY MR. GIANFORTI:

16   Q.  Special Agent Bush, are you familiar with the term "case

17   agent"?

18   A.  I am.

19   Q.  What is a case agent?

20   A.  The case agent is the person that's in charge of the entire

21   investigation from inception to the end.

22   Q.  Were you the case agent for this investigation?

23   A.  I was not.

24          MR. GIANFORTI:  Ms. Jung, could you please pull up

25   Government Exhibit 5029, please.

1              (Pause)

2              MR. GIANFORTI:  Actually, if you could pull up 715

3    simultaneously, that would be great.

4              (Pause)

5              MR. GIANFORTI:  Ms. Jung, could you please blow up the

6    date in the upper left-hand corner.

7    Q.  Special Agent Bush, do you remember this document from your

8    direct and cross-examination?

9    A.  I do.

10   Q.  What is the date of this document?

11   A.  It's February 11, 2020.

12   Q.  What was the date of your search at 125 Jennifer Lane?

13   A.  It was March 9, 2020.

14             MR. GIANFORTI:  Okay.  Thank you.

15             Ms. Jung, could you please pull up Government Exhibits

16   5004 and 5002, please, and could you please blow up the logo on

17   these two items.

18             (Pause)

19   Q.  Special Agent Bush, do you recall me showing you these

20   photographs earlier?

21   A.  I do.

22   Q.  Do you recall looking at these items physically earlier in

23   your direct-examination?

24   A.  I do.

25   Q.  And do you remember me asking you about a logo on these

```
 1    items earlier?

 2    A.  I do.

 3    Q.  What is that logo?

 4    A.  It's the horse's head on both of these items?

 5              MR. GIANFORTI:  No further questions.

 6              MR. FASULO:  Nothing further.

 7              THE COURT:  All right.  Thank you very much, Special

 8    Agent Bush.  You are excused.

 9              THE WITNESS:  Thank you, your Honor.

10              THE COURT:  Who is the government's next witness?

11              MS. MORTAZAVI:  The government calls Daniel Folensbee.

12    DANIEL FOLENSBEE,

13         called as a witness by the Government,

14         having been duly sworn, testified as follows:

15    DIRECT EXAMINATION

16    BY MS. MORTAZAVI:

17    Q.  Good afternoon, Mr. Folensbee.

18    A.  Good afternoon.

19    Q.  Would you let us know where you work?

20    A.  I work for the FBI.

21    Q.  And what position do you have there?

22    A.  I'm a staff operation specialist.

23    Q.  Is that the same thing as a special agent?

24    A.  No.

25    Q.  And how long have you been with the FBI?
```

1    A.   Since October of 2016.

2    Q.   Do you work in a particular region?

3    A.   Yes.

4    Q.   Where did you work prior to joining the FBI?

5    A.   Publix supermarkets.

6    Q.   What sorts of duties do you have in your role as a staff

7    operation specialist?

8    A.   I am similar to that of an analyst.  I work with

9    headquarters division.  So we provide assistance to the field.

10   Q.   "To the field" you mean FBI agents?

11   A.   Yes, ma'am.

12   Q.   I'd like to direct your attention to October 27, 2019.

13   Were you asked to perform anything that day in relation to a

14   company called -- I'm sorry -- in relation to your work as a

15   staff operation specialist?

16   A.   Yes.  I was asked to be a photographer for a search

17   warrant.

18   Q.   What was the address of the premises being searched?

19   A.   3500 Northwest Second Avenue, Unit 723 Boca Raton, Florida.

20   Q.   Can you describe the type of property being searched that

21   day?

22   A.   Yes.  It was a office/warehouse complex similar to that of

23   a strip mall.

24   Q.   Were the premises located within a larger property?

25   A.   Yes.

1    Q.  What about, could you describe the larger property?

2    A.  It was an office complex.

3    Q.  How many law enforcement agents were present during the

4    search?

5    A.  About 20 or 30.

6    Q.  You were asked to be the photographer that day?

7    A.  Yes.

8    Q.  Apart from serving as photographer, did you take any other

9    steps during the search?

10   A.  No.

11   Q.  Approximately, what time did the search start?

12   A.  Just after 12 A.M. on October 28.

13   Q.  And approximately, what time did the search end?

14   A.  Just before 6:00 A.M. that dame day.

15   Q.  Can you walk us through the steps that you took during that

16   search from the time you entered the premises till the time you

17   left?

18   A.  Yes.  I took entry photos which showed the location as it

19   is as we come across it.  And once those are complete, the

20   search begins.  I take photos of each item of evidence before

21   it is logged and packaged.  Then once all the evidence items

22   were collected, I took exit photos which show the premises

23   after we leave the premises.

24   Q.  Have you been trained to undertake those steps during the

25   search?

1    A.  Yes.

2    Q.  Mr. Folensbee, when you walked up there you had a binder

3    that contained Government Exhibit 4000 to 4007; is that

4    correct?

5    A.  Yes.

6            MS. MORTAZAVI:  Your Honor, I've shown that binder to

7    defense counsel.

8    Q.  Mr. Folensbee, have you reviewed the exhibits in that

9    binder before taking the stand?

10   A.  Yes.

11   Q.  Could you let us know what those exhibits are?

12   A.  These are the photos that I took of the scene.

13           MS. MORTAZAVI:  The government moves Government

14   Exhibit 4000 to 4047 into evidence.

15           MR. FASULO:  No objection.

16           THE COURT:  It will be admitted.

17           (Government's Exhibits 4000 -047 received in evidence)

18   Q.  I'd like to walk through those photos of the search that

19   happened that day.

20           MS. MORTAZAVI:  Ms. Jung, could you please pull up

21   Government Exhibit 4000.

22   Q.  Could you explain what's shown here?

23   A.  This is the entryway to the search location through the

24   front door.

25           MS. MORTAZAVI:  Ms. Jung, if you could pull up

1   Government Exhibit.

2   Q.  What's depicted here, Mr. Folensbee?

3   A.  This is the one side of the search location, the office

4   side with some cabinets.

5   Q.  Could you just remind us what was the other side of the

6   search location other than the office?

7   A.  That was a storage location.

8           MS. MORTAZAVI:  Ms. Jung, could you pull up Government

9   Exhibit 4032 and 4031 please.

10          (Pause)

11  Q.  Mr. Folensbee, can you tell us what we're looking at here?

12  A.  This is the storage side of the search location.

13  Q.  Okay.  Looking at Government Exhibit 4032, which is on the

14  right-hand side of your screen, do you see that there appears

15  to be medal racks?

16  A.  Yes.

17  Q.  Can you tell us what appears to be stacked on those racks.

18  A.  Bins and other storage equipment.

19          MS. MORTAZAVI:  Ms. Jung, could you please pull up

20  Government Exhibit 4031.

21          (Pause)

22  Q.  What appears to be located on these metal racks,

23  Mr. Folensbee?

24  A.  Shipping boxes and other equipment.

25          MS. MORTAZAVI:  Ms. Jung, could you pull up Government

1    Exhibit 4046.

2    Q.  Mr. Folensbee, you just testified that there were bins

3    stacked on these metal racks in the warehouse side of the

4    searched premises, correct?

5    A.  Yes.

6    Q.  Was this one of the bins that was located in that premises?

7    A.  Yes.

8    Q.  Could you go ahead and read the label.

9    A.  Label says "trazodone".

10            MS. MORTAZAVI:  I'll ask you not to read the middle

11   line.

12            Ms. Jung, could you please pull up Government Exhibit

13   4001.

14   Q.  What are we look ago the here?

15   A.  These are refrigerator and freezers on the storage side of

16   the search location.

17   Q.  Does there appears to be writing on some of these

18   refrigerators?

19   A.  Yes.

20            MS. MORTAZAVI:  Ms. Jung, if you could please pull up

21   Government Exhibit 4002 and 4003.

22            (Pause)

23   Q.  Mr. Folensbee, looking at Government Exhibit 4002 which is

24   on the left-hand side of your screen, do you see the list of

25   what appears to be names?

1   A.  Yes.

2   Q.  Do you know ACTH on that list?

3   A.  I do.

4           MS. MORTAZAVI:  All right.  Ms. Jung, you can take

5   that down.

6   Q.  Looking at Government Exhibit 4003, is that the interior of

7   one of the bridges that you photographed that day?

8   A.  Yes.

9           MS. MORTAZAVI:  If you could pull up Government

10  Exhibit 4036 and, and 4608.

11          (Pause)

12  Q.  Mr. Folensbee, is it fair to say all three of these

13  exhibits depict the interior of bridges that were located in

14  premises that was searched?

15  A.  Yes.

16  Q.  Can you described what's located in each of these bridges?

17  A.  Boxes filed with vials from some kind of drug.

18  Q.  Does some of these boxes have labels?

19  A.  Yes.

20          MS. MORTAZAVI:  Can you tell pull up the following

21  Government Exhibits, 4018, 4019, 4020 and 4029.

22  Q.  Mr. Folensbee, I am going to take these one-by-one starting

23  with 4018.  Could you read out the product name, sir?

24  A.  Totrazodone.

25  Q.  The manufacture date or what's listed here beside --

1   A.  May 6, 2013.

2   Q.  What's listed beside EXT.date?

3   A.  May 5, 216.

4   Q.  Remind us, Mr. Folensbee, in what month and year did the

5   search take place?

6   A.  October of 2019.

7   Q.  What's the gross weight listed here?

8   A.  28 kilograms.

9       MS. MORTAZAVI:  Ms. Jung, you can take that image down

10  and take a look at Government Exhibit 4019.

11  Q.  Mr. Folensbee, can you read out what's next to the word --

12  A.  Totrazodone.

13  Q.  Again, can you read out the gross weight?

14  A.  28 kilograms.

15  Q.  The date besides the EP date.

16  A.  May 5, 2016.

17  Q.  Now at the very type top in slightly larger text than what

18  we see on the rest of this label there's a name, could you read

19  that out loud into the record.

20  A.  N.J. Farm Limits.

21  Q.  If you could read the second stage of the address which is

22  the third line from the top of this label?

23  A.  Hong Kong Island, Hong Kong.

24  Q.  Looking at the very bottom, do you see the word

25  "destination"?

1    A.   Yes.

2    Q.   Then there's a caution statement. could you go ahead and

3    read that in full, please?

4    A.   Caution for pharmacy compound use only.  Caution RX only.

5            MS. MORTAZAVI:  Ms. Jung, you can take that down and

6    I'd like you to take a look at Government Exhibit 4020.

7    Q.   Once again, can you read the name that is in bold at the

8    very top of the label.

9    A.   Ang Shang Pharma Limited.

10   Q.   The address that's associated with that --

11   A.   Ang Shang Way.

12   Q.   Now, you mentioned that the product name listed on this

13   label was trazadone, correct?

14   A.   Yes.

15   Q.   What's the gross weight of this listed on this label?

16   A.   12 kilograms.

17   Q.   What's the EXP date listed here?

18   A.   26th of March 2016.

19   Q.   Can you read that into the record please?

20   A.   Caution.  For pharmacy compound use only.  Caution.  RX

21   only.  Caution.  Federal use restricts this drug for use by or

22   on the order of a licensed vet.

23           MS. MORTAZAVI:  Ms. Jung, look the original version of

24   government exhibit 4020.  Can you blow up the top right-hand

25   side of that.

1    Q.  Mr. Folensbee, does it look as if there was text cutoff

2    from this photo?

3    A.  Yes.

4    Q.  Can you read the portions that are --

5    A.  I can close my eyes?

6    Q.  Okay.  Does it appear that there is -- could you describe

7    the colors associated with this image?

8    A.  Green, white and red.

9    Q.  If that there appears to be in the middle, could you

10   describe that the best you can.

11   A.  E-S with wings.

12   Q.  Mr. Folensbee, does this appear to be a UPS label?

13   A.  Yes.

14   Q.  Was that a UPS container attached to one of the labels that

15   we were just looking at?

16   A.  Yes.

17   Q.  Do you see the very top above "ship to", could you please

18   read the lines that Ms. Jung just highlighted?

19   A.  Lisa Ranger Equestology 125 Jennifer Lane, Felton,

20   Delaware.

21   Q.  Underneath the line "ship to", can you go ahead and read

22   out the name and address.

23   A.  Seth Fishman, Equestology, 2565 South Ocean Boulevard,

24   Highland Beach, Florida.

25           MR. FASULO:  Can you please up Government Exhibit

1    4022.

2    Q.  Mr. Folensbee, are these a stack of labels that you

3    photographed at the searched premises?

4    A.  Yes.

5    Q.  Can you describe that in general?

6    A.  These are some of the labels that were used to placed onto

7    the vial?

8              MR. FASULO:  Objection.

9              THE COURT:  Sustained.

10   Q.  Sir, did you take photographs of some of the vials that

11   were found at the search premises?

12   A.  Yes.

13   Q.  You've reviewed images of those photographs in preparation

14   for your testimony today, correct?

15   A.  Yes.

16   Q.  You also observed the bottles when you were asked --

17   A.  Yes.

18   Q.  Do you recognize any labels here from the items that you've

19   photographed or otherwise seized?

20   A.  Yes.

21             MS. MORTAZAVI:  Ms. Jung, I'd like to go through some

22   of the labels in a bit more detail.  If we could focus on the

23   second label from the top.

24   Q.  Mr. Folensbee, do you see the name Equestology on this

25   label?

1    A.   No.

2    Q.   Do you see any company name on this label?

3    A.   No.

4    Q.   I'd like to read out the line that appears on this label.

5    At the very bottom in white starting with the word

6    "proprietary"?

