M52BGIA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

       v.                      20 Cr. 160 (MKV)

LISA GIANNELLI,

          Defendant.

                           Trial

------------------------------x

                           New York, N.Y.
                           May 2, 2022
                           9:45 a.m.

Before:

              HON. MARY KAY VYSKOCIL,

                           District Judge

                  APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  SARAH MORTAZAVI
     BENJAMIN A. GIANFORTI
     Assistant United States Attorneys

FASULO, BRAVERMAN & DiMAGGIO, LLP
     Attorneys for Defendant Giannelli
BY:  LOUIS V. FASULO
     -and-
ALEX S. HUOT

Also Present:  Karline Jung, USDA Paralegal

               Mattison Stewart, Defense Intern

M52BGIA1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Please be seated, everyone.

3     Good morning.  I hope everyone had a nice weekend.  Do we have

4     anything we need to talk about?

5          MR. FASULO:  Just one thing, Judge.  Because of the

6     volume of the materials, the Court is more than aware of the

7     terabytes and petabytes, Mattison is one of our interns.  She's

8     been helping to help organize.  I wanted the Court's permission

9     for her to sit at counsel table.

10          THE COURT:  Sure.  Good morning.  Thank you.  That's

11     fine Mr. Fasulo.

12          And nothing from you, Ms. Mortazavi?

13          MS. MORTAZAVI:  No, your Honor.

14          THE COURT:  All right. Our jurors are all here and

15     ready to go and Ms. Dempsey will go and bring our jurors out.

16     And you are going to be calling a witness right away.

17          MS. MORTAZAVI:  Yes, your Honor.  That will be

18     Dr. Bowman.

19          (Continued on next page)

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Good morning, ladies and gentlemen.  I

3    hope you all had a nice weekend.  We certainly had beautiful

4    weather, not like this gloomy day today. I think we are ready

5    to proceed, so Ms. Mortazavi or Mr. Gianforti.

6           MS. MORTAZAVI:  Yes, your Honor.  The government calls

7    Dr. Jean Bowman.

8    JEAN BOWMAN,

9         called as a witness by the government,

10        having been duly sworn, testified as follows:

11          THE DEPUTY CLERK:  State and spell your name for the

12   record.

13          THE WITNESS:  My name is Jean Bowman, and it's spelled

14   J-E-A-N, last name B-O-W-M-A-N.

15          THE COURT:  Thank you.

16          Ms. Mortazavi.

17   DIRECT EXAMINATION

18   BY MS. MORTAZAVI:

19   Q.  Good morning, Dr. Bowman.

20   A.  Good morning.

21   Q.  Could you tell us where you are employed?

22   A.  I'm employed at the FDA Center for Veteran Medicine.

23   Q.  Dr. Bowman, I ask you to just adjust the mic.

24          Could you just repeat the answer that you gave to make

25   sure everyone heard you?

1    A.   Yes. I'm employed at the FDA Center for Veterinarian

2    Medicine.

3    Q.   Is that sometimes referred to as FDACVM?

4    A.   Yes, it is.

5    Q.   What's your current title there?

6    A.   I'm a veterinarian medical officer.

7    Q.   What sort of work do you currently do?

8    A.   I work in, until a few weeks ago, it was called the

9    division of the surveillance and the office of surveillance and

10   compliance.  We're now the division of drug compliance, and my

11   work there involves providing scientific support to enforcement

12   actions that are taken by the center.

13   Q.   What are enforcement actions?

14   A.   Enforcement actions can be things like warning letters,

15   advisory letters, seizures and injunctions generally related to

16   poorly manufactured or unapproved animal drugs.

17   Q.   And what exactly is being enforced in an enforcement

18   action?

19   A.   We are enforcing the Federal Food Drug and Cosmetic Act and

20   implementing regulations.

21   Q.   Does the FDACVM where you work focus on animal drugs?

22   A.   Yes, they do.

23   Q.   Are animal drugs regulated by the FDA?

24   A.   Yes.

25   Q.   Are there different regulations applicable to animal drugs

1    versus drugs intended for human use?

2    A.  Yes, some are the same.  Most are different.

3    Q.  For approximately how long have you worked at the FDACVM?

4    A.  I worked there for over 32 years.

5    Q.  Generally speaking what is the FDA's mission as it relates

6    to animal drugs?

7    A.  Our mission is to make sure that there are safe and

8    effective animal drugs available for use for the treatment of

9    animals and to prevent drug residue in human food.

10   Q.  Are you a licensed veterinarian?

11   A.  I am.

12   Q.  What state are you licensed in?

13   A.  I'm licensed in Maryland.

14   Q.  Could you tell us your educational background?

15   A.  Yes. I have a bachelor of science in animal science from

16   the University of Maryland College Park and I have a doctorate

17   in veterinary medicine from Virginia Tech, Virginia Maryland

18   College of Veterinarian Medicine.

19   Q.  Were you employed between college and veterinary school?

20   A.  Yes, I was.

21   Q.  Whereabouts?

22   A.  I was employed by the University of Maryland Horse Research

23   Center.

24   Q.  What sort of work did you do there?

25   A.  I was responsible for all types of general care of the

1    horses as well as helping the professors that were doing

2    research there; collecting samples, maintaining records,

3    providing follow-up to any injuries or treatments that the

4    veterinarians prescribed for the horses.

5    Q.  Were you supervised by anyone?

6    A.  Yes.

7    Q.  Who?

8    A.  Norman Luban.

9    Q.  What position did he hold?

10   A.  He was the farm manager.

11   Q.  What year did you start veterinary school?

12   A.  1985.

13   Q.  And what year did you graduate?

14   A.  1989.

15   Q.  What did you do for work after you graduated?

16   A.  I started working right away with another practitioner in

17   the equine practice.  The type of practice you tend to call a

18   farm call practice.  We go to people's facilities and farms and

19   treat the animals on site, and then I applied and also accepted

20   a position with the Center for Veterinary Medicine.

21   Q.  In that farm call practice that you just described, can you

22   explain some of the work that you engaged in?

23   A.  So we were responsible for routine heart health as far as

24   deworming, giving vaccination, treating lamenesses, diagnosing

25   problems, doing physical exams and history of patient that

1    presented within the problem and then providing a diagnosis,

2    sometimes ordering diagnostic test to get the vac diagnosis and

3    then prescribing treatment.

4    Q.   Have you heard of the term "medical record"?

5    A.   Yes.

6    Q.   What is that term?

7    A.   It reflects the records that a veterinarian is obligated to

8    keep on each patient regarding that patient's history, any

9    problems that its had, any visits that it required, any

10   treatments that were recommended or given.

11   Q.   And while engaged in that farm-call practice, did you

12   maintain medical records?

13   A.   Yes, we did.

14   Q.   You mentioned that you had joined the FDACVM at around the

15   same time you joined the farm-call practice?

16   A.   That is correct.

17   Q.   Did you join in 1989?

18   A.   Yes.

19   Q.   When you first joined the FDACVM, what position did you

20   hold?

21   A.   I was a veterinary medical officer in the office of new

22   animal drug approval.

23   Q.   What sorts of duties did you have in that role?

24   A.   In that role we worked with drug companies to develop a

25   plan for getting the drugs they wanted to get approved,

approved.  They have to collect data for safety and

effectiveness, as well as complete technical sections in

several other areas, such as manufacturing and labeling.

         So we worked directly with the drug companies and then

reviewed the data that was generated to ensure that those

products met our standard of safety and effectiveness before

they were approved.

Q.  Was there a point at which you transferred to a separate

office within the FDACVM?

A.  Yes.

Q.  Approximately when was that?

A.  2008.

Q.  What division was that?

A.  That was the division of compliance in the office of

surveillance and compliance.

Q.  Is that the office where you currently work?

A.  Yes.

Q.  Focusing on your current position, is there a particular

focus to your duties and responsibilities within the division

of enforcement?

A.  So my duties are involving providing scientific support for

enforcement action. I also help collect evidence and organize

evidence for cases that we're initiating in-house, and at times

we also make referrals to the criminal side of FDA if we can't

gain compliance with a firm.

1    Q.  And apart from the professional experience that you've just

2    described, have you any experience with horses beyond the

3    farm-call practice you mentioned and your work with the FDACVM?

4    A.  Yes, I've been a horse owner since I was 11, and to this

5    day I currently have three horses that are pleasure horses,

6    life shown and trail ridden and went through 4H on my horses,

7    always had a deep activity with the horses in all different

8    ways.

9    Q.  Do you race horses?

10   A.  No.

11   Q.  Have you ever entered a horse in a horse race?

12   A.  No.

13   Q.  Have you ever attended any conferences having to do with

14   veterinarian client/patient relationship?

15   A.  Yes.

16   Q.  Could you describe that?

17   A.  There was -- because of COVID-19 and kind of a rapidly

18   changing world of the use of video appointments for people,

19   there was a lecture presented at the AAEP conference, the

20   American Association of Equine Practitioners in December of

21   2021 on that topic regarding equine practitioners.

22   Q.  Dr. Bowman, have you testified on behalf of the FDACVM

23   before?

24   A.  Yes.

25   Q.  Have you ever been qualified as an expert witness before?

1    A.  Yes.

2              MS. MORTAZAVI:  Your Honor, at this time the

3    government moves to qualify Dr. Bowman as an expert regarding

4    FDA new animal drug approval and enforcement processes and the

5    standards for veterinarian practice.

6              THE COURT:  Mr. Fasulo.

7              MR. FASULO:  No objection.

8              THE COURT:  She will be deemed qualified in those

9    areas.

10   BY MS. MORTAZAVI:

11   Q.  Dr. Bowman, you mentioned that in a prior position you held

12   as a veterinarian officer, you were apart of the FDACVM new

13   animal drug approval process; is that right?

14   A.  Yes.

15   Q.  What does the FDA consider an animal drug?

16   A.  An animal drug is substance or they call it an article in

17   the act, and article that is intended to treat, diagnose, cure,

18   mitigate the symptoms of any abnormal condition in the animal,

19   apart of any of those defined substances or effective structure

20   and function of the animal.

21   Q.  Can those drugs be either prescription or over-the-counter

22   just like human drugs?

23   A.  Yes.

24   Q.  Can you give us an example of those prescription drugs?

25   A.  Phenylbutazone.

1    Q.   Is that sometimes called Bute?

2    A.   Yes.

3    Q.   Have you heard of Banamine?

4    A.   Yes.

5    Q.   Is that a prescription drug?

6    A.   Yes, it is.

7    Q.   Have you heard of pentosan?

8    A.   Yes.

9    Q.   Is that a prescription animal drug?

10   A.   That is not an approved animal drug.  It is an approved

11   human drug in an oral form for irritable bladder symptoms, but

12   it's not approved in the United States for use in horses.

13   Q.   As part of the FDA's drug approval process, does a drug

14   have to be approved for a particular species?

15   A.   Yes.  However, under 21 CFR 530, there are conditions for

16   which a drug may be used for off label, an approved drug.

17   Q.   Can you give us an example of an over-the-counter animal

18   drug?

19   A.   So an over-the-counter animal drug would be something like

20   ivermectin paste dewormer for horses.

21   Q.   How is ivermectin administered?

22   A.   That particular ivermectin is an oral product.

23   Q.   How is Banamine administered.

24   A.   Banamine is administered by injection.

25   Q.   What about phenylbutazone?

1    A.   It can be administered by injection or orally.  It comes in

2    tablets and in an injectable formulation.

3    Q.   Have you heard the term API?

4    A.   Yes.

5    Q.   What does that mean?

6    A.   An API is the active pharmaceutical ingredient of a drug.

7    Q.   Can you give us some examples of APIs?

8    A.   I already described phenylbutazone. Phenylbutazone is the

9    active pharmaceutical ingredient in a couple of approved

10   products.  Banamine is the active pharmaceutical ingredient in

11   flunixin meglumine.

12   Q.   What about toltrazuril?

13   A.   Toltrazuril is not approved in the United States for any

14   animal use or human use and it is an active pharmaceutical

15   ingredient.

16   Q.   What about Diclazuril?

17   A.   Diclazuril is an active pharmaceutical ingredient, and it

18   is an active ingredient in at least I think two approved animal

19   drugs.

20   Q.   What about erythropoietin?

21   A.   Erythropoietin is an endogenous, which means your body

22   produces it. It's a hormone that increases blood cell

23   formation.

24          There is medical formulation of that, that's not

25   exactly the same, it's called Epogen.  It's approved for use in

1    humans, but not animals.

2    Q.  What does the FDACVM look to in determining whether a

3    substance is a drug?

4    A.  We generally look to the intended use.  If a drug is listed

5    in the official pharmacopoeia of the United States, the USPUS

6    pharmacopoeia, that is also a way that we can determine that a

7    product is a drug.

8             But if the intended use is something that obviously

9    meets that definition of an article that's intended to treat,

10   cure, prevent, diagnose a disease or abnormal condition, or it

11   has effective structure of function and it's not a food, then

12   it qualifies as a drug.

13   Q.  What sorts of records does the FDACVM look to determine the

14   intended use for a drug?

15   A.  We tend to start with the label and the labeling, so the

16   labeling can be printed labeling that is not on the package of

17   the drug, but is handed to you perhaps when you purchase the

18   drug, or it can be the website where you can purchase a drug,

19   all the information on the website constitutes labeling.

20   Q.  What about brochures or promotional material?

21   A.  That can also be labeling.

22   Q.  What about oral statements by the manufacturer's

23   representative?

24   A.  That can definitely be evidence of intended use.

25   Q.  What about the name of the product itself?

1  A.  At times, yes.

2  Q.  To what extent does the chemical content of the substance

3  matter in determining whether or not it is a drug?

4  A.  It depends.  If that's the best evidence we have that it is

5  intended to be used as a drug, it's the formulation in which

6  it's presented and the active ingredient, then we can use that;

7  however, we prefer to use evidence of intended use.

8  Q.  So can the FDACVM conclude that something is a drug without

9  conducting any drug testing?

10  A.  Yes.

11  Q.  We discussed API a moment ago.  What if a product contains

12  no API, but there are claims made that it would treat a

13  particular disease, would that still be considered a drug?

14  A.  Yes.

15  Q.  What is considered a new animal drug?

16  A.  A new animal drug is an animal drug that is not generally

17  recognized as safe and effective by experts in the field, so

18  most drugs actually qualify as new animal drugs.

19  Q.  Can you walk us through the process for obtaining FDA

20  approval for a new animal drug?

21  A.  So there's seven technical sections that firms have to

22  complete in order to get their drug approved, that includes an

23  animal safety section that would be completed in each species

24  for each indication that a firm was interested in having on

25  their label.

1          Then there's an animal safety section or they're

2     required to do studies to show that the drug is safe at the

3     dose administered, and kind of what the range of safety is so

4     that we can develop a label that will allow the user to know

5     whether an overdose is deadly or whether there's going to be an

6     adverse event if you guess the animal weight wrong or treat the

7     animal improperly.  All that information has to go on the label

8     eventually.

9          Then there's the manufacturing control section which

10    is all about the manufacturing of the drug where the firm has

11    to lay out step by step the entire manufacturing process,

12    identify the facilities, where it's going to be manufactured,

13    however many facilities that is -- and quite often it's more

14    than one -- they have to identify and provide testing on all

15    the ingredients that are going to go into that product.  And

16    those become the sources, the approved sources of that drug.

17    If that needs to change, then they have to change that in a

18    supplement application.

19         Then there's the labeling section.  There's the

20    environmental section.  And if it's a food animal drug, there's

21    a section on human food residues, and finally there's an all

22    other information section.

23    Q.  How long can the process take for getting a drug approved?

24    A.  It can take multiple years.  And rough guess, three to ten.

25    Q.  What are the terms "safe" and "effective" mean in the

1    context of a new animal drug?

2    A.  So A new animal drug is safe and effective when it's used

3    according to the labeling.  It's considered -- so it's not

4    generally recognized as safe and effective.

5          It's only safe and effective within the confines of

6    that approved application.  So as long as it's being

7    manufactured in a way that was described at the facilities that

8    were identified and those facilities have all been inspected,

9    and then that drug is used in accordance with the label

10   directions, then it's expected to be safe and effective for

11   that intended use.

12   Q.  Can you give a hypothetical example for drugs that would be

13   considered ineffective given its intended use?

14   A.  So if you gave the intended use is to treat an eye

15   infection, but you gave a dewormer, then we would not expect

16   that to be -- is that what you meant?

17   Q.  Yes.

18   A.  Okay. Then you would not expect to get any effectiveness on

19   that because you're not using the right product.

20   Q.  Can you now give us a hypothetical example of a drug that

21   would be considered unsafe given its intended use?

22   A.  An approved drug?

23   Q.  Any drug.

24   A.  The best example I can think of off the top of my head is

25   the current use in humans of ivermectin as a treatment for

1    Covid.  It's an approved drug, but that's not its use and it

2    would be unsafe for that purpose because it doesn't work.

3    Q.  What is the FDACVM's role in the process of reviewing data

4    regarding safety and efficacy as part of the new animal drug

5    approval process?

6    A.  As a veterinarian medical officer and a primary reviewer in

7    that office, I was responsible for reviewing the data that was

8    generated.  We work in combination with statisticians and other

9    specialists if needed.

10         But generally, I would review all that safety and

11   effectiveness data and determine whether it met the standards

12   that were required to be substantial.

13   Q.  And the new animal drug approval process you described,

14   does that apply for both prescription and over-the-counter

15   drugs?

16   A.  Yes, it does.

17   Q.  And if I refer to over-the-counter drugs as OTC drugs, will

18   you understand what I'm referring to?

19   A.  Yes.

20   Q.  Are there any differences in the approval process between

21   prescription drugs and OTC drugs for animals?

22   A.  No, there isn't.

23   Q.  What about as part of the labeling process?

24   A.  So the labeling process is different between prescription

25   and non-prescription, but sometimes that distinction isn't made

1    for a drug until it's late into its approval process.

2              After we've evaluated the safety and effectiveness

3    data and we've determined whether it would be appropriate for

4    labeling it as an over-the-counter or a prescription drug, so

5    that comes later.

6              And the labeling for a prescription drug is required

7    to bear a different -- well, let me start with those, the

8    over-the-counter drugs.

9              The over-the-counter drugs are required to have

10   adequate directions for use by the layperson.  As long as they

11   can write adequate directions to be used by a layperson, the

12   drug can be approved as an OTC drug.

13             Prescription animal drugs are required to have -- are

14   not appropriate for adequate directions for use by the layman

15   for multiple reasons why that is, and their labeling is

16   required to bear a special statement that say, "caution." This

17   drug is -- federal law restricts this drug to use by or on the

18   order of a license veterinarian.

19             And then their standard for the rest of that label, it

20   has to provide substantial -- that might not be the exact word

21   that they use, but it has to provide sufficient information for

22   the safe use of that product as labeled.

23   Q.  What does a company have to show in order to establish that

24   its drug is safe and effective?

25   A.  They have to do multiple efficacy studies to demonstrate

1    safety under a variety of conditions of use for that indication

2    and that species, often regionally.

3             They do studies in different regions of the country

4    underneath different clinical investigators, and then they have

5    to show safety in a number of safety studies from a 10

6    ex-overdose study, to a 1, 3 and 5 ex-overdose study, and then

7    the additional data is collected at the use level in the

8    efficacy study to substantiate safety.

9    Q.  And, Dr. Bowman, you mentioned as one of the technical

10   requirements of process, a firm will have to show their

11   manufacturing process; is that right?

12   A.  Yes.

13   Q.  Why do they have to establish how they're going to be

14   manufacturing a particular drug?

15   A.  It can make the difference between the drug being effective

16   and safe and not.  Something as simple as with tablets, how

17   hard those tablets are pressed can make a difference in the

18   absorption of the drug from the stomach or the intestines; and

19   therefore change the blood levels making the drug more or less

20   effective, or more less toxic, so it becomes imperative that

21   they follow all of those manufacturing processes that were

22   approved.

23   Q.  Have you heard the term CGMP?

24   A.  Yes.

25   Q.  What does that stand for?

1    A.   That's the current good manufacturing practices.

2    Q.   And what issues, if any, could arrive if a drug is not

3    manufactured in conformance with current good manufacturing

4    practices, besides what you just mentioned about pills being

5    pressed?

6    A.   The drug could wind up --for a sterile drug, it might not

7    be sterile if it's not manufactured properly, which could lead

8    to very serious complications in the patients that it's given.

9    It could wind of having a different concentration, not being

10   safe on any number of levels.

11   Q.   Assuming a manufacturer did not comply with CGMP, how would

12   that impact the approval process for a new drug?

13   A.   That drug would not get approved.

14   Q.   And what measures, if any, does the FDACVM take to ensure

15   that firms are complying with CGMP?

16   A.   They're regularly inspected both pre-and post-approval for

17   the lifetime of that drug.  They have routine inspections,

18   often annually or semiannually to ensure that they're following

19   their CMC section, just manufacturing, controls and something.

20   Q.   Does the FDA track all manufacturers?

21   A.   Yes.

22   Q.   Can you explain that in a little more detail?

23   A.   All legal manufacturers are required under the act to

24   establishment register with FDA.

25            And once they're establishment registered that all the

1    drugs that are being manufactured through their site are listed

2    with FDA, and the inspectors know what to look for when they go

3    to those facilities to inspect.

4    Q.  And you mentioned as part of the technical process there's

5    also a section on labeling?

6    A.  Yes.

7    Q.  Starting with OTC drug, can you just walk us through the

8    types of information that would be included on the label for an

9    OTC drug?

10   A.  So an OTC drug will have a list of the active ingredients,

11   and generally the major inactive ingredients that may or may

12   not be required depending on the dosage form.  Most firms will

13   put that on there anyway, and it will include the adequate

14   directions for use.

15            So there will be a section that explains to you when

16   you should use this drug, for what animals you should use it

17   for, species, what age, what problems, and then there'll be any

18   warning statements.  Like, don't use on old animals or

19   something like that just to prevent adverse events that are

20   typical with that drug in older animals.

21   Q.  And what type of information would be present on the label

22   for a prescription drug?

23   A.  So prescription drug have multiple sections that are

24   required that includes that statement that we talked about, the

25   federal law restricts this drug to use by or on the order of a

M52BGIA1                    Bowman- Direct

1    license veterinarian. It also includes an indication section

2    that explains what the drug is used for.  It will often have a

3    section describing how the drug works.

4        There's actually a lot of information on a

5    prescription drug label that isn't required an over-the-counter

6    drug label.

7        So it will have that indication section, direction for

8    use, how the drug works.  It can vary how in depth that goes,

9    but it's generally on there.

10       They'll be a section of warnings and contraindications

11   so that the veterinarian knows which patients shouldn't

12   prescribe that drug for, and then there will be an identifier

13   of the manufacturer, the distributor with contact information

14   and a description of any adverse events that are commonly seen

15   with that drug so people know how to identify an adverse event

16   and report it.  Those get reported to the manufacturer or the

17   FDA directly.

18       I'm sure there's other things that I'm forgetting.  It

19   also would have the statement of ingredients, including --

20   depending on the dosage form.

21       Injectable dosage forms are required to have a

22   complete list of all the ingredients, including the

23   concentration of each ingredient.

24       The oral formulation have to have the active

25   ingredient, and then if there's any major inactive ingredient

M52BGIA1                    Bowman- Direct

1    that might cause an allergic reaction or something.  Those

2    would be listed.

3    Q.  And would the information that you described that would

4    appear on the label, would that be included with every bottle

5    of a particular drug?

6    A.  Yes.

7    Q.  Can oral instructions replace that written label?

8    A.  No.

9    Q.  What, if any, records does the FDACVM maintain of approved

10   animal drugs?

11   A.  FDACVM maintains an internal database that's the Stars

12   database where we track all the investigational and approved

13   drugs, and that includes every supplement to any existing

14   application and how that was handled, what happened with it.

15   Sometimes drugs are sold at bought and sold commodities, so it

16   might have a new firm that's in charge of that drug.

17   Q.  And, Dr. Bowman, once a drug is approved by the FDA, can

18   any company manufacture that drug?

19   A.  No.

20   Q.  Why not?

21   A.  That drug is sponsored by a specific drug company and that

22   drug company is the only one that can make it in accordance and

23   has access to all the proprietary information that's in their

24   application that explains how the drug has to be manufactured

25   in order for it to be safe and effective.

1    Q.  Can a manufacturer of an approved animal drug change the

2    active ingredients without first going through the FDA?

3    A.  No.

4    Q.  How about the amount of a particular active ingredient in a

5    drug, can a manufacturer change that without going through the

6    FDA?

7    A.  No.

8    Q.  And does the FDACVM oversight end after a new animal drug

9    is approved?

10   A.  No.  After a new animal drugs are approved, the firm

11   continues to submit new annual reports that describe how much

12   of the drug was manufactured, how much was sold into

13   distribution.

14        They provide information on all the adverse events.

15   And they do that more often than once a year if the adverse

16   events qualify as significant adverse events, but definitely

17   once a year even for the most minor reported adverse event, and

18   they get regular inspections post-approval.

19   Q.  What tools does the FDA have to enforce compliance with FDA

20   regulations?

21   A.  We have the -- generally with an approved drug, we will

22   send a warning letter if something's wrong, and those firms

23   have a lot of interest in coming into compliance.  Often that's

24   all that's required, but we also have the ability to do

25   seizures or injunction.

1          We can enjoin a firm not to manufacture certain types

2     of drugs anymore if they've proven that they can't manufacture

3     them properly, or we can have a drug withdrawn from the market.

4     Q.  You also mention that there may be criminal referrals; is

5     that right?

6     A.  Yes.

7     Q.  What sort of employees work in that division of the FDACVM?

8     A.  So we have an office, an FDA office of criminal

9     investigations, and that's staffed by agents, similar to FBI

10    agents, but they're tasked with following up on criminal

11    referrals from all of FDA for different types of drugs.

12    Q.  You also testified previously about adverse events, can you

13    just explain what that means?

14    A.  So adverse events are unexpected or unpleasant things that

15    happen to you or your animal after a drug is administered.

16    Sometimes they're not actually related to the drug.

17          But if the labeling is complete, it should give you an

18    idea of what kinds of adverse events you might expect to find

19    if you overdose the drug, or maybe the dog or the animal is

20    dehydrated, and therefore it wind up with a higher blood level

21    than you would have expected from the approved dose and

22    therefore experience some adverse reaction.

23    Q.  Why are those reported to the FDA?

24    A.  That's a monitoring tool that we can use to ensure that the

25    products are continuing to be safe and effective under

1    conditions of actual use, and that they're being manufactured

2    properly.

3    Q.  I'd like to shift to talk a little bit more about

4    prescription drugs and over-the-counter drugs.

5         Can you just explain what the difference is and how

6    someone would acquire a prescription drug versus an

7    over-the-counter drug?

8    A.  So an over-the-counter drug for animals would be purchased

9    from a feed store or a pet store or maybe a tack store for

10   horses, and it's just like when you go into the pharmacy and

11   you buy Ibuprofen off the shelf.  You just pick it up off the

12   shelf.  You walk to the counter and you can purchase it.

13        If you are purchasing a prescription animal drug, you

14   would need a prescription or it would be dispensed directly to

15   you.  When your veterinarian treated your animal, he would

16   dispense -- he or she would dispense that prescription animal

17   drug at the time that they determined that that was the

18   appropriate treatment for your animal.

19   Q.  How does the FDA determine whether a drug should be sold as

20   over-the-counter drug or as a prescription drug?

21   A.  It goes back to that adequate directions for use.  If

22   adequate directions for use for the layperson can be written,

23   the drug will be approved as an over-the-counter drug.

24        Certain things are considered to be red flags to

25   adequate -- to the use by the laymen.  That would include

1   things like IV administration, if the drug had to be given

2   intravenously right into a vein, that's going to require that

3   the drug be prescription animal drug.

4         And there are also drugs that have to be given by

5   nasogastric tube that will require that the drug be a

6   prescription animal drug.

7         If a diagnosis is required prior to determining that

8   that is the drug of choice for that patient, then that would be

9   a prescription drug because a veterinarian has to make that

10  diagnosis and prescribe that drug.

11  Q.  Dr. Bowman, what is a nasogastric tube?

12  A.  A nasogastric tube is a tube that's inserted generally in

13  horses, but could also be in dogs, through the nose and down

14  into the stomach.

15        And if you do it improperly, you can wind up with it

16  in the lungs.  And then if you administer medication into the

17  lung that was intended to the stomach, you can actually kill an

18  animal.

19  Q.  You also mentioned the term "layperson" or "laymen;" is

20  that what you use to refer to someone who is not a

21  veterinarian?

22  A.  Yes.

23  Q.  And you mentioned the term "IV" drug?

24  A.  Yes.

25  Q.  Does that stand for intravenous drug?

1    A.  Yes, it does.

2    Q.  And are those typically prescription?

3    A.  Yes.

4    Q.  Are you familiar with the term "IM" drug?

5    A.  Yes.

6    Q.  What does that mean?

7    A.  That's an intramuscular injection.

8    Q.  Are those drugs, IM drugs, typically over-the-counter or

9    prescription?

10   A.  They can be either depending on the species that they're

11   for and the indications for use.

