M536GIA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          20 Cr. 160 (MKV)

LISA GIANNELLI,

                Defendant.
                                        Trial
------------------------------x
                                        New York, N.Y.
                                        May 3, 2022
                                        9: 50 a.m.

Before:

                HON. MARY KAY VYSKOCIL,

                                        District Judge
                        APPEARANCES

DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
BY:   SARAH MORTAZAVI
      BENJAMIN A. GIANFORTI
      Assistant United States Attorneys


FASULO, BRAVERMAN & DiMAGGIO, LLP
        Attorneys for Defendant Giannelli
BY:   LOUIS V. FASULO


Also Present:  Karline Jung, USDA Paralegal

                        Anthony Imperatore, USDA Paralegal

                        Sean McCabe, Defense Paralegal

                        Mattison Stewart, Defense Intern

M536GIA1

|    | |
|----|--|
| 1  | (Trial resumed; jury not present) |
| 2  | THE COURT:  Good morning.  Please be seated, everyone. |
| 3  | MR. FASULO:  Ms. Giannelli is going to the bathroom. |
| 4  | THE COURT:  Okay.  We'll wait for her to get back. |
| 5  | MR. FASULO:  Judge, while we're waiting, on an |
| 6  | unrelated matter to anything substantive, my request would be |
| 7  | that the way the courtroom is set up and where Ms. Giannelli is |
| 8  | sitting, at times, she can't see the witness because of the |
| 9  | screen, obviously, that the reporter needs, and we understand |
| 10 | the necessity of that.  I don't have a problem.  My only |
| 11 | request is that at certain points, can she sit behind us if |
| 12 | that's okay and move around? |
| 13 | (Discussion off the record) |
| 14 | THE COURT:  Very good.  Nothing else we need to |
| 15 | discuss? |
| 16 | MS. MORTAZAVI:  Nothing, your Honor. |
| 17 | MR. FASULO:  Nothing. |
| 18 | THE COURT:  Ms. Dempsey, do you want to bring our jury |
| 19 | out? |
| 20 | MR. GIANFORTI:  Should we bring the witness out first, |
| 21 | Judge? |
| 22 | THE COURT:  No.  I think I prefer to get the jurors |
| 23 | out.  Thank you. |
| 24 | And we're with Mr. Flynn; is that right? |
| 25 | MR. GIANFORTI:  That's right, Judge. |

1          (Jury present)

2              THE COURT:  Please be seated, everyone.

3              Good morning, ladies and gentlemen.  Would someone

4      please retrieve our witness, Mr. Flynn?

5              Good morning.  You may be seat.  And I remind you,

6      sir, you remain under oath.

7              THE WITNESS:  Yes, your Honor.

8              THE COURT:  Mr. Gianforti.

9      CONOR FLYNN, resumed.

10     DIRECT EXAMINATION CONTINUED

11     BY MR. GIANFORTI:

12     Q.  Good morning Mr. Flynn.

13     A.  Good morning.

14     Q.  Mr. Flynn, did there come a time when you were charged with

15     crimes related to your use of performance enhancing drugs on

16     racehorses?

17     A.  Yes.  I was arrested March 9, 2020.

18     Q.  What did you decide to do after you were arrested?

19     A.  Come to a point in time where I decided to cooperate.

20     Q.  Approximately, when did you start cooperating with the

21     government?

22     A.  September of 2020.

23     Q.  As part of your cooperation, did you meet with prosecutors

24     from the United States Attorney's Office?

25     A.  Yes.

1    Q.  Had you met with me previously?

2    A.  Yes.

3    Q.  Approximately, how many times have you met with the

4    government?

5    A.  I'd say approximately a dozen times.

6    Q.  Did there come a time when you entered into a cooperation

7    agreement with the government?

8    A.  Yes.

9            MR. GIANFORTI:  Ms. Jung, can you please pull up for

10   the witness but not for the jury what's been marked for

11   identification as Government Exhibit 11001?

12   Q.  Mr. Flynn, do you recognize the document that's displayed

13   on your screen right now?

14   A.  Yes.

15   Q.  What is it?

16   A.  My cooperation agreement.

17   Q.  Did you sign this agreement?

18   A.  Yes.

19   Q.  When did you sign it?

20   A.  September 29, 2020.

21   Q.  Did you plead guilty to any crimes after you signed this

22   agreement?

23   A.  Yes.

24   Q.  What crimes did you plead guilty to?

25   A.  One count to misbrand and adultered drugs for use to

1    covertly dope racehorses.

2    Q.  And what did you do that made you guilty of that crime,

3    sir?

4    A.  I acquired drugs without prescriptions, acquired false

5    prescriptions, and essentially doped racehorses with them.

6    Q.  Did you take steps to avoid getting caught while you were

7    committing that crime?

8    A.  Yes.

9    Q.  To avoid being caught by who?

10   A.  Racing officials.

11   Q.  Under the terms of this agreement, Mr. Flynn, what are you

12   required to do?

13   A.  I'm required to truthfully disclose any information, attend

14   all meetings, truthfully testify at any trials, and also commit

15   no further crimes.

16   Q.  Are you -- are you required to testify here today under

17   your agreement?

18   A.  Yes, sir.

19   Q.  If you hold up your obligations under this agreement, what

20   is it you understand the government will do for you?

21   A.  My understanding would be they would submit a letter to the

22   judge with all the good things I've done and also the bad

23   things I've done in my life, and it would be up to him to

24   determine my sentencing.

25   Q.  When you say him, who do you mean?

1    A.  The judge overseeing my case.

2    Q.  Is that letter you're referring to sometimes referred to as

3    a 5K letter?

4    A.  Yes, I believe so.

5    Q.  Mr. Flynn, apart from your use of misbranded and

6    adulterated drugs for racehorses, did you tell the government

7    about other crimes you've committed?

8    A.  Yes.

9    Q.  Did that include your use and sale of marijuana?

10   A.  Yes.

11   Q.  Approximately how many times have you used marijuana?

12   A.  I would say pretty frequently in my younger years, 2008,

13   2009.

14   Q.  Approximately how many times have you sold marijuana?

15   A.  On a few occasions.

16   Q.  Were you paid when you sold the marijuana?

17   A.  Yes.

18   Q.  Have you used cocaine in the past?

19   A.  Yes.

20   Q.  Approximately how many times?

21   A.  I'd say maybe 15 times.

22   Q.  Have you personally used prescription medication in the

23   past without a valid prescription?

24   A.  Yes.  On a few occasions.

25   Q.  Have you ever been charged with any of these crimes that we

1   just went over?

2   A.  No, sir.

3   Q.  Did you voluntarily tell the government about those crimes?

4   A.  Yes.

5   Q.  If you live up to your obligations under this agreement,

6   what is it that you expect the government will do with respect

7   to those crimes?

8   A.  I don't believe I'll be prosecuted, but they'll be turned

9   over to the judge at sentencing.

10  Q.  So as far as you're aware, the sentencing judge will be

11  made aware of those crimes?

12  A.  Yes.

13  Q.  As you sit here today, have you been guaranteed a 5K letter

14  from the government?

15  A.  No.

16  Q.  Under this agreement, does the outcome of this trial matter

17  at all in the decision -- in the government's decision to issue

18  a 5K letter?

19  A.  No.

20  Q.  If you lie on the stand today and Lisa Giannelli is

21  ultimately convicted, what happens to your cooperation

22  agreement?

23  A.  Essentially, it will go away, and I'll have to plead guilty

24  to this crime.

25  Q.  Will you get a 5K letter in that case?

1    A.  No.

2    Q.  If you lie on the stand, could you be prosecuted for any

3    additional crimes?

4    A.  Yes.  I believe I could be prosecuted for perjury.

5    Q.  If you lie on the stand, do you get to take your plea back?

6    A.  No.

7    Q.  And, Mr. Flynn, if you could keep your voice up and pull

8    the mic in?  It's for the court reporter's benefit the jury's

9    benefit.

10          Mr. Flynn, if you tell the truth on the stand today

11   but the defendant is acquitted, do you still get a 5K letter?

12   A.  Yes.

13   Q.  What's the maximum sentence you could face?

14   A.  I face up to five years.

15   Q.  Have you been sentenced yet?

16   A.  No.

17   Q.  As you sit here today, have you been promised any

18   particular sentence by the government?

19   A.  No.

20   Q.  Who decides your sentence, sir?

21   A.  The judge that's overseeing my case.

22   Q.  Mr. Flynn, apart from the criminal conduct that we just

23   discussed, did there come a time when you were suspended from

24   racing in Saratoga, New York, for a period of time?

25   A.  Yes.

1    Q.  When was that, approximately?

2    A.  I believe 2012, 2013.

3    Q.  And what happened exactly?

4    A.  I got a positive test on a horse for a TCO2 overage, which

5    would be baking soda.

6    Q.  Mr. Flynn, I believe you testified yesterday that your

7    understanding is that giving baking soda to a horse will reduce

8    lactic acid in the horse's system, and thereby help their

9    endurance.  Is that a fair summary of your testimony?

10   A.  Yeah.  That's my understanding.

11   Q.  So in that sense, did you give baking soda to that horse in

12   order to improve its performance?

13   A.  Yes.

14   Q.  To the best of your knowledge, what are the rules with

15   respect to administering baking soda to a racehorse in

16   New York?

17           MR. FASULO:  Time frame.

18   Q.  Sorry.  During your time as a racehorse trainer --

19           THE COURT:  Thank you.

20   Q.  -- what was your understanding of the rules in New York

21   State in administering baking soda to a racehorse?

22   A.  I don't believe it could be administered on race day.

23   Q.  And in this case, the one from Saratoga, did you, in fact,

24   give the horse baking soda on race day?

25   A.  Yes.

1   Q.  How long were you suspended for?

2   A.  I believe I was suspended for six months just from that

3   particular track.

4   Q.  Okay.  So not for the state as a whole?

5   A.  Not for the state.  It was just a track test.

6   Q.  Mr. Flynn, did there come a time when you were suspended

7   from racing in New Jersey for a period of time?

8   A.  Yes.

9   Q.  When was that approximately?

10  A.  I got a positive test in 2013, but my suspension wasn't

11  finalized until about 2015.

12  Q.  What did you get a positive test for?

13  A.  Dexamethasone.

14  Q.  What is dexamethasone?

15  A.  It's anti-inflammatory drug.

16  Q.  Why did you give dexamethasone to your horse?

17  A.  To reduce inflammation in the horse.

18  Q.  Did you do it to improve the horse's performance?

19          MR. FASULO:  Objection.  Leading.

20          THE COURT:  No.  That's not leading.

21  Q.  You can answer the question.

22  A.  Yeah, I would say.

23  Q.  To the best of your knowledge, during the period of time

24  that you were a racehorse trainer, what were the rules with

25  respect to administering dexamethasone in New Jersey?

1   A.   I believe it was -- had to be given 48 hours out.

2   Q.   And in this case, did you give the dexamethasone within

3   48 hours of the race?

4   A.   Yeah.  I believe I gave it the night before.

5   Q.   How long were you suspended for?

6   A.   I think I received a 15-day suspension and maybe a fine.

7   Q.   Did there come a time, sir, when you were suspended from

8   racing in Ohio for a period of time?

9   A.   Yes.

10  Q.   When was that?

11  A.   That would have been in 2014.

12  Q.   What happened there?

13  A.   TCO2 overage.  The same as in Saratoga.

14  Q.   Baking soda?

15  A.   Yes.

16  Q.   To do the best of my knowledge during the period of time

17  when you were a racehorse trainer, what were the rules with

18  respect to administering baking soda to a racehorse in Ohio?

19  A.   It couldn't be given on a day of the race.

20  Q.   And in that case, did you give baking soda on the day of a

21  race?

22  A.   Yes.

23  Q.   How long were you suspended in Ohio?

24  A.   I believe 30 days.

25  Q.   Did there come a time when you were suspended in Kentucky

1    for a period of time?

2    A.   Yes.

3    Q.   When was that?

4    A.   2014.

5    Q.   What happened?

6    A.   I got a positive test for a drug called Ambroxol.

7    Q.   What is Ambroxol?

8    A.   It be like a drug to break up mucus, kind of like, open up

9    a horse's airway type drug -- break up mucus or open maybe a

10   horse's airway.

11   Q.   Why did you give Ambroxol to the horse you were working

12   with in Kentucky?

13   A.   Because it was sick prior to the race, and trying to speed

14   up the recovery process.

15   Q.   Did you give the horse Ambroxol to improve its performance?

16   A.   Yes.

17   Q.   To the best of your knowledge, when you were a racehorse

18   trainer, what were the rules with respect to administering

19   Ambroxol to a racehorse in the state of Kentucky?

20   A.   I believe it was a 72-hour withdraw time.

21   Q.   Did you give the horse Ambroxol within 72 hours of a race?

22   A.   Yes.  I gave it too close.

23   Q.   How long were you suspended for?

24   A.   I believe that was 45 days.

25   Q.   Mr. Flynn, you testified a bit about a drug called blood

1    builders.  Do you remember that?

2    A.  Yes.

3    Q.  I believe you testified that in New York, blood builders

4    are prohibited outright for racehorses; is that what you said?

5    A.  Yes.

6    Q.  Have you ever given a blood builder to a racehorse in the

7    State of New York?

8    A.  Yes.

9    Q.  Have you ever given a blood builder in a state other than

10   New York?

11   A.  Yes.

12   Q.  I believe you also testified yesterday that in New York

13   State, during the years you were a racehorse trainer, you were

14   not allowed to give racehorses any drugs on race day; is that

15   what you said?

16   A.  Yes.

17   Q.  To the best of your knowledge, during your time, the time

18   when you were a racehorse trainer, did the other states in

19   which you held licenses have the same rules about giving drugs

20   the day of the race?

21   A.  Yes.  They all had similar rules.

22   Q.  Have you ever given drugs to a racehorse in New York State

23   on the day of a race?

24   A.  Yes.

25   Q.  How about any other states in which you held licenses over

1    the years?

2    A.  Yes.

3    Q.  Sir, are you familiar with the term drenching?

4    A.  Yes.

5    Q.  What does that term mean to you?

6    A.  Well, it would be a tube that would be administered through

7    a horse's nose that goes to the horse's stomach and attach a

8    funnel, and you could essentially poor in a liquid substance.

9    Essentially for something maybe a horse wouldn't eat or drink.

10   Q.  Can you administer performance enhancing drugs using a

11   drench?

12   A.  Yes.

13   Q.  When would you do that typically?

14   A.  Me personally, I would do it at the farm before the horses

15   left for the race.

16   Q.  During your years as a racehorse trainer, was drenching a

17   horse with performance enhancing drugs permissible in the State

18   of New York?

19   A.  No.

20   Q.  Was it permissible in any of the states in which you held a

21   license?

22   A.  No.

23   Q.  Have you ever drenched a racehorse with performance

24   enhancing drugs on the day of a race in New York?

25   A.  Yes.

M536GIA1                    Flynn - Direct

1   Q.  How about in the other states in which you were licensed?

2   A.  Yes.

3   Q.  Taking a step back, Mr. Flynn, during your time as a

4   racehorse trainer, did you violate the rules regarding

5   administering drugs to racehorses in all of the states in which

6   you help licenses?

7   A.  Yes.

8   Q.  Were you caught every time you violated the rules?

9   A.  No.

10  Q.  On the occasions that you gave racehorses drugs you were

11  not supposed to, where would you typically administer those

12  drugs?

13  A.  At the farm.

14          THE COURT:  Sustained.  You need to lay a foundation.

15          MR. GIANFORTI:  Yes.

16  Q.  All right.  Mr. Flynn, you testified a moment ago that you

17  administered drugs to racehorses in every state in which you

18  held licenses, drugs you weren't supposed to give; is that

19  right?

20  A.  Yes.

21  Q.  And you personally administered those drugs on some

22  occasions?

23  A.  Yes.

24  Q.  And for instance, in the State of New York, before a race,

25  where would you typically administer the drugs to the horse?

M536GIA1                    Flynn - Direct

1    A.  At the farm before we left for the races.

2    Q.  Okay.  What about in New Jersey?

3    A.  Same thing.  At the farm.

4    Q.  Okay.  What about all the other states you were licensed

5    in?

6    A.  For most of my career, I was stabled at a farm.  Maybe on a

7    couple of occasions.  For a small period of time, I was stabled

8    at Saratoga racetrack, so I may have given some drugs there.

9    Q.  But at the other states, you typically gave it at the barn?

10   A.  Yes.

11   Q.  Why would you administer the drugs at the barn rather than

12   at the racetrack?

13   A.  Because not to get caught, there was a lot of racing

14   officials, security at the racetracks.

15   Q.  What would happen if you were caught administering drugs to

16   a racehorse at the track?

17   A.  You'd have penalties, fines, and suspensions.

18          THE COURT:  You need to keep your voice up.  You tend

19   to drop off at the end of your answers, so if you can try to

20   keep your voice up?  All right?

21          THE WITNESS:  Sorry.

22   Q.  Pretend you're talking to somebody in the back of the room

23   even though you have a microphone.

24          Mr. Flynn, I am now going to show you what's been --

25   what is in evidence as Government Exhibit 10001.

M536GIA1                    Flynn - Direct

1          MR. GIANFORTI:  Ms. Jung, if you can pull that up?

2          Mr. Flynn, do you recognize this individual?

3   A.  Yes.

4   Q.  Who is it?

5   A.  Lisa Ranger.

6          MR. GIANFORTI:  Okay.  And, Ms. Jung, you can take

7   that down.

8   Q.  Mr. Flynn, how do you know Lisa Ranger?

9   A.  She was working with my boss at the time when I started

10  working for Mr. Banca in 2015.

11  Q.  The first time you met her, what was she doing?

12  A.  Dropping off drugs or veterinary supplies at the barn.

13  Q.  Approximately what year was that?

14  A.  Early 2015.

15  Q.  Mr. Flynn, what, if anything, did you know about

16  Lisa Ranger before you met her?

17         MR. FASULO:  Objection.

18         THE COURT:  Grounds?

19         MR. FASULO:  Hearsay.

20         MR. GIANFORTI:  Goes to reputation in the community.

21  State of mind.

22         THE COURT:  Overruled.

23  A.  I believe she was in the industry a long time and was maybe

24  married to a former trainer, driver, Bruce Ranger, that was

25  pretty reputable.

1   Q.  How frequently -- and just to confirm.  Mr. Flynn, this is

2   when you were at the Mount Hope Training Facility --

3   A.  Yes.

4   Q.  -- that you talked about yesterday?

5   A.  Yes.

6          THE COURT:  You need to slow down too.  I am having a

7   hard time absorbing your questions.

8          MR. GIANFORTI:  In my mind, I'm going slow, but I'll

9   slow down even further.  All right.

10  Q.  To confirm -- I'll stake a step bark.

11         Mr. Flynn, to confirm you met her at the Mount Hope

12  Training Facility; is that correct?

13  A.  Yes.

14  Q.  How frequently would she come to your barn at the

15  Mount Hope Training Facility?

16  A.  I would say biweekly.

17  Q.  What would generally happen when she came to your barn?

18  A.  She would just drop off products to us.

19  Q.  Do you recall her ever leaving samples of anything?

20  A.  There were some samples that were in our office that

21  Mr. Banca said she left for him.

22         MR. FASULO:  Objection.

23         MR. GIANFORTI:  Coconspirator statement.

24         THE COURT:  Hold on.

25         Sustained.  The jury should disregard that last

M536GIA1                    Flynn - Direct

1    answer, or at least the part what Mr. Banca said.

2    Q.  Okay.  Why don't we take a step back?

3         So you said you recalled her giving -- there being

4    samples at the barn -- sorry.  Did she ever personally give you

5    a sample of anything?

6    A.  No.

7    Q.  Do you recall seeing any bottles of drugs that you didn't

8    recognize in the barn?

9    A.  Yeah, there were a few that sat on the shelf for a while.

10   Q.  Okay.  Did you ever use any of those samples?

11   A.  No.

12   Q.  Why not?

13   A.  I was told not to by my boss.

14   Q.  Did he say why not to?

15   A.  He wasn't sure if they would pass a drug test.

16   Q.  How would Ms. Ranger typically deliver the drugs to your

17   barn?

18           MR. FASULO:  Objection.  If he knows, Judge.

19           THE COURT:  Every question is if the witness knows.

20           MR. FASULO:  From his own personal knowledge.

21           THE COURT:  Do you want to rephrase the question,

22   please?

23   Q.  To the best of your knowledge, did you personally witness

24   Lisa Ranger delivering drugs to your barn?

25   A.  Yes.

1    Q.  On the occasions when she delivers drugs to your barn and

2    you witnessed it, how did she deliver them?

3    A.  She would drive to the barn and deliver them just packaged

4    up in cardboard boxes.

5    Q.  What kind of car did Lisa Ranger drive?

6    A.  She drove a Nissan Xterra.

7    Q.  And when you observed her come to the barn, what was sort

8    of the process -- what would happen when she came?

9    A.  Either I would meet her down by the car and get the

10   products, or she would leave them in our office if I was busy.

11   Q.  How would they come packaged, the drugs?

12   A.  Most of them were injectables in glass bottles, and there

13   were needles, syringes, stuff like that.

14   Q.  Did you buy pills from Lisa Ranger?

15   A.  Yes.  I bought bleeder pills.

16   Q.  How were those pills packaged when you bought them?

17   A.  They come in -- like, I would say a sandwich baggy with

18   written directions on them.

19   Q.  Okay.  Did you ever assist Lisa Ranger with unloading

20   product from her car?

21   A.  Occasionally I met her down by the car and receive it, the

22   products, from there.

23   Q.  On the occasions when you helped her unload the car, were

24   you able to see inside of her car?

25   A.  Yes.

1   Q.  What do you recall seeing?

2   A.  Just more boxes similar to ones I was getting.

3   Q.  How full would the car generally be?

4            MR. FASULO:  Objection.

5            THE COURT:  Sustained.

6   Q.  When you observed her car, when you helped her unload the

7   car, how full was the car on those occasions?

8            MR. FASULO:  Objection.

9            THE COURT:  Sustained.

10  Q.  Can you think of an example of a time when you unloaded

11  drugs for her?

12  A.  Yes.

13  Q.  Okay.  And on that occasion, how full was her car?

14  A.  I would say fairly full.

15  Q.  And what do you mean by fairly full?

16  A.  There were a good amount of boxes in there.

17  Q.  Mr. Flynn, who was responsible for paying for the products

18  that Lisa Ranger delivered to your barn?

19  A.  Mr. Banca.

20  Q.  How was payment handed between Lisa Ranger and Mr. Banca?

21  A.  Usually, she'd leave a bill, and then Mr. Banca would leave

22  an envelope on the desk the next time with a check in it.

23  Q.  Did you ever see any of the bills that Lisa Ranger left for

24  Mr. Banca?

25  A.  Yes.

M536GIA1                    Flynn - Direct

1    Q.  What do you recall the bills looking like?

2    A.  They were just an itemized bill on the top.  It says

3    Equestology, maybe with a logo and an address out of Delaware.

4    It was itemized, it would say the product, quantity, price, and

5    total at the bottom.  Standard bill.

6    Q.  When you first started working for Mr. Banca in early 2015,

7    who handled ordering the products from Lisa Ranger?

8    A.  Mr. Banca.

9    Q.  Did there come a time when you began ordering directly from

10   Lisa Ranger?

11   A.  Yes.

12   Q.  When was that?

13   A.  I'd say a couple months prior to me starting there.

14   Q.  So sometime in 2015?

15   A.  Yes.

16   Q.  How did you order from her, usually?

17   A.  Usually call or text the night before, and I would just

18   reorder products that previously were ordered.

19   Q.  Okay.  How did you decide what to reorder?

20   A.  Well, we had a room where we kept all our drugs, I would

21   say, and depending on how many horses we had or what we used, I

22   would check, say, the inventory and either order more or less

23   of certain products.

24   Q.  Mr. Flynn, on the occasions that you ordered drugs directly

25   from Lisa Ranger, did you consult with a veterinarian before

M536GIA1                    Flynn - Direct

1   placing those orders?

2   A.  No.

3   Q.  Did you obtain a prescription before placing orders with

4   Lisa Ranger?

5   A.  No.

6   Q.  During Lisa Ranger's visits to Mount Hope, that you

7   observed, did you ever -- did she ever examine any of the

8   horses in your barn?

9   A.  No.

10  Q.  And, again, on the times that you observed her at the barn,

11  did she ever bring anyone with her to examine any of the horses

12  in your barn?

13  A.  No.

14  Q.  On the occasions when you ordered drugs from her, did she

15  ever ask for the names of any of the horses in your barn?

16  A.  No.

17  Q.  Did you ever tell Lisa Ranger which horses were receiving

18  which of the drugs you ordered from her?

19  A.  No.

20  Q.  Did Lisa Ranger ever ask you for a prescription when you

21  were ordering prescription drugs?

22  A.  No.

23  Q.  Was the barn you worked in at Mount Hope the only barn

24  there?

25  A.  No.  There was a few here barns there.

 1  Q.  In addition to observing her at your barn, did you ever

 2  observe Lisa Ranger going to the other barns at the facility?

 3  A.  Yes.  She stopped at most of the barns at the facility.

 4  Q.  Which barns do you remember her visiting?

 5  A.  I would say she would come through go to Rick Dane's barn

 6  then our barn would be the next one, then Bill and

 7  Andrew Danzig's barn, and then the last barn would be

 8  Renée Lards.

 9  Q.  And how often would she go visit those other barns?

10  A.  I would say biweekly whenever she was there.

11  Q.  Do you know if Lisa Ranger worked for or with anyone?

12  A.  I believe she worked for Seth Fishman.

13  Q.  What do you know about Seth Fishman?

14  A.  He was kind of highly regarded in the horse industry for

15  getting drugs.

16  Q.  What kind of drugs, sir?

17  A.  Performance enhancing drugs.

18  Q.  Have you ever met Dr. Fishman?

19  A.  No.

20  Q.  Did you ever see Dr. Fishman at Mount Hope?

21  A.  No.

22  Q.  To your knowledge, during the time you were at Mount Hope,

23  did Dr. Fishman ever examine any of the horses you worked with?

24  A.  No.

25  Q.  Mr. Flynn, are you familiar with the term exotics in the

1    context of ugh drugs for horses?

2    A.   Yes.  I would consider that maybe drugs that you couldn't

3    get from any veterinarian.  You'd have to go to maybe a certain

4    person to get them.

5    Q.   Did you ever purchase exotics from Lisa Ranger?

6    A.   I would say maybe the bleeder pills and also a product

7    called ChemBlock.

8    Q.   What are bleeder pills?

9    A.   Bleeder pills would be pills to give to a horse to stop

10   them from bleeding.  Horses that overexert themselves would

11   bleed in their lungs, and it affects their performance --

12   they'll have a poor performance if they bleed.

13   Q.   Okay.  Have you ever personally administered bleeder pills

14   to a racehorse?

15   A.   Yes.

16   Q.   Have you ever done so on race day?

17   A.   Yes.

18   Q.   To the best of your knowledge, during your time as a

19   racehorse trainer, was it permitted to administer bleeder pills

20   to a racehorse on race day in any of the states in which you

21   were licensed?

22   A.   No.

23   Q.   Did any of the horse you worked with have a prescription

24   for bleeder pills?

25   A.   No.

M536GIA1                    Flynn - Direct

1    Q.  Did the bleeder pills you received from Lisa Ranger come

2    with any instructions?

3    A.  It was written on the bag.  I believe it said give eight

4    pills six to eight hours out.

5    Q.  Six to eight hours from what, if you recall?

6    A.  When they say out, that usually means before a race.

7    Q.  All right.  I believe you testified earlier that the

8    bleeder pills came in like a sandwich baggy; is that right?

9    A.  Yes.

10   Q.  In your experience during the time when you were a

11   racehorse trainer, did prescription drugs for racehorses

12   usually come in a sandwich baggy?

13   A.  No.

14   Q.  And I believe you testified a moment ago about buying a

15   product from Lisa Ranger called ChemBlock; is that right?

16   A.  Yes.

17   Q.  What is ChemBlock?

18   A.  It would be a drug that would be injected into a horse's

19   joint to block the pain in that particular joint.

20   Q.  Why would you administer ChemBlock to a racehorse?

21   A.  To block the pain if a horse was sore.

22   Q.  Would you give ChemBlock to enhance the horse's

23   performance?

24   A.  Yes.

25   Q.  Have you ever -- I think you said a moment ago that

1    ChemBlock is usually administered by a hypodermic needle?

2    A.   Yes.

3    Q.   Have you ever personally administered a horse with

4    ChemBlock?

5    A.   No.

6    Q.   Have you ever observed someone inject a horse with

7    ChemBlock?

8    A.   Yes.

9    Q.   Who?

10   A.   Our veterinarian for our barn, Dr. Grasso.

11   Q.   Approximately how many times have you seen him administer

12   ChemBlock to a racehorse?

13   A.   I'd say about five times.

14   Q.   On any of those occasions, do you recall Dr. Grasso's

15   demeanor as he was administered the ChemBlock?

16   A.   He didn't like to administer it.  It would kind of make a

17   horse uncomfortable.  They would dig in their stall after.

18   Q.   On the times that Dr. Grasso injected ChemBlock into a

19   horse you were working with, at what point in time did he do

20   that?

21   A.   Usually the day before the race.

22   Q.   And I think you said that you would see the horses digging

23   in their stalls --

24   A.   Yes.

25   Q.   When he would inject --

1    A.  -- yeah, after.

2             MR. FASULO:  Objection.  Leading.

3             MR. GIANFORTI:  I'm just repeating --

4             THE COURT:  Hold on.  Don't keep answering until I

5    rule, please.  All right?

6             MR. GIANFORTI:  Absolutely.

7             THE COURT:  Don't argue with Mr. Fasulo.  Let me look

8    at the transcript.

9             All right.  And you cut each other off, so I don't

10   even know what the question is.

11            MR. GIANFORTI:  Okay.  I'll just move on, your Honor.

12   Thank you.

13   Q.  Mr. Flynn, are you familiar with the term therapeutics in

14   the context of racehorse drugs?

15   A.  Yes.

16   Q.  What does that term mean to you?

17   A.  I would say maybe like anti-inflammatory drugs, vitamins,

18   stuff like that.

19   Q.  Are you familiar with a Banamine?

20   A.  Yes.

21   Q.  What is that?

22   A.  Anti-inflammatory drug.

23   Q.  Are you familiar with a drug that is often called -- are

24   you familiar with a drug that is sometimes called bute?

25   A.  Yes.

1  Q.  What is bute?

2  A.  Also an anti-inflammatory drug.

3  Q.  Have you ever purchased Banamine from Lisa Ranger?

4  A.  Yes.

5  Q.  Have you ever purchased bute from Lisa Ranger?

6  A.  Yes.

7  Q.  How is -- during your time as a racehorse trainer, how did

8  you typically administer Banamine to a racehorse?

9  A.  With a needle and syringe and inject it.

10  Q.  And during your time as a racehorse trainer, how did you

11  typically administer bute to a racehorse?

12  A.  The same way.

13  Q.  Are you familiar, sir, from your time as a trainer with the

14  rules in New York around the administration of therapeutics

15  like Banamine and bute to racehorses?

16  A.  There was withdraw times, so I believe it was 48 hours

17  before the race.

18  Q.  Have you ever personally administered a therapeutic drug to

19  a racehorse within that 48-hour withdraw time?

20  A.  No.  You mean close?

21  Q.  Yes.

22  A.  No.

23  Q.  I'm sorry.  Could you clarify?

24  A.  No, I have not.

25  Q.  Okay.

M536GIA1                    Flynn - Direct

1    A.  It's usually before the 48 hours.

2    Q.  Okay.  And during your time as a racehorse trainer, did any

3    of the horses you worked with have a prescription for Banamine?

4    A.  No.

5    Q.  How about bute?

6    A.  No.

7            MR. GIANFORTI:  All right.  Ms. Jung, could you please

8    pull up Government Exhibits 1509, 1510, and 1511, which are in

9    evidence?

10   Q.  Okay.  Mr. Flynn, I'm showing you Government Exhibits 1509

11   through 1511, which are photographs of items seized from the

12   Mount Hope Training Facility on March 9, 2020.

13           Are you familiar with the item that's displayed in

14   these photographs?

15   A.  Yeah.  They look similar to bottles that were taken out of

16   our office.

17   Q.  Okay.  And focusing on Government Exhibit 1510, do you see

18   the bold text there in the center of the bottle?