7    A.   Proprietary blends lends directives.

8    Q.   Next to the word "directions" go ahead and read what's on

9    this label.

10   A.   Intravenous use only, administer of 10 to 15 mils IV slowly

11   four to six hours prior to strenuous exercise.

12   Q.   This product is called what?

13   A.   Pain X.

14   Q.   Do you see an image on the left-hand side of this label and

15   this exhibit?

16   A.   Yes.  This is horse head.

17   Q.   What color is it and what color is the background so we're

18   clear for the record?

19   A.   Silver with black.

20           MS. MORTAZAVI:  Is we could go back to Government

21   Exhibit 4022 and focus on the label immediately below the one

22   we looked at.

23   Q.   Was is the name of this as listed on the label?

24   A.   HG Leader Plus.

25   Q.   Does there appear to be a company name here?

1    A.  Yes.

2    Q.  Could you read that out?

3    A.  SPP.

4    Q.  There's some text below that.  I know there's a bit of

5    glare.  Are you able to read any of those?

6    A.  I believe it's a specialized performance compound.

7    Q.  Can you describe the logo that appears around that

8    manufacturer name?

9    A.  Red, silver and green with a snake with wings around it.

10   Q.  Can you read out the directions that are listed on this

11   label?

12   A.  Administered 10 CC IV or IN five or six hours before

13   exercise.  This product contains no long test of long range.

14   Q.  I'd like you to take a look at the label immediately below

15   the one that we looked at.  What's the name of home product?

16   A.  Homeogesic.

17   Q.  Do you see a logo here?

18   A.  Yes.

19   Q.  Could you describe it?

20   A.  It's a silver and black horse head.

21   Q.  Do you see any manufacturer name on the label?

22   A.  No.

23   Q.  Do you see the word reflexology?

24   A.  No.

25   Q.  Could you read out the directions?

1   A.  Intravenous IV slowly four to six hours prior to exercise.

2   Q.  Again, the very bottom line of this label in white could

3   you read it out?

4   A.  Proprietary blends of amino assets.

5          MS. MORTAZAVI:  Ms. Jung, if we could focus on

6   immediately before that.

7   Q.  There appears to be there an image on this label; is that

8   correct?

9   A.  Yes.

10  Q.  What's the company name that's listed here?

11  A.  SPC specialized performance compound.

12  Q.  What's the name that appears for the associate with that

13  product?

14  A.  Homeopathic analgesic.

15  Q.  At the bottom, what's the writing in white text against a

16  blue background starting with --

17  A.  Administer intravenously also.

18          MR. FASULO:  Objection, judge.  There is more writing

19  here.

20          THE COURT:  That's fine.

21  Q.  Good.  Mr. Folensbee, if you could go ahead and read the

22  continuation of that last line?

23  A.  All right.  Www.spc/brand.com.

24  Q.  If we could go back to Government Exhibit 4022.  You've

25  looked at this before today?

1   A.   Yes.

2            MS. MORTAZAVI:   Ms. Jung, if we could now take a look

3   at 4023, please.

4   Q.   Tell us what we're looking at here if you would?

5   A.   Another stack of labels.

6   Q.   Looking at the very bottom labels, could us just describe

7   what we're looking at?

8   A.   A green write and red label with a black out line horse

9   head with the name SP brands.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. MORTAZAVI:  And looking eat the second label from

2     the top, Ms. Jung, if you could blow that up?

3     Q.  Mr. Folensbee, could you say out loud the letters at the

4     very top of this label in black?

5     A.  BPR.

6     Q.  And the portion of this after the directions that starts

7     with use, could you read that line?

8     A.  Use as directed by a veterinarian.

9          MS. MORTAZAVI:  All right.  Ms. Jung, if we could go

10    back to Government Exhibit 4302?

11    Q.  You've looked at this exhibit before today, correct?

12    A.  Yes.

13    Q.  Did you see Equestology written on these labels?

14    A.  No.

15         MS. MORTAZAVI:  Could you pull up 4024, Ms. Jung?  And

16    if we could again look at the second label from the top?

17    Q.  Mr. Folensbee, does this appear to be another label you

18    photographed the day of the search?

19    A.  Yes.

20    Q.  Could you read out the directions on the left-hand side of

21    this exhibit?

22    A.  Administer 5 to 10 MLs or IM or IV slowly four to six hours

23    prior to strenuous exercise.

24    Q.  In the middle of the page, could you describe what's

25    depicted on this label?

1   A.  The logo of a horse head with black outline named Equitech,

2   called PSDS pain shot DS.

3   Q.  Do you see the word Equestology here, sir?

4   A.  No.

5         MS. MORTAZAVI:  Ms. Jung, if we could go back to

6   Government Exhibit 4024 and look at the label we were looking

7   at before with Mr. Folensbee?

8   Q.  Does there appear to be a company or manufacturer name?

9   A.  Equitech.

10  Q.  Is that below a horse head logo?

11  A.  Yes.

12  Q.  Is that similar to several of the horse head logos we've

13  reviewed today?

14  A.  Yes.

15  Q.  What does the name of this product appear to be, according

16  to this label?

17  A.  Serenity.

18  Q.  And could you read the directions again?  There is a glare

19  on this particular photo, but to the best you can, if you can

20  read that into the record?

21  A.  Give 5 to 10 CC IV 24 hours, four hours before stressful.

22        MS. MORTAZAVI:  Ms. Jung, if we could pull up

23  Government Exhibit 4027, please?

24  Q.  Once again, Mr. Folensbee, is this a stack of labels you

25  took photos of?

 1  A.  Yes.

 2  Q.  Could you read the product label of the very bottom label?

 3  A.  Oxygenator.

 4  Q.  Could you read the directions?

 5  A.  Give 10 MLs intravenously 24 hours and four to eight hours

 6  prior to strenuous exercise.

 7  Q.  And to the left-hand side, do you see that there appears to

 8  be an image that's covered up with tape?

 9  A.  Yes.

10  Q.  And below that, do you see what looks like an e-mail

11  address -- or, I'm sorry, a website?

12  A.  Yes.

13  Q.  Could you read that out, please?

14  A.  Www.equi-science.com.

15  Q.  Thank you.

16          MS. MORTAZAVI:  If we could back to Government Exhibit

17  4027?

18  Q.  Again, does the word Equestology appear on any of these

19  labels?

20  A.  No.

21          MS. MORTAZAVI:  Ms. Jung, could we to go to Government

22  Exhibit 4028?

23  Q.  Mr. Folensbee, this appears to be an image of a number of

24  vials, of bottles; is that correct?

25  A.  Yes.

1  Q.  Can you read out the product name here?

2  A.  GNRH.

3  Q.  And there appears to be a logo on this label as well,

4  correct?

5  A.  Yes.

6  Q.  Could you describe it, please?

7  A.  A horse head.

8  Q.  The same horse head as the ones that we've reviewed

9  previously?

10  A.  Yes.

11       MS. MORTAZAVI:  Ms. Jung, can you pull up Government

12  Exhibit 4029?

13       Mr. Folensbee, is this a closer image of one of the

14  bottles we saw in the prior exhibit?

15  A.  Yes.

16       MS. MORTAZAVI:  Your Honor, at this time, I'd like to

17  read a stipulation into the record.

18       THE COURT:  You may.

19       MS. MORTAZAVI:  And once again, I'm going to skip the

20  preliminary portion.

21       And this is Government Exhibit 9012.

22       If called to testify at trial, law enforcement agents

23  with the Federal Bureau of Investigation would testify that on

24  March 9, 2020, law enforcement with the Federal Bureau of

25  Investigation conducted a search of the Golden Shoe Training

1  Center, a racehorse training facility, at street address 261

2  Bullville Road, Montgomery, New York 12549.  That's the

3  Bullville property.  Government Exhibits 1400 through 1413,

4  that's 13, and 9500 through 9505 are physical items, including

5  paper records, seized from the Bullville property at the time

6  of the search, or photographs fairly and accurately depicting

7  the Bullville property or photographs fairly and accurately

8  depicting items taken during the search of the Bullville

9  property.

10           On March 9, 2020, law enforcement agents with the

11  Federal Bureau of Investigation conducted a search of the

12  Mount Hope Training Center, a racehorse training facility, at

13  street address 335 Guymard Turnpike, Middletown, New York

14  10940.

15           Government exhibits 1500 through 1511 and 9600 through

16  9604 are physical items, including paper records, seized from

17  the Guymard property at the time of the search, or photographs

18  fairly and accurately depicting the Guymard property or

19  photographs fairly and accurately depicting items taken during

20  the search of the Guymard property.

21           On March 9, 2020, law enforcement agents with the

22  Federal Bureau of Investigation conducted a search of the

23  residence of Jorge Navarro at street address 10477 Southwest

24  49th Place Cooper City, Florida 33332, the 49th Place property.

25  Government Exhibit 1220 is a photograph fairly and accurately

1    depicting an item taken during the search of the 49th Place
2    property.  Government Exhibit 9203 is a physical item seized
3    from the 49th Place property.
4             On or about March 14, 2019, law enforcement agents
5    with the Federal Bureau of Investigation conducted a search of
6    a horse barn used by Christopher Oaks at street address
7    121 Bald Mountain Road, bear Creek Village, Pennsylvania 18702,
8    the Bald Mountain property.  Government Exhibits 1100 through
9    1128 and 9300 through 9311 are physical items, including paper
10   records, seized from the Bald Mountain property at the time of
11   the search, or photographs fairly and accurately depicting the
12   Bald Mountain property or photographs fairly and accurately
13   depicting items taken during the search of the Bald Mountain
14   property.
15            And it's further stipulated and agreed by and between
16   the parties that the aforementioned government exhibits and
17   this stipulation may be received in evidence at trial.
18            So, your Honor, the government offers Government
19   Exhibit 9012 and the exhibits referenced within.
20            MR. FASULO:  By stipulation, Judge.
21            THE COURT:  The stipulation itself is admitted into
22   evidence, as are all of the exhibits referenced in that
23   stipulation.
24            (Government's Exhibit 9012 received in evidence).
25            MS. MORTAZAVI:  Thank you, your Honor.

1              Ms. Jung, could you please pull up Government Exhibit

2     1405?  This is a photograph of one of the items seized from the

3     search of the Bullville property, the Golden Shoe Training

4     Center, which is a racehorse training facility on March 9th

5     20th, 2020.

6              Could we pull up alongside 1405 Government Exhibit

7     4029, which, again, is a photograph that Mr. Folensbee took

8     during the premises search of the property in Florida.

9     Q.  Mr. Folensbee, looking at Government Exhibit 1405 on the

10    left-hand side of your screen, can you read out the portions of

11    this label that are legible in large font at the very top?

12    A.  Yes.  GNR.

13    Q.  Okay.  And underneath directions, could you go ahead and

14    read out the portions that are legible?

15    A.  Reconstitute with 20 MLs bacterias each ML contains 50

16    micrograms or IV as prescribed by veterinarian.

17    Q.  Thank you.

18              And looking at these two exhibits side by side, do

19    they both have labels with green backgrounds?

20    A.  Yes.

21    Q.  Do they both have the labels GNR?

22    A.  Yes.

23    Q.  Do they both have silver and green caps?

24    A.  Yes.

25              MS. MORTAZAVI:  Ms. Jung, can you please pull up two

1  exhibits side by side, that's Government Exhibit 4029, which we

2  were just looking at, and Government Exhibit 1507, which is an

3  item that was seized from the search of the Mount Hope

4  premises, which is another racehorse training center.

5  Q.  And focusing on Government Exhibit 1507 for one minute,

6  Mr. Folensbee, can you read the large block letters at the top

7  of this label?

8  A.  GNRH.

9  Q.  And the directions, whichever portions you can read given

10  the glare?

11  A.  Reconstitute with 20 MLs bacteriostatic.  Each ML contains

12  50 micrograms GNRH, or IV as prescribed by veterinarian.

13  Q.  Does this label have a purple background, sir?

14  A.  Yes.

15          MS. MORTAZAVI:  Ms. Jung, going back to the two

16  exhibits in their entirety.

17  Q.  Does Government Exhibit 507 appear to have a silver and

18  green cap, Mr. Folensbee?

19  A.  Yes.

20  Q.  Is that similar, if not identical, to the cap in Government

21  Exhibit 4029?

22  A.  Yes.

23          MS. MORTAZAVI:  Ms. Jung, you can go ahead and take

24  those down and pull up government Exhibit 4039, 4040, 4041?

25  Q.  Mr. Folensbee, for the record, are these all images of the

1   same bottle you photographed from different angles?

2   A.  Yes.

3   Q.  Looking at Government Exhibit 4039, can you just describe

4   for the record what image is depicted here?

5   A.  A vial with clear liquid with the label SPC, Specialized

6   Performance Compounds, with a red cap.

7   Q.  Is there a logo that shows wings and a snake?

8   A.  Yes.

9   Q.  All right.  Looking at Government Exhibit 4040 for a

10  moment, can you read the portions of this label that you can

11  recognize given the angle?

12  A.  Anti-something pain block.  Directions, administer 5 TC IV

13  or ingredients --

14  Q.  Sir, I'll stop you there.  Thank you.

15          MS. MORTAZAVI:  Ms. Jung, if we could go back to those

16  three images.  And, in fact, Ms. Jung, please take these down.