12   Q.  And what if a drug description says it should be

13   administered IV or IM?

14   A.  Then it would have a prescription drug label.

15   Q.  Are there oral animal drugs that require prescription?

16   A.  Yes.

17   Q.  Can you give me an example?

18   A.  Phenylbutazone.

19   Q.  That's the Bute that we talked about earlier?

20   A.  Yes.

21   Q.  So the method of administration is one factor, but it's not

22   the only factor; is that fair to say?

23   A.  Yes.

24   Q.  Are you familiar with the concept of nutritional

25   supplements for humans?

1    A.  Yes.

2    Q.  Does the FDACVM recognize that category for animals?

3    A.  No.

4    Q.  Can you explain?

5    A.  When the law was written, it's called the DHSA, the Dietary

6    Health Supplement Act, animal drugs or animal products were

7    left out.

8            Our products are either foods or drugs or medical

9    devices, but we don't have a category for dietary supplements.

10   Q.  So it would be either considered a food or a drug?

11   A.  Yes.

12   Q.  Have you heard the term "homeopathic"?

13   A.  Yes.

14   Q.  Does the FDACVM recognize a separate category of drugs

15   known as homeopathic drugs?

16   A.  No.

17   Q.  Are there any homeopathic drugs approved by the FDACVM?

18   A.  They wouldn't say homeopathic on the label.  They would

19   just be drugs.

20   Q.  I'd like to shift and ask you a little bit your experiences

21   in veterinarian practice.  I asked you earlier about the term

22   "VCPR." Are you familiar with that term?

23   A.  Yes.

24   Q.  What does it stand for?

25   A.  It stands for the veterinarian-client-patient relationship.

1   Q.   And in that relationship who's the client?

2   A.   The client is usually the animal's owner or a person

3   designated by the animal's owner to act in its behalf.

4   Q.   Who is the patient?

5   A.   The patient is the animal.

6   Q.   What's the concept of establishing a VCPR?

7   A.   In order to provide good medical care, it's important that

8   the veterinarian establish a relationship, examine the patient,

9   meet the owner, come to an agreement that, you know, if I'm

10  going to care for this patient, sort of implicit that the owner

11  is going to provide the recommended care and the veterinarian

12  will provide follow-up.

13  Q.   And how would a veterinarian establish a valid VCPR with a

14  new animal patient?

15              MR. FASULO:  Objection.

16              THE COURT:  Basis?

17              MR. FASULO:  Vague.

18              THE COURT:  Overruled.

19  A.   That would generally require that the veterinarian see the

20  patient in person, examine that patient, collect a history of

21  the patient's past problems as well as any current ones,

22  perhaps run some diagnostic tests if the patient's exhibiting

23  or having a current medical problem, and all that would be

24  incorporated into the medical record.

25              And then if the patient is experiencing a current

1    medical problem, the diagnosis would be made and treatments

2    prescribed.

3    Q.  And what steps typically occur before a veterinarian

4    legitimately issues a prescription for a drug?

5    A.  That process I just described would take place in advance

6    of that.

7    Q.  So is it fair to say the veterinarian has to know the

8    animal?

9    A.  Yes.

10   Q.  Is that prescription process you described the same for

11   both new and existing patients?

12   A.  It depends.  At times with an existing patient that has a

13   chronic medical problem, it might be enough if the

14   veterinarian's already established that

15   veterinarian-client-patient relationship to have a discussion

16   with the owner about what's going on, and it may be the type of

17   problem that a veterinarian can expect is a recurrence of a

18   past problem, therefore may need the same treatment.

19   Q.  Why do veterinarians conduct a physical exam?

20   A.  In order to diagnose most problems and to establish the

21   underlying health of the animal.

22           But in order to diagnose post-problems, you have to do

23   a physical exam, because there could be a lot of reasons; for

24   example, why a horse limps on its left foot.

25           It's limping on its left front leg, but you don't know

M52BGIA1                    Bowman- Direct

1  why until you've done that physical examination and made a

2  diagnosis.

3  Q.  I'd like to ask you some hypothetical questions regarding

4  the presence or absence of a VCPR under various scenarios.

5        So what if a veterinarian never physically examines

6  the animal, but sells the client an injectable drug, would

7  there be a valid VCPR?

8  A.  No.

9  Q.  Why not?

10  A.  Because he hasn't examined that animal and determined what

11  the underlying problem is that he's prescribing a medication

12  for.

13  Q.  What if a client describes symptoms to the veterinarian

14  over the phone, but the veterinarian never conducts a physical

15  examination, would that be sufficient to establish a VCPR?

16  A.  No.

17  Q.  Why not?

18  A.  Because as we were just saying, there can be multiple

19  reasons for similar symptoms.  And until the veterinarian has

20  established what the actual diagnosis is, it's really

21  impossible to prescribe a treatment.

22  Q.  And what if a client sends the veterinarian blood tests

23  conducted of an animal, but there's still no physical

24  examination, is there a valid VCPR?

25  A.  No.

1    Q.  Why not?

2    A.  Because the blood tests have to be interpreted in light of

3    the physical exam findings and history of the patient.

4    Q.  What if a client ask a veterinarian for a prescription drug

5    by name without referencing the animal and there's no physical

6    examination?

7    A.  No.

8    Q.  What if all those things happened between a pet owner and a

9    non-veterinarian, would there be a valid VCPR?

10   A.  No.

11   Q.  Have you heard of the term "companion animal"?

12   A.  Yes.

13   Q.  Can you give us some examples?

14   A.  Companion animals are generally, at least in the CVM world,

15   horses, dogs, cats and small pets, like guinea pigs, gerbils,

16   hamsters.

17   Q.  Are cattle considered companion animals?

18   A.  No.

19   Q.  What about sheep?

20   A.  No.

21   Q.  What about pigs?

22   A.  No.

23   Q.  Are veterinarian different from drug manufacturers?

24   A.  Yes.

25   Q.  In what ways?

M52BGIA1                    Bowman- Direct

1    A.  Veterinarians are license to practice medicine and drug

2    manufacturers are in the business of manufacturing and selling

3    drugs.

4    Q.  And are veterinarians exempt from the FDA's regulations

5    regarding drug manufacturing?

6    A.  No.

7    Q.  I'd like to review a few exhibits with you, Dr. Bowman.

8    These consist of intercepted calls that are already in

9    evidence, and I'd like to ask you a few questions based on the

10   substance of those intercepted calls.

11        Ms. Jung, if you could please display Government

12   Exhibit 169AT and play Government Exhibit 169A.  And if the

13   jurors would like to follow along with their binders, they can

14   turn to tab 169AT.

15        For the record, this is an April 30, 2019 call between

16   Lisa Giannelli and Norman more forward.

17        If the jurors are ready, I ask Ms. Jung to please play

18   Government Exhibit 169A.

19        (Media played)

20        (Media stopped)

21   BY MS. MORTAZAVI:

22   Q.  Dr. Bowman, are you familiar with the term RX?

23   A.  Yes.

24   Q.  What does that refer to?

25   A.  That refers to prescription drugs.

1    Q.  Assuming there was no veterinarian participating in this

2    call, was there a valid VCPR?

3    A.  No.

4          MS. MORTAZAVI:  Ms. Jung, could you please display

5    Government Exhibit 182T and Government Exhibit 182.

6          And if the jurors would like to follow along in their

7    binders, they could turn to that tab.

8          For the record, this is an April 27, 2019 call between

9    Lisa Giannelli and Timothy Collins, and I'll have Ms. Jung

10   please play Government Exhibit 182.

11          (Media played)

12          (Media stopped)

13   BY MS. MORTAZAVI:

14   Q.  Dr. Bowman, in that call, were there any drugs described

15   that would be considered prescription dugs?

16   A.  Yes.

17   Q.  Could you name some?

18   A.  The Banamine, the Bute and the omeprazole.

19   Q.  And again, assuming there was no veterinarian participating

20   in that call, was that request a valid VCPR?

21   A.  No, it wouldn't.

22          And let me clarify, omeprazole can be over-the-counter

23   or prescription depending on the administration instructions.

24   Q.  The Bute and Banamine would be considered prescription?

25   A.  Yes, there's no over-the-counter version of either of those

1    drugs.

2    Q.  Can you repeat your answer I'm not sure I caught it.  Is

3    this request a valid VCPR?

4    A.  No.

5    Q.  And why not?

6    A.  Because there's no discussion of the -- there's no

7    identification of the animal.  There's no verification from a

8    veterinarian that these drugs would be appropriate for

9    dispensing to this client.

10            There's no discussion of the information that would be

11   needed to add into a medical record.

12            MS. MORTAZAVI:  Ms. Jung, you can take this down, and

13   if you could please display Government Exhibit 185T and

14   Government Exhibit 185.

15            And if the jurors would like to turn to that tab in

16   their binders and they can follow along.

17            Ms. Jung, if you can please play Government Exhibit

18   185.

19            (Media played)

20            (Media stopped)

21   BY MS. MORTAZAVI:

22   Q.  Dr. Bowman, does that reflect a valid VCPR?

23   A.  No.

24   Q.  Why not?

25   A.  There's no identification of the animal that these

1    medications will be used on.  There's no discussion of whether

2    that would have approved the dispensing of medications or the

3    problem that's being treated.

4           It sounds like it's just two people having a

5    transaction.

6    Q.  Dr. Bowman, you mentioned that in your role as FDACVM, I

7    believe you mentioned you conduct reviews on safety and

8    efficacy; is that correct?

9    A.  In my old role I did, yes.  .

10   Q.  All right.  Are those sometimes referred to as GRASE

11   analyses?

12   A.  Okay.  I do GRASE analyses now, a little bit different than

13   the review of safety and effectiveness data.

14   Q.  Can you tell us what that term stands for, GRASE?

15   A.  So a GRASE is a review of an unapproved drug where we're

16   looking to determine whether it's generally recognized as safe

17   and effective by experts in the area.

18          If it is generally recognized as safe and effective by

19   experts in the field, then it would not require a new animal

20   drug approval because it wouldn't be a new animal drug.

21   Q.  What steps do you take when you undertake a GRASE review?

22   A.  So when I do a GRASE review, I take all the information

23   that we have about the drug to determine its intended use and I

24   evaluate whether the drug is listed with FDA, if we know who

25   the manufacturer is, whether the manufacturer is establishment

1   registered.  I check to see if that drug is approved or an

2   investigational drug that's being misused.

3          And I also then using that intended use information is

4   evidence of intended use, I go through and I search the

5   published medical literature, the peer review literature, to

6   look and see what types of studies have been done to establish

7   any level of safety or effectiveness for that drug for that

8   use.

9   Q.  As part of that process, do you check whether a drug is FDA

10  approved?

11  A.  Yes.

12  Q.  Do you check whether the manufacturer is registered with

13  the FDA?

14  A.  Yes.

15         MS. MORTAZAVI:  I'm going to read into the record a

16  stipulation between the parties, your Honor.

17         This is Government Exhibit 9002, and I'm going to

18  forego the initial paragraph.

19         THE COURT:  Yes.

20         MS. MORTAZAVI:  If called to testify at trial,

21  representatives of the Food and Drug Administration Center for

22  Veterinary Medicine, "FDA" would testify that (a) after

23  conducting a diligent search of all relevant records in

24  databases, the FDA has no records indicating that any of the

25  following companies, entities or individuals were ever

M52BGIA1                    Bowman- Direct

1   registered with the FDA to manufacture drugs in the United

2   States:

3           Equestology, Inc., Equestology LLC, Seth Fishman DVM,

4   21st Century Biochemicals, Inc., Jordan Fishman, Equiformance,

5   Equi-Science, Equi-Tech, Specialized Performance Compound.

6           B.  After conducting a diligent search of all relevant

7   records and databases, the FDA has no records indicating that

8   any of the following drug products were listed with the FDA:

9           VO2 Max, BB2, BB3, Serenity, TB-7, (Tymosyn Beta)

10  ITPlus, BPB, HP Bleeder, HP Bleeder Plus, Homeopathic Bleeder

11  Paste, EPM Double Kill, Iron Sucrose, GNRH, PSDS, (Pain Shot

12  DS),  ACTH.

13          And C.  After conducting a diligent search of all

14  relevant records and databases, the FDA has no records

15  indicating that the FDA issued export certificates for any of

16  the following companies, individuals, entities or drug

17  products:

18          Equestology, Equestology, Inc., Equestology LLC, Seth

19  Fishman DVM, 21st Century Biochemicals, Inc., Jordan Fishman,

20  Equiformance, Equi-Science, Equi-Tech, Specialized Performance

21  Compound,  and I'll stop reading this and skip to the bottom.

22          It is further stipulated and agreed by and between the

23  parties that this stipulation which is Government Exhibit 9002

24  may be received in evidence at trial, and the government offers

25  Government Exhibit 9002.

1          THE COURT:  It will be received.  This is in evidence.

2     It's an agreement between the parties, and this is evidence she

3     may consider.

4          (Government's Exhibit 9002 received in evidence)

5     BY MS. MORTAZAVI:

6     Q.  Dr. Bowman, were you asked to evaluate whether certain

7     drugs received any approval from the FDACVM?

8     A.  Yes.

9     Q.  Were you also asked to conduct a GRASE review of various

10    drugs?

11    A.  Yes, I was.

12    Q.  And who asked you to do that?

13    A.  You do.

14         MS. MORTAZAVI:  So I'd like to review some categories

15    of drugs with you and then discuss the analysis that you

16    conducted in this case.

17         Ms. Jung, could you please display for the jurors and

18    the witness Government Exhibit 711 which is a record that was

19    extracted from Lisa Giannelli's computer seized from her

20    residence.

21    Q.  Dr. Bowman, I'd like to review this document with you which

22    consist of a list of different drugs.

23         Looking at the first category, HP Bleeder Plus.

24         Ms. Jung, if you could focus on it.  That's perfect,

25    thank you.

1        Can you please read this into the record, Dr. Bowman,

2   starting with "a combination."

3   A.  A combination of a proven.

4        MR. FASULO:  Objection.  The document speaks for

5   itself.

6        THE COURT:  I'll give her some latitude.  She's not

7   going to read the whole document.  It is in evidence.  The jury

8   understands that.

9        MS. MORTAZAVI:  Certainly not.

10  A.  "A combination of a proven and test free "bleeding" (EIPH:

11  Exercise induced pulmonary hemorrhage) and analgesic.  The

12  analgesic constituents have been published as effective and

13  safe in a peer reviewed study in global and journals."

14  Q.  Let me pause you right there.

15       Are you familiar with EIPH?

16  A.  Yes.

17  Q.  What is that?

18  A.  It's exercise induced pulmonary hemorrhage, and it occurs

19  in the lungs following extreme exercise in some horses.

20  Q.  And the term "analgesic" as used here, are you familiar

21  with that is?

22  A.  Analgesic are pain relievers.

23       MS. MORTAZAVI:  I'm going to read into the record a

24  portion of this description.

25       "HP bleeder plus contains the strongest test free

M52BGIA1                    Bowman- Direct

vasodilators available on the market.  Vasodilation is a

benefit to all athletes shown in numerous published articles

for humans.  Horses benefit even more as they are prone to

EIPH.  Lasix is the current common treatment for EIPH which

will aid in the reduction of blood volume, but will also

produce dehydration and the risk to the equine of tying up and

other conditions. HP Bleeder Plus can achieve same results

without the side effects of Lasix."

Q.  I'm going to ask you about some of the terms.

          Are you familiar with vasodilators?

A.  Yes.

Q.  What are those?

A.  When you think of a blood vessel, around the outside of

that blood vessel, there's a layer of muscle.  So vasodilator

is a drug that relaxes that muscle and allows the blood vessel

to expand and that just tends to reduce blood pressure.

Q.  Are you familiar with Lasix?

A.  Yes.

Q.  What is that?

A.  Lasix, is furosemide.  It's a commonly used drug that

causes the body to eliminate excess fluid and therefore reduces

the blood volume and blood pressure.

Q.  And to just distill it down, what claims are made here

about this drug intended use as you understand it?

          MR. FASULO:  Objection.

1          THE COURT:  Grounds?

2          MS. MORTAZAVI:  It's her expert opinion.

3          MR. FASULO:  The document speaks for itself.

4          THE COURT:  Overruled.

5          Ms. Mortazavi is asking for your understanding.

6     A.  Could you repeat the question.

7     Q.  What is your understanding reviewing this product

8     description about this drug's intended use?

9     A.  So it appears that this drug is intended to use as a

10    vasodilator in the treatment of horses with exercise induced

11    pulmonary hemorrhage, and it claim to be better than the

12    standard treatment which would be Lasix.

13    Q.  Are those claims related to the effecting the structure or

14    function of an animal?

15    A.  Yes, and treating a disease.

16    Q.  So is this a drug that would typically require a

17    prescription?

18    A.  Yes.

19    Q.  Was HP Bleeder Plus FDA approved?

20    A.  No.

21    Q.  Were you asked to conduct a GRASE analysis?

22    A.  Yes.

23    Q.  And what were your conclusions?

24    A.  My conclusions were that there are not any published

25    articles to support that this drug is safe or effective for

M52BGIA1                    Bowman- Direct

1    intended use.

2    Q.  Ms. Jung, could you please display Government Exhibit 1018.

3            Dr. Bowman, I'm going to ask you about this particular

4    label. Does this contain all the information the FDA typically

5    requires on an approved drug label?

6    A.  No, it doesn't.

7    Q.  What, if any, information is missing?

8    A.  So this label is missing a lot of the label sections.

9    Because it's an IV administration, it would be expected to be a

10   prescription drug, so it's missing the prescription legend is

11   what it's called.

12           The law restricts this drug to use by or on the order

13   of a license veterinarian.  It lacks the contact information

14   for the firm that manufactured it or distributed it.

15           It lacks a complete ingredient statement and an

16   indication statement.

17           It also lacks cautions, precautions and other

18   information that would be necessary in order to know when to

19   safely use the drug.

20   Q.  Ms. Jung, could you please display Government Exhibit 1122,

21   1123 and 1124.

22           MS. MORTAZAVI:  For the record, these are photographs

23   that are already in evidence of drugs that were seized during a

24   search of Christopher Oakes's barn.

25   Q.  Dr. Bowman, do you want to take a minute and just look at

1    the different angles of this particular label, which for the

2    record it appears to have the writing on it HP bleeder and then

3    a plus sign.

4           Dr. Bowman, I'm going to ask you a minute whenever

5    you're done reviewing, whether you can tell us what

6    information, if any, is missing from these labels that FDA

7    typically requires?

8    A.  Similar to the other label it lacks the identification of

9    the manufacturer or the distributor with contact information.

10   It lacks the indication for use.

11          It lacks the complete ingredient statement and it

12   lacks the information, such as cautions, precautions and

13   warnings that would be necessary to use the drug safely.

14   Q.  Ms. Jung, if you could take these down and please display

15   Government Exhibit 1407, 1408, 1409 and 1410.

16          Which is again, for the record, in evidence as

17   photographs of a bottle that was seized or a drug that was

18   seized from the Golden Shoe Training Center.

19          And, Dr. Bowman, I'll be asking you the same question

20   regarding these labels whenever you had a chance to review, you

21   can begin to answer?

22   A.  Similar to the HP bleeder plus label, this also lacks the

23   information on the manufacturer or the distributor with the

24   contact information.

25          It lacks information.  It lacks the prescription

1    legend, an indication statement.  The direction for use don't

2    even -- which it didn't on any of the labels -- doesn't even

3    tell you what species you're supposed to administer to, and it

4    lacks all the information about caution, precaution and warning

5    statements and a complete ingredient statement.

6    Q.  Ms. Jung, if you can take these down and please display

7    Government Exhibit 161AT, and please play Government Exhibit

8    161A.

9               And again the jurors can follow along with their

10   binders if they'd like or they can follow the transcript on

11   their screen.

12              For the record, this is an intercepted call dated

13   April 22, 2019, between Lisa Giannelli and Brian Malone.

14              Ms. Jung, can you please play this exhibit.

15              (Media played)

16              (Media stopped)

17   BY MS. MORTAZAVI:

18   Q.  Dr. Bowman, having reviewed that phone call and that

19   transcript, assuming there's no veterinarian on that call, does

20   that reflect a valid VCPR?

21   A.  No, it didn't.

22   Q.  Why not?

23   A.  It doesn't identify the horses these drugs are going to be

24   used for.  There's no veterinarian providing the authority to

25   dispense those drugs, not even a reference to the veterinarian

M52BGIA1                    Bowman- Direct

1    has to pay or anything and there's been no diagnosis that we

2    know of.

3    Q.  And, Dr. Bowman, I'm going to ask you to lean the

4    microphone a little closer to your mouth just to make sure

5    everyone can hear you.

6         Ms. Jung, if you could please go back to Government

7    Exhibit 711.

8         Dr. Bowman, do you see at the bottom of the first page

9    there's a number 2 with bleeding pills?

10   A.  Yes.

11   Q.  Could you review the sentences that follow starting with

12   "Bleeder pills increase vascular integrity and help reduce

13   inflammation," and you can just look up at me when you're done

14   reading.

15        Dr. Bowman, what claims, if any, are made about

16   bleeding pills intended use?

17   A.  The claims made include vasodilation, analgesic and an

18   antiinflammatory claim in that they describe it as being

19   equivalent of getting a low dose corticosteroid steroid.

20   corticosteroid are antiinflammatory, so I would say it makes

21   all three of those claim.

22   Q.  Is this a drug that would typically require a prescription?

23   A.  Yes, because it requires a diagnosis of EIPH before you

24   would decide to dispense this product.

25   Q.  Ms. Jung, if we could go back to the full exhibit,

1  Government Exhibit 711, and go to number 3 on the list which is

2  on page 2 and that's VO2 Max.

3            Dr. Bowman, could you read the first line that appears

4  under the red text starting VO2 Max?

5  A.   "VO2 Max: HP Bleeder plus with additional ingredients.

6  Usually 10 mils 4-5 fors prior to race."

7  Q.   If you can read the next sentence that follows and you can

8  pause at the end of that sentence.

9  A.   "All-natural Japanese amino acid-based product that has

10  profound vasodilatory properties."

11  Q.   Is there a recommendation as to dose that's provided in the

12  second paragraph, in the second to last line of this

13  description?

14  A.   In the last paragraph there is a dose provided.

15            MS. MORTAZAVI:  I'm going to read that out loud into

16  the record.

17            "Dose is 10-20 mls intravenously for 1000 pound 450

18  kilograms."

19  Q.   So what claims are made as to this drug's intended use,

20  Dr. Bowman?

21  A.   So this drug is also being claimed as useful for horses

22  with exercise induced pulmonary hemorrhage and it's claiming

23  that it provides vasodilation and it proves lactic acid

24  accumulation.

25            Lactic acid accumulates when horses intensely

1    exercise.  Muscles produce lactic acid and they become somewhat

2    anaerobic in their physiology and lactic acid can build up, so

3    they're claiming that this will also aid in that process.

4    Q.  And are the claims here relating to effecting the structure

5    or the function of an animal?

6    A.  Yes, and controls symptoms of disease.

7    Q.  Is this drug one that would typically require a

8    prescription?

9    A.  Yes.

10   Q.  Was this drug FDA approved?

11   A.  No.

12   Q.  And were you asked to conduct a GRASE analysis of VO2 Max?

13   A.  Yes, I was.

14   Q.  What were your conclusion?

15   A.  My conclusion was that I couldn't find any published

16   studies to demonstrate that there was any safety or

17   effectiveness of this product for the indications.

18   Q.  Ms. Jung, if we could take down this exhibit and please

19   display Government Exhibit 1028 which is also in evidence.

20         If we could focus on just one of the labels that

21   appear here, for the record, on what appears to be a label

22   sheet.

23         Dr. Bowman, looking at this label which has the

24   writing on it VO2 Max, could you tell us if this contains all

25   the information that the FDA would typically require on a drug

1   label?

2   A.  No, it doesn't.

3   Q.  What, if any, information is missing?

4   A.  It's missing the prescription legend.  It's missing the

5   identifier of the manufacturer or distributor with contact

6   information.

7           It's missing the indication section, a proper

8   ingredient statement and the caution, precautions that would be

9   relative to the specific use of this drug.

10  Q.  I'm sorry, Dr. Bowman, I may have missed it.

11          Did you already discuss whether or not this included

12  manufacturer information?

13  A.  Yes.

14  Q.  Ms. Jung, if you could please display Government Exhibit

15  1114, 1115, 1116 and 1117.

16          And for the record, these are photographs taken during

17  the search of Christopher Oakes's barn that have been admitted

18  by stipulation.

19          Ms. Jung, if you can zoom in on 1117.

20          Dr. Bowman, just given this angle, are you able to

21  read most of the text on this label?

22  A.  Yes.

23  Q.  Does this appear to be the same product with a slightly

24  different label than the one we viewed before?

25          MR. FASULO:  Objection.

1          THE COURT:  Sustained.

2     Q.  Dr. Bowman, is there any information on this label, just

3     given the current view that is missing that the FDA would

4     require?

5     A.  Yes.  Similar to other labels we've looked at, this one is

6     missing the manufacturer, distributor contact information.

7     It's missing an indication section.  It's missing a complete

8     ingredient statement.  It's missing the prescription legend.

9     Q.  Thank you, Dr. Bowman.

10          If we take down these exhibits, please, Ms. Jung. And

11     could you please display for the jury Government Exhibit 127BT

12     and prepared Government Exhibit 127B, which is a portion of a

13     call intercepted on April 4th, 2019 between Seth Fishman and

14     Nick Devita.

15          Once again, the jurors are welcome to follow along

16     with their binders or on their screen.

17          Ms. Jung, if you could please play this government

18     exhibit.

19          (Media played)

20          (Media stopped

21          MS. MORTAZAVI:  Ms. Jung, if you can take down, this

22     exhibit, and please return to Government Exhibit 711, and if

23     you could turn to page 2 of that exhibit number 5 on the

24     itemized list.

25          For the record, this is PSDS, natural analgesic-pain

1  killer.

2  BY MS. MORTAZAVI:

3  Q.  Dr. Bowman, could you read the first lines that follow the

4  portion that I just read.

5  A.  "This product is based on the original Panacin formulation.

6  It has 2.5 times more D-Phenylalanine then all other compounded

7  and production versions."

8  Q.  Are you familiar with D-Phenylalanine?

9  A.  Yes.

10  Q.  What is it?

11  A.  It's an amino acid.

12       MS. MORTAZAVI:  And continuing on this description,

13  the sentence that follows.

14       "It is a mild anti-inflammatory compound and is a

15  prominent component in wound healing.  Intense exercise always

16  involved an anaerobic component and thus results in significant

17  reductions in ATP, an increase in muscle lactic acid, and an

18  increase in tissue acidity."

19       Ms. Jung, if you can turn to the next page to the

20  description that continues.  I'm going to read out loud the

21  text in bold.

22       Best used over two to three days prior to strenuous

23  exercise.  The typical dose is 5 mls and the last dose is

24  usually administered four to six hours prior to strenuous

25  exercise.

1    BY MS. MORTAZAVI:

2    Q.  Dr. Bowman, are there any claims made here about this

3    drug's intended use?

4    A.  They make claims that this drug will help with muscle

5    fatigue and the name itself implies pain relieving aspect to

6    this drug cause.

7              MR. FASULO:  Objection.

8              THE COURT:  Grounds?

9              MR. FASULO:  Speculation.

10             THE COURT:  Overruled.

11             You can continue, Dr. Bowman.

12   A.  It's a pain shot double shot PSDS, so that certainly -- we

13   would expect from that name that the drug would be used as a

14   pain reliever as well as to improve the muscle function during

15   extreme exercise.

16   Q.  So is this a drug that would typically require a

17   prescription?

18   A.  Yes.

19   Q.  Was this drug FDA approved?

20   A.  No.

21   Q.  Were you asked to conduct a GRASE analysis of this drug?

22   A.  Yes.

23   Q.  And what were your conclusions?

24   A.  I was not able to find any substantial evidence of safety

25   effectiveness for this drug in the published literature.

1    Q.  Ms. Jung, could you please display Government Exhibit 1027.

2          Dr. Bowman, I know that the text given the coloring is

3    a little tricky to read, but could you tell us, does this label

4    contain all the information the FDA typically requires on an

5    approved drug label?

6    A.  No, it doesn't.

7    Q.  What, if any, information is missing?

8    A.  Well, it's missing the information that would identify the

9    distributor, the manufacturer with contact information for

10   them.

11         It's missing the prescription legend.  It's missing

12   the section and the warnings and precautions for the safe use

13   of the drug.

14         And I'm not sure if that's a complete ingredient

15   statement, but because it's an injectable product, it should

16   give -- and maybe it does give the concentration of the active

17   ingredients, but I don't know if the inactive ingredients are,

18   if there are any.

19         MS. MORTAZAVI:  Ms. Jung, if you could take down this

20   and please play Government Exhibit 171A, and display its

21   corresponding transcript 171AT.

22         For the record, this is a May 1, 2019 between Lisa

23   Giannelli and Tyler Bitager (ph).

24         Ms. Jung, if you could please play.

25         (Media played)

1          (Media stopped)

2     BY MS. MORTAZAVI:

3     Q.  Dr. Bowman, reviewing that transcript and that call,

4     assuming there's no veterinarian that was apart of that call,

5     did that reflect a valid VCPR?