19   A.  Yes.

20   Q.  What is that?

21   A.  ACTH.

22   Q.  Are you familiar with ACTH?

23   A.  Yes.

24   Q.  And during your time as a racehorse trainer, what was your

25   understanding of what ACTH was used for?

1    A.   I believe it would help a horse's attitude.

2    Q.   And what do you mean by that, sir?

3    A.   Maybe, like, enhance their attitude or mood.  A horse with

4    a poor attitude obviously wouldn't have a very good

5    performance.

6    Q.   Did you ever purchase ACTH from Lisa Ranger?

7    A.   I don't believe so.

8    Q.   And focusing in on Government Exhibit 1509, can you make

9    out a logo on the bottle, sir?

10   A.   Yes.

11   Q.   What is it?

12   A.   Looks like a horse.

13   Q.   And focusing on Government Exhibit 1511, please, can you

14   make out a website on this bottle?

15   A.   Yes.  It says www.equi-tides.com.

16   Q.   What's your understanding of how ACTH is typically

17   administered on a racehorse?

18   A.   It would be injected with a needle and syringe.

19   Q.   Did you ever personally inject ACTH into any of the

20   racehorses you worked with?

21   A.   Yes.

22   Q.   Did any of the horses you worked with have a prescription

23   for ACTH?

24   A.   No.

25            MR. GIANFORTI:  You can take that down, Ms. Jung.

M536GIA1                    Flynn - Direct

1    And, Ms. Jung, can you now please pull up Government Exhibits

2    1507 and 1508, which are in evidence?

3    Q.  All right.  Mr. Flynn, these are photographs of other items

4    that were seized from the Mount Hope training facility on

5    March 9, 2020, and they're in evidence.

6            Mr. Flynn, do you recognize the item displayed in

7    these photographs?

8    A.  They look similar to a bottle that could have been taken

9    from our barn.

10   Q.  Okay.  And focusing on Government Exhibit 1508, can you

11   make out a logo on that bottle?

12   A.  Yes.

13   Q.  What is it?

14   A.  It's the same logo, a horse.

15   Q.  Sir, did you ever buy this particular product from

16   Lisa Ranger as best you can recall?

17   A.  No.

18           MR. GIANFORTI:  You can take that down, Ms. Jung.

19   Thank you.

20   Q.  Mr. Flynn, based on your experience and years as a

21   racehorse trainer, what's the most strenuous thing a racehorse

22   does?

23   A.  I would say race day or racing.

24   Q.  Is training the most strenuous thing a racehorse does?

25   A.  No.  It would be a lot lighter pace.

M536GIA1                    Flynn - Cross

1    Q.  In your experience and in your 10 years plus as a racehorse

2    trainer, did you ever win any money if your horse ran really

3    fast in training?

4    A.  No.

5    Q.  Did you win money if your horse ran really fast in a race?

6    A.  Yes.

7              MR. GIANFORTI:  No further questions.

8              THE COURT:  Mr. Fasulo.

9    CROSS-EXAMINATION

10   BY MR. FASULO:

11   Q.  Good morning.

12   A.  Good morning, sir.

13   Q.  You remember being asked some questions about an agreement

14   that you entered into with the government earlier?

15   A.  Yes.

16   Q.  And you entered into that agreement after you were arrested

17   at your home, correct?

18   A.  Yes.  I was arrested March 9.

19   Q.  And after you had an opportunity to speak with your

20   counsel, correct?

21   A.  Yes.

22   Q.  And after you understood the penalties that you were facing

23   in this particular case?

24   A.  Yes, sir.

25   Q.  And you entered into that agreement in the hopes that when

1   the judge does sentence you, you will get a reduced sentence

2   from what you would get if you didn't enter into such an

3   agreement?

4   A.  Yes, sir.

5   Q.  That's your hope?

6   A.  Yes.  That's my hope.

7   Q.  One of the things you have to do is to cooperate with the

8   government?

9   A.  Yes.

10  Q.  Testify truthfully?

11  A.  Yes, sir.

12  Q.  And disclose all of your prior bad acts?

13  A.  Yes.

14  Q.  So when you say you volunteered your prior criminal or

15  prior bad acts to the government during proffer sessions, you

16  did that because that was a requirement of the agreement that

17  you signed with the government?

18  A.  Yes, that was a requirement.

19  Q.  You didn't just do it because you wanted to?

20  A.  Yes.

21  Q.  Right.  And you also stated that you were a trainer at the

22  mount -- you were a trainer at the Mount Hope stables?

23  A.  I was an assistant trainer.

24  Q.  As an assistant trainer, you worked under a trainer?

25  A.  Yes.

1    Q.  Who was that trainer?

2    A.  Richard Banca.

3    Q.  And do you know what Richard Banca's relationship, if any,

4    to Dr. Seth Fishman was?

5    A.  No.

6    Q.  Have you ever had any conversations with -- without the

7    content, have you ever had conversations with Mr. Banca

8    regarding his relationship with Seth Fishman?

9    A.  No.

10   Q.  Who was the vet that Banca used for the horses you were

11   overseeing as an assistant trainer in Mount Hope?

12   A.  Dr. Grasso.

13   Q.  Are you aware of any conversations with Dr. Grasso and

14   Dr. Fishman?

15   A.  No.

16   Q.  You don't know if they happened, and you don't know if they

17   didn't happen?

18   A.  No.

19   Q.  And when you saw a couple of products that you said weren't

20   products that you got from Lisa Ranger, do you remember seeing

21   a --

22   A.  Yes, small bottles.  Yes, sir.

23   Q.  And do you know where those products came from?

24   A.  Well, Mr. Banca told me that they were given to him by Ms.

25   Ranger and not to use them.

M536GIA1                    Flynn - Cross

1   Q.  Right.  But the ones that you saw here, do you know where

2   they've been?

3   A.  No.

4           MR. FASULO:  Let me have -- can we have 1509?  I'm

5   going to withdraw that question, just for clarity.

6   Q.  Do you remember looking at these photographs a minute ago?

7   A.  Yes.

8   Q.  And you stated you did not purchase these products from

9   Lisa Ranger?

10  A.  No.  They're on the shelf in our barn for a while.

11  Q.  And they were on the shelf before you came -- worked

12  with --

13  A.  Not sure if was before or during, but they were there, and

14  I asked about them.

15  Q.  Do you know where these products came from?

16  A.  I don't personally, but Mr. Banca told me.

17  Q.  So you don't personally know where they came from?

18  A.  No, sir.

19  Q.  And during the time that you were with Mr. Banca,

20  Dr. Grasso was the vet?

21  A.  Yes.  He was the veterinarian.

22  Q.  He would facilitate the barn getting the necessary

23  medications for his animals, correct?

24  A.  Yes.

25  Q.  And when you administered any of the medications to the

M536GIA1                    Flynn - Cross

1    horses in the barn, was Dr. Grasso available -- aware of the

2    administration of those, to your knowledge?

3    A.  He provided medications, and he wasn't there when I

4    administered them.

5    Q.  And when you say he provided the medications, do you know

6    where those medications came from that he provided?

7    A.  No.

8    Q.  Let me talk to you a little bit about as your time as a

9    trainer and what you did.

10   A.  Yes.

11   Q.  You were both a trainer and assistant trainer?

12   A.  My trainer career went out of business.  I took a job with

13   Mr. Banca as an assistant trainer.

14   Q.  In your time as an assistant trainer or the time you

15   testified on direct as a trainer, how was it determined by the

16   trainers what the needs of the horses were as it related to

17   medications?

18   A.  Different trainers used different things or different

19   veterinarians had different processes of doing things.

20   Q.  And when the trainers needed medication, what was the

21   process for a trainer to get the medications that they deemed

22   necessary for their horses?

23              MR. GIANFORTI:  Objection.

24              THE COURT:  Sustained.

25   Q.  During the time that you were at the Mount Hope stables?

M536GIA1                    Flynn - Cross

1          THE COURT:  Sustained.  You need to lay a foundation

2    that there was a consistent practice.

3          MR. FASULO:  Okay.

4    Q.  Did you have a practice -- did you have a routine in terms

5    of obtaining medications for the horses that you were caring

6    for as a trainer?  Let's just talk about the Mount Hope

7    stables.

8    A.  Mr. Banca had a process that I followed.

9    Q.  Okay.  And what was that process?

10   A.  Horses got treated, drenched, stuff like that, stumps

11   administered.  Vets did vet work.

12   Q.  I'm sorry?

13   A.  Vets did vet work, and Mr. Grasso did work, and I just

14   don't understand the question, I guess, really.

15   Q.  And where would the drugs that you would need to do what

16   you said you just did come from at that time?

17   A.  Various people.

18   Q.  Like where did you get them from during the time that you

19   were at Mount Hope?  What were the sources for you?

20   A.  I got them from Dr. Grasso, Lisa Ranger, Brandon Simpson,

21   and Mr. Banca may have had other people he dealt with

22   personally.

23   Q.  Who would order the drugs, you or Mr. Banca?

24   A.  I would order them -- usually reorder drugs that he used in

25   his program.

M536GIA1                    Flynn - Cross

1    Q.  So when you say reorder, you wouldn't establish a new

2    order, you would just refill what was --

3    A.  Or refill.  I wouldn't go off the beaten path of what was

4    already ordered.

5    Q.  That's because you were the assistant trainer?

6    A.  I was the assistant trainer.

7    Q.  In the world of training horses, would it be your

8    understanding that the trainer himself, or herself, is the one

9    ultimately responsible for the care and wellbeing of the horse?

10   A.  Yes.  If there was a positive test for something,

11   essentially the trainer would be suspended, not myself.

12   Q.  Or not the groomsman?

13   A.  Not the grooms.

14   Q.  No one but the trainer?

15   A.  No one but the trainer.  Yes, sir.

16   Q.  Let me ask you specifically about -- you also testified

17   that you were actually suspended a number of times, correct?

18   A.  Yes.

19   Q.  You were suspended because you broke different track rules?

20   A.  Track rules or racing commission rules.

21   Q.  Or racing commission rules, right?

22   A.  Yes.

23   Q.  And you would agree with me each state has different

24   regulations, correct?

25   A.  Yes.

M536GIA1                    Flynn - Cross

Q.  Some of them mirror each other?

A.  Yes.  Some of them mirror each other, but it --

Q.  But each track and each state have their own regulations as to the administering of drugs -- each track has differing rules as to the time frame where it is permissible to administer certain drugs to certain horses?

A.  Yes.  Certain therapeutics would be -- they may have different time frames.

Q.  In fact, during the time that you ordered from Lisa Ranger while you're working at Mount Hope, you ordered a great number of what would be considered vitamins, correct?

A.  Yes.

Q.  That that was the bulk of your order?

A.  I would say so, yes.

Q.  The reason you ordered those vitamins from her was the price of the vitamins from Lisa Ranger, correct?

A.  I wasn't -- she was -- that was an already established relationship before I got there.

Q.  How was the relationship between you and Ms. Ranger as it relates to the ordering of those products?

A.  Like I said, reorders quick.

Q.  Were they delivered to you timely?

A.  Yeah.

Q.  Was she courteous to you when she delivered them to you?

A.  Yes.

M536GIA1                    Flynn - Cross

1    Q.  Were the orders filled properly?

2    A.  Yep.

3    Q.  Was there anything about that relationship that questioned

4    Ms. Ranger's professionalism in terms of the delivering of --

5    A.  No.

6    Q.  -- those products?

7              THE COURT:  Excuse me.  You each need to let the other

8    finish.  You keep stepping on the questions, and Mr. Fasulo,

9    you keep stepping on the answers.

10             THE WITNESS:  Sorry, your Honor.

11             MR. FASULO:  Very well.

12   Q.  And, in fact, you never saw Lisa Ranger act in the role of

13   a veterinarian, correct?

14   A.  No.

15   Q.  You never saw her examine horses?

16   A.  No.

17   Q.  You never saw her give medical advice?

18   A.  No.

19   Q.  You saw her just deliver the pills, correct?

20   A.  Yep.

21   Q.  And leave the invoices?

22   A.  Yes.

23   Q.  Pick up the checks?

24   A.  Yes.

25   Q.  And then come back and do the same thing again?

M536GIA1                    Flynn - Cross

1    A.  Yes.

2    Q.  And you also stated you knew of a person named Dr. Seth

3    Fishman, correct?

4    A.  I knew of him.

5    Q.  Right.  You also stated on direct examination you knew

6    about his reputation, correct?

7    A.  Yes.  He had a reputation in the horse business.

8    Q.  And when you say reputation, was that -- as far as you

9    know, what was that reputation?

10   A.  He was pretty highly regarded between people that would

11   push the limits, I would say.

12   Q.  Okay.  What do you mean by push the limits?

13   A.  Or give drugs that weren't permitted.

14   Q.  And, in fact, let's talk a little bit about the drugs that

15   you were giving the horses yourself where you were suspended.

16   A.  Yeah.

17   Q.  At one track, the first time that you had an infraction was

18   in March of 2020, about; would that be fair to say?

19   A.  Infraction for racing?

20   Q.  Infraction as a trainer.

21   A.  March of 2020, I was arrested.

22   Q.  I'm sorry.  In March 9 of 2020, there was an infraction

23   filed against you, correct?

24   A.  Yes.  I was arrested.

25   Q.  And there was conduct detrimental to the best interest of

1    horseracing, correct?

2    A.  Yes.  I'm sorry --

3    Q.  I'm sorry.  My fault?

4    A.  No, I thought you were talking about the arrest.  Yes.  My

5    license was revoked.

6    Q.  And you got an indefinite suspension at that point?

7    A.  Yes, sir.

8    Q.  And prior to that, you also had an infraction date of

9    November 14, 2015; isn't that right?

10   A.  Yes.

11   Q.  And in that case, you were given a 15-day suspension,

12   correct?

13   A.  Was that the one pertaining to New Jersey?

14   Q.  Well, in that case it had to do with a horse, Every Mile

15   Memory.

16   A.  Yes, that was from probably 2013, but it wasn't settled

17   until 2015.

18   Q.  And in that case, what did you do?

19   A.  I gave dexamethasone too close to the race.

20   Q.  At that time you were a trainer?

21   A.  Yes?

22   Q.  And you were taking responsibility for your actions?

23   A.  Yes.

24   Q.  It was your decision to give that drug to the horse

25   ultimately?

M536GIA1                    Flynn - Cross

1  A.  Yes, it was.

2  Q.  And you gave that drug to the horse understanding that it

3  was a violation of the rules of the track that you were at at

4  that time?

5  A.  Yes.

6  Q.  And it was against the New Jersey Racing Commission,

7  correct?

8  A.  Yes.  Gave it too close.

9  Q.  After giving that drug, the horse tested positive, correct?

10 A.  Yes.

11 Q.  And you received a five-day suspension for that; do you

12 remember that?

13 A.  Well, it was 15 years to 5 --

14 Q.  Was it a full suspension, 5 days?

15 A.  I think it was 15 days.  To the best of my knowledge, it

16 was 15 days, but it could have been reduced.

17 Q.  If I show you a list of your record, would that help to

18 refresh your recollection?

19 A.  Yes.

20        MR. FASULO:  Judge, may I approach?

21        THE COURT:  Yes.

22 A.  Oh, a $500 fine, 15-day suspension.  Oh, 5 days.  Okay.

23 Yes.  It was -- it must have been reduced.

24 Q.  And in that case, you administered -- what was the drug you

25 administered to the horse?

1   A.   Dexamethasone.

2   Q.   What was that drug?

3   A.   An anti-inflammatory.

4   Q.   When you said it was anti-inflammatory, in your role as a

5   trainer, did that drug have any legitimate uses as you saw it

6   for the wellbeing of horses?

7   A.   Yes.

8   Q.   What would be the use of that drug in relationship to the

9   horses?

10  A.   To reduce inflammation.

11  Q.   And when would that be necessary?

12  A.   Leading up to a race.

13  Q.   And during a training, or vigorous training, could it be

14  administered at that time as well?

15  A.   Yeah.  You may want to administer it after training.

16  Q.   And, in fact, there was a rule as to when it could be

17  administered in relationship to the timing of races, correct?

18  A.   Yes.

19  Q.   So it wasn't not allowed to be administered; it had to be

20  administered within the confines of the regulations as stated

21  by the track, correct?

22  A.   Yes.  I believe it was 48 hours, but I'm not positive.

23  Q.   Okay.  Can we go to the date of September of 2015.  You had

24  a violation for leaving a horse unattended; do you remember

25  that?

1   A.  Yes.

2   Q.  And you were fined $100, right?

3   A.  Yes.

4   Q.  And you paid that fine?

5   A.  Yes.

6   Q.  And then in February of 2015, you -- let me go -- withdraw

7   that.

8             In October of 2014, you had a horse, Irish Elitist; do

9   you remember that, sir?

10  A.  Yes.

11  Q.  Were you the trainer of that horse?

12  A.  Yes, sir.

13  Q.  And at that time, you administered a drug to that horse,

14  correct?

15  A.  Yes.

16  Q.  And what was the drug you administered to that horse?

17  A.  Well, it was baking soda, so I don't know if you consider

18  that a drug or not.

19  Q.  So baking soda, correct?

20  A.  Yes.

21  Q.  And where did you -- do you remember, you just bought that

22  baking soda at a --

23  A.  Grocery store, pharmacy, somewhere, convenience store.

24  Q.  Other than -- would you use the baking soda with the horses

25  on dates other than racing dates?

1    A.  Me personally, I usually would not.  Maybe occasionally if

2    a horse tied up, but other than it was mostly racing.

3    Q.  But you knew that it was not permissible to use the baking

4    soda on the day of the races in accordance with the Ohio Racing

5    Commission, state racing commission?

6    A.  Yes, sir.

7    Q.  You decided to do that, correct?

8    A.  Yes, sir.

9    Q.  And, in fact, you were caught at that time; your horse

10   tested positive, correct?

11   A.  Yes.

12   Q.  And was that a random horse test, or did the horse place in

13   order to be tested?

14   A.  I believe the horse was either first or second.

15   Q.  Okay.  And when the horse was first or second, you received

16   the benefit from that, right?

17   A.  Yes.  The owner would get the purse money.

18   Q.  Right.  And if the owner got the purse money, he would

19   split percentages to his team, correct?

20   A.  Depends.  It was either billed or some did percentage.  The

21   trainer got 5 percent essentially on every horse.

22   Q.  Were you a trainer at that time?

23   A.  Yes, sir.

24   Q.  I want to ask you about August of 2014, a horse Touch And

25   Go.

M536GIA1                    Flynn - Cross

1   A.  Yes.

2   Q.  Do you remember that horse?

3   A.  Yes.

4   Q.  And do you remember racing that horse at the Red Mile?

5   A.  Yes.  In Kentucky.

6   Q.  In Kentucky, right?

7   A.  Yes.

8   Q.  And at that time, your horse was disqualified, correct?

9   A.  Yes.  It had a positive test.

10  Q.  It was disqualified because it was given a drug, Ambroxol?

11  A.  Yes.

12  Q.  What is Ambroxol, as far you know?

13  A.  As far as I know, it would break up mucus, speed up the

14  recovery process.  A horse was sick, it just would speed up the

15  recovery process.

16  Q.  At that time when you gave the horse Ambroxol in 2014, you

17  didn't get that Ambroxol from Lisa Ranger, correct?

18  A.  No, sir.

19  Q.  Do you remember where you got that Ambroxol from?

20  A.  I don't recall.

21  Q.  Where would you get your drugs in 2014 that you used

22  illegal in these races?

23  A.  Usually from a veterinarian in Ohio.

24  Q.  And did Ambroxol have any other purpose -- did you know of

25  any legitimate purpose that Ambroxol had in dealing with the

1   horse's pain or the horse's performance?

2   A.  My understanding is it just speeded up the process of

3   recovering from sickness, break up the mucus.

4   Q.  Was this a drug that had a certain waiting period before a

5   race time to be administered?

6   A.  Yeah.  I think you would have to stop 72 hours.  To the

7   best of my knowledge, 72 hours.  But there was a time.  Not

8   sure of the exact time.

9   Q.  And you administered this drug within the period that was

10  prohibited, correct?

11  A.  Yeah.  I gave it too close towards the race.

12  Q.  And in that infraction, you received a 30-day suspension;

13  is that right?

14  A.  I believe so.

15  Q.  And you received a fine of $500, right?

16  A.  Yes.

17  Q.  And when you received the 30-day suspension, what did that

18  mean?  Did that mean you can go back and train horses in

19  30 days, or does that mean you couldn't be on the track in

20  30 days?  What did you understand that suspension to be?

21  A.  Well, you couldn't enter any horses for 30 days.

22  Q.  At that track?

23  A.  Or -- well, if it was USC, then anywhere.

24  Q.  Were you able to train horses -- were you still working?

25  A.  Yes, I still had horses.

1  Q.  And you were still getting paid, right?

2  A.  Yes.

3  Q.  Let me ask you about one more infraction.  In November of

4  2015, you were at the Freehold Racetrack, correct?

5  A.  Yes.

6  Q.  And you were racing a horse called Every Mile Memory,

7  correct?

8  A.  It would have been in 2013.  It got finalized --

9  Q.  In '15?

10  A.  In '15.  So it could have been before the violations in

11  Ohio and Kentucky.

12  Q.  Again, your horse tested positive?

13  A.  Yes.  That was the dexamethasone.

14  Q.  In all the cases where you received the infraction, it was

15  your decision to administer the drug to that horse at that

16  time?

17  A.  Yes.

18  Q.  And you could have decided not to administer it within the

19  prohibited period of time?

20  A.  Yes.

21  Q.  That was solely your decision?

22  A.  Yes.

23  Q.  Okay.  You didn't consult with Ms. Ranger when you were

24  going to administer that drug, did you?

25  A.  No.

M536GIA1                    Flynn - Cross

1    Q.  Let me ask you about drenching.

2    A.  Yes.

3    Q.  Can you tell the jury what that is again?

4    A.  Well, it would be a small rubber hose that would be entered

5    in a horse's mouth and go into the horse's stomach, and you

6    could administer fluids that way.

7    Q.  When you say fluids, would those fluids include supplements

8    and vitamins?

9    A.  Yes.

10   Q.  And would you use the drenching method to give the horse

11   supplements and vitamins at times?

12   A.  Yes.  After racing or training, I might drench them with

13   vitamins and electrolytes.

14   Q.  In fact, when you did that, and it wasn't a racing day and

15   it wasn't in the time frame prohibited by a track, that was

16   allowed, correct?

17   A.  Yeah, I believe it was allowed.

18   Q.  Well, was it or was it not allowed?

19   A.  I think so.

20   Q.  Okay.  And bleeder pills, you talked about bleeder pills?

21   A.  Yes.

22   Q.  Every horse will react different to strenuous activity; is

23   that fair to say?

24   A.  Yes.

25   Q.  And sometimes due to strenuous activity after a race, a

1   horse may bleed, correct?

2   A.   Yeah.

3   Q.   And the blood comes from the nose of the horse?

4   A.   You may see it, or you have to use a scope or camera to see

5   it.

6   Q.   When the horse is bleeding like that, one of the purposes

7   of a bleeder pill, if you know, is to stop the bleeding,

8   correct?

9   A.   Yes.

10  Q.   And that's a legitimate use of bleeder pills, correct?

11  A.   Yes.

12  Q.   And it does help to reduce the pain of the horses?

13  A.   Yes.

14         MR. GIANFORTI:  Objection.

15  Q.   As far as you know.  If you know.

16         THE COURT:  Overruled.  You can answer.

17  A.   Yes.  I would give it to the horse on race day to stop them

18  from bleeding.

19  Q.   There's nothing prohibited about using bleeder pills in

20  that matter post-race, correct?

21         MR. GIANFORTI:  Objection.

22         THE COURT:  Hold on.  When there is an objection, you

23  have to wait for me to rule on it.

24         What's your ground?

25         MR. GIANFORTI:  Foundation.  Time period.

M536GIA1                    Flynn - Cross

1          THE COURT:  Overruled.  You can answer.

2          The question -- can you read the question back,

3   please?

4          MR. FASULO:  For simplicity, I'll withdraw the

5   question and re-ask the question.

6   Q.  In the post-race scenario, there would be nothing

7   prohibited by law of you administering bleeder pills to a horse

8   in need; would that be true?

9   A.  It would be true, but it would not be something I would do.

10  Q.  All right.  But you have given bleeder pills to horses?

11  A.  Yes.  Before they bled, not after.

12  Q.  And have you given them during the training process of the

13  horses?

14  A.  No.

15  Q.  Let me ask you about -- you talked about Ranamine.  Do you

16  remember that?

17  A.  About -- excuse me?

18  Q.  Branamine, bute.

19  A.  Bute, Banamine.  Yes.  Sorry.

20  Q.  What is your understanding of bute?

21  A.  It would be the same class, like dexamethasone,

22  anti-inflammatory-type drugs that would be given with a

23  withdraw time.

24  Q.  If it's given within the proper withdraw time, there's

25  nothing prohibited about the use of that bute; is that fair to

1    say?

2    A.  Yes.

3    Q.  And have you given bute to horses?

4    A.  Yes.

5    Q.  And have you given it within the prescribed withdraw time?

6    A.  You mean further?

7    Q.  Yes.

8    A.  Yes.  I've given it outside of the 48 hours.

9    Q.  Right.  Let me ask you about blood builders.

10   A.  Yes.

11   Q.  What is your understanding of blood builders?

12   A.  My understanding, it would build a horse's red blood cells.

13   Q.  And in your time as a trainer, assistant trainer or

14   trainer, as you testified here today, have you administered

15   blood builders to horses?

16   A.  Yes.

17   Q.  And when was it that you administered blood builder to your

18   horses?

19   A.  You mean the time frame or like --

20   Q.  Anytime during the time you testified that you were a

21   trainer or assistant trainer at Mount Hope.

22   A.  They were frequently given when you worked at Mount Hope.

23   Q.  When you say frequently given, they were given at the barn?

24   A.  Yes.

25   Q.  They were given not on race day?

M536GIA1                    Flynn - Cross

1   A.  Yes.  It was usually probably three days before a race.

2   Q.  And was it your understanding that if it was given within a

3   prescribed period of time, the withdraw period of time, it was

4   okay to give it to the horse?

5   A.  I don't believe there was a withdraw time for -- per se.  I

6   used Epogen, so there was no withdraw time for that.

7   Q.  And it was your decision to give it to the horse at that

8   time, correct?

9   A.  My boss' decision, but yes.

10  Q.  And how about when you were a trainer and you had the

11  ultimate decision?

12  A.  Yeah.  It would be your decision when you give something.

13  Q.  Right.  And sometimes you would give it to a horse that

14  wouldn't even race -- that ended up not even racing, correct?

15  A.  Yes.

16  Q.  And prior to giving that drug, did you have any

17  conversations with Ms. Ranger, Ms. Giannelli, regarding when

18  and how you were going to administer any of the drugs that you

19  talked about here today?

20  A.  No.

21          MR. FASULO:  One moment, your Honor.

22          THE COURT:  Sure.

23  Q.  Mr. Flynn, is your hope after testifying here today

24  truthfully that you will give -- you will get a 5K letter from

25  the government?

1    A.  Yes.

2    Q.  And that at the time you go in front of your judge for

3    sentencing?

4    A.  Yes.

5    Q.  That the judge will look at that 5K letter, evaluate it?

6    A.  Yes.

7    Q.  And give you a much lesser sentence than the five years

8    that you currently face?

9    A.  Yes.  My hope is to get a reduced sentence.

10          MR. FASULO:  Very well.  No further questions.

11          THE WITNESS:  Thank you, sir.

12          THE COURT:  Thank you.  Redirect.

13          MR. GIANFORTI:  Yes.  Thank you, your Honor.

14   REDIRECT EXAMINATION

15   BY MR. GIANFORTI:

16   Q.  Mr. Flynn, Mr. Fasulo asked you some questions about blood

17   builder.  Do you remember that?

18   A.  Yes.

19   Q.  And I believe you testified on direct that, to the best of

20   your knowledge, during your time as a racehorse trainer, it was

21   never permitted to give blood builder to a racehorse in any of

22   the states you were licensed; is that right?

23   A.  Yes.

24   Q.  I believe you also testified that during your time as a

25   racehorse trainer, it was not permissible to give drugs to a

1    racehorse on the day of a race in any of the states in which

2    you were licensed; is that correct?

3    A.  Yes.

4    Q.  And I believe Mr. Fasulo also asked you whether you gave

5    bleeder pills to any of your horses during training; do you

6    remember that?

7    A.  Yes.

8    Q.  I believe you said you never did give bleeder pills during

9    training; is that's correct?

10   A.  No.

11            MR. FASULO:  Objection.

12            THE COURT:  Sustained.  You can reorient the witness,

13   but you can't just reiterate is this what you said.  The record

14   is what it is.

15            MR. GIANFORTI:  Certainly, your Honor.

16   Q.  Mr. Flynn, did you ever give any of the racehorses in your

17   care blood builder in connection with training?

18   A.  No.

19   Q.  Why not?

20   A.  I would usually use Lasix or -- and it was a lot.  Not as

21   strenuous of an exercise as training or racing, not as fast.

22   Q.  Why would you give the horses in your care bleeder pills

23   before racing?

24   A.  To prevent bleeding.  It was a lot faster, quicker, more

25   strenuous exercise.

1   Q.  And do you recall Mr. Fasulo asking you about

2   dexamethasone?

3   A.  Yes.

4   Q.  And Ambroxol?

5   A.  Yes.

6   Q.  And do you recall him asking you about whether those drugs

7   have legitimate uses?

8   A.  Yes.

9   Q.  During your time -- to the best of your knowledge, during

10  the time you were a racehorse training, did those drugs require

11  a prescription?

12  A.  I believe so.

13  Q.  Did you ever have a prescription for those drugs?

14  A.  I don't think so.

15          MR. GIANFORTI:  Ms. Jung, if you could, would you

16  please pull up for Mr. Flynn Government Exhibits 1509, 1510,

17  and 1511?

18  Q.  Mr. Flynn, do you remember asking questions about this

19  product on direct?

20  A.  Yes.

21  Q.  Do you recall Mr. Fasulo asking you questions about where

22  this drug came from, or your knowledge of where this drug came

23  from?

24  A.  Yes.

25  Q.  And can you just identify for the jury if you see a logo on

1   this bottle?

2   A.  Yes.  It has a horse.

3   Q.  Are you familiar with this logo?

4   A.  I believe it was the same logo they used for Equestology.

5   That was on the bills.

6   Q.  Mr. Flynn, do you recall testifying on direct about -- or

7   me asking you questions on direct about other crimes that you

8   committed?

9   A.  Yes.

10  Q.  Did you tell the government about your personal drug use

11  and other crimes before you signed the cooperation agreement?

12  A.  I believe in the proffer that was disclosed.

13  Q.  Are those crimes listed in your cooperation agreement?

14  A.  Yes.

15  Q.  So does that mean you told the government about those

16  crimes before signing it?

17  A.  Like I said, I believe it was disclosed during a proffer.

18          MR. GIANFORTI:  No further questions.

19          THE WITNESS:  Thank you.

20          MR. FASULO:  Nothing further, Judge.

21          THE COURT:  All right, thank you very much, sir.

22  You're excused with the thanks of the Court.

23          THE WITNESS:  Thank you very much, your Honor.

24          (Witness steps down.)

25          THE COURT:  And the government's next witness?

M536GIA1                    Hall - Direct

1          MR. GIANFORTI:  The government calls Adrienne Hall.

2          THE COURT:  All right.

3          (Pause)

4          THE COURT:  Good morning, Ms. Hall.  If you would

5    please take your mask off and stay standing on the witness

6    stand.

7          Ms. Dempsey.

8    ADRIENNE HALL,

9          called as a witness by the Government,

10         having been duly sworn, testified as follows:

11         DEPUTY CLERK:  Can you raise your microphone so can

12   you speak into it?

13         Can you state and spell your name?

14         THE WITNESS:  Adrienne Hall, A-D-R-I-E-N-N-E, H-A-L-L.

15   DIRECT EXAMINATION

16   BY MS. MORTAZAVI:

17   Q.  Good morning, Ms. Hall.

18   A.  Good morning.

19   Q.  Can you tell us the city and state you currently live?

20   A.  Cream Ridge, New Jersey.

21   Q.  And just make sure the --

22         MR. FASULO:  I couldn't hear, that, Judge.

23         THE WITNESS:  Cream Ridge, New Jersey.

24   Q.  Ms. Hall, I ask you to keep your voice up.  It's a big

25   room.  We want to make sure our court reporter can hear you.