17  If you could pull up Government Exhibit 4042, 4043, and 4044?

18  Q.  Mr. Folensbee, for the record, Government Exhibits 4042,

19  4043, are they the same bottle from different angles that you

20  photographed the day of the search?

21  A.  Yes.

22  Q.  Looking at Government Exhibit 4042, there appears to be an

23  image depicted on this label; is that correct?

24  A.  Yes.

25  Q.  And can you describe that image for the record?

1    A.   A red, white, and blue snake with wings surrounding it with

2    the letters SPC.

3         MS. MORTAZAVI:   Okay.   And then Government Exhibit

4    4043, Ms. Jung?

5    Q.   Mr. Folensbee, could you go ahead and read into the record

6    the portion of this label that are visible?

7         MR. FASULO:   Judge, I'm going to object at this point.

8    May I approach?

9         THE COURT:   May you approach?   Is that what you said?

10        MR. FASULO:   I have an objection, Judge.

11        THE COURT:   On the grounds?

12        MR. FASULO:   The item speaks for itself.   It's not

13   visible to see the entire thing.   It's misleading to the jury.

14   They did look at it and ascertain what value it has.

15        THE COURT:   They are in evidence, Ms. Mortizavi.

16        MS. MORTAZAVI:   Yes, your Honor.   All we want to do is

17   read it into the record.   It's not anything beyond what is

18   visible in the photo.

19        THE COURT:   Can you display the photos, though?   You

20   don't need a witness sitting on the stand to just read into the

21   record what's on these exhibits.

22        MS. MORTAZAVI:   Certainly, your Honor.

23        Ms. Jung, if you could take these down and pull up

24   Government Exhibits 4016 and 4017?

25   Q.   Mr. Folensbee, once again, are these photographs that you

```
 1    took during the search of the same bottle from different
 2    angles?
 3    A.  Yes.
 4           MS. MORTAZAVI:  All right.  I'd like to take down
 5    these photos for a moment, Ms. Jung, and shift to asking you
 6    some questions, Mr. Folensbee.
 7           Ms. Jung, if we could please pull up -- just one
 8    moment, your Honor.  My apologies.
 9           THE COURT:  No problem.
10           MS. MORTAZAVI:  Government Exhibit 307, which, for the
11    record, is a document that was produced by the company
12    Equestology.
13           Ms. Jung, could you please focus on the middle portion
14    of the page?  I'm sorry slightly higher than that.  If we could
15    focus on the lower-in chain e-mail.  Thank you.
16           And, your Honor, I'm happy to either read it into the
17    record myself or give the jurors a few minutes to read this
18    into the record.
19           THE COURT:  You can read it in.  Whichever you prefer.
20           MS. MORTAZAVI:  Thank you, your Honor.
21           THE COURT:  This is in evidence, right?
22           MS. MORTAZAVI:  Correct, your Honor.  This is a
23    document produced by Equestology from Mary Fox.
24           Sent Wednesday January 4, 2017, to Seth Fishman,
25    SethFishman@hotmail.com.  Subject, Lisa needs descriptions to
```

1    sell more of this product for you and any other new items you

2    are considering.

3           I also need a short explanation, endorse his terms

4    about his new products..if he wants to open the door to them,

5    he needs them to be able to ask and understand the product..

6           And for the record, I'm reading from the very top line

7    of Government Exhibit 307 from Seth Fishman to Mary Fox sent

8    January 4, 2017, cc Lisa Ranger, Equestology@gmail.com.

9           Ms. Jung, if we can go back to the entirety of

10   Government Exhibit 307, and if you could focus on the following

11   page, modified growth factor.

12          Your Honor, I'm going to read this into the record.

13          Modified growth factor for muscles, the peptide was

14   studied for years, and the human version contains a carry

15   molecule that is easily detected.

16          I'm skipping a line here.

17          The peptide specifically targets damaged muscle tissue

18   and accelerates healing.  Some have noticed increased RBCs

19   using the product.  I cannot recommend using within four days,

20   but there are some using the day before for tie up horses.

21   Since the molecule is altered, the labs could never detect

22   unless a snitch tuned a bottle in, and the racing authorities

23   decided to make a test.  This is highly unlikely, but a

24   possibility.

25          Ms. Jung, could we please go back to the first page of

1      this exhibit?

2             And, your Honor, I'm not going to read the entirety of

3      this record, but there are certain portions of this that I'd

4      like to read out now.

5             Heptamo B12, which is followed by a paragraph of text.

6      PSDS.  Ms. Jung, no need to focus on that portion of it.  Thank

7      you.

8             PSDS with some text that follows, LC 200 with some

9      text that follows, homeogesic with text that follows, and EGH.

10     Ms. Jung, if you could focus on EGH for a moment, Ms. Jung?

11            I'm going to read a portion of this into the record,

12     your Honor.

13            DHEA at the highest concentration and the source was

14     not cheap, so I based but synthesized.  DHEA is a prohormone

15     that is predominantly used in human athletes to increase

16     testosterone levels.

17            Ms. Jung, you can take down this exhibit.  I'm going

18     to ask you to pull up Government Exhibit 4005.

19     BY MS. MORTAZAVI:

20     Q.  Going back to the search you conducted on October 28,

21     2019 -- let me correct myself.  The search that you

22     participated in where you were photographing items that other

23     people were seizing, was this taken from that search that day?

24     A.  Yes.

25     Q.  Can you describe what this image shows?

1  A.  It's one of the draws inside one of the refrigerators

2  containing vials labeled ITP.

3       MS. MORTAZAVI:  Ms. Jung, can you display Government

4  Exhibit 132AT, please?

5       And I'm going to direct the jurors to their binders if

6  they'd like to follow along in hard copy.  It would be

7  tab 132AT.

8       THE COURT:  Are you going to be playing a recording?

9       MS. MORTAZAVI:  Yes, your Honor.

10      THE COURT:  Mr. Lee, can you just turn that speaker so

11  it faces towards the jury?  I noticed earlier it seemed a

12  little hard to hear the recording.  Thank you.  And I'll give

13  the jurors a moment to find their place.

14      MS. MORTAZAVI:  If anyone is still searching, it's tab

15  132AT.

16      For the record, while the jurors are finding their

17  place, this is an intercepted wire call between Seth Fishman

18  and Richard Silverman from April 17, 2019.

19      THE COURT:  Okay.  It looks like we're ready.

20      MS. MORTAZAVI:  Ms. Jung, can you please play

21  Government Exhibit 132AT?

22      (Audio played)

23      MS. MORTAZAVI:  Before the jurors put their binders

24  away, I ask Ms. Jung pull up Government Exhibit 143CT.  If the

25  jurors can turn to the tab in their binders, if they'd like to

1  follow along, this is an intercepted call between three

2  individuals, Seth Fishman, John Pundyk, Geoff Vernon from

3  June 12, 2019.

4          I believe everyone has found their place.  If you

5  could please play Government Exhibit 143C?

6          (Audio played)

7          MS. MORTAZAVI:  Ms. Jung, if you could take down those

8  exhibits, and I ask you to pull up Government Exhibits 4006,

9  4007, 4008, and 4009.

10  BY MS. MORTAZAVI:

11  Q.  Mr. Folensbee, are these photographs that you took during

12  the search that you described?

13  A.  Yes.

14  Q.  Looking at the left-hand side of your screen, which is

15  Government Exhibits 4006 and 4007, are these two different tubs

16  filled with multiple vials?

17  A.  Yes.

18  Q.  And 4006 has a label on it.  Could you just read that into

19  the record, please, sir?

20  A.  Serenity Plus.

21  Q.  And the bottom label, does that read Serenity?

22  A.  Yes.

23  Q.  Looking to the left-hand side of the screen, that's

24  Government Exhibits 4008 and 4009, are these two different

25  angles -- photographs of the same bottle taken from two

1    different angles?

2    A.  Yes.

3           MS. MORTAZAVI:  Okay.  And, Ms. Jung, is there a way

4    for us to focus just on Government Exhibits 4008 and 4009,

5    please?

6           All right.  And, your Honor, I'm going to read into

7    the record what's written next to directions on the label for

8    this item, which is labeled Serenity.

9           Give 5 to 10 CC IV 24 hours and four hours before

10   stressful event.  Ingredients proprietary sugars and amino acid

11   blend.

12          Ms. Jung, if you could please pull up Government

13   Exhibit 1368T and prepare Government Exhibit 136A.

14          And, again, the jurors can follow along on their

15   screens or in their binders by turning to that tab.

16          For the record, this is a call between Lisa Giannelli

17   and Nicholas Devita that took place April 23rd, 2019.

18          Ms. Jung, if you could please play government exhibit

19   136AT?

20          THE COURT:  Ms. Mortizavi, would you find a convenient

21   breaking time?

22          MS. MORTAZAVI:  This is actually a convenient breaking

23   time, your Honor.

24          THE COURT:  We are going to take out afternoon break

25   down.  If you can please leave everything on your seats and do

1    not talk about the case.

2              Sir, you remain under oath, so please don't discuss

3    your testimony with anyone during the break.

4              All right.  I'll see everyone back at 3:00 o'clock.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   (Jury not present)

 2                   MS. MORTAZAVI:  Could I address the issue relating to

 3      Mr. Fasulo's question?

 4                   THE COURT:  Let's do it when we come back at 3:00.

 5                   MS. MORTAZAVI:  Thank you, your Honor.

 6                   (Recess)

 7                   THE COURT:  Ms. Mortazavi.

 8                   MS. MORTAZAVI:  Your Honor --

 9                   MR. FASULO:  She's in the conference room.

10                   THE COURT:  Okay.

11                   MS. MORTAZAVI:  Your Honor, may I stand at the podium?

12                   THE COURT:  Sure.  No problem.

13                   MR. FASULO:  We're ready.

14                   MS. MORTAZAVI:  The break was instructive in what

15      Mr. Fasulo and I discussed.  I wanted to clarify the basis of

16      his objection previously because I misunderstood it, and he was

17      able to clarify.

18                   Even though I had been asking the witness to just read

19      the portion that was legible, I believe I asked him that

20      multiple times, he appeared to be reading portions that were

21      not visible, and plaintiff was objecting to that.  I clarified.

22      He does not object to the witness reading into the

23      record Government Exhibits which have already been admitted,

24      which is what I intend to do next.