6          MR. FASULO:  Objection.

7     A.  No, it didn't.

8          THE COURT:  Overruled.

9     Q.  Why not?

10    A.  There's no discussion of what horse this is for, whether

11    he's trying to accomplish -- he says it's to calm them down,

12    but for what purpose.  That would make a difference into what

13    drug you would prescribe.

14         If you're trying to calm them down to have their feet

15    trim, you might use a different product, and it would depend on

16    when its next race was, that type of information, and none of

17    that is going on, so there's no evidence that there was a

18    veterinarian in this conversation.

19         THE COURT:  Ms. Mortazavi, when you get to a

20    convenient breaking point.

21         MS. MORTAZAVI:  Your Honor, I'm about to move onto a

22    new category approach, so this might be a good breaking point.

23         THE COURT:  All right.

24         Ladies and gentlemen, why don't you leave your

25    notepads on your seat with the transcript binders.  We'll take

1    a short break.

2              Please remember not to discuss the case during the

3    break and wait until all evidence has come in before you start

4    discussing the case with each other.

5              I'll see everyone back here in about 10 to 15 minutes.

6              All right.  Thank you.

7              Dr. Bowman, you remain under oath, so please do not

8    discuss your testimony with anyone during the break.

9              Thank you.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Is there anything we need to discuss?

3           MS. MORTAZAVI:  Not from the government.

4           MR. FASULO:  Not from the defense.

5           THE COURT:  Thank you, everyone.  Have a good break.

6    I'll see you back shortly.

7           (Recess)

8           THE COURT:  Before we bring the jurors back,

9    Mr. Fasulo, I just want to mention to you when you and your

10   colleagues are shuffling papers and talking, sometimes it's a

11   little loud and distracting.

12          MR. FASULO:  We'll be very careful.

13          THE COURT:  Try to be mind. Thank you.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2                THE COURT:  Dr. Bowman, you remain under oath.

3    Ms. Mortazavi.

4                MS. MORTAZAVI:  Thank you, Your Honor.

5                Ms. Jung, can we please display Government Exhibit

6    711, and please turn to page 3 and item number 7 on the

7    itemized list.

8    BY MS. MORTAZAVI:

9    Q.  I'm going to read this out loud for you, Dr. Bowman, in red

10   text.

11               "GNRH Factrel, Androgenic Hormone

12               Gondorelin Acetate is similar Factrel and identical in

13   sequence to Cystorelin.  This product is best used for sulking

14   horses, typically half to full bottle is used four to six hours

15   prior to strenuous exercise."

16               Dr. Bowman, are you familiar with any of the terms

17   that I just read out?

18   A.  Yes.

19   Q.  Could you tell us which ones and what they mean?

20   A.  So Gondorelin acetate is the active ingredient in two -- at

21   least two approved animal prescription drugs.  Factrel and

22   Cystorelin, those are the brand names of two approved products.

23               They talk about this drug being used for sulking

24   horses.  I think that's a term more commonly used in the horse

25   industry as sour horses, so horses that are not willing to put

1    forth their best.  They may be a little afraid of the other

2    horses on the track, maybe they don't even want to leave the

3    stall or the barn area.  It sounds like this drug is being

4    promoted for that use.

5    Q.  Based on this description, what claims are made about this

6    drug's intended use?

7    A.  It's an androgenic hormone so that is a hormone that would

8    increase the androgens which are the testosterone so that would

9    increase the aggressive behavior of the horse.

10   Q.  So are there claims made here relating to effecting the

11   structure or function of an animal?

12   A.  Yes.

13   Q.  Is this a drug that would typically require a prescription?

14   A.  Yes, it is.

15   Q.  Is this drug FDA approved?

16   A.  No, it's not, not this version of the drug. Factrel and

17   Cystorelin are not approved.

18   Q.  Were you asked to conduct a GRASE analysis of GNHR?

19   A.  Yes, I was.

20   Q.  What were your conclusion?

21   A.  I couldn't find any published study from the literature to

22   support the safety or effectiveness of Dr. Fishman's version of

23   GNRH.

24          MS. MORTAZAVI:  Ms. Jung, can you please display

25   Government Exhibit 1023 and focus in on one of the label on

1   this with the name GNRH.

2   Q.  Dr. Bowman, could you tell us looking at this if there is

3   any information missing that the FDA would typically require?

4   A.  Yes.

5   Q.  Could you explain?

6   A.  So this label is also missing the information on the

7   distributor or the manufacturer with contact information.  It's

8   missing the prescription legend.  The indication section, I

9   assume that this was -- it's a powder for injection, so that

10  probably is a complete list of the ingredients on this one, but

11  it does lack warnings and precaution statement that would be

12  necessary.

13          MS. MORTAZAVI:  Ms. Jung, could you please display

14  Government Exhibit 1404, 1405 and 1406.

15          For the record, these are photographs of a bottle that

16  was seized from a search of the Golden Shoe training center.

17  Could you focus in on Government Exhibit 1405 and 1406.

18          I'm going to read out loud the text that appears in

19  bold at the top of this label, GNRH.

20          Ms. Jung, if you can take this down and please display

21  Government Exhibit 1507, which for the record is another

22  photograph of a bottle that was seized from a search of the

23  barn of the Mount Hope Training Center.

24          And once again, I'm going to read the text that

25  appears in bold at the top of the label, GNRH.

M52BGIA1                          Bowman– Direct

                    Ms. Jung you can take this down, and please display

Government Exhibit 711.  Once again, turn to page 3.

                    This time if you could focus on item number 8.  ITTP

Plus increase oxygen release in blood, and I'm going to be

reading the description as a whole.

                    "ITPP plus other ingredients.  ITPP increases oxygen

release.  Compared to what's sold online, it's less than half

the price.  Most people are using half bottle night before and

remainder of bottle four to five hours before event."

BY MS. MORTAZAVI:

Q.  Dr. Bowman, what claims are made here about this drug's

intended use?

A.  It appears this drug's intended use is to increase the

oxygen content in blood, thereby improving performance by

having a sufficient amount of oxygen for the muscles to work.

Q.  Is that a claim that relates to the structure or function

of the animal?

A.  Yes, it is.

Q.  Is this a drug that would typically require a prescription?

A.  Yes, it is.

Q.  Is this drug FDA approved?

A.  No, it isn't.

Q.  Were you asked to conduct a GRASE analysis of this drug?

A.  I think it's the same drug.  I did IT plus, but I would

have found anything that was for ITPP plus in my searches if it

1   were there.

2   Q.  And in your analysis of IT plus, what were your conclusions

3   there?

4   A.  My conclusion was that there is no evidence in the

5   published literature to support the safety or effectiveness of

6   this drug for any purpose in horses.

7   Q.  Once again, Dr. Bowman, I'm going to ask you to pull the

8   microphone closer.

9           Ms. Jung, if you could please display Government

10  Exhibit 1025, focus on one of the labels on this label sheet.

11          Dr. Bowman, could you tell us what information is

12  missing, if any, that the FDA would typically require?

13  A.  So it's missing the distributor or manufacturer contact

14  information, the indication section.  It's missing the

15  contraindications and warnings and the prescription legend.

16          And I will give the benefit of a doubt that that may

17  be the complete ingredient statement; however identifying

18  propriety amino acids and sugars would not be an acceptable

19  ingredient definition.

20  Q.  You stated "proprietary amino acids and sugars," is that

21  the actual text that appears on this label?

22  A.  Proprietary AA which stands for amino acids and sugars.

23  Q.  Is it sufficient as part of an ingredient list to just

24  include propriety blend or here, proprietary AAs?

25  A.  No, it isn't.

1    Q.  Why not?

2    A.  You have to identify each active ingredients by its

3    specific established name.

4    Q.  Ms. Jung, if you could take down this exhibit and please

5    display Government Exhibit 711, and this time turn to page 4.

6           Looking at number 9 on the itemized list, I'm going to

7    read portions of this into the record, Dr. Bowman, but for the

8    record, did you review this entire description as part of your

9    preparation for your testimony today?

10   A.  Yes, I did.

11          MS. MORTAZAVI:  "TB-7 accelerated tissue repair

12   especially in lungs.  It has in some cases been effectively

13   used as short-term prerace, but in most cases this has been

14   short lived and with athletes crashing. Like all

15   immunomodulators they are highly beneficial in small strategic

16   doses and promote overall healing and increased immunity.

17   Q.  Are there any claims made here about this drug's intended

18   use?

19   A.  Yes.

20   Q.  What are those?

21   A.  This drug has an intended use of promoting healing, and

22   especially postrace, after postrace bleeding, so for horses

23   with the EIPH.

24   Q.  And are those claims that relate to the structure or

25   function of the animal?

1    A.  Yes, they do.

2    Q.  Is this a drug that would typically require a prescription?

3    A.  Yes.

4    Q.  Is TB-7 FDA approved?

5    A.  No, it isn't.

6    Q.  Were you asked to conduct a GRASE analysis?

7    A.  Yes, I was.

8    Q.  What were your conclusions?

9    A.  My conclusion was that there was no published medical

10   literature to support the use of this compound in horses for

11   this use.

12        MS. MORTAZAVI:  Ms. Jung, could you please display

13   Government Exhibit 1111, 1112 and 1113, which for the record

14   are photographs of drugs that were seized from the barn of

15   Christopher Oakes.

16   Q.  Dr. Bowman, if you need a minute to review the three

17   photographs, I'm going to be asking you, what, if any,

18   information is missing from this label that the FDA typically

19   requires.

20        I'll repeat my question, Dr. Bowman.  What

21   information, if any, is missing from this label that the FDA

22   typically requires?

23   A.  This label is missing the identifier for the manufacturer,

24   the distributor with contact information.  It's missing the

25   prescription legend.

1          It's missing the indication section, and it's unclear

2     whether that is intended to be a complete ingredient statement.

3     But because it's an injectable product or it's intended for

4     injection, it would be required to give the concentration of

5     each active ingredient which it does not, and there's no

6     warnings or precautions.

7          MS. MORTAZAVI:  Ms. Jung, if you could please take

8     down these exhibits.  Could you please display Government

9     Exhibit 320FK, and if you could focus on the messages in the

10    middle starting with March 1, 2019, 2:31 p.m.,  and then the

11    section that follows.

12          And for the record, this is a record of Equestology

13    that is already in evidence per stipulation.  I'm going to read

14    it into the record.

15          "Lisa Ranger Cell.  Some of the TB-7 I have here is

16    expired. Is it still good.  Expired May 2018.

17          Seth AA:  Yes.

18          Lisa Ranger cell:  Okay."

19    Q.  Dr. Bowman, what's the FDA's position on selling expired

20    drugs?

21    A.  You would not be permitted to sell expired drugs.  If you

22    were an approved product, you could extend your expiration

23    dating through supplemental data potentially if it did stay

24    within its parameters of effectiveness, but you can't sell

25    expired drugs.

1          MS. MORTAZAVI:  Ms. Jung, if you could please take

2     this down and return to Government Exhibit 711, and again turn

3     to page 4, looking at number 13 on the numbered list which is,

4          "ACTH, in small dozens will act as natural

5     anti-inflammatory, larger doses 2CC or more will act as a

6     sedation.

7          With testing of corticosteroid, there are not many

8     viable options left.  ACTH causes the adrenal gland to release

9     cortisol, the body's natural corticosteroid."

10    Q.  Dr. Bowman in this description of ACTH that continues onto

11    the following page.

12         Ms. Jung, if you can just please turn to the next page

13    and focus on that.

14         Do you see here a recommendation as to dose,

15    Dr. Bowman?

16    A.  *Yes.*

17         (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.   The typical dose is 250 IUs four to six hours prior to

2    strenuous exercise?

3    A.   Yes.

4    Q.   Could you tell us looking at this description, what claims

5    are made about the intended use of ACTH?

6    A.   So the claim for ACTH is that it will increase the

7    endogenous, the body's own production and release of

8    corticosteroids.

9    Q.   And are those claims related to affecting the structure or

10   function of an animal?

11   A.   Yes.

12   Q.   Is this one that would typically require a prescription?

13   A.   Yes.

14   Q.   And is ACTH FDA approved?

15   A.   There are two FDA approved animal drugs that has ACTH as

16   their active ingredient, but they may not be marketed at the

17   current time.  There's also an approved human ACTH drug that is

18   available.

19   Q.   Is there a version of ACTH that has been approved for any

20   of the companies that we reviewed previously?

21   A.   No.

22            MR. FASULO:  Time frame, Judge.

23            THE COURT:  Clarify, please.

24   Q.   Dr. Bowman, when you review the FDA's database for approved

25   drugs, for what time period does that database apply?

1   A.  That database started in 1989, 1990.  And before that, it

2   was in the file database, which was rolled into the new

3   database.  So I'm not sure exactly how far back it goes, but I

4   would say 1965.

5   Q.  That database goes back as far back at least 1989?

6   A.  Yes, I just can't recall.  I did look up to see when the

7   dial data started.  I think it was 1965, but I can't recall a

8   hundred percent for sure.

9   Q.  Were you asked to conduct a grassy analysis of ACTH?

10  A.  Yes, I was.

11  Q.  What were your conclusions?

12  A.  I couldn't find any published medical letter literature to

13  support the use of ACTH, this ACTH product, or for this use.

14          MS. MORTAZAVI:  Ms. Jung, could you please display

15  Government Exhibit 1022?  If you can focus on one of the labels

16  on the label sheet?

17  Q.  Once again, Dr. Bowman, what is missing on this label that

18  the FDA typically requires?

19  A.  So this label is missing the contact information and

20  identifier for the manufacture, or the distributor, it's

21  missing the indication, it's missing the prescription legend It

22  is missing the contraindications and warnings.

23  Q.  And, Dr. Bowman, do you see at the bottom of this label,

24  this appears to be a website?

25  A.  Yes.

M526GIA2                    Bowman - Direct

1   Q.  Is that sufficient to establish manufacturer contact

2   information?

3   A.  No, it isn't.

4   Q.  Why not?

5   A.  Because the regulation stipulates they have to provide

6   contact information with a telephone number.

7   Q.  All right.

8   A.  Address and telephone number.

9            MS. MORTAZAVI:  Ms. Jung, if could you take down these

10  exhibits and display Government Exhibit 1400, 1401, 1402, and

11  1403.

12           And, for the record, these are photographs of drugs

13  that were seized from the Golden Shoe Training Center.  I want

14  to read out loud the bold portion at the top of the label that

15  appears visible on Government Exhibit 1402, ACTH.  Ms. Jung if

16  you can please take this down an display Government Exhibits

17  1508, 1509, 1510, and 1511, which are photographs of the drugs

18  seized from the Mount Hope Training Center.  And I'm going read

19  again from the top portion of the label in all caps and bold,

20  ACTH.

21           Ms. Jung, you can take down these exhibits.

22           Can you please return to Government Exhibit 711,

23  Ms. Jung.  And could you please turn to the last page of this

24  exhibit?

25           THE COURT:  Can you hold up for one second?  I have--

1   an issue with my LiveNotes.

2             MS. MORTAZAVI:  Certainly, your Honor.

3             THE COURT:  I think it might be coming back now.

4             MS. MORTAZAVI:  Okay.  Thank you, your Honor.

5             THE COURT:  Thank you.

6   Q.  I'm going to read into the record portions of this

7   description that appears on Government Exhibit 711, Dr. Bowman,

8   Serenity sedation.  It's anti-anxiety for the most part.  Takes

9   away stress without affecting performance.  Typically 5 to 10

10  IV four to six hours before event.

11            And then at the bottom, L-theanine can cross the blood

12  brain barrier and has many published studies demonstrating it

13  can significantly reduce anxiety and stress.  It was also shown

14  to increase GABA and stimulates dopamine in the brain.  More

15  recent studies have shown it increases serotonin levels as

16  well, having the ability to increase three key

17  neurotransmitters, the end result is a destressed mind and

18  muscle relaxation.

19            Are you familiar with any of the terms I just read

20  out?

21  A.  Yes.

22  Q.  Could you explain which ones and what those terms mean?

23  A.  So, anti-anxiety is pretty self explanatory.  It means it

24  reduces the nervousness of the animal prior to the race.  These

25  ingredients, L-theanine -- Suntheanine is a brand name for a

1   version of L theanine, and those are amino acids.  GABA is a

2   neuro transmitter in the brain.  And when you increase GABA and

3   stimulate dopamine, that gives a feeling of wellbeing to the

4   patient and increase serotonin levels as well, you know, just

5   create a relaxed, happy patient.

6   Q.  So are those all claims made about this drug's intended

7   use?

8   A.  Yes.

9   Q.  Generally to affect the mood of the patient?

10  A.  Yes.

11  Q.  And are those claims related to affecting the structure or

12  function of an animal?

13  A.  Yes.

14  Q.  Is this a drug that would typically require a prescription?

15  A.  Yes, it is.

16  Q.  Is this drug FDA approved?

17  A.  No, it is isn't.

18  Q.  Were you asked to conduct a GRASE analysis of Serenity?

19  A.  Yes, I was.

20  Q.  What were your conclusions?

21  A.  I was unable to find any data to support the claims made

22  for Serenity, and I concluded that it was not generally

23  recognized as safe and effective for the intended use.

24          MS. MORTAZAVI:  Ms. Jung, can you please display

25  Government Exhibit 391S?  And, for the record, this is a

1  document produced by Equestology.

2  Q.  And, Dr. Bowman, looking at that label, can you tell us

3  what, if any, information is missing that the FDA typically

4  requires on a label?

5  A.  So it's missing the manufacturer or the distributor and the

6  contact information, it's missing the indication section, the

7  prescription legend, a complete ingredient statement

8  identifying all the ingredients and the concentrations of them,

9  and the warnings and precautions that might be necessary to use

10  the drugs safely.

11         MS. MORTAZAVI:  All right.  Ms. Jung, if you can take

12  down this exhibit.  And can you please display Government

13  Exhibit 319R?

14         For the record, another document produced by

15  Equestology that I will read into the record.

16         From Lisa Ranger, sent Thursday, June 8, 2017, to

17  Seth Fishman, subject Serenity/Equility.  Can you write a short

18  explanation about Serenity and how to use it?  Thanks, Lisa.

19         If can you take that down, please.

20         Please display Government Exhibit 308, once more a

21  record from Equestology.  I'll read this into the record from

22  Seth Fishman, sent June 8, 2017, to Lisa Ranger, RE

23  Serenity/Equility.  I can make a simple description if you

24  want.  It's an anti-anxiety, for the most part.  Takes away

25  stress without affecting performance.  Typically 5 to 10 CC IV

1   four to six hours before event.

2               Ms. Jung, if you can take this down, and please

3   display for the jurors Government Exhibit 165AT and prepare

4   Government Exhibit 165A?  Once again, the jurors can follow

5   along from their screens or binders.

6               This is an April 25, 2019, call between Lisa Giannelli

7   and Joshua Parker.  If you can please play.

8               (Audio played)

9               MS. MORTAZAVI:  Ms. Jung, you can take this exhibit

10  down.  And can you please display Government Exhibit 1220,

11  which is in evidence?  And, for the record, is a photograph of

12  a bottle that was seized from Jorgde Navarro's residence.

13              Ms. Jung, if we can rotate the image so we can see the

14  label, which says BB3?

15  Q.  Dr. Bowman, were you asked to conduct a GRASE analysis of

16  something called BB3?

17  A.  Yes, I was.

18  Q.  And did you first check to see whether BB3 is an FDA

19  approved drug?

20  A.  Yes, I did, and it isn't.

21  Q.  And what were your conclusions after conducting your GRASE

22  analysis?

23  A.  I was unable to find any data or information in the medical

24  literature to support the use of a drug called BB3.

25  Q.  Looking at this label, I know it may appear obvious, could

1  you give us three examples of what is missing?

2  A.  The indication section, the prescription legend, the

3  directions for use, the manufacturer identifier, the

4  ingredients list.

5           MS. MORTAZAVI:  All right.  Ms. Jung, if we could

6  please take this down, and could you please display

7  Government Exhibit 309, which is a record produced by

8  Equestology.  I'm going to read it into the record.  Ms. Jung,

9  if you can focus on the header information and the

10  lower-in-chain e-mail?

11          Thank you.  From Lisa Ranger, sent Friday, January 4,

12  2019, to Seth Fishman, subject simple terms.  If you could

13  focus on the header information, in the higher-in-chain e-mail?

14          From Seth Fishman sent Saturday, January 5, 2019, to

15  Lisa Ranger, subject, RE simple terms.  See below.

16          And, Ms. Jung if you can focus on the line that says

17  BB3 in red and the text that follows?

18          BB3 long acting blood builder.  Would only let trusted

19  clients have this.

20          Ms. Jung, if can you take this down and display 319J

21  which is, again, a record produced by Equestology.

22          I'm going to read the header information and

23  lower-in-chain e-mail.  From Lisa Ranger, sent Wednesday,

24  January 2nd, 2019, to Seth Fishman and Mary Fox, subject item

25  description needed.  Can you please send a short description of

1    each item, please?

2            And focusing on the descriptions, I'll read item

3    number 1.

4            B3.  This is a blood builder that is used five to six

5    days prior.  Usually it takes two weeks to see results.  The

6    dosing is once every two weeks.  I would really stay low key on

7    this one.

8            Ms. Jung, can you please display Government Exhibit

9    113AT and play Government Exhibit 113A?  For the record, this

10   is a February 21, 2019, call between Seth Fishman and Jeff

11   Gillis.

12           (Audio played)

13   Q.  Dr. Bowman, you testified earlier about Epogen.  Do you

14   recall your testimony?

15   A.  Yes.

16   Q.  Is there an equine-approved version of Epogen?

17   A.  No.

18           MS. MORTAZAVI:  Ms. Jung, can you please display

19   Government Exhibit 113BT and prepare Government Exhibit 113B?

20           And, for the record, this is a portion of the same

21   call, a later portion of the same call that we just played,

22   February 21, 2019, between Seth Fishman and Jeff Gillis.

23           Ms. Jung, if you can please play.

24           (Audio played)

25           MS. MORTAZAVI:  Good.  You can take this down.  And

1   please display Government Exhibit 113CT and Government Exhibit

2   113C, which is another portion of that same call we listened

3   to.  February 21, 2019, between Seth Fishman and Jeff Gillis.

4   If you can please play this portion of this call.

5            (Audio played)

6            MS. MORTAZAVI:  Ms. Jung, if you can take down this

7   exhibit.

8            If you can please display Government Exhibits 4016 and

9   4017, which are photographs taken during the search of the

10  office associated with Seth Fishman in Florida.  And if we

11  could focus on the bottles that appear in the center of this

12  exhibits, Ms. Jung?  I'm going to read what appears to be the

13  drug name which is listed here, EGH, equine growth hormone.

14  Q.  Are you familiar, Dr. Bowman, with equine growth hormone as

15  a general concept?

16  A.  Yes.

17  Q.  What is it?

18  A.  It's a hormone that's produced naturally in the body that

19  is responsible for enhancing the growth of tissues and repair

20  of cells.

21  Q.  All right.  And looking at this label, does this contain

22  all the information the FDA typically requires on an approved

23  drug label?

24  A.  No, it doesn't.

25  Q.  What information is missing?

1   A.  It's missing the distributor or manufacturer information

2   with the contact information, it's missing the indication

3   section, the prescription legend, the information on the

4   warnings, precautions, and it must have other ingredients

5   besides just the DHEA, which --

6               MR. FASULO:  Objection.  Speculation.

7               THE COURT:  Lay a foundation.

8   Q.  You stated earlier, Dr. Bowman, that you're familiar with

9   the concept of equine growth hormone?

10  A.  Yes.

11  Q.  That's separate from this particular drug, correct?

12  A.  Yes.

13  Q.  All right.  And how are you familiar with equine growth

14  hormone?

15  A.  Understanding the physiology of the body and how it works.

16  Q.  What is DHEA?

17  A.  It's a chemical name for a compound that is metabolized in

18  the body to androgen.

19  Q.  Can that alone stimulate equine growth hormone in an

20  animal?

21  A.  Not that I'm aware of.

22  Q.  All right.  Now, you were about to describe why you believe

23  the ingredient list here is incomplete.  Can you finish your

24  answer?

25              MR. FASULO:  Objection.

1          THE COURT:  Overruled.

2    A.   The reason I believe that the ingredient statement is

3    incomplete is because I believe it would be a powder if -- for

4    reconstitution for injection if it was pure equine growth

5    hormone, or even pure DHEA, but instead it's a liquid.  So

6    unless it was -- it hasn't already been reconstituted because

7    it has the complete top in place.  So it has some kind of

8    diluent in it.

9    Q.   Thank you.

10         MR. FASULO:  Objection.  Move to strike.

11         THE COURT:  Overruled.

12   Q.   What is that, diluent?

13   A.   That is a liquid that's used in the manufacturer of

14   pharmacy products that are injectable liquids.  It's what the

15   active ingredients that are solids dissolve into.

16   Q.   You used the term reconstitute.  Can you explain what that

17   means?

18   A.   Well, if you noticed some of the other products, they came

19   as a powder in an injection vial with the directions to add

20   bacteriostatic water to that.  That's reconstitution.  So it

21   has a longer shelf life if it's in the dry powdered form, and

22   you add the liquid just before you're ready to use it.

23         MS. MORTAZAVI:  Your Honor, no further questions.

24         THE COURT:  Thank you.  Mr. Fasulo.

25         MR. FASULO:  Thank you, your Honor.  One moment.

1        THE COURT:  Sure.

2        MR. FASULO:  If I may?

3        THE COURT:  Please, yes.  Thank you.

4    CROSS-EXAMINATION

5    BY MR. FASULO:

6    Q.  Good afternoon, Dr. Bowman.

7    A.  Good afternoon.

8    Q.  You and I haven't met prior to today; is that correct?

9    A.  I believe that's correct.

10   Q.  You have met with the government a number of times,

11   correct?

12   A.  Correct.

13   Q.  And you've consulted with the government, right?

14   A.  Yes.

15   Q.  And you've gone over your testimony with the government,

16   correct?

17   A.  Yes, in general.

18   Q.  And they asked you about your background, your job?

19   A.  Yes.

20   Q.  They asked you to look at some products, correct?

21   A.  Yes.

22   Q.  They asked you what your testimony would be related to

23   those products, correct?

24   A.  Yes.

25   Q.  And as you come here today, you come as an expert in the

1   field of -- in your experience with the FDA, and also in your

2   role as a veterinarian; is that correct?

3   A.  With limitations, yes.

4   Q.  Well, as we've spoken.

5          As a vet, though, you had to first go and take an

6   undergraduate degree?

7   A.  Yes, I did.

8   Q.  You received that undergraduate degree, and as part of the

9   requirements to get into medical school -- which is the next

10  step, correct?

11  A.  Yes.

12  Q.  You had to take certain science courses as well, correct?

13  A.  Yes, I did.

14  Q.  You were exposed to a number of science courses during

15  undergraduate, correct?

16  A.  Correct.

17  Q.  You took many courses in chemistry, organic chemistry?

18  A.  I took courses in those, yes.

19  Q.  Applied sciences, right?

20  A.  Yep.

21  Q.  And then you entered into a rigorous program at your

22  school?

23  A.  Yes.

24  Q.  One of the finer programs in the country?

25  A.  Well, I don't know about that, but it's a good program.

1    Q.  It's a good program.  And the program included not only a

2    very comprehensive course load, but a lot of field experience,

3    correct?

4    A.  Yes.

5    Q.  And part of the comprehensive course load meant being

6    familiar with all the -- well, being familiar with chemical

7    properties of various drugs; is that fair to say?

8    A.  To a certain extent, yes.

9    Q.  And you would say that it was a very highly competitive

10   program, correct?

11   A.  Yes.

12   Q.  And expectations were high, correct?

13   A.  Yes.

14   Q.  You needed focus, right?

15   A.  Yes.

16   Q.  And commitment?

17   A.  Yes.

18   Q.  And a lot of studies to get to where you are today,

19   correct?

20   A.  Yes.

21   Q.  And that's not only to get through the program, and then

22   there was licensing -- then there was an ongoing program after

23   that to become a vet, correct, after you received your MD?

24   A.  Well, DVM, but yes.

25   Q.  There were even additional courses relating to animals and

1    the effect of drugs on animals and treating animals, et cetera?

2    A.   That was all incorporated into the veterinary program.

3    Q.   Right.  And you took all those, you took many of those

4    courses, correct?

5    A.   Yes.

6    Q.   You took enough of those courses that you were able to

7    graduate and then be licensed as a vet, correct?

8    A.   Correct.

9    Q.   That's approximately how many years ago?

10   A.   It was in 1989.

11   Q.   Since 1989 you've been dealing with -- you have been in

12   your industry, meaning in the role of a veterinarian or in the

13   role of a veterinarian in the FDA, correct?

14   A.   Correct.

15   Q.   And even through that time period, from 1989 to present,

16   you have had a lot of ongoing continuing education, correct?