1          THE COURT:  If you would pull the microphone a little

2     bit forward?  That's better, I think.  Thank you.

3          MS. MORTAZAVI:  Thank you, your Honor.  Pardon me.

4     Q.  What do you currently do for a living?

5     A.  I'm currently not working at the moment.

6     Q.  How far did you go in school?

7     A.  I have a bachelor's degree.

8     Q.  In what?

9     A.  Media communications.

10    Q.  And where did you get that degree?

11    A.  East Stroudsburg University.

12    Q.  What year?

13    A.  Graduated early 2000.

14    Q.  What kind of work did you do after you graduated from

15    college?

16    A.  After I graduated, I worked in real estate, and then I

17    worked in home finance.

18    Q.  At any point have you owned any racehorses?

19    A.  Yes.

20    Q.  Were they standardbred or thoroughbred?

21    A.  I've owned both.

22    Q.  Have you ever worked as a racehorse trainer?

23    A.  Yes.

24    Q.  For thoroughbred or standardbred?

25    A.  Standardbred.

1   Q.  When did you start racing horses as a trainer?

2   A.  I got my trainer's license in December of 2017, and my

3   first full year of training was 2018.

4   Q.  Have you continued to race horses as a trainer since you

5   first got your license in 2017?

6   A.  Yes.

7   Q.  When was your last race a licensed trainer?

8   A.  December of '21.

9   Q.  Are you familiar with a company called Equestology?

10  A.  Yes.

11  Q.  What's your understanding of the business Equestology is

12  engaged in?

13  A.  They sell pharmaceutical products for horses.

14  Q.  Have you met anyone from Equestology in person?

15  A.  Yes.

16  Q.  Who is that?

17  A.  I met Dr. Seth Fishman.

18  Q.  Have you had contact in any form with anyone else from

19  Equestology, even if it was not in person?

20  A.  Yes.

21  Q.  Who was that?

22  A.  Lisa Giannelli.

23  Q.  At the time, how did you know her?

24  A.  Lisa Ranger.

25  Q.  And how did you communicate with Lisa Ranger or

1    Lisa Giannelli?

2    A.   Phone, text, and e-mail.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M53BGIA2                    Hall - Direct

1    BY MS. MORTAZAVI:

2    Q.  Did you ever meet with her in person?

3    A.  No.

4    Q.  Prior to today's testimony, did there come a point in time

5    when you started meeting with prosecutors in this case?

6    A.  Yes.

7    Q.  And after meeting with the prosecutors, did you enter into

8    an agreement with the government?

9    A.  Yes.

10   Q.  Was that agreement in writing?

11   A.  Yes.

12   Q.  What did you call that agreement?

13   A.  A non-prosecution agreement.

14   Q.  What's your understanding of what you're required to do

15   under that agreement with the government?

16   A.  To always be honest and to be available and to provide any

17   material needed.

18   Q.  And if you do those things, what's your understanding of

19   what you will receive in return from the government?

20   A.  In return I will not be prosecuted.

21   Q.  Not prosecuted for what?

22   A.  For giving my horses performance enhancing drugs.

23   Q.  What's your understanding of what could happen to you if

24   you do not tell the truth today?

25   A.  The contract would not be applicable.

M53BGIA2                    Hall - Direct

1   Q.  By contract, do you mean that non-prosecution agreement?

2   A.  Yes.

3   Q.  Is there anything else that could happen if you're not

4   truthful today?

5   A.  I could be charged with perjury.

6   Q.  I'm going to turn back, Ms. Hall, to the first time that

7   you received your trainers license, what agency issued you your

8   license?

9   A.  So I had to first get a membership through the United

10  States Trotting Association.

11  Q.  Is that sometimes called the USTA?

12  A.  That's the USTA, yes.

13  Q.  After you got that membership, what did you do?

14  A.  Then I applied with Ohio State Racing Commission for my

15  trainer and owner license.

16  Q.  What's your understanding at the time that you applied for

17  your license of what the Ohio State Racing Commission does?

18  A.  They regulate horseracing and pari-mutuel wagering in the

19  state of Ohio.

20  Q.  Other than Ohio over the course of your career, have you

21  obtained your trainers license in any other states?

22  A.  Yes.

23  Q.  Which ones?

24  A.  Kentucky, Florida, New Jersey, New York and Pennsylvania.

25  Q.  Did you have to apply for a trainers license in each of

M53BGIA2                    Hall - Direct

1   those states?

2   A.  Yes.

3   Q.  I'm going to start with Florida.

4           Can you tell us what agency granted you your trainers

5   license in Florida?

6   A.  The Florida Gaming Commission.

7   Q.  What's your understanding of what that commission does?

8   A.  They also regulate the rules and bi-laws of horseracing

9   pari-mutuel wagering.

10  Q.  What about New York, what agency granted you your license

11  there?

12  A.  The New York Gaming Commission.

13  Q.  What's your understanding of what the New York Gaming

14  Commission does?

15  A.  They also regulate horseracing and pari-mutuel wagering.

16  Q.  With the other states that you mentioned, Kentucky, New

17  Jersey and Pennsylvania, did you apply for your trainers

18  license to a commission in each of those states?

19  A.  Yes.

20  Q.  And as far as you're aware, what do each of those state

21  commissions do?

22  A.  They oversee horseracing. They make the rules.  They punish

23  people that break the rules.  They do investigations and things

24  like that.

25  Q.  And is that the same with both Florida and New York?

M53BGIA2                    Hall - Direct

1   A.  Yes.

2   Q.  As a result of being licensed in each state, do you have to

3   be familiar with the rules and regulations governing

4   horseracing in each state?

5   A.  Yes.

6   Q.  How did you come to learn those rules?

7   A.  Every state has a website, their bi-laws are on their

8   website or there's pamphlets that you can pick up.

9   Q.  Are there some commonalities across the rules for each of

10  the states that you're familiar with?

11  A.  There are, yes.

12  Q.  And do those rules include rules regarding administering

13  drugs to racehorses?

14  A.  Yes.

15  Q.  What's your understanding of whether a racehorse trainer

16  can give a horse the day of a race for the time period that you

17  were licensed?

18  A.  They cannot.

19  Q.  And what's your understanding of whether a racehorse

20  trainer can give a horse blood builders like Epogen for the

21  time that you were licensed?

22  A.  They cannot.

23  Q.  Focusing on 2018, what were the range of penalties that you

24  believe you could face if you violated anti-doping rules?

25  A.  Suspension, fine, your horse would be disqualified and the

1   purse money would have to be returned.

2   Q.  When you say suspension, what would be suspended?

3   A.  Your license.  You would be a unable to compete.

4   Q.  And you mentioned purse money being returned, what do you

5   understand purse money to be?

6   A.  Purse money is the prize money that the horses pick up when

7   they -- usually with standardbred racing, it's first through

8   fifth place you get purse money.

9   Q.  Over the period of time when you were licensed, were your

10  horses drug tested?

11  A.  Yes.

12  Q.  As far as you know, what are the various ways in which a

13  state racing commission could possibly catch you violating the

14  anti-doping rules?

15  A.  So they could catch you by --

16          MR. FASULO:  Objection.

17          THE COURT:  Grounds?

18          MR. FASULO:  Speculating as to how they would catch

19  her.

20          THE COURT:  Overruled, just for her understanding.

21  Q.  You can answer, Ms. Hall.

22  A.  They could stop in your barn and do a surprise search.  If

23  they caught you with injectables or administering anything, you

24  could be in trouble that way.

25          They could catch you by doing out of competition

M53BGIA2                    Hall - Direct

1    testing, meaning they could come to your barn un-announced as

2    well, pull any horse, pull blood on it, take a hair sample,

3    take a urine sample and test that.

4            And the other way would be postrace or prerace testing

5    of the horse.  Each state has different laws for that, but they

6    could either do a prerace bicarbonate test, a test for Baking

7    Soda.

8            Or after the race, they would take blood and urine for

9    sending off to the lab for drug testing.

10   Q.  Let me ask you just a few follow-up question. You mentioned

11   out of competition testing?

12   A.  Yes.

13   Q.  Does that mean that the racing commission could come into

14   the barn even if a horse wasn't about to race and drug test

15   that horse randomly?

16   A.  Yes.

17   Q.  And you also mentioned postrace testing?

18   A.  Yes.

19   Q.  That's after a race, right?

20   A.  Correct.

21   Q.  Which horses could be subject to postrace testing?

22   A.  Most -- often times the winner is always tested.  Some

23   tracks will take the first and second place horses always, and

24   then they can also special a horse.  They can pick any horse

25   out of the race that they want regardless of where it finished

M53BGIA2                    Hall - Direct

1    and pull it in for testing.

2    Q.  So I want to orient you to October of 2018, at that point

3    where were you licensed as a trainer?

4    A.  Ohio, Kentucky and Florida at that time.

5    Q.  And at that time, where were you living?

6    A.  Florida.

7    Q.  And in approximately that month and year, how many horses

8    did you train?

9    A.  I had two horses at the time, only one was racing.

10   Q.  And who was the owner of those horses?

11   A.  I was.

12   Q.  At your peak, how many racehorses did you train?

13   A.  Five.

14   Q.  And how many racehorses did you own at the peak of your

15   career?

16   A.  Also five.

17   Q.  I'd like to talk to you about the first time you had

18   contact with Lisa Ranger or Giannelli from Equestology.

19           How did you make contact with her initially?

20   A.  Initially it would have been phone or email.

21   Q.  How did you get her contact information?

22   A.  From another trainer in Ohio.

23   Q.  Can you describe the conversations between you and that

24   other trainer?

25   A.  I was just curious as to where he was getting his supplies

M53BGIA2                    Hall - Direct

1   from and he had referred me to her.

2   Q.  And prior to that, had you heard of Lisa Ranger before?

3   A.  No.

4   Q.  Did you reach out to Lisa Ranger in approximately October

5   of 2018?

6   A.  Yes.

7   Q.  Why did you reach out to her initially?

8   A.  I was hoping to buy supplies from her.

9   Q.  Did you believe that Lisa Ranger was a veterinarian?

10  A.  No.

11  Q.  At any point did you have any discussion with her about a

12  veterinarian?

13  A.  Yes.

14  Q.  Can you describe that conversation?

15  A.  At one point -- it wasn't our first conversation, but I

16  asked if she could have Dr. Fishman call me and be my primary

17  vet down in Florida.

18  Q.  You mentioned Dr. Fishman who you believed was associated

19  with Equestology, correct?

20  A.  Yes, I thought he owned the company.

21  Q.  What had you heard of Dr. Fishman before you had that

22  conversation with Lisa Ranger?

23  A.  I believe I had heard -- well, I know I heard from someone,

24  if you wanted to win races, that Dr. Fishman was the person to

25  talk to.

M53BGIA2                    Hall - Direct

1   Q.  Had you met him prior to that conversation with Lisa Ranger

2   that you just described?

3   A.  No.

4   Q.  When you asked to be in touch with Dr. Fishman to get a

5   veterinarian, what did Lisa Ranger say?

6   A.  She said he would be unable to come to the farm to see my

7   horses.

8   Q.  Did she say why?

9   A.  She said he did not do that type of work anymore because he

10  had a bad back.

11  Q.  Did you ever purchase drugs from Lisa Ranger?

12  A.  Yes.

13  Q.  When did you start purchasing drugs from her?

14  A.  October 2018.

15          MS. MORTAZAVI:  Ms. Jung, could you please pull up,

16  just for the witness, not for the jury, Government Exhibit

17  1915.

18  Q.  Ms. Hall, do you recognize this document?

19  A.  Yes.

20  Q.  What is it?

21  A.  It's an email from Lisa Ranger to myself.

22  Q.  How do you recognize it?

23  A.  That's her email address and that is my email address.

24          MS. MORTAZAVI:  The government offers Government

25  Exhibit 1915 into evidence.

M53BGIA2                    Hall - Direct

1              MR. FASULO:  No objection.

2              THE COURT:  It is received in evidence.  You may

3      publish it to the jury.

4              (Government's Exhibit 1915 received in evidence)

5      BY MS. MORTAZAVI:

6      Q.  Ms. Hall, I'm just going to read out some of the header

7      information on this email.  It looks like a message from Lisa

8      Ranger using equestology@Gmail.com, sent Tuesday, October 16,

9      2018, at 12:38 p.m. to hallracingstable@Gmail.com.

10             Is that your email address in the "to" section?

11     A.  Yes.

12     Q.  Can you read the body of this email, Ms. Hall.

13     A.  It says, "Here's the product sheet, but we are always

14     adding to it.  If you don't see it, just ask.  Thanks, Lisa."

15     Q.  Were there attachments to this email?

16     A.  Yes.

17             MS. MORTAZAVI:  Ms. Jung, could you please go back to

18     the original Exhibit 1915 and turn to page 3.

19     Q.  Ms. Hall, is that Equestology written at the very top of

20     the page?

21     A.  Yes.

22     Q.  And underneath it inventory travel sheet?

23     A.  Yes.

24             MS. MORTAZAVI:  Ms. Jung, if we can go back to the

25     main portion.

M53BGIA2                    Hall - Direct

1    Q.  Do you see a category here, Ms. Here, that's listed doc or

2    DOC?

3    A.  Yes.

4    Q.  Ms. Hall, if you look through this list, could you tell us

5    if you recognize any drugs that you ultimately received from

6    either Seth Fishman or Lisa Ranger?

7    A.  Yes.

8    Q.  Which ones?

9    A.  The BB3, the TB-7 and the VO2 Max.

10         THE COURT:  Ms. Mortazavi, if you could find a

11   convenient breaking point.

12         MS. MORTAZAVI:  Certainly, your Honor. If we could

13   finish with this.

14         THE COURT:  Sure.

15   BY MS. MORTAZAVI:

16   Q.  Ms. Jung, if you can turn to page 6 of this exhibit.

17         Ms. Hall, was this another attachment to the email

18   that you received?

19   A.  Yes.

20   Q.  Written at the top, Dr. Seth Fishman, a number and then

21   questions, and then below that Lisa a number and then orders

22   and payments?

23   A.  Yes.

24   Q.  Ms. Jung, could you turn to page 2 of this exhibit.  Pardon

25   me, if we could turn to the next page of that attachment which

1    I believe is page 7 of this exhibit.

2            Ms. Hall, do you recognize any products on this sheet

3    that you received from Ms. Ranger of drugs that you ultimately

4    purchased or received from either of the individuals we've

5    mentioned?

6    A.   No.

7    Q.   Ms. Jung, could you turn to page 8 of this exhibit.

8            Do you recognize any items here that you received?

9    A.   There's one that I received from Dr. Fishman.

10   Q.   Which one is that?

11   A.   The TB-7.

12   Q.   Turning to the next page, Ms. Jung.

13           Any items here that you received?

14   A.   No.

15   Q.   Turning to the page after that, Ms. Jung.

16           Any items here that you ever received from Seth

17   Fishman or Lisa Ranger?

18   A.   Yes, the EGH.

19   Q.   And, Ms. Jung, could you turn to next page in this exhibit,

20   and the page after that.

21           Ms. Hall, looking through that list of items in this

22   attachment to the email that you received from Lisa Ranger,

23   were there any items that you received that are not on this

24   list?

25   A.   Yes.

M53BGIA2                        Hall - Direct

1    Q.  What are those?

2    A.  The VO2 Max.

3    Q.  Anything else?

4    A.  No.

5    Q.  You testified earlier that you recognized BB3?

6           MR. FASULO:  Objection, Judge.

7           THE COURT:  Overruled.

8    A.  I'm sorry, yes, I did.  I forgot about getting that as

9    well.

10          MS. MORTAZAVI:  Your Honor, this is a convenient

11   breaking point.

12          THE COURT:  Ms. Hall, I remind you, you remain under

13   oath.  Please do not talk about your testimony with anyone

14   during the break.

15          Ladies and gentlemen, please leave your notepads on

16   your seats and we'll take a break until about 11:30.  Please

17   don't talk about the case during your break and we'll see you

18   back here shortly.  Thank you.

19          (Recess)

20          THE COURT:  Let's get the jury.

21          (Jury present)

22          THE COURT:  Would someone please retrieve Ms. Hall.

23          Thank you, Ms. Hall.  You can remove your mask and you

24   remain under oath.

25          Ms. Mortazavi.

M53BGIA2                    Hall - Direct

1    BY MS. MORTAZAVI:

2    Q.  Ms. Jung, could you please display Exhibit 1915, just the

3    first page that we were looking at before the break, and if you

4    could focus on the header information in that email.

5            Ms. Hall, this was an email that was sent from Lisa

6    Ranger October 16, 2018, at 12:38 p.m.; is that right?

7    A.  Yes.

8    Q.  Ms. Jung, could you please now display for the witness only

9    what's been marked as Government Exhibit 1914.

10           Ms. Hall, do you recognize this document?

11   A.  Yes.

12   Q.  What is it?

13   A.  An email from Lisa to myself.

14   Q.  How do you recognize it?

15   A.  That's her email address and that's to my email address.

16   Q.  And, Ms. Hall, I'm just going to ask you to keep your voice

17   up again.

18           MS. MORTAZAVI:  Your Honor, the government offers

19   Exhibit 1914 into evidence.

20           MR. FASULO:  No objection.

21           THE COURT:  It is received.

22           (Government's Exhibit 1914 received in evidence)

23   BY MS. MORTAZAVI:

24   Q.  Ms. Jung, could you please publish for the jury.

25           Ms. Hall, is this an email that was sent from

M53BGIA2                    Hall - Direct

1    Equestology@Gmail.com to your email address?

2    A.   Yes.

3    Q.   Was this sent October 16, 2018, at 1:51 p.m.?

4    A.   Yes.

5    Q.   Is that within about two hours of the last exhibit we were

6    looking at?

7    A.   Yes.

8    Q.   In those two hours between the two emails that we're

9    talking about, did you talk to Seth Fishman?

10   A.   No.

11   Q.   Ms. Jung, could you turn to the second page of this

12   exhibit.

13          Ms. Hall, was this an attachment to the email we just

14   reviewed?

15   A.   Yes.

16   Q.   Do you see in the top left corner the company name

17   Equestology with an address in Delaware?

18   A.   Yes.

19   Q.   And looking back at the full invoice, do you see your name

20   associated with an address?

21   A.   Yes.

22   Q.   Do you recognize that address?

23   A.   Yes.

24   Q.   What is it?

25   A.   That's where I was living at the time.

M53BGIA2                    Hall - Direct

1   Q.  You see here that there's an itemized list of various

2   drugs?

3   A.  Yes.

4   Q.  Do you recognize any of the items on this list as

5   injectable drugs?

6   A.  Yes.

7   Q.  Do you recognize any of these drug as prescription drugs?

8   A.  Yes.

9   Q.  What was your understanding at the time of whether you as

10  the trainer could purchase these from Lisa Ranger?

11  A.  I was not supposed to be purchasing these.

12  Q.  According to what?

13  A.  The racing commission rules.

14  Q.  And before you placed this order, what conversation, if

15  any, did you have with Lisa Ranger about a prescription for

16  these drugs?

17  A.  I don't remember having any conversation about the

18  prescription.  I think she just asked for the horse's name.

19  Q.  And after placing the order, did you receive these drugs?

20  A.  Yes.

21  Q.  Who administered these drugs to your racehorses, if anyone?

22  A.  I did.

23  Q.  You testified that Lisa Ranger told you that Seth Fishman

24  could not perform a physical exam on your horses; is that

25  correct?

M53BGIA2                        Hall - Direct

1    A.   Yes.

2    Q.   At any point after you had that conversation, did you hire

3    someone to examine your horses?

4    A.   I did find someone, yes.

5    Q.   Who is that person?

6    A.   At the time I believe it was Dr. Carinda (ph).

7    Q.   Not Seth Fishman?

8    A.   No.

9    Q.   And you testified that you at one point met Seth Fishman in

10   person, correct?

11   A.   Correct.

12   Q.   How did you come to meet with him in person for the first

13   time?

14   A.   We had dinner.

15   Q.   And who set up that meeting?

16   A.   He initiated it.

17   Q.   Did you reach out to him prior to that?

18   A.   Yes.

19   Q.   And approximately when did you first reach out to Seth

20   Fishman?

21   A.   I reached out to him in October of 2018 initially.

22   Q.   And approximately when was your first meeting with him?

23   A.   Not until January 2019.

24   Q.   Ms. Jung, could you please display Government Exhibit 900A.

25   This is an electronic record retrieved from Seth Fishman's

M53BGIA2                    Hall - Direct

1    electronic device which is already admitted into evidence.

2           Ms. Hall, looking at this exhibit, do you see that it

3    contains text messages between two parties?

4    A.   Yes.

5    Q.   And who are the parties in this chat?

6    A.   Seth Fishman and myself.

7    Q.   Do you recognize the number that's associated with the name

8    Adrienne Hall?

9    A.   Yes.

10   Q.   How do you recognize that phone number?

11   A.   That was my old phone number.

12   Q.   Is that how you spell your name?

13   A.   No.

14   Q.   Looking at the full exhibit, Ms. Jung, does it appear that

15   these blue messages are from you, Ms. Hall, and the green

16   messages are from Seth Fishman?

17   A.   Yes.

18   Q.   Ms. Jung, could we focus on the very first message here.

19   That's the one for the record dated October 21, 2018 at 11:59

20   p.m.

21          Ms. Hall, could you read that message?

22   A.   "Hi, my name is Adrienne and I'm a horse trainer at

23   Sunshine Meadows. I got your number from Lisa.  I was wondering

24   if you can help me come up with some prerace options for a new

25   horse I just got in. I can email you his most recent blood work

M53BGIA2                    Hall - Direct

1    if so."

2    Q.  What did you mean by "prerace options"?

3    A.  To help treat the horse leading up to a race to help

4    improve its performance.

5    Q.  During your initial meeting with Seth Fishman, what did you

6    discuss with him?

7    A.  I don't remember all of the conversations, but I know I

8    talked a lot about my horses and he had touched on a little bit

9    of his business.

10   Q.  Apart from that conversation, what else happened at that

11   meeting?

12   A.  He had asked me to meet him at his car and he gave me a

13   gift bag with some samples of drugs in it.

14   Q.  Do you remember any of the drugs?

15   A.  VO2 Max was in there and a syringe bleeder paste it was

16   called.

17   Q.  And what did Seth Fishman tell you about VO2 Max at that

18   meeting?

19   A.  He said that it would be best used on the day of a race or

20   before a workout.

21   Q.  And what was VO2 Max supposed to do for a racehorse?

22   A.  To help improve its performance.

23   Q.  Did you ultimately administer VO2 Max to any of your

24   racehorses?

25   A.  Yes, to one I did.

M53BGIA2                    Hall - Direct

1    Q.  And when did you administer it?

2    A.  On race day.

3    Q.  What penalties could you have faced if you had been caught

4    administering that VO2 Max to your racehorse?

5              MR. FASULO:  Objection.  Place, time.

6              THE COURT:  I'm sorry.

7              MR. FASULO:  Place, time, track, state.

8              THE COURT:  When she did it, what penalties could you

9    have faced.

10   A.  The day and time.

11   Q.  At the time that you administered VO2 Max to your horse the

12   day of a race, what penalties do you believe you could have

13   faced if you were caught?

14   A.  If I was caught, my horse would have been scratched, would

15   not have been allowed to race that day.  I would have most

16   likely faced a suspension and fine.

17   Q.  By scratch you mean disqualified?

18   A.  Just not even allowed to enter.

19   Q.  And for what length of time were you in touch with Seth

20   Fishman after that first in-person meeting?

21   A.  Our last conversation was very end of may, very beginning

22   of June.

23   Q.  Was that about a five-month period?

24   A.  Yes.

25   Q.  And over the course of that five-month period, which drugs

M53BGIA2                    Hall - Direct

1  did you receive from him?

2  A.  He had given me some samples of drug called BB3, a drug

3  called TB-7 and VO2 Max and the EGH, equine growth hormone.

4  Q.  How did you physically receive those drugs?

5  A.  He gave them to me and there was one other time I met

6  another woman that I thought worked for him, but I wasn't sure.

7  Q.  Was that woman someone other than Lisa Ranger?

8  A.  Yes.

9  Q.  And you stated that you received samples from Seth Fishman?

10 A.  Correct.

11 Q.  Were you purchasing or paying for those drugs?

12 A.  No, he just wanted me to try them.

13 Q.  And the TB-7, EGH and BB3, how would you categorize each of

14 those drugs?

15 A.  The BB3, it was my impression that was a blood builder.

16 Q.  What effect does a blood builder have on a racehorse?

17 A.  It increases their red blood cell count which helps them

18 with their performance.  They don't get fatigued as quickly.

19 Q.  Were you permitted to administer blood builders to your

20 horse?

21 A.  No.

22 Q.  What about the TB-7, how would you characterize that?

23 A.  I'm not really quite sure how I would characterize it.  I

24 think it was part of the blood builder.

25 Q.  And the EGH?

M53BGIA2                    Hall - Direct

1    A.  That was an equine growth hormone.

2    Q.  What was that supposed to do for your racehorse as you

3    understood it?

4    A.  As I understood, it was to help build muscle.

5    Q.  And the blood builders that you received from Seth Fishman,

6    did you actually administer those to any of your racehorses?

7    A.  I did try them on one horse, yes.

8    Q.  Apart from that in-person meeting and text messages with

9    Seth Fishman, how else did you communicate with him?

10   A.  Over the phone.

11            MS. MORTAZAVI:  Ms. Jung, could you please display

12   Government Exhibit 102AT and please prepare Government Exhibit

13   102A, and the jurors can wither follow along on their screens

14   or in their binders by turning to that tab.

15            For the record, this is March 7, 2019, intercepted

16   phone call between Seth Fishman and Adrienne Hall.

17            Ms. Jung, if you could please play.

18            (Media played)

19            (Media stopped)

20            MS. MORTAZAVI:  You can take down this exhibit,

21   Ms. Jung.

22   BY MS. MORTAZAVI:

23   Q.  Ms. Hall, do you know what Epo is?

24   A.  Epogen.

25   Q.  Is Epo another term for Epogen.

M53BGIA2                    Hall - Direct

1    A.  E-P-O, yes.

2    Q.  Are you familiar with the phrase Epo mimetic?

3    A.  From that conversation, yes.

4    Q.  What did you understand that to mean?

5    A.  It was something that might have the same effect as an

6    Epogen, but not as bad as it.

7           MS. MORTAZAVI:  Ms. Jung, could you please now display

8    Government Exhibit 102CT and prepared Government Exhibit 102C.

9           And for the record, this is another portion of that

10   same intercepted call, March 7, 2019, between Seth Fishman and

11   Adrienne Hall.

12          Ms. Jung, if you could please play.

13          (Media played)

14          (Media stopped)

15          MS. MORTAZAVI:  Ms. Jung, I'm going to ask you to

16   prepare Government Exhibit 102ET and Government Exhibit 102T,

17   which again for the record is another portion of that same

18   intercepted call between Adrienne Hall and Seth Fishman.

19          Ms. Jung, if you could please.

20          (Media played)

21          (Media stopped)

22   BY MS. MORTAZAVI:

23   Q.  Ms. Hall, there was a reference in this phone call to a

24   commission, what did you understand that to be referencing?

25   A.  The racing commission.

M53BGIA2                    Hall - Direct

1  Q.  What, if anything, did Seth Fishman about the testability

2  of the products he sold?

3  A.  He was very confident that they did not test.

4  Q.  Was that important to you?

5  A.  Yes.

6  Q.  Why is that.

7  A.  If I had gotten a positive test, then I would have faced a

8  suspension hearing, fines, disqualification.

9  Q.  There is also a reference on that to cloudy test, what did

10  you understand that to mean?

11  A.  My understanding of a cloudy test is, you know, they pull

12  the blood.  Something is detected on it, they're just not quite

13  sure what it is, so it's kind of like an inconclusive test, but

14  something has shown up as a little suspicious.

15          MS. MORTAZAVI:  Ms. Jung, could you please display

16  Government Exhibit 102FT and prepared Government Exhibit 102F.

17          For the record, this is another portion of that same

18  March 7, 2019 intercepted call between Seth Fishman and

19  Adrienne Hall.

20          Ms. Jung, if you could please play

21          (Media played)

22          (Media stopped)

23  BY MS. MORTAZAVI:

24  Q.  There was a reference here and in other calls that we

25  reviewed, Ms. Hall, to Mary, did you know who Mary was?

M53BGIA2                    Hall - Direct

1    A.  I had met her on two occasions.

2    Q.  Was she the individual that you testified about earlier who

3    would give you drugs?

4    A.  Yes.

5    Q.  Were all the drugs that you received from Seth Fishman

6    labeled?

7    A.  No.

8    Q.  Were some of them unlabeled?

9    A.  Yes.

10   Q.  How would you refer to the drugs that had no label?

11   A.  By the color of their cap.

12   Q.  And which drugs, if you recall, did not have a label on

13   them?

14   A.  The BB3.

15   Q.  Any others?

16   A.  I think it was just the BB3.

17   Q.  Ms. Jung, could you please display Government Exhibit 900D,

18   which for the record is another extraction from an electronic

19   device belonging to Seth Fishman which is already in evidence.

20         Ms. Hall, do you see, this is a text chain between you

21   and Seth Fishman?

22   A.  Yes.

23         MS. MORTAZAVI:  So, Ms. Jung, if we could focus on the

24   very bottom message of this page, which for the record is dated

25   March 11, 2019.

M53BGIA2                    Hall - Direct

Q.  Ms. Hall, could you go ahead and read out what Seth Fishman

texted you.

A.  "Here's reality, I was tortured so much by a race

commission without a client ever getting a single positive

other than stupid shit like Bute given by another vet.  I

voluntarily gave up my license and then the veterinarian board

had me investigated for BS.  They even accused Lisa of

practices veterinary medicine.  I spent 25,000 dollars in legal

fees and had a personal political favor called in to end the

BS."

Q.  Ms. Hall, what, if anything, did you know about Equestology

being investigated by a racing commission?

A.  Nothing.

Q.  Apart from that text message, nothing else?

A.  No.

Q.  What about an investigation by a veterinary board into Seth

Fishman or Lisa Ranger?

A.  I was not aware of that until that conversation.

Q.  Did you have any idea what he was talking about?

A.  No.

           MS. MORTAZAVI:  Ms. Jung, could you please now display

Government Exhibit 900E, and turn to the top of page 2.

Q.  And, Ms. Hall, looking at this page, does this also appear

to be messages between you and Seth Fishman?

A.  Yes.

M53BGIA2                    Hall - Direct

1          MS. MORTAZAVI:  And for the record, this was extracted

2    from the same electronic device belonging to Seth Fishman as

3    the prior exhibits we've reviewed.

4          Ms. Jung, could you please display the very top

5    message on the page, which is for the record from Seth Fishman,

6    March 12, 2019.

7    Q.  Ms. Hall, could you go ahead and read the contents of this

8    text message to you.

9    A.  "It's Seth trying to call you.  Reconstitute TB-7 with 2 to

10   3 mls bacteriostatic water and give one dose IV.  For horse you

11   want to build blood take the one green cap bottle and one navy

12   cap amber bottle and reconstitute with 2-3 mls and give IV."

13   Q.  What did you understand reconstitute to mean?

14   A.  Mix together.

15   Q.  How did you administer the TB-7 that you received from Seth

16   Fishman to your horses?

17   A.  In the vein how he described it.

18   Q.  How he described it in this text message?

19   A.  Yes.

20   Q.  What about the BB3?

21   A.  I believe that was the same way, that was in the vein as

22   well.

23   Q.  To mix it and then give it into the vein?

24   A.  Yes.

25   Q.  And what about the EGH?

M53BGIA2                    Hall - Direct

1    A.  That was a muscle shot.

2    Q.  What does that mean?

3    A.  In the muscle of the skin.

4    Q.  Did you have to mix that?

5    A.  No.

6    Q.  At what time of day were you administering the drugs that

7    you received from Seth Fishman?

8    A.  In the evening.

9    Q.  Why is that?

10   A.  I was hoping to not be seen by anyone.

11           MS. MORTAZAVI:  Ms. Jung, you can take down this

12   exhibit.  Thank you.