25                   MR. FASULO:  I have no objection reading testimony, et
```

1    cetera.  She's going with everything, and we talked about that

2    earlier.  However, on some of the photographs, to be honest, I

3    think it's wasting the jurors' time.  The photographs speak for

4    themselves, and the witnesses struggle to read the words.  You

5    can see the words and let the jurors see themselves.  For

6    those --

7              THE COURT:  I thought that's what you were saying.

8              MR. FASULO:  That's what I am saying.

9              In terms of what we were clarifying in terms of being

10   able to read parts of testimony or have the witness read parts

11   of testimony, I understand that's the objective how they want

12   to get a stipulated transcript in.  I still have that objection

13   to --

14             THE COURT:  Well, I mean, you're going to have to make

15   the objection if it comes up again.  But, Ms. Mortazavi, the

16   point is at a certain point it becomes cumulative to just have

17   the witness keep reading from label after label that is in

18   evidence and the jurors can see the photograph, and secondly,

19   pieces of it are not legible, so he's reading one line and

20   picking up on the next line and missing all the words that are

21   off the photograph on the right-hand side.  It's creating kind

22   of a confusing record.

23             So my sustaining of the objection was really on the

24   grounds that it's just all cumulative, and to some extent a

25   little bit misleading, with respect to the photographs.

1          MS. MORTAZAVI:  Not an issue, your Honor.  And I just

2    wanted to make sure that we were all clear as to the basis for

3    the objection, because I -- and I previewed for Mr. Fasulo.  I

4    do plan to go through some of the admitted exhibits that are

5    e-mails and text messages.  I will ask the witness to read

6    portions, I will read portions.  But that's how we intend to

7    proceed.  I understand Mr. Fasulo is saying that's fine.

8          MR. FASULO:  That's fine.

9          THE COURT:  Thank you.  And if he has objections, I'll

10   raise them and I'll rule.

11         MS. MORTAZAVI:  Very good.

12         THE COURT:  Are we all ready to move?

13         MS. MORTAZAVI:  Yes.

14         THE COURT:  Mr. Lee, if you can bring in the jurors?

1                (Jury present)

2                THE COURT:  All right.  Please be seated, everyone.

3     And, sir, you remain under oath.

4                THE WITNESS:  Yes, ma'am.

5                THE COURT:  Ms. Mortizavi.

6                MS. MORTAZAVI:  Thank you, your Honor.

7     BY MS. MORTAZAVI:

8     Q.  Mr. Folensbee, are you familiar with a concept of a case

9     agent?

10    A.  Yes.

11    Q.  What is that, as you understand it?

12    A.  That is a special agent that is in charge of the case that

13    they're working -- they oversee all -- parts of the

14    investigation.

15    Q.  You mentioned previously you're not a special agent with

16    the FBI, correct?

17    A.  Correct.

18    Q.  And so you are not the case agent for this investigation,

19    correct?

20    A.  Correct.

21    Q.  And apart from taking photographs during the search that

22    you've discussed in your testimony today, did you have any

23    other involvement into this investigation?

24    A.  No.

25    Q.  Mr. Folensbee, I'd like to review some records into the

1   record solely for the purpose of having you read it into the

2   record.

3            MS. MORTAZAVI:  Ms. Jung, can you please display

4   government exhibit 332A?

5   Q.  This is a document produced by the company Equestology, and

6   it appears to be an e-mail.  Could you please read the name,

7   not the e-mail address, just the name from from line and the to

8   line, and then please read the date?

9   A.  From Lisa Ranger to Mary Fox, sent Friday, February 10,

10  2017.

11  Q.  What's the subject line?

12  A.  More supplies needed.

13           MS. MORTAZAVI:  I'm going to be reading from portions

14  of this exhibit, your Honor.

15           This is the body of the e-mail:  On our last phone

16  conversation, I had asked if in the future the homeopathic

17  bleeder can be send directly here.  Is that in motion?  I will

18  be needed more in a very short time.  Where is he on the

19  powdered ACTH?  I will need that whenever you have it

20  available.

21           Did he get the silver top EQ order in?  Approximately

22  when will that be available?  I received 134 FHS iron sucrose I

23  will need labels for please.  Also, I will be needed folic 5X

24  here in a few months.  Not sure if that's been added to the

25  list of products to make.  More items.  NPX new and old

1    version.  As many bleeder pills as he can get.  Again, mind as

2    well send to me versus storage down there.

3              Ms. Jung, can you please pull up Government Exhibit

4    329?  This is yet another record that was produced by the

5    company Equestology.

6    Q.  And, Mr. Folensbee, this appears to be a lower in chain

7    e-mail and a higher in chain e-mail, is that roughly accurate?

8    A.  Yes.

9    Q.  Looking at the lines below forwarded message, can you read

10   the from, the date, the subject, and to?

11   A.  From Lisa Ranger, Wednesday, February 22, 2017, subject,

12   new order to Mary Fox.

13   Q.  I'm going to go ahead and --

14             MR. FASULO:  Objection, your Honor.  This has already

15   been entered in and read to the jury, this exhibit number,

16   through Agent Bush.  We're just going to read it again?

17             THE COURT:  Is that true?

18             MS. MORTAZAVI:  Yes, your Honor.

19             THE COURT:  All right.  The objection is sustained on

20   the grounds that it's cumulative.

21             MS. MORTAZAVI:  Not a problem, then.

22             I ask, Ms. Jung, please pull up Government Exhibit

23   319E.

24             Once again, for the record, this is a document that

25   was produced by the company Equestology.  This was once

1   again -- this is an e-mail thread with a lower in chain e-mail

2   and a higher in chain e-mail.

3   Q.  Mr. Folensbee, could you please read the from, date,

4   subject, and to lines underneath forwarded message in the

5   middle of the page?

6   A.  From Lisa Ranger, Wednesday, June 21, 2017, to Mary Fox,

7   subject, follow-up.

8           MS. MORTAZAVI:  I'm going to read portions of the body

9   of this e-mail into the record.

10          I need a few things from down there.  One, how are you

11  doing on getting the label for the pentosan 80, in parentheses,

12  and the acetylcysteine, 300 in parentheses.  Two, I also still

13  need the PG2 and the Serenity on the list from the purchase

14  order I sent you on May 26.  Three, I sent another purchase

15  order today for 20 more regular omeprazole ASAP, please.  Four,

16  there was also the purchase order for the iron sucrose order

17  that needs to be filled.  Five, send whatever else doc is

18  working on and might want this area to have.

19  Q.  And then, Mr. Folensbee, at the very top of the page, do

20  you see there's an e-mail that was sent later than the one I

21  just read into the record?

22  A.  Yes.

23  Q.  Can you go ahead and read the from, sent, to, and subject

24  line?

25  A.  From Lisa Ranger, sent Wednesday, June 28, 2017, to

1   Seth Fishman, subject forward, follow-up.

2          MS. MORTAZAVI:  And I'll go ahead and read into the

3   record the body of this e-mail.  This e-mail from the 21st went

4   to you also.  I've since received the PG2 and Serenity,

5   parentheses, just got it yesterday, with yesterday in all caps,

6   but still need the iron, labels, and rest of the omeprazole, in

7   parentheses, she sent me six bottles with the PG2 and Serenity.

8          Ms. Jung, can you please take down this exhibit?

9   Please pull up Government Exhibits 4010 and 4011.

10  Q.  Are these, again, two photographs of the same bottle that

11  you took during your search of the premises?

12  A.  Yes.

13         MS. MORTAZAVI:  For the record, I'll read out the

14  large text on this bottle, which is Pain Three X.

15         Thank you, Ms. Jung.

16         If we can take these down, Ms. Jung, and pull up

17  Government Exhibit 4034 and 4035?

18  Q.  Are these photographs you took of vials that were observed

19  by you during the search?

20  A.  Yes.

21  Q.  Looking at the left-hand side of the screen,

22  Government Exhibit 4034, do you see that collection of three

23  bottles and four boxes next to it?

24  A.  Yes.

25  Q.  And those are labeled Equitosan, correct?

1   A.  Yes.

2   Q.  Looking at Government Exhibit 4035, does that appear to be

3   the front image of one of those four packages?

4   A.  Yes.

5   Q.  Thank you, sir.

6          MS. MORTAZAVI:  Ms. Jung, can we please pull up

7   Government Exhibit 309?  This was another e-mail sent from the

8   company Equestology.

9          If we can focus on the middle of the page, the second

10  instance we see the line, from, and if you can take that entire

11  header information and the black text that follows?

12         Thank you very much, Ms. Jung.

13  Q.  Mr. Folensbee, can you read once more the from line, the

14  sent line, the to line, and the subject line?

15  A.  From Lisa Ranger sent Friday, January 4, 2019, to

16  Seth Fishman, subject, simple terms.

17  Q.  And could you read the black text, the three lines here

18  starting with let's try this?

19  A.  Let's try this, simple terms, please input for pain, tie

20  up, attitude, inflammation, et cetera.  I know you gave

21  description, but I need a one-word blip to catch their

22  attention without me suggesting or telling them.  That way they

23  will question, then ask you or me about it.

24         MS. MORTAZAVI:  Ms. Jung, if you could go back to the

25  original Government Exhibit 309 and blow up the top portion?

1    Thank you very much.

2              (Continued on next page)

 1

 2          MS. MORTAZAVI:  Thank you very much.

 3   Q.  Once again, Mr. Folensbee, if you could read the "from

 4   line", the "sent line", the "to line" and then the body of this

 5   email.

 6   A.  From Seth Fishman, sent Saturday, January 5, 2019, to Lisa

 7   Ranger.  Please, see below.

 8          MS. MORTAZAVI:  All right.  Ms. Jung, if we could

 9   focus on red text with the black text beside it for a moment.

10   Thank you.

11   Q.  I am going to read out, your Honor, some of these names

12   though I'm not going to be reading the entirety of what's

13   displayed in Government Exhibit 309.

14          THE COURT:  All right.

15          MS. MORTAZAVI:  GNRH factrel androgenic hormone ITTP

16   plus increased oxygen release in blood.

17          TB7 accelerated tissue repair especially lung tissue.

18          Oxygenatore increased oxygen release in blood.

19          EGH increases testosterone.

20          Homeogesic natural analgesic painkiller.

21          PSDS natural analgesic painkiller.

22          BB3 long acting blood builder.

23          Would only let trusted clients have this.

24          ACTH, in small doses will act as natural

25   antiinflammatory larger doses 2C or more.  Sedation.

1          At the bottom, serenity, sedation.

2          Ms. Jung, you can take this exhibit down.  Thank you.

3          Could you please, Ms. Jung, pull up Government Exhibit

4  1412, which is a photograph of an item that was seized during

5  the premise search of the Golden Shoe Training Center which is

6  a racehorse training facility.

7          Going to give the jurors a moment just to look at this

8  label.

9          If you could please now pull up Government Exhibit 320

10  F I.

11          That once more is a record that's produced by the

12  company Equestology.

13          Ms. Jung, if you could focus on the July 22, 2017

14  message sent at 2:03 P.M.

15          I am going to give the jurors a moment to look at

16  this, your Honor.  And for the record, there appears to be a

17  gray bubble on the left-hand side of the screen on top of that

18  in blue text is the following:

19          Lisa Ranger cell 302-222-2220.

20  Q.  Mr. Folensbee, below is a July 22, 2017 message.  Do you

21  see a message July 24, 2017 sent at 9:05 P.M. from that same

22  contact name and number that you just read out?

23  A.  Yes.

24  Q.  Could you read the text that appears in the gray bubble on

25  the left-hand side of the screen starting with "question from

1    client"?

2    A.   Question from client, can you text that so I can forward it

3    to him forward.  This power block, how far out do I inject with

4    it and does it test MPA and how long does it last?  Do you know

5    offhand?  Thank you.

6         MS. MORTAZAVI:  And for the record, the bottom

7    right-hand side of the screen is a green bubble, appears to be

8    a text message sent July 24, 2017 at 9:07 P.M. blue text

9    underneath that timestamp reads Seth AA with a number that

10   follows.

11   Q.   And in that green message in white text, Mr. Folensbee,

12   could you go ahead and read what is displayed there.

13   A.   I would suggest using it two to three days out because it

14   burns.  It will not test anywhere.  Depending on how about bad

15   the joint is, it can last up to three weeks.

16        (Pause)

17        MS. MORTAZAVI:  Could we please pull up Government

18   Exhibit 319-M as in "Mary".

19        And for the record, this is a document that was

20   produced by the company Equestology.

21   Q.   Mr. Folensbee, looking at the top of this email, could you

22   once more read the 'from' line the "sent" line, the "to" line?

23   A.   From Lisa Ranger sent Tuesday May 24, 2016 to Mary Fox.

24   Q.   And I want to read the portion of the body of the email,

25   not the entirety of exhibits.  It would sell more but more

1   people need to know it exists.  If you could write a short

2   description of each of the new products below in understandable

3   layman's terms it would help his case tremendously, and then a

4   smiley emoticon.  Product NPX power block help tam and amblock,

5   EPM double kill.  In lower case, it's a great seller but a

6   description could make get it there more and have even greater

7   sales.

8           Ms. Jung, if we could take down this exhibit and

9   please pull up Government Exhibit 319-G.

10          For the record this is another document that was

11  produced by the company Equestology.

12  Q.  Mr. Folensbee, could you read the "from" line, the "sent"

13  line and "to" line that appears on this exhibit?

14  A.  From Lisa Ranger, sent Thursday, June 23, 2016, to Seth

15  Fishman.

16  Q.  And subject line please, sir?

17  A.  New products that need short description and uses.

18  Q.  I am going to read the first line that appears on the body

19  of this e-mail.

20          Write a short description of each of the new products

21  below in understandable layman's terms.  It would help his

22  sales tremendously.  Smiley face emoticon.  Then there are a

23  list of products that follow.  The last item EPM double kill

24  with a line.  It's a great seller but a description could make

25  it get it there more and have even greater sales.

1        Could we please take down and pull up Government

2   Exhibit 332-N as in "Nancy" which is once again for the record,

3   a document produced by Equestology.  And could you please

4   expand the very top of this exhibit, Ms. Jung, as you are

5   doing.  Thank you very much.

6        Mr. Folensbee, if you could read the "from", "sent"

7   and "to" lines here?

8   A.  From Lisa Ranger, sent Monday, December 19, 2016 to Mary

9   Fox.

10  Q.  I am going to read portions of the body of this email just

11  a reminder to keep on doc about making more folic.  I will need

12  that before February, with February in bold.  I also need a

13  short explanation in horseman's terms about his new products...

14  if you wants to open the door to them, he needs them to be able

15  to ask and understand the product...

16        And finally, Ms. Jung, could you take down this

17  exhibit and please pull up Government Exhibit 319-U, once again

18  a record produced by Equestology.

19        Ms. Jung, if you could focus on the middle portion

20  that appears to be in a different font from the top portion

21  underneath the line original message, just the first few lines

22  in that email.

23        Thank you, Ms. Jung.

24  Q.  Mr. Folensbee, if you could read the "from" line, the "to"

25  line and the "subject" line, as well as the "sent" line.

1    A.   From Mary Fox, sent Wednesday, January 4, 2017 to Seth

2    Fishman.   Subject, Lisa needs descriptions to sell more of this

3    product for you and any other new items you are considering.

4               MS. MORTAZAVI:   I am going to read the first few lines

5    of the body of this e-mail.   I also need a short explanation in

6    horseman's terms about his new products.   If he wants to open

7    the door to them he needs them to be able to ask and understand

8    the product...

9               With that I have no further questions for this

10   witness, your Honor.