17   A.   Yes.

18   Q.   Both mandated by the agency?

19   A.   And voluntary, yes.

20   Q.   And also voluntary, correct?

21   A.   Yes.

22   Q.   And in addition, your work itself has educated you on an

23   ongoing basis, correct?

24   A.   Yes.

25   Q.   And in fact, working for the FDA things, rules,

1    regulations, new drugs come out, changes -- changes often and

2    causes you to do additional research and get up to speed with

3    whatever the new trends may be, correct?

4    A.   There is an amount of that, yes.

5    Q.   And you've done all that, correct?

6    A.   I've tried.

7    Q.   Right.  And within the context of your job in the FDA, you

8    are a component of that job, you said the scientific analysis

9    or scientific expert in the area, correct?

10            MS. MORTAZAVI:  Objection.  Vague.

11            THE COURT:  Are you able to answer, Dr. Bowman?

12   A.   We're called subject matter experts.

13   Q.   Subject matter experts, correct?  And that's in -- you're

14   part of a whole group of people that you work with, correct?

15   A.   Yes.

16   Q.   Some are subject matter experts, right?

17   A.   Yes.

18   Q.   Then there are legal experts, correct?

19   A.   Yes.

20   Q.   And then there are investigatory experts, field experts?

21   A.   Yes.

22   Q.   And other titles for other people that work with you in

23   your area, correct?

24   A.   Yes.

25   Q.   And you all work in this enforcement area, correct, that

1   you talked about earlier?

2   A.  Maybe not all of us, but most of us, that you just

3   described.

4   Q.  There's a lot of cross -- sharing of cross information back

5   and forth from different departments within the FDA when you're

6   doing analysis, correct?

7   A.  Depends on what kind of analysis you're referring to, not

8   when we're doing the GRASE analysis.  That is -- that's kind of

9   all me.  If I'm doing it, I don't consult with others.

10  Q.  But there are specialists in regulatory language and

11  regulatory interpretation, correct, within the agency?

12  A.  Not that I know of, I guess, except for our lawyers.

13  Q.  Your lawyers, for example, correct?

14  A.  But they don't review my work.

15  Q.  No, but they help to give direction as to how to interpret

16  certain areas of the regulations; is that right?

17          MS. MORTAZAVI:  Objection.  Vague.  To whom?

18          THE COURT:  She can answer generally.

19  A.  Sometimes.

20  Q.  And on many -- on some occasions, you need to consult them,

21  correct?

22  A.  On some occasions they need to consult with us.

23  Q.  That's true.  The point is that it is a very complex system

24  that's run at the FDA.  Very organized and very complex,

25  correct?

1  A.  I don't think it's that complex.  But, I mean, it does take

2  a variety of scientific experts to get to the best answers.

3  Q.  Right.  And there's a variety of different divisions within

4  the FDA, correct?

5  A.  Yes.

6  Q.  And everybody is working together to make sure that the

7  rules are followed in the way that they are intended to be,

8  correct?

9  A.  That's the ideal.

10  Q.  And you talked about one of the things you do is you notice

11  companies, individuals, product manufacturers, of defects that

12  may exist in the way they are interpreting the rules, correct?

13  A.  Sometimes.

14  Q.  Right.  And sometimes a warning letter is sent, for

15  example?

16  A.  Yes.

17  Q.  And in those letters, you try to resolve issues regarding

18  labeling or regarding product usage or intended uses just like

19  you talked about here today, correct?

20  A.  And marketing, yes.

21  Q.  And marketing, correct?

22        And some of those are informal procedures, right?

23  A.  I think everything we described was pretty formal.

24  Q.  Are there informal procedures as well?

25  A.  I think the field staff may at times informally stop by a

1    facility and say, hey, you may not want to do that, but we're

2    not part of that -- part of the process.

3    Q.  And then there's a more formal process you're involved in,

4    correct?

5    A.  Correct.

6    Q.  You talked about the different levels of that process,

7    correct?

8    A.  Yes.

9    Q.  And it's your hope that you can resolve most of these with

10   whoever it is that may be either misinterpreting or just

11   violating a condition of the FDA or provision of the FDA

12   regulations?

13   A.  Correct.

14   Q.  Is that fair to say?

15   A.  That's fair to say.

16   Q.  And during the -- during the course of this investigation,

17   you spoke about a number of categories of product that you --

18   that the FDA oversees, correct?

19   A.  Yes.

20   Q.  And one of it was the idea of an approved drug, correct?

21   A.  Correct.

22   Q.  And that would mean, if I'm -- if I'm right, that would

23   mean that the FDA has evaluated it, and it is now on an

24   approved list as indicated through the FDA, correct?

25   A.  Not exactly.  An approved drug has -- is sponsored by a

1   single company.  It doesn't just land on a list for anyone to

2   use.  It's a very specific proprietary product owned by a

3   specific company.

4   Q.  And they have that ownership for a number of years before

5   it becomes a generic drug; is that right?

6   A.  Yes.  Generics are a different issue.  It depends on the

7   drug when the original pioneer drug is approved.  It is usually

8   eligible for five to seven years of exclusivity, but even once

9   it's eligible for a generic copy, that is still an approval

10  process virtually the same as the original approval process

11  with a few shortened sections.

12  Q.  And we talked about the approval process, that it's a

13  comprehensive process.  Would that be fair to say?

14  A.  Yes.

15  Q.  That covers, I think you said, seven areas, correct.

16  A.  Correct.

17  Q.  Each area, there has to be submissions as to support, the

18  viability of the drug and, matching the criteria with each of

19  those seven areas; is that fair to say?

20  A.  Yes, it is.

21  Q.  That takes -- and within each of those areas, part of it is

22  testing of the drug, correct?

23  A.  Yes.

24  Q.  There's clinical tests that are done on various drugs,

25  correct?

1    A.  Yes.

2    Q.  And those are done by the manufacturers or by the founders

3    or veterinarians that are helping to create the product?

4    A.  Or the people they employ to do that testing.

5    Q.  Right.  And those tests then have to be submitted to the

6    FDA before, in fact, the drug could ever be approved, right,

7    and the results of those tests?

8    A.  Yes.

9    Q.  Let me rephrase.

10          As well as the results of those tests?

11   A.  Yes.

12   Q.  And you stated that it could run a few years or up to

13   10 years; is that fair to say?

14   A.  That's fair to say.  I mean it can be shorter or longer.

15   If it's a generic, it could be.  Very short.

16   Q.  After that process, the drug would be approved in the

17   terminology that you just stated, correct?

18   A.  I'm not saying it's absolutely necessary benchmarks for

19   approval.

20          (Pause)

21          MR. FASULO:  Let me just withdraw the last question.

22   And, judge, I ask to strike the last answer.  I'll ask another

23   question because I don't remember the wording of the question.

24          Would it be fair to say that after the drug went

25   through the process, it would either be approved or it would be

1    sent back for further testing or disapproved; is that fair to

2    say?

3    A.  We don't have a formal disapproval process, but it would

4    either be approved or it would not.

5    Q.  So, those are approved drugs, right?  There's other

6    categories of drugs that you look at.  And when we say drugs,

7    that's any product as used as you previously testified,

8    correct?

9    A.  Under the definition in the Federal Food and Cosmetic Act.

10   Q.  Correct.  And the second area is unapproved drugs, correct?

11   A.  Well, as you alluded to, there's multiple areas, there's

12   index listed drugs, there's conditionally approved drugs,

13   there's generic approved drugs, there's pioneer approved drugs,

14   and there are unapproved drugs.

15   Q.  So there are all those areas that a drug could be sold but

16   have those kind of -- those kind of labels put on it, correct?

17   A.  I don't understand the question.

18   Q.  You just named a bunch of areas where drugs would be

19   considered approved under different labels, correct?  Can you

20   repeat that for us again?

21   A.  That's not what I was talking about.

22   Q.  But I'm asking you, under approved drugs can you give me

23   the labels that would go with the approved drugs?

24              MS. MORTAZAVI:  Objection.  Vague.

25              THE COURT:  Sustained.

1   Q.   What did you mean by approved drugs.

2   A.   When I refer to an approved drug, I mean a drug that is

3   either an FDA approved pioneer drug, an FDA approved generic

4   drug, or an FDA approved -- conditionally approved drug which

5   is also in the process of getting its full approval.

6   Q.   Other than those three categories of approved drugs, as you

7   just stated, there's another level of drugs, which are

8   unapproved drugs; is that fair to say?

9   A.   That is fair to say.

10  Q.   Can you define unapproved drugs as it relates to your role

11  in the FDA?

12  A.   Unapproved drugs are marketed animal drugs that lack FDA

13  approval.

14  Q.   Right.  And would it be fair to say that within a vet's

15  practice, a vet has the authority to prescribe both an approved

16  drug as you stated and an unapproved drug?

17  A.   A veterinarian under 21CFR530 should be prescribing an

18  approved drug as long as there is one, an approved human or

19  animal drug, that will work for the indication and the intended

20  use.  If there is no approved drug, then there are conditions

21  under which it is possible to have drugs compounded, and those

22  conditions are all laid out in 21CFR530.

23  Q.   Correct.  And if a veterinarian does not find an approved

24  drug and has to compound a drug, it's within his discretion as

25  a vet with his license to decide whether or not he believes

1   that drug is appropriate; is that fair to say?

2   A.  He has to meet the conditions listed in 21CFR530, which

3   include, among many other provisions, that the drug needs to be

4   necessary to prevent death or suffering, and that there's no

5   approved drug that can perform that function.

6   Q.  And when you say prevents suffering, that's within the

7   discretion of the veterinarian who is prescribing that drug,

8   would that be fair to say?

9   A.  Not entirely.  I think there's a pretty good working

10  definition of what is meant by animal suffering.  I think -- I

11  won't say that.

12  Q.  Okay.  But the FDA doesn't regulate that term of art; isn't

13  that fair to say?  That is done by a state-by-state basis under

14  the licensing provisions of each state as it relates to

15  veterinarians?

16  A.  That law is a federal law, so that would be interpreted and

17  enforced by federal enforcement.

18  Q.  What is -- what is your understanding of the definition --

19  your legal understanding of the definition of suffering -- of

20  an animal suffering?

21  A.  Well, I'm not a lawyer, but I know when an animal is

22  suffering when it's unable to eat, it's in pain, especially

23  chronic pain.  Those are the kinds of things that we look for.

24  There's behavioral markers for all of those that are well

25  documented in the literature so you can document when an animal

1    is in pain, which is not always easy because it's not like they

2    can tell us.

3    Q.  And it's the job of the vet to make that determination; is

4    that fair to say?

5    A.  Within a valid veterinarian-client-patient relationship

6    after performing a physical examination of the patient.

7    Q.  And that also the veterinarian-client-patient relationship

8    is also a regulation that the veterinarian has to follow; is

9    that fair to say?

10   A.  Yes, it is.

11   Q.  And it's a regulation that's not only set out in the

12   language of the FDA, but is regulated by state-by-state

13   statute, correct?

14   A.  It is in both places.

15   Q.  Right.  And each state has a different way of interpreting

16   what actually is expected in the veterinarian-client-patient

17   relationship; is that fair to say?

18   A.  I think it's fair to say that most of them mirror what the

19   AVM, the American Veterinarian Medical Association definition

20   is, which is very close also to what the federal definition is.

21   Q.  But it's up to the state to make that determination as it

22   regulates the veterinaries -- the vets that are licensed within

23   their individual states; is that fair to say?

24   A.  Unless it comes up in a federal violation, in which case it

25   becomes a federal concern.

M526GIA2                        Bowman - Cross

1   Q.  Correct.

2           THE COURT:  So I want to instruct the jury.

3   Mr. Fasulo, you have a habit of saying "correct."  I'm going to

4   instruct you on the law.  The fact that Mr. Fasulo says correct

5   doesn't mean it's correct.  All right?

6           Thank you.

7           MR. FASULO:  Thank you, Judge.

8           I lost my train of thought for a second.

9   Q.  You talk about 21CFR530, correct?

10  A.  Yes, I do.

11  Q.  And when you speak of 21CFR530, that is a section of the

12  law that allows vets to compound certain drugs.

13  A.  It allows veterinarians to compound drugs from approved

14  human and animal drugs under the specific conditions laid out

15  in 21CFR530.

16  Q.  And that provision is specifically designated to instruct

17  the vets as to what they can and cannot do?

18  A.  That's one of the purposes.

19  Q.  That is the purpose, correct?

20  A.  That is one of the purposes.

21  Q.  And it is the vet who is responsible for his own action --

22          MS. MORTAZAVI:  Objection.  Vague.

23  Q.  -- as it relates to compounding?

24          If a vet decides to compound a product, it's the vet

25  who's responsible for the actions of compounding that product?

1    A.  I would need more information to answer that.

2    Q.  Well, in compounding a drug under 21CFR530, a vet,

3    hypothetically, can get two approved products and decide to use

4    them together in a new product that's not available and use it

5    on a case-by-case basis; would that be fair to say?

6    A.  No.

7    Q.  Well, tell me what compounding means to you, then.

8    A.  When you're compounding under 21CFR530, if you're, it's

9    a -- typically -- I'll use your example of the two different

10   approved drugs.

11        If the two different approved drugs are available for

12   your use and you want to use them together, you don't need to

13   compound anything.  You can just administer both drugs in

14   accordance with their label and instructions.  So compounding

15   typically takes place more in the situation of animals come in

16   a range of sizes, from a canary up to a hippopotamus, and the

17   dosage forms that are approved typically don't come in a range

18   that's suitable of all those weights and of all those animals.

19        Under the off-label use provisions, you can use a

20   product that's an -- approved and intended for use in cattle

21   for the canary, but the dosage form would be too concentrated,

22   so it might be a fairly simple matter to dilute that to a

23   concentration where you can dose the canary without killing it.

24        So those are the kinds of compounding activities.

25   That's just one example of that would be allowed under

1  21CFR530.

2  Q.  You talked about off label.  Can you describe what that

3  means?

4  A.  So off-label use of an approved drug is any use that is

5  different from the approved uses.

6       So the label says give 10 milligrams five times a day

7  to a dog, and you have a cat with an issue you think would

8  benefit from the active ingredient that's in this product but

9  there's no approved cat drug, then you might choose to use that

10  dog drug at the dose that's appropriate for a cat.

11  Q.  When you say you might choose, who's the "you" that you're

12  speaking about?

13  A.  In that case, it would be the veterinarian making that

14  decision.

15  Q.  Okay.  And the veterinarian would call upon their expertise

16  and their experience in making that decision; is that fair to

17  say?

18  A.  They should look at references because we don't treat

19  canaries, most of us, every day, so we would have to look that

20  up and do some research before we made that kind of decision.

21  Q.  Or use their experience if they are experienced in dealing

22  with certain animals and the using of certain drugs; is that

23  fair to say?

24  A.  There should be a basis for that experience.

25  Q.  Right.  If they have a basis for it, they can use that

1    basis?

2    A.   And that basis --

3    Q.   Let me finish the question.

4           If they have that basis and the basis is something

5    they can use to render that judgment of using that drug in that

6    off-market way?

7    A.   That would depend on what the basis is.

8    Q.   All right.  And when we're talking about basis, that would

9    be the basis of the licensed vet, right?

10   A.   No.  The basis for the decision-making would have to come

11   from someplace besides just a whim.  So there would have to be

12   some basis on which to have an expectation that that off-label

13   use of the drug would actually be effective and safe for the

14   condition that you've diagnosed after you've examined the

15   patient and taken it history and done your diagnostics.  There

16   has to be a kind of sequential basis for the determination of

17   the final treatment.

18   Q.   That basis would be part of what the experience of that vet

19   would be with the particular animals, with the particular drug,

20   and with their particular research that they would do in regard

21   to the prescription of that off-market drug; is that fair to

22   say?

23   A.   That sounds like a summary of what I just said.  I think

24   that's fair enough.

25   Q.   Okay.  Now, you talked about over-the-counter versus

1   prescription drugs.  Do you remember your testimony regarding

2   that?

3   A.  Yes.

4   Q.  And when you talk about over-the-counter drugs, those drugs

5   would be readily available to the public without prescription?

6   A.  Correct.

7   Q.  And those drugs, would be available through various

8   outlets; is that fair to say?

9   A.  Yes.

10  Q.  Through the manufacturers?

11  A.  Not typically.  But --

12  Q.  Through feed stores?

13          THE COURT:  Hold on.  You're stepping on each other.

14  A.  Typically, they'd be available through feed stores, tack

15  stores, pet stores.

16  Q.  Or through the vets?

17  A.  Maybe on rare occasions.  Most vets don't have the time or

18  the money to invest in over-the-counter medications people can

19  buy at the drugstore.

20  Q.  But there's nothing that prohibits a vet from providing

21  over-the-counter -- over-the-counter drugs to his clients; is

22  that fair to say?

23  A.  That is fair to say.

24  Q.  And as far prescription drugs, are you familiar with the

25  term herd management.

1   A.   Yes.

2   Q.   Can you describe to us what herd management is?

3   A.   There are some situations -- for example, feed lots, and

4   poultry farms -- where you're managing a group of animals in a

5   closed setting as opposed to an individual animal.

6   Q.   Are you aware of any setting where horses can be considered

7   herd animals?

8   A.   No.

9   Q.   None?

10  A.   Not within the confines of the drug world.

11  Q.   So is it your testimony here today that any prescription to

12  any horse requires the doctor to actually see that horse?

13  A.   At some -- it may be not that day, but have had prior

14  knowledge of that horse, have -- establish that

15  veterinarian-client-patient relationship, yes.

16  Q.   And when you say once a horse, who's the client, is -- the

17  patient, once the horse is the patient, it becomes an existing

18  patient; is that fair to say?

19  A.   With limitations.

20  Q.   As you know as a vet, would that be considered an existing

21  patient if you were out there --

22  A.   If I hadn't seen that patient for an extended period of

23  time or the problem that I was being asked about was a new

24  problem or didn't fall into the expectations of whatever old

25  problems the horse had been treated for, then it would be a new

M526GIA2                    Bowman - Cross

1    problem.  And it could be a new patient, if it's been more than

2    six months to a year, I would consider that a new patient

3    again.

4    Q.  But an existing patient could have the same problem for a

5    number of years, but you're familiar with as the veterinarian,

6    and you deal with that problem as an existing patient if you

7    were a vet, correct?

8    A.  I would --

9    Q.  Let me rephrase.

10   A.  Not over years.

11   Q.  I'm going to withdraw that and rephrase the question.

12           THE COURT:  I'm going to remind both out of,

13   Dr. Bowman, you keep answering before Mr. Fasulo, and sometimes

14   Mr. Fasulo, you're stepping on the answers.  So both of you

15   take a breath and let each other finish.

16           Thank you.  Go ahead, Mr. Fasulo.

17   Q.  There's a difference between new patient and existing

18   patient?

19   A.  Yes.

20   Q.  You would agree that existing patient is a patient the vet

21   had a relationship with, correct, prior to?

22   A.  There's a time element in that.  If the time element is not

23   there, if you have not had an existing, ongoing relationship

24   with that patient within a reasonable amount of time -- and

25   there may be slight differences in different practice acts; we

1  haven't specified it that I'm aware of, in the federal law, but

2  I know for most doctors' offices, it's a year.  If you haven't

3  been to see them in a year, you are considered a new patient

4  again.

5  Q.  And that's your understanding of most practices, correct?

6  Is that what you're saying?

7  A.  I think that would be a reasonable way to approach it for a

8  practice.

9  Q.  Is that also fair to say that is within the vet's

10  discretion under his own license to make that determination?

11  A.  No, I don't think it is.  I think it's under the discretion

12  of the practice acts for the states he's licensed in.

13  Q.  So it's under the practice acts, and the vets consult the

14  practice acts and then interpret what that practice act means

15  in relationship to existing patients, and it's within their

16  discretion to make the right judgment as to the art of those

17  words?

18  A.  Well, it's not just about the existing patient, it's about

19  the existing problem.

20  Q.  I'm only asking about existing patient.

21  A.  Well, you can't just separate those.  The existing

22  patient --

23          MR. FASULO:  Excuse me.  Judge, she if can't answer --

24          MS. MORTAZAVI:  She's trying to answer.  She's telling

25  you she doesn't believe you can answer it in isolation.

M526GIA2                      Bowman - Cross

1          MR. FASULO:  That's fine.

2    Q.  So let me ask you:  Would you agree the state regulations

3    regulate what an existing patient relationship is?

4          THE COURT:  That's a yes or no.

5    A.  I think it depend on the state, not all states probably do.

6    Q.  Would they give guidance as to what -- do you, as an expert

7    here today, do you believe that the state statutes give

8    guidance to the vets as to what an existing relationship is?

9    A.  Most probably do.

10   Q.  And therefore, would it be fair to say that you're not

11   familiar with each of those state regulations?

12   A.  Specifically regarding when a patient is a new patient

13   versus an existing patient?  No, I am not familiar with all 50

14   states and how they do that.

15   Q.  You would agree it's up to the vet in his capacity as a

16   licensed veterinarian in that state to consult the state

17   statutes?

18   A.  It is.  And it's important to note that the veterinarian

19   needs to be licensed in every state in which they are

20   practicing medicine.  So every state in which they are

21   dispensing drugs as part of their practice, they need to be

22   licensed in that state.

23   Q.  And when you say dispensing drugs, they need to be licensed

24   in the states where the patient is actually located; would that

25   be fair to say?

1  A.  And the state in which they have their facility.

2  Q.  Right.  So if my facility is in Delaware, I need to be

3  licensed in Delaware if I'm working out of a Delaware location?

4  A.  But if your patients --

5  Q.  My question is if I'm working at a Delaware location, do I

6  need to be licensed in Delaware if my office is in Delaware?

7  Yes or no.

8       THE COURT:  No.  No.  She can finish her answer.

9  Dr. Bowman, you can answer.

10  A.  Okay.  So you need to be licensed in the states in which

11  the animals are being treated.  So you might live in Delaware,

12  your facility might be in Delaware, but you may be treating

13  patients in Maryland, Pennsylvania, and New Jersey, in which

14  case you need to be licensed in all of those states.

15  Q.  Which is my next question.

16       You also need to be licensed in the states where the

17  animals are actually being treated?

18  A.  If you're treating them, yes, of course.

19  Q.  But you don't need to be licensed in the states where the

20  owners are located?

21  A.  Not necessarily.  Unless the owners are located in the same

22  states as the horses.

23  Q.  Right.  So it's possible -- you do not need to be licensed

24  in a state in which an owner exists if that's not where the

25  horse is actually being treated?

1  A.  Well, if you're actually treating the horse, wouldn't you

2  dispense the medications while you were there?

3          THE COURT:  Dr. Bowman, you just need to answer the

4  question.

5          THE WITNESS:  I don't understand that question.

6  Q.  If I own a horse -- hypothetically, someone owns a horse

7  and they live in New York, and the horse is located in Kentucky

8  and the horse is treated in Kentucky, if the vet is treating

9  the horse that's located in Kentucky, the vet must be admitted

10 as a licensed vet in the state of Kentucky?

11 A.  Correct.

12 Q.  He does not need to be admitted in the State of New York?

13 A.  Correct.

14 Q.  Thank you.

15         MR. FASULO:  Judge, I don't know what time you want to

16 break.

17         THE COURT:  1:00 o'clock.  Unless you know that's --

18         MR. FASULO:  That's fine.  I just wanted to have an

19 idea of where I should go next based on that.

20 Q.  Now, during your direct examination you talked about

21 typically -- it's typically a prescription, do you remember

22 using that term of art?

23 A.  No, I don't.  Can you give me context?

24 Q.  For example, you said IV medications are typically

25 prescribed medications.  Do you remember testifying to that?

M526GIA2                    Bowman - Cross

1    A.   That sounds right.

2    Q.   When you use the term "typically prescribed," what did you

3    mean by that term?

4    A.   I meant that in the modern era, all the drugs that are

5    administered by IV injection will be prescription drugs.  I'm

6    sure that you can find a couple of old, old products that are

7    still marketed that may be marketed with IV on the label that

8    are not -- do not bear the prescription legend and are not

9    approved.

10   Q.   And once again, when you say not approved, does that mean

11   the drug cannot be dispensed?

12   A.   In the case of the drug that I'm thinking of, I think if we

13   did a GRASE evaluation, we would find that that drug is

14   generally recognized as safe and effective under the conditions

15   of use on its label, which would mean it's not a new animal

16   drug, it's just an animal drug, and it can continue to be

17   marketed.

18          MR. FASULO:  Judge, that was a yes-or-no.  Your Honor,

19   can I have the last question read back, please?

20          THE COURT:  No.  I think that's how she can answer it,

21   Mr. Fasulo.

22   Q.   You used the term "not approved" again.  Yes?

23   A.   I don't know.  You can read the answer back, and I'll tell

24   you.

25   Q.   When you use the -- I'll withdraw that question.

1          When you use the term "not approved," does that mean

2    the drug cannot be dispensed?  Yes or no.

3    A.   It depends.

4    Q.   Would that be yes or no?

5          THE COURT:  No, no.  It depends means she can't answer

6    yes or no.

7    Q.   Well, let me ask you this:  If a drug was not approved,

8    would that drug not be permitted to be dispensed?

9    A.   If a drug is not approved but is marketed illegally, it is

10   being dispensed but that doesn't make it legal.

11   Q.   You talked about nutritional supplements for horses.  You

12   indicated that there are no regulations regarding nutritional

13   supplements in the current FDA regulations.

14   A.   For nutritional supplements, correct.

15   Q.   And you talked about homeopathic drugs.

16   A.   Yes.

17   Q.   And you said that there isn't a separate categorization for

18   homeopathic drugs.

19   A.   Homeopathic animal drugs.

20   Q.   Is that right?

21   A.   That is right.  There is no special category.

22   Q.   Would it be fair to say that without any other information,

23   it's hard to determine whether a nutritional supplement or a

24   homeopathic drug would be considered an over-the-counter drug

25   or a prescribed drug?

1              MS. MORTAZAVI:  Objection.

2              THE COURT:  No.  She can answer.

3    A.  If you're able -- repeat that question.

4              MR. FASULO:  Can I have it read back, please?

5              THE COURT:  Yes.  Would the court reporter please read

6    it back?

7              (Record read)

8              MS. MORTAZAVI:  Your Honor, I renew my objection on

9    the basis of the witness' last answer.

10             THE COURT:  Overruled.

11   A.  So a nutritional supplement is either a food or drug.  It's

12   not a special category where it has qualities of both.

13   Nutritional supplements are oral.  They have nutritional

14   components in them that provide taste, aroma, nutrition.  So

15   that's -- if they make drug claims for animals, then they're

16   going to be regulated as an animal drug.  If they make

17   structure function claims and they have elements of nutritional

18   benefit to the animal and sufficient quantity to provide actual

19   nutrition and they are administered orally, then they could be

20   considered a food with the structure function claim.

21             As far as knowing whether a drug should be marketed

22   prescription or over-the-counter, by looking at the label, we

23   can -- I can't think of a single example where we couldn't tell

24   that.  Because if it's going to be suitable for

25   over-the-counter administration, it has to provide adequate

1    directions for use by the laymen.

2    Q.  And that is what you've studied, and that is what you've

3    done for a number of years to make those determinations in the

4    FDA, correct?

5    A.  That's part of what I do.

6    Q.  All right.  And it requires a certain expertise to do that;

7    would that be fair to say?

8    A.  It requires a knowledge of regulations.

9    Q.  And is there an expertise in the area of science in order

10   to do and make those determinations; is that fair to say?

11   A.  It's really not challenging.

12   Q.  Do the people that work with you have similar backgrounds

13   to you in terms of expertise and experience?

14   A.  Not all of them, no.

15   Q.  Do they have a scientific background?

16   A.  Some of them do.

17   Q.  Do they have a background that has experience in the area

18   of labeling as it relates to medications.

19   A.  In our compliance area, very few people actually have that

20   experience.

21   Q.  I'm asking about your area specifically.

22   A.  Well, I'm in the division of drug compliance now, so one

23   team of our division has that kind of subject matter expertise,

24   the other teams do not.

25   Q.  That's what I'm saying.  You need to have a subject matter

1  expertise to contribute in that division in the way that you

2  operate and the job that you do; is that fair to say?

3  A.  We have guidance documents that very clearly and easily

4  provide a chart so that you can look at a drug label and tell

5  what it needs.

6  Q.  And in order to do that, you have to receive certain

7  training from the FDA as to how to use those charts and what

8  value those charts have in the analysis that are being done?

9  A.  No.  Those guidance documents are available publicly.  If

10  you Google it, they'll pop right up.  And they are written to

11  the level, I think, of a 7th grade education, so that you can

12  very simply and easily tell what needs to be on the label for

13  each type of drug and how to tell what each type of drug is.

14  Q.  And would it be fair to say there's a number of drugs that

15  are not properly labeled that you have looked at during the

16  course of your employment, right?

17  A.  Yes.

18  Q.  And a number of those drugs are manufactured by major

19  manufacturing companies that are approved?

20  A.  No.

21  Q.  None of them, never?

22  A.  No.

23  Q.  Okay.  And in terms of the ingredients that be listed, you

24  have dealt with the issue of what ingredients need to be on the

25  label and what don't, right?