13   Q.  Ms. Hall, during the time you were receiving drugs from

14   Seth Fishman, what contact, if any, did you have with Lisa

15   Ranger?

16   A.  Just over the emails when I was placing orders with her.

17   Q.  How would you place your orders with her?

18   A.  Mostly email and text.

19   Q.  How often would you place orders with her?

20   A.  Probably once a month, once every couple of weeks.

21   Q.  What types of drugs were you purchasing from her?

22   A.  Most of my orders were vitamins, some Bute, Banamine,

23   Amicar, a lot of electrolyte drugs.

24   Q.  Are Bute and Banamine vitamins?

25   A.  No.

1    Q.  What are they?

2    A.  Pain killers.

3    Q.  Are they drugs?

4    A.  Yes.

5    Q.  Do they typically require a prescription?

6    A.  Yes.

7    Q.  And what, if any, conversations did you have with Lisa

8    Ranger about prescriptions for those drugs?

9    A.  None.

10   Q.  What, if any, conversations did you have with her about

11   Seth Fishman?

12   A.  None.  After that initial asking if he could come to my

13   farm, I don't think I had any.

14   Q.  Would you pay Lisa Ranger for the drugs that you were

15   ordering?

16   A.  Yes.

17   Q.  You testified that Seth Fishman gave you samples of a

18   number of drugs, correct?

19   A.  Yes.

20   Q.  Did you end up ordering and paying for any of those drugs?

21   A.  No.  I ordered -- you mean from Dr. Fishman or from --

22   Q.  From either Dr. Fishman or Lisa Ranger.

23   A.  I bought two bottles of VO2 Max from Lisa Ranger.

24   Q.  You did not buy them from Seth Fishman?

25   A.  No.

M53BGIA2                    Hall - Direct

1    Q.  Who did you contact when you were ready to pay for VO2 Max?

2    A.  Lisa.

3           MS. MORTAZAVI:  Ms. Jung, could you please display

4    Government Exhibit 105D as in dog T, and prepare Government

5    Exhibit 105D.

6           And again, the jurors can follow along on their

7    screens or in their binders.

8           For the record, this is a March 20, 2019 call between

9    Seth Fishman and Adrienne Hall.

10          Ms. Jung, could you please play this call.

11          (Media played)

12          (Media stopped)

13          MS. MORTAZAVI:  Ms. Jung, if you could take down this

14   exhibit and place display Government Exhibit 900G, G as in

15   golf.

16          For the record, this is another extraction from an

17   electronic device belonging to Seth Fishman.

18   Q.  And, Ms. Hall, does this look like a series of text

19   messages between you and Seth Fishman?

20   A.  Yes.

21          MS. MORTAZAVI:  Ms. Jung, could we turn to the last

22   page of this exhibit, and could you focus on the very last

23   message.

24          For the record, this is a text message from Adrienne

25   Hall, dated March 31, 2019.

M53BGIA2                    Hall - Direct

Q.  Ms. Hall, was this the last time you had contact with Seth

Fishman by text?

A.  That was our last text exchange, yes.

Q.  Do you recall one way or the other whether you had any

further contact with Seth Fishman after this text message?

A.  Yes, he called me one time.

Q.  What happened during that phone call?

A.  He basically was bringing up how he had given me free

samples of these drugs and he seemed a little agitated with me;

and in fact said he regretted ever helping me because I turned

out to be a huge waste of his time.

Q.  Did you understand what he meant by that?

A.  Yeah.  I think -- yes, I think he was hoping that I would

bring in some big name trainers and clients for him and that's

why he wanted to have me try these samples on my horses because

if they raced well, then these other guys would notice and want

to work with him as well.

Q.  Did you actually bring in those big named trainers as you

put it?

A.  No.

Q.  After March 31, 2019, did you continue to order drugs from

Lisa Ranger?

A.  I'm sorry, after what date?

Q.  After you sent that text message to Seth Fishman, did you

continue to order drugs from Lisa Ranger?

M53BGIA2                    Hall - Direct

1   A.  I placed one last order with her, yes.

2           MS. MORTAZAVI:  Ms. Jung, could you please display

3   Government Exhibit 608, which for the record is an item that

4   was extracted from a device seized from Lisa Giannelli's

5   residence.

6   Q.  Ms. Hall, do you recognize this document?

7   A.  Yes.

8   Q.  Next to the word "for," is that your name?

9   A.  Yes.

10  Q.  And you see the address listed under your name, do you

11  recognize that?

12  A.  Yes.

13  Q.  What is it?

14  A.  That was where I was living at the time.

15  Q.  Do you see at the top of this it says invoice and then on

16  the left side Equestology with an address in Delaware?

17  A.  Yes.

18  Q.  Do you see a line item in this invoice for VO2 Max?

19  A.  Yes.

20  Q.  Are these the bottles of VO2 Max that you testified about

21  earlier?

22  A.  Yes.

23  Q.  The same VO2 Max you believed you received from Seth

24  Fishman, correct?

25  A.  No.

M53BGIA2                    Hall - Direct

1   Q.  I'm sorry.  The same name of the drug that you received

2   from Seth Fishman?

3   A.  Yes.

4           MS. MORTAZAVI:  Ms. Jung, could you please take this

5   down and display Government Exhibit 715 and turn to page 12.

6   If we could focus on the lower third of the page, Ms. Jung.

7   Q.  Ms. Hall, do you see your name on this list?

8   A.  Yes.

9   Q.  And there's an address associated with Monroe, New Jersey,

10  correct?

11  A.  Correct.

12  Q.  Was that the address where you had moved to after you left

13  Florida?

14  A.  Yes.

15          MS. MORTAZAVI:  Ms. Jung, you can take down this

16  exhibit.

17  Q.  Ms. Hall, how much money in purse winnings did you earn in

18  2018?

19  A.  2018 or 2019?

20  Q.  In 2019, pardon me.

21  A.  Roughly 60,000.

22  Q.  And how much did you profit?

23  A.  I lost money.

24  Q.  During the time you knew Seth Fishman, had he ever

25  physically examined your horses?

1    A.  No, he did not.

2    Q.  You testified earlier that during the time you were

3    speaking with Seth Fishman, your horses were drug tested,

4    correct?

5    A.  Correct.

6    Q.  Had you ever been told that a horse tested positive on a

7    drug test?

8    A.  No, I never got a positive test.

9    Q.  And during that time, had your license ever been suspended?

10   A.  No.

11          MS. MORTAZAVI:  No further questions.

12          THE COURT:  Thank you.

13          Mr. Fasulo.

14   CROSS-EXAMINATION

15   BY MR. FASULO:

16   Q.  Good afternoon, Ms. Hall.

17   A.  Hello.

18   Q.  Ms. Hall, you spoke on your direct examination about

19   meetings you had with the government, correct?

20   A.  Yes.

21   Q.  And how many times did you meet with the government prior

22   to January 17, 2022?

23          Do you remember?

24   A.  No.

25   Q.  Was it more than five, less than five?

1  A.  I don't remember.

2  Q.  Did you meet with them more than one time?

3  A.  Yes.

4  Q.  Would you say more than four times?

5  A.  Probably, yes.

6  Q.  And prior to testifying here today, you've met with both

7  U.S. Attorneys and the agents in the case, right?

8  A.  Yes.

9  Q.  Your lawyer was present, correct?

10  A.  Yes.

11  Q.  And at some point after meeting with them for a period of

12  time, you entered into a non-prosecution agreement, correct?

13  A.  Correct.

14  Q.  And you entered into that agreement because you had

15  committed acts which could be charged by the government in this

16  courtroom; is that what your understanding was?

17  A.  That's not why I entered into the agreement, no.

18  Q.  Did you believe that you committed acts that were illegal

19  acts?

20  A.  To be honest with you, I didn't believe that what I did was

21  going to merit me being arrested or convicted or indicted.  I

22  was never really worried about that.

23  Q.  And why didn't you believe that?

24  A.  I didn't really think that what I had done was punishable

25  by law.

1    Q.  And what was it that you had done?

2    A.  I gave my horse prescription -- or, I'm sorry.  I gave my

3    horse performance enhancing drug.

4    Q.  And did you do that without -- with drugs that were not

5    prescribed to your horse?

6    A.  Correct.

7    Q.  And did you do that with drugs that were not labeled

8    properly?

9    A.  Correct.

10   Q.  And did you do that in hope of winning races?

11   A.  Correct.

12   Q.  And you never believed that was going to get you in any

13   trouble?

14   A.  Not with the federal government, no.  I thought with the

15   racing commissions, yes.

16   Q.  And you said before you became involved in racing, you had

17   went to, I think you said, East Stroudsburg State?

18   A.  Yes.

19   Q.  And you have your degree there?

20   A.  Yes.

21   Q.  And you actually owned a number of horses?

22   A.  I owned a couple.

23   Q.  Five?

24   A.  No more than five, yes.

25   Q.  And you owned those horses over what period of time?

1   A.  I owned one or two thoroughbreds with my ex-husband.  I

2   don't remember the exact year, maybe 2014, 2015, and then I

3   acquired my first standardbred in I believe it was 2017.

4   Q.  And what was your relationship with your horses?

5           Did you care about your horses?

6   A.  They're like my children, yes, I did.  I do.

7   Q.  Was it ever your intent to endanger the health of the

8   horses as you gave these horses these medications that you

9   talked about earlier?

10  A.  No.

11          MS. MORTAZAVI:  Objection, relevance.

12          THE COURT:  Overruled.  You can answer.

13  A.  No, it was not.

14  Q.  You said there came a point of time again that you entered

15  into this agreement with the government, that was about January

16  17, 2022, correct?

17  A.  Correct.

18          MR. FASULO:  And I'd like to show you what I'd like

19  marked as Defense Exhibit 1103.

20  Q.  If you can take a look at this agreement.

21          Do you remember seeing that agreement prior to coming

22  here today?

23  A.  I believe this is the same one, yes.

24  Q.  Do you remember reading it before you signed it?

25  A.  Yes.

1    Q.  And is that the agreement that you signed that you talked

2    about as a non-prosecution agreement?

3    A.  I believe so, yes.

4    Q.  And prior to signing that agreement, did you have time to

5    speak to your attorney about that agreement?

6    A.  Yes.

7    Q.  Did you understand the terms and conditions of that

8    agreement?

9    A.  As well as I could, I believe so.

10   Q.  And did you voluntarily sign that agreement?

11   A.  Yes.

12   Q.  Is that your signature on the last page?

13   A.  Yes.

14   Q.  And who else signed the agreement?

15   A.  My attorney.

16   Q.  And anyone else?

17   A.  The prosecutor and chief criminal Daniel Gitner.

18          MR. FASULO:  Your Honor, at this time I ask that this

19   be entered into evidence as defense -- I want to use the

20   exhibit number that we all know, 1103.

21          THE COURT:  Ms. Mortazavi.

22          MS. MORTAZAVI:  Your Honor, if it's Government Exhibit

23   11003, there's no objection.

24          THE COURT:  You can work out what the exhibit number

25   is.  We don't need to take time with the jury, but the exhibit

1    itself will be admitted into evidence without objection?

2                MS. MORTAZAVI:  No objection, your Honor.

3                THE COURT:  Thank you.

4                (Government's Exhibit 11003 received in evidence)

5    BY MR. FASULO:

6    Q.  Pursuant to that agreement, it was your understanding that

7    if you testified here today and tell the truth and you were

8    cooperative with the government, that you will not be

9    prosecuted for any crimes related to the -- giving the horses

10   the performance enhancing drugs during the time that you were a

11   trainer, correct?

12   A.  Yes.

13   Q.  I want to go back to a couple of the exhibits that you were

14   able to see during your direct examination and review them with

15   you.  If we can show 1915.

16   A.  Can I add something to that last question?

17               THE COURT:  No, there's not a question pending.

18   BY MR. FASULO:

19   Q.  Let me ask you this question because it looks like there

20   seems to be an issue.

21               Going back to the agreement that you signed on January

22   17, 2022, is it your understanding that after you signed that

23   agreement that you would not be prosecuted for the crimes

24   related to your activity as an owner-trainer in the related

25   time period that you testified during direct examination?

1  A.  Yes, but I was committed to helping regardless of signing

2  an agreement or not.

3  Q.  But you didn't start helping until you signed this

4  agreement, correct?

5  A.  That's not correct.

6  Q.  And you'd be here today even if the government did not --

7  A.  Yes.

8        THE COURT:  Let him finish the question.

9  Q.  So your testimony here today is that this agreement really

10  isn't the reason why you're testifying here today?

11  A.  The reason why I'm testifying here today and why I am doing

12  what I'm doing is because I believe that this will help the

13  sport and it will help the horses and we desperately need that.

14  Q.  And you understand that if you testified here today and you

15  admitted to certain acts and the government believed those acts

16  were illegal, that you would face penalties for them?

17        Do you understand that?

18  A.  Could you repeat that.  I'm sorry.

19  Q.  You understand that if you didn't have this agreement and

20  you gave that testimony that you gave here today, you would be

21  admitting to acts which the government believes are illegal,

22  correct?

23  A.  Correct.

24  Q.  And you would be admitting to acts that you could face some

25  sort of penalty for in the criminal -- some sort of criminal

1    penalty for?

2    A.  Yes.

3    Q.  And you said that you would do that despite the fact of

4    signing that agreement, correct?

5    A.  Yes.

6    Q.  And that's because you care about animals?

7    A.  Yes.

8    Q.  And you care about the integrity of the racing industry?

9    A.  Yes, very much so.

10   Q.  Yet when you were involved in the racing industry, you

11   never believed anything you were doing was criminally illegal?

12   A.  I did not get my first standardbred and join this business

13   with the intent to cheat or drug horses or do any of this.

14        In fact, my first vet that I used was a holistic vet,

15   and we did salt therapy and acupuncture, and that was --

16   however, it did become very evident within a short period of

17   time that if I wanted to keep these animals and I wanted to

18   compete, I would need to do some other things.

19   Q.  And so then you decided to break the rules, correct?

20   A.  Yes.

21   Q.  And you decided to go against the integrity of the racing

22   commission?

23   A.  Yes.

24   Q.  And you are part of the problem in terms of the conditions

25   that you just talked about that you are now seeking to remedy,

1    correct?

2    A.  Yes.

3    Q.  And you created those problems because you as a trainer

4    made those judgments as to what to administer to your horses,

5    correct?

6    A.  Correct.

7    Q.  And you did that based on greed?

8    A.  No.

9    Q.  You did it because you could make money, correct?

10   A.  I lost money actually doing this.

11   Q.  So you did it to lose money?

12   A.  I did it so I could stay in the business and I could keep

13   my horses.  And if they were at least getting third, fourth,

14   fifth place checks, then they would be paying their way, and I

15   felt that was what I needed to.

16   Q.  Right. So you did it to make money to support your ability

17   to own horses?

18   A.  I made it to pay the bills to keep them and to keep going.

19   Q.  And you did that because you were hoping to make the money

20   that you needed to do that, correct?

21   A.  I was, yes.

22   Q.  And you didn't do it not to make money, correct?

23   A.  Correct.

24   Q.  And so greed, making money, was one of the reasons you did

25   it; is that fair to say?

1   A.  I would say it was more love for my horses to keep them

2   because if I was not making money, I would lose them.

3   Q.  Let me move on.

4           And, in fact, it was your decision as the trainer to

5   engage in the dispensing of those drugs, to those horses at the

6   time that you testified during direct examination, correct?

7   A.  Yes.

8   Q.  And it was solely your decision, correct?

9   A.  Correct.

10  Q.  Now I want to bring your attention -- now I ask you to put

11  up 1915.

12          This is an email that you received from Lisa Ranger,

13  correct?

14  A.  Yes.

15  Q.  And you received this on October 16, 2018, correct?

16  A.  Yes.

17  Q.  And sometime during the next month I believe you said,

18  November 4, 2018, you actually made contact with Dr. Fishman,

19  correct?

20  A.  No, it wasn't until January of 2019.

21  Q.  January of 2019?

22  A.  Yes.

23  Q.  When you did make contact with Ms. Ranger, you said that

24  you were putting certain orders in, correct?

25  A.  Yes.

1   Q.  And prior to that time you had owned horses, right?

2   A.  Yes.

3   Q.  And you had ordered medications, correct?

4   A.  Yes.

5   Q.  Where did you order medications before you had this email

6   exchange with Lisa Ranger in October 16, 2018?

7   A.  So you could either buy things directly --

8   Q.  What do you mean by that?

9   A.  If the vet prescribed medication for your horses, you could

10  buy the medication from them directly off the truck.

11  Q.  And other than that, where did you purchase medication?

12  A.  There was another person in Ohio where I was stabled at the

13  time that would drive around and he sold everything you could

14  imagine on his truck and it was at a discounted price.

15  Q.  And in Florida, when you were in Florida, where was it that

16  you were purchasing?

17  A.  I made my first order with Lisa the first month I was in

18  Florida.

19          MR. FASULO:  And if I can go now to 900A.

20          Can we just highlight the top.

21  Q.  Now, you remember seeing this on your direct examination?

22  A.  Yes.

23  Q.  And this was an email that you had on October 2018,

24  correct?

25  A.  Yes.

1  Q.  And who was it that you were emailing on that day?

2          MS. MORTAZAVI:  Objection, misstates evidence.

3  Q.  Who were you texting on that particular day in this

4  exchange?

5  A.  Dr. Seth Fishman.

6  Q.  And that was October 2018, a few days after you had had the

7  initial email with Lisa Ranger; is that true?

8  A.  Yes.

9  Q.  And at that time, you introduced yourself to Dr. Fishman in

10  the first part that's marked blue and dated 10/22/2018,

11  12:51:07; is that right?

12  A.  Yes.

13  Q.  And at that time, Dr. Fishman indicated that he had been

14  trying to reach you, right?

15  A.  Yes.

16  Q.  At that time, he indicated that he was out of the country

17  and he was going to return, correct?

18  A.  Yes.

19  Q.  And that communication happened on November 4, 2018,

20  correct?

21  A.  Correct.

22  Q.  And then again you continued to text with the doctor, and

23  on 11/23/2018, you indicated that you were interested in

24  knowing when the doctor would return to Florida, correct?

25  A.  Yes.

1   Q.  And then he responded to you December 27, 2018, correct?

2   A.  Yes.

3   Q.  And at that time he indicated that he was coming home?

4   A.  Yes.

5   Q.  And it was after the final communication with him that you

6   were able to arrange at some point a meeting with him in

7   January 2019; is that fair to say?

8   A.  That was the first time I met him was in January 2019.

9   Q.  And you met him in Florida, correct?

10  A.  Correct.

11  Q.  And at that time you had a conversation about your horses,

12  correct?

13  A.  Yes.

14  Q.  And Dr. Fishman gave you his philosophy.

15       What did Dr. Fishman talk about at that time with you?

16  A.  We had actually had a phone call before the dinner and we

17  talked for a very long time about my horses and his business.

18       And I remember on that very first phone call I made it

19  clear to him that I needed help to compete, but I did not want

20  to resort to using Epogen or baking soda or any heavy things

21  that I knew were being used by other trainers.

22  Q.  And what was your understanding of Dr. Fishman's knowledge

23  about horses, the racing industry, and about his expertise in

24  dealing with the issues that you were presenting to him?

25  A.  Again, this was my very first year in the harness business,

1   so I didn't really know everyone very well.

2          What I had heard about Dr. Fishman was that -- and I

3   think I mentioned this earlier -- if you wanted to win races,

4   he's a good person to have help you.

5   Q.  And you had this long conversation with him, right?

6   A.  Yes.

7   Q.  And he responded to a lot of your concerns during that

8   conversation; is that right?

9   A.  Yes.

10  Q.  What was your impression after that conversation you had

11  with Dr. Fishman about Dr. Fishman?

12  A.  I thought he was very smart and I thought he understood

13  what I was looking for help with.

14  Q.  When you say "very smart," did he seem -- why do you say

15  that?

16  A.  Again, it was my first year in the business, so I think

17  anyone with half a clue would be smart, but he seemed to know

18  all the answers to the questions I had and seemed very

19  knowledgeable and experienced.

20  Q.  Did you have continuing conversation with him from that day

21  until the last day you said sometime in May that you stopped

22  speaking with Dr. Fishman?

23  A.  Yes.

24  Q.  And were those continued text messages?

25  A.  Phone calls, text messages, yes.

1    Q.  And were those conversations about your horse and the types

2    of -- the program that he was suggesting for your horse?

3    A.  Yes, those were parts of the conversations, yes.

4    Q.  And during those conversations, did he explain to you the

5    reasons why he thought a certain program would be appropriate

6    for your horse based on the way you were presenting the issues?

7    A.  Yes, and I think at one point he referred to what he was

8    helping me with was a stupid starter pack.

9    Q.  And what did you think that meant?

10   A.  Well, he had said on a scale of one to ten, ten being the

11   most severe, what I'm going to help you with is going to be

12   like a two or three; so I think he understood I didn't want to

13   tear my horses up, but I needed some help to compete.

14           MR. FASULO:  I want to ask the government to put up

15   102 series up starting with 102A.

16   Q.  You remember seeing this on direct examination Government

17   Exhibit 102AT, a transcript of a conversation you had with

18   Dr. Fishman on March 7, 2019?

19   A.  I can't see the conversation.

20   Q.  This is only a portion of that conversation, right, as far

21   as you remember?

22   A.  As far as I know, yes.

23   Q.  And one of the things that you were asking about here was,

24   what are people doing to get their red blood cell count up and

25   what?

1    A.   Yes.

2    Q.   What did you mean by that?

3    A.   What else besides Epogen are people using.

4    Q.   And what did you understand the doctor's response here to

5    mean to you?

6    A.   I don't remember this at the time, but Thymosin and EPO

7    mimetics, something that was similar to Epogen, would raise red

8    blood cell count levels, but not be harmful.

9    Q.   Was it your understanding after this conversation that the

10   doctor understood that you did not want to give your horse

11   Epogen?

12   A.   I think before this conversation he understood that, yes.

13   Q.   Is that also relevant in this conversation, as well?

14   A.   I can't answer it for that.  I don't know what he really

15   meant by this conversation.

16   Q.   What did you understand it to mean at all?

17   A.   I think that's what he was trying to say that he -- there

18   are things that's you can use that are similar to Epogen, but

19   not as harmful or as severe.

20        MR. FASULO:  Can I see now 102C.

21   Q.   Again, this is the portion of the same conversation on

22   3/7/2019 between you and Dr. Fishman.

23        Do you remember seeing this on your direct

24   examination?

25   A.   Yes.

1  Q.  Have you had the chance to read it and refresh your

2  recollection as to what that conversation was about?

3  A.  Yes.

4  Q.  What was it that you understood Dr. Fishman was telling you

5  in this portion of the conversation?

6  A.  I believed that he had his own things that he was creating

7  and they were separate from anything else out there, so he

8  would give some things to one trainer, other things to another

9  trainer.  So if one person got a positive, the other trainer

10  would be safe.

11  Q.  Did you believe that there were different formulations that

12  the doctor was using for one trainer in his compounding versus

13  another trainer?

14  A.  That's what it sounded like to me, yes.

15          MR. FASULO:  Can I see 102F.

16  Q.  Again, this is the same conversation, different time.

17          Can we now go to the body of the conversation.

18          You had a chance on direct to look at this

19  conversation, right?

20  A.  Can I read it again?

21  Q.  If not, why don't you read it now.

22  A.  Yes.

23  Q.  Can I draw your attention to line 2, where it says SF?

24  A.  Yes.

25  Q.  What did you understand Dr. Fishman to be saying to you at

1    that time?

2              What was your understanding?

3    A.  I'm not really quite sure what he was trying to say there.

4    Q.  Was this very similar to other conversations you had with

5    the doctor in terms of the clarity of the conversations that

6    you were having with him?

7    A.  He would talk a lot.

8    Q.  How much?

9    A.  A lot.

10   Q.  And would he be focused or would you say that was unfocused

11   conversation?

12   A.  He would ramble a lot.

13   Q.  And if you go to line 4 here, he talks about, on the bottom

14   of line 4, the words are that, "Then what you'll do is you'll

15   race your horse on Saturday and all that, and then when it's

16   time to take your CBC" -- did you understand what CBC was?

17   A.  That's a complete blood count.

18   Q.  "You'll take it 72 hours after they race to see how it

19   moves, all right."

20   A.  Yes.

21   Q.  Did you understand that taking the CBC 72 hours after a

22   race was in violation of any racing commission rules?

23   A.  No, it's not.  You can pull blood counts as often as you

24   like on a horse.

25   Q.  Now, I'd just want to go back to some of the substances

1    that you said that you received from Seth Fishman, Dr. Seth

2    Fishman.

3            I think you said that you received TB-7?

4    A.  Yes.

5    Q.  You stated on direct that you are familiar with TP-7 was,

6    correct?

7    A.  I'm not really familiar with what it was.

8    Q.  And did you know whether it was a prescription drug or not

9    a prescription drug?

10   A.  I believe it was something that he had created himself.

11   Q.  And you know how it was to be administered to the horse?

12   A.  Yes.

13   Q.  How was that?

14   A.  That was one that was supposed to be mixed together with

15   another one and administered in the vein.

16   Q.  When you say administered in the vein, what was your

17   understanding of who can administer -- as a trainer, what was

18   your understanding of who can administer a drug in the veins of

19   a horse?

20   A.  As a trainer, you're not allowed to administer anything to

21   a horse, injectable.

22   Q.  But you did do that?

23   A.  I did, yes.

24   Q.  Let me ask you about the EGH.  That was another drug that

25   you said you got from Dr. Fishman, correct?

1   A.  Correct.

2   Q.  And what's your understanding of what that was?

3   A.  That he referred to as equine growth hormone.

4   Q.  Did you know what that was?

5   A.  I didn't know fully what it was, but he know I had a horse

6   that was tying up and he seemed to think that would help and I

7   thought it would probably help increase muscle.

8   Q.  And when was it that -- did you ever give the EGH to your

9   horse?

10  A.  I did to one of them, yes.

11  Q.  When did you do that?

12  A.  Probably the week before it raced.  I think it was

13  something that you gave like seven days out.

14  Q.  And did you give it seven days out because it was

15  permissible as far as you understood to give that to the horse

16  seven days out?

17  A.  No, that was not permissible no matter what day it would

18  have been.

19  Q.  So you gave it knowing that you were doing something wrong,

20  correct?

21  A.  Yes.

22  Q.  And how did you give that to your horse?

23  A.  That was a IM, intermuscular shot.

24  Q.  Would it be within the role of a trainer to be able to give

25  an intermuscular shot to a horse?

1    A.  Again, as a trainer you're not supposed to be giving any

2    shot to your horses.  I think they might make an exception if

3    there was an emergency situation, but --

4    Q.  And then you also said that you used something called BB3,

5    correct?

6    A.  Yes.

7    Q.  And you ordered that from Dr. Fishman, correct?

8    A.  I didn't order that.  He had given me a sample of it.

9    Q.  So you never ordered BB3?

10   A.  No.

11   Q.  And the only place you got it was from Dr. Fishman in

12   Florida, correct?

13   A.  No, he had give me samples of it.

14   Q.  And what did you understand that BB3 to do?

15   A.  That I believe was a blood builder.

16   Q.  What did you understand a blood builder was?

17   A.  Something that would help increase the red blood cell

18   count.

19   Q.  Why would you need to increase the red blood cell count in

20   a horse as far as you know?

21   A.  I was hoping it would help them perform better and not get

22   tired.

23   Q.  And what was your understanding about giving this BB3 to

24   the horse as it relates to the places where your horse was

25   racing?

1    A.  Not allowed.

2    Q.  And did you give the BB3 to your horse?

3    A.  Yes.

4    Q.  And did you again break the rules that existed?

5    A.  I did, yes.

6    Q.  And VO2 Max, you also got that from Dr. Fishman?

7    A.  Yes.

8    Q.  And what did you understand that to do?

9    A.  You know, it was labeled as a blend.  One dose amino acids.

10   I didn't really know fully what it was for, but I believe that

11   it was for getting more energy, oxygen, somehow improving their

12   performance.

13   Q.  You said you did give VO2 Max to your horse, correct?

14   A.  Yes.

15   Q.  And you did give it to one of your horses the day of the

16   race, correct?

17   A.  Yes.

18   Q.  And you also gave it to the horse you said before workouts,

19   correct?

20   A.  I did on a few occasions, yes, but I did give it on a race

21   day too.

22   Q.  And it was when you gave it on the race day that you were

23   breaking the racing commission's rules and regulations,

24   correct?

25   A.  I think any day I was not supposed to be giving it, but

1  specifically on a race day, yes, that was not allowed.

2  Q.  You also stated that you received -- that at times you

3  would call Lisa Ranger to order some product; is that right?

4  A.  Correct.

5  Q.  And you placed orders with her?

6  A.  Correct.

7  Q.  And those were orders of drugs or items that you had

8  already received from Dr. Fishman in Florida that you wanted

9  refilled to redo?

10  A.  No.

11  Q.  Were there new things that you ordered from Lisa Ranger?

12  A.  The very last order I placed, I ordered two bottles of the

13  VO2 Max which I had gotten the samples of that from

14  Dr. Fishman.

15  Q.  You had already got a sample from Dr. Fishman?

16  A.  Correct.

17  Q.  And then you called Lisa Ranger and you then ordered them,

18  correct?

19  A.  I think I emailed her, yes.

20          (Continued on next page)

21

22

23

24

25

1   BY MR. FASULO:

2   Q.  I'm sorry, you e-mailed her?

3   A.  Some -- somehow I ordered it.

4   Q.  Can we look at 608, please, just so we're clear.

5           Is this the final time that you ordered from

6   Equestology?

7   A.  I believe that was my last invoice with them, yes.

8   Q.  And in this invoice, you'll see that you -- let me mark it

9   there like that.

10          You'll see VO2 on the first line, correct.  And, in

11  fact, when you put this order on, you had already received a

12  sample from Dr. Fishman in Florida?

13  A.  Correct.

14  Q.  So this was not something new, correct?

15  A.  Correct.

16  Q.  And what was folic 5x 100 CC?

17  A.  That's folic acid.  It's a vitamin.

18  Q.  What was the next item on the invoice here?

19  A.  Vitamin C.

20  Q.  Okay.  And the next item?

21  A.  Vitamin B12.

22  Q.  And the final item, 1 eq postal?

23  A.  That was the shipping charge.

24  Q.  So other than the VO2 max, which you had already gotten a

25  sample of in Florida, these items were all vitamins, correct?

1  A.  Correct.

2  Q.  Other than -- well, where else were you able to get these

3  vitamins as a trainer during the period you testified here

4  today?

5          MS. MORTAZAVI:  Objection.  Vague.

6          THE COURT:  Do you want to fix the time, please?

7          MR. FASULO:  Sure.

8  Q.  It was during the time you were a trainer and that you

9  testified you worked with horses directly.  Where else would

10  you get your vitamins?

11  A.  So you mean from the end of 2017 to --

12  Q.  This time, any time that you owned the horses and that you

13  were either an owner or trainer, where would you purchase

14  vitamins?

15  A.  The only place besides a vet's truck would have been from

16  the other person I mentioned in Ohio or Equestology.

17  Q.  At any time that you had phone conversations, did you have

18  any phone conversations with Ms. Ranger other than the initial

19  conversation we heard here in court?

20  A.  I honestly don't remember.

21  Q.  At any time that you had any communication, whether it be

22  by phone, e-mail, text, did you ever ask Lisa Ranger for

23  medical advice?

24  A.  I don't believe so, no.

25  Q.  Did she ever give you medical advice?

1  A.  No.

2  Q.  You also stated that you dealt with a woman, Mary in

3  Florida, correct?

4  A.  Correct.

5  Q.  And what did you understand Mary's role to be?

6  A.  I really wasn't quite sure what her role was, if she was

7  just an assistant, a friend.  I really was not sure if she

8  worked for the company or not.

9  Q.  And in terms of the company Equestology that appeared on

10  the top of the document we just saw, what was your

11  understanding of who owned that company?

12  A.  Dr. Seth Fishman.

13          MR. FASULO:  No further questions, Judge.

14          THE COURT:  Thank you.

15          Redirect.

16          MS. MORTAZAVI:  Only a few questions, your Honor.

17          THE COURT:  Okay.

18  REDIRECT EXAMINATION

19  BY MS. MORTAZAVI:

20  Q.  Ms. Hall, do you recall being asked a few questions about

21  VO2 max?

22  A.  Yes.

23  Q.  You testified that you believed you weren't supposed to

24  administer it race day, correct?

25  A.  Correct.

M536GIA3                    Hall - Redirect

1   Q.  Were you permitted to administer any injectable medications

2   to your racehorse as a trainer on any day?

3   A.  No.

4   Q.  And, Ms. Hall, how often did you race your horses?

5   A.  Do you mean like monthly or --

6   Q.  Exactly.  How frequently would you race your horses?

7   A.  Technically, they race weekly, but I sometimes -- I would

8   race every other week depending on how they were doing.