11              THE COURT:   All right.   Thank you.

12              Mr. Fasulo, cross?

13   CROSS-EXAMINATION

14   BY MR. FASULO:

15   Q.   Agent Folensbee --

16              MS. MORTAZAVI:   Objection.

17   Q.   Mr. Folensbee, you went only to the Florida property; is

18   that correct?

19   A.   That is correct.

20   Q.   And those photographs that you took were of the Florida

21   property?

22   A.   Correct.

23   Q.   Did you learn whose property that was that you appeared to

24   the day of the search?

25   A.   Yes.

1   Q.  Whose property was that?

2   A.  Seth Fishman's.

3   Q.  And at the time that you arrived there, who was at that

4   property?

5   A.  FBI and FDA personnel.

6   Q.  Anybody else other than FBI or agents?

7   A.  Not to my knowledge.

8   Q.  And Ms. Ranger, Ms. Gianelli, she wasn't at that property

9   that day, right?

10  A.  Not to my knowledge.

11  Q.  You also were asked to read some transcripts into the

12  record here today, correct?

13  A.  Yes.

14  Q.  And those were not part of your investigation, correct?

15  A.  Correct.

16  Q.  Other than reading them here, you had no other dealings

17  with those particular transcripts, correct?

18  A.  Correct.

19          MR. FASULO:  Nothing further, judge.

20          Thank you.

21          THE COURT:  Thank you.

22          MS. MORTAZAVI:  Thank you, your Honor.  And we have no

23  further questions for this witness.

24          THE COURT:  All right.  Sir, you are excused with the

25  thanks of the Court.  Have a good rest of the day.

1           Your next witness?

2           MS. MORTAZAVI:  Prior to calling our next witness,

3   your Honor, we would like some of the intercepted calls into

4   the record.

5           THE COURT:  All right.  You may do that.

6           MS. MORTAZAVI:  Thank you, your Honor.

7           Going to ask Ms. Jung to please display Government

8   Exhibit 128-AT.

9           THE COURT:  These are all in the jurors' binders?

10          MS. MORTAZAVI:  Yes.  If they would like to turn to

11  that tab in their binder and I'll ask Ms. Jung to prepare

12  Government Exhibit 128.

13          And, your Honor, if it's all right I'll step to the

14  podium.

15          THE COURT:  Yes.  And you can take your mask off when

16  you are at the podium.

17          MS. MORTAZAVI:  Thank you, your Honor.

18          For the record this is an intercepted call between

19  Seth Fishman and an unidentified male on April 5, 2019.

20          Ms. Jung, it appears everyone has found their place.

21          Yes?

22          If you could please play Government Exhibit 128-A.

23          (Audio played)

24          MS. MORTAZAVI:  Your Honor, I have one more

25  intercepted call I'd like to play before we call our witness.

1          If the jurors would like to turn to tab 139-T and I'll

2    have Ms. Jung pull up 139-DT and prepare Government Exhibit

3    139-D.

4          I think the jurors have all found their place and

5    Ms. Jung could you play that call.  It's an intercepted call.

6    This is Mr. Fishman and Ms Giannelli speaking on June 4, 2019.

7          (Audio played)

8          MS. MORTAZAVI:  Your Honor, we're prepared to call our

9    next witness who is Ross Cohen.

10          THE COURT:  All right.  Thank you.

11   ROSS COHEN,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MS. MORTAZAVI:

16   Q.  Good afternoon, Mr. Cohen.

17   A.  Good afternoon.

18   Q.  Can you tell us how old you are, sir?

19   A.  I am 50-years-old.

20   Q.  Where did you grow up?

21   A.  I grew up in Long Island, New York, Windmere, New York.

22   Q.  Mr. Cohen, I am going to ask you to keep your voice up to

23   make sure everybody can hear you in the courtroom.

24          Where do you work currently, sir?

25   A.  I currently work in Montgomery, New York for Edenbrook.

1   Q.  What type of work are you engaged in?

2   A.  I sell agricultural and farm supply hays and shaving and

3   straw to farm and to retailers.

4   Q.  Prior to that, what did you do for work?

5   A.  I trained racehorses.

6   Q.  How long did you train racehorses for?

7   A.  Approximately, 30 years.

8   Q.  Did you attend college, Mr. Cohen?

9   A.  Yes.  I attended state university of New York in

10  Morrisville.

11  Q.  What did you study?

12  A.  Animal science.

13  Q.  When did you graduate?

14  A.  In 1991.

15  Q.  What did you do after you graduated from college?

16  A.  I worked as an assistant trainer and a groom for

17  standardbred racehorses.

18  Q.  Is assistant trainer different from a trainer?

19  A.  Yes.

20  Q.  Is there a point at which you became a trainer?

21  A.  Yes.  Approximately, 1994 I opened up my own public stable.

22  Q.  Did you have to get licensed in order to work as a trainer?

23  A.  Yes.

24  Q.  You mentioned you opened up your own public stable.  Where

25  was that?

1    A.   Yonkers Raceway, in Yonkers, New York.

2    Q.   In what state did you get your license?

3    A.   New York.

4    Q.   Who issued you your trainers license?

5    A.   At the time it's the New York State Racing and Wagering

6    Board which is now the New York State Gaming Commission.

7    Q.   And have you ever been licensed as a racehorse trainer in I

8    other states apart from New York?

9    A.   Yes.  I held a license in New Jersey.  I held a license in

10   Pennsylvania.  I held a license in Massachusetts.  I held a

11   license in New Hampshire.

12   Q.   Where were you primarily based over your 30-year career as

13   a race horse trainer?

14   A.   Primarily, in New York.

15   Q.   What responsibilities did you have as a trainer?

16   A.   As a trainer I had employees that worked for me that were

17   my responsibility.  I had horses under my care that were owned

18   partially by myself and with other owners.

19   Q.   You mentioned that you were partial owner of some of the

20   racehorses that you trained?

21   A.   Yes, correct.

22   Q.   Are trainers always partial owners of racehorses?

23   A.   Not all, no.

24   Q.   Did you train any horses that you didn't partially own?

25   A.   Yes.

1  Q.  And just for the sake of clarity, can you tell us how is a

2  trainer different from an owner?

3  A.  A trainer oversees the day-to-day activity exercise and

4  care, where an owner just basically is exactly that.  He owns

5  the horses.  He communicates with the trainer on the status of

6  the animals.

7  Q.  And as a licensed trainer in New York, were there rules

8  that you were required to follow?

9  A.  Yes.

10  Q.  Specifically, were there rules governing what drugs you

11  could give to the racehorses you trained?

12  A.  Yes.

13  Q.  And the drugs that you could not give the racehorses you

14  trained, correct?

15  A.  Yes.

16  Q.  What kind of racehorses did you train, Mr. Cohen?

17  A.  I trained standardbred racehorses.

18  Q.  What kind of horses were those?

19  A.  They're horses that have a cart behind them.  They are more

20  of a solid workhorse breed as opposed to thoroughbreds who are

21  more finer thinner bread.

22  Q.  You mentioned standardbreds are raced with a cart behind

23  them; is that right?

24  A.  Correct.

25  Q.  They don't have a person riding on the saddle on a

1  standardbred horse?

2  A.  No.  The driver, as they're called, sits in a cart behind

3  the horse.

4  Q.  You mentioned thoroughbreds, correct?

5  A.  Yes.

6  Q.  Can you just tell us how thoroughbreds race differently

7  than standardbreds?

8  A.  Thoroughbreds have a jockey on top of the horse in a saddle

9  sitting in the saddle.

10 Q.  Going back to your description of getting licensed as a

11 trainer in the state of New York, can you walk us through the

12 steps that you took to get your racehorse trainer's license for

13 the first time?

14 A.  You have to pass a written test with the United States

15 Trotting Association.

16 Q.  Mr. Cohen, what is the United States Trotting Association?

17 A.  They're a governing body for standardbred racing, harness

18 racing.

19 Q.  Do they operate in New York exclusively as you understand

20 it?

21 A.  No.  They're nationwide.

22 Q.  Are they sometimes known as the USTA?

23 A.  Right.

24 Q.  So you have to get some sort of license from the USTA?

25 A.  Yes.

1   Q.  Was that sufficient for you to race in New York?

2   A.  No.  You then need to fill out a license application and

3   submit it to the state and get approval.

4   Q.  Over the course of your 30-year career have you had to

5   review your trainer's license in the state of New York?

6   A.  Yes.

7   Q.  Approximately, how often do people have to renew their

8   trainer's licenses in New York?

9   A.  Sometimes annually.  Sometimes there's every three years.

10  Q.  Apart from trainers, are there other people involved in the

11  racehorse industry who have to be licensed?

12  A.  Yes.  Officials, grooms, assistant trainers, investigators

13  blacksmiths, vendors have to be licensed.

14  Q.  What are vendors?

15  A.  People that sell feed at the racetrack or equipment

16  otherwise known as "tack".

17  Q.  As far as you know who enforces those rules?

18  A.  The commission of each state enforces those rules.

19  Q.  And in New York States currently known as New York State

20  Gaming Commission; is that right?

21  A.  Correct.

22  Q.  As far as you are aware, Mr. Cohen, what steps, if any,

23  does the commission take in New York to try to catch people who

24  might be violating state racing rules?

25  A.  They have investigators that will patrol their facilities

1    and they also have post race testing of horses that compete and

2    have finished in a high position that have earned first lane.

3    Q.  "Post race" that means after a race, correct?

4    A.  Correct.

5    Q.  Okay, just to be clear.  Are there tests that are conducted

6    or can be conducted apart from post race?

7    A.  Yes.  Some states have out-of-commission testing where they

8    will travel to facilities where the annals are stabled at and

9    pull a blood sample.

10   Q.  Are those like random searches or -- I'm sorry -- random

11   drug tests?

12   A.  Yes.

13   Q.  And as far as you know, what are the possible penalties

14   that you could face if you give a drug to your racehorse in

15   violation of those rules?

16   A.  You will get suspended and possibly fined and the animal

17   will, the owner will have to return any sort of prize money

18   they received for the competition that they participated in.

19   Q.  Again, for sake of clarity, how is that prize money can be

20   won with a horserace?

21   A.  During the race the animal needs to finish in a top

22   position.  Usually, the top five positions in harness racing

23   pay a prize money to the owners.

24   Q.  Now you also testified that you were licensed in states

25   apart from New York, correct?

1   A.  Yes, correct.

2   Q.  And do each of those states have agencies that issue these

3   licenses?

4   A.  Yes, they do.

5   Q.  Are you generally familiar with each of the agencies that

6   issued you your license?

7   A.  Yes.

8   Q.  I'd like to ask you about some of those agencies that

9   issued you your trainer's license in those states.  Starting

10  with New Jersey, which commission or agency gave you your

11  license in that state?

12  A.  The New Jersey Racing Commission.

13  Q.  What about Pennsylvania?

14  A.  Pennsylvania Horseracing Commission.

15  Q.  What about Massachusetts?

16  A.  Massachusetts Racing Commission.

17  Q.  And each of the states that I just mentioned that you're

18  licensed, do those commissions also regulate what drugs you can

19  and cannot give to your racehorse?

20  A.  Yes, they did.

21  Q.  And as part of being licensed in each of those states, do

22  you have to have general familiarity of the racing rules in

23  each of those states?

24  A.  Yes.

25  Q.  Are the rules slightly different in each of those states?

1    A.  Slightly.

2    Q.  Are there some common rules that apply across all of the

3    states you're familiar with?

4    A.  Yes.

5    Q.  What about rules regarding giving drugs to horses the day

6    of a race?

7    A.  You're not allowed to give any drugs race day.

8    Q.  When you say "you're", who you are you referring to?

9    A.  Horsing care, trainer or even yourself, you're not allowed.

10   Any racing medication must be given by a veterinarian.

11   Q.  Just to be clear again, are trainers permitted to give

12   drugs to their racehorses on race day?

13   A.  No.

14   Q.  What about the rules on something called blood builders,

15   are you familiar with the term "blood builder"?

16   A.  Yes.

17   Q.  What is a blood builder?

18   A.  A blood builder is basically you know, it's basically

19   something that will build up the red blue cell count or

20   hemoglobin which will help produce healthy red blood cells that

21   carry oxygen throughout the horse's system.

22   Q.  Can that be performance enhancing?

23   A.  Yes.

24   Q.  Can you describe how?

25   A.  If you have a higher red blood cell or -- producing

1   healthier red blood cells and oxygen, the horse won't get

2   tired, won't go into oxygen debt as quick.

3   Q.  So you mentioned the horse won't get tired?

4   A.  Yes.

5   Q.  Have you heard of epigon.

6   A.  Yes.

7   Q.  What is it epigon?

8   A.  Epigon is a substance that will help increase the

9   production of red blood cells in an animal.

10  Q.  Is that a type of blood builder?

11  A.  Yes.

12  Q.  Are there other terms used to refer to either blood

13  builders or epigon?

14  A.  Epigon can be known as airiness or EPO or Procrit and other

15  blood builders.  I guess a lot of vitamins can increase the

16  production of red blood cells as well.

17  Q.  Epigon is not the only type of blood builder that exists,

18  correct?

19  A.  Correct.

20  Q.  Going back to each of the states in which you are licensed.

21  Do each of those states administer drug tests to racehorses?

22  A.  Yes.

23  Q.  I'd like to go back, Mr. Cohen, to the point at which you

24  became a full-time racehorse trainer and you mention that you

25  stabled your horses in Yonkers, New York, correct?

1    A.   Yes.

2    Q.   How long were you stabled in Yonkers?

3    A.   Till about 1997 for about three/four years.

4    Q.   Why did you leave Yonkers?

5    A.   I received a trespass letter from Monticello Raceway and

6    they subsequently informed Yonkers Raceway that I was no longer

7    allowed to race at Monticello and they felt that they should

8    abide the same way and asked me to leave.

9    Q.   And Monticello Raceway and Yonkers, are both those

10   racetracks?

11   A.   Yes.

12   Q.   Are those both racetracks in which you had entered horses

13   that were racing?

14   A.   Yes.

15   Q.   After you received the letter of removal what, if anything,

16   happened to your New York State trainer's license?

17   A.   Nothing.  I never got suspended before that.

18   Q.   Are those two racetracks run by the New York State Gaming

19   Commission.

20   A.   Yes.

21   Q.   Are they overseen by the New York State Gaming Commission?

22   A.   Yes.

23   Q.   Are they private property or government property?

24   A.   Private property.

25   Q.   Okay.  And so by getting removed from those tracks, is it

1  your testimony that it had no impact on your New York State

2  trainer's license?

3  A.  Correct.

4  Q.  Did you continue to race your horses after the letter of

5  removal?

6  A.  Yes.

7  Q.  In your name or someone else's name?

8  A.  Somebody else's name.

9  Q.  Where did you move your stable, if anywhere, after that

10  point?

11  A.  I moved to Big Z Farm in Mountain View, New Jersey.

12  Q.  Like to direct to you to the fall of 2001, a few years

13  after you moved to Big Z Stables, where were you living at that

14  time?

15  A.  I was living in Schwartzberg, New York, with Tom Guido.

16  Q.  Who is Tom Guido?

17  A.  He is a racehorse trainer.

18  Q.  How did you know him?

19  A.  We had just met, just friends, just being around the farms

20  and racetracks.

21  Q.  And at that time were you training racehorses?

22  A.  Yes.

23  Q.  Where were your racehorse horses stabled?

24  A.  At Mount Hope Training Facility.

25  Q.  Where is Mount Hope located, if you know, the city and,

1   well, obviously, the state?

2   A.   Otisville, New York.

3   Q.   Where were Guido's horses stabled at that time, if you

4   know?

5   A.   At Mount Hope Training Facility.

6   Q.   How long were you stabled at Month Hope Training Facility?

7   A.   Approximately, eight years.

8   Q.   While you were stabled there, in what racetracks did you

9   enter your horses in races?

10  A.   Yonkers Raceway, Meadowlands Racetrack, Monticello

11  Racetrack, Pocono Downs.  Those were primarily the places

12  raced.

13  Q.   At Mount Hope Training Center, were you and Mr. Guido the

14  only two trainers who stabled horses there?

15  A.   No.

16  Q.   Approximately, how many other people stabled horses there

17  starting with the fall of 2001?

18  A.   Oh, there was probably eight to ten other trainers there.

19  Q.   Did that change over time?

20  A.   It always fluctuated.

21  Q.   Are you familiar with someone called Rick Dane?