1    A.  Yes.

2    Q.  And your division sends out a number of warning labels

3    every year -- warning letters.  I'm sorry.  Every year.

4    A.  We do.

5    Q.  And some of those letters are sent to companies that have a

6    history of doing the right thing all the time, and some are

7    sent to companies that don't have that same history; would that

8    be fair to say?

9               MS. MORTAZAVI:  Objection.  Vague.

10              THE COURT:  Overruled.

11   A.  They are sent to all kinds of companies.

12   Q.  Right.  And at times, a company makes a judgment error and

13   needs to correct a label or needs to correct an ingredient list

14   in order to comply with your regulations?

15   A.  Yes.

16   Q.  And at times, they do that and then they are in full

17   compliance?

18   A.  Yes.

19              THE COURT:  All right.  Mr. Fasulo, where is a good

20   break point?  If you're on a topic, you can finish.  That's

21   fine.

22              MR. FASULO:  You know, Judge.  This is a good point,

23   and I can go on to the transcripts.

24              THE COURT:  That's fine, then.

25              All right.  Ladies and gentlemen, let's take our lunch

1    break.  If we can be back in 45 minutes, that would be great.

2    Please leave your notepads and the binders on the chairs, and

3    do not discuss the substance of the case.

4            Dr. Bowman, please wait.  Please be seated.

5            THE WITNESS:  Oh, I was just standing.

6            THE COURT:  Please do not discuss the case, the

7    testimony, or anything related to the subject matters during

8    your break.  All right?  Thank you very much.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  All right.  Please be seated, everyone.

3              Dr. Bowman, you remain under oath.  I hope you have a

4    pleasant lunch break, and we'll see you back after the break.

5              Okay.  You may step down.  Thank you.

6              THE WITNESS:  Thank you.

7              THE COURT:  Some of our jurors are exiting, so it's

8    not appropriate for you to leave yet, Dr. Bowman.

9              Okay.

10             (Witness steps down)

11             THE COURT:  All right.  Is there anything we need to

12   talk about?

13             MS. MORTAZAVI:  Not from the government.

14             MR. FASULO:  Not from the defense.

15             THE COURT:  Okay.  Great.  Have a good lunch.  I'll

16   see you at about 1:45.

17             (Luncheon recess)

18

19

20

21

22

23

24

25

M526GIA2

AFTERNOON SESSION

1:50 p.m.

(Trial resumed; jury not present)

THE COURT:  Good afternoon, everybody.  Please be seated.

Is our jury ready?

DEPUTY CLERK:  Yes, your Honor.

THE COURT:  All right.  Will someone retrieve Dr. Bowman while we're getting seated?

1          (Jury present)

2          THE COURT:  Good afternoon, Dr. Bowman.

3          THE WITNESS:  Good afternoon.

4          All right.  I hope you had a pleasant break and that

5   our jurors did as well.

6          Mr. Fasulo, whenever you're ready.

7          MR. FASULO:  If I may, your Honor.  Thank you.

8          I'd like, if I can, to ask the government's assistant,

9   I'd like to look at 1609AT again.

10          THE COURT:  Do you want the jurors to retrieve their

11  binders?

12          MR. FASULO:  Yes.

13          THE COURT:  So this is the transcript you looked at

14  earlier.  If you would all please pull your binders out or look

15  on the screen.

16          MR. FASULO:  And if I could have the first page,

17  please?  Sorry.

18  BY MR. FASULO:

19  Q.  This is a transcript of April 30, 2019, between

20  Lisa Giannelli and Norman Morford.

21          Would it be fair -- doctor, you don't know who

22  Norman Morford is?

23  A.  No, I don't.

24          MR. FASULO:  Can we now look at the transcript,

25  please, page 1.

1  Q.  Do you remember looking at this transcript and hearing it

2  played to you during your direct examination?

3  A.  Yes, I do.

4  Q.  And do you remember a statement that you made regarding

5  this transcript regarding whether or not it established the

6  VCPR relationship?

7  A.  Not specifically.  But I believe I probably did say that.

8  Q.  And would it be fair to say -- and the government said in

9  their question to you -- that if a vet was part of this

10  conversation, it would have a different import to you, correct?

11  A.  Possibly.

12  Q.  Right.  And is it also fair to say that this is a small

13  transcript -- small snippet of a full transcript as far as you

14  know?

15  A.  As far as I know, I just know what I am shown.

16  Q.  Right.  And you don't know whether or not this Norman --

17         MR. FASULO:  Go back to the first page again.

18  Q.  Whether or not Norman Morford had any other conversations

19  with the vet, Dr. Fishman, do you?

20  A.  I don't.

21  Q.  And you don't know what the relationship he had with the

22  animals that Norman Moford was ordering these materials for?

23  A.  I don't, but they don't --

24  Q.  Do you or do you not?

25         THE COURT:  That is a yes or no, Dr. Bowman.  Do you

M526GIA2                    Bowman - Cross

1    know what the relationship --

2    Q.  Between Dr. Fishman and Norman Moford or his patients, his

3    horses were, you don't know that relationship --

4    A.  No, I don't.

5    Q.  You don't know if it was an existing relationship?

6    A.  No, I don't.

7    Q.  And you don't know what information Moford would have given

8    to Fishman before he made this call, if any?  You don't know

9    that?

10   A.  I don't.

11   Q.  And all of those things would have to be considerations

12   before you would be able to say whether there was a VCPR

13   relationship between Dr. Fishman and the horse that

14   Norman Morford was ordering for.

15   A.  I think there are certain pieces of information that would

16   have to be included in this call in order to document that

17   there was a VCPR, including the names of the patients and

18   reference to a conversation with Dr. Fishman, because I don't

19   know how the person selling the drugs would know that he had

20   given his okay unless she was told that from the owner or she

21   asked for that information.

22   Q.  Or if she was told that from the vet?

23   A.  That seems unlikely to me.

24   Q.  I'm not asking you whether it seems unlikely.  My question

25   is you don't have the basis to make that judgment; is that fair

M526GIA2                    Bowman - Cross

1   to say?

2            MS. MORTAZAVI:  Objection.

3   A.  The information I can see in this --

4            THE COURT:  Overruled.

5            From what's on this transcript, do you have the

6   information you need to make that determination?  You can

7   answer that.

8            THE WITNESS:  My personal determination would be this

9   fails to meet the VCPR.

10  Q.  If you were hypothetically to find out there was a

11  conversation and an examination of the animal that

12  Norman Moford had by the doctor before this conversation took

13  place, would that be a consideration in your determination?

14           THE COURT:  Is this a hypothetical question?

15           MR. FASULO:  Yes.  That's a hypothetical.

16  A.  It could be.

17  Q.  And if, in fact, hypothetically there was a phone call

18  between Dr. Fishman and Lisa Giannelli regarding this upcoming

19  call from a Norman Morford describing what the call would be

20  about and what Mr. Morford would want, that would be another

21  consideration that would go into your determination that there

22  was or was not a VCPR relationship?

23  A.  It could.

24  Q.  So without that information, you're not able to make a

25  judgment right here as whether or not there was a VCPR

M526GIA2                    Bowman - Cross

1  relationship between the doctor and this particular client, or

2  his horses?

3           MS. MORTAZAVI:  Objection.  Asked and answered.

4           THE COURT:  Overruled.

5  A.  I'm sure that there could exist other information --

6           MR. FASULO:  Judge, I asked for a yes-or-no.

7  A.  -- would lead me to come to a different conclusion.  I can

8  only base it on what I know.

9  Q.  Very well.  Thank you.

10          MR. FASULO:  I'd like to go to transcript number 182.

11 This is a phone call, intercepted line, on 4/27/2019 between

12 Lisa Giannelli and Timothy Collins.

13 Q.  Can we go over -- Doctor, you also looked at this

14 conversation, correct?

15 A.  I did.

16 Q.  And without having any other context, without knowing

17 anything else about this conversation -- let me withdraw that

18 question.

19          And, doctor, you don't know if there were other

20 conversations between Tim Collins and Dr. Fishman before this

21 conversation, do you?

22 A.  No, I don't.

23 Q.  Do you know if Tim Collins' horse was ever evaluated by

24 Dr. Fishman?

25 A.  From the information presented today, I don't know.

1    Q.  And do you know whether or not there was actually a

2    relationship between Tim Collins' horse and Dr. Fishman under

3    the VCPR?

4    A.  No, I don't.  And I also don't know if there's relationship

5    between Lisa Giannelli and Dr. Fishman.

6    Q.  Thank you.

7            Next, I'd like you to look at 185.

8            Doctor, I direct your attention to the screen.  This

9    is Government Exhibit 185T, a conversation between

10   Lisa Giannelli and an unknown female.

11           MR. FASULO:  Can we turn to the first page, please?

12   Q.  Take a moment to reflect your recollection about this

13   conversation.  Do you know who Nancy Hargis is?

14   A.  No, I don't.

15   Q.  Do you know if she's a vet or not a vet?

16   A.  No, I don't.

17   Q.  And do you know whether or not Nancy Hargis had had any

18   conversations with Dr. Fishman about her horse or needs of her

19   horse prior to her conversation with Lisa Giannelli?

20   A.  I don't even know if she knows Dr. Fishman.

21   Q.  Do you know whether Lisa Giannelli had any conversations

22   with Dr. Fishman before she sent out the order?

23   A.  I don't.

24   Q.  Okay.  And would you agree that all those factors would be

25   factors  that need to be considered in determining whether

M526GIA2                    Bowman - Cross

1    there's a valid VCPR relationship?

2    A.   If they are available.

3    Q.   If they happened?

4    A.   Yeah.  Yeah, if they happened.

5    Q.   Thank you.

6              Transcript number 171.  Again, this is a May 1st,

7    2019, conversation between -- transcript between Lisa Giannelli

8    and Tyler Buter.  Take a look at this transcript, Doctor.

9              And just once again, briefly, it's fair to say that

10   you don't know what transpired before this snippet of a

11   conversation, correct?

12   A.   No.  I have no way of knowing what happened before.

13   Q.   And you don't know whether Tyler Buter had a conversation

14   or had an existing relationship with Dr. Fishman?

15   A.   There's no mention of Dr. Fishman in this.

16   Q.   So you don't know that?

17   A.   I don't know either way.

18   Q.   And you don't know -- and this is a portion of that

19   conversation, correct, as far as you know?

20   A.   As far as I know.

21             MR. FASULO:  And that's it for this.  Go to 127B.

22   Q.   This is the transcript, 127B.  The date is 4/4/2019 between

23   Seth Fishman and Nick Devita.

24             Do you remember seeing this transcript before?

25   A.   Yes, I do.

M526GIA2                    Bowman - Cross

1   Q.  And, again, you don't know who Nick Devita is?

2   A.  No, I don't.

3   Q.  And Seth Fishman, you have learned is a veterinarian,

4   correct?

5   A.  Yes.  He is a veterinarian as far as I know.

6   Q.  And this is a conversation between the vet and this person

7   named Nick Devita.  In this conversation, is it fair to say

8   that the doctor is talking about what the potential use of the

9   bleeder could be if I draw your attention to line 8?

10  A.  Yes.

11  Q.  And is it clear from this conversation that Dr. Fishman was

12  also telling -- let me read on number 10, Fishman says:  It's

13  using much newer, more let's just blood bioengineered amino

14  acids, correct?

15  A.  Blood is not in there.  But, yes, that's what it says.

16  Q.  I'm sorry.  Bioengineered amino acids.

17  A.  That's what he says.

18  Q.  You would agree with me that this is alone a part of a

19  conversation; this is all you saw when you testified, correct?

20  A.  Correct.

21  Q.  And you don't know what the conversation was before this or

22  after this relating to what was discussed in this conversation,

23  correct?

24  A.  That is true.

25  Q.  And you don't know whether the animal that Mr. Devita may

1   have had was or was not an existing patient or existing patient

2   under Dr. Fishman's care; do you know that?

3   A.  Not from this conversation.

4   Q.  I'd like to go to 1605AT.  It is a conversation between

5   Lisa Giannelli and Joshua Parker dated April 25, 2019.

6           MR. FASULO:  You can go to the next page.

7   Q.  Do you remember being shown this conversation during your

8   direct examination?

9   A.  Yes.

10  Q.  And at this point, I think earlier you stated you don't

11  know if Lisa Giannelli worked for Dr. Fishman.  If you look at

12  line six, can you read that line?

13  A.  In this conversation, she says she still works for

14  Dr. Fishman.

15          MR. FASULO:  Okay.  And can I have the whole -- thank

16  you for that.

17  Q.  And, in fact, if you read line 11, this indicated to you

18  that Dr. Fishman didn't answer and I sent him a text message

19  and he still hadn't responded.  Is that what line 11 says?

20  A.  That's what it says.

21  Q.  Do you know whether JP ever made contact with Dr. Fishman

22  or if Lisa Giannelli made contact with Dr. Fishman before she

23  dispensed or sent these items to JP?

24  A.  I don't know whether she tried or didn't try or -- no, I

25  don't.

M526GIA2                    Bowman - Cross

1    Q.  And would the fact that Fishman -- would it affect your

2    opinion that you gave in court about the VCPR relationship --

3    would it affect your opinion if you were to find out that there

4    were conversations or knowledge or examinations done by

5    Dr. Fishman before these items were sent out?

6              THE COURT:  Are you asking hypothetically or --

7              MR. FASULO:  Hypothetically, Judge.

8    A.  Well, if there were examinations carried out and diagnoses

9    made that would affect my determination.  I don't believe

10   that's the case based on information.

11   Q.  Well, the information you have is only the transcript; is

12   that right?

13   A.  Presented here today.

14   Q.  You don't have any reason -- you don't have any other

15   information to guide you on that; is that correct?

16   A.  Can I make reference to anything in the past?

17             THE COURT:  If you have other information, that's the

18   question.  So you can answer.

19   Q.  Specifically related to this conversation and this

20   transaction?

21   A.  Not this specific transaction.

22   Q.  Well, that's what we're talking about, aren't we --

23   A.  No, we're talking about VCPRs with Dr. Fishman and his

24   patients.

25   Q.  No, I was talking about specifically about VCPR

1  relationship between Dr. Fishman and JP, who's labeled in this

2  conversation.  And do you have information regarding that

3  relationship that affects your opinion here today specifically

4  about that relationship.

5  A.  The information that I have is that Dr. Fishman didn't have

6  a valid veterinarian-client-patient relationship with any of

7  the horses for which he was prescribing drugs.

8  Q.  But you don't know that from any of the facts as it relates

9  to this particular individual, isn't that fair to say?

10 A.  No.

11 Q.  You don't know if he ever went to the farm where this horse

12 was; do you know that?

13 A.  The information I have would --

14         THE COURT:  Let her finish.

15         MR. FASULO:  I object to the answer.  She can only

16 base her answer on what information she actually knows.

17         THE COURT:  That is correct.  That is correct,

18 Dr. Bowman.  But you can answer based on what you actually

19 know.

20         THE WITNESS:  Your Honor --

21         THE COURT:  Not what you have been told by someone

22 else.

23         MS. MORTAZAVI:  Could we have a sidebar on this point

24 in particular?

25         THE COURT:  Sure.

1          MS. MORTAZAVI:  Thank you, your Honor.

2          (Continued on next page)

1              (At the sidebar)

2              MS. MORTAZAVI:  Your Honor, my issue with how this

3    question is being phrased -- it's not specific as to what types

4    of information Mr. Fasulo is trying to elicit.  We've obviously

5    had conversations about this case with this witness, and so she

6    knows information, it is just information that I've transmitted

7    to her.  It's not materials that Mr. Fasulo is referencing

8    which are sitting in on in-person meetings or transcripts or

9    e-mails or whatever else he might be referring to.

10             THE COURT:  I understand that.  But the problem is she

11   can only testify to what she personally knows, or you get an

12   opportunity to -- hold on -- to redirect you can ask about

13   information that she relied upon or what was made available to

14   you or what she might have known.

15             Having said that, Mr. Fasulo, I keep asking, is it

16   hypothetical?

17             MR. FASULO:  It is.  I keep saying yes.

18             THE COURT:  I know that, but I shouldn't have to keep

19   asking it.  I just don't want the record -- I know you wouldn't

20   do it intentionally, but I don't want the record to

21   misrepresent or create an impression on something that you know

22   to be contrary to the facts.

23             MR. FASULO:  Correct, Judge.  That's why I'm saying

24   it's hypothetical.

25             THE COURT:  That's what I'm saying.

1          MR. FASULO:  I'm sorry.

2          MS. MORTAZAVI:  Your Honor, so my request would be

3    Mr. Fasulo just punctuate his question because --

4          THE COURT:  What do you mean by punctuate?

5          MS. MORTAZAVI:  I think clarify his question because I

6    think this witness is just getting confused.

7          THE COURT:  I think she's holding her own.

8          MS. MORTAZAVI:  Okay.  All right.

9          THE COURT:  Ms. Mortazavi, you can object if you have

10   an objection.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. FASULO:  If I may, your Honor?

3     BY MR. FASULO:

4     Q.  Let me ask again, hypothetically, if there was an ongoing

5     relationship between Dr. Fishman and the animal that JP

6     represented, and that ongoing relationship included Dr. Fishman

7     having a relationship with the horse, understanding the horse,

8     and doing what a vet does, would that affect your judgment as

9     to whether or not it was a VCPR relationship?

10    A.  Yes, it would.  But that is hypothetical.

11    Q.  That is hypothetical.

12         THE COURT:  That's what the question said.

13    Q.  That's what I asked.

14    A.  Yes.

15    Q.  Thank you.

16         Now, let me ask you specifically about some of the

17    exhibits that you looked at during your direct examination of

18    other exhibits that are in evidence here today.

19         MR. FASULO:  First of all, I'd like the government, if

20    I may ask again, if you can publish Government Exhibit 5007.

21    And if we can zoom many on the second row of that exhibit.  Can

22    we get a little bit closer on that?  Is it possible?  Thank

23    you.

24    Q.  Now, doctor, during your direct examination, you talked

25    about a number of different products; do you remember that?

1   A.   Yeah.

2   Q.   Are you familiar with the product that's all the way on the

3   left?  I'm sorry.  Let me just get rid of that.  One second.

4        I'd like to direct your attention to that product.

5   Can you read the name of that product?

6   A.   It looks like it's Flunixamine.

7   Q.   What's Flunixamine?

8   A.   Well, the active ingredient Flunixamine is flunixin

9   meglumine, the same as Banamine.  I can't see that label well

10  enough, and I haven't memorized the brand names for every

11  approved flunixin meglumine, so I can't tell you if that's an

12  approved product or an unapproved product.

13  Q.   So you can't tell us that right now?

14  A.   From that picture, I can't.

15       MR. FASULO:  Can we get it a little bigger?

16  A.   It's so blurry when it's blown up.

17  Q.   We don't have it in the courtroom, so I'm doing the best

18  with the picture that we have.

19       Would you agree, at least, that Flunixamine -- there

20  is an approved product of Flunixamine on the market?

21  A.   As I just said, I can't tell if that's the approved

22  product.  There are approved products with that active

23  ingredient, but it's so blurry, I can't read it.

24       MR. FASULO:  If we can go back to the bigger picture.

25  Q.   I'd like to draw your attention now to -- here we go.

1        THE COURT:  Are you still on the same shelf or were

2   you trying to move down a shelf?

3        MR. FASULO:  This is where I wanted to go, Judge.  If

4   we can make this a little bit bigger, that would be great.

5   Q.  Can you see the name of the product, at least here, that

6   I'm marking with the blue line?

7   A.  The shelf label reads Tridex.

8   Q.  What is Tridex?

9   A.  I do not know.

10       MR. FASULO:  Can we go to the bigger picture again and

11  go to the next shelf?  Thank you.

12       Even with my eyes it's hard to see.  If we can zone in

13  on that a little bit and see if it comes out?

14  Q.  Can you see the name of that product?

15  A.  Yes.  It's Agrimycin 200.

16  Q.  Are you familiar with that product?

17  A.  I am.

18  Q.  Are you familiar with this lab that's labeled underneath?

19  A.  AgriLabs, yes.

20  Q.  What is AgriLabs?

21  A.  It's an approved sponsor of multiple new animal drugs.

22  Q.  What is Agrimycin?

23  A.  Agrimycin is a formulation of oxytetracycline,

24  200 milligrams per mil.

25  Q.  Are you able to determine whether this is an approved

1   product or not an approved product?

2   A.  It is an approved product.  I can't -- it's so blurry, I

3   can't tell you that, but I'm pretty sure that at the very top

4   it says NAD-something.

5           THE COURT:  Is it easier to read if we make it less

6   large?

7           THE WITNESS:  Maybe.  You're blowing it up so big.

8           MR. FASULO:  I'm going to go to the next shelf, your

9   Honor.  Thank you.

10  Q.  I'm going to ask you to look at this product I'm circling

11  right here, these two products.

12  A.  Okay.

13  Q.  And I apologize about the visual.  We don't have the

14  product here in the court for various reasons.  It's the

15  easiest way to show it to you.

16          Can you see the name of that product?

17  A.  Yes, it's Adequan.

18  Q.  Are you familiar with that product?

19  A.  I am.

20  Q.  Is that an approved product?

21  A.  Yes, it is.

22  Q.  The one next to it, can you see that product.

23  A.  That's another version of Adequan.

24  Q.  Is that an approved product?

25  A.  Yes, it is.

1          MR. FASULO:  If we can go to the big screen, please,

2     if we can go to the lowest level?

3     Q.  I'd like to draw our attention to this product right here.

4     Can you read the name of the manufacturer of this product?

5     A.  Yeah.  This is Henry Schein.

6     Q.  What is Henry Schein?  Who is Henry Schein?

7     A.  It's a veterinary distributor company.

8     Q.  Is it on the approved list from the FDA?

9     A.  Henry Schein?

10    Q.  Yes.

11    A.  They're a registered company, if that's what you mean.

12    Q.  Right.  And are they -- on this, do you see the product

13    name here?

14    A.  Yeah.  Thyroxine.

15    Q.  Are you familiar with that product?

16    A.  I am.

17    Q.  Is that an approved product from the FDA?

18    A.  No, it isn't.

19    Q.  What about this product have you indicated makes it not an

20    approved product by the FDA?

21    A.  Well, I can't read the label because it's too blurry, but

22    I'm familiar with that product, and it's not an approved

23    product.

24    Q.  And on this product, you see that it's produced by this --

25    or distributed by this manufacturer, correct?

1   A.  Yes.

2   Q.  And if a doctor wants to describe this product, is it

3   permissible for the vet to prescribe this product even though

4   it's not approved?

5   A.  Yes.

6   Q.  And is it permissible for Henry Schein to distribute this

7   product to a vet to be distributed within the vet's discretion

8   under the guidance of state and federal statute to animals?

9   A.  Well, under the state statutes, it may very state to state.

10  We have given this product -- this specific product enforcement

11  discretion for marketing because it's considered medically

12  necessary in the treatment of horses with hypothyroidism.  So

13  until there's an approved version for administration to horses,

14  we're allowing the distribution of the unapproved product.

15  Q.  That's something a veterinarian needs to know before they

16  prescribe this or dispense this product; is that correct?

17  A.  Not really.

18  Q.  Well, if it was not conditionally approved, as you just

19  stated -- Let me rephrase the question.  I misstated.

20          Since it's an unapproved product, which you're

21  allowing vets to dispense, it's important for the vets to know

22  that you are allowing them to dispense it under certain

23  circumstances; would you say that's important to know?

24  A.  No.  Because there's no alternative.

25  Q.  Right.  But there's nothing that the FDA does that would

1  prohibit a vet from dispensing this product under the right

2  conditions; is that fair to say?

3  A.  The FDA doesn't object to a veterinarian dispensing this

4  product under the appropriate conditions.

5  Q.  But it is labeled as an unapproved product, right?

6  A.  It is an unapproved new animal drug.

7  Q.  Now, I'd like to now --

8         MR. FASULO:  That's fine with this particular line.

9  I'd like to go to Government Exhibit 5014, also, that's been

10 entered into evidence.

11 Q.  And you see again -- do you see the product again here

12 that's circled in blue?

13 A.  Yeah, the Banamine, or the one next to it?

14 Q.  I meant just the Banamine.

15 A.  Yes.

16 Q.  Are you familiar with that product?

17 A.  Yes.

18 Q.  Are you familiar with the manufacturer of that product?

19 A.  Merck, yes.

20 Q.  Is this product approved by the FDA?

21 A.  Yes, it is.  And if you look at the box --

22        THE COURT:  You've answered the question.

23 A.  It's right there.

24 Q.  And you stated earlier in looking at specifically -- and it

25 says on this product it's FDA approved.  Is that what you were

1  going to say -- it's within the vet's discretion to prescribe

2  this product as necessary?

3  A.  Yes.

4  Q.  Okay.  I want you to look at Government Exhibit 5011.  I'd

5  like to draw your attention as best we can to this product we

6  circled.

7       Now, doctor you talked about labels during your direct

8  examination; do you remember that?

9  A.  Yes.

10  Q.  Do you see a label on this product, right?

11  A.  Some of a label.

12  Q.  Some of a label, correct.  And you see that there's an --

13  well, there was one label that is here and here, which seems to

14  go around the bottle, right?

15  A.  Yes.

16  Q.  And there's another label here, correct?

17  A.  Yes.

18  Q.  And when you were looking at the sample labels that were

19  displayed to you, those were on a flat sheet of paper, some of

20  those were on a bottle, correct?  Do you remember seeing those?

21  A.  Some were; some weren't.

22  Q.  Do you remember seeing the ones on a bottle?

23  A.  Yes.

24  Q.  And, additionally, to those types of labels, there's

25  another label here, correct?

1  A.  Yes, there is.

2  Q.  Are you able to make out the contents of that label?

3  A.  Not much of it.  Some of it.

4  Q.  Okay.  And can you tell me what purpose this part of -- let

5  me just do this.  Do this.

6       MR. FASULO:  And if we can highlight that, that would

7  be great.  I don't know if it's going to get blurry.  Hopefully

8  not.

9  Q.  In terms of the labeling -- necessity of the labeling

10 process, pursuant to the FDA, what ingredients does this label

11 have that comply with the labeling process of the FDA.

12 A.  I can't see enough of this label to say.

13 Q.  Does it have the name of a physician who has prescribed

14 this medication?

15 A.  There's more than one type of label.

16      MR. FASULO:  Excuse me, judge.  My questions was --

17      THE COURT:  You need to answer the question that was

18 asked, Doctor.  Does it have the name of the veterinarian who

19 prescribed it?  It says physician who's prescribed this

20 medication.

21      THE WITNESS:  Yes.

22 Q.  Does it have a prescription number?

23 A.  Yes, it does.

24 Q.  Does it have a quantity?

25 A.  Yes.

1    Q.  Does it list the active ingredients as well as the -- does

2    it list the API ingredients?

3    A.  It lists some API ingredients.  I can't read all of it, and

4    I don't know if that's everything.

5    Q.  Okay.  And you would have to do a further GRASE analysis to

6    figure that out?

7    A.  I need to be able to figure out all of both labels.

8    Q.  Before you said that, in terms of that part of the label,

9    my question is in terms of that part of the label, the active

10   ingredients and -- the active ingredients, that's something

11   that you learned during the time that you've become a doctor

12   and become a representative at the FDA, correct?

13   A.  Yeah.  It's something I've learned.

14   Q.  It's not something a seven-year-old knows, right?

15   A.  Correct.

16   Q.  Okay.  And that's part of the labeling process you

17   evaluated, correct?  The ingredients?

18   A.  Yes.

19   Q.  So when you said a seven-year-old can figure out what a

20   label should look like --

21   A.  I never said that.

22   Q.  Oh, okay.  So you would agree that you need to have a

23   certain expertise to make a determination whether or not a

24   label is in compliance or not compliant with the FDA rules and

25   regulations?

1    A.  You can look at our guidance documents and trace what's

2    required on each label.

3    Q.  But as to the specificity of the needs of the label, you

4    would need to have a certain expertise, specifically, as it

5    goes to the listing of the ingredients of the product?

6    A.  Or you could call us and ask.

7    Q.  But eventually, you wouldn't know that unless you had a

8    basis to understand the chemistry that went into these

9    ingredients; wouldn't that be fair to say?

10   A.  No.

11   Q.  Hypothetically, if an individual looked at this label,

12   would they be able to determine what API and what ingredients

13   needed to be listed on this product without any other basis for

14   making that determination?

15   A.  I believe they would make that determination based on other

16   labels that they've seen.

17   Q.  Right.  But in terms of the specific milligrams, the

18   specific chemical compounds that are put into this label, you

19   would need to have some scientific basis to understand what's

20   being said here?

21   A.  I disagree.

22   Q.  Well, for example, this word -- tell me what that word is.

23   A.  Triphosphate.

24   Q.  Triphosphate.  You would need to know what triphosphate was

25   and what its intended use was when you were labeling this

1    product; wouldn't you?

2    A.  Well, no, not really.  You would need just --

3            THE COURT:  You've answered, Doctor.  You said no.

4    Q.  So, Doctor, is it your testimony --

5            MR. FASULO:  Withdrawn, judge.

6    Q.  Let's look -- let me go to the bottom line here.

7            Would you agree that this is one of the requirements

8    in the labeling process of medication -- prescription

9    medication, the last line there?