9   Q.  Why were they racing that frequently?

10  A.  It's interesting.  It's very different from the

11  thoroughbreds, but standardbreds, it's normal to race every

12  week.  That's their schedule.

13  Q.  Normal for you or normal as you understand it generally?

14  A.  It's an industry norm.

15  Q.  And you were receiving a number of samples from

16  Seth Fishman, correct?

17  A.  Correct.

18  Q.  You received them on more than one occasion?

19  A.  Correct.

20  Q.  Did you use all the samples of drugs that Seth Fishman gave

21  you?

22  A.  No.

23  Q.  Why did you -- why didn't you use all the samples?

24  A.  It just was a little complicated for me and a little scary.

25  I didn't want to mess it up.  It was -- I didn't feel

1  comfortable.

2  Q.  Can you describe what was complicated about it?

3  A.  Just the mixing and the colors and the withdraw time.

4  Q.  What was scary about it?

5  A.  I didn't want to mix the wrong thing or give the wrong

6  day -- or you know, I didn't know what would happen if I mixed

7  two things different or --

8  Q.  What did you think would happen?

9  A.  I would have hurt the horse.

10  Q.  And at the time you were using these medications from

11  Seth Fishman, you testified that you didn't think you were

12  breaking a federal law, correct?

13  A.  Correct.

14  Q.  Did you believe that you were deceiving the racing

15  commission?

16  A.  Yes.

17  Q.  How did you feel about what you were doing at the time you

18  were doing it?

19  A.  Not good.  I knew it was wrong.

20  Q.  Why are you testifying here today, Ms. Hall?

21  A.  I'm testifying here today because I really -- I do want to

22  make a difference in this industry, and I think this is how I

23  can do it.  And like I said, this business is in desperate need

24  of help, and so are the horses and all the industry

25  participants, and I think this is going to make a difference.

1   I hope it makes a difference.

2   Q.  And, Ms. Hall, you were asked questions about your

3   nonprosecution agreement.  Do you recall those?

4   A.  Yes.

5   Q.  Does the outcome of this trial have any barring on that

6   nonprosecution agreement?

7   A.  No.

8   Q.  Did you enter that agreement because you wanted protection

9   here today?

10  A.  To be honest with you, I -- I didn't even think that it was

11  necessary, but I'm -- yes.  That's, I guess, the point of it,

12  yes.

13          MS. MORTAZAVI:  All right.  No further questions, your

14  Honor.

15          THE COURT:  Thank you.  Any recross, Mr. Fasulo?

16          MR. FASULO:  One second, Judge.

17          No, I'm fine, Judge.

18          THE COURT:  All right.  Thank you, Ms. Hall.  You're

19  excused with the thanks of the Court.

20          THE WITNESS:  Thank you.

21          (Witness steps down)

22          THE COURT:  The government's next witness.

23          MS. MORTAZAVI:  Your Honor before calling our next

24  witness, I'll display an exhibit for the jury.

25          THE COURT:  Why don't you wait for Ms. Hall to leave?

1          MS. MORTAZAVI:  Certainly.  All right.

2          For the record, the witness has left the courtroom.

3          Ms. Jung, if you could please display Government

4    Exhibit 320FJ, which, for the record, is already in evidence as

5    a record that was produced by Equestology.

6          Can you focus on the top three -- I'm sorry.  The top

7    four messages here?

8          For the record, your Honor, this is a text exchange

9    between Seth AA and a contact listed as Lisa Ranger Cell.  And

10   the text message is sent from Seth AA on October 21, 2018, at

11   5:52 p.m.:  Just landed in California and got this next.  Hi.

12   My name is Adrienne, and I'm a harness trainer at Sunshine

13   Meadows.  I got your number from Lisa.  I was wondering if you

14   can help me come up with some prerace options for a new horse I

15   just got in.  I can e-mail you his most recent blood work if

16   so.

17         And the response from Lisa Ranger Cell that same day

18   at 5:54 p.m.:  She's going to send you a blood work that she

19   has.  She is a referral of Daniel Maier, and has been ordering

20   supplies from us.  Go ahead and ta k to her.  She doesn't have

21   much knowledge, as you can surmise, from the text.  Old

22   Policino client.  Tired of his BS.

23         And October 23, 2018, 10:19 a.m., from Lisa Ranger

24   Cell:  Hey, can you please try to call that Adrienne Hall

25   today?

1        Ms. Jung, can you please turn to page 3 of Government

2    Exhibit 320FJ.  Can you focus on the top three text messages,

3    please?

4        I'm going to read into the record the text message

5    that is dated December 19, 2018, 10:51 a.m. from Lisa Ranger

6    Cell, there's an attachment and then:  Adrienne Hall is going

7    to text you.  Can you please get up with her when you get a

8    chance.  She has some questions.

9        Ms. Jung, you can take down this exhibit.  Your Honor

10   the government calls Rita Noblett.

11       THE COURT:  Good afternoon, Ms. Noblett.  If you would

12   please just stand here in the witness stand, take off your

13   mask, and once you're situated, my courtroom deputy will

14   administer the oath.

15       THE WITNESS:  Okay.

16       DEPUTY CLERK:  Please raise your right hand.

17    RITA NOBLETT,

18       called as a witness by the Government,

19       having been duly sworn, testified as follows:

20       DEPUTY CLERK:  Thank you.  Please state and spell your

21   name for the record

22       THE WITNESS:  Rita Noblett.

23       DEPUTY CLERK:  You can please have a seat and adjust

24   the microphone to where you're sitting.

25       THE COURT:  Mr. Gianforti.

1        MR. GIANFORTI:  Thank you, your Honor.

2    DIRECT EXAMINATION

3    BY MR. GIANFORTI:

4    Q.  Good afternoon, Ms. Noblett.

5    A.  Hi.

6    Q.  Ms. Noblett, where do you work?

7    A.  I am retired.

8    Q.  Where did you work last prior to your retirement?

9    A.  I was employed by the Pennsylvania Department of

10   Agriculture in Thoroughbred Horseracing.

11   Q.  Was there a particular part of the Department of

12   Agriculture in which you worked?

13   A.  I was a special investigator stationed at Parks Racetrack,

14   which is in Bensalem, Pennsylvania.

15   Q.  Thank you.  Ms. Noblett, if you could pull the mic close to

16   your face and try to keep your voice up for everybody?  We tell

17   everybody that.

18   A.  I'd like to know if I could turn it up so I can hear you.

19   Q.  Absolutely.

20        THE COURT:  Pull the microphone up.

21        MR. GIANFORTI:  I should take the advice I give.

22   Q.  Ms. Noblett, are you familiar with the Pennsylvania State

23   Racing Commission?

24   A.  Yes, I am.

25   Q.  Is that where you worked?

1  A.  Yes.

2  Q.  What was your position at the time that you retired?

3  A.  I was a special investigator 1.

4  Q.  How long were you a special investigator with the racing

5  commission?

6  A.  I started in 2014, and I retired in 2021.  So I held that

7  position for about six and a half years.

8  Q.  Could you please describe to the jury what some of your

9  responsibilities were as a special investigator with the

10  Pennsylvania Racing Commission?

11  A.  Sure.  I will kind of take it through my day, and then if I

12  recall anything in addition to that, I'll let you know.

13          In the morning, it was basically office work.  What I

14  did first was got all of the information from the previous

15  day's races from the detention barn.  It was an envelope with

16  the names of all the horses that they tested.  And after I

17  received them, they were identified just by a sample number,

18  but we had to wait for the results to come back for those

19  tests.  Either they were negative or they were positive.  If

20  they had a questionable outcome, they were put on hold until

21  they were deemed either clear or positive.  That was done on a

22  daily basis.

23          And we would get replies from the lab, and we would

24  correspond with the bookkeeper until they were cleared.  So

25  that was a constant thing.  And each sample was -- that was not

1    clear or deemed questionable, we made a file for with all the

2    information that was on the sheet; the owner, the trainer, the

3    horse.  That was done without short-term holds.

4         We then got information from the state vets.  We got

5    daily treatment sheets.  We got dead horse reports.  We got a

6    report from our head state vet which reflected all prescription

7    drugs, who they were prescribed to, the dosage, and the

8    expiration date.  We made a file for that.  If --

9    Q.  Can I pause you there, Ms. Noblett, for a moment?

10   A.  Sure.

11   Q.  You were talking a moment ago about the state lab and about

12   results that you would get back.

13   A.  Yes.

14   Q.  During your time with your racing commission, what's your

15   general understanding of what the lab was looking for?

16   A.  They were looking for any presence of overages, anything

17   that would deem the horse positive, which was basically drugs.

18   We knew nothing about what drugs they were testing for, and we

19   were told not to contact the lab because they didn't want any

20   interaction between the investigators and the lab.  Strictly

21   sample numbers.  But they were looking for the presence of a

22   foreign substance.

23   Q.  You can continue going through your day as a special

24   investigator.  Thank you.

25   A.  In the morning, if there was anybody applying for a license

1    of any kind that listed an arrest, we would have to interview

2    them.  We assisted with fingerprinting if we needed -- if an

3    applicant needed it.  Human drug testing as well.  We were

4    responsible for collecting those samples and packaging them and

5    transporting them to a lab to be analyzed and follow-up with

6    that.

7         We also -- or I also -- we had preprinted trainers

8    tests.  There were about four -- or three different packages of

9    them in the computer.  There were a series of 50 questions.  We

10   would administer the trainers -- the physical trainers test in

11   question form.  I think there were 50 to the applicant.

12   They -- we logged in the time they started and the time they

13   finished.  They were then packaged and sent up to Harrisburg to

14   the director of licensing to be graded, and then he would

15   e-mail us with pass or fail for each applicant.  We did that.

16        We also -- this was a while ago.  I retired in '21.

17   We also reserved the morning for any searches because that was

18   the busy time on the backside of the racetrack.  If there was a

19   positive, part of that positive investigation was after telling

20   the trainer they had a positive, we would prepare the

21   paperwork, take it to the barn and do a barn search.

22   Q.  Can I pause you for just one moment?  When you say

23   backside, what do you mean by that?

24   A.  It's kind of racetrack lingo.  The backside is the barn

25   area.  Our licensing office was adjacent to the barn area, and

1   the front side is considered the racetrack, the paddock, that

2   area.

3   Q.  And, Ms. Noblett, were you involved in -- are you familiar

4   with the concept of releasing purses?

5   A.  Yes.

6   Q.  And what does that mean?

7   A.  We would actually type up a little paper that told the

8   bookkeeper to either hold the purse on the following horses,

9   which were questionable, and then release the ones that had

10  been cleared.  That's basically how that worked.

11  Q.  Cleared by who?

12  A.  The lab.

13  Q.  And, Ms. Noblett, what did you do for the racing commission

14  prior to becoming a special investigator?

15  A.  My husband was a trainer, so I was licensed probably for

16  the first time in the mid-80s.  And we went to various tracks

17  but returned to Parks probably -- probably around 2014.  I was

18  a groom for my husband, and then I worked -- I only worked part

19  time for the racing commission in the test barn at the same

20  time I was a groom.

21          MR. GIANFORTI:  Your Honor, I'm conscious of the time.

22  I'm happy to keep going for another 10 minutes or so, whatever

23  you prefer.

24          THE COURT:  Why don't we keep going until 1:00 o'clock

25  and find a convenient breaking point around 1:00 o'clock?

1          MR. GIANFORTI:  Thank you, your Honor.  Happy to.

2     Q.  Ms. Noblett, during the period of time that you worked for

3     the Pennsylvania Racing Commission, what was your understanding

4     of the racing commission's mission?

5     A.  We were just to with -- hold the best standards of racing.

6     Q.  During your time at the racing commission, did the racing

7     commission enforce any rules?

8     A.  Yes.

9     Q.  Which rules?

10    A.  There was a whole book of rules.  When we administered --

11    or prior to administering the trainers test, if an applicant

12    came up -- until maybe a year or so -- I might have that time a

13    little -- I'm not quite sure about that time.  But we always

14    used to give an actual book which contained the rules of racing

15    to each applicant so they understood everything before they

16    took the test because part of the test was about the rules of

17    racing.

18    Q.  What, if any, jurisdiction did the racing commission have

19    during your time there over veterinarians specifically?

20    A.  Well, each veterinarian was supposed to hand in a daily

21    treatment sheet, and that sheet had on it the name of the

22    horse, the name of the trainer, and the exact dosage of any

23    medications that were administered.

24    Q.  And would that apply to veterinarians licensed in the state

25    of Pennsylvania?

M536GIA3                    Noblett - Direct

1   A.  The ones on our racetrack, those are the only -- I mean

2   they're all licensed in the state of Pennsylvania in order to

3   be there, but those are the only ones we've received from our

4   track.

5   Q.  What, if any, jurisdiction did you have as a special

6   investigator over veterinarians that were not on the racetrack?

7   A.  None.

8   Q.  I believe you testified a moment ago --

9   A.  Let me answer that.

10  Q.  Sure.

11  A.  If they were licensed with us in Pennsylvania, we had

12  jurisdiction.  If they weren't licensed with us, we had none.

13  Q.  I see.  I believe you testified a moment ago that you -- as

14  part of your duties as a special investigator, you conducted

15  searches; is that right?

16  A.  Correct.

17  Q.  And I believe you also testified that the racing commission

18  had the power to conduct those searches?

19  A.  Correct.

20  Q.  As a general matter, when was the commission allowed to

21  conduct a search during your time there?

22  A.  Whenever we deemed necessary.  We could search your

23  vehicle, your barn, whatever.

24  Q.  All right.  At any time?

25  A.  At any time.

1   Q.  During your time at the commission, did you participate in

2   the execution of any searches?

3   A.  Absolutely.  We were required to do two barn searches and

4   two vehicle searches per month.  And they were all logged, and,

5   you know, that was just part of our job.  We also searched

6   jockeys' room or any other things.  But they required us to

7   search the jockeys' room, barn searches, and vehicle searches.

8   Q.  Fair to say you could search anything on the premises of

9   the racetrack?

10  A.  Off the premises?

11  Q.  On the premises.

12  A.  Anything.

13  Q.  And if you had to estimate, how many searches do you think

14  you participated in over the course of your career?

15  A.  Over -- hundreds.

16  Q.  Ms. Noblett, directing your attention to February 3, 2020,

17  did you participate in a search involving somebody named

18  Silvio Martin?

19  A.  I did.

20  Q.  Who was Silvio Martin?

21  A.  He was a licensed owner/trainer with the racing commission,

22  and he was stabled at Parks.

23  Q.  Prior to your encounter with Silvio Martin on February 3,

24  2020, had you had any prior encounters with him?

25  A.  I searched his barn probably about a year earlier.  Just a

1    random search like I just told you about.  And I found an

2    unmarked container of tyrosine, which, you know, shouldn't have

3    been in the barn.  I confiscated it.  And I had never met

4    Silvio.  Even after searching his barn, I didn't meet him.  He

5    was never there.  I had to speak to his assistant.  And I

6    interviewed the assistant, I believe at that time, and I

7    interviewed Silvio.  And they told me that that medication was

8    for a horse that hadn't -- that hadn't been used in a year, but

9    he wanted it back, so...

10   Q.  Ma'am, what was the name of that horse; if you recall?

11   A.  Paper Moon.

12   Q.  Okay.

13           MR. GIANFORTI:  Your Honor, I think this would be a

14   convenient time.

15           THE COURT:  That's fine.  So, ladies and gentlemen, we

16   will take our break now.  If we can be back at 1:45 or so?

17   It's a little bit before 1:00 now.  So please leave your

18   notepads on your chair, and I remind you again, please do not

19   talk about the case, about the lawyers, about the witnesses,

20   about the issues in the case among each other or with anyone.

21           Thank you very much.

22           And I remind the witness, you'll remain under oath,

23   but please do not discuss your testimony with anyone during the

24   break.  And if you could just remain there until the jury

25   leaves?  Thank you.

1                    (Jury not present)

2                    THE COURT:  All right.  Please be seated.

3                    You may put your mask back on and step down from the

4     witness stand.  Thank you.

5                    (Witness steps down)

6                    THE COURT:  If you would just check with Ms. Dempsey

7     that the path is clear, Agent?

8                    MS. MORTAZAVI:  Your Honor, there is a conference room

9     that the witness could stay in while the jurors exit, if the

10    Court would prefer?

11                   THE COURT:  Some of them are in that vestibule.

12    That's the problem.

13                   MS. MORTAZAVI:  Certainly.

14                   THE COURT:  If one of you want to go back -- I don't

15    know who's in the back, which of the special agents.  If you

16    want to go back and let him know that -- oh, okay, seems clear.

17    Thank you.

18                   All right.  Is there anything for the record that we

19    need to discuss?

20                   MR. GIANFORTI:  Not from the government.

21                   MR. FASULO:  Not from the defense.

22                   THE COURT:  All right.  Everyone, have a good lunch.

23    I'll see you at about 1:45.

24                   (Lunch recess)

25

AFTERNOON SESSION

1:45 p.m.

3      (Jury not present)

4          THE COURT:  I need to speak with you all at some point

5   about jury instructions as well, not the charging conference

6   itself, but just a couple of things I want you to focus on.

7          So depending on where we're at, it may be that it

8   makes sense to break at the end of the government's case if you

9   think you're going to get there today, but let's just see where

10  we're at.

11         MR. FASULO:  We're fine with whatever the Court

12  decides, but that does make sense to me.

13         THE COURT:  We'll see where we're at.  This is not

14  your last witness?

15         MS. MORTAZAVI:  No, your Honor.  Dr. Cole is our last

16  witness. We're happy to have that conference at the close of

17  today, regardless of where we are with the defense is. If the

18  Court wants to just have --

19         THE COURT:  That's what we're going to do.  Either way

20  we're going to break a little bit early, it just depends on

21  where we're at.

22         MR. FASULO:  Judge, if I can ask to begin, they will

23  not come in because they'll all the way back at the office

24  still.

25         THE COURT:  They can come in through the side.  No

1    problem.   Thank you.

2               MR. FASULO:   I don't want to hold up the Court.

3               (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Can one of our agents retrieve the

3    witness, please.

4          Good afternoon, Ms. Noblett.  You can have a seat and

5    remove your mask and I will just remind you that you remain

6    under oath.

7          THE WITNESS:  Yes.

8          THE COURT:  Mr. Gianforti, please.

9    BY MR. GIANFORTI:

10   Q.  Ms. Noblett, I would like to turn your attention back to

11   the search that you conducted on February 3, 2020, if I could?

12   A.  Okay.

13   Q.  What exactly did you search?

14   A.  I was in my office.  I needed a partner because we always

15   searched with two people.  I asked the field investigator to

16   come with me.  There were two vans --

17         THE COURT:  The question was, what did you search.

18   A.  I'm saying we searched a van and a truck.

19   Q.  When you say a van, what do you mean by that?

20   A.  There was a horse van attached to the truck, pick-up truck.

21   Q.  You said that somebody else helped you with this; is that

22   right?

23   A.  Yes.

24   Q.  Who was that?

25   A.  That was the field investigator Joyce Kleppinger.

1    Q.  Why did you search Sylvio Martin's truck and van?

2    A.  It was just a random search.

3         Again, we had to do two vehicle searches a month, and

4    he was coming through the gate.  I asked him to pull over.

5    Q.  Where did the search occur?

6    A.  They had signed a horse into the racetrack, and then they

7    went through the gate.  And as soon as they got through the

8    gate, I asked them to pull over into the parking lot.

9    Q.  Who, if anyone, did you encounter during the search?

10   A.  It was the owner-trainer Sylvio Martin, his assistant

11   trainer Ernesto Padilla Presciado (ph) and there was a minor

12   also in the truck.

13   Q.  What were you looking for?

14   A.  Nothing in particular, just any kind of contraband, any

15   kind of drugs, anything.

16   Q.  How did you and Ms. Kleppinger go about conducting the

17   search?

18   A.  I asked her, I said, look, you go in the passenger side.

19   I'll go on the drivers side.  We'll start in the truck and

20   we'll just move back.

21        MR. GIANFORTI:  I'd now like to show you a collection

22   of photographs.  If I may approach, your Honor?

23        THE COURT:  Yes.

24        MR. GIANFORTI:  And for the record.  These are marked

25   for identification as Government Exhibits 15003 through 15009.

1   BY MR. GIANFORTI:

2   Q.  Ms. Noblett, do you recognize these photos?

3   A.  Yes.

4   Q.  What are they?

5   A.  This is what was found inside the truck itself.

6   Q.  And looking at the collection as a whole, do you recognize

7   this collection in general?

8   A.  Yes, I took the photos.

9   Q.  You took these photos?

10  A.  Yes.

11  Q.  And in general, what are they photos of?

12  A.  The shipping box with the medications and the needles.

13  Q.  Are these photos you took during your search?

14  A.  Yes, they were behind the seat.

15  Q.  I'll just stop you there, Ms. Noblett.

16          MR. GIANFORTI:  Your Honor, the governments offers

17  Government Exhibits 15003 through 15009.

18          MR. FASULO:  May I just see them.  I have copies.  I

19  just want to confirm what I have.

20          THE COURT:  Yes.

21          MR. FASULO:  No objection.

22          THE COURT:  All right.  These photos will be received

23  in evidence.

24          (Government's Exhibits 15003 through 15009 received in

25  evidence)

1      MR. GIANFORTI:  Thank you, your Honor.  Ms. Jung,

2    could you please publish the first page of Government Exhibit

3    15003 for the jury.

4    BY MR. GIANFORTI:

5    Q.  Ms. Noblett, what is depicted here?

6    A.  This was found behind the driver seat.  It's a shipping box

7    with injectables and a box of needles.

8    Q.  What items did you find in this box?

9    A.  There was a 250 milligram boxed bottle of Banamine.  There

10   was a 100 milligram -- milliliter, I'm sorry, milliliter,

11   bottle of dexamethasone and 200 milliliter bottles of

12   phenylbutazone as well as the injectable, the needles.

13      MR. GIANFORTI:  Ms. Jung, could you pull up the fourth

14   page of this exhibit, please.

15   Q.  Ms. Noblett, what's depicted in this picture?

16   A.  That was located behind the passenger seat and that is also

17   a box of 100 disposable syringes.

18      MR. GIANFORTI:  Ms. Jung, could you now please bring

19   up Government Exhibit 15007.

20   Q.  Ms. Noblett, there's a number of photos that are part of

21   this exhibit and you have the hard copy, so it may be easier

22   for you to flip through if that's easier for you.

23      Ms. Noblett, what are the pictures in 15007, what do

24   they depict?

25   A.  That is the bottle of Banamine.

1    Q.  That was recovered from where?

2    A.  Behind the driver seat in the shipping box.

3    Q.  Are you familiar with Banamine?

4    A.  Yes.

5    Q.  What is it?

6    A.  It's an anti-inflammatory medication that reduces swelling

7    and it's good for pain.

8    Q.  And the format that we see here, how is this particular

9    format of Banamine administered to a racehorse?

10   A.  By hypodermic needle.

11   Q.  During your time with the Pennsylvania Racing Commission,

12   did the commission regulate Banamine usage in racehorses?

13   A.  Yes.

14   Q.  During your time at the racing commission, were you

15   permitted to give Banamine to a racehorse on the day of a race?

16   A.  No.

17   Q.  And in looking through this collection of photos of the box

18   of Banamine, do you see a prescription label on this box

19   anywhere?

20   A.  No.

21   Q.  Do you see a name of the veterinarian?

22   A.  No.

23   Q.  Do you see the name of a particular horse?

24   A.  No.

25          MR. GIANFORTI:  Ms. Jung, could you please pull up

1    Government Exhibit 15006.

2            And again for the record, this is a collection of more

3    than one photograph.

4    Q.  Ms. Noblett, what do these pictures depict?

5    A.  That is a bottle of phenylbutazone.

6    Q.  Do you know which bottle of phenylbutazone it is?

7    A.  There were two.  I took photographs of both of them.

8    Q.  That you found in the truck?

9    A.  Yes.

10   Q.  Is phenylbutazone sometimes referred to as Bute?

11   A.  Yes.

12   Q.  What is Bute?

13   A.  It's also an anti-inflammatory medication for swelling and

14   also for pain.

15   Q.  When it comes in this format that we see here on the

16   screen, how is it administered to a racehorse?

17   A.  A hypodermic needle.

18   Q.  During your time with the racing commission, did the

19   commission regulate Bute usage in racehorses?

20   A.  Yes.

21   Q.  Were you permitted to give Bute to a racehorse on a day of

22   the race?

23   A.  No.

24   Q.  In looking through these photos, do you see a prescription

25   labor on the bottle?

1   A.  No, I do not.

2   Q.  Do you see the name of a veterinarian?

3   A.  No.

4   Q.  Do you see the name of a particular horse?

5   A.  No.

6        MR. GIANFORTI:  And, Ms. Jung, if you could please

7   pull up Government Exhibit 15005.

8        And, again, for the record, there are more than one

9   photo in this collection.

10  Q.  Ms. Noblett, what do these pictures depict?

11  A.  That is the bottle of dexamethasone.

12  Q.  That was found where?

13  A.  Also behind the drivers seat in the shipping box.

14  Q.  Are you familiar with this product?

15  A.  Yes.

16  Q.  What is it?

17  A.  It's also an anti-inflammatory and it's also used for pain.

18  Q.  And --

19  A.  Well, I'd say pain in addition to it being an

20  anti-inflammatory.

21  Q.  And when this drug comes in this format, how it is

22  administered to a racehorse?

23  A.  By hypodermic needle.

24  Q.  During your time with the racing commission, did the

25  commission regulate the use of dexium in racehorses?

1    A.  Yes.

2    Q.  Were you permitted to give dexium to a racehorse on the day

3    of a race?

4    A.  No.

5    Q.  Looking through these photos, Ms. Noblett, do you see a

6    prescription label on the bottle?

7    A.  No, I do not.

8    Q.  Do you see the name of a vet?

9    A.  No.

10   Q.  Do you see the name of a particular horse?

11   A.  No.

12          MR. GIANFORTI:  All right.  You can take that down,

13   Ms. Jung.  Thank you.

14   Q.  Ms. Noblett, during your time as a special investigator

15   with the racing commission, were trainers permitted to give any

16   drugs to a racehorse on race day under the Pennsylvania rules?

17   A.  No, they were not.

18   Q.  And, Ms. Noblett, I asked you a few times about

19   prescription labels, the name of a vet, the name of a horse and

20   whether those appeared on the products. Do you remember that?

21   A.  Yes.

22   Q.  Are you familiar with the term "veterinarian-client-patient

23   relationship" or VCPR?

24   A.  Yes.

25   Q.  In that relationship, who is the client?

1    A.  The client is the owner-trainer, but it's also the horse.

2    Q.  Well, who's the patient?

3    A.  The patient is the horse.

4    Q.  And based on your experience with the racing commission,

5    what does the term "VCPR" mean to you?

6            MR. FASULO:  Objection, foundation.

7            THE COURT:  Overruled.

8    Q.  You can answer.

9    A.  The term to me, you can kind of relate it to your own

10   doctor.  The horse would be the patient, so you would have the

11   doctor examine the horse, evaluate it, make a determination on

12   if it needed treatment at all and then treat it, just like your

13   own doctor without going to see him and getting a diagnosis or

14   an examination, he's not going to give you drugs.

15           MR. FASULO:  Objection.

16           THE COURT:  Sustained.  You've answered the question.

17   Move on, Mr. Gianforti.

18   Q.  Ms. Noblett, in your capacity as a special investigator for

19   racing commission, did you investigate whether trainers had

20   valid VCPRs with their purported vets?

21   A.  Yes.

22   Q.  Why did you do that?

23   A.  It's a requirement by the racing commission that each vet

24   submits a daily treatment sheet.  Everything is recorded,

25   filed.  We use it if there's a positive, that's what it's for.

1   Q.  How would you verify if a trainer has a valid VCPR with a

2   particular vet?

3   A.  Through that form.

4   Q.  What, in your experience, as a special investigator --

5   what, if anything, would indicate to you that a trainer did not

6   have a valid VCPR with a particular vet?

7   A.  Again, it's all verified.  They're required to submit that

8   form.  So if it's not on there and the horse comes up with

9   anything, we can verify it.

10  Q.  Ms. Noblett, focusing on the hypodermic needles and

11  syringes that you found in Sylvio Martin's truck, are those

12  items that the racing commission regulated during your time

13  there?

14  A.  Yes.

15  Q.  And during your time with the racing commission, what was

16  your understanding of the general rules around trainers

17  possessing hypodermic needles?

18  A.  They were not allowed to possess them.  It was just

19  licensed veterinarian that were allowed to use and have them in

20  their possession.

21          MR. GIANFORTI:  Ms. Jung, could you please pull up and

22  turn to the second page of Government Exhibit 15003, and if you

23  could zoom in on that white label at the bottom, please.  We'll

24  take the zoomed out view for a moment.

25  Q.  Ms. Noblett, what are we looking at here?

1    A.  That was the shipping label that was affixed to the box

2    with -- that you're looking at with the injectables and the

3    needles.

4              MR. GIANFORTI:  Ms. Jung, if you could please zoom in

5    on the shipping labels.

6    Q.  Ms. Noblett, based on this label, who does it appear that

7    this box was shipped to?

8    A.  To?

9    Q.  To.

10   A.  It was shipped to Equestology at 125 Jennifer Lane in

11   Felton, Delaware.

12   Q.  Does it appear it was shipped to a particular person as

13   well?

14   A.  Equestology was the only recipient.

15   Q.  What does it say immediately above Equestology?

16   A.  What does it say about it?

17   Q.  What does it say immediately above Equestology?

18   A.  Dr. Seth Fishman.

19             MR. GIANFORTI:  All right.  You can take that down,

20   Ms. Jung.

21   Q.  Ms. Noblett, calling your attention to February 10, 2020,

22   did you participate in another search involving Sylvio Martin?

23   A.  Yes.

24   Q.  Could you tell the jury a little bit about that, please?

25   A.  We went to Sylvio's barn.  He was not there, so I

1   approached his assistant and I told him we were there to do a

2   barn search.

3            And he said, well, Sylvio isn't here.  So I said, I

4   have to have permission.  he goes, well, go ahead.  I said

5   okay, so we did.

6   Q.  Did your search turn up anything of note?

7   A.  No.

8            MR. GIANFORTI:  Ms. Jung, could you please pull up for

9   the witness, but not for the jury, Government Exhibit 15001,

10  please.

11  Q.  Ms. Noblett, are you familiar with this document?

12  A.  This was an invoice that was faxed to us by Sylvio Martin

13  in reference for -- I asked him for that.  When I interviewed

14  him, if he could produce a receipt or an invoice, and that's

15  what he sent us via fax.

16           MR. GIANFORTI:  Your Honor, the government offers

17  Government Exhibit 15001.

18           MR. FASULO:  No objection.

19           THE COURT:  It is received in evidence.

20           (Government's Exhibit 15001 received in evidence)

21           THE COURT:  You may publish it to the jury.

22  BY MR. GIANFORTI:

23  Q.  Ms. Noblett, who does this invoice appear to have been

24  issued by?

25  A.  Who generated it?

1    Q.   Yes.

2    A.   Equestology.

3    Q.   Is there an address associated with Equestology?

4    A.   125 Jennifer Lane, Felton, Delaware.

5    Q.   And do you see the itemized list in sort of the middle of

6    the screen?

7    A.   Yes.

8    Q.   And do you see where it says syringes?

9    A.   Yes.

10   Q.   And immediately to the left of that, what do you see?

11   A.   I see that it was -- the services were 2/2/20 and it was

12   for the horse Paper Moon.

13   Q.   Is Paper Moon the name of the horse that you mentioned

14   earlier in your testimony?

15   A.   Yes.

16   Q.   Could you just refresh the jury on what your general

17   understanding of Paper Moon's reputation was at that point in

18   time?

19            MR. FASULO:  Objection.

20            THE COURT:  Sustained.

21            Please clarify the question.

22   Q.   What, if anything, did you know about Paper Moon at this

23   time?

24   A.   Well, from the previous search, the name Paper Moon was

25   brought up.  The horse was not on the track and they told me

1    that that particular medication was for her and was not used

2    for a year, so we assumed that horse went to the farm.

3              MR. FASULO:  Objection.

4              THE COURT:  Sustained.  The part of the answer after

5    "we assumed" is stricken.  The witness can't assume.  They can

6    only tell you what they actually know, so the jury is directed

7    to disregard the balance of the answer after we assume.