22  A.   Yes.

23  Q.   Who is that?

24  A.   He was a trainer that was stabled there.

25  Q.   Are you familiar with someone called Renee Allard?

1   A.  I know of him.

2   Q.  You don't know him personally?

3   A.  I've met him on occasion but not someone who is a friend.

4   Q.  Who is Renee Allard?

5   A.  He was one of the leading trainers in the country of

6   standardbred racehorses.

7   Q.  Have you heard the name "Rich Banca" and "Richie Banca"?

8   A.  Yes.

9   Q.  Who's that?

10  A.  He also was a racehorse trainer and was stabled at Mount

11  Hope.

12  Q.  Was he stabled a Mount Hope at the same time you were?

13  A.  For a briefer period, yeah.

14  Q.  At any time when you were, when your horses were stabled at

15  Mount Hope, did you encounter Lisa Ranger?

16  A.  Yes.

17  Q.  How did you come to meet Lisa Ranger?

18  A.  I originally just met her by being introduced to her on a

19  visit to Florida many years earlier to visit Tom Guido when he

20  was stabled at South -- Trotting Center.

21  Q.  What do you recall of that visit?

22  A.  She was working as his assistant for Dr. Fishman and it was

23  just a brief, Hello.  How are you?  Nice to meet you.

24  Q.  Was that before you were stabled at Mount Hope?

25  A.  Yes.

1  Q.  And after you were stabled at Mount Hope, did there come a

2  time when you were reacquainted with Lisa Ranger?

3  A.  Yes.  Richie Banca introduced me to her.

4  Q.  Before you met Lisa Ranger, what did Mr. Banca tell you?

5       MR. FASULO:  Objection.

6       MS. MORTAZAVI:  State of mind.

7       THE COURT:  Overruled.  You can answer.

8  A.  I basically had complained to him about, that I was

9  spending too much money purchasing drugs vitamins that I needed

10  to run my barn and he recommended, that he would talk to Lisa

11  to introduce me, that I could probably pay less money for a lot

12  of the things I was buying.

13  Q.  Prior to that conversation had you seen Lisa Ranger at

14  Mount Hope training Center?

15  A.  I had seen her some mornings but never spoke to her.

16  Q.  And generally speaking, on the morning you observed her,

17  what did you observe her doing?

18  A.  She was dropping off packages at different barns.

19  Q.  And approximately, how often would you see her dropping off

20  these packages in different Barnes?

21  A.  About once a week.

22  Q.  After that conversation that you just described with

23  Mr. Banca, were you put in touch with Ms. Ranger?

24  A.  Yes.

25  Q.  And prior to that conversation with Mr. Banca, have you

1    thought to just introduce yourself to Ms. Ranger?

2            MR. FASULO:  Objection.

3            THE COURT:  Grounds?

4            MR. FASULO:  Relevance.

5            THE COURT:  Overruled.

6            MS. MORTAZAVI:  You can answer the question,

7    Mr. Cohen.

8    A.  I didn't have the nerve.

9            MS. MORTAZAVI:  Ms. Jung, could you please display

10    what's already in evidence and has already been displayed as

11    Government Exhibit 403 "N" as in "Nancy".

12            For the record, this is an extraction from cellular

13    phones that were seized from Lisa Ranger's residence.

14    Q.  Mr. Cohen, do you see on the left-hand side of this chart

15    "contact"?

16    A.  Yes.

17    Q.  Can you read the text that appears after the word "name"?

18    A.  52 Ross Cohen.

19    Q.  Then looking closer at the middle of the page, do you see

20    words written under the line entries?

21    A.  Yes.

22    Q.  Do you recognize that phone number?

23    A.  Yes.

24    Q.  Whose phone numb is it, if you know?

25    A.  My cellphone.

1  Q.  Okay.  And underneath that is an e-mail.  Do you recognize

2  that email?

3  A.  Yes.  That's an old email of mine.

4        MS. MORTAZAVI:  Ms. Jung, you can take down that

5  exhibit.  Thank you.

6  Q.  Mr. Cohen, as far as you knew what, if any, company was

7  Lisa Ranger affiliated with?

8  A.  I only had known when I received an invoice that said

9  "Equestology".

10  Q.  That was an invoice that came with drugs that you'd

11  purchased?

12  A.  Correct.

13  Q.  After you were introduced to Ms. Ranger approximately how

14  long after that introduction did you start purchasing drugs

15  from her?

16  A.  Almost immediately.

17  Q.  What types of drugs did you purchase?

18  A.  Vitamins, B complex, B12, folic acid, iron sucros, then

19  some phenobutizone fluixone, otherwise known as banimine,

20  fovacine, just different medications.

21  Q.  I want to ask you about a few of those starting with

22  phenobutizone.  Is that known by any other names?

23  A.  It's known as "bute".

24  Q.  How is that drug administered?

25  A.  Intravenously.

1    Q.  Prior to purchasing it from Lisa Ranger -- withdrawn, your

2    Honor.

3              As far as you are aware what does that drug do?

4    A.  It reduces inflammation.  Well, it's a nonsteroidal

5    anti-inflammatory.

6    Q.  Is that sometimes known as an --

7              MR. FASULO:  Objection, judge; leading.

8              THE COURT:  You are leading.  Sustained.

9    Q.  What, if any, acronyms are associated with nonsteroidal

10   antiinflammatory drugs?  And if you are aren't aware of any

11   that's perfectly fine.

12   A.  I'm a little -- you mean "acronym", other names?

13   Q.  Yes.

14   A.  There's banimine.  Is an antiinflammatory.  I don't know of

15   any off the top of my head.

16   Q.  Okay.  And you also mentioned flunixen?

17   A.  That's banimine.

18   Q.  How is that administered?

19   A.  Can be, it's administered intravenously.

20   Q.  Robacine, how is that administered?

21   A.  Also intravenously.

22   Q.  Of the products that you described, Mr. Cohen, which, if

23   any, of them require prescriptions?

24   A.  I want to say --

25              MR. FASULO:  Objection, judge, if he knows, he knows.

1           THE COURT:  Do you know, sir?

2           THE WITNESS:  Most of them do.  That's what I know.

3           THE COURT:  All right.

4    Q.  Apart from the injectable drugs, some of which you just

5    described, did you receive any other drugs from Lisa Ranger?

6    A.  I purchased ACTH.  Bleeder pills, maybe dexamethasone.  I

7    couldn't remember all off the top of my head right now.  It was

8    a while ago.

9    Q.  No problem, Mr. Cohen.

10          Starting with ACTH, how is that administered?

11   A.  Administered intramuscularly.

12   Q.  And the bleeder pills, how are those administered?

13   A.  Orally.

14   Q.  Specifically, are they, can you describe the process by

15   which they're orally given to a horse?

16   A.  They could be fed in the horse's feed or they can be mixed

17   in and drenched intranasally through a stomach tube.

18   Q.  How does a stomach tube work when you are drenching a

19   horse?

20   A.  The tube is inserted through the horse's nostril and down

21   into the stomach.

22   Q.  You also mentioned dexamethasone; is that right?

23   A.  Correct.

24   Q.  Is that known by any other name?

25   A.  "Dex" is all I know it as.

1  Q.  How is that administered?

2  A.  Intravenously or intramuscularly.

3  Q.  I want to turn back to the bleeder pills that you say that

4  you received from Ms. Ranger.  What, if anything, did she tell

5  you about the affect the bleeder pills would have on a

6  racehorse?

7  A.  They would prevent the onset of pulmonary hemorrhaging or

8  bleeding.

9  Q.  Can you describe what bleeding is in a racehorse?

10  A.  Racehorses when they go into oxygen or get tired a lot of

11  times capillaries will burst in their lungs and they will bleed

12  down deep or sometimes up the trachea and sometimes out the

13  nostrils.

14  Q.  What did she tell you about when you should administer

15  bleeder pills to a racehorse?

16  A.  She said for best affect to give them day ever before and

17  day of race.

18  Q.  That is day before the race and day of the race?

19  A.  Correct.

20  Q.  For the bleeder pills that you received from Ms. Ranger,

21  did you follow her directions?

22  A.  Yes, I did.

23  Q.  As far as you know, are you allowed to administer bleeder

24  pill to racehorses the day of the race?

25  A.  You are not allowed.

1   Q.  Are trainers allowed to administer any drugs to the

2   racehorse the day of the race, as far as you know?

3   A.  They are not.

4   Q.  As far as you know in what state or states does that rule

5   apply?

6   A.  All states that conducts racing.

7   Q.  What, if anything, did Lisa Ranger tell you about whether

8   or not the bleeder pills would test positive on the drug test?

9          MR. FASULO:  Objection, judge.  This is leading.

10         THE COURT:  That's not leading.

11         What, if anything, did she tell him?

12         Overruled.  You can answer.

13  A.  She said that they do not test at this time but there's no

14  guaranty that they will always not test.

15  Q.  What, if anything, had you discussed with Lisa Ranger

16  generally about whether or not the drugs she sold would test

17  positive on a drug test?

18  A.  If there was ever a thought in my mind to question, I would

19  ask her and I would always get the same answer, that they're

20  not testing at this time but there's always a shot that they

21  will test.

22  Q.  How often would you have conversations with her about the

23  test ability of a drug she was offering for sale?

24  A.  Maybe once a month.

25  Q.  Was testability of those drugs important to you in deciding

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   whether or not to buy a drug she was offering for sale?

2   A.  Yes.

3   Q.  Why?

4   A.  Because I did not want to get suspended and I did not want

5   to get fined and did not want the owners to lose the prize

6   money.

7   Q.  How often, approximately, would Lisa Ranger offer you new

8   products she was willing to sell?

9          MR. FASULO:  Objection; leading, judge.

10         THE COURT:  Not leading.  Overruled.

11         You can answer.

12  A.  During conversation we might talk maybe once a month.

13  Q.  On each of those occasions, what, if anything, did you ask

14  about testability?

15  A.  Just the same thing, whether a substance would test or not

16  test.

17  Q.  Mr. Cohen, you mentioned that you were stabled at Mount

18  Hope for several years, correct?

19  A.  Correct.

20  Q.  For what period of that time while you were at Mount Hope

21  were you purchasing drugs from Lisa Ranger?

22  A.  Approximately, almost the whole time.

23  Q.  How would you place your orders?

24  A.  I would call her on the phone and if she was coming up that

25  week she would drop it off when she made her rounds or

1   sometimes she would mail.

2   Q.  So, she would sometimes mail you the drugs.  Is that what

3   you just said, Mr. Cohen?

4   A.  Yes.  It would come UPS.

5   Q.  Apart from receiving them in shipments, how else would you

6   receive the drugs if you received them in any other way?

7   A.  She would drop off packages at the barn the morning she

8   made her rounds.

9   Q.  How frequently would you place an order with Lisa Ranger

10  for drugs that she was selling?

11  A.  Once a week or once every two weeks.

12  Q.  When you spoke with Lisa Ranger, what, if anything, did you

13  talk about with her about your work?

14  A.  Pardon.

15  Q.  What, if anything, did you mention to her about what you do

16  for a living?

17  A.  Oh, she knew I trained racehorses.  I didn't really talk

18  about what I did.

19  Q.  What, if any, conversation did you have with Lisa Ranger

20  about prescriptions?

21  A.  I don't recall having conversations about prescriptions.

22  The only conversation --

23          MR. FASULO:  Objection, judge.  The question was

24  answered.

25          THE COURT:  You've answered the question, Mr. Cohen.

1    Wait for the next question.

2            MS. MORTAZAVI:  Just a moment, your Honor.

3            THE COURT:  Sure.

4    Q.  Mr. Cohen, when you received bottle of, some of the drugs

5    from that you had ordered from Lisa Ranger, can you describe

6    what the labels looked like?

7    A.  There were stickers attached with horse's names and Dr.

8    Fishman's name on them from different places.

9    Q.  You mentioned that there were horse's names on there?

10   A.  Correct.

11   Q.  Were they all horses you recognized?

12   A.  Some of them were mine.  Some of them were other trainers.

13           MS. MORTAZAVI:  Ms. Jung, could you please pull up

14   Government Exhibit 320-FE.

15           (Pause)

16           MS. MORTAZAVI:  For the record, this is a document

17   that was produced by Equestology.

18           Ms. Jung, if you could please focus on the bottom two

19   messages in this exhibit.

20           (Pause)

21           THE COURT:  This is in evidence.

22           MS. MORTAZAVI:  This is in evidence, your Honor,

23   stipulated to pursuant to Government Exhibit 9006.

24           THE COURT:  All right.  Thank you.

25   Q.  Mr. Cohen --

1              MR. FASULO:  Judge, I'm going to object.

2              MS. MORTAZAVI:  Ms. Jung, please take down the

3     exhibit.

4              MR. FASULO:  The witness is not a party to this

5     conversation and the government is introducing as part of their

6     evidence in the case.

7              MS. MORTAZAVI:  Your Honor, I am.

8              THE COURT:  Let's talk at side bar.

9              (Continued on next page)

1          (side bar)

2          MS. MORTAZAVI:  The bottom two messages, your Honor.

3          THE COURT:  OK.  Have you seen this?

4          MR. FASULO:  May I see it again, judge.

5          (Pause)

6          MR. FASULO:  Judge, I understand it to be a

7    conversation between Lisa Ranger and Seth Fishman.  Neither of

8    them are in the courtroom right now and he shouldn't be privy

9    to information that he wasn't a party to this conversation.

10          MS. MORTAZAVI:  Your Honor, I don't know on what basis

11   Mr. Fasulo is making that objection.  This witness is clearly

12   not a party to this conversation.  There's no suggestion that

13   he is.  I expect that he is going to say that he doesn't

14   recall.  But I think the government is entitled to highlight it

15   given that it may have a connection to this witness.

16          MR. FASULO:  Judge, it would be as if the witness was

17   in the room listening to another witness' testimony or

18   listening to other evidence in the case.

19          THE COURT:  It's a document that is in evidence.  You

20   didn't object to the document.  In fact, as I recall, I think

21   you stipulated to it.  So it is in evidence and this excerpt

22   arguably goes to Ms. Gianelli's state of mind.

23          MR. FASULO:  Not this witness's state of mind.

24          THE COURT:  Correct.  And she is the defendant here.

25   It's clearly relevant.

 1                MR. FASULO:  He is going to hear Ms. Gianelli's state

 2    of mind from this piece of evidence and then ask --

 3                THE COURT:  I don't know what he is going to be asked.

 4                MR. FASULO:  Well, then, that's what the relevance --

 5    I don't see the relevance with this witness and I feel --

 6                THE COURT:  -- have to be relevant to the issues in

 7    the case.

 8                MR. FASULO:  I understand, judge.

 9                THE COURT:  Your objection is overruled.  It's fair

10    grounds.  It's in evidence.  We'll hear the next question.  You

11    have an objection to the question?  If there is one, we'll deal

12    with it.

13                MS. MORTAZAVI:  Your Honor, I'd like to suggest a

14    solution which is, I will withdraw the question.  I will ask

15    generally about whether he remembers this.  I expect he will

16    say no.

17                THE COURT:  Whether he remembers what?

18                MS. MORTAZAVI:  Whether he remembers asking about this

19    particular substance.

20                THE COURT:  Okay.

21                MR. FASULO:  I am objecting to that question.  I have

22    no objection to that question.

23                THE COURT:  We'll see.  Okay.

24                Thank you.

25                (In Open Court)

1    BY MS. MORTAZAVI:

2    Q.  Mr. Cohen, are you familiar with the substance or product

3    called propanlone bromide?

4    A.  Yes.

5    Q.  What is that?

6    A.  It's a bronchodilator.

7    Q.  What is a bronchodilator, sir?

8    A.  It helps increase the airways for better breathing.

9    Q.  The airways of who or what?

10   A.  Racehorses.  I don't know if you can use it for humans.

11   Q.  But it's something designed for racehorses?

12   A.  Yeah.  I can't answer.  I don't know.

13   Q.  It's something that can be used on racehorses is that fair

14   to say?

15   A.  Correct.

16   Q.  Do you recall having any conversations with Lisa Ranger

17   about that substance?

18   A.  I don't recall specifically.

19   Q.  Okay.  Mr. Cohen, while you were stabled at Mount Hope, how

20   often did you see Dr. Fishman at that location?

21   A.  He visited once when I was stabled there.

22   Q.  In the approximately seven years you were there; is that

23   right?

24   A.  Correct.

25   Q.  Who, if anyone, was with him at the one time he was at the