10   A.  It is.

11   Q.  And would that be necessary for this particular medication?

12   A.  Yes.  I think it would be.  But, again, I can't read the

13   whole label, so it's hard to draw conclusions.

14   Q.  I'm just asking about this -- that part.

15   A.  Well, I need to know what else is in the product in order

16   to say whether that's required.

17   Q.  And once you would know what else is in the product you'd

18   have to look at those ingredients, compare them to what type of

19   ingredients they were, and then make that determination, right?

20   A.  And look at the intended use, the directions for

21   administration, and the indications.

22   Q.  And all of which you have been trained to do, correct?

23   A.  Anyone who reads labels knows those things.

24   Q.  Okay.  Thank you.

25           I'd like to go to one more exhibit, if I may.  I'd

1    like to go to Government Exhibit number 5012.  I'd like to

2    focus your attention on -- what happened here?  One second.

3              Can you see this label?

4    A.  Yes.

5    Q.  Do you see a prescription number on this particular item?

6    A.  Yes, I do.

7    Q.  And do you see also the name of the physician?

8    A.  The veterinarian, yes.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. FASULO:

2    Q.  Do you also see the name of the patient that this

3    medication was going to go to?

4    A.  Yes.

5    Q.  And do you also see this -- can you also see this warning

6    right here?

7    A.  I don't think that qualifies as a warning, but I see the

8    statement you're referring to.

9    Q.  And what is the purpose of that statement from the FDA's

10   perspective?

11   A.  I don't think the FDA has a perspective on that particular

12   statement.  That may be something that the pharmacy board

13   requires.

14   Q.  Underneath that, you see this, correct?

15   A.  Yes, I see that.

16   Q.  And that is an expiration date, right?

17   A.  Yes, it is.

18   Q.  And above the expiration date there is a term N-butyl

19   alcohol, 21 percent?

20   A.  Yes.

21   Q.  What is that?

22   A.  It's a type of alcohol.

23   Q.  And what's the purpose of that particular drug?

24         What's the purpose of that ingredient?

25   A.  That probably is -- that is the drug and N-butyl alcohol 21

1   percent and they're probably using that as a diluent for

2   certain other drugs.  I couldn't tell you what they're using it

3   for.

4   Q.  And you also see here there's INJ. You see that.  Does that

5   mean injectable?

6   A.  It does.

7   Q.  And you also see up top here where I put an X, a name of a

8   pharmacy.  Do you see that?

9   A.  Yes.

10  Q.  Are you familiar with that pharmacy?

11  A.  I've heard of them.

12  Q.  Do you know if they are FDA approved?

13  A.  There's no such thing as an FDA pharmacy.

14  Q.  And you see over here there's an address up there, 221.  I

15  don't think we have another view of this bottle.  I looked.  I

16  don't see.

17          And on the bottle there's a lot number, correct?

18  A.  Yes.

19  Q.  And that's in order to trace back this product if there was

20  something wrong with it, is that why the lot number's there?

21  A.  That's why the lot number is there.

22          MR. FASULO:  Just a few more questions, Judge.  Just

23  one or two more questions.

24          THE COURT:  That's fine.  You're finished with the

25  exhibit from the Boothwyn pharmacy.

1              MR. FASULO:  Yes.

2              THE COURT:  You can take that down, Ms. Jung.

3              Thank you.

4    BY MR. FASULO:

5    Q.  If we can have 1111 shown to the jury, Government Exhibit

6    1111.

7              Doctor, you said you looked at this exhibit earlier,

8    correct?

9    A.  Yes, I did.

10   Q.  And did you do a GRASE analysis?

11   A.  GRASE?

12   Q.  GRASE analysis on this particular item?

13   A.  I did.

14   Q.  And I think in your direct testimony you indicated that it

15   didn't pass the GRASE test, per se?

16   A.  It's not generally recognized as safe and effective.

17   Q.  Would it be fair to say that a veterinarian would be able

18   to dispense this medication even though it didn't pass the

19   GRASE test under any circumstance?

20   A.  For the intended use as we understand it, there would be no

21   way to dispense this product under the 21 CFR 530 regulations.

22             There is nothing in the regulations that allows for

23   the compounding of animal drugs from bulk, and this is an

24   unapproved new animal drug that isn't generally recognized as

25   safe and effective.  It's misbranded because it lacks so much

1    labeling information that would be needed for its use.  What

2    else can I say?

3    Q.  At the end of the day, this drug is available to the

4    veterinarian. In the veterinarian's discretion based on the

5    regulations to prescribe if he, in his professional opinion,

6    believes it to be necessary and complies with the FDA

7    regulations?

8    A.  My point is, there's no way to comply with the FDA

9    regulations for this drug, not as it sits right here now.

10   Q.  So let me ask you something, another thing on this drug, do

11   we know who -- does this indicate to you who prescribed this

12   medication?

13   A.  No.

14   Q.  Does it indicate to you where this medication came from?

15   A.  No.

16   Q.  Does it have any indication of its origin or its potency as

17   far as you can tell from the label?

18   A.  I think it had some information about the potency on the

19   other side of the label.  But from what I can see right now,

20   no.

21   Q.  I'd like to look at Government Exhibit 1113.

22   A.  It lists the two components, but doesn't list the

23   concentrations.

24   Q.  And when you say the two components, would that be the B4

25   and B10?

M52BGIA3                    Bowman - Cross

1    A.  Beta 4 and Beta 10.

2    Q.  Is Beta 4 an approved drug from the FDA?

3    A.  No.

4    Q.  Is Beta 10 an approved drug from the FDA?

5    A.  No.

6    Q.  And 1114, my last one.

7           Doctor, you see what's on the screen right now in

8    front of you?

9    A.  I do.

10   Q.  Are you familiar with the medication?

11   A.  Factrel, yes.

12   Q.  Is that an approved drug from the FDA?

13   A.  Yes, it is.

14   Q.  Doctor, in terms of who may actually administer these drugs

15   once they are dispensed, is it fair to say that it may be, even

16   if it's a prescription drug, that there are cases where a

17   trainer can administer these drugs under the auspices of a vet?

18           MS. MORTAZAVI:  Objection, vague.  "These drugs."

19           THE COURT:  I'm sorry.

20           MS. MORTAZAVI:  Vague as to which drugs.

21           THE COURT:  You want to clarify.

22           Sustained.

23   Q.  Doctor, you talked about administering drugs on direct

24   examination, correct?

25   A.  Yes.

M52BGIA3                    Bowman - Cross

1   Q.  And you talked about some drugs had to be administered by a

2   license veterinarian, correct?

3   A.  Correct.

4   Q.  Isn't it also true that it can be administered -- some of

5   those drugs could be administered by a trainer or somebody

6   under the direction of a licensed vet?

7   A.  Yes, it is.

8   Q.  And that's because we don't have enough vets?

9   A.  No, that's not why.

10  Q.  But isn't it true that we have -- well, why is it?

11  A.  The reason that is allowed is because the veterinarian

12  makes the determination whether a specific individual is

13  capable of administering the drug as directed by the

14  veterinarian.

15          And if he makes that determination, then he can

16  prescribe that drug for an animal and dispense it to the

17  individual with the directions for use.

18  Q.  And that determination is within the sole discretion of the

19  vet who's prescribing that job?

20  A.  Within a valid client-patient relationship.

21  Q.  My question is, is that discretion -- is that the sole

22  discretion of the veterinarian to make that determination?

23  A.  Within the veterinarian-client-patient relationship.

24  Q.  Doctor, are you familiar with the code, the Delaware code

25  as it relates to the definition of what a valid

1    veterinarian-client-patient relationship is?

2    A.   Not specifically, no.

3    Q.   And you would agree with me that that code, the Delaware

4    code, is what would guide veterinarians who are licensed in the

5    state of Delaware treating animals, do you agree?

6    A.   The first thing that guides the veterinarian in whether to

7    dispense a prescription animal drug is whether the individual

8    client or person charged with that animal's care is capable of

9    administering the drug as directed.

10           And then there are a number of other decisions that

11   have to be made, the practice act would be one, racing rules

12   would be another, it depends on the use of the horse and the

13   stage of its life.  There's many factors that go into that

14   decision.

15   Q.   In terms of prescribing the medications that would be based

16   on the veterinarian's judgment based on the rules that he was

17   following within the individual states as it relates to the

18   veterinarian-client-patient relationship?

19   A.   It relates to all those things I just said.

20           MR. FASULO:  Okay.  No further questions.

21           THE COURT:  All right.  Thank you.

22           Is there redirect, Ms. Mortazavi?

23           MS. MORTAZAVI:  Yes, your Honor.

24   REDIRECT EXAMINATION

25   BY MS. MORTAZAVI:

1    Q.  Dr. Bowman, I just have a few questions for you to

2    follow-up on a few of the statements that you judge made to

3    Mr. Fasulo.

4         Dr. Bowman, you stated just a moment ago that some

5    drugs can be administered by trainers or others under the

6    supervision of a veterinarian; is that right?

7    A.  Yes.

8    Q.  And you were speaking directly based on veterinarian

9    practice principles; is that correct?

10   A.  Yes.

11   Q.  You were not opining on any states racing rules, were you?

12   A.  No.

13   Q.  Ms. Jung, could you please pull up Government Exhibit 1111,

14   1112 and 1113.  These are the bottles of TB-7 -- photographs of

15   the TB-that were taken in the search of Christopher Oakes's

16   barn.

17        Dr. Bowman, you were asked some questions about this

18   label, do you recall that?

19   A.  Yes.

20   Q.  And you stated there's no manufacturer information or

21   contact information here, correct?

22   A.  Correct.

23   Q.  Ms. Jung, could you please focus on Government Exhibit

24   1112, if you could expand that.

25        Dr. Bowman, do you see a watermark on this label that

1    appears to be a horse head logo?

2    A.   Yes.

3    Q.   Ms. Jung, you can take this down.  Thank you.

4           If you could please pull up Government Exhibit 5011,

5    if you could focus on the bottle to the far left, Ms. Jung.

6           Dr. Bowman, do you recall being asked some questions

7    about this prescription label?

8    A.   Yes.

9    Q.   Do you recall starting to say that there were many

10   different types of labels?

11   A.   Yes.

12   Q.   Could you explain your answer?

13   A.   Yes.  I think we're all familiar with receiving drugs from

14   the pharmacy and the pharmacy is required to apply a label that

15   specifies, among other things, who prescribed the drug, what

16   the -- how many tablets or how much is in the container, who

17   it's for, how you're supposed to administer it in the simplest

18   of directions, that kind of information.

19          That doesn't substitute for or replace the required

20   prescription drug labeling that would come on the original

21   container.

22          In those cases, for example, in this picture, this

23   image, they're using the original container and then applying

24   that pharmacy label over top of it which is commonly done with

25   a lot of animal drugs because you're gonna use a 100 ml to

1   treat a single horse over time.  So, you definitely would want

2   the whole bottle, so they're not going to subdivide that this

3   into smaller quantities like they would in a human pharmacy if

4   you just needed 10 mls to treat a child, so you see multiple

5   labels on something that's dispensed.

6   Q.  Ms. Jung, could you please display Government Exhibit 5035.

7          Dr. Bowman, we just looked at a bottle of TB-, do you

8   recall that?

9   A.  Yes.

10  Q.  Do you see the sticker here that says TB-7?

11  A.  Yes.

12  Q.  Ms. Jung, if you could take this down and please pull up

13  Government Exhibit 5012.

14         Dr. Bowman, do you recall being asked questions about

15  this particular label?

16  A.  Yes.

17  Q.  Do you recall being asked questions about the so-called

18  patient name on this label?

19  A.  Yes.

20  Q.  Hypothetically, if a prescription drug is obtained in the

21  name of one horse, can it be legally dispensed to a different

22  horse?

23  A.  No, not that I'm aware of.  There could be some variation

24  in the pharmacy rules because this was prepared at a pharmacy,

25  so that's a pharmacy label.

1  Q.  Ms. Jung, if you could take this down and please display

2  Government Exhibit 5014 and focus on the bottle of Banamine

3  here.

4          Dr. Bowman, you referenced that there was some

5  markings on this label indicating that this was approved by

6  FDA?

7  A.  Yes.

8  Q.  That's the line that appears below NADA number 101-479?

9  A.  Yes.

10  Q.  You also testified that you're familiar with the company

11  Merck, correct?

12  A.  Correct.

13  Q.  Going back to that NADA language, what does that acronym

14  stand for if you're familiar?

15  A.  That stands for new animal drug application, and the number

16  that follows that is the official number for that product.

17  Q.  And are all approved products given a number like that?

18  A.  Yes.

19  Q.  And do approved drugs have to include statements like that?

20  A.  Yes.  Well, qualify that.

21          If we ever get our new regulations, that will be

22  required for everyone.  At present, it's recommended, but not

23  required.  Nearly all approved sponsors do put it on their

24  label, but you will find some examples of product that are

25  approved drugs without that language on the label.

1   Q.  Ms. Jung, can you please display side by side Government

2   Exhibit 5014 and Government Exhibit 1220 which is the bottle of

3   BB3 that was seized from Jorge Navarro's residence.

4           Are there differences in the labels between the

5   approved drug Banamine and BB3?

6   A.  Yes.

7   Q.  Can you name three examples?

8   A.  It lacks the cautions, the precautions, including the

9   caution statement, the prescription legend.  It's lacking the

10  NDC number which is how you know that it's properly listed with

11  FDA, and it's lacking the established name for the ingredient.

12  Q.  Ms. Jung, could you display side by side Government Exhibit

13  5014, the approved version of Banamine and Government Exhibit

14  1022.  If you could focus on one of the portions of the

15  Government Exhibit 1022.

16          Dr. Bowman, looking at these two labels side by side,

17  can you list three differences between the approved drug on the

18  left and ACTH on the right?

19  A.  So, it lacks the manufacturer identifying information.  It

20  lacks the prescription legend and it lacks the caution and

21  precaution statements.

22  Q.  Ms. Jung, if you could take these exhibits down.  If you

23  could please just play Government Exhibit 5007 and focus on the

24  second shelf, Ms. Jung.

25          Dr. Bowman, do you recall being asked questions about

1   these drugs generally?

2   A.  Yes.

3   Q.  Which of these drugs require a prescription?

4   A.  Of the ones whose labels I can read which is I think three,

5   they all require prescriptions.

6   Q.  Ms. Jung, could you please go back to the original image

7   and focus on the third shelf that appears here.

8           Dr. Bowman, could you tell us which of these drugs

9   would require a prescription, if any?

10  A.  They all require a prescription.

11  Q.  Are you familiar with ventipulmin?

12  A.  Yes.

13  Q.  What is that?

14  A.  That's a clenbuterol drug.  It's to improve breathing.

15  Q.  Ms. Jung, if we could focus on the fourth shelf.

16          Dr. Bowman, are there any drugs here that would

17  require a prescription?

18  A.  I hate to rely on the shelf tag because I'm not confident

19  that the shelf tags are accurate, but the ones who labels I can

20  read, which are five, and all of them require prescription.

21  Q.  Ms. Jung, if we could focus on the bottom, going back to

22  the original exhibit focusing on the very bottom to the right.

23          Dr. Bowman, do you recall being asked questions about

24  Thyroxine L powder?

25  A.  Yes.

1    Q.  Before you were asked those questions, correct?

2    A.  Yes.

3    Q.  And you were already aware that the FDA exercises

4    enforcement discretion with respect to this powder, correct?

5    A.  Yes.

6    Q.  And you were already aware of the distributor of this

7    powder, correct?

8    A.  Yes.  There actually should be more than one distributor.

9    Q.  And can you remind us what condition Thyroxine L powder?

10   A.  Thyroxine L powder is used to treat hypothyroidism in

11   horses and other animals, but not the powder form.

12          It had been marketed without approval for people and

13   animals for many, many years, and it came to the attention of

14   the FDA -- and this is all out there publically -- that it

15   actually wasn't being manufactured to a satisfactory standard

16   so that it was always the same which was causing problems, and

17   treating patients, human and animal patients for thyroid

18   deficiency.

19          So we now have approved human products and we have

20   approved products for dogs, but nobody's gotten an approval yet

21   for horses, so until they do, we've exercised enforcement

22   discretion over this product, so there's something out there to

23   treat horses with.

24   Q.  And you stated in your testimony that you are familiar with

25   Henry Schein, the distributor that appears on this label,

1   correct?

2   A.  Yes.

3   Q.  Were you familiar with Equestology before you were

4   contacted to perform a GRASE analysis?

5   A.  Only in the context of looking at unapproved drugs for

6   potential enforcement activities.

7           THE COURT:  Ms. Mortazavi, you want to find a good

8   breaking point, please.

9           MS. MORTAZAVI:  Your Honor, I'll ask one more question

10  and I think that would be a good breaking point, your Honor.

11          THE COURT:  Sure.

12  BY MS. MORTAZAVI:

13  Q.  Dr. Bowman, you were asked some questions about several

14  calls and transcripts that I had originally reviewed with you

15  in your direct examination.  Do you remember that?

16  A.  Yes.

17  Q.  And at that time when I asked you those questions, you had

18  concluded that those calls did not reflect a valid VCPR,

19  correct?

20  A.  Correct.

21  Q.  Can you just explain what led you to testify that those did

22  not reflect a valid VCPR?

23  A.  I was involved in a prior trial where --

24          MR. FASULO:  Objection, Judge.

25          THE COURT:  Hold on.  Hold on.  The objection is

1  sustained, so why don't we take a break at this point and I'll

2  talk to counsel.

3          MS. MORTAZAVI:  Thank you, your Honor.

4          THE COURT:  And then we'll pick it up, Dr. Bowman,

5  after the break.

6          Ladies and gentlemen, we're going to take our

7  afternoon break.  Please leave everything on your seats, and I

8  remind you again, please don't talk about the trial or the

9  testimony or the issues involved in the trial during your

10 break.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Dr. Bowman, you can step out.  Just

3     remember you're under oath.

4          Mr. Fasulo.

5          MR. FASULO:  Judge, I objected because she's talking

6     about a prior trial.  If she was talking about the basis of her

7     knowledge, I understand I opened the door to that.

8          THE COURT:  Talking about the basis of her knowledge.

9     You understand you opened the door.

10          MR. FASULO:  I understand I opened the door.  She

11     talked about what she knew if it's relevant to what she

12     testified to, I understand, but not the results of that trial

13     or anything that happened at that trial because that's not

14     really part of what she should be testifying here today about,

15     whether there's a conviction or not a conviction.

16          THE COURT:  Of course, she can't talk about the

17     outcome.

18          MS. MORTAZAVI:  I suppose I want to clarify

19     Mr. Fasulo's position.  I'm looking to clarify, your Honor,

20     whether Mr. Fasulo would allow me to explore that a prior trial

21     took place, but would not like me to explore who was on trial

22     or the outcome.  It seems like a minefield and I want to make

23     sure I understand what Mr. Fasulo's position is.

24          MR. FASULO:  I think there should be an offer of proof

25     because I don't think the fact that there was a prior trial or

1   anything about a prior trial.  Her knowledge is different.

2           THE COURT:  The problem is, as you say, you kind of

3   opened the door about the basis of her knowledge, and

4   Ms. Mortazavi asked her what was the basis for your forming the

5   conclusion, and she started to say what I learned from

6   testifying in a prior trial, I think is what she started to

7   say.  Let me just scroll back.

8           Okay.  As far as she got was, I was involved in a

9   prior trial.

10          MR. FASULO:  Judge, I ask for an offer of proof where

11  this is going so we can avoid any kind of maybe minefields

12  here.

13          MS. MORTAZAVI:  Your Honor, my intention was not to

14  elicit the prior trial.  And if I'm permitted for this

15  particular line of questions to ask a few more leading

16  questions, specifically as to the lack of reference to Seth

17  Fishman, lack of reference to a prescription or veterinarian.

18  I tried to keep my question open-ended because it is redirect.

19  But given this witness's experience in the litigation as a

20  whole, I think it's appropriate that I ask leading questions at

21  this point.

22          THE COURT:  You mean in the conversation transcript,

23  the lack of reference to A,B,C?

24          MS. MORTAZAVI:  Correct.

25          THE COURT:  The issue is, though -- that's all fine,

1    but Mr. Fasulo asked in his questioning hypothetically if this

2    happened, would that influence your opinion.  And she tried to

3    offer more, and I thought that's what you were getting at, but

4    you can ask those three questions.

5           And I agree that asking them in a leading fashion is

6    probably the safest.  Any objection, Mr. Fasulo?

7           MR. FASULO:  No objection.  Without hearing the

8    question, obviously, but no objection to what we're going to

9    do.

10           MS. MORTAZAVI:  I think that resolves it, your Honor.

11           THE COURT:  Okay.  You can ask those three leading

12    questions.

13           MS. MORTAZAVI:  Thank you.

14           THE COURT:  All right.  Why don't we take a break.  We

15    told the jury about 3:15.  I'll see everyone back then at 3:15.

16           (Recess)

17           MR. FASULO:  Judge, before the jury comes in.

18           THE COURT:  Yes.

19           MR. FASULO:  I want to address our last conversation.

20    I just want to be a little clearer.  I believe that the

21    government -- I opened the door.  They can ask the witness what

22    the basis of her understanding is, however if the basis of her

23    understanding is hearsay, it is still objectionable, and I'm

24    going to make the objection.

25           The mere fact she's told something about the

1    government is going to be objectionable, so it's what she knows

2    still that she can testify to.

3            THE COURT:  I thought we agreed though that

4    Ms. Mortazavi wasn't going to do.  She's going to ask three

5    leading questions.

6            MR. FASULO:  I wanted to review that.

7            THE COURT:  You're correct about that.

8            MR. FASULO:  If that comes up.  I have no idea of the

9    questions, and she doesn't have to tell me, so I don't know

10   what they are.

11           THE COURT:  I think she did tell you though.

12           MS. MORTAZAVI:  I believe I did, your Honor.

13           THE COURT:  Are we ready for the jury?

14           MS. MORTAZAVI:  Yes, your Honor.  I'll ask the agents

15   to recall the witness.

16           THE COURT:  Let's let Dr. Bowman get in before we get

17   the jury out.

18           (Continued on next page)

19

20

21

22

23

24

25

1      (Jury present)

2          THE COURT:  Government, Ms. Mortazavi, please.

3          Let me just remind you, Dr. Bowman, I know you know,

4   but you're still under oath.

5   BY MS. MORTAZAVI:

6   Q.  Dr. Bowman, I'm just going to pick up where we left off

7   before the break.

8          I was asking you if you recalled during my direct

9   examination and Mr. Fasulo's questions going over certain

10  transcripts and going over certain calls and being asked to

11  opine on them.  Do You recall that?

12  A.  Yes.

13  Q.  And do you recall being asked whether there was or was not

14  a valid VCPR?

15  A.  Yes.

16  Q.  And across the calls that you reviewed, apart from one

17  example, was there a reference to Seth Fishman?

18  A.  No.

19  Q.  Was there a reference to a horse?

20  A.  Not in any that I can recall, not by name at least.

21  Q.  Was there a reference to any patient?

22  A.  It was kind of a vague description in one of the calls, but

23  it wasn't name.

24  Q.  Was there any reference to a prescription?

25  A.  No.

1    Q.  Are those the sorts of things you would expect a

2    veterinarian employee to ask about when discussing prescription

3    drugs?

4    A.  Yes, or at least remind a client that, you know, the

5    approval of the prescriptions that they are hoping to get lands

6    with the vet that will make the final decision, something along

7    those lines.

8    Q.  You were also asked questions about whether you knew of any

9    calls or meetings that had happened before the calls that we

10   reviewed took place.  Do you recall that?

11   A.  Vaguely.

12   Q.  In any of the transcripts that we reviewed, was there any

13   reference to a prior examination that you can remember?

14   A.  No, not that I recall.

15   Q.  Dr. Bowman, you were asked about FDACVM sending warning

16   letters to manufacturers, do you recall that?

17   A.  Yes.

18   Q.  And do you recall being asked about letters sent to known

19   manufacturers regarding drug labels?

20   A.  Yes.

21   Q.  Do you have to know the manufacturer of a drug in order to

22   send them a warning letter?

23   A.  Yes.

24   Q.  Do you have to know the mailing address in order to send a

25   warning letter?

1   A.  Yes.  In rare circumstances, we'll send an electronic

2   warning letter if we have an email address, but not a physical

3   address, but that's pretty rare.

4   Q.  And if somebody turns in a bottle to the FDA that contains

5   no manufacturer information, how are you supposed to know who

6   manufactured that drug?

7   A.  I ask my boss that a lot, and we do the research we can do,

8   but often in many cases, it is impossible to figure out where

9   the drug is manufactured.

10  Q.  You were also asked questions about drug compounding, do

11  you recall those?

12  A.  Yes.

13  Q.  Can you walk us through how a veterinarian would validly

14  compound a drug?

15          MR. FASULO:  Objection, vague.

16          THE COURT:  Overruled.  You can answer, Doctor.

17  A.  Drug compounding is a complex area of pharmaceutical use

18  and the way the animal law is written, all compounding from

19  bulk drugs is illegal.

20          There is no provision in the statute or the law that

21  allows for the compounding of animal drugs from bulk

22  pharmaceutical ingredient there.

23          There is a provision in the law under 21 CFR 530 to

24  manufacture or to compound for individual patients from

25  approved human and animal drugs.  So if you needed to dilute it

1    make it more –- dilute it for a small animal or you needed to

2    crush a tablet into a powder and then mix it with a liquid to

3    administer it as a liquid because of your patient, patient

4    didn't tolerate pilling, but would tolerate liquid medication,

5    something like that.

6            That said, we understand that there are rare

7    circumstances when there is no approve product for which to

8    compound a medically important drug for a specific animal, or

9    even in very limited circumstances for office stock and our new

10   guidance just came out, but it basically follows the same

11   thread as our old guidance.

12           And we developed a list of drugs for which it's

13   acceptable to compound from bulk for office stock.  Other than

14   that, compounding from bulk is very limited.

15   Q.  Dr. Bowman, the new guidance you mentioned, when did that

16   come into effect?

17   A.  I believe it published in final the beginning of last week

18   or the end of the week before.

19   Q.  So within the last few weeks?

20   A.  Yes, it was in draft.  There was a draft version that was

21   circulated for comment and then a final version just came out.

22   Q.  That guidance was not in effect between the years 2000 and

23   2020?

24   A.  No.

25   Q.  Is drug compounding the same as manufacturing a brand new

1    drug from scratch?

2    A.  No, not typically.

3    Q.  Is a drug typically compounded from an existing approved

4    drug?

5    A.  That is the goal.

6    Q.  And you testified that typically a compounded drug would

7    have to be compounded pursuant to a prescription; is that

8    right?

9    A.  Yes.

10   Q.  Would it have to be patient specific?

11   A.  It has to be patient specific unless it's one of those

12   drugs on the office stock list.

13   Q.  Does that mean that the veterinarian would have to actually

14   know the patient?

15   A.  Yes.

16   Q.  And I believe you also testified that a determination has

17   to be made that no approved drug would be adequate before a

18   drug could be compounded; is that correct?

19   A.  That is correct.

20   Q.  Did you also testify that there would have to be a

21   determination that it would be necessary to compound a drug to

22   prevent death or suffering?

23   A.  Yes.

24   Q.  Would an animal that's racing slowly be considered

25   suffering?

1  A.  No.

2  Q.  Is compounding a drug to enhance a horse's performance

3  necessary to alleviate animal suffering?

4  A.  No.

5  Q.  You were also asked several questions about whether it was

6  ultimately up to a veterinarian's discretion whether or not to

7  compound a drug?  Do you recall those questions?

8  A.  Yes.

9  Q.  Are veterinarians subject to standards?

10  A.  Yes.

11  Q.  And that includes the requirement that there be a valid

12  VCPR, that's what you testified to, correct?

13  A.  Correct.

14  Q.  Are veterinarians also subject to the Food Drug and

15  Cosmetic Act or the FDCA?

16  A.  Yes, wherever it applies to what they're doing.

17  Q.  And if a veterinarian is manufacturing a drug, is that

18  veterinarian subject to the FDCA?

19  A.  Yes.

20  Q.  In fact is anybody who is distributing drugs in the United

21  States subject to the FDCA and associated regulations?

22  A.  Yes.

23  Q.  Does it matter whether or not they are a veterinarian?

24  A.  No, it doesn't.

25  Q.  You also testified that a veterinarian has to be licensed

1    in the states where they dispense medications as well as the

2    states where they treat animals, correct?

3    A.  That may have been -- I was assuming that they would

4    dispense the medications at the time they saw the animals, so

5    they would be in the same state at the same time.

6    Q.  Assuming they were not in the same state at the same time,

7    would a veterinarian have to be licensed in a state where the

8    veterinarian dispenses medication?

9    A.  First of all, I don't know why they would be dispensing

10   medication to somebody in a different state.

11              MR. FASULO:  Objection.  Move to strike.

12              THE COURT:  Please just answer the question that's

13   asked.