8    BY MR. GIANFORTI:

9    Q.  Ms. Noblett, were you involved in interviewing Sylvio

10   Martin in connection with your investigation?

11   A.  Yes.

12   Q.  How many times?

13   A.  Twice.

14   Q.  When was the first time you interviewed him?

15   A.  The day of the search.

16   Q.  When was the second time that you interviewed him?

17   A.  I tried to get a hold of him numerous times and his

18   assistant always told me he's working, can't be disturbed until

19   afternoon, so he never responded.

20             So I called and left a message on his phone, and I

21   said, look,  I need you to come in for an interview.  These are

22   the office hours, you know, please come in.

23             He didn't respond to that call until I went up to do

24   the barn search and I believe he called me. He set up an

25   appointment to come in for Tuesday.

1  Q.  Do you recall how long after your search the interview took

2  place approximately?

3  A.  I know it was at least 10 days.

4  Q.  Ms. Noblett, what kind of questions do you recall asking

5  him at that time during his interview?

6  A.  Well, since he had horses at various tracks and training

7  farms and also his private farm, I asked him who's your vet.

8       He gave me the name of the vet for Parks Racetrack.

9  He gave me the name of the vet for Delaware Park.  He said he

10 didn't know who his vet was at West Hampton farm.  He would

11 have to ask his assistant, and Seth Fishman was his vet at his

12 private farm.

13 Q.  Do you recall asking him any other questions?

14 A.  I asked him where he purchased the items.  He told me a

15 pharmacy.  He couldn't remember the address.  I asked him how

16 many times Dr. Fishman had been to his farm, and he said in the

17 middle of 2019 to treat a mare.

18      To me, you know, I asked him also who called in the

19 prescription for these items, who was the vet for the items

20 that were confiscated since there was no label or anything on

21 it.  He said, he didn't know.  He said, I don't know who wrote

22 the prescription, but I'll find out.

23 Q.  Did you ask him if he had a veterinarian license?

24 A.  I did ask him if he had a veterinarian license and he

25 answered no.

1    Q.  The questions that you asked him with respect to who his

2    vet was, which vet had issued the prescription, those kinds of

3    questions, why did you ask him those questions?

4    A.  One, to see if there was a patient-client relationship, and

5    just, I was curious because he had horses at so many different

6    places.  I was curious who the vets were at the different

7    locations.

8    Q.  Why did you ask him how recently Dr. Fishman had seen his

9    horses?

10   A.  I, in reviewing the information that was on the shipping

11   label, I looked up Dr. Fishman and he was a Florida vet and

12   Equestology was a company that sold drugs through a website,

13   drugs for camels, drugs for horses, and I thought it was just

14   odd that Seth Fishman was one of his vets.

15          So I wanted to see where between -- I remember he

16   spent a lot of time in Florida, and I thought, well, if you

17   have a Florida vet, it didn't make sense to me.

18   Q.  Ms. Noblett, during your investigation, did you speak with

19   Seth Fishman?

20   A.  Did I speak with him?

21   Q.  Yes.

22   A.  No, I did not.

23   Q.  Have you ever spoken with Seth Fishman?

24   A.  No.

25   Q.  During your investigation, did you speak with somebody

1    named Lisa Ranger or Lisa Giannelli?

2    A.   No.

3    Q.   Have you ever spoken to that individual?

4    A.   No.

5            MR. GIANFORTI:  Ms. Jung, can you pull up 403B which

6    is in evidence.

7            For the record, this is a text message exchange

8    between Lisa Giannelli and Seth Fishman, and I'm going to read

9    an excerpt of it into the record.

10           Ms. Jung, can you please go to the page of line 27 on

11   it.  If you can blow up from line 17 to 27 that would be great.

12           This first text message starting at the bottom.  This

13   is in reverse chronological order.

14           This first text message was sent to Seth on February

15   16, 2020 at 11:06 p.m. by Lisa Ranger and it reads:

16           "Are you back home.  A client had an issue.  Do you

17   want them to call you or can you call me?"

18           Seth then replied.  "Client can call me."

19           Then Ms. Giannelli replied:  "OK.  And then she said,

20   Sylvio Martin."

21           And then the following text is to Seth from February

22   24, 2020.  It reads:

23           "Just sent over email.  PA investigator wants to speak

24   to you about Sylvio Martin.  I sent you the invoice and phone

25   number."

1          Seth then replied:  "OK."

2          The next text message is a little bit later on

3    February 24, 2020 to Seth again.  It reads:  "I believe he's

4    calling you now."

5          Seth responds: "OK. Please text -- and appears to me

6    with a typo -- Sylvio's number again."

7          And then Ms. Giannelli sent a text message to Seth

8    reading:  "Sylvio Martin."

9          Seth replies:  "Yes."

10         And Ms. Giannelli sends a phone number to Seth.

11         And you can take that down.

12         Ms. Jung, could you now please pull up Government

13   Exhibit 403O as in Oscar, which is in evidence.

14         For the record, this is a text message exchange

15   between Lisa Giannelli and somebody that's listed as Padilla

16   Sylvio Martin, and the exchange I'm going to focus on is from

17   February 16, 2020.

18         If you could start at line 25, Ms. Jung, which I think

19   is on the next page, and I'll again read this into the record.

20         So the first text message is from Padilla Sylvia

21   Martin to Ms. Giannelli and it reads:   This is February 2,

22   2020.

23         It reads:  "Hey, Lisa, is it too late to pick up an

24   order today?"

25         And the response from Ms. Giannelli is: "I'm not

1    there, but I can see if the kids are.  What do you need?"

2              And if you could blow up to line 18.

3              Padilla Sylvio Martin responds: "One box needles, 19,

4    one inch; one box syringes, 12CC, one bottle Banamine, one Dex,

5    two Bute.  Thanks just let me know when I can get it.  Thanks

6    again."

7              Ms. Giannelli responds:  "Do you want monoject or

8    nipro syringes?"

9              Padilla Sylvia Martin respond:  "Whatever I always

10   get,"

11             Ms. Giannelli responds: "OK."

12             She then sends another message that says:  "He is

13   putting it out there now.  Thank you."

14             Padilla Sylvio Martin responds:  "Awesome, thanks."

15   BY MR. GIANFORTI:

16   Q.  Ms. Noblett, beyond what we've discussed today, did you

17   have any further involvement in this investigation?

18   A.  No.

19             MR. GIANFORTI:  No further questions.

20             THE COURT:  Mr. Fasulo.

21   CROSS-EXAMINATION

22   BY MR. FASULO:

23   Q.  Good afternoon, Ms. Noblett.

24   A.  Hi.

25   Q.  Ms. Noblett, during the time you were investigating this

1    matter, you were in your position with the Pennsylvania Racing

2    Commission, correct?

3    A.  Yes.

4    Q.  You said you looked at -- you asked Sylvio about his vets,

5    right?

6    A.  I can't hear you.

7    Q.  You said that you had asked Sylvio about the vets that he

8    had on his horses, correct?

9    A.  Yes.

10   Q.  And he responded to you, correct?

11   A.  Yes.

12   Q.  Do you indicate who were his vets at the various locations?

13   A.  I remember Parks -- I got to think of his name.  It was so

14   long ago.  I think it was Dr. Clager (ph) and his associate.  I

15   know Delaware Park was Amy Warren.

16          Like I said, he didn't know the vet's name at the

17   farm, and Dr. Seth Fishman at his private farm.

18   Q.  When you're a vet at a private farm, does that come under

19   your authority?

20   A.  At a private farm?

21   Q.  He said he was his vet at a private, farm, correct, that's

22   what he told you?

23   A.  That was his home.  I'm assuming it was his home.  It was

24   the farm.

25   Q.  Right.  And does that come under your authority at the

1  racing commission in Pennsylvania?

2  A.  Not in Pennsylvania.

3  Q.  In fact, did you ever have a chance to check and see

4  whether Seth Fishman was a licensed vet in the state of

5  Pennsylvania?

6  A.  I did.

7  Q.  Was Seth Fishman a license vet in the state of

8  Pennsylvania?

9  A.  His license had expired and he didn't renew it.

10 Q.  When did you know that his -- when was it that his license

11 expired?

12 A.  I don't recall that.

13 Q.  Do you recall in relation to the dates in question here,

14 did you know whether his license was current at those times?

15 A.  In 2020 it was not current.

16 Q.  Were you made aware that that license had ever been renewed

17 in Pennsylvania after the date?

18 A.  I believe it wasn't.

19 Q.  Now, you also testified earlier about -- if I can have the

20 items 900E I think it is.  I'm sorry, 403B.

21       Ms. Noblett, these were text messages that were read

22 while you were sitting on the witness stand?

23 A.  Correct.

24 Q.  Did you have these during the course of your investigation?

25 A.  No, I did not.

1   Q.  These had nothing to do with your investigation, fair to

2   say?

3   A.  No, I did not.

4        MR. FASULO:  If I can have 1500, 1503, 1509.

5   Q.  This is something that -- what is this when you're looking

6   at it now which is labeled 15003?

7   A.  It's what was found behind the driver seat.

8   Q.  And on what day did you find this?

9   A.  It was a Monday and I believe it was 2/3.

10  Q.  Excuse me?

11  A.  I believe it was 2/3/2020.

12       MR. FASULO:  Can I go to 15005.

13  Q.  You remember testifying about this?

14  A.  Yes.

15  Q.  You said that this did not have any other information on it

16  other than what we see here, correct?

17  A.  It had a label on it, but no prescription label.

18  Q.  What kind of label was on it?

19  A.  It had the information Equestology and not to use within 24

20  hours of race time.

21  Q.  And where was that?

22       Was that on the back of this item?

23  A.  I can't remember exactly where it was.  There were pictures

24  taken of all parts of it.

25       MR. FASULO:  If I may have one moment.

1          THE COURT:  Yes.

2     BY MR. FASULO:

3     Q.  Can I approach and grab the hard copy from you?

4     A.  Yes.

5     Q.  Can we go to -- on the same 15005, is this the back that

6     you were speaking about of the same medication, if you know?

7     A.  I don't know what it says on the front of it, so this is --

8     I can't tell you if it's the back of that bottle.

9          MR. FASULO:  I ask the government to stipulate that

10    15003, the three pictures, these three pictures are pictures of

11    the same bottle, different angles of the same item.

12         THE COURT:  You need to say it into the record.

13         MR. FASULO:  I'd like the government to stipulate that

14    the exhibit noted as 15005 which has three photographs of it,

15    are actually different angles of the same item.

16         MR. GIANFORTI:  Agreed.

17         THE COURT:  All right. The government so stipulates

18    with the defendant, so you now have in evidence that these are

19    three photos of the same bottle from different angles.

20    BY MR. FASULO:

21    Q.  I'd ask you to look at this photograph.  Can you tell me

22    what is on this photograph as it relates to the label?

23    A.  The bar code, the product number and the directions for

24    use.

25    Q.  And also has the manufacturer, correct?

1    A.  Yes.

2    Q.  And I'd like to now turn to the third page of this set of

3    documents labeled 15005.

4         Is this the other label that you were speaking about

5    in terms of warning, correct?

6    A.  Yes.

7         MR. FASULO:  Now I'd like to turn your attention to

8    15006.  Again, I'd like a stipulation from the government that

9    there are four photographs attached to Government Exhibit 15006

10   and they all relate to the same item just at different angles.

11        MR. GIANFORTI:  Agreed.

12        THE COURT:  All right.  So 15006 is a series of four

13   photographs of the same bottle from different angles.

14   BY MR. FASULO:

15   Q.  Is this an item that you recovered the day that you did the

16   search of the vehicle?

17   A.  Yes.

18   Q.  And it was Butaject, that's what its name is?

19   A.  Phenylbutazone, yes.

20   Q.  And in this second page, this label indicated what it was

21   to be used for, correct?

22   A.  Yes.

23   Q.  It indicates the dosage that was to be used, correct?

24   A.  Yes.

25   Q.  And it also, if we can go to the next page, it also

1   indicated -- if we can show -- and it also indicated when it

2   could or could not be used, correct?

3   A.  Correct.

4   Q.  And if we go to the next page, the next pages are exactly

5   the same.  I'll like to move on to 15007 now.

6          MR. FASULO:  Again, your Honor, 15007 are three

7   photographs. I'd like the government to stipulate that they are

8   three photographs of the same item as they introduced as 15007

9   showing the same photograph.

10          MR. GIANFORTI:  Agreed.

11          THE COURT:  The government has agreed with the

12   defendant that Exhibit 15007 is a series of three photographs

13   of the same item.

14   BY MR. FASULO:

15   Q.  This is another thing that you recovered that day?

16   A.  Yes.

17   Q.  And it's Banamine, correct?

18   A.  Correct.

19   Q.  And, again, it has certain warnings on it, if we turn to

20   the next page, correct?

21   A.  Yes.

22   Q.  And it says, do not use within 24 hours of racing, correct?

23   A.  Right.

24   Q.  Now, I like to go to 15008.

25          Monoject, you see that?  You see 15008?

1    A.  Yes.

2    Q.  Do you recognize it?

3    A.  Yes.

4    Q.  And you stated earlier this something else you recovered

5    from that box, correct?

6    A.  Correct.

7            MR. FASULO:  And again if the government will agree

8    that the three photographs are the same item from different

9    angles.

10           MR. GIANFORTI:  Agreed.

11           MR. FASULO:  Pictures of the same item from different

12   angles.

13           THE COURT:  So there is stipulation between the

14   parties that 15008 is a series of three photographs of one item

15   from three different angles and that is evidence.

16   BY MR. FASULO:

17   Q.  During your time with the racing commission, you stated

18   that you would investigate a number of different drugs in

19   different situations regarding drug use at tracks, correct?

20   A.  Regarding what?

21   Q.  Drugs used at the different racetracks, correct?

22   A.  At the different racetracks?

23   Q.  No?

24   A.  I don't understand what you're asking me.

25   Q.  You stated earlier that you did investigations, right?

1   A.  Correct.

2   Q.  And you investigated racehorses, correct?

3   A.  Correct.

4   Q.  And you investigated the drugs that were used on racehorses

5   at times, correct?

6   A.  The only thing I investigated was what was on the daily

7   treatment sheets, and also if we got a positive on a sample, I

8   did the barn search, looked for evidence regarding that sample,

9   and that was all the involvement I had.

10  Q.  Well, you also said that you did random searches, right?

11  A.  Correct.

12  Q.  And those random searches would be of -- what would those

13  random searches be of?

14  A.  Anything on the racetrack, could be the jockeys room, could

15  be -- anything.  But when there were random searches, they were

16  usually of the barns and the vehicles.

17  Q.  And those random searches, some of them were just random,

18  like this one, you just stop the car and search the vehicle,

19  right?

20  A.  Correct.

21  Q.  And at that time you were searching for whatever items were

22  in that vehicle?

23  A.  Right.

24  Q.  And to conform whether or not they were appropriate or not

25  appropriate to be on the track?

1    A.  Correct.

2    Q.  Right?

3    A.  Right.

4    Q.  And some of the things I think you talked about looking for

5    during your direct examination was, you were looking for

6    different -- the drugs that were being present at the track?

7    A.  Any contraband.

8    Q.  Right.  So you also saw -- recovered these standard

9    hypodermic needles from the vehicle that day?

10   A.  Correct.

11   Q.  And you would agree with me if you go to page 2, if we may

12   show the other side.  This is 15008, if we can highlight that.

13          In your experience in your role, what did you

14   understand this part of the label on this product to be?

15   A.  It looks like it's instructions on how to use it.

16   Q.  And do you see the word "caution" as well?

17   A.  Yes.

18   Q.  And on the back of it, what do you understand this to be as

19   it relates to this product?

20   A.  When we photograph things like -- anything we confiscated,

21   we were to take, not only the picture itself, but we were also

22   supposed to photograph the lot number and other related

23   information on the item, expiration date, whatever.

24   Q.  And this was on the item at the time that you recovered it,

25   correct?

1    A.   Yes.

2    Q.   The lot number, the reference number, the expiration date,

3    correct?

4    A.   Yes.

5    Q.   And some sort of code that identifies the item, correct?

6    A.   Yes.

7            MR. FASULO:  And lastly, finally 15009.

8            Again, Judge, I ask 15009 are four photographs of the

9    same item taken from different angles.

10           MR. GIANFORTI:  Agreed.

11           THE COURT:  All right.  The government has just

12   stipulated with the defendant that this exhibit is a series of

13   four photographs of the same item from four different

14   perspectives or angles.  That stipulation is evidence in this

15   case.

16   BY MR. FASULO:

17   Q.   On the front of this where you're looking at now which is

18   15009, can you tell me what you understood this product to be?

19   A.   They're disposal syringes.

20   Q.   When it says without needles, what significance is that?

21   A.   That is just the syringe itself.

22   Q.   And what use in your experience, if you know, what use

23   would a syringe like this be used for without a needle?

24   A.   Syringe like this couldn't really be used for anything or

25   shouldn't I should say without a needle.

1  Q.  In your experience, have you recovered these syringes

2  before?

3  A.  Not these type of syringes.

4  Q.  Now I'd like you to turn to the second page, and now I'd

5  like to turn to the third page.

6       You see on this page there's a certain lot number,

7  correct?

8  A.  Yes.

9  Q.  Certain expiration, correct?

10  A.  Correct.

11  Q.  And certain order number, right?

12  A.  And what?

13  Q.  And the order number, correct, right there, reorder?

14  A.  A reorder number, yes.

15       MR. FASULO:  Can we turn to the last page.

16  Q.  You see the last page with certain precautions, correct?

17  A.  Yes.

18  Q.  Now, is it your testimony here today that a licensed vet

19  would not be able to use this product?

20  A.  A licensed vet?

21  Q.  That's what I'm asking.

22  A.  Yes, they would be able to use this product.

23  Q.  So there's nothing wrong with a licensed vet using this

24  product?

25  A.  No.

1            MR. FASULO:  Nothing further for this witness.

2            Thank you very much.

3            THE COURT:  Any redirect?

4            MR. GIANFORTI:  Yes, your Honor.

5            Thank you.

6    REDIRECT EXAMINATION

7    BY MR. GIANFORTI:

8    Q.  Ms. Noblett, do you recall Mr. Fasulo asking you about a

9    sticker that you found on the bottles in the truck that said,

10   Don't use within 24 hours of racing"or something like that?

11   A.  Yes.

12   Q.  When you saw those stickers, what, if any, impact did that

13   sticker have on your decision to seize those drugs as

14   contraband?

15   A.  It was not a prescription label.  It was just instructions.

16   Q.  Did you still consider the drugs contraband even though

17   they had that sticker?

18   A.  Yes.

19   Q.  Hypothetically, if you learned that a trainer had ignored

20   that sticker and used those drugs within 24 hours of a race,

21   would they have avoided penalties because of that sticker?

22            MR. FASULO:  Objection.

23            THE COURT:  Sustained.  She's not here as an expert

24   witness.  You can ask her fact questions.

25            MR. GIANFORTI:  Ms. Jung, could you please pull up

1    Government Exhibit 15009 again, and turn to the fourth page.

2    Q.   Ms. Noblett, do you remember answering questions about this

3    box of syringes a moment ago?

4    A.   Yes.

5    Q.   Do you see where it says "caution" in the middle of the

6    page?

7    A.   Yes.

8    Q.   Could you read what it says under cautions?

9    A.   "Discard after single use.  Do not store at high

10   temperature and humidity.  By prescription only."

11           MR. GIANFORTI:  No further questions.

12           THE COURT:  Thank you.

13           Any recross?

14           MR. FASULO:  No, recross.

15           THE COURT:  Thank you very much, Ms. Noblett, you are

16   excused with the thanks of the Court.  Put your mask on and you

17   may leave the courtroom.

18           Why don't we take a two minute pause for the witness

19   to leave and the court reporter to change out.

20           (Continued on next page)

21

22

23

24

25

1    THE COURT:  Go ahead, Mr. Gianforti.

2    MR. GIANFORTI:  I'd like to read a stipulation into

3  the record at this time.

4    THE COURT:  All right.

5    MR. GIANFORTI:  I will once again skip the preamble.

6  Government Exhibit 9010, which I have shown to Mr. Fasulo.

7    THE COURT:  You may proceed.

8    MR. GIANFORTI:  If called to testify at trial, a

9  representative of Dropbox Inc., Dropbox, would testify as

10  follows:

11    Government Exhibits 2001-A through 2056-F listed under

12  column A and the chart appended to this the stipulation are

13  true and correct copies of certain records and associated data

14  with a Dropbox account associated with the user name

15  Seth@Equestology.com, the Equestology Dropbox account

16  maintained by Dropbox.

17    The file names listed under column B appended to the

18  stipulation are true and correct reflections of the original

19  file names of each exhibit as maintained on Equestology Dropbox

20  account.

21    The folder structure listed under column C in the

22  chart appended to the stipulation are true and correct

23  reflections of the original stored location of each government

24  exhibit as maintained by the Equestology Dropbox account.

25    It is further stipulated and agreed by and between the

1    parties that the aforementioned Government Exhibits and this

2    stipulation, which is government exhibit 9010, may be received

3    in evidence as trial.  And then there is a -- the table that I

4    mentioned, which runs for many pages, and I will not read into

5    the record.

6              And your Honor, the government offers Government

7    Exhibit 9010 and the exhibits listed therein.

8              THE COURT:  All right.  And are the tables part of

9    the --

10             MR. GIANFORTI:  They are.  They describe the different

11   exhibits -- the different files.

12             THE COURT:  My question is:  Are they part of what

13   you're moving into evidence?

14             MR. GIANFORTI:  Yes.

15             THE COURT:  So the stipulation 9010 and exhibits

16   2001-A through 2056-F are admitted into evidence as are the

17   charts that are attached to the body of the stipulation itself.

18   Those are all in evidence and are evidence that you may

19   consider in this case.

20             (Government's Exhibits 9010, 2001-A through 2056-F

21   received in evidence)

22             MR. GIANFORTI:  Thank you, your Honor.

23             At this time, your Honor, the government calls

24   Dr. Cindy Cole.

25             THE COURT:  All right.  Dr. Cole.

1        (Pause)

2            THE COURT:  Good afternoon, Dr. Cole.  If you could

3    please stand on the witness stand, remove your mask,

4    Ms. Dempsey will administer the oath.

5     CYNTHIA COLE,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8            DEPUTY CLERK:  Thank you.  Please state and spell your

9    name for the record.

10           THE WITNESS:  Cynthia Cole, C-Y-N-T-H-I-A, C-O-L-E.

11   DIRECT EXAMINATION

12   BY MS. MORTAZAVI:

13   Q.  Good afternoon, Dr. Cole.

14   A.  Good afternoon.

15   Q.  I'm going to ask you to pull the microphone closer to your

16   mouth, or you may want to move your chair.

17   A.  How is that?

18           THE COURT:  I think you're just fine.

19           MS. MORTAZAVI:  Great.  Thank you.

20           THE COURT:  Please, Ms. Mortazavi.

21   Q.  Dr. Cole, can you tell us what's your profession?

22   A.  I'm a veterinarian pharmacologist.

23   Q.  Where are you employed?

24   A.  At the University of Florida.

25   Q.  And, specifically, what division or subset of the

1    University of Florida are you employed in?

2    A.  I'm an associate clinical professor and director of the

3    racing laboratory in the department of pathology in the college

4    of medicine.

5    Q.  And how long have you held that position?

6    A.  Currently, I've held it for about three and a half years.

7    Q.  Was there a time period before that where you held a

8    similar position?

9    A.  From 2003 to 2006, I was also director of the racing

10   laboratory.

11   Q.  Can you describe your duties as director of the racing

12   laboratory?

13   A.  I oversee the analytical chemistry program with the lab.

14   The laboratory is designed to assay samples that are collected

15   from racehorses in the state of Florida, and we're looking for

16   drugs and medications and potentially performance altering

17   substances.

18   Q.  What's your educational background?

19   A.  I have, in addition to a bachelor's degree from the

20   University of Florida, I have a doctor of veterinary medical

21   degree, a DVM, and a PhD in cardiovascular pharmacology.  I

22   also completed a post doctoral fellowship in molecular

23   pharmacology and an internship in equine clinical

24   pharmacology -- and internship in equine medicine and surgery.

25   Q.  Do you today hold any licenses from any regulatory bodies?

1    A.  I'm licensed to practice veterinary medicine in the state

2    of Florida.

3    Q.  And in addition to those degrees, do you have any other

4    types of professional credentials?

5    A.  I am a specialist boarded by the American College of

6    Veterinary Clinical Pharmacology.

7    Q.  Do you lecture in the field of clinical pharmacology?

8    A.  Yes, I do.

9    Q.  Are you a member of in any professional organizations in

10   your field, apart from the ones you mentioned?

11   A.  I am a member of the American Academy of Veterinary

12   Pharmacology and Therapeutics, I am a member of the Scientific

13   Advisory Board for the American Racing Commissioners

14   International, and for the Racing Medication and Testing

15   Consortium, and I am a member of the American Association of

16   Equine Practitioners.

17   Q.  Have you published any articles in your field?

18   A.  I have approximately -- just less than 40 peer-reviewed

19   publications, most of them dealing equine pharmacology,

20   pharmacokinetics and pharmacodynamics specifically.

21   Q.  What about any chapters or books?

22   A.  I have approximately 10 chapters and have edited -- lead

23   author on a book called Equine Clinical Pharmacology.

24   Q.  Have you overseen clinical studies in the field of equine

25   pharmacology?

1    A.  Yes.  Most of my publications have dealt with reviewing the

2    effects or the time course of drugs, medications, and

3    substances in horses.

4    Q.  Can you describe in general terms the categories of

5    substances that have been the subject of your studies?

6    A.  It's a very wide range from therapeutic substances such as

7    local anesthetics, nonsteroidal anti-inflammatory drugs, which

8    are analgesics, to drugs such as cocaine and morphine and

9    fentanyl, which, in some cases, may have therapeutic benefits,

10   but in others, we are more concerned with performance altering

11   effects.

12   Q.  And with respect to the substances that you have examined

13   in your field, does that include performance enhancing drugs?

14   A.  Yes, it does.

15   Q.  And what, if any, work have you conducted regarding the

16   ability of drug testing laboratories to detect the presence of

17   drugs in horses?

18   A.  So a member -- as part of the Racing Medication and Testing

19   Consortium, it's a constant program that we have of testing

20   blind samples as well as coordinating with developing new

21   programs in order to detect new substances, and to assure that

22   all the laboratories are consistently detecting drugs of known

23   abuse.

24   Q.  Have you previously testified as an expert in the field of

25   veterinary medicine and pharmacology?

M536GIA5                    Cole - Direct

1    A.   Yes, I have.

2    Q.   And in preparation for your testimony today, have you

3    reviewed certain materials that the prosecutors in this case

4    provided you?

5    A.   Yes, I have.

6            MS. MORTAZAVI:  Your Honor, the government offers

7    Dr. Cole as an expert in veterinary equine medicine and

8    veterinary equine pharmacology.

9            THE COURT:  No objection.

10           MR. FASULO:  No objection.

11           THE COURT:  The doctor will be qualified as an expert

12   in those disciplines.

13           MS. MORTAZAVI:  Ms. Jung, can you please display

14   Government Exhibit 711, which, for the record, was a document

15   retrieved from a computer seized from Lisa Giannelli's

16   residence.

17   BY MS. MORTAZAVI:

18   Q.   Dr. Cole, have you seen this particular document before?

19   A.   I have, yes.

20   Q.   Have you had a chance to review the entirety of this

21   document before today?

22   A.   I have, yes.

23   Q.   And have you reviewed certain terms and phrases contained

24   throughout there document?

25   A.   Yes.

1   Q.  Were you familiar with some of the terms used in this

2   document on the basis of your experience?

3   A.  Yes.

4   Q.  Were there various drugs referenced throughout this

5   document whose instructions dictated that they be administered

6   within hours of a race or event?

7   A.  Yes, there were.

8   Q.  What's the most strenuous event a racehorse will typically

9   experience?

10  A.  The race itself.

11  Q.  It would not be training?

12  A.  No.  Not in my opinion.

13  Q.  Why not?

14  A.  Because the race is the episode that when the horse is

15  asked to give 110 percent in an effort to try to win the race.

16          During training, the horse generally will go for a

17  shorter distance.  It may go at racing speeds, but it generally

18  isn't asked to typically go as long as a horse would go in the

19  race.  And, generally, it's only racing -- it only exercises by

20  itself, maybe with one or two other horses, as opposed to the

21  race where there may be a full field of anywhere from 8 to 12

22  horses.

23  Q.  Have you worked with the Florida Pari-mutuel Wagering Board

24  through your work at the laboratory?

25  A.  Yes, I have.

M536GIA5                    Cole - Direct

1    Q.  Through that, have you become familiar with the types of

2    drugs that are restricted or banned in the state of Florida?

3    A.  Yes, I am.

4    Q.  And through that, have you also become familiar with

5    certain conduct related to the administration of drugs that is

6    restricted or banned?

7    A.  Yes.

8    Q.  Are trainers permitted to administer drugs to horses the

9    day of a race?

10   A.  No, there are not.

11   Q.  Are you aware of any state where that is permitted?

12   A.  I'm not aware of any state that permits that

13   administration.

14        MS. MORTAZAVI:  Ms. Jung, can you please display

15   Government Exhibit 139A and it's corresponding transcript,

16   Government Exhibit 139AT?  And the jurors are welcome to follow

17   on their screens or in their binders.

18        For the record, this is a June 4th, 2019, intercepted

19   call between Seth Fishman and Lisa Giannelli.  If you could

20   please play.

21        (Audio played)

22   Q.  Dr. Cole, you testified --

23        MS. MORTAZAVI:  And we can take this exhibit down,

24   thank you.

25   Q.  Dr. Cole, you testified that you work on refining drug

M536GIA5                    Cole - Direct

1    tests for performance enhancing drugs; is that correct?

2    A.   That's correct.

3    Q.   Are trainers permitted to administer drugs to racehorses

4    that have not been approved by the FDA?

5    A.   No.

6              MR. FASULO:  Objection as to form -- overruled.

7              THE COURT:  Overruled.

8              MR. FASULO:  Withdrawn.

9    Q.   Are you familiar through the course of your work with

10   something called the ARCI?

11   A.   Yes, I am.

12   Q.   What is that?

13   A.   It's the Association Of racing Commissioners International.

14   Q.   What does that body do?

15   A.   It is a group of generally regulatory authorities that

16   are -- have worked to try to standardize and -- classification

17   system for drugs and medications based on the likelihood that

18   they would be -- are therapeutics in the horse or the

19   likelihood they might alter the outcome of the race and have no

20   therapeutic value.  And they have also developed a set of

21   standards and practices, not only around just drugs and

22   medications, but how racing and betting and wagering should be

23   conducted in the United States and internationally.

24   Q.   And these guidelines that you referenced, they are not

25   state law; are they?

M536GIA5                    Cole - Direct

1    A.  In Florida, in 2015, the 2014 regulations from ARCI for

2    their drug classifications for adopted into state statute.

3    Q.  So in the state of Florida, the ARCI guidelines have been

4    incorporated into state law?

5    A.  That is correct.

6    Q.  And based on your experience, have you come to learn

7    whether trainers are permitted to administer prescription drugs

8    to horses if they have no valid prescription?

9    A.  They are not permitted.

10           MS. MORTAZAVI:  Ms. Jung, if we could please display

11   Government Exhibit 711?

12   Q.  Dr. Cole, I'd like to walk through this document, which

13   once again, was a record retrieved from a computer seized from

14   the residence of Lisa Giannelli.

15           Looking at the very first item here, HP bleeder plus,

16   under the title new products, you've reviewed the entirety of

17   this description, correct, Dr. Cole?

18   A.  Correct.

19   Q.  I'm just going to be reading portions of it into the

20   record.

21           HP bleeder plus, a combination of a proven and

22   test-free bleeding.  Pressure within pulmonary vasculature

23   increases nearly three- to fourfold during racing.  HP bleeder

24   plus contains the strongest test-free vasodilators available on

25   the market.  Vasodilation is a benefit to all athletes.

1        And at the bottom of this description:  Typically used

2   four to six hours prior to strenuous exercise.

3        Dr. Cole, I'd like to ask you but a few of the terms

4   that appear in this description.

5        Are you familiar with the term "bleeding"?

6   A.  I am.

7   Q.  What is that?

8   A.  Racehorses -- when we refer to a horse as bleeding or

9   having bled, we're referring to it developing exercise-induced

10  pulmonary hemorrhage.  Horses, when they exercise at a very

11  high level intensity, will rupture some of the small blood

12  vessels in their lungs.  It can be very mild and clinically

13  non-apparent to a veterinarian unless they endoscope the horse,

14  so actually put a scope down into the lower portion of the

15  lungs.  Or it could be very severe, in which case blood may

16  actually be apparent at the nose of the horse.