```
 1    Mount Hope Training Center?

 2    A.  Lisa Ranger was with him.

 3    Q.  What did you observe that day?

 4    A.  They walked to most of the barns there and visited with

 5    trainers at the facility.

 6    Q.  What about your barn?

 7    A.  They stopped by and visited.

 8    Q.  What did you discuss with those two individuals during that

 9    time?

10    A.  I actually was, thought I had some troubles with some

11    horses and had some blood work on some horses and I wanted

12    Dr. Fishman to look at the blood work.

13    Q.  What else did you discuss?

14    A.  I remember that specifically.  I don't remember much other

15    specific conversations.  He asked me how I was doing and that

16    conversation came up.

17    Q.  What, if anything, did he do with respect to your horses?

18    A.  Nothing.

19    Q.  What do you mean?

20    A.  He looked at blood work.  We had conversation.  He didn't

21    look at any specific animals.

22    Q.  What, if anything, did Lisa Ranger say about why he was at

23    Mount Hope that day?

24    A.  He needed to come around to the people that were purchasing

25    products in order to, he could say that he looked at animals
```

1   that he was prescribing medications for.

2   Q.  What, if any, prescriptions did he write for you after your

3   conversation with him?

4   A.  I don't recall any.

5   Q.  Did you consider Seth Fishman a veterinarian for your

6   horses?

7   A.  No, I did not.

8   Q.  Who was the veterinarian for your horses during the time

9   you were stabled at Mount Hope?

10  A.  I used a wide variety.  I used Dr. Joe Malone.  I used Lou

11  Grasso.  I used Dr. Richie Zinn.  I used Dr. Brian Lasan.  I

12  used Dr. Herby.  I used a wide variety of veterinarians.

13  Q.  Mr. Cohen, you had mentioned that you had first encountered

14  Lisa Ranger and Seth Fishman in Florida many years prior to you

15  being stabled at Mount Hope; is that correct?

16  A.  Correct.

17  Q.  And at that time there is some conversation about their

18  relationship, correct?

19  A.  I don't understand.

20  Q.  You testified previously, Mr. Cohen, and correct me if I'm

21  wrong, that you believed that Lisa Ranger worked for Seth

22  Fishman?

23  A.  Right.  That was my assumption that she was his assistant.

24          THE COURT:  All right.  You cannot assume, sir.  Do

25  you know?

1          THE WITNESS:  I don't know for a fact, no.

2          THE COURT:  Okay.

3          MR. FASULO:  Move to strike.

4          THE COURT:  It is stricken.  That means the jurors

5   should disregard Mr. Cohen's assumption that Ms. Gianelli, then

6   Ms. Ranger, worked for Dr. Fishman or was his assistant.

7   Q.  So from what you observed, Mr. Cohen, you saw the two of

8   them together in Florida some years prior to the time you were

9   stabled at Mount Hope, correct?

10  A.  Correct.

11  Q.  While you were stabled at Mount Hope and purchasing from

12  Lisa Ranger, what, if any, conversation did you have with her

13  about Seth Fishman?

14  A.  I had asked about some substances and she said I need to

15  talk to Dr. Fishman about it.  And I had also talked about some

16  horses that hadn't been racing well and I had blood work and

17  she said I need to show them to Dr. Fishman to get his opinion.

18          MS. MORTAZAVI:  I'd like to pull up, Ms. Jung, if you

19  could please pull up Government Exhibit 715, which is an

20  electronic record retrieved from the computer found at Lisa

21  Gianelli's residence.

22  Q.  Mr. Cohen, do you see the term "Equestology" in bold at the

23  top?

24  A.  Yes.

25  Q.  And below that "client list with phone num"?

1    A.  Yes.

2    Q.  Okay.  Looking at this list of names on the first page of

3    this Government Exhibit, do you recognize any of the names

4    here?

5    A.  Yes.

6    Q.  Approximately, how many?

7    A.  Multiple amounts 20, 30.

8            MS. MORTAZAVI:  Thank you, Mr. Cohen.

9            Ms. Jung, if we could turn to page two of Government

10   Exhibit 715.

11           (Pause)

12   Q.  Do you recognize any names on this page, Mr. Cohen?

13   A.  Yes.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. MORTAZAVI:

2    Q.  How many?

3    A.  Approximately about the same.

4             MR. FASULO:  Objection, Judge, relevance.

5             MS. MORTAZAVI:  If I may ask my next question?  It may

6    be relevant.

7             THE COURT:  Let's tie it up.

8    Q.  Of those names that you recognize, Mr. Cohen, how many of

9    those are people whose professions you are familiar with?

10            MR. FASULO:  Objection.

11            THE COURT:  I don't see the relevance yet.

12   Q.  All right.  I'll direct you to one particular name,

13   Mr. Cohen.  Do you see the name Rich Banca in the middle of the

14   page?

15   A.  Yes, I do.

16   Q.  What's the city and state associated with Rich Banca?

17   A.  Otisville, New York.

18   Q.  You mentioned that a Richie Banca had introduced you to

19   Lisa Ranger, correct?

20   A.  Correct.

21   Q.  In what city and state did he live or work?

22   A.  In Otisville, New York.

23            MS. MORTAZAVI:  Ms. Jung, you can take this down.

24            If we could please turn to page six of Government

25   Exhibit 715.

 1   Q.  Mr. Cohen, do you see your name on this page?

 2   A.  Yes, I do.

 3   Q.  Okay.  And there's a city and a state associated with your

 4   name, correct?

 5   A.  Correct.

 6   Q.  Were you at one point staying in Pine Bush, New York?

 7   A.  Yes.

 8          MS. MORTAZAVI:  Ms. Jung, if we could take this down

 9   and turn to page seven?

10   Q.  And towards the bottom of the page, do you see the name

11   Rick Dane, Mr. Cohen?

12   A.  Yes.

13   Q.  All right.  How do you know Rick Dane?

14   A.  I had met him at Mount Hope Training Facility when he

15   stabled there.

16   Q.  Okay.  When did he do for a living, if you know?

17   A.  He trained racehorses.

18          Stabled.

19          MS. MORTAZAVI:  Ms. Jung, you can take this down and

20   you can turn to Page 12.

21   Q.  Mr. Cohen, do you see the name Tom Guido in the middle of

22   this page?

23   A.  Yes, I do.

24   Q.  What city and state are you associated with Tom Guido as it

25   appears?

1   A.  Montgomery, New York.

2   Q.  You mentioned you had lived with a Tom Guido previously?

3   A.  Correct.

4   Q.  What did he do, if you can tell the jury?

5   A.  He trained racehorses.

6   Q.  Are you familiar with where he generally lived and worked?

7   A.  When I lived with him, he lived in Wurtsboro, New York.

8   Q.  Aside from that, were you familiar with where he lived or

9   worked after you stopped living with him?

10  A.  He bought Golden Shoe Training Facility and moved there in

11  Montgomery, New York.

12          MS. MORTAZAVI:  Staying on Page 12, Ms. Jung, can you

13  please focus on the name Adrienne Hall?

14  Q.  And, Mr. Cohen, what city and state are associated with

15  Adrienne Hall?

16  A.  Monroe, New Jersey.

17  Q.  At the time you were a racehorse trainer, were you familiar

18  with Adrienne hall?

19  A.  No.

20          MS. MORTAZAVI:  Ms. Jung, if you can please take this

21  down.  If you could turn to Page 22 of the exhibit?

22  Q.  I'm going to direct you to two names.  Do you see

23  Christopher Oaks and Sue Oaks?

24  A.  Yes.

25  Q.  Is the name Sue Oaks associated with a city and state?

1    A.  White Haven, Pennsylvania.

2    Q.  Is the name Chris Oaks associated with any city or state?

3    A.  No.  It's blank.

4    Q.  Do you know anyone name Chris Oaks?

5    A.  Yes.

6    Q.  How do you know him?

7    A.  I raced horses with him, and I also sold him performance

8    enhancing drugs.

9    Q.  What does he do for a living?

10   A.  He trains racehorses.

11          MS. MORTAZAVI:  Ms. Jung, if you could please take

12   down this exhibit?

13          And if you could please pull up Government Exhibit

14   707, which is a record retrieved from a computer found in

15   Lisa Giannelli's residence.

16   Q.  Mr. Cohen, have you seen this exhibit before today?

17   A.  Yes, in a pretrial prep.  I think -- yeah.  This is a list

18   that was shown to me.

19   Q.  At the time you were a racehorse trainer, were you familiar

20   with this list?

21   A.  No.

22   Q.  Looking at the very top, the text in red, could you read

23   that out?

24          MS. MORTAZAVI:  Ms. Jung, if you could blow this up,

25   please?

1   A.  It says cold calls.

2   Q.  Okay.  And below, there's a numbered list of 43 names,

3   correct?

4   A.  Correct.

5   Q.  Of those names, how many racehorse trainers do you

6   recognize?

7   A.  20, 25.

8   Q.  Next to 40, what's the name written there in all caps?

9   A.  Rich Banca.

10          MS. MORTAZAVI:  Ms. Jung, if you could please take

11  this down?

12  Q.  Did there come a time, Mr. Cohen, when you were no longer

13  stabled at the Mount Hope Training Center?

14  A.  Yes.

15  Q.  When was that?

16  A.  Approximately 2009, 2010.  I moved to Pine Bush Training

17  Facility in Pine Bush, New York.

18          MS. MORTAZAVI:  If I may pause, your Honor, this might

19  be a natural breaking point.  I don't know if you want us to

20  break today.

21          THE COURT:  It's a little early.

22          MS. MORTAZAVI:  All right.

23  Q.  Pardon me, Mr. Cohen.  I missed the answer to your

24  question.  Could you please repeat when it is that you were no

25  longer stabled at Mount Hope?

1  A.  Approximately 2009, 2010.  I moved to Pine Bush Training

2  Facility in Pine Bush, New York.

3  Q.  How long were you stabled at the Pine Bush Training

4  Facility?

5  A.  Approximately eight years.

6  Q.  And after you left the Mount Hope Training Center, did you

7  keep purchasing drugs from Lisa Ranger?

8  A.  Yes.

9  Q.  Were you purchasing the same types of drugs generally as

10  those you purchased before?

11  A.  Yes.

12  Q.  And at the time you were at the Pine Bush Training Center,

13  did you observe Lisa Ranger at that facility?

14  A.  Yes.

15  Q.  What did you observe her doing, if anything?

16  A.  Coming around once a week and dropping off boxes of things

17  to different barns.

18  Q.  And how often did Seth Fishman come to the Pine Bush

19  Training Facility during the period of time you were stabled

20  there?

21          MR. FASULO:  Objection to the form of the question.

22          THE COURT:  Can you rephrase?

23  Q.  What, if any, interactions did you have with Seth Fishman

24  during the period of time you were at Pine Bush?

25  A.  I did not see him there, but I have spoken to him on the

 1   phone.

 2   Q.  And when you say did you not see him there, I'd like to

 3   clarify, did you not see him at the Pine Bush training center?

 4   A.  Correct.

 5   Q.  Did you see him anywhere during that period of time?

 6   A.  No.

 7   Q.  How often would you order drugs from Lisa Ranger, again

 8   during the period of time you were at the Pine Bush training

 9   facility?

10   A.  Approximately once a week.

11   Q.  Who else was stabled at that training facility besides you?

12         MR. FASULO:  Objection as to relevance.

13         THE COURT:  Overruled.

14         THE WITNESS:  Carmen Asiello, Dr. Quitones, Peter