14   A.  I'm not sure.

15              THE COURT:  It is stricken.

16   A.  I'm not sure.

17   Q.  What does it mean to dispense medication?

18   A.  To dispense medication means to basically to give the

19   medication to the person who's responsible for treating the

20   animal.

21   Q.  And how does that typically happen?

22   A.  That typically happens at a visit.  So the veterinarian is

23   there, they make the diagnosis.  They recommend the treatment

24   and they dispense the treatment at that time.

25   Q.  As in they physically hand it to the person, the client

1    they're dispensing the medication to?

2    A.  That's most common.

3    Q.  And if there isn't that in-person transfer, how else do

4    people get prescription medications?

5    A.  The veterinarian writes a prescription just like your

6    physician writes a prescription, and then they take that

7    prescription to a pharmacy that will fill it.

8    Q.  Do veterinarians typically ship drugs?

9    A.  None that I know of.

10   Q.  Do drug manufacturers typically ship drugs?

11   A.  Yes.

12   Q.  You were also asked some questions about how often a

13   veterinarian needs to consult with an existing patient.  Do you

14   recall those questions?

15   A.  Yes.

16   Q.  Does someone need to know the horse's name in order to

17   determine whether it's an existing patient?

18   A.  Yes.

19   Q.  Is it typical for a veterinarian to take an order for a

20   prescription drug without knowing the patient name?

21   A.  No.

22   Q.  Is it typical for someone working for a veterinarian to

23   take an order for a prescription drug without knowing the

24   patient name?

25   A.  No.

1          MS. MORTAZAVI:  No further questions, your Honor.

2          THE COURT:  Thank you.  Mr. Fasulo.

3          MR. FASULO:  Just one, Judge.

4    RECROSS EXAMINATION

5    BY MR. FASULO:

6    Q.  Dr. Bowman, you talked about -- rephrase.

7          Dr. Bowman, would it be fair to say that there's no

8    federal law that prohibits a doctor from shipping a drug to a

9    patient, a drug that he prescribed?

10   A.  No.

11   Q.  It is not prohibited?

12   A.  No, it is not allowed.

13   Q.  If I'm a doctor and I have a drug and I prescribed it for a

14   client, I can ship that drug to the client?

15   A.  No, not if it goes in interstate commerce.  It goes in

16   interstate commerce, it has to follow all the rules.

17   Q.  And if it follows the rules, it would be okay, correct?

18   A.  Yes.

19   Q.  You don't know what those rules are, do you?

20   A.  I know what the federal rules are.

21   Q.  But you don't know whether or not -- what I'm asking you

22   is, in the job of the veterinarian in taking care of an animal,

23   he can ship a drug from his premises to the client and there's

24   no FDA rule forbidding that; isn't that fair to say?

25   A.  No.

1                    THE COURT:  No it's not fair to say?

2                    THE WITNESS:  No, it's not fair to say.

3    Q.  What FDA rule addresses that issue?

4    A.  They have to comply with the regulations on interstate

5    commerce.

6    Q.  And if they comply with the interstate commerce rules, then

7    there is no FDA prohibition?

8    A.  Well, it would depend on the drug and it would depend on

9    the interstate commerce.

10   Q.  So those two factors would go into play, but if they pass

11   those requirements, the vet can ship that drug as far as you

12   know?

13   A.  I think there's too many hypotheticals.  I can't answer

14   that.

15   Q.  Let me ask you a hypothetical then -- not a hypothetical.

16                    Is it your testimony here today that a doctor is not

17   permitted to ship a drug if the doctor follows both interstate

18   commerce laws and the FDA regulations?

19                    THE COURT:  A veterinarian.

20   Q.  The doctor being the vet?

21   A.  Can I explain it.  As if I'm the vet, I have a patient.  My

22   patient has moved to another state.  I have a valid VCPR with

23   that patient, but I'm not licensed in that other state, I

24   cannot ship drug there.

25   Q.  Say you are licensed in that state?

1   A.   If I am licensed in that state as well as the state where I

2   am, then as long as it meets all the other rules of a drug

3   that's allowed in interstate commerce, I could ship it.

4            MR. FASULO:  No further questions.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. FASULO:  No further questions.

2          THE COURT:  Thank you.

3          MS. MORTAZAVI:  Just one question, your Honor.

4    REDIRECT EXAMINATION

5    BY MS. MORTAZAVI:

6    Q.  Dr. Bowman, I want to make sure I understand your last

7    answer.

8          I believe you stated that if you were the veterinarian

9    and you were in one state and you were shipping a drug to a

10   separate state that you were not licensed in, you would not be

11   allowed to do that; is that correct?

12   A.  That is correct.

13         MS. MORTAZAVI:  Thank you.

14         MR. FASULO:  Nothing further.

15         THE COURT:  All right.  Thank you, Dr. Bowman.  You're

16   excused with the thanks of the Court.

17         THE WITNESS:  Thank you.

18         (Witness steps down)

19         THE COURT:  Mr. Gianforti or Ms. Mortizavi.

20         MR. GIANFORTI:  Thank you, your Honor.

21         Before we call the next witness, can we read the

22   remaining stipulations into the record?

23         THE COURT:  Sure.

24         MR. GIANFORTI:  Ms. Jung, can you please pull up

25   Government Exhibit 9001, please?

1          All right.  This is a stipulation between the parties,

2     I will skip the preliminaries.

3          Paragraph 1:  If called as a witness at trial, a

4     record custodian for the entity T-Mobile Incorporated,

5     T-Mobile, and for each of the government exhibits identified

6     below would testify at follows:

7          T-Mobile provided law enforcement agents with

8     historical location data, subscriber records, and other

9     information for cellular phone with call number 561-270-9286,

10    9286 phone.

11         Government Exhibits 3600 and 3601 consists of account

12    information and call detail records associated with the 9286

13    phone.

14         B:  Government Exhibits 3602 and 3607 consists of call

15    detail records and historical location information associated

16    with the 9286 phone.

17         C:  Government Exhibits 3600 through 3602 and 3607 are

18    true and correct copies of records of T-Mobile, maintained by

19    T-Mobile, and are records regularly conducted of T-Mobile that

20    were made at or near the time by or from information

21    transmitted by someone with knowledge of the information

22    contained therein, kept in the course of regularly conducted

23    activities of T-Mobile, and made as a regular practice of the

24    activities of T-Mobile.

25         Paragraph 2:  If called as a witness at trial, a

record custodian for the entity Verizon Wireless, Verizon, and

for each of the Government Exhibits identified below would

testify as follow:

Verizon provided law enforcement agents with

historical location data, subscriber records, and other

information for cellular telephone -- cellular phone with call

number 302-222-2220, the 2220 phone.  Government Exhibits 3603

through 3605 consists of account information and call detail

records associated with the 2220 phone.  Government Exhibit

3606 consists of call detail records and historical location

information associated with the 2220 phone.  Government

Exhibits 3603 through 3606 are true and correct copies of

records of Verizon maintained by Verizon and are records of

regularly conducted activities of Verizon that were made at or

near the time by or from information transmitted by someone

with knowledge of information contained therein, kept in the

course of regularly conducted activities of Verizon and made as

a regular practice of the activities of Verizon.

It is further stipulated and agreed by and between the

parties that the aforementioned Government Exhibits in this

stipulation, which is Government Exhibit 9001, may be received

in evidence at trial.  And, your Honor, the government offers

Government Exhibit 9001 and the exhibits listed therein.

THE COURT:  Government Exhibit 9001, which is the

stipulation, is admitted.  It is evidence in this case, as are

1   the exhibits referenced in 9001.

2              (Government's Exhibits 9001, 3600-3607 received in

3   evidence)

4              MR. GIANFORTI:  Thank you, your Honor.  If you can

5   please pull up Government Exhibit 9004, Ms. Jung?

6              One moment, your Honor.

7              All right.  This is another stipulation.  I will skip

8   the preamble again.

9              If called as a witness at trial, a record custodian

10  for FedEx Services, FedEx, and for each of Government Exhibits

11  8000 through 8536 would testify that Government Exhibits 8000

12  through 8536 are true and correct copies of records of FedEx,

13  maintained by FedEx, and are records of regularly conducted

14  activities of FedEx that were made at or near the time by or

15  from information transmitted by someone with knowledge of the

16  information contained therein, kept in the course of regularly

17  conducted activities with FedEx, and made as a regular practice

18  of the activities of FedEx.

19             It is further stipulated and agreed upon by and

20  between the parties that the aforementioned Government Exhibits

21  in the stipulation, which is Government Exhibit 9004, may be

22  received in evidence at trial.

23             Your Honor, the government offers Government Exhibit

24  9004 and all exhibits listed therein.

25             THE COURT:  May I see the first page again, please?

M526GIA4

1    Okay.

2            Government Exhibit 9004, which is the stipulation, is

3    admitted as evidence in this case, and the exhibits referenced

4    in that stipulation are also admitted as evidence in this case.

5            (Government's Exhibits 9004, 8000-8536 received in

6    evidence)

7            MR. GIANFORTI:  Thank you, your Honor.

8            Your Honor, the government calls John Rubino.

9            THE COURT:  Leave the stip up for one minute.

10           All right.  Thank you.  You may take it down.

11           Good afternoon, sir.  Would you please stand here and

12   remove your mask?

13           DEPUTY CLERK:  Good afternoon, please raise your right

14   hand.

15    JOHN RUBINO,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18           DEPUTY CLERK:  Please state and spell your name for

19   the record.

20           THE WITNESS:  John Rubino, J-O-H-N, R-U-B-I-N-O.

21           THE COURT:  Thank you.  Please sit down.

22           Sir, will you please pull the mic down so you're

23   speaking directly into the microphone?  Can you bend it?  Thank

24   you.

25           Mr. Gianforti.

1   DIRECT EXAMINATION

2   BY MR. GIANFORTI:

3   Q.   Please do keep your voice up as I ask you questions, if you

4   don't mind.

5   A.   Okay.

6   Q.   Thank you.  Where do you work?

7   A.   I work the Federal Bureau of Investigation.

8   Q.   What's your position?

9   A.   I'm a forensic accountant.

10  Q.   How long have you been a forensic accountant with the

11  Federal Bureau of investigation?

12  A.   I've been a forensic accountant over here for three and a

13  half years now.

14  Q.   What did you do before you joined the FBI?

15  A.   Prior, I was -- I worked at an accounting firm for two and

16  a half years as an auditor.

17  Q.   How far did you go in school?

18  A.   Bachelor's in accounting.

19  Q.   Mr. Rubino, did there come a time when you were asked to

20  review some records in connection with your testimony today?

21  A.   Yes.

22  Q.   What were you asked to do?

23  A.   I was asked to review bank records as well as create

24  summary productions.

25          MR. GIANFORTI:  Ms. Jung, can you please pull up

1   Government Exhibit 9003?

2          Your Honor, I'd like to read another stipulation into

3   the record, if I could?

4          THE COURT:  All right.

5          MR. GIANFORTI:  All right.  I will skip the

6   preliminary paragraph again.

7          This stipulation reads:

8          If called as a witness at trial, a representative of

9   WSFS Bank, WSFS, would testify that in or about September 2014,

10  WSFS acquired the First National Bank of Wyoming.  If called as

11  a witness at trial, a record custodian for WSFS and for each of

12  Government Exhibits 3700 through 3707 are true and correct

13  copies of records of WSFS maintained, by WSFS, and are records

14  of regularly conducted activities with WSFS that were made at

15  or near the time by or from information transmitted by someone

16  with knowledge of the information contained therein, kept in

17  the course of regularly conducted activities of WSFS, and made

18  as a regular practice of the activities of WSFS.

19         It is further stipulated and agreed by and between the

20  parties that the aforementioned Government Exhibits in this

21  stipulation, which is Government Exhibit 9003, may be received

22  in evidence at trial.

23         Your Honor, the government offers Government Exhibit

24  9003 and all exhibits listed therein.

25         THE COURT:  Government Exhibit 9003 is admitted into

M526GIA4                    Rubino - Direct

1    evidence as are exhibit 3700 through 3707, which are referenced

2    in that stipulation.  They are also in evidence.

3            (Government's Exhibits 9003, 3700-3707 received in

4    evidence)

5            MR. GIANFORTI:  Thank you, your Honor.

6            Ms. Jung, can you please pull up 3706 and 3707?

7    BY MR. GIANFORTI:

8    Q.  Mr. Rubino, do you recognize these documents?

9    A.  I currently don't see anything.

10   Q.  Oh, they're not up on your screen?

11   A.  No.  Oh, now I do.

12   Q.  Hold on.

13           THE COURT:  Is the jury seeing okay?

14           MR. GIANFORTI:  These are in evidence.  They were

15   stipulated.

16           THE COURT:  That's why I was asking if they're seeing

17   them.

18   Q.  Do you recognize these documents?

19   A.  Yes, I do.

20   Q.  What are they?

21   A.  These are account statements for Equestology Inc. from WSFS

22   bank.

23   Q.  Have you seen these records before?

24   A.  I have.

25   Q.  Did you summarize these records at the government's

1   request?

2   A.  I did.

3          MR. GIANFORTI:  Okay.  Ms. Jung, can you now please

4   pull up Government Exhibit 1318?  This is in evidence pursuant

5   to stipulation, Government Exhibit 9015.

6   Q.  For the record, Mr. Rubino, these are records from the

7   First National Bank of Wyoming that were seized from a storage

8   unit controlled by Seth Fishman.  Have you seen these records

9   before?

10  A.  I have.

11  Q.  What are these?

12  A.  These are account statements from the First National Bank

13  of Wyoming for Equestology Inc. account.

14  Q.  Did you summarize these records at the government's

15  request?

16  A.  I did.

17  Q.  And you said these are for an account for Equestology Inc.,

18  correct?

19  A.  Right.

20  Q.  Are their names associated with Equestology Inc. just below

21  that?

22  A.  Yes.

23  Q.  What are those names?

24  A.  It's Seth Fishman and Lisa Ranger.

25  Q.  And is there an address associated with this account?

1    A.  Yes.  It's 125 Jennifer lane, Felton, Delaware.

2              MR. GIANFORTI:  Ms. Jung, can you actually pull up

3    3706 and 3707 just briefly?

4    Q.  Mr. Rubino, is there a company associated with these --

5    with this account?

6    A.  I'm sorry?

7    Q.  Is there a company associated with this account?

8    A.  Yes.  Equestology Inc.

9    Q.  Are there names associated with this account?

10   A.  Yes.  Seth Fishman and Lisa Giannelli.

11   Q.  And do you see an address in Delaware associated with these

12   accounts?

13   A.  Yes.  It's 125 Jennifer Lane, Felton, Delaware.

14   Q.  Thanks very much.

15             MR. GIANFORTI:  Ms. Jung, can you please pull up

16   Government Exhibit 3700 and turn to the second page?

17             If I may approach, your Honor?  I'm going to hand a

18   copy to the witness in hard copy.

19             THE COURT:  Sure.  Did you give it to Mr. Fasulo?  Do

20   you have a copy?

21             MR. FASULO:  Yes, I do.

22             THE COURT:  Thank you.

23   BY MR. GIANFORTI:

24   Q.  All right, Mr. Rubino.  If you flip through those

25   documents -- have you seen them before?

1    A.  Yes, I have.

2    Q.  What do these documents appear to; be?

3    A.  These are account opening documents.

4    Q.  Associated with which account?

5    A.  Associated with the First National -- these are from the

6    First National Bank of Wyoming, and it's the account for

7    Equestology.  Additional customer names are Seth Fishman and

8    Lisa Giannelli.

9    Q.  Okay.  Thank you.

10            MR. GIANFORTI:  Ms. Jung, can you please go to page 1

11   of this document?  All right.  And can you blow up underneath

12   where it says authorized persons?

13   Q.  Mr. Rubino, based on this document, who appears to be the

14   authorized persons associated with this account?

15   A.  Seth Fishman and Lisa Giannelli.

16   Q.  Who appears to be the corporate secretary for Equestology

17   according to this document?

18   A.  It appears to be Lisa Giannelli.

19   Q.  And based on this document, when does it appear this

20   account was opened?

21   A.  11/7/2011.

22   Q.  So around November 7, 2011?

23   A.  Correct.

24            MR. GIANFORTI:  Ms. Jung, can you please go to page 3

25   of this document?

1   Q.  Mr. Rubino, looking at the very top of this document, what

2   kind of form does it appear to be?

3   A.  This is an enhanced due diligence for high risk customers.

4   Q.  And do you see a company name written in the upper

5   right-hand corner in what appears to be handwriting?

6   A.  Yes.

7   Q.  What is that?

8   A.  It's Equestology.

9       MR. GIANFORTI:  Ms. Jung, can you please zoom in on

10  lines six and seven of this document?

11  Q.  Do you see line six, Mr. Rubino?

12  A.  Yes.

13  Q.  What is the business type that is listed here?

14  A.  It's listed as horse meds.

15  Q.  And do you see line seven there?

16  A.  Yes.

17  Q.  What is the business' primary customer trading area listed

18  here?

19  A.  It's racing horses.

20  Q.  All right.

21      MR. GIANFORTI:  All right.  And, Ms. Jung, can you

22  please go to page 5?

23  Q.  Mr. Rubino, what does this document appear to be?

24  A.  It's a certificate of incorporation for Equestology Inc.

25      MR. GIANFORTI:  Can you please zoom in on where it

1    says second?

2    Q.  Mr. Rubino, what is the address associated with Equestology

3    according to this document?

4    A.  The address is 125 Jennifer Lane, Felton, Delaware.

5            MR. GIANFORTI:  All right.  And, Ms. Jung, if you can

6    then zoom out and zoom in on the very bottom where the

7    signature is?

8    Q.  Mr. Rubino, who appears to be the incorporator of

9    Equestology Inc.?

10   A.  It's Lisa Ranger.

11   Q.  And when is this document dated?

12   A.  December 21, 2006.

13           MR. GIANFORTI:  Okay.  Ms. Jung, can you go to page 6

14   of this document?

15   Q.  All right.  Mr. Rubino, what does this document appear to

16   be?

17   A.  This is a signature card for the Equestology Inc. account

18   with Seth Fishman and Lisa Giannelli.

19   Q.  And do you see where it says signatures of authorized

20   signers?

21   A.  Yes.

22   Q.  Who appears to be the authorized signers for this account?

23   A.  It's Seth Fishman and Lisa Giannelli.

24           MR. GIANFORTI:  Okay.  And, Ms. Jung, if you can

25   please zoom in on the bottom part of this document?

1    Q.   Is there an address here associated with Lisa Giannelli?

2    A.   Yes.

3    Q.   What is this address?

4    A.   It's 125 Jennifer Lane, Felton, Delaware.

5         MR. GIANFORTI:  All right.  You can take this down.

6    Thank you.

7    Q.   All right.  So, Mr. Rubino, turning back to the WSFS Bank

8    statements that you reviewed and summarized, what time period

9    was covered by those statements?

10   A.   The time period was January 2015 to -- I believe it was

11   five years.  So it was January 2015 to December 31st, 2019,

12   with a five-month gap in between.

13   Q.   And when was that gap?

14   A.   The gap was August 2018 to December 2018.

15   Q.   So other than that five-month gap, you reviewed essentially

16   five years' worth of account statements for the WSFS

17   Equestology account?

18   A.   Correct.

19   Q.   All right.  For that time period, Mr. Rubino, what was the

20   total amount of deposits into the Equestology account?

21   A.   The total amount of deposits were approximately

22   4.5 million.

23   Q.   How were those deposits made principally?

24   A.   They were typically made in -- via merchant sales as well

25   as checks.

1              MR. GIANFORTI:  Okay.  Ms. Jung, can you please pull

2      up Government Exhibit 1304, which is in evidence, and go to

3      Page 15 of that document?

4              I'm sorry.  I think I have that wrong -- it's

5      Government Exhibit -- I think it's -- I think it's 3704.

6      Apologies.  Yes, thank you.  And please go to Page 15.

7              Can you please zoom in on the third check from the

8      top?

9              All right.  This document is in evidence, and I'm

10     going to read certain information into the record.

11             This is a check made out to "cash" from the

12     Equestology account made out by a John J. Sheehan of 355

13     Guymard Turnpike, Middletown, New York 10940.  It is stated

14     December 3, 2014, and made out in the amount of $200.  In the

15     memo line it reads "bleeder pills" with the number 150 circled.

16             Ms. Jung, can you go to page 3 and zoom in on the

17     third check?  I'm going to read certain information into the

18     record from this as well.

19             This is another check made out by John J Sheehan of

20     335 Guymard Turnpike, Middletown, New York 10940.  The check is

21     dated May 19, 2015.  It's made out to "cash" in the amount of

22     $80.  The memo line reads "bleeder pills."  And you can take

23     that down.  Thank you.

24     BY MR. GIANFORTI:

25     Q.  Mr. Rubino, in reviewing the WSFS account statements for

1    the Equestology account, did you see any payments that went to

2    somebody named Lisa Giannelli or Lisa Ranger?

3    A.  I did.

4    Q.  How were those payments made principally?

5    A.  They were made principally through check.

6            MR. GIANFORTI:  I will ask Ms. Jung to pull up for you

7    but not for the jury Government Exhibit 19000.

8    Q.  Mr. Rubino, do you recognize this document?

9    A.  I do.

10   Q.  What is it?

11   A.  This is a summary chart of Lisa Giannelli payments made out

12   of the Equestology Inc. WSFS bank account, with the last four

13   digits 4901.

14   Q.  For what time period?

15   A.  For the time period of January 2015 to December 31, 2019,

16   with that five-month gap in between.

17           MR. GIANFORTI:  Your Honor, the government offers

18   Government Exhibit 19000 as a demonstrative exhibit.

19           MR. FASULO:  No objection.

20           THE COURT:  All right.  It will be received as a

21   demonstrative exhibit, which means it's a summary of

22   information obtained from other documents that are in evidence.

23           (Government's Exhibit 19000 received in evidence)

24           MR. GIANFORTI:  Thank you, your Honor.

25           If we could publish that for the jury, Ms. Jung?

Q.  All right.  Mr. Rubino, based on your analysis, how much

money did Ms. Giannelli receive from the WSFS account in 2015?

A.  She received $143,542.

Q.  How about 2016?

A.  $200,730.

Q.  2017?

A.  $184,266.

Q.  2018?

A.  $86,181.

Q.  And you testified earlier that 2018 has a five-month gap;

is that right?

A.  Correct.

Q.  What was the total for 2019?

A.  Total for 2019 was $172,243.

Q.  And over this five-year period, what was the total amount

of money that Lisa Giannelli received from this account minus

the five-month gap from 2018?

A.  The total was $786,964.

        MR. GIANFORTI:  You can take that down.  Let's turn

now to the analysis.  We'll turn now to his analysis of the

banks statements from the First National Bank of Wyoming.

Q.  Mr. Rubino, what time period did those records reflect?

A.  Those records reflected February 2009 to November 2009 with

the slight gap, I believe -- approximately like a four- to

five-day gap in between.

1    Q.  Did you see any payments from this account that went to

2    someone named Lisa Ranger or Lisa Giannelli?

3    A.  I saw payments that went to Lisa Ranger.

4    Q.  How were those payments made principally?

5    A.  They were made via check.

6    Q.  I'm now going to show you what's been marked for

7    identification as Government Exhibit 19001, not to be displayed

8    to the jury.

9           Sir, do you recognize this document?

10   A.  Yes.

11   Q.  What is it?

12   A.  This is an account summary statement.  It's detailing the

13   payments to Lisa Giannelli over the time frame of 2001 -- I

14   mean the time frame of February 2009 to November 2009, with

15   that slight five-day gap in between.

16   Q.  Okay.

17   A.  For the account Equestology Inc.

18   Q.  Did you prepare this table?

19   A.  I did.

20   Q.  Would it be helpful to you in testifying today?

21   A.  Yes.

22          MR. GIANFORTI:  The government offers 19001 as a

23   demonstrative exhibit as well.

24          MR. FASULO:  No objection.

25          THE COURT:  All right.  It will be received as a

1    demonstrative exhibit.

2            I will instruct you further about demonstrative

3    exhibits at the end of the case, but that means this is a

4    summary of information obtained from other documents.  Those

5    documents are in evidence; this is just a summary of that

6    information, which was prepared by this witness to aid him in

7    summarizing for you other evidence.

8            (Government's Exhibit 19001 received in evidence).

9            THE COURT:  Mr. Gianforti.

10           MR. GIANFORTI:  Ms. Jung, if you haven't already, can

11   you publish that for the jury?

12   BY MR. GIANFORTI:

13   Q.  Mr. Rubino, based on your analysis, how much money did

14   Ms. Giannelli receive from the First National Bank of Wyoming

15   account in 2009?

16   A.  133,698.

17   Q.  Mr. Rubino, in preparing to testify today, did you review

18   any of Lisa Giannelli's personal bank account records?

19   A.  No, I did not.

20           MR. GIANFORTI:  No further questions.

21           THE COURT:  Mr. Fasulo.

22   CROSS-EXAMINATION

23   BY MR. FASULO:

24   Q.  Good afternoon, agent.

25   A.  Good afternoon.  I'm not an agent.  I'm a forensic

1   accountant.

2   Q.  Good afternoon.  Thank you.

3           MR. FASULO:  I want the government to publish

4   Government Exhibit 3700 again.  And if we could go to page -- I

5   think it's page 2 -- 3, page 3.  Next page.  Next page.  There

6   we go.

7   Q.  Do you remember being asked some questions about this

8   document?

9   A.  Yes.

10  Q.  And you stated that Lisa Ranger was incorporated.  Do you

11  understand what that means or what that is?

12  A.  What was the question specifically?

13  Q.  You stated that on the bottom there it indicates that

14  Lisa Ranger -- I believe Ranger, was the incorporator.  Do you

15  understand what that is or what that means?

16  A.  Not specifically.

17  Q.  Okay.  And you also had a chance to review this document

18  before coming to court today?

19  A.  I had.

20  Q.  And is it fair to say there's nothing in this document that

21  indicates the share distribution of this company as it relates

22  to any of the shareholders; is that correct?

23  A.  Correct.

24  Q.  And there's nothing in this document that indicates that

25  Lisa Ranger is a shareholder of Equestology Inc; is that

1    correct?

2    A.   Correct.

3    Q.   Now, you also said you did analyses of two banks -- of

4    certain statements for specific periods of time; is that

5    correct?

6    A.   Correct.

7              MR. FASULO:   If we could put the summary sheet up for

8    Bank of Wyoming?

9              MR. GIANFORTI:   Just the Wyoming one?

10             MR. FASULO:   Yeah.

11   Q.   You prepared this sheet, correct?

12   A.   Correct.

13   Q.   You prepared this sheet from bank documents that you had

14   accessible to you, correct?

15   A.   Correct.

16   Q.   And they were bank documents regarding the account of the

17   First National Bank account of Equestology Inc; is that

18   correct?

19   A.   Correct.

20   Q.   And at the end of the day, these numbers reflect the amount

21   that was given to Lisa from this account of $133,698.56,

22   correct?

23   A.   Correct.

24   Q.   You did not review her personal taxes, right?

25   A.   No.

M526GIA4                    Rubino - Cross

1    Q.   And you didn't review any deductions that she took

2    regarding this income?

3    A.   I did not.

4    Q.   Right.  And that was the only year you did this analysis

5    from the First National Bank of Wyoming?

6    A.   Correct.

7              MR. FASULO:  Can we show the other summary sheet,

8    please?  Thank you.

9    Q.   Again, you had an opportunity to look at bank documents for

10   the year of 2015, 2016, 2017, 2018, 2019; is that fair to say?

11   A.   Correct.

12   Q.   And in one of those years there was a gap, right?

13   A.   Yes.

14   Q.   That's because you couldn't get those bank statements, or

15   you didn't have them?

16   A.   Yeah.  Didn't have them.

17   Q.   The analysis you did you looked at all of the checks that

18   were made out of that account that were directly made to

19   Lisa -- at that time, Lisa Giannelli, correct?

20   A.   Correct.

21   Q.   And you were able to identify the amount of money that

22   Lisa Giannelli received from that account, correct?

23   A.   Correct.

24   Q.   What was the five-year total revenue that was disclosed in

25   that account; if you recall?

1  A.  I don't know what the total revenue was.  The only thing I

2  could attest to was the total deposits in that time frame was

3  4.5 million.

4  Q.  I'm sorry?

5  A.  Was approximately 4.5 million.

6  Q.  Over that whole period of time?

7  A.  Correct.

8  Q.  Over that whole period of time you concluded that

9  Lisa Ranger received $786,964.95?

10  A.  Correct.

11        MR. FASULO:  Nothing further, Judge.  Thank you.

12        THE COURT:  Any redirect?

13        MR. GIANFORTI:  Yes, just briefly.

14  REDIRECT EXAMINATION

15  BY MR. GIANFORTI:

16  Q.  Mr. Rubino, Mr. Fasulo just asked you about your analysis

17  of the WSFS -- I'm sorry.  It's a difficult acronym.  The WSFS

18  account and the total amount of deposits that were received in

19  that account over that five-year period minus that gap; do you

20  remember that?

21  A.  Yes.

22  Q.  And I think you testified both when I asked you and when

23  Mr. Fasulo asked you that the total amount of deposits were

24  approximately $4.5 million over that five-year period?