17  Q.  Does exercise-induced pulmonary hemorrhaging affect the

18  performance of a racehorse?

19  A.  Certainly, if it's mild to severe.  We -- definitely

20  interferes with the horse's ability to race and to run or

21  exercise intensely.  If it's mild, it's unclear, and I think it

22  is variable depending upon the horse and his response to the

23  level of severity that it's developing.

24  Q.  Are you familiar with the term "bleeder" in this context?

25  A.  Yes.  We would refer to a horse that's suffering from EIPH

1    as a bleeder.

2    Q.   Are all horses bleeders?

3    A.   That's a bit hard to answer.  Most racehorses, if not all,

4    if they intensely exercise and really race hard, will have some

5    level of bleeding.  Other horses that are used for only

6    pleasure may never exercise to the extent that they will bleed.

7    Q.   What is an analgesic?

8    A.   An analgesic is a pain reliever.

9    Q.   Does the administration of analgesics help in the treatment

10   of EIPH?

11   A.   I'm unaware of any scientific evidence that supports an

12   analgesic would decrease the severity or incidence of EIPH.

13   Q.   What effect can the use of analgesics have in improving the

14   performance of a racehorse?

15   A.   If a horse has an injury and is administered an analgesic,

16   he'll no longer feel the pain of that injury, or he'll feel it

17   less.  And so the horse's competition or level of competition

18   will be less if it was experiencing that pain and would compete

19   better if it was no longer painful.

20   Q.   Are you familiar with the term vasodilator or vasodilation?

21   A.   Yes, I am.

22   Q.   What do those refer to?

23   A.   So one could think of our blood vessels as garden hoses or

24   tubes that are connected to a pump, which is the heart.  And

25   vasodilating agents will cause those tubes to dilate or to

1    relax the muscle that's within those tubes.  So they will lower

2    the blood pressure that those tubes are experiencing.

3    Q.  And can that have a performance enhancing effect?

4    A.  If a horse is suffering from EIPH, and we were able to

5    selectively decrease the pressure in the pulmonary vessels

6    which are being ruptured, it's possible that a horse would

7    improve performance based on the fact that he would bleed less.

8    If the vasodilation produced more of a systemic response, so

9    also lowered your systemic blood pleasure, it's unlikely -- or

10   it would enhance the performance.  The risk would be that it

11   actually would impair performance.

12   Q.  Looking at the entirety of this description, is there

13   anything here indicating that this particular drug HP bleeder

14   plus, is intended to be used to enhance performance.

15   A.  Well, I think when looking at the recommendations, it is

16   that the -- as it says, if the horse does not demonstrate

17   obviously pain or bleeding, there is -- the likely there is no

18   pain or bleeding is near zero.  So the indication would be that

19   the horse would be improved by being administered this drug

20   either through an analgesic effect or through improving its

21   response to EIPH.

22   Q.  And looking at the directions for use, it says here

23   typically used four to six hours prior to strenuous exercise.

24   Do you see that?

25   A.  Yes.

M536GIA5                          Cole - Direct

1    Q.  Are therapeutic medications typically tracked based on the

2    timing of strenuous exercise?

3    A.  There are certain medications that are administered prior

4    to strenuous exercise, but they are very limited in how they're

5    used.

6    Q.  All right.  Does that indicate anything to you about the

7    intended use of this drug?

8    A.  No.

9            MS. MORTAZAVI:  If we could turn to number 2 on this

10   itemized list, please, Ms. Jung?

11   Q.  And you see at the very bottom of the first page bleeding

12   pills, Dr. Cole?

13   A.  Yes.

14           MS. MORTAZAVI:  And, Ms. Jung, if we could turn to the

15   second page, which contains the description of that item?

16   Q.  And once again, Dr. Cole, I'm going to read out portions of

17   this description, with the understanding that you've reviewed

18   the entirety of it, correct?

19   A.  Yes.

20   Q.  All right.  Bleeder pills increase vascular integrity and

21   help reduce inflammation.  They have coagulant properties as

22   well.  They have benefits far beyond bleeding.  If you wanted

23   to make an analogy, they would be equivalent to giving a low

24   dose corticosteroid for prevention of bleeding.

25           HP bleeder plus is a strong, natural vasodilator and

1    mild nature analgesic.  Vasodilators are extremely beneficial

2    for many reasons beyond decreasing bleeding in horses.

3              Dr. Cole, can you explain to us what it means to

4    increase vascular integrity?

5    A.  So this is -- would be referring to horses suffering from

6    EIPH, and as I indicated, we believe that it originates from

7    the rupture of the very small vascular vessels in the lungs.

8    And so by improving vascular integrity, in theory, you would be

9    lessening the chance that these small vessels would rupture.

10   Q.  What does it mean for something to have coagulant

11   properties?

12   A.  It means that it helps the blood clot.

13   Q.  Are you familiar with the term corticosteroids?

14   A.  I am.

15   Q.  What are corticosteroids?

16   A.  Corticosteroids are a very diverse class of drugs.  They

17   are -- both occur naturally as well as are synthetically made.

18   What they share is a chemical structure of four rings that are

19   attached in a specific manner.  And then modifications and

20   additions to those rings are made chemically in order to change

21   how the drugs act and their specific activities.

22             In equine veterinary medicine, corticosteroids are

23   most often used because of their major effects is

24   anti-inflammatory effects.

25   Q.  In the context of racing, what to corticosteroids do?

1    A.  So we're back to it being an anti-inflammatory agent.  And

2    if the horse has an injury that's associated with inflammation,

3    that might cause the horse pain or decreasing performance.  The

4    corticosteroid would take away some of that pain and allow the

5    horse to compete at a more normal level.

6    Q.  Is the use of corticosteroids on racehorses restricted?

7    A.  Yes, it is.

8         MS. MORTAZAVI:  Ms. Jung, if we could return to the

9    main image of Government Exhibit 711, still on page 2, and if

10   you could focus on the third item on the list, VO2 max?

11   Q.  Dr. Cole, I'm going to read portions of this description

12   into the record.

13        VO2 max, HP bleeder plus with additional ingredients,

14   usually 10MLs four to five fors prior to race.

15        Vasodilation benefits all performance animals because

16   it reduces cardiac exertion during performance.  Pharmaceutical

17   vasodilators are usually tested in most jurisdictions and

18   disciplines because they are proven to be effective sports

19   enhancing.

20        The formula is a proven oral preword designed for

21   Olympic athletes.  Best results are when used within two hours

22   of exertion, and results have lasted up to six to eight hours.

23        Dr. Cole, as a general matter, are you familiar with

24   the term VO2 max?

25   A.  Yes, I am.

1    Q.   What does that mean?

2    A.   It means the maximum amount of oxygen that an individual

3    consumes when they are exercising to their utmost or maximal

4    capabilities.

5    Q.   Does an increase in oxygen intake have any affect of the

6    performance of a racehorse?

7    A.   Yes, it certainly could.  The limitation for a horse racing

8    would be how intensely his or her muscles could work.  And if

9    they are exercising at maximal exertion, how long could they

10   continue to exert that level of exercise.

11        That is mostly governed by the amount of oxygen they

12   can consume.  That allows the muscles to continue to work and

13   be most efficient, producing very few byproducts, and

14   essentially continue to work very hard for a longer period of

15   time.

16        So anything that would improve their VO2 max would, in

17   theory, improve a horse's ability to race.

18        MS. MORTAZAVI:  Ms. Jung, if we could take down this

19   exhibit for a moment and please display government exhibit 166A

20   and 166AT?

21   Q.   We'll give our paralegals a moment, Dr. Cole.

22        MS. MORTAZAVI:  Your Honor, if I could have a minute?

23        THE COURT:  Sure.  We're a minute or two away from the

24   break, so why don't we take the afternoon break, and you can

25   figure out what's going on with the AV.  All the computers seem

1  a little slow down.

2           We'll take our afternoon break now.

3           Dr. Cole, I'm going to remind you you remain under

4  oath.  During the break, please don't talk about your testimony

5  with anyone during the break.  And ladies and gentlemen of the

6  jury, please leave your notepads on your seat, and I remind you

7  again, please do not discuss the case until all of the evidence

8  is in and you retire to deliberate.

9           Thank you.

M536GIA5                        Cole - Direct

1              (Jury not present)

2              THE COURT:  All right.  Dr. Cole, you may put your

3    mask back on and step down, and I'll see everyone back in about

4    10 or 15 minutes.

5              MS. MORTAZAVI:  Thank you, your Honor.

6              (Recess)

7              THE COURT:  You can be seated.

8              MR. FASULO:  I assume we should wait until the jury is

9    in before we call in our witness.

10             THE COURT:  Yes.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  All right.  Please be seated, everyone.

3    And would someone retrieve Dr. Cole?

4          (Pause)

5          THE COURT:  Thank you, Dr. Cole.  You can remove your

6    mask.

7          Ms. Mortazavi, please.

8          MS. MORTAZAVI:  Thank you, your Honor.

9          If I could ask our paralegals to please display

10   Government Exhibit 711 and turn to page 2?

11         THE COURT:  Gentlemen, please.

12         MS. MORTAZAVI:  And if we could please focus on item

13   number 4 on this list after VO2 max.  That's the homeogesic --

14   natural analgesic painkiller.

15   BY MS. MORTAZAVI:

16   Q.  I'm once again going to be reading portions of this

17   description out loud, Dr. Cole.

18         The combination of the three most common preparatory

19   product in global racing combined in one product with the most

20   value and benefit.

21         MSM and DMG are well documented in the racing

22   industry.  There are no published toxicities with the

23   recommended doses and should be considered with all performance

24   animals.  The literature regarding the benefits for both MSM

25   and DMG, in the equine athlete is endless.

1          Dr. Cole, you've testified previously that analgesics

2    can affect a horse's performance during a race, correct?

3    A.  Yes, I have.

4    Q.  That it might have the effect of masking a strain or an

5    injury; is that right?

6    A.  Correct.

7    Q.  Are you familiar with MSM?

8    A.  Yes, I am.

9    Q.  And DMG?

10   A.  Yes, I am.

11   Q.  What performance enhancing effect, if any, does MSM have?

12   A.  So MSM is methylsulfonylmethane.  And it is commonly used

13   as an anti-inflammatory agent.

14   Q.  What about DMG?

15   A.  It is an agent that has effects both as an antioxidant and

16   as a buffering agent.

17   Q.  What's a buffering agent?

18   A.  So when we spoke about exercising at maximal exertion and

19   the value of being able to provide adequate oxygen during

20   exercise, when those muscles are exercising, and they do not

21   have adequate levels of oxygen, they can still create energy,

22   but they must do it without the presence of oxygen or an

23   anaerobic capability.  That type of metabolism results in the

24   production of much more side products such as lactic acid and

25   other acidic products.  And, generally, it is felt that that

1    acidic accumulation lowers the PH in the muscles, and that

2    contributes to fatigue and tiring in the muscles.  And so a

3    buffering agent like DMG would be able to counteract some of

4    that aspect of the acidic acid.

5    Q.  If I understand it correctly, lactic acid build-up can lead

6    to fatigue?

7    A.  That's correct.

8    Q.  And a buffering agent helps reduce the lactic acid; is that

9    right?

10   A.  That's correct.

11          MS. MORTAZAVI:  Ms. Jung, can we please look at

12   number 5 on Government Exhibit 711, which is PSDS, also

13   described as a natural analgesic painkiller.

14   Q.  Once again, I'll be reading portions of this out loud and

15   asking you some questions, Dr. Cole.

16          This product is based on the original Panacin

17   formulation.  This has 2.5 times more D-phenylalanine than all

18   other compounded and production versions.

19          Intense exercise always involves an anaerobic

20   component and thus results in significant reductions in ATP, an

21   increase in muscle lactic acid, and an increase in tissue

22   acidity.

23          MS. MORTAZAVI:  Ms. Jung, if you could please turn to

24   the next page of this exhibit where the description of PSDS

25   continues.

1     Thank you.

2   Q.  With increasing acidity comes premature muscle fatigue with

3   an associated decrease in performance.  The typical dose is

4   5MLs and the last dose is usually administered four to six

5   hours prior to strenuous exercise.

6         Dr. Cole, I read out loud a number of different terms

7   here.  Are you familiar with D-phenylalanine?

8   A.  I am.

9   Q.  What is that?

10  A.  It's a phenylalanine is an amino acid which is one of the

11  very basic building blocks for a number of different tissues,

12  including neurotransmitters and proteins.

13  Q.  And we've already discussed previously the ways in which an

14  analgesic or a painkiller can improve a horse's race

15  performance, correct?

16  A.  Correct.

17  Q.  In this description with increased acidity -- with

18  increasing acidity comes premature muscle and fatigue with an

19  associated decrease in performance.  Do you interpret that to

20  be the build-up of lactic acid we spoke of a minute ago?

21  A.  Yes, I do.

22        MS. MORTAZAVI:  All right.  Ms. Jung, if we could take

23  this down and look at number 6 on Government Exhibit 711, which

24  is Equi-Mass PG-2 (muscle growth factor)

25        Human growth hormone is a highly controlled substance

1    and has many permanent negative side effects, making it

2    dangerous to both purchase and use.  Modified growth factor

3    specially targeted to muscle tissue are neither controlled nor

4    proven dangerous.  It's a unique product and specific for

5    equine athletes.  The product has been safely used in many

6    jurisdictions five days out, although we recommend seven days

7    for complete elimination.  Usually a vial is administered IM or

8    IV every three to five days for a series of three to four

9    shots.

10            Dr. Cole, are you familiar with growth factors?

11   A.   I am.

12   Q.   What are those?

13   A.   Growth factor is a very nonspecific term for any substance

14   or cytokine that's made in the body that would stimulate growth

15   and development or division of tissue or specific cells.

16   Q.   And are you also familiar with human growth hormone?

17   A.   Yes, I am.

18   Q.   Is there any performance enhancing effect that could result

19   in giving human growth hormone to a horse?

20   A.   I don't think it's clear how much of a cross-reactivity --

21   in other words, human growth hormone is actually a hormone that

22   is produced synthetically for use in humans.  But there is a

23   great deal of similarity between the structure of equine growth

24   hormone and human growth hormone.

25            In athletes, it has a natural function.  Obviously, in

1   young, immature humans or horses, growth hormone is responsible

2   for the growth and development and maturation of, among other

3   things, the musculoskeletal system, so increasing muscle mass

4   and increasing bone formation.

5           So assuming there is a fair amount of cross-reactivity

6   between equine growth hormone and human, if this was

7   administered to a horse, especially a young and still-growing

8   horse, you'd expect to see increased muscle mass as well as

9   increased bone development.

10  Q.  Could that improve a horse's race performance?

11  A.  Yes.  I think typically we associate larger horses with

12  having a longer stride, larger muscle being able to have,

13  again, increased performance.  It's not definitive, but it is

14  certainly something that we think is an advantage for the

15  horses to be larger and more fully developed.

16  Q.  And in this description, there's a reference to this

17  product having been safely used in many jurisdictions five days

18  out.  Are you familiar with that phrase, X many days out?

19  A.  Yes.  It's typically used when one is referring to the

20  amount of days, weeks, or hours when you withdraw the drug in

21  order to avoid the detection of the drug by the testing

22  authorities.

23  Q.  And how many days out from what event or circumstance?

24  A.  Race is generally what we're concerned with.  Most often,

25  most of the horses are tested post-race in the U.S., although

1   there is some testing that's being done during other time

2   periods of training.  But certainly, in all the jurisdictions

3   I'm aware of, post-race testing is very standard.

4           MS. MORTAZAVI:  Ms. Jung, can we look at number 7 on

5   Government Exhibit 711, which is GNRH factrel, androgenic

6   hormone.

7           I'm going read out one portion of this description.

8   This product is best used for sulking horses.  Typically half

9   to full bottle is used four to six hours prior to strenuous

10  exercise.

11  Q.  Dr. Cole, are you familiar with the concept of GNRH?

12  A.  I am.

13  Q.  What is that?

14  A.  It is an acronym for gonadotropin-releasing hormone.

15  Q.  What does that do?

16  A.  It's generally released by the hypothalamus, which is a

17  gland in the brain.  It acts on the pituitary gland, and it

18  causes the release of two hormones, luteinizing hormone, or LH,

19  and follicle stimulating hormone, or FSH.

20          In young and intact male horses, that will cause the

21  production of testosterone.  And in young fillies and mares, it

22  will cause a production of the maturation of follicles and

23  ovulation, and typically alter their endocrine cycle, so their

24  reproductive cycle.

25  Q.  What effect does that have on a racing horse?

1    A.  Well, certainly, an intact male would cause a production of

2    more testosterone.  So I think most of us are familiar with

3    testosterone increasing muscle mass and development, so this

4    would be above and beyond what the normal intact male horse

5    would produce.

6         In fillies and mares, the effect would more likely to

7    be simply altering their reproductive cycle.  And so sulking

8    tends to be the term used when horses are not really excited

9    about their training, maybe not particularly aggressive in

10   their training, they may not be finishing up their feed, they

11   may be a little depressed.  And so what you're trying to do

12   with these mares would be to circle their hormones in order to

13   get them in a better state physiologically and more interested

14   in training.

15   Q.  Can that improve a horse's attitude during a race?

16   A.  Yes.  Absolutely.

17        MS. MORTAZAVI:  Ms. Jung, can we please display

18   Government Exhibit 4028 and 4029, which were photographs taken

19   during a premises search of a location associated with

20   Seth Fishman in Florida?

21        For the record, these photographs are bottles of

22   something labeled GNRH.

23        Ms. Jung, can you please now display 1507 and then

24   1405?

25        For the record, 1507 is a photograph of a drug seized

1    from the premises search of Mount Hope Training Center.  And

2    Government Exhibit 1405 is a drug seized during a premises

3    several of the Golden Shoe Training Center.

4         And we can take these exhibits down.  And if we could

5    please return to Government Exhibit 711, page 3.

6         And looking at the bottom of the page, ITTP plus

7    (increase oxygen release in blood).  I'm going to be reading

8    out portions of this description.

9         Most people are using half bottle night before and

10   remainder of bottle four to five hours before event.  And,

11   earlier, ITPP plus other ingredients.

12   Q.  Dr. Cole, are you familiar with, in general, terms a

13   substance called ITPP plus?

14   A.  ITTP, yes.

15   Q.  What is that?

16   A.  It generally refers to inositol tripyrophosphate.

17   Q.  Is that an approved drug?

18   A.  It is not approved drug.

19   Q.  What is it?

20   A.  It's a chemical that has been studied primarily in

21   laboratory rodents.  It is a drug that binds to hemoglobins.

22   So when we spoke earlier about the importance of oxygen being

23   delivered to the muscles in terms of maintaining exercise

24   performance, that oxygen is carried in the blood by the red

25   blood cells when it is bound to a compound called hemoglobin.

1    What ITTP plus does, it alters the binding of oxygen

2    to the hemoglobin molecule and facilitates release of the

3    oxygen into the muscle.  So in the mice that were treated with

4    this particular compound, they ran longer and produced higher

5    VO2 maxes than mice that were not treated with this compound.

6    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. MORTAZAVI:

2   Q.  Has the use of this drug on horses been the subject of any

3   study as far as you know?

4   A.  There is a study that was conducted in Hong Kong that was

5   primarily interested in being able to detect the presence of

6   the compound in samples collected from treated horses.

7          To my recollection, there was no studies looking at

8   the safety or efficacy of the compound in the horse.

9   Q.  And in your experience, is it possible to safely conclude

10  that a drug will have the same effect on a rodent as on a

11  horse?

12         MR. FASULO:  Objection as to form.

13         THE COURT:  Overruled.  The answer will stand.  Did

14  you answer.  You may answer.

15         MS. MORTAZAVI:  Could you have the court reporter read

16  the question back, please.

17         (Record read)

18  A.  No, it is not.

19  Q.  Why not?

20  A.  The metabolic enzymes, for one, in a mouse can be very

21  different in a horse.  So the way the horse processes a

22  compound will be very different.

23         So a compound that is safe and effective in a horse at

24  a particular dose, may be very different from that which could

25  be used in any rodent species.

M53BGIA6                    Cole - Direct

1      MS. MORTAZAVI:  Ms. Jung, could we please return to

2   Government Exhibit 711 and turn to page 4, and specifically

3   item number 13 on that page which is at the very bottom.

4      Once again, Dr. Cole, I'll read portions of this out

5   loud and then ask you some questions.

6      "ACTH in small doses will act as natural

7   anti-inflammatory, larger doses 2CC or more will act as

8   sedation.  With testing with corticosteroids there are not many

9   viable options left."

10      Ms. Jung, can we turn to the next page where this

11   description continues.

12      It has been recommended that in jurisdiction that test

13   cortisol levels only 250 IU's be sued. The typical dose is 250

14   IU's four to six hours prior to exercise."

15   Q.  Dr. Cole, are you familiar with ACTH?

16   A.  Yes, I am.

17   Q.  What is that?

18   A.  It is adrenocorticotropic hormone.

19   Q.  So is that a hormone?

20   A.  It is a hormone.  It is naturally produced by the pituitary

21   gland and it acts on the adrenal gland in the body to, among

22   other things, release cortisol which is an endogenously or

23   naturally produced corticosteroid.

24   Q.  And what, if any, performance enhancing effect can that

25   have on a racehorse?

M53BGIA6                    Cole - Direct

1   A.  As we discussed, if a horse has an inflammatory-based

2   injury of some kind that is causing him pain, by taking away

3   that pain with this anti-inflammatory agent, you can allow the

4   horse to compete at a normal level of which he typically would

5   not with the presence of this injury.

6   Q.  Is there a difference between reducing inflammation caused

7   by injury and healing injury?

8   A.  Yes, there is.

9   Q.  And what is that?

10            JUROR: Judge, we lost our monitors.

11            MS. MORTAZAVI:  Your Honor, we may have a hard copy or

12   two of this exhibit.  If the seating is uncomfortable, we can

13   hand that up.

14            JUROR: It came back up.

15            THE COURT:  Why don't you just flag me if it goes out

16   again.  We'll try to get it fixed before the morning.

17            Thank you.

18   BY MS. MORTAZAVI:

19   Q.  Dr. Cole, I believe you were answering what the difference

20   is between reducing inflammation caused by injury and healing

21   the injury.

22            Could you continue.

23   A.  I think the most important difference would be a timing.

24   So if, for example, you stepped off the curb in New York City

25   and sprained your ankle, it would be fine to administer an

1   anti-inflammatory agent.

2           Once the severity of that injury had been diagnosed,

3   the doctor may give you that anti-inflammatory, tell you to

4   stay off the limb for seven to ten days, whatever, in order to

5   help heal and limit further damage.

6           If, however, you did not get that damaged ankle

7   assessed and maybe it had a ligament or a tendon tear, the use

8   of an anti-inflammatory that allowed you to continue to walk

9   around on the ankle would really be contradicted because you

10  might do additional damage.

11          So the same drug can be used, it really is a timing or

12  understanding of what is causing that inflammation and pain in

13  whatever limb is affected.

14          MS. MORTAZAVI:  Ms. Jung, could we return to

15  Government Exhibit 711, page 5, and look at item 14 on the

16  list, which is oxygenator, increased oxygen release in blood.

17          "ITPP upon initial studies was quite promising for the

18  equine athlete.  Renowned Dr. Tobin who consults with all

19  jurisdictions had to synthesize a sample for Hong Kong for

20  testing purposes in 2012.

21          Oxygenator has a combination of a unique complex sugar

22  and MSM mixed by biochemist and not compounders.  The suggested

23  use is 10 to 15 cc IV 24 hours out and another 10 to 15 cc four

24  hours prior to event."

25  BY MS. MORTAZAVI:

M53BGIA6                    Cole – Direct

1  Q.  Dr. Cole, you already testified about the performance

2  enhancing affect of increased oxygen in a racehorse, correct?

3  A.  Correct.

4  Q.  Let me ask you.  There's a reference here to Hong Kong for

5  testing purposes.

6          In the context of your field, what do you understand

7  that to be a reference to?

8  A.  Hong Kong is the laboratory that conducted the study on

9  ITPP in order to detect it.  The Hong Kong laboratory is

10 probably one of the best drug testing programs in the world.

11 Q.  Best drug testing programs for what kind of animal or

12 athlete?

13 A.  For the horseracing.

14         MS. MORTAZAVI:  Ms. Jung, if we could turn back to the

15 exhibit number 15 on the itemized list which is written here as

16 Heptamamo B12 mild blood builder, and I'll again read portions

17 of this.

18         "Facilities energy availability during exercise, and

19 provides a potent anti-catabolic effect to limit muscle damage

20 during exercise.

21         During exercise, large amounts of glutamine are lost

22 from muscle tissue.  As the provider of glutamine, OAK has a

23 potent anti-catabolic effect, i.e.,  helps prevent tissue

24 breakdown, especially muscles."

25 BY MS. MORTAZAVI:

1   Q.  Dr. Cole, have you heard of the term blood builder?

2   A.  I have.

3   Q.  What is that?

4   A.  As we discussed, anything that generally increases the

5   number of red blood cells that are circulating in the body

6   would be considered a blood builder.

7   Q.  And what performance enhancing effect can it have to

8   increase the red blood cell count in a racehorse?

9   A.  Since the red blood cells are the primary source for

10  carrying oxygen to the muscles, increasing the number of red

11  blood cells is one of the mechanisms by which we try to improve

12  athletic performance.

13  Q.  What are some examples of non-blood builder drugs that

14  you're aware of?

15  A.  Probably the most commonly known one at this point is

16  called erythropoietin, or commonly referred to as epo.

17  Q.  Are you familiar with the term Epogen?

18  A.  That would be the trade name for erythropoietin.

19  Q.  Are familiar with the Epogen?

20  A.  Yes, I am.

21  Q.  Is that approved for use on racehorses?

22  A.  It is not.

23  Q.  Have you heard of the term "EPO mimetic"?

24  A.  Yes.  Once Epo was developed, there had been at number of

25  similar hormones, and for modifications, and these are commonly

M53BGIA6                    Cole - Direct

1    referred to as Epo mimetic, they have the same effect in that

2    they work on the level of the bone marrow to increase red blood

3    cell production.

4    Q.  And from your work with the Florida Division of Pari-mutuel

5    Wagering, do you have an understanding of whether Epo may be

6    used on racehorses?

7    A.  In the state of Florida, the administration of Epo or Epo

8    like drugs is a prohibited practice.

9    Q.  Is that a prohibited practice on race day?

10   A.  It is prohibited at any time for a horse that's under the

11   supervision of the Division of Pari-mutuel Wagering.

12   Q.  Dr. Cole, you've reviewed the entirety of Exhibit 711 prior

13   to today, correct?

14   A.  Yes.

15   Q.  Was there a drug listed on here on the itemized list called

16   BB3?

17   A.  Not that I recall.

18          MS. MORTAZAVI:  Ms. Jung, could you please display

19   Government Exhibit 709, which is in evidence as a record

20   retrieved from a computer that was seized from Lisa Giannelli's

21   residence, and could you please turn to page 3 of that list.

22   Looking at the very bottom category, doc.  I'm going to ask our

23   paralegal to highlight the line that has DBB3.

24   Q.  Do you see a price listed next to BB3?

25   A.  250.

M53BGIA6                    Cole - Direct

1    Q.  Thank you.

2           MS. MORTAZAVI:  Ms. Jung, could we please turn back to

3    Government Exhibit 711 and turn to page 5, please.  I'd like to

4    look at number 16 on that itemized list which is EGH, increases

5    testosterone.

6           Once again, Dr. Cole, I read out portions of this.

7           DHEA is a prohormone that is predominantly used in

8    human athletes to increase testosterone levels. Using

9    testosterone by itself alters the ratios and much more easily

10   detected.  Giving one shot a week has never caused levels to

11   test positive.

12          In some cases in HK people using two shots per week

13   for more than four weeks had pushed the upper limits of

14   testosterone limits."

15   Q.  Dr. Cole, are you familiar with the term EGH?

16   A.  I am.

17   Q.  What is that?

18   A.  It would appear to be an acronym for equine growth hormone.

19   Q.  And you talked about human growth hormone, can you explain

20   what equine growth hormone is?

21   A.  So that would be the equivalent hormone in the horse as is

22   indicated very similar in the peptide structure to human growth

23   hormone, but there are some subtle differences.

24          And its effect would be similar as previously

25   described increasing in muscle mass and bone formation.

M53BGIA6                    Cole - Direct

1   Q.  Are there any commercially available versions of EGH in the

2   United States as far as you know?

3   A.  Not as far as I'm aware.

4   Q.  Are you familiar with the term DHEA?

5   A.  I am.

6   Q.  What is that?

7   A.  It is dehydroepiandrosterone.

8   Q.  What effect can that have on a racehorse?

9   A.  It is pre-testosterone compound.  So when administered, it

10  is converted into testosterone.

11  Q.  And you've already testified that increased testosterone

12  can improve a horse's race performance?

13  A.  Yes.

14  Q.  Can you tell us in what ways?

15  A.  So I think the easiest way to understand would be the

16  difference between a Filly and a Colt.  So the Colt being

17  intact.  Stallions or intact males, generally are heavier, more

18  muscle, larger horses than the Fillys.

19          So, occasionally more testosterone is administered

20  even to intact males.  It certainly is used in Fillys and

21  Jeltrin to improve the production of testosterone.  Making

22  these horses larger, fitter, and it also has some effects on

23  mentation, so making them particularly more aggressive which

24  some may interpret to be as a better racehorse.

25          MS. MORTAZAVI:  Ms. Jung, if we can turn back to that

M53BGIA6                    Cole - Direct

1    page and go to page 6 of Government Exhibit 711.  I'd like to

2    look at item number 17 which is Equifactor, and again I'll be

3    reading portions of this out loud.

4            "The peptide was studied for years and the human

5    version contains a carry molecule that is easily detected.

6    Since the molecule is altered, the labs could never detect

7    unless a snitch tuned a bottle in and the racing authorities

8    decided to make a test.  This is highly unlikely, but a

9    possibility."

10   BY MS. MORTAZAVI:

11   Q.  Dr. Cole, you testified previously that you have worked on

12   developing drug tests for novel performance enhancing drugs; is

13   that right?

14   A.  That's correct.

15   Q.  Why have you engaged in that work through the racing

16   laboratory?

17   A.  For our line of business, whenever a new drug is detected

18   and we start to test for it, we certainly recognize that those

19   who want to not follow the rules can go out and seek the next

20   new, better drug, something different that can evade our

21   ability to detect them, so it's a constant -- constant

22   improvement plan within the laboratories to try to find new and

23   novel compounds that are being administered to the horses.

24   Q.  And if someone were to turn a bottle of a particular drug

25   into your testing laboratory, would that facilitate your

M53BGIA6                    Cole - Direct

1    ability to design a drug test?

2    A.   Yes, that would be the holy grail of the ability to detect

3    new substances that are being abused.

4    Q.   Can you explain?

5    A.   Then you would have to not be looking in a urine or a serum

6    sample collected from a horse, but you actually know what that

7    molecule is in a very high concentration, and you're able to

8    develop a test directly from the molecule itself.

9         MS. MORTAZAVI:  Ms. Jung, if we could turn to the last

10   page of Government Exhibit 711, that's item number 19 on the

11   list, which is serenity sedation.

12        And once again I'll read out portions of this and ask

13   you sos question, Dr. Cole.

14        "It's an anti-anxiety for the most part.  Takes away

15   stress without affecting performance.  Typically 5-10 cc IV

16   four to six hours before event."

17   BY MS. MORTAZAVI:

18   Q.   Dr. Cole, have you studied the affect of sedatives on

19   racehorses?

20   A.   Yes, I have.

21   Q.   Can those improve a horse's race performance?

22   A.   Yes.  Somewhat counterintuitive, but particularly in very

23   young horses first starting out in racing, one of the issues

24   that they have is anxiety or stress associated with race day.

25        When a horse first goes out on the track, first few

1    time they race, there's a crowd, there's a lot of horses and

2    activity, and the horses could become very nervous.

3            So a small amount of sedative something to, quote,

4    unquote, take the edge off the horse, can actually improve the

5    horse's performance, rather than thinking about a sedative not

6    being performance enhancing.  It actually can,  we believe,

7    help the horse race.

8    Q.  And you've already testified I believe Dr. Cole that the

9    most strenuous event a racehorse will face is the race?