15   Trenton, Brittany Robertson, Paul Bloomingfeld, Augie --

16   Augustino Appatello.

17   Q.  Mr. Cohen, I'll stop you there.  Why don't you tell us the

18   number of people who were stabled there?

19   A.  Approximately five or six different trainers.

20   Q.  And when you say trainers, were these all standardbred

21   trainers?

22   A.  Yes.

23   Q.  Are you familiar with a facility known as Golden Shoe in

24   Montgomery, New York?

25   A.  Yes.

1  Q.  How are you familiar with that location?

2  A.  It is also a standardbred training facility about 5 miles,

3  6 miles away from Pine Bush Training Facility.

4  Q.  Have you ever been there?

5  A.  Yes.

6  Q.  How often?

7  A.  I'd be guessing.  I couldn't tell you exactly how many

8  times I have been there.

9  Q.  Have you ever stabled your horses there?

10  A.  No.

11  Q.  From the times that you've been there, did you observe the

12  facilities in the premises?

13  A.  Yes.

14  Q.  From the times you were at that location, were you able to

15  see the number of people who were stabled there?

16  A.  Yes.

17  Q.  Approximately, how many people were stabled at that

18  facility?

19  A.  Approximately five or six different trainers.

20  Q.  Mr. Cohen, by March 9, 2020, were you stabled at

21  Mount Hope?

22  A.  No.

23  Q.  Where were you stabled at that time?

24  A.  I had horses in Goshen, New York, Historic Track.

25  Q.  Mr. Cohen, you had mentioned in your prior testimony that

1    you had sold performance enhancing drugs to somebody.  Do you

2    remember that?

3              MR. FASULO:  Objection, Judge.  Testimony today?

4              THE COURT:  Correct.  He said that.

5              MR. FASULO:  I was trying to get clarification.

6              THE COURT:  You may answer.

7              THE WITNESS:  Yes.  Yes.

8    Q.  And you testified today that you had administered a bleeder

9    pill to your horses the day of a race, correct?

10   A.  Correct.

11   Q.  During the course of your time as a racehorse trainer, did

12   you administer performance enhancing drugs to your racehorses

13   on more than one occasion?

14   A.  Yes.

15   Q.  When you did that, did you believe you were violating

16   applicable rules that govern racing horses in New York?

17   A.  Yes.

18   Q.  And rules in other states?

19   A.  Yes.

20             THE JUDGE:  All right, Ms. Mortazavi.  It is 4:30, so

21   wherever is a convenient breaking point.

22             MS. MORTAZAVI:  I'm about to enter a new section, your

23   Honor.

24             THE COURT:  How long would it take to finish that?

25             MS. MORTAZAVI:  Longer than we have for the day.

1          THE COURT:  Why don't we break for the day?

2          Ladies and gentlemen, please leave your notebooks in

3    the jury room, and you can pick them up first thing tomorrow

4    morning.  Remember, we will have light breakfast available for

5    you starting at roughly 8:30 tomorrow.

6          Do we have anything we need to discuss tomorrow

7    morning?

8          MS. MORTAZAVI:  No, your Honor.

9          MR. FASULO:  No, your Honor.

10          THE COURT:  All right.  So I do have an appointment at

11   8:30 tomorrow morning, so why don't we plan to start at about

12   9:45.  But if you all please be here by 9:30 in case my

13   appointment finishes up, we'll get going as soon as we can to

14   try to get things moving along.

15          Do not talk about the case with anybody, including all

16   your family members.  Please don't do any research about the

17   case or about the subject matters of the issues that are

18   relevant to this case.

19          And I remind you again, if somehow inadvertently

20   something should come to your attention, please call that to

21   the attention of our courtroom deputy or my clerk, Ms. Popper.

22          All right.  So thank you, all.  Have a very good

23   evening.

24

25

1                    (Jury not present)

2                    THE COURT:  All right.  Please be seated.

3                    Mr. Cohen, you are excused for the evening.  You

4    remain under oath, though.  Tomorrow, we'll be asking you to

5    resume the stand and complete your testimony tomorrow, so

6    please do not talk about the case with anybody while you remain

7    under oath.  And I wish you a good evening.

8                    THE WITNESS:  Thank you, your Honor.

9                    THE COURT:  You may step down.

10                    (Witness steps down)

11                    THE COURT:  All right.  Anything for the record,

12   Ms. Mortizavi?

13                    MS. MORTAZAVI:  Nothing from the government, your

14   Honor.  Thank you.

15                    THE COURT:  Mr. Fasulo.

16                    MR. FASULO:  Just one thing.

17                    THE COURT:  Why don't you come over here?

18                    MR. FASULO:  So I may articulate it better tomorrow,

19   but I want to articulate to the Court my concern.  I understand

20   the government can put in their evidence in whatever order they

21   wish to put in the evidence, and I understand that any written

22   documents are in evidence.

23                    What I'm concerned about is, and what my objection is,

24   just like a witness is not present when another witness

25   testifies, if the evidence does not reflect directly on

1     something that witness knows or is involved in, a conversation,

2     to give it to the witness is prompting the witness and

3     refreshing the witness' recollection about something they

4     haven't even indicated they need a refreshment on.

5             THE COURT:  It may or may not be.  May or may not be.

6     If all Ms. Mortizavi is doing is having the witness read it

7     into the record, she's using them as a prop, which I suppose

8     the witness could object to, but the document is in evidence.

9     There was no question that was being asked --

10            MR. FASULO:  I understand.  But --

11            THE COURT:  We have to take it question by question.

12    You're correct --

13            MR. FASULO:  I agree.  That's what I said.  I do have

14    to do it question by question, and I plan on it.  But I just

15    want to alert the government that is what my concern is, is

16    that the witness will then be asked an area of questioning that

17    relates to a document or a conversation that they were not a

18    party of, and then it will appear that the witness is talking

19    fresh in their memory when, in fact, they have now seen a

20    document they really should not be privy to.

21            THE COURT:  It may.  It just depends on the question.

22    You may be correct, but I can't rule in a vacuum.

23            MR. FASULO:  I understand.  I had to get it off my

24    chest because it's bothering me.

25            THE COURT:  I hope you feel better.

1          MR. FASULO:  I do feel better.

2          MS. MORTAZAVI:  Just to make the record very perfectly

3     clear, Mr. Fasulo articulated that objection with one exhibit

4     in particular that involved text messages.  The Court, I think,

5     correctly overruled that objection, but the government

6     voluntarily decided to withdraw the question.

7          MR. FASULO:  They did.  They did.

8          THE COURT:  That's correct.

9          MS. MORTAZAVI:  With respect to the other exhibits

10    that were shown to the witness, the witness was merely asked

11    questions about what was on the page and not necessarily his

12    state of mind or his opinion as to those exhibits, so I do want

13    to make clear that there's some distinction in the exhibits

14    we're talking about.  As the Court said, we need to take it

15    question by question.

16         MR. FASULO:  Question by question, Judge.  I agree.

17         THE COURT:  Okay.  Anything else for the record?

18         MR. FASULO:  Nothing, nothing.

19         THE COURT:  All right.  Then I'll see you all as close

20    to 9:30 tomorrow, as I am able when I finish my earlier

21    appointment.  And we'll aim to pick up the testimony at about

22    9:30, 9:45.  You can still stay seated.

23         Do you anticipate you're going to finish with

24    Mr. Cohen tomorrow?

25         MS. MORTAZAVI:  Yes, your Honor.

1              THE COURT:  And then, your other witnesses?

2              MS. MORTAZAVI:  Our next witnesses will be Lenny

3    Ikested who is an FDA agent, Jonathan Fricke, another FDA

4    agent.  These are both agents who handled searches.  And I

5    believe tomorrow we will begin reading into the record the

6    testimony of Courtney Adams.  The witness who will do that is

7    Christina Rusigne.

8              THE COURT:  You're fine with that?

9              MR. FASULO:  Judge, we're fine with that.  And we've

10   talked about a slight instruction or a slight instruction to

11   the jury in the stipulation.

12             THE COURT:  To the extent you can submit that to me

13   this evening, that would be helpful.

14             MR. FASULO:  We will.

15             MS. MORTAZAVI:  We're discussing the language.

16   Mr. Fasulo wanted to give it more thought.  We have a draft but

17   we wanted to --

18             THE COURT:  We'll have a lunch break.  Presumably

19   she'll be after the lunch break.

20             Now, we talked about adjourning tomorrow at 3:00?

21             MR. FASULO:  Yes, Judge.

22             THE COURT:  So that will be the schedule, then.

23             I hope everyone has a nice evening, I'll see you

24   tomorrow morning.  Thank you.

25             (Adjourned to April 29, 2022 at 9:30 a.m.)

<pre>
1                        INDEX OF EXAMINATION

2   Examination of:                              Page

3   KAITLYN BUSH

4   Direct By Mr. Gianforti  . . . . . . . . . . .36
    Cross By Mr. Fasulo  . . . . . . . . . . 102
5   Redirect By Mr. Gianforti  . . . . . . . . . 117

6   DANIEL FOLENSBEE

7   Direct By Ms. Mortazavi  . . . . . . . . . . 119

8   ROSS COHEN

9   Direct By Ms. Mortazavi  . . . . . . . . . . 169

10                       GOVERNMENT EXHIBITS

11  Exhibit No.                             Received

12   10001  . . . . . . . . . . . . . . . . . . .39
     10001  . . . . . . . . . . . . . . . . . . .39
13   5019 . . . . . . . . . . . . . . . . . . . .42
     5019 . . . . . . . . . . . . . . . . . . . .42
14   9119 - 9122  . . . . . . . . . . . . . . . .45
     9119 - 9122  . . . . . . . . . . . . . . . .45
15   908  . . . . . . . . . . . . . . . . . . . .48
     908  . . . . . . . . . . . . . . . . . . . .48
16   5000 - 5014, 5020 - 5024 and 5032 - . . . . .53
                5037
17   5000 - 5014, 5020 - 5024 and 5032 - . . . . .53
                5037
18   9011  . . . . . . . . . . . . . . . . . . .57

19   1906  . . . . . . . . . . . . . . . . . . .59

20   1902  . . . . . . . . . . . . . . . . . . .61

21   9111  . . . . . . . . . . . . . . . . . . .63

22   9117  . . . . . . . . . . . . . . . . . . .66

23   9100  . . . . . . . . . . . . . . . . . . .68

24   9006  . . . . . . . . . . . . . . . . . . .70

25   9005  . . . . . . . . . . . . . . . . . . .87
</pre>

```
1    4000 -047   . . . . . . . . . . . . . 122
     4000 -047   . . . . . . . . . . . . . 122
2    9012     . . . . . . . . . . . . . . . 139
```