25  A.  Correct.

1  Q.  Did the government ask you to assess the profits of

2  Equestology?

3  A.  No.

4  Q.  In other words, did the government ask you to assess

5  revenue minus costs?

6  A.  No.

7  Q.  So when you looked at those bank records, you were solely

8  looking at the amount of deposits that came in, right?

9  A.  Correct.

10          MR. GIANFORTI:  No further questions.

11          THE COURT:  Thank you.  Mr. Fasulo, anything?

12          MR. FASULO:  Just one question, Judge.

13          Can the government can publish a deposit slip -- let

14  me see the number.  I think it was 3701.

15          THE COURT:  Did you say 3701?

16          MR. FASULO:  I thought it was, but I'm looking it up.

17          THE COURT:  Oh.

18          MR. FASULO:  Just to save time, if I may, one moment,

19  Judge.

20          3704.  Thank you.

21  RECROSS EXAMINATION

22  BY MR. FASULO:

23  Q.  Mr. Rubino, as part of your analysis, you did look -- you

24  just testified on redirect that you looked at the deposits,

25  correct?

1    A.   Right.

2    Q.   And was this one of the deposits that you saw in your

3    analysis?

4    A.   It must have been at some point.

5    Q.   Well, did you have a chance to look at the check?

6    A.   Yes.

7    Q.   And you see on the back of the check, is that indication

8    that the -- this check was deposited into that account, as far

9    as you know as an accountant?  Let me direct your attention --

10   A.   Yes.

11   Q.   So when you talked about revenue, this would have been

12   reflected in the total amount of -- when you talk about

13   deposits, this would have been reflected in those deposits,

14   correct?

15   A.   Correct.

16           MR. FASULO:  Nothing further, Judge.

17           THE COURT:  Thank you.

18           MS. MORTAZAVI:  Nothing further, your Honor.

19           THE COURT:  Thank you very much, sir.  You can step

20   down with the thanks of the Court.

21           THE WITNESS:  Thank you.

22           (Witness steps down)

23           THE COURT:  The governments next witness?

24           MR. GIANFORTI:  Your Honor, the government calls

25   Conor Flynn.

1          THE COURT:  All right.

2          MR. GIANFORTI:  I'll read a couple of stips before we

3  get to Conor Flynn if that's all right.

4          THE COURT:  All right.

5          MR. FASULO:  Your Honor, I am not asking the preamble

6  to be, read but I would like the Court to remind the jury this

7  is an agreement between the government and the defense.

8          THE COURT:  When the government is offering these

9  stipulations, he is not reading into the record the very first

10 paragraph which says it's agreed by and between Damian

11 Williams, who's the United States Attorney for the

12 Southern District, and the two attorneys here representing the

13 government and the other side.  So this is a binding agreement

14 between the parties, and it is evidence.

15         Go ahead, Mr. Gianforti.

16         MR. GIANFORTI:  Ms. Jung, can you please pull up

17 Government Exhibit 9014?

18         All right.  This is a stipulation where I'll once

19 again skip the preamble.

20         If called as a witness at trial, a law enforcement

21 agent with United States Customs and Border Protection, CBP,

22 would testify that Government Exhibits 18000 through 18001 are

23 true and correct copies of records maintained by CBP with

24 respect to Seth Fishman's United States border crossings from

25 in or about October 1, 2011, through in or about January 9,

1    2020.

2              In our records of regularly conducted activities of

3    CBP that were made at or near the time by or from information

4    transmitted by someone with knowledge of the information

5    contained therein, kept in the course of CBP's regularly

6    conducted activities, and made as a regular practice of CBP's

7    activities.  It is further stipulated and agreed by and between

8    the parties that the aforementioned Government Exhibits in the

9    stipulation, which is Government Exhibit 9014, may be received

10   in evidence at trial.

11             Your Honor, the government offers Government Exhibit

12   9014 and the exhibits listed therein.

13             THE COURT:  All right.  Exhibit 9014 is in evidence,

14   as are exhibits 18000 and 18001, which are admitted pursuant to

15   this stipulation, in other words, by agreement of the parties.

16   Those two exhibits will come into evidence.

17             (Government's Exhibits 9014, 18000, 18001 received in

18   evidence)

19             THE COURT:  Is there another stipulation?

20             MR. GIANFORTI:  There's one more, your Honor.

21             Ms. Jung, can you please pull up government exhibit

22   9016?

23             All right.  Again, skipping the preamble.

24             If called as a witness at trial, Howard Taylor,

25   Taylor, would testify that Government Exhibit 16000 reflects

1   true and accurate copies of records that Taylor maintained with

2   respect to Equestology.  It is further stipulated and agreed by

3   and between the parties that the aforementioned Government

4   Exhibits and this stipulation, which is Government

5   Exhibit 9016, may be received in evidence at trial.

6           Your Honor, the government offers Government Exhibit

7   9016 in the exhibits listed therein.

8           THE COURT:  Do you want to go back to the first page,

9   please?  It would help if you gave me a copy.

10          MR. GIANFORTI:  I apologize.  I thought you had a

11  collection.  We can hand you up one.

12          THE COURT:  They're over there.

13          Again, this stipulation is in evidence, as is the

14  exhibit -- there's only one exhibit -- 16000.

15          MR. GIANFORTI:  That's right.

16          THE COURT:  Is also received into evidence.  That's

17  all right.

18          (Government's Exhibits 9016 and 16000 received in

19  evidence)

20          THE COURT:  All right.  Thank you.

21          MR. GIANFORTI:  Thank you, your Honor.  The government

22  calls Conor Flynn.

23          THE COURT:  Is Mr. Flynn here?

24          MR. GIANFORTI:  The agent will bring him in, your

25  Honor.

1          THE COURT:  He's getting him.  Thank you.

2          All right, sir.  If you would stand behind the stand

3    and take your mask off, please?

4          Ms. Dempsey.

5     CONOR FLYNN,

6        called as a witness by the Government,

7        having been duly sworn, testified as follows:

8          DEPUTY CLERK:  Thank you.  Please state and spell your

9    name for the record.

10          THE WITNESS:  Conor Flynn, C-O-N-O-R, F-L-Y-N-N.

11          DEPUTY CLERK:  Thank you.  Please be seated.

12          THE COURT:  You have a microphone in front of you.

13    Please adjust it down so it's pointed toward your mouth, and

14    try to speak into the microphone when you're answering

15    questions.

16          THE WITNESS:  Yes, your Honor.

17          THE COURT:  Mr. Gianforti.

18    DIRECT EXAMINATION

19    BY MR. GIANFORTI:

20    Q.  Thank you.  And just try to keep your voice up as we go.

21    A.  Okay.

22    Q.  How old are you, sir?

23    A.  32 years old.

24    Q.  Where were you born?

25    A.  Attleboro, Massachusetts.

M526GIA4                    Flynn - Direct

1    Q.  How far did you go in school?

2                THE COURT:  Let's slow down a little bit.  Okay?

3                MR. GIANFORTI:  Okay.

4    Q.  What do you currently do for work?

5    A.  I graduated high school.  I didn't answer that question.

6    Q.  Oh, I'm sorry.

7                And what do you currently do for work?

8    A.  I drive a furniture truck for a furniture company.

9    Q.  Where are you living currently?

10   A.  I'm living in Durham, Michigan.

11   Q.  Prior to delivering furniture, what did you do for work?

12   A.  I was a horse trainer and assistant horse trainer for

13   Richard Banca.

14   Q.  Who is Richard Banca?

15   A.  He is a trainer that is -- was out of Middletown, New York.

16   Q.  Was Mr. Banca based at a particular facility?

17   A.  Mount Hope Training Facility.

18   Q.  Do you know what county in New York that's in?

19   A.  I believe it's Orange.

20   Q.  When did you start working with Richard Banca?

21   A.  Early 2015.

22   Q.  And how did you get that job?

23   A.  We shared a mutual owner client, and I trained some horses

24   on my own.  So when I kind of stopped training, went out of

25   business, per se, I delivered some horses to Mr. Banca, and he

M526GIA4                    Flynn - Direct

1    offered me a job.

2    Q.   What kind of horses did Mr. Banca train?

3    A.   Standardbred racehorses.

4    Q.   What is a standardbred racehorse?

5    A.   A standardbred is a breed of a horse that races, and it

6    pulls a sulky or cart, as, per se, the thoroughbred, the jockey

7    would be on the horse's back.

8    Q.   What kind of horses have you worked with primarily in your

9    career?

10   A.   Standardbreds.

11   Q.   Mr. Flynn, what is the job of a horse trainer?

12   A.   Just the day-to-day care of horses, make sure they're

13   exercised, fit, in good condition, make sure the help is doing

14   all the work, classification of horses, dealing with owners,

15   clients, billing, stuff like that.

16   Q.   What's the job of an assistant horse trainer?

17   A.   Just to assist the trainer, more with the day-to-day care,

18   exercising, making sure the help is doing what they're supposed

19   to do, arranging rides to racetracks, making sure there's

20   transportation, stuff like that.

21   Q.   Are you familiar with the role of a groom?

22   A.   Yes.

23   Q.   What is the role of a groom?

24   A.   That would probably be like the lowest level in the

25   hierarchy where they would just do basic care; clean stalls,

1    tack up horses, stuff like that, bathe them.

2    Q.  And in terms of the hierarchy in a barn, let's say, how do

3    those various roles rank?

4    A.  Like I said, I would assume the groom would be the lowest,

5    and he may have some exercise riders or people that jog horses,

6    I would say, and then an assistant trainer and a trainer, I

7    would say.

8    Q.  Who does the trainer ultimately report to?

9    A.  The trainer ultimately reports to the owners or the clients

10   that own the horses.

11   Q.  And is the owner responsible for paying all those people in

12   the organizational tree, so to speak?

13   A.  The owner would pay the trainer, and then the trainer would

14   pay his employees.

15   Q.  So the trainer does the actually hiring; is that fair to

16   say?

17   A.  The trainer would do the actual hiring, yes.

18   Q.  Mr. Flynn, when did you start working with racehorses for

19   the first time?

20   A.  I would say around 2006.

21   Q.  Where was that?

22   A.  In Plainville, Massachusetts.

23   Q.  And what did you do?

24   A.  I was a groomer or stall cleaner.

25   Q.  How did you get involved -- how did you get that job?

1    A.  I had a friend I went to school with that had a job, and I

2    went with him on weekends and started when I was in high school

3    just working weekends.

4    Q.  How long did you -- how long were you a groom in

5    Massachusetts?

6    A.  I would say through the later years of high school, two

7    years, and then I moved to New Hampshire after high school in

8    2008, and after that I went to New York.

9    Q.  What did you do in New Hampshire?

10   A.  I was a groom.  Same thing.

11   Q.  How long did you do that for?

12   A.  Just one summer there.  The summer of 2008.

13   Q.  After you were done -- after the summer of 2008, where did

14   you go?

15   A.  I believe I went to New York after that.

16   Q.  Whereabouts in New York?

17   A.  Saratoga.

18   Q.  What's in Saratoga?

19   A.  A racetrack, Saratoga Harness Track.

20   Q.  Who did you work for there?

21   A.  I worked for a few people.  Rob Mangiori [ph],

22   Mark Beckwith, and I also trained a few horses on my own.

23   Q.  What was your role when you were in Saratoga?

24   A.  I would say I was more like a groom or exercise rider, more

25   just exercising horses.

1    Q.  And did there come a time when you started racing in

2    New Jersey?

3    A.  Yes.

4    Q.  When was that, approximately?

5    A.  I would say on and off, you know 2009, 2010.  Saratoga was

6    closed in the winter, so I used to go down to New Jersey.

7    Q.  Did your time in New Jersey overlap with your time in

8    Saratoga?

9    A.  Yeah.  I would go back and forth.

10   Q.  And what did you do in New Jersey, specifically?

11   A.  I worked a little bit there, and I also trained -- I

12   started training more horses down there.

13   Q.  And did there come a time when you moved to Ohio?

14   A.  Yes.  I believe that was late 2013, early 2014.

15   Q.  And what was your role in Ohio?

16   A.  I was a trainer.

17   Q.  While you were living in Ohio, did you also race in

18   Kentucky?

19   A.  Yes.

20   Q.  Did you engage in horse training in Kentucky?

21   A.  Yes.  I would ship my horses from Ohio to -- some horses

22   down to Kentucky to race.

23   Q.  And after -- well, what, if anything, did you do after your

24   time in Ohio in Kentucky?

25   A.  Well, after that, I would have proceeded to work for

1   Mr. Banca.

2   Q.  Okay.  Sir, do you still work for Richard Banca?

3   A.  No.

4          MR. GIANFORTI:  Just one moment, your Honor.

5   Q.  Mr. Flynn, is it fair to say that you worked in total --

6   you've worked with racehorses over a decade; is that fair to

7   say?

8   A.  Yeah, I would say that.

9   Q.  Did you have to be licensed to work with racehorses during

10  that time period?

11  A.  Yeah.  Every track you would go to, you'd have to be

12  licensed.

13  Q.  Are you familiar with the United States Trotting

14  Association?

15  A.  Yeah.  The USTA, like --

16  Q.  Go ahead --

17  A.  -- the governing body, I would say, over harness racing.

18  Q.  You said sometimes it's referred to as the USTA?

19  A.  Yes.

20  Q.  And it has a national scope, is that what you said?

21  A.  Yeah.  I would say it would be like the governing body.

22  Q.  Governing body for what?

23  A.  Harness racing.

24  Q.  Is there a separate governing body for thoroughbred racing,

25  as far as you know?

1    A.  I believe so.  I'm not too familiar with the thoroughbred

2    side.

3    Q.  Does the USTA issue licenses?

4    A.  Yes.

5    Q.  What kinds of licenses?

6    A.  Owners, trainers, and drivers would have to be licensed

7    through the USTA before they could get licensed by the state

8    race commission.

9    Q.  Have you ever held a license with the USTA?

10   A.  Yes.

11   Q.  What kind of license?

12   A.  An owner's license and also a trainer's license.

13   Q.  When did you get your trainer's license?

14   A.  I would say around 2009.

15   Q.  When did you get your owner's license?

16   A.  Either late 2008, early 2009.

17   Q.  How does one go about getting a license with the USTA?

18   A.  Well, you would have to take a written test where there's

19   questions, and then upon passing the written test, there would

20   be a practical test where you would go to the racetrack and

21   there would be somebody -- some representative from USTA would

22   watch you in a practical exam.

23   Q.  And what subjects, if you recall, were covered by the

24   written examination?

25   A.  Equipment, there were some rules, basic horse care, stuff

1    like that.

2    Q.  And what was the test format; multiple choice, essays?

3    A.  I believe it was multiple choice.

4    Q.  All right.  And you mentioned that the practical test

5    involved harnessing a horse and racing it a bit?

6    A.  Yeah.  Like exercising it or training it a mile.

7    Q.  Were there any other components to the practical exam you

8    can recall?

9    A.  Not that I can recall.

10   Q.  Mr. Flynn, if you want to work with racehorses in a

11   particular state, do you need a license from that state as

12   well?

13   A.  Yes.  You would have to be licensed in each particular

14   state also.

15   Q.  All right.  And we were talking about a number of states a

16   moment ago.  Have you ever held a trainer's license in

17   Massachusetts?

18   A.  Yes.

19   Q.  How about in -- I think you said you were in New Hampshire.

20   Did you have in New Hampshire?

21   A.  I believe I just had a groom's license there.

22   Q.  Did you have a trainer's license in New York?

23   A.  Yes.

24   Q.  New Jersey?

25   A.  Yes.

1    Q.  Ohio and Kentucky?

2    A.  Yes.

3    Q.  Did you have one in Pennsylvania?

4    A.  Yes.

5    Q.  Any states I missed?

6    A.  I believe that's it.

7    Q.  Okay.  So let's use New York as an example.  How did you go

8    about getting your trainer's license in New York State?

9    A.  Well, you just go to the track and fill out an application.

10   It will be reviewed by the judges there, and then they would

11   issue you a license.

12   Q.  Do you have to have your USTA license first?

13   A.  You would have to put your USTA number if you were an

14   owner, trainer, or driver.

15   Q.  Got you.  When did you get your trainer's license in

16   New York State?

17   A.  I believe around 2009.

18   Q.  Is that when you moved to Saratoga?

19   A.  Yes.

20   Q.  During the years that you worked with racehorses, did you

21   come to have an understanding of different states' rules around

22   the use of medication on racehorses?

23   A.  Yeah, I had an understanding about the rules.

24   Q.  Did you come to have an understanding of the penalties for

25   violating those rules?

M526GIA4                    Flynn - Direct

1  A.  Yeah, I had an understanding.

2  Q.  What were some of those penalties?

3          MR. FASULO:  Objection.

4          THE COURT:  Basis?

5          MR. GIANFORTI:  If he knows.

6          THE COURT:  What's the basis of the objection?

7          MR. FASULO:  The correction, Judge.  If he knows.

8          THE COURT:  Can you only testify to what you know.  If

9  your answer is you don't know, that's your answer.  That's true

10  with every question.

11          MR. GIANFORTI:  I'll ask it again.

12  Q.  What were some of the penalties associated with violating

13  the rules around administering medications to racehorses as

14  you -- to the best of your knowledge?

15  A.  They would vary for the lower level, like, therapeutic-type

16  drugs, it could be a small fine and a number of days'

17  suspension.  And if you got to a higher class of drug, it could

18  be up to 10 years and up to 10,000.

19  Q.  Sir, are you familiar with the concept of purse money?

20  A.  Yes.

21  Q.  What is purse money?

22  A.  That would be the money that you would win during a race.

23  Q.  Could you lose purse money if you violate rules?

24          MR. FASULO:  Objection.

25          THE COURT:  Basis?

1        MR. FASULO:  Speculation.

2        THE COURT:  What's your understanding if you violated

3    the rules, could you lose purse money?

4        THE WITNESS:  Yes.  The purse would have to be

5    returned.

6    Q.  And, in general, how did you come to have an understanding

7    of the rules of each state that you raced in?

8    A.  There was -- they were posted, the fines and suspensions,

9    so you could see it online who got fined and who got

10   suspensions.  You could review them.

11   Q.  Is that something you personally reviewed from time to

12   time?

13   A.  I reviewed them from time to time, yes.

14   Q.  Were the rules and regulations posted elsewhere physically

15   anywhere?

16   A.  They were posted at the racetracks also.

17   Q.  Okay.  Mr. Flynn, in the State of New York, are there drugs

18   that are prohibited outright for racehorses?

19   A.  I believe that you're not supposed to administer to a horse

20   on race day.

21   Q.  Okay.  How about are there any rules -- to the best of your

22   knowledge, are there any rules in New York State that prohibit

23   the administration of a substance completely regardless of

24   whether it's race day or not?

25       MR. FASULO:  Objection.  Foundation.

M526GIA4                    Flynn - Direct

1          MR. GIANFORTI:  If he knows.

2          THE COURT:  To the best of your knowledge.  Overruled.

3     You can answer.

4     A.   I would say you would never be allowed to administer, like,

5     Epogen or a blood builder.

6     Q.   What's your understanding of what a blood builder is?

7     A.   My understanding would be it would build a horse's red

8     blood count to obviously carry more oxygen so they wouldn't get

9     as tired fast.

10    Q.   Would you consider a blood builder to be a performance

11    enhancing drug?

12    A.   Yes.

13    Q.   How come?

14    A.   Because obviously it -- it builds -- they wouldn't get as

15    tired as fast.

16    Q.   Mr. Flynn, have you heard of the Food and Drug

17    Administration, or FDA?

18    A.   Yes.

19    Q.   What's your general understanding of what the FDA does?

20    A.   My understanding would be is they review drugs to make sure

21    they're safe for -- to be distributed or sold.

22    Q.   To the best of your knowledge, under New York rules, are

23    you allowed to give racehorses non-FDA approved drugs?

24    A.   I don't believe so.

25          MR. FASULO:  Objection.

M526GIA4                    Flynn - Direct

1          THE COURT:  Foundation?

2          MR. FASULO:  Relevance.

3          THE COURT:  Overruled.

4    Q.  You can answer the question.

5    A.  I don't believe so.

6    Q.  You don't believe you can sell non-FDA approved drugs for

7    racehorses?

8    A.  I don't believe so.

9    Q.  And I believe --

10         MR. FASULO:  I move to strike, Judge.  "I don't

11   believe so."

12         THE COURT:  Do you know, sir?

13         THE WITNESS:  No.

14         THE COURT:  All right.  The answer is stricken then.

15   Q.  Okay.  All right.  In New York State, sir -- I believe you

16   answered this a moment ago.  Are you allowed to give racehorses

17   any drugs on race day, to the best of your understanding?

18   A.  No.  You're not allowed to administer anything to a horse

19   on race day.

20   Q.  All right.  Mr. Flynn, how could someone get caught for

21   violating New York's rules around administering drugs to

22   racehorses?

23         MR. FASULO:  Objection.

24         THE COURT:  Sustained.

25   Q.  To the best of your knowledge, how could someone get caught

M526GIA4                    Flynn - Direct

 1   for violating New York rules around administering drugs to

 2   racehorses?

 3              MR. FASULO:  Objection.

 4              THE COURT:  Sustained.

 5   Q.  Mr. Flynn, are you familiar with state racing authorities?

 6   A.  Yes.

 7   Q.  Are you familiar with what they do?

 8   A.  Yes.

 9   Q.  To the best of your understanding, what are some of the

10   things that state racing authorities do?

11   A.  License and handle all the testing.

12   Q.  What kind of testing?

13   A.  They have prerace and postrace testing for horses that

14   race.

15   Q.  And when you say testing, what are they testing for, to the

16   best of your knowledge?

17   A.  I would say drugs that aren't allowed.

18              MR. FASULO:  Objection.  "I would say," Judge.

19   A.  Drugs that aren't allowed.

20              THE COURT:  Do you know?

21              THE WITNESS:  Yes.

22              THE COURT:  Overruled, then.

23   Q.  As best you recall, how does testing work in the State of

24   New York?

25              MR. FASULO:  Objection.  Time period.

1            THE COURT:  Sustained.

2    Q.  During the over -- during the decade-plus that you were a

3    racehorse trainer, to the best of your understanding and

4    recollection, how did drug testing work for racehorses in the

5    State of New York?

6    A.  Well, before the race, they would randomly do some prerace

7    testing, which would test the horse's TCO2 levels, and usually

8    after the race, the first and second horse that finished would

9    be taken to a separate area, and they'd collect blood and

10   urine.

11   Q.  You mentioned TCO2 levels a moment ago.  What do you mean

12   by that?

13   A.  Essentially, they'd be testing for baking soda.

14   Q.  Why would a racing commission test for baking soda?

15            MR. FASULO:  Objection.

16            THE COURT:  Sustained.

17   Q.  Why would one -- sorry.

18            What's your understanding of the uses of baking soda

19   on a racing horses?

20   A.  My understanding would be it would settle lactic acid in

21   the horse's stomach, and they wouldn't get tired as fast.

22   Q.  Do you consider baking soda to be a performance enhancing

23   drug?

24            MR. FASULO:  Objection.

25            THE COURT:  Sustained.

1  Q.  You said that your understanding is that baking soda breaks

2  down lactic acid in a horse; is that correct?

3  A.  That's what my understanding would be, yes.

4  Q.  What's your understanding of why you would want to do that?

5  Why would you personally want to do that?

6  A.  Because I think it would -- a horse wouldn't get as tired

7  as fast.

8          MR. FASULO:  Objection.

9          THE COURT:  Sustained.

10 Q.  If you know, in your own knowledge, Mr. Flynn, what's your

11 understanding of what baking soda does to a racehorse?

12 A.  It settles lactic acid in their stomach so they wouldn't

13 get as tired as fast.

14 Q.  Are you familiar with a concept in racing called

15 out-of-competition testing?

16 A.  Yes.

17 Q.  What is that?

18 A.  Well, randomly, the racing commissions could come to your

19 barn and test horses that were not racing.

20 Q.  How frequently, if you know, or during your time as a

21 racehorse trainer, the 10-plus years as a racehorse trainer,

22 how frequently, if you know, would out-of-competition testing

23 happen in the State of New York?

24         MR. FASULO:  Objection.

25         THE COURT:  Sustained.

M526GIA4            Flynn - Direct

1        You need to lay a better foundation.

2        MR. GIANFORTI:  Okay.  All right.

3   Q.  During your time as a racehorse trainer, did you ever --

4   were any of the horses under your care ever the subject of

5   out-of-competition testing?

6   A.  Yes.

7   Q.  Approximately how many times?

8   A.  Approximately three times.  They came to Mr. Banca's barn.

9   Q.  Okay.  What about during your time in other states?  Do you

10  recall any other out-of-competition testing?

11  A.  No.  I never had any other done.

12  Q.  In the 10-plus years you were a trainer, about three times?

13  A.  About three times, yes.

14  Q.  All right.  Mr. Flynn, to the best of your knowledge, are

15  the general rules we've been discussing in New York more or

16  less the same for all the states in which you held licenses?

17        MR. FASULO:  Objection.

18        THE COURT:  Sustained.

19  Q.  All right.  So for the states in which you were licensed,

20  Mr. Flynn, did those states have a drug testing program for

21  racehorses?

22  A.  Yes.

23        MR. GIANFORTI:  All right, your Honor.  I know it's

24  4:30.  This is actually a decent breaking point for me.

25        THE COURT:  We'll break at this point.  I'll remind

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   you that you remain under oath.  So this evening, you may not

2   talk to anybody, including the government lawyers, about the

3   substance of your testimony.

4           THE WITNESS:  Yes, your Honor.

5           THE COURT:  If you please remain in your seat.  Well,

6   actually I'm going to excuse you at this point, with the thanks

7   of the Court.

8           You remain under oath.

9           THE WITNESS:  Thank you, your Honor.

10          THE COURT:  And after he leaves, I will excuse our

11  jurors.  And if you would please then leave the area quickly

12  because the jurors are going to be departing as well.

13          THE WITNESS:  Yes, your Honor.

14          (Witness steps down)

15          THE COURT:  All right.  So I thank you all very much

16  for your attention today.  Please leave your notepads either on

17  your seats or in the jury room when you are on your way out.

18  I'll see you all tomorrow morning at 9:45.  And I remind you,

19  please do not research anything about the case, please don't

20  talk to anybody about the case, about the witnesses, about

21  what's gone on in the courtroom today, or about the subject

22  matters of this trial.  All right?

23          So I wish you all a good evening, and I'll see you

24  tomorrow morning.  Thank you.

25          (Continued on next page)

1                    (Jury not present)

2               THE COURT:  All right.

3               Mr. Gianforti and Ms. Mortazavi, is this your last

4    witness?

5               MR. GIANFORTI:  Overall?

6               THE COURT:  Yes.

7               MR. GIANFORTI:  No.  After Mr. Flynn, I think it will

8    likely be some combination of Adrienne Hall, Rita Noblett and

9    Cynthia Cole.

10              THE COURT:  Who are the last two witnesses?

11              MR. GIANFORTI:  Rita Noblett is a representative of

12   the Pennsylvania State Racing Commission, and Cynthia Cole is

13   one of our experts, and I suspect that will take us all the way

14   through tomorrow at a minimum.

15              THE COURT:  Okay.  All right.

16              Is there anything that we need to talk about from the

17   government's point of view

18              MR. GIANFORTI:  Not from the government, your Honor.

19   Thank you.

20              THE COURT:  Mr. Fasulo?

21              MR. FASULO:  Nothing from the defense.

22              THE COURT:  Thank you.  Then I'll see everybody

23   shortly before 9:45 tomorrow then.  I'll see you a little bit

24   before then.  Thank you.

25              (Adjourned to May 3rd, 2022, at 9:45 a.m.)

1                    INDEX OF EXAMINATION

2   Examination of:                              Page

3   JEAN BOWMAN

4   Direct By Ms. Mortazavi . . . . . . . . . . 419

5   Cross By Mr. Fasulo . . . . . . . . . . . . 495

6   Redirect By Ms. Mortazavi . . . . . . . . . 562

7   Recross By Mr. Fasulo . . . . . . . . . . . 584

8   Redirect By Ms. Mortazavi . . . . . . . . . 587

9    JOHN RUBINO

10  Direct By Mr. Gianforti . . . . . . . . . . 592

11  Cross By Mr. Fasulo . . . . . . . . . . . . 605

12  Redirect By Mr. Gianforti . . . . . . . . . 609

13  Recross By Mr. Fasulo . . . . . . . . . . . 610

14   CONOR FLYNN

15  Direct By Mr. Gianforti . . . . . . . . . . 615

16                   GOVERNMENT EXHIBITS

17  Exhibit No.                              Received

18   9002    . . . . . . . . . . . . . . . . . 456

19   9001, 3600-3607  . . . . . . . . . . . . . 590

20   9004, 8000-8536  . . . . . . . . . . . . . 591

21   9003, 3700-3707  . . . . . . . . . . . . . 594

22   19000   . . . . . . . . . . . . . . . . . 602

23   19001   . . . . . . . . . . . . . . . . . 605

24   9014, 18000, 18001 . . . . . . . . . . . . 613

25   9016 and 16000 . . . . . . . . . . . . . . 614