10   A.  That's correct.

11           MS. MORTAZAVI:  No further questions, your Honor.

12           THE COURT:  Mr. Fasulo.

13           MR. FASULO:  If the government can put up 711 for me,

14   please.

15   CROSS-EXAMINATION

16   BY MR. FASULO:

17   Q.  Good afternoon, Doctor.

18   A.  Good afternoon.

19   Q.  Doctor, first of all, how many years of studies did you do

20   postcollege graduate to get to where you are today?

21   A.  Official training, probably about 14.

22   Q.  Let me ask you, you had a chance to review these products

23   prior to coming here today, correct?

24   A.  Yes.

25   Q.  And you looked at this entire list, correct?

1   A.   Correct.

2   Q.   Number one through -- if we can just skip through the page

3   1 through 19, correct?

4   A.   Yes.

5   Q.   And you did an analysis based on what you read here and

6   your background of these items, correct?

7   A.   Correct.

8   Q.   You didn't do a chemical analysis, however, correct?

9   A.   I did not do a chemical analysis.

10  Q.   There was no looking into what compounds were actually in

11  any of these products, correct?

12  A.   That is correct.

13  Q.   And you based your analysis on your past experience with

14  the names that they are given, correct?

15  A.   The names they're given and the description of what they

16  produce.

17  Q.   And the description that were put into the items, correct?

18  A.   Correct.

19  Q.   And you weren't aware of any chemical analysis done on any

20  of these products, were you?

21  A.   I am not.

22  Q.   And you would agree that your testimony then is based on

23  what you read, but not necessarily what the compounds were

24  actually composed of?

25  A.   That is correct.

1   Q.  I'd like you to look at what's been marked as Government

2   Exhibit 709.  I think at some point in the testimony you were

3   asked to take a look at that.

4          Do you remember seeing this at all during the

5   testimony?

6   A.  Yes, I do.

7   Q.  Did you have this during the course of your analysis in

8   this case?

9   A.  I did not.

10  Q.  You did not.

11         Prior to coming here today to testify, you had met

12  with the government, right?

13  A.  Correct.

14  Q.  And the government had instructed you on certain things

15  that they'd like you to do in regard to your testimony,

16  correct, certain research, certain conclusions that they would

17  like to figure out if you can reach, correct?

18         Let me rephrase that.

19         The government asked you to evaluate certain

20  documents, correct?

21  A.  Correct.

22  Q.  And the government asked you to give your opinions on those

23  documents; is that fair to say?

24  A.  That is correct.

25  Q.  And then they asked you to give reports regarding those

1    opinions, correct?

2    A.   That is correct.

3    Q.   And you did all of that, right?

4    A.   Correct.

5    Q.   And in the process, you looked at both the information the

6    government gave you, correct?

7    A.   Yes.

8    Q.   And you used your own information base as well, correct?

9    A.   Correct, access to published literature.

10   Q.   And you used your prior experience and expertise in doing

11   that analysis?

12   A.   Correct.

13   Q.   And you were also a licensed vet you stated, correct?

14   A.   That's correct.

15   Q.   And you're licensed in the State of Florida, correct?

16   A.   That's correct.

17   Q.   So I'd like you to look at this document which is 709.   I

18   want to take you through a couple of the categories in 709.

19   I'd like to begin with the first one.  You see that category.

20   If we can highlight that for the doctor.

21        You see this list of items?

22   A.   Yes, I do.

23   Q.   Are you familiar with any of the items as written here?

24   Take your time.

25   A.   Quite a few of them that's written here.

1   Q.  Would you agree some of the items here are vitamins?

2   A.  Yes.

3   Q.  And some of the items here are prescription medications,

4   correct?

5   A.  Some of these items should only be distributed as

6   prescription products.

7   Q.  And would you also agree with me when it says adrenals

8   thyroid-glands, would you agree that these items have to do

9   with that heading, if you can give us an opinion on that?

10  A.  Some of these would be related to adrenal thyroid-gland if

11  that's what you're referring to?

12  Q.  Yes.

13  A.  Some of them would not.

14  Q.  And if we can go to the next part of this document which

15  says anti-inflammatory, relax pain.

16          You see this list?

17  A.  I do.

18  Q.  And can I draw your attention to what I marked.  You see

19  the little blue line going down there?

20  A.  Yes.

21  Q.  You see the word "Banamine"?

22  A.  Yes.

23  Q.  And flunixin?

24  A.  Yes.

25  Q.  Can you tell me, are you familiar with those products?

1    A.  Yes.

2    Q.  And are you familiar with what those products can do in

3    relationship to horses?

4    A.  Yes.  They are actually the same product.  Banamine is a

5    brand name for the drug name flunixin meglumine.  They are

6    commonly used non-steroidal anti-inflammatory drugs.  And

7    similar to with humans, something like Aspirin or Ibuprofen

8    would be their effects.

9    Q.  Would you agree that there are legitimate reasons for a

10   veterinarian or for somebody to use this on a horse?

11   A.  Yes.

12          MR. FASULO:  If we can go to the next page of the

13   document, please.  If we can highlight antibiotic and lung

14   repair.

15   Q.  You see under the words antibiotic and lung repair on

16   what's been marked in evidence as Government Exhibit 709.  You

17   see that?

18   A.  I do.

19   Q.  Again to be fair, doctor, you haven't had an opportunity to

20   do an analysis on these items prior to coming here and

21   testifying?

22   A.  That is correct.

23   Q.  And I'd like to take your attention down on this document

24   to where I marked with the blue.  Are you familiar with that

25   drug?

1    A.  I am.

2    Q.  And what is that drug do?

3    A.  It is an antibiotic.

4    Q.  Would it be your testimony here today that that drug has a

5    legitimate purpose for the treatment of horses under the proper

6    conditions?

7    A.  Correct, yes, I would.

8    Q.  And as you look at the drugs, if you can just give yourself

9    a moment to look at the drugs in column one and column two?

10   A.  Yes.

11   Q.  I asked you to look at the drugs I'm marking right here,

12   and I'm marking it only cause it's easier to mark it than to

13   try to pronounce it.

14          Are you familiar with that item?

15   A.  I am.

16   Q.  What is that?

17   A.  Neomycin is another antimicrobial drug.

18   Q.  What would be the use of that item in relationship to

19   treating horses?

20   A.  It is a very -- it would be a very unusual drug to

21   administer orally to horses because it is can be very toxic.

22   It is generally more often used as a topical application.

23   Q.  And if we look down one after that, Neopolybac eye

24   ointment, are you familiar with that?

25   A.  That would be more of what I was just referring to,

1   Neomycin and Polysporin, Bacitracin, so an eye ointment more

2   for administration if a horse has a scratched or irritated eye.

3   Q.  That would be the more normal way of treating it rather

4   than through the oral method, correct?

5   A.  Correct.

6   Q.  And that would be your judgment as a vet whether to use one

7   or the other, correct?

8   A.  Correct.

9   Q.  After you look at the horse, evaluated its condition, and

10  had the history of that horse, correct?

11  A.  Correct.

12  Q.  I'd like to go to now the next page, please.

13          Doctor, I'd like you to look at what, if I can

14  highlight this, please.

15          If you can take a look at the drugs listed here?

16  A.  Yes.

17  Q.  If I could draw your attention specifically, let's say to

18  the one I marked, Vitamin K?

19  A.  Yes.

20  Q.  Does that drug have something to do with bleeding and

21  breathing?

22  A.  Vitamin K is a component of the clotting cascade, so it is

23  important to be present for a horse to have adequate clotting.

24  Q.  Is that something that you can buy over-the-counter or is

25  it prescription if you know?

1    A.  I suspect that it is readily available.

2              MS. MORTAZAVI:  Objection.

3              THE COURT:  Sustained.  Do you know, doctor?

4              THE WITNESS:  No.

5    BY MR. FASULO:

6    Q.  Doctor, do you have an opinion -- do you have a basis for

7    knowing whether vitamins are readily available over-the-counter

8    or not readily available as it relates to horses?

9    A.  Vitamins are readily available over-the-counter.

10   Q.  I'd also like you to look here at something called this RX

11   Bleeder and the bleeding paste.  You see those?

12   A.  I do.

13   Q.  Are you familiar with those items?

14   A.  I am not.

15   Q.  Are you familiar with items known as bleeding paste?

16   A.  I'm aware of many items that are listed for sale with these

17   types of trade names.

18   Q.  And during the course of your experience and expertise and

19   research, have you looked into bleeders?

20   A.  We have done -- I've participated in research projects

21   evaluating exercise induced pulmonary hemorrhage in horses.

22   Q.  Would they be commonly known as bleeders?

23   A.  Yes.

24   Q.  You so you did do that research, correct?

25   A.  Yes.

1  Q.  Is there a legitimate purpose for the prescribing of what

2  we would call in laymen's terms "bleeders"?

3  A.  I don't think I understand the question.

4  Q.  As a vet, would it be proper for a veterinarian to

5  prescribe this medication to a horse to address certain

6  conditions?

7          THE COURT:  What medication?

8          MR. FASULO:  Bleeders as she stated.

9  A.  If you're referring to these specific products?

10  Q.  I'm not referring to any of the specific products.

11          In your experience and expertise as looking at

12  bleeders, I'm asking you whether they have a legitimate purpose

13  in diagnosis and treatment as a veterinarian?

14  A.  No.

15  Q.  When would somebody use a bleeder in your experience, in

16  your research what did you find?

17  A.  The difficulty I'm having is I don't know what a bleeder

18  medication is.

19  Q.  I'm asking you --

20          THE COURT:  I think you're misstating her testimony.

21  Q.  You stated you did some research in this area, correct?

22  A.  I studied the pathophysiology of that condition in horses.

23  Q.  And did you also study what treatment would be appropriate

24  if a horse suffered that deformity or injury or condition?

25  A.  I personally have not conducted any studies on the efficacy

1    of any drugs on the condition of bleeding or exercise induced

2    pulmonary hemorrhage.

3    Q.  Are you aware as an expert of the efficacy any drugs that

4    directly have an effect on that condition?

5    A.  I am.

6    Q.  And what drugs would have an affect on that condition?

7    A.  The only drug that I have seen evidence to support the

8    efficacy for the treatment or prevention of EIPH in horses is

9    furosemide.

10   Q.  Is that a condition that exist -- what is your

11   understanding of that as it relates to horses?

12             Is it prevalent in horses or not prevalent in horses?

13   A.  EIPH is prevalent in all horses that exercise to a very

14   intense extent.

15   Q.  Would you consider racing horses to be in that category?

16   A.  Yes, I would.

17   Q.  I'm going to skip to page 4 if I may.  I'd like to draw

18   your attention to the section there.

19             Are you familiar with fluids, electrolytes and

20   drenching?

21   A.  Yes, I am.

22   Q.  If you can take at look at these items.

23   A.  Yes.

24   Q.  I draw your attention to this itemize mark.  It says S

25   saline fluids?

1  A.  Yes.

2  Q.  Are you familiar with that?

3  A.  Yes.

4  Q.  What would saline fluids be used for in the treatment for

5  the addressing of conditions within a horse if you know?

6  A.  Dehydration.

7  Q.  Would that be also true of electrolytes for dehydration?

8  A.  Yes.

9  Q.  How would both saline fluids or electrolytes be

10  administered to a horse to address dehydration if you know,

11  what are the ways?

12  A.  The most efficient and particularly if a horse is severely

13  dehydrated would be an intravenous infusion of saline, a

14  sterile saline solution.

15         If the horse is mildly dehydrated and stable, you

16  could administer -- and you felt it was still electrolyte

17  imbalanced -- you could administer -- give him access to water

18  that had been supplemented with electrolytes.

19  Q.  I'd like to turn to page -- I think it's page 10.

20         I'd like to highlight this section, please.

21         I'd like you to look at the items that are listed here

22  under the subheading tie-up muscle.

23         Does tie-up have any meaning to you as a veterinarian

24  or somebody who studies racehorses?

25  A.  Yes.

M53BGIA6                    Cole - Cross

1    Q.   What does that mean?

2            What do you understand that to mean?

3    A.   Some horses in particular seem to be subject to a disease

4    of the muscles that will cause them to cramp and become very

5    painful, either through anxiety or following work, particularly

6    if it's a work that's more intense than the horse has been

7    trained up to.  We typically refer to that as horse being tied

8    up.

9    Q.   You see this list over here, sodium bicarbonate, are you

10   familiar with that item?

11   A.   I am.

12   Q.   What is that?

13   A.   Sodium bicarbonate is a buffering agent.

14   Q.   Is it a medication or what are the components of the sodium

15   bicarbonate?

16   A.   It is a chemical.

17   Q.   And what would be the use of the sodium bicarbonate as it

18   relates to a horse?

19   A.   So if the horse was in -- it depends on the situation of

20   the horse.  If the horse was say in surgery for colic, severity

21   acidotic you might administer sodium bicarbonate to correct

22   that imbalance.

23           It has been administered as a prerace administration

24   for performance enhancing purposes as well.

25   Q.   This item here Robaxin methocarbamol, are you familiar with

1   something --

2   A.  I am.

3   Q.  What is that?

4   A.  It is a very mild muscle relaxant.

5   Q.  What would be the purpose of a veterinarian or somebody

6   using this on a horse?

7   A.  There are some individuals that believe that it helps in

8   the prevention or treatment of tying up in a horse.

9   Q.  You don't agree with that?

10  A.  I'm not a fan.  I'm unaware of any literature to support

11  the use of Robaxin in tying up.

12  Q.  You will agree that certain vets would use this at certain

13  times?

14  A.  I would agree.

15  Q.  Finally, last thing, are you familiar with the term Lacto

16  15 here?

17  A.  I am not.

18  Q.  How about magnesium sulfate?

19  A.  Yes, I am.

20  Q.  And what is magnesium sulfate?

21  A.  Similar to sodium bicarbonate, it is both magnesium and --

22  is an electrolyte.  There are very rarely horses that are

23  deficient in magnesium, but it is a required electrolyte that

24  is regulated in a horse.

25  Q.  And how is it usually administered to a horse?

1  A.  Usually intravenously.

2          MR. FASULO:  May I have a moment.

3          THE COURT:  Sure.

4  Q.  Now, you were asked during your direct examination on the

5  idea of the most strenuous exercise a horse would get, and I

6  believe your testimony was, it was probably in the races,

7  correct?

8  A.  That's correct.

9  Q.  You would agree that there are also strenuous exercises

10  that a horse would engage in before races in training?

11  A.  I would agree with that statement.

12  Q.  And you would agree that conditions can come up during the

13  time of training a horse as well as during the time of racing

14  the horse, correct?

15  A.  That's correct.

16          MR. FASULO:  If I can have one moment?

17          THE COURT:  Yes.

18          MR. FASULO:  Doctor, thank you for your testimony here

19  today.  No further questions.

20          THE COURT:  Thank you.

21          MS. MORTAZAVI:  Brief redirect.

22          If I may approach the witness and hand her a copy of

23  Government Exhibit 711 in hard copy.

24          THE COURT:  Yes.

25          MS. MORTAZAVI:  I'll just show it to Mr. Fasulo.

1   REDIRECT EXAMINATION

2   Q.  Good afternoon again, Dr. Cole.

3           Do you recall being asked some questions about

4   Government Exhibit 709, which was a few sheets of paper that

5   just had rows of various different drugs and other items listed

6   on it?

7   A.  Yes, I do recall.

8   Q.  Do you recall being asked about several categories within

9   that itemized list?

10  A.  Yes.

11  Q.  And do you recall stating that some of the itemized items

12  were prescription drugs?

13  A.  Correct.

14  Q.  Would you expect a non-veterinarian to sell those

15  prescription drugs?

16  A.  It's possible.

17  Q.  Would you expect a non-veterinarian to legally sell those

18  prescription drugs if there was no prescription?

19          MR. FASULO:  Objection, Judge, as to legally.

20          THE COURT:  As to what?

21          MR. FASULO:  The word "legally."

22          THE COURT:  Sustained.

23          Rephrase your question.

24  Q.  In your experience, Dr. Cole, are most prescription drugs

25  typically being distributed when there is a prescription for

1   them?

2   A.  Yes.

3   Q.  And I believe you testified earlier that in the State of

4   Florida and in your work through the Florida Racing Laboratory

5   that you have become familiar with the rules and regulations in

6   the State of Florida, correct?

7   A.  Correct.

8   Q.  And from your familiarity with those rules, are trainers

9   permitted to have prescription drugs if they have no

10  prescription?

11  A.  No, they are not.

12  Q.  You were also asked if there were certain drugs that had

13  legitimate medical or therapeutic purposes, do you recall those

14  questions?

15  A.  I do.

16  Q.  Can certain drugs be used to treat a sick animal?

17  A.  Yes.

18  Q.  And can those same drugs also be abused to enhance the

19  performance of a healthy animal?

20  A.  Yes, it's possible.

21  Q.  Do you recall being asked questions about a few different

22  drugs.  I'm going to list them starting with penicillin.  Do

23  you recall being asked about that?

24  A.  Yes, I do.

25  Q.  And do you recall being asked about phenylbutazone?

1   A.  Yes, I do.

2   Q.  Do you recall being asked about Banamine?

3   A.  Yes, I do.  I actually don't know if phenylbutazone was

4   actually listed or discussed.

5   Q.  Do you recall being asked about Bute?

6   A.  Not particularly, but Banamine.

7   Q.  Penicillin and the Banamine you recall.

8           And those items were on Government Exhibit 709,

9   correct?

10  A.  Yes.

11  Q.  Were any of those items on Government Exhibit 711, which we

12  reviewed during the course of your testimony today?

13  A.  No, they were not.

14  Q.  You were also asked about something called neomycin oral.

15  Do you recall that?  I may be mispronouncing it and you can

16  correct me.

17  A.  The neomycin, yes.

18  Q.  Thank you.  Do you recall your testimony that that was

19  toxic?

20  A.  It can be, yes.

21  Q.  You also testified about something called furosemide

22  correct?

23  A.  Correct.

24  Q.  And that treats bleeding?

25  A.  Correct.

1   Q.  Is there an improved version of furosemide?

2   A.  Furosemide is approved. There are several formations.  It

3   is approved by the Food and Drug Administration for use in

4   humans.

5   Q.  And that is the commercially available treatment for horses

6   with EIPH that you're familiar with, correct?

7   A.  Correct.

8   Q.  And that already exists in the market, correct?

9   A.  Correct.

10  Q.  You were also asked about sodium bicarbonate, do you recall

11  those questions?

12  A.  I do.

13  Q.  Can sodium bicarbonate be administered for performance

14  enhancing purposes?

15  A.  No.

16  Q.  Have you heard of the term "milk shaking"?

17  A.  That would be the administration of sodium bicarbonate in

18  terms of a milk shake.

19  Q.  With respect to drug tests, are familiar with TCO2 levels

20  in the context of drug testing?

21  A.  Yes, I am.

22  Q.  Is that something that is tested for?

23  A.  Yes.  Generally before the race, blood samples are drawn,

24  and there's a maximum permitted level of TCO2; in other words,

25  sodium bicarbonate would raise the PH, and thereby the

1    concentration of CO2 in the blood, and so it's tested for it to

2    prevent the administration of the sodium bicarbonate prerace.

3    Q.  So there is testing conducted for sodium bicarbonate as

4    part of drug testing?

5    A.  Yes.

6    Q.  And why is that?

7    A.  Because that's actually one of the few drugs that there are

8    substances that there is evidence that alkalizing an athlete

9    prior to competition can improve performance.

10          Don't know that's been proven in horses, but it's

11   certainly well-documented in humans.

12   Q.  So in humans, sodium bicarbonate can be used to enhance

13   performance?

14   A.  Correct.

15   Q.  And sodium bicarbonate is something that you've tested for

16   in the body of work that you've conducted on behalf of the

17   racing laboratory, correct?

18   A.  Correct.

19   Q.  And is that something that is restricted for use of

20   racehorses in State of Florida?

21   A.  It is not permitted to administer any type of drench or

22   nasogastric tube which is typically how that's administered or

23   any alkalizing agent within 24 hours of the race.

24          MS. MORTAZAVI:  No further questions, your Honor.

25          THE COURT:  Thank you.

1          Any recross?

2          MR. FASULO:  No recross.

3          THE COURT:  All right.

4          Dr. Cole, thank you very much.  You're excused with

5     the thanks of the Court.

6          (Witness excused)

7          THE COURT:  Ms.  Mortazavi.

8          MS. MORTAZAVI:  Thank you, your Honor.  I have a

9     stipulation I'd like to read into the record.

10         It's been marked as Government Exhibit 9018, and I'm

11    going to skip the preliminary portion of this stipulation which

12    is identical to the past stipulations that we've read into the

13    record.

14         THE COURT:  Are you going to display this?

15         MS. MORTAZAVI:  Not until I've offered it into

16    evidence.  I believe there may be a hard copy to hand up to the

17    Court if the Court would like a copy.

18         THE COURT:  I would.  Thank you.

19         MS. MORTAZAVI:  And I'll impose on my colleague

20    Mr. Gianforti.

21         THE COURT:  Thank you.  Ms. Mortazavi.

22         MS. MORTAZAVI:  If called to testify at trial, a

23    representative of the relevant state agencies that regularly

24    maintain public records reflecting the identities of licensed

25    veterinarians in each respective state would testify that Seth

1  Fishman did not hold a veterinarian license in the following

2  jurisdictions from 2000 to in or about April of 2020:

3          Alabama, Arkansas, California, Connecticut, the

4  District of Columbia, Georgia, Illinois, Iowa, Kentucky, Maine,

5  Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada,

6  New Hampshire, New Mexico, North Carolina, Oregon, Rhode

7  Island, South Carolina, Tennessee, Texas, Vermont, Virginia,

8  Washington, West Virginia, Wisconsin.

9          It is further stipulated and agreed by and between the

10  parties that this stipulation which is Government Exhibit 9018

11  may be received in evidence at trial, and the government offers

12  Government Exhibit 9018.

13          THE COURT:  It will be received in evidence and this

14  stipulation or agreement between the parties as just read into

15  the record is evidence that you may consider in this case.

16          (Government's Exhibit 9018 received in evidence)

17          MS. MORTAZAVI:  May I have a moment, your Honor.

18          THE COURT:  Sure.

19          MS. MORTAZAVI:  Your Honor, at this time the

20  government rests.

21          THE COURT:  At this point, ladies and gentlemen, we're

22  going to break for the day.

23          The government has concluded its presentation of

24  evidence.  We'll resume tomorrow morning at 9:45.  If you could

25  please leave your notebooks on your chair or in the jury room

1  and I remind you that when you go home please do not speak to

2  anyone including your family members about this case.

3         Please don't speak to each other about the case on the

4  way out, and please do not conduct any research.  If by any

5  chance anybody should approach you about the case or you should

6  hear anything inadvertently about the subject matters of this

7  trial, you need to let me know about that through my courtroom

8  deputy Ms. Dempsey.

9         Thank you all very much, and I wish everyone a good

10  evening.

11         (Continued on next page)

12         (Jury not present)

13         THE COURT:  Anything for the record.

14         MR. FASULO:  Under Rule 29, we have a motion for a

15  trial order of dismissal.

16         THE COURT:  Ms. Mortazavi, do you wish to be heard?

17         MS. MORTAZAVI:  I'm happy to respond to any questions

18  the Court has, I think the record is clear that the government

19  has sustained its burden at least as to this point.

20         THE COURT:  The motion under Rule 29 is denied.

21         For the record, obviously there is a heavy burden that

22  a defendant faces on a Rule 29 motion.

23         On such motion, the Court must view the evidence in

24  the light most favorable to the defendant, crediting every

25  inference that could have been drawn in the government's favor

1    and deferring to the jury asses ment of witness credibility and

2    its assessment of the weight of the evidence.

3            The evidence is sufficient for the case to go to the

4    jury and could support a verdict of reasonable doubt or no

5    reasonable doubt.  Both are equal possibilities at this stage.

6    So the motion is denied.

7            All right.

8            Anything else for the record?

9            MR. FASULO:  Yes, Judge, we do have a defense case.

10           THE COURT:  Yes.  Okay.

11           And tomorrow morning you will be calling?

12           MR. FASULO:  Tomorrow morning we plan on calling our

13   witness which will be Ms. Giannelli.

14           THE COURT:  Is Ms. Giannelli your only witness?

15           MR. FASULO:  She is our only witness.

16           THE COURT:  All right.  Thank you.

17           Anything from the government at this point?

18           MR. FASULO:  Just so the record is clear, obviously

19   this is Ms. Giannelli's right to either take the witness stand

20   or not.  We have obviously opened on that.  We plan on her

21   taking it.  I want to make it clear that it will be her

22   decision, again, to make that and she will make that at that

23   time, but it's our intention 100 percent that she will be on

24   the witness stand tomorrow.

25           THE COURT:  Absolutely.

1      Ms. Giannelli, you do understand that is ultimately

2  your decision whether to testify or not to testify, and that

3  you have no obligation whatsoever to do so.  All right.

4      Anything else from the government?

5      MS. MORTAZAVI:  I'd like to forecast, your Honor, that

6  it's possible, based on the substance of the defendant's

7  testimony, that the government might have a rebuttal case.

8  It's very hard to say now not knowing what it is she will

9  testify to, I want to make sure the Court is aware and the

10 defense counsel is aware.

11     THE COURT:  And I assume you would talk with

12 Mr. Fasulo before any witness is called to the stand about what

13 your witnesses would be testifying about.

14     MS. MORTAZAVI:  Certainly, your Honor.

15     THE COURT:  All right.

16     MR. FASULO:  In that regard, I'd like the Court to a

17 scheduling issue for us, because I understand even if the

18 defendant begins her testimony tomorrow we could have a charge

19 conference, it would be my preference that we sum up on

20 Thursday rather than trying to put everything together

21 tomorrow.  And the government now tells me that there may be a

22 rebuttal case, I think just for clarity it would be good to

23 start fresh with the jury on Thursday.

24     THE COURT:  All right. Let me just talk about

25 scheduling with you.  Before we get there, I want to just talk

1    about a brief observation about the jury charges.

2         First, I think you need to add a proposed charge with

3    respect to demonstratives because there were -- I think there

4    were two offered into evidence yesterday.  I gave a brief

5    instruction at the time which I think basically does the job,

6    but that was ad lib.

7         I do have a prior submission from the parties before

8    there was a mistrial, so you can pull that or you can take a

9    look at Sands and propose something to me.

10        The other thing I want to mention -- well, two things.

11   One, I'm working my way through what you have jointly proposed.

12   There are, as I noted, a couple of areas of disagreement.  One

13   of them I will need ultimately a decision about whether certain

14   things are applicable in this case, specifically whether you're

15   going to be including a request for a lesser-included offense

16   because some of your charges become irrelevant.

17             MR. FASULO:  Judge --

18             THE COURT:  I'm not asking you to answer right now.

19             MR. FASULO:  I want to give the Court a heads of where

20   I'm going.  I have not formally made a decision if I'm going to

21   ask for it.  If I had, I let the Court know and I would work on

22   it.  But I have thought about that charge as well, and

23   therefore I do understand it impacts on what we currently have

24   as a charge.

25             THE COURT:  I understand that and obviously --

M53BGIA6                   Cole - Redirect

1          MR. FASULO:  I'm inclined that I'm not probably going

2     to ask for it.  It will depend on her testimony tomorrow.

3          THE COURT:  You said you're inclined that you're not

4     probably going to ask for it.

5          MR. FASULO:  It will depend on how the testimony is

6     elicited tomorrow, what the rebuttal case is, how she answers

7     the question on cross-examination and that's really going to

8     dictate my request.

9          THE COURT:  That makes good sense.  I'm just flagging

10    issue.  The final issue I want to flag for you at this point is

11    your request to charge number six.

12          You have it labeled conspiracy to commit drug

13    misbranding and drug adulteration and then you began with

14    saying the charge is, and you quote four paragraphs from the

15    indictment.

16          I find that completely pointless to be perfectly

17    honest for me to read into the record to the jury subsections

18    of a statute.  That's meaningless to a jury, so I would like

19    you to go back and talk to each other about whether those four

20    paragraphs should be eliminated altogether, and we just begin

21    with the paragraph that starts with conspiracy and summarizes

22    and then breaks into each of the elements.

23          You have a prior request number five, summary of the

24    indictment, maybe that's sufficient, or maybe you want to agree

25    on a more full-some summary of the indictment.  But for me to

1    read violation of Title 21, United States Code, Section 331,

2    352(a)(1)(A)5. That's just meaningless to a jury. It does not

3    assist them in understanding the law in any respect.

4              MR. FASULO: I understand the Court's request and I

5    will work with the government on that.

6              THE COURT: Those are my comments up to this point. I

7    also made some other editorial changes before we have the

8    charging conference we will try to give you a red line copy.

9    But I had asked you to go back and try to eliminate repetition

10   in here.

11             Just by way of example, request number one that you

12   gave me ends with the sentence: "You are to perform the duty

13   of finding the fact without bias or prejudice to any party."

14             Request number two begins: "You are to perform the

15   duty of finding the facts without bias or prejudice to any

16   party."

17             I would like not to repeat like that. All right. So

18   that's what I'm going through now to weed out, so that's just

19   to give you a heads up of where I'm going with things.

20             All right. Anything else for the record?

21             MS. MORTAZAVI: Not from the government.

22             THE COURT: Mr. Fasulo?

23             MR. FASULO: Nothing from the defense.

24             THE COURT: All right.

25             So I will see you all a little bit before 9:45. If

1    there's anything we need to talk about, let us know in advance,

2    otherwise I'll see you a little before 9:45 and be prepared to

3    start with the jury at 9:45 with the defense calling Ms.

4    Giannelli.

5              MR. FASULO:  Judge, I had requested, I do have

6    something.  I had requested just a general idea of what the

7    court's thoughts were in term of scheduling?

8              THE COURT:  I'm fine with the defense's case tomorrow

9    and the rebuttal case, to the extent there is any.  If we have

10   time, we'll then proceed to the charging conference.  I'm fine

11   with, assuming we can accomplish all that tomorrow, putting

12   summations over to Thursday.

13             If there were ample time tomorrow afternoon, we'll

14   just adjourn that.  Doesn't seem like it's likely to happen in

15   any event.  Summations, plan for them on Thursday.

16             MR. FASULO:  It would be my preference and I

17   appreciate that, your Honor.

18             THE COURT:  I do have, just to give you a heads up, I

19   do have a VOSR hearing on Thursday morning at 8:30.  I hope it

20   won't run more than an hour, but it might and we might have

21   things we need to finish with the jury charges.

22             Depending on where we're at tomorrow, we'll instruct

23   on what time to show up on Thursday morning, but you can plan

24   that summations will not happen tomorrow, but you need to be

25   ready on Thursday depending on the length of the government's

1    rebuttal case, if any, and the defense case.

2              Okay.  All right.  Anything else?

3              MS. MORTAZAVI:  No.  Thank you, your Honor.

4              THE COURT:  Thank you.  Have a good evening.

5              (Adjourned to May 4, 2022, at 9:45 a.m. )

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  INDEX OF EXAMINATION

2  Examination of:                           Page

3  CONOR FLYNN

4  Direct By Mr. Gianforti . . . . . . . . . . 638

5  Cross By Mr. Fasulo . . . . . . . . . . . 668

6  Redirect By Mr. Gianforti . . . . . . . . . 691

7  ADRIENNE HALL

8  Direct By Ms. Mortazavi . . . . . . . . . . 695

9  Cross By Mr. Fasulo . . . . . . . . . . . 732

10  Redirect By Ms. Mortazavi . . . . . . . . . 757

11  RITA NOBLETT

12  Direct By Mr. Gianforti . . . . . . . . . . 763

13  Cross By Mr. Fasulo . . . . . . . . . . . 793

14  Redirect By Mr. Gianforti . . . . . . . . . 805

15  CYNTHIA COLE

16  Direct By Ms. Mortazavi . . . . . . . . . . 809

17  Cross By Mr. Fasulo . . . . . . . . . . . 848

18  Redirect Q. . . . . . . . . . . . . . . . 863

19  GOVERNMENT EXHIBITS

20  Exhibit No.                             Received

21  1915  . . . . . . . . . . . . . . . . . 708

22  1914  . . . . . . . . . . . . . . . . . 712

23  11003  . . . . . . . . . . . . . . . . . 737

24  15003 through 15009  . . . . . . . . . . . 777

25  15001  . . . . . . . . . . . . . . . . . 786

9010, 2001-A through 2056-F   . . . . . . . . 808

9018     . . . . . . . . . . . . . . . . . 869