1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        20 Cr. 160 (MKV)

5   LISA GIANNELLI,

6                  Defendant.
                                         Trial
7   ------------------------------x
                                         New York, N.Y.
8                                        May 4, 2022
                                         9:45 a.m.
9   Before:

10

                     HON. MARY KAY VYSKOCIL,
11

                                         District Judge
12                                            -and a jury-

13                       APPEARANCES

14  DAMIAN WILLIAMS
         United States Attorney for the
15       Southern District of New York
    BY:  SARAH MORTAZAVI
16       BENJAMIN A. GIANFORTI
         Assistant United States Attorneys
17

18  FASULO, BRAVERMAN & DiMAGGIO, LLP
         Attorneys for Defendant Giannelli
19  BY:  LOUIS V. FASULO

20  Also Present:  Karline Jung, USDA Paralegal

21

22

23

24

25

1          (Trial resumed; jury not present)

2          THE COURT:  All right.  I understand the parties have

3     things you need to discuss with me.

4          MS. MORTAZAVI:  Just one matter, your Honor, that we

5     just wanted to bring to the Court's attention.  Assuming that

6     the defendant does, in fact, testify today, which I expect her

7     to, which is that there have been some briefings certainly

8     before the prior trial regarding the advice of counsel defense,

9     and this Court ruled that absent a waiver of the

10    attorney-client privilege and discovery, that defense could not

11    be invoked.  There has been no waiver of the attorney-client --

12    I'm sorry.  Let me restart.

13         There's been no waiver of Ms. Giannelli's

14    attorney-client privilege with Benjamin Schwartz, the attorney

15    who represented her, with respect to the Delaware Division of

16    Professional Responsibility proceedings.

17         The parties had discussed that prior to this trial,

18    but ultimately there was no waiver.  I understand that

19    Ms. Giannelli does not intend to invoke the advice of counsel

20    defense, but I would ask the Court to instruct the witness not

21    to while she is on the stand, attempt to invoke that defense.

22         THE COURT:  Mr. Fasulo.

23         MR. FASULO:  May I take the mask off?

24         Judge, we had a discussion on this.

25         THE COURT:  You and Ms. Giannelli or you and

 1   Ms. Mortizavi?

 2            MR. FASULO:  We discussed, me and Ms. Mortazavi, and

 3   along with Ms. Giannelli, I discussed it also.  We are not

 4   waiving the attorney-client privilege.  We also are not putting

 5   into evidence on our direct case, nor do we anticipate the

 6   government will go into it, anything counsel had told her.  I

 7   previewed what Ms. Giannelli is going to say about what she

 8   knew about that and results of that, how she was going to

 9   testify, and I think we have come to an understanding that

10   there will not be any invoking of attorney client -- attorney

11   advice.

12            THE COURT:  Okay.  So there there's nothing for me to

13   do?

14            MS. MORTAZAVI:  We just strictly want to alert the

15   Court in case it was inadvertently mentioned.

16            THE COURT:  Then we'll deal with it.  We've had that

17   discussion raised.

18            Anything else before we bring out the jury?

19            MS. MORTAZAVI:  Nothing from the government.

20            MR. FASULO:  We're ready to proceed, your Honor.

21            THE COURT:  Thank you.  Ms. Dempsey will retrieve our

22   jurors.

23

24

25

1              (Jury present)

2              THE COURT:  Please be seated, everyone.  Good morning,

3    ladies and gentlemen.

4              All right.  The government has rested.

5              Mr. Fasulo?

6              MR. FASULO:  Yes, your Honor.  At this time, the

7    defense would like to call Ms. Lisa Giannelli.

8              THE COURT:  All right.  Ms. Giannelli, will you stand

9    at the witness stand, please?

10             Good morning, Ms. Giannelli, when you're ready, you

11   can remove your mask, please, and Ms. Dempsey will administer

12   the oath.

13             DEPUTY CLERK:  Good morning.  Please raise your right

14   hand.

15    LISA VOSHELL,

16        called as a witness by the Defendant,

17        having been duly sworn, testified as follows:

18             DEPUTY CLERK:  Thank you.  Please state and spell your

19   name for the record.

20             THE WITNESS:  Lisa Voshell, V-O-S-H-E-L-L.

21             DEPUTY CLERK:  Thank you.  Please have a seat and

22   adjust the microphone.

23             THE WITNESS:  Yes.

24             THE COURT:  Whenever you're ready, Mr. Fasulo.

25             MR. FASULO:  Thank you, your Honor.

1    DIRECT EXAMINATION

2    BY MR. FASULO:

3    Q.  Good morning.

4    A.  Good morning.

5    Q.  You just stated your name as Lisa Voshell?

6    A.  Correct.

7    Q.  When did you become Lisa Voshell?

8    A.  Just last year.

9    Q.  And how did that --

10   A.  Well, I was engaged to be married at the time of my arrest.

11   We got married since then.

12   Q.  And pursuant to that, did you change your name?

13   A.  I was Ranger, and I was -- Giannelli as my maiden name.

14   Q.  And when you were arrested, you were known as

15   Lisa Giannelli; is that fair to say?

16   A.  Correct.

17   Q.  And I met you as Lisa Giannelli?

18   A.  Correct.

19   Q.  So during the course of your testimony, for simplicity's

20   sake, I'm going to address you as Lisa Giannelli.

21   A.  Sorry.  Yes.

22   Q.  It's easier for me.

23          And you said Lisa Ranger.  How did you come upon

24   having that name?

25   A.  I met my husband in Massachusetts.  Well, obviously, I

1    dated first and then I met my husband and became married.

2            Sorry.  I'm nervous.

3    Q.   I was going to ask, are you nervous here today?

4    A.   Absolutely.

5    Q.   Have you ever testified in a courtroom under oath in front

6    of a jury prior to today?

7    A.   No, I have not.

8    Q.   And if you can keep your voice up in a loud voice, take

9    your time with your answers, and we're going to proceed through

10   your testimony.  Okay?

11           So, Lisa, tell me where you live now.

12   A.   I live in Delaware.

13   Q.   And what is the address of your home in Delaware?

14   A.   125 Jennifer Lane, Felton, Delaware.

15   Q.   Is 125 Jennifer Lane the place where you -- how long have

16   you been residing at 125 Jennifer Lane?

17   A.   Since 2005.

18   Q.   Okay.  And was that the place you were at at the time that

19   you were arrested?

20   A.   Yes, I was.

21   Q.   Do you remember when you were arrested in this case?

22   A.   March 9, 2020.

23   Q.   And at that time, who were you living with at

24   125 Jennifer Lane?

25   A.   My husband.  He was my fiancé at the time.  And his

1    children.

2    Q.  Okay.  And can you describe your home at 125 Jennifer Lane?

3    A.  Sure.  It is a log cabin.  It is a structure that has a

4    bottom floor and a top floor.  And since my husband and I got

5    together -- he's very handy, and we actually built another

6    building beside the original structure, which was his office

7    and his son's room.

8    Q.  And what types of rooms existed in the home at

9    125 Jennifer Lane?

10   A.  It was a residence, so it was a living room, kitchen,

11   another room that was a bedroom that I kind of turned into a --

12   my personal office.  Upstairs was our bedroom, and then off of

13   that was a game room, poolroom, TV room.  Downstairs below,

14   there was a two-bay garage, and off of that was a third garage

15   that was turned into an exercise room, and also Dr. Fishman's

16   supplies and work area was in there.

17   Q.  And when you say it was a work room, when did you create a

18   work room, and what was the purpose -- when did you create that

19   work room?

20   A.  For Dr. Fishman's supplies to be in.  He required me to

21   have a certain amount of supplies on hands for his clients, so

22   that room was designed basically for that.  You know, I had an

23   office computer with the program that the veterinarian program

24   that he had me use, and there was a door to the outside.  So it

25   had its own little private side door in addition to the garage

1    bay.

2              MR. FASULO:  I'd like the government, if you may -- if

3    you can put on the screen Government Exhibit 5019?

4    Q.  I'd like you to look at 5019, Ms. Giannelli.  It's a

5    document that has I believe six pages.

6    A.  Mm-hmm.

7    Q.  Ms. Giannelli, is this diagram accurate as to the way

8    your -- this floor of your house looked?

9    A.  That is actually the side building.

10   Q.  Okay.  And can you explain to me, was this connected to the

11   main house?

12   A.  No, it was not.

13   Q.  This is the structure that was put on later in the time?

14   A.  Correct.  We did renovations.

15   Q.  Okay.  And was -- what was the purpose of this structure?

16   What was the use of this structure at the time that you were

17   arrested and during the time of 2000- -- from the time you had

18   the house until you were arrested?

19   A.  It was -- it was basically my husband's.  You know, the

20   lower bedroom that says -- does the jury see this?  Okay.

21             The open bedroom and the kitchen and bathroom, that

22   was my husband's grownup son -- he was in college, so he was --

23             MS. MORTAZAVI:  Objection, 403.

24             THE COURT:  I'm sorry?

25             MS. MORTAZAVI:  403, your Honor, as to this line of

1  testimony.

2            THE COURT:  Let me see everybody at sidebar.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Ms. Mortazavi.

3              MS. MORTAZAVI:  I believe that there are statements

4    that are completely irrelevant that are being introduced

5    through this witness strictly to invoke sympathy.

6              For example, at the point which I objected, she was

7    about to describe I believe a stepson who was in college.  It's

8    entirely irrelevant, and I think designed to air out details of

9    her personal biography to elicit sympathy from the jurors.  It

10   has no relevance here, and I think the witness should be

11   instructed not to.  I have been giving some latitude,

12   certainly, to establish her background, but details about her

13   family life, about her wedding, about her game room -- I think

14   this is --

15             THE COURT:  You introduced this exhibit.  You put in

16   evidence that there was a game room.

17             MS. MORTAZAVI:  Certainly, your Honor.  And I did not

18   object on those points, but I think to the point she is

19   describing the biographical details of her stepchildren, that

20   is a bridge too far.

21             MR. FASULO:  I don't plan on going into biological

22   details.  I do plan on explaining the house, the use of the

23   house.  The government put the house in.  It could give the

24   impression to the jury that this was like a factory mill or

25   something, but it was also their home, and there were rooms

1   that were used for other purposes, and I think it's relevant.

2   I can't control how she's answering these questions, but I'll

3   be pointed and try to just get through the location of the

4   house.

5           THE COURT:  Right.  I think the general subject matter

6   is fair game.  You put this in evidence.  But I do think you

7   need to keep your questions circumscribed so that you're not

8   eliciting information about her family background.  An certain

9   amount of background information is legitimate.

10          MR. FASULO:  Well, there's going to be background

11  information introduced where she grew up and what she did and

12  how she learned about horses.  Everything is relevant.

13          THE COURT:  I understand.

14          MR. FASULO:  I'll take the objections as they come.

15          THE COURT:  So will I.

16          MR. FASULO:  By that I mean I'll argue those

17  separately, but I want to be clear that that is part of what

18  the directed testimony is.

19          THE COURT:  All right.  It's true that the details

20  about -- Mr. Fasulo, the details about her family are relevant.

21          Thank you.

22          (Continued on next page)

23

24

25

1           (In open court)

2     Q.  You see in Government Exhibit 509E on this page you see a

3     label of office, do you see that?

4     A.  Yes, I do.

5     Q.  Whose office was that?

6     A.  That was my husband's office.

7           MR. FASULO:  Now go to the next page please.

8     Q.  What does this indicate to you?

9     A.  That's the general layout of the -- my house and the

10    garages.

11          MR. FASULO:  Can we go to page 4?

12    Q.  And was this a fair and accurate description of the area up

13    to the poolroom and -- the area that's open in the garage, the

14    hallway that's indicated in this particular picture?

15    A.  That's the bottom floor of the house, yes.

16          MR. FASULO:  Okay.  Next.

17    Q.  Is this also another picture of the bottom floor of the

18    house?

19    A.  That is the upstairs floor.

20          MR. FASULO:  Thank you.  You can take it down.

21    Q.  I'd like to you now look at Government Exhibit 5020.  Do

22    you remember seeing this on the government's case?

23    A.  Yes, I do.

24    Q.  Directing your attention to this area right there that I've

25    circled in blue, do you see that area?

1          THE COURT:  Is the jury able to see?

2          JUROR:  Yes.

3          THE COURT:  I'm sorry, Ms. Giannelli.  Do you want to

4   say your answer again?

5          THE WITNESS:  Yes, I do.

6   Q.  And what are those?

7   A.  Those are Dr. Fishman -- supplies for Equestology.  Those

8   are hydration fluids, either lactated ringers or maybe saline,

9   I don't know.  I can't see.

10  Q.  And do you see a vehicle here?

11  A.  Yes, I do.

12  Q.  That I put an X on?

13  A.  Mm-hmm.

14  Q.  Whose vehicle is that?

15  A.  That is mine.

16          MR. FASULO:  And you can take that down.  Thank you.

17  Q.  Okay.  So can you give me an idea, what is your educational

18  background?

19  A.  I graduated high school.

20  Q.  Where was that?

21  A.  Franklin, Massachusetts.

22  Q.  And when was that?

23  A.  1985.

24  Q.  Okay.  And what did you do -- as it relates to your work in

25  dealing with horses, what did you do after graduation as it

1    relates to your work in horses?

2    A.   When I met Bruce Ranger, somewhere along the line he

3    basically showed me how to take care of standardbred

4    racehorses.   I had riding horses growing up, but I was not

5    familiar with standardbred racehorses.   He -- you know, as the

6    relationship progressed, he taught me how to harness a horse

7    and, you know, put the bits and the bridle, the general taking

8    care of the horse's legs, jogging horses, training horses, the

9    overall care of a standardbred.

10   Q.   And who was Bruce Ranger?

11   A.   At the time he was my boyfriend, fiancé, husband.

12   Q.   Who was he related -- what was his job or what does he do?

13   A.   He was a standardbred trainer and also a standardbred

14   driver, you know, drives in a race.

15   Q.   For how long did you work with him?

16   A.   Eventually, yes.   Originally, I was just dating and working

17   as a waitress.   I did become a groom for him.

18   Q.   When you say you were a groom for him, what was it that you

19   did?   What did you do as a groom?

20   A.   Basically got there in the morning.   You fed the horses,

21   you would turn them out in the field if there was a field

22   available, and you clean their stall, clean their water bucket.

23   You would observe the night sleep the horse had the night

24   before.   If they were pacing around in a stall in a circle, you

25   knew they were upset.   There was something going on.   If they

1  were dropping grain into the water bucket, you knew there was

2  something wrong with the horse's teeth.  You know, you could

3  learn a lot about cleaning a horse's stall.

4          THE COURT:  Ms. Giannelli, I'm going to instruct you

5  that you have to answer the question that was asked.  What did

6  you do.  Not what you observed, not what you could learn,

7  what --

8          THE WITNESS:  That's what I was doing.

9          THE COURT:  No.  You were expanding on it.  What did

10  you do?

11          THE WITNESS:  I apologize.

12  Q.  What did you do as a groom?

13  A.  I cleaned their stalls, I cleaned the water buckets.  I

14  tacked the horse with equipment to jog.  Sometimes I would jog

15  the horse, sometimes the trainer would jog the horse.  I would

16  bathe the horse, I would brush the horse afterwards, wrap

17  his -- the legs with bandages.  And that's it.

18  Q.  And how did you learn to do those things?

19  A.  Bruce Ranger taught me.

20  Q.  Did you receive any formal education or training or

21  schooling before you became a grooms person?

22  A.  No, I did not.

23  Q.  Where was it that you were a grooms person?

24  A.  Originally in Florida, and then multiple states over the

25  years.

1    Q.  And after you were a grooms person, did you have any other

2    role or job within the racing world or with racehorses?

3    A.  At one point I did become a trainer.  I took the trainers

4    test and passed.

5    Q.  When you say take a trainers test, where did you take that

6    test?

7    A.  I believe it was in Florida.

8    Q.  Okay.  And how long were you a trainer?

9    A.  Off and on.  I mean, I just -- possibly 5 years, 10 years.

10   I'm not sure.

11   Q.  Okay.  And during that time, what did you do as a trainer

12   at that time?

13   A.  Trainers -- I did -- you know, I entered a horse into a

14   race, you train that horse in preparation for that race, you

15   oversee the daily routines, talk to the owners.

16   Q.  Did you ever become familiar with what's called the

17   Ultimate Trainer Responsibility Rule?

18   A.  Yes, I did.

19   Q.  What do you understand that to be?

20   A.  The document you sign, the contract you sign with the

21   state, is that you ultimately are responsible for that horse.

22   So you're responsible for their care, you're responsible for

23   anything that that horse receives for medication, you're

24   responsible for when that horse races, and what can and cannot

25   be in that horse's body at the time of the race.  Ultimately,

1    you are responsible.

2    Q.  And as a trainer during that period of time, did you have

3    contact with vets?

4    A.  Yes, I did.

5    Q.  Which vet did you have contact with at that time?

6    A.  In Florida, it was Dr. Smith.

7    Q.  And you said you were in Florida.  Did you stay in Florida

8    as a trainer, or did you travel with the horse?

9    A.  The meet in Florida usually ended when it got really hot

10   down there in the summer.  So we would go up north depending

11   on -- "we" meaning my husband and I -- but depending on what

12   horses you had at the time.  It was different every year.  We

13   may go to Ohio one summer and go back to Florida in the fall or

14   we may go to New Jersey.  It was different all the time.  But

15   you were licensed in the state that you were going to.

16   Q.  When I ask you a question -- and you'll have a chance to

17   answer other questions -- just answer the question as I ask

18   them, just to be clear.

19   A.  I apologize.

20   Q.  And in approximately 1998, were you working for somebody

21   called Nick Salanentri?

22   A.  What year?

23   Q.  About 1998?

24   A.  Yes.

25   Q.  And who was he?

1    A.  He was an owner of a stable of horses, standardbred horses.

2    Q.  What was your role when you were working for him?

3    A.  I was a groom.

4    Q.  Okay.  And who was the trainer at that time?

5    A.  I'm not sure if it was Nick Salanentri or Peter Simpson.

6    Q.  How long did you work for him?

7    A.  Maybe three to six months.

8    Q.  And after working for him, where did you go next?

9    A.  Worked for Peter Fusco.

10   Q.  Who was that?

11   A.  A standardbred trainer.

12   Q.  What was your role or what did you do when you worked for

13   Peter Fusco?

14   A.  I was a groom.

15   Q.  How long did you have that role?

16   A.  About four years.  There was --

17   Q.  Okay.  And when did you stop working for Fusco?

18   A.  There were times during that --

19   Q.  The question is when did you stop.

20   A.  Oh, when I stopped?

21          MR. FASULO:  I'm sorry, Judge.

22   A.  That's kind of the answer.  I stopped and started multiple

23   times.

24   Q.  Okay.  When was the last time that you worked for him in

25   this period.

1    A.   2002.

2    Q.   And after that, did you work for a trainer name Kevin Lare?

3    A.   Yes, I did.

4    Q.   Who was that?

5    A.   He was a standardbred trainer in Delaware.

6    Q.   How did you know him?

7    A.   From racing -- multiple races.  He was a trainer.  I was a

8    groom at the track.  Just met each other that way.

9    Q.   And how many horses did you -- do you remember how many

10   horses you cared for at that time?

11   A.   When I worked for Kevin Lare?

12   Q.   Yes.

13   A.   Approximately five.

14   Q.   That brings us to Carl Conti.  Are you familiar with the

15   name Carl Conti?

16   A.   Yes.

17   Q.   What was your relationship with him in terms of work?

18   A.   He was the standardbred trainer, and I was the groom.

19   Q.   When was that?

20   A.   That was in 2000- -- November, December 2004, and 2005 for

21   a few months.

22   Q.   And where was he -- where was it that you were working for

23   him as a groom?

24   A.   That was South Florida Training Center.

25   Q.   What was South Florida Training Center?

1    A.  I apologize.  That was Sunshine Meadows.  I apologize.

2    Same thing -- same area.

3    Q.  What was that?

4    A.  That was a training farm for standardbred horsemen for

5    training two-year-olds.

6    Q.  What state were you living in at that time?

7    A.  I was living in Delaware, but I went to Florida for that

8    short window of five or six months.

9    Q.  Now, after working there, what was the next job that you

10   had related to the horse -- the standardbred or the horseracing

11   industry?

12   A.  I met Dr. Fishman at that time, and then I started -- I

13   worked for Carl Conti in the morning and Dr. Fishman in the

14   afternoon collecting his past due invoices.

15   Q.  Okay.  So when was it that you met Dr. Fishman?

16   A.  About November, December, approximately, of 2004.

17   Q.  Just so the record is clear, that's Dr. Fishman who's been

18   mentioned in this case; is that correct?

19   A.  Correct.

20   Q.  Where did you meet him in at that time?

21   A.  I was working as a groom for Carl Conti and overheard a

22   conversation of Dr. Fishman.

23   Q.  And at some point, did you have a conversation with

24   Dr. Fishman?

25   A.  Yes, I did.

1   Q.  And based on that conversation, did you begin to work for

2   him?

3   A.  Yes, I did.

4   Q.  What was your understanding of your job at that time

5   working for Dr. Fishman part-time?

6   A.  Was to collect his past due bills that he had for his

7   clients.

8   Q.  Okay.  And, approximately, how would you split your day at

9   that time between Carl Conti and Dr. Fishman?

10  A.  Working for Carl Conti in the morning, got done about

11  noontime, 1:00 o'clock.  They were not racehorses, so in the

12  afternoon, I had free -- I would go and work for Dr. Fishman

13  collecting bills.

14  Q.  When you say they were not racehorses, what kind of horses

15  were they?

16  A.  Young horses, anywhere from one and a half to two and a

17  half, I guess.  I'm not sure.

18  Q.  Okay.  And then what happened in terms of your work world

19  and working?

20  A.  Mr. Conti went north, I chose not to continue with his --

21  with his stable.  I was working part-time for Dr. Fishman, so

22  Dr. Fishman asked me if I would like to drive him around the

23  farms in New Jersey as he visited his clients, become his

24  driver, and I said sure.

25  Q.  When was that about?

1    A.   That was in 2005, about May or June.  I'm not sure.

2    Q.   And did you do -- did you take on that responsibility in

3    that role with Dr. Fishman at that time?

4    A.   To drive him, sure.

5    Q.   What would you do when you drove Dr. Fishman?  Tell me what

6    you would do and what you would observe at that time.

7    A.   The day would start, Dr. Fishman would have a set farms

8    that he wanted to go to.  He would have the vehicle packed.  It

9    was his vehicle.  He had a vet box in the back, and he -- I

10   observed him putting supplies into that vet box.  He would tell

11   me which farm to go to, I would start -- I drive him to that

12   farm.  He was -- I observed him working on his laptop.  I got

13   to the farm, he went to speak to the trainer, I observed him.

14   The trainer would pull the horse out of the stall, Dr. Fishman

15   would look at the horse, whatever he happened to do -- I don't

16   remember, but -- and he would ask me to go to his vehicle, pull

17   out a supply and bring it to the trainer.

18   Q.   And for how long did you have that role with Dr. Fishman?

19   A.   That particular role, about three or four months.

20   Q.   Okay.  And at some point, did your relationship, your

21   business relationship with Dr. Fishman change?

22   A.   As far as I didn't drive around anymore.  I always

23   continued collecting bills for him, even during that time

24   period.  My dad passed away, and it changed when I wanted to

25   purchase a home and stop bouncing from state to state every

1  three months.

2  Q.  And when you say you continued to collect bills for him,

3  can you explain what you mean by that?

4  A.  Dr. Fishman -- he had his bills for his clients and he also

5  had another veterinarian working for him at the time,

6  Dr. Elaine Gillis.  She had bills that she worked under

7  Equestology.  So I was collecting her bills as well.  And then

8  those checks were given to Dr. Fishman, and, you know, that was

9  my job, was to make sure that they got -- those bills got paid.

10 Q.  And how did you do that job?

11 A.  I would make multiple phone calls.  The Avimark software

12 had the address and the phone number of these people.  It's a

13 little difficult because they tend to move around, so you have

14 to -- it's like herding cats.  You have to find out where their

15 new address is.

16      My knowledge of, you know, being in the industry, I

17 also knew that if a person who was licensed with the racetrack

18 did not pay their bills, you could go to -- you know, a

19 judgment against them, and the judges of the racetrack would

20 make them pay that bill, and they would not be allowed to race

21 any horse of theirs until that bill was paid.  So that could

22 hang over their head, that they knew they had to pay these

23 bills.  They had to be financially responsible.

24 Q.  Okay.  And you talked about a system called Avimark.

25 A.  Yes.

1    Q.   What is that system?

2    A.   It's a veterinary software program.

3    Q.   And what kind of system is that?

4    A.   For veterinarians.

5    Q.   Is it a computer program?

6    A.   Yes.

7    Q.   Is it a Cloud-based program?

8    A.   No, it's not.

9    Q.   Okay.  And who provided that program to you?

10   A.   Dr. Fishman.

11   Q.   And what was your use of the Avimark program in your job

12   for Dr. Fishman at that time?

13            Actually, let me withdraw that question.

14            How long did you use the Avimark program?

15   A.   From the first day I started working for Dr. Fishman in the

16   fall of 2004 until -- up to my arrest.

17   Q.   And how did you learn that system?

18            THE COURT:  How did you?

19            MR. FASULO:  Learn that system.

20            THE COURT:  Thank you.

21   A.   Originally I taught myself.  I had no professional

22   teaching, I had no classes on it.  There was a software book in

23   the office of Dr. Fishman at the time that I started working

24   for him, and I just read it.

25   Q.   At the time you used the Avimark system that you just

1   testified to, who had access to that Avimark system?

2   A.  I'm sorry?

3   Q.  Who had access to the software program?

4   A.  Myself and Dr. Fishman.

5   Q.  Okay.  And was that true the entire time?

6   A.  Yes.

7   Q.  Can you tell me what information you would input into this

8   Avimark system as it relates to your job with Dr. Fishman?

9   A.  Everything as far as --

10          THE COURT:  Excuse me.  At what period of time?

11  Q.  During the time you worked for Dr. Fishman and the time

12  relevant in this indictment until 2019, what was the

13  information, the type of information, categories, that you

14  would input into the Avimark system?

15  A.  Originally, when I started working for him, it was the

16  checks that came in the mail for Dr. Fishman.  Dr. Fishman had

17  me input Dr. Elaine Gillis' invoices sometimes.

18  Q.  Let me stop you there.  I'm sorry.  Let me direct your

19  attention specifically to the time of, say, 2010 to your arrest

20  date.  During that time, can you be specific as to what

21  categories and what information you were inputting into the

22  Avimark system?

23  A.  Okay.

24  Q.  At that time.

25  A.  At that time, Dr. Fishman had his clients calling my

1   number.

2   Q.  Again, I'm asking you what information you put in, and then

3   I'll ask you some other questions.

4   A.  I apologize.

5   Q.  Just listen to the question.  I know you're nervous.  If

6   you could just listen to the question, answer the question, I

7   think we'll be much more efficient in getting through your

8   testimony.

9   A.  Orders, invoices, checks.

10  Q.  When you say orders, what information about the orders did

11  you put in?

12  A.  The supplies that the client -- clients' orders were.

13  Q.  And how were you identifying who would receive those

14  orders?

15  A.  The identifier was the trainer and then the horse and

16  ultimately the owner.

17  Q.  And what address did you input into the system?

18  A.  The client's address.

19  Q.  And would that be a billing address or would it be the

20  location of the horses?

21  A.  Sometimes both.

22  Q.  Okay.  And other than the client information, did you put

23  in what you actually -- what the client ordered from

24  Equestology?

25  A.  Was that a question?

1    Q.   Yes.  Did you put the items that were ordered from

2    Equestology?

3    A.   Yes, yes.

4    Q.   Okay.  And in terms of that, were you specific as to the

5    types of products that were being ordered and then sent to

6    those clients?

7    A.   Yes, it was specific.

8    Q.   And did you also put the price of those items?

9    A.   Yes.

10   Q.   And did you also keep track of whether those accounts were

11   current or they were running behind in payment?

12   A.   Yes, I did.

13   Q.   Is there any other information that you inputted into the

14   system that you were working on?

15   A.   The vendor invoices.

16   Q.   What were vendor invoices?

17   A.   The supplies, the products that the clients of Dr. Fishman

18   were ordering, they needed to come from somewhere.  And the

19   vendors -- I don't know if I'm expanding.  I apologize.  The

20   vendors sent invoices, and they needed to be entered into the

21   Avimark system.

22   Q.   When you say vendors, who were the vendors that you were

23   dealing with during this period of time?

24             THE COURT:  What period of time?

25             MR. FASULO:  The period of time from 2010 through her

1    arrest in 2019.

2            THE COURT:  Thank you.

3            MR. FASULO:  I'm sorry.  Judge.

4    A.  The vendors that Dr. Fishman set up were Henry Schein

5    Animal Health, Midwest Veterinarian Distribution,

6    Wedgewood Pharmacy, Boothwyn Pharmacy, and then doc was listed

7    as a vendor as well.

8    Q.  I believe you named Henry Schein, Midwest, and Boothwyn.

9    Were those --

10   A.  Mm-hmm.

11   Q.  What were they, as far as you know?

12   A.  As far as I knew, Henry Schein Animal health, they had

13   manufactured products.  They were a distributor of manufacturer

14   products.

15   Q.  Would that be true of Midwest as well?

16   A.  Yes.

17   Q.  Would that be true as Boothwyn as well?

18   A.  Boothwyn was a pharmacy, so they would be compounded.

19   Q.  Okay.  And are you familiar with A&G?

20   A.  Yes, I am.

21   Q.  What is A&G?

22   A.  I believe they are a distributor of manufactured products

23   as well.

24   Q.  Is that a distributor that you used as well in that vendor

25   list?

 1  A.  Occasionally, yes.

 2  Q.  And there was also a company called Rapid Equine?

 3  A.  That was a pharmacy.

 4  Q.  And are you familiar with a company called Horse

 5  Necessities?

 6  A.  That was also a pharmacy.

 7  Q.  How about -- and then you said you got other products from

 8  the doctor himself, correct?

 9  A.  Correct.

10  Q.  Now, when you were inputting this data you would put --

11  would you put the quantities that were ordered from these

12  vendors into the Avimark system?

13  A.  Absolutely.

14  Q.  Would you put the quantities that were received?

15  A.  Yes.

16  Q.  And who would pay the vendors' bills as they came in?

17  Whose responsibility was that?

18  A.  Dr. Fishman.

19  Q.  Now, when you were working in the Avimark system, what was

20  your understanding based on your relationship with Dr. Fishman

21  about his use of the Avimark system?  What did you understand

22  that to be?

23  A.  It was his system.

24  Q.  And when a client was entered in Avimark system was a --

25  when you say client who was the client?

1    A.  The client was the trainer.

2    Q.  Okay.  And who was the patient?

3    A.  Patient was the horse.

4    Q.  And was there a history of the medications or the products

5    that that client was using or that that client was receiving?

6    A.  Absolutely.

7    Q.  And did you have access to that on an as-needed basis?

8    A.  Did I -- I'm repeat the question.

9    Q.  Did you have access to that information on an as-needed

10   basis?

11   A.  Yes.

12   Q.  Meaning, can you get on your computer and look it up and

13   find out what it was?

14   A.  Yes, yes.

15   Q.  Is that something you did when you were receiving orders

16   and calls for Dr. Fishman's clients?

17   A.  Yes.

18   Q.  Now, there came a point in time that we saw some bank

19   records.  Do you remember that?

20   A.  Yes, I do.

21            MR. FASULO:  Can I have Government Number 1318, I

22   think it is?

23   Q.  Do you remember seeing this on direct examination?  This is

24   government 1318.

25   A.  Yes, I do.

1   Q.  And the top of this says First National Bank of Wyoming,

2   correct?

3   A.  Correct.

4   Q.  And whose name appear here?

5   A.  Equestology Inc., Seth Ian Fishman, Lisa M. Ranger.

6   Q.  What was your relationship to Equestology Inc.?

7   A.  I was the employee.

8   Q.  When you say you were the employee, were you a W2 employee?

9   How would you categorize your employment under Equestology

10  Inc.?

11  A.  I worked for Dr. Fishman 100 percent, but he had me as a

12  1099 employee.

13  Q.  And what does that mean?  What did it mean to you?

14  A.  Basically, I was responsible for my own taxes and my own

15  health insurance.  It meant to me I had no package from, you

16  know, retirement or benefits.

17  Q.  What was your understanding of the reason Dr. Fishman had

18  you as a 1099 employee under the company of Equestology Inc.?

19  A.  I never really understood the reason.  I would have

20  preferred to have been a W2.

21  Q.  Okay.  And at any time, had you any discussions with

22  Dr. Fishman about switching you from a 1099 status to a status

23  of a W2?

24  A.  Yes, I did.

25          MS. MORTAZAVI:  Objection.  Calls for hearsay.

1          THE COURT:  No.  Overruled.

2    Q.  Did that relationship -- did your categorization of a 1099

3    employee ever change?

4    A.  No, it did not.

5    Q.  And what was your relationship to these bank accounts?  How

6    were you using these bank accounts?

7    A.  I was the authorized signer on that bank account, and I was

8    the one who deposited the checks into this bank account.

9    Q.  And did you have authority to also make out checks out of

10   this bank account?

11   A.  Yes, I did.

12   Q.  And did you make checks out?

13   A.  Yes, I did.

14   Q.  Who did you make those checks out for, or what purpose?

15   A.  For my paycheck.

16   Q.  Okay.  And other than your paycheck, who was responsible

17   for making the other checks out of this account relating to the

18   products that were received by Equestology and the other

19   expenses for Equestology?

20   A.  Dr. Fishman made the payments.

21   Q.  How would it be that Dr. Fishman would make the payments?

22   What would he receive, and how would he receive it to know that

23   he had to make the payments?

24   A.  He received invoices of every transaction that I was aware

25   of.  I'm sorry.  You know...

1    Q.  And you saw a summary sheet.

2           MR. FASULO:  Can I have the summary sheet which is in

3    as a demonstrative but not in evidence?

4           One moment, Judge.  We'll get to it.

5    Q.  Do you remember seeing a summary sheet of the income you

6    made out of this account?

7    A.  Yes, I do.

8           MR. FASULO:  Can I have the demonstrative?  It's not

9    in evidence.  It's only as a demonstrative.  Do we have the

10   demonstrative available?  The summary sheet?

11          THE COURT:  Ms. Mortazavi, are you able to help?

12          MS. MORTAZAVI:  We're trying to determine which

13   demonstrative he's referring to.

14          THE COURT:  Okay.  I think it was Mr. Gianforti who

15   used it.

16          MR. FASULO:  I believe it's 19,000, 19,001.

17          I just remind the jury it's not in evidence, but it is

18   a demonstrative.

19          If I have can have 19000, 19001?  Thank you, Ms. Jung.

20          THE COURT:  Is this what you're looking for?

21          MR. FASULO:  Yes.

22          THE COURT:  Thank you, Ms. Jung, very much.

23   BY MR. FASULO:

24   Q.  Ms. Giannelli, you see that this -- on the top of this it

25   says WSFS, correct?

 1   A.  Correct.

 2   Q.  And is that the same -- is that your understanding that

 3   these were from the bank statements that we just looked at, the

 4   First National Bank of Wyoming?

 5   A.  The Equestology, Dr. Fishman account, yes.

 6   Q.  Let me draw your attention to right now the diagram, which

 7   is on the left-hand side of the screen first.

 8   A.  Okay.

 9   Q.  Had you a chance to look at the bank statements before you

10   came here to testify?

11   A.  Yes, I have.

12   Q.  Did you have a chance to review those with your 1099 income

13   that you received during those years?

14   A.  Yes, I did.

15   Q.  And would it be fair to say that fairly and accurately

16   reflects the amount of money that you received from Equestology

17   Inc. during the periods of time that was is noted.

18   A.  Yes.

19   Q.  And so if I go to 2015, Ms. Giannelli, it indicates on

20   this -- what's in front of you right now, that your 1099 income

21   was $143,543.48, correct?

22   A.  Correct.

23   Q.  How was that income that you received here determined from

24   the work you did at Equestology?

25   A.  That was for collections.

1   Q.  What was it that you received -- when you say that was for

2   collections, how was your income package structured with

3   Dr. Fishman at Equestology Inc.?

4   A.  Dr. Fishman is -- told me that I would get a percentage of

5   the collected invoices, and it was 17 percent.

6   Q.  Okay.  And when you say collected invoices, that would not

7   just be sales.  It would be actually money that the company

8   Equestology Inc. would receive; is that fair to say?

9   A.  If it went into Dr. Fishman's bank, then I received a

10  percentage of that.

11  Q.  And that percentage was 17 percent?

12  A.  Correct.

13  Q.  Was that true during 2015, 2016, 2017, 2018, and 2019?

14  A.  Yes, it was.

15  Q.  And actually, was it true the entire time that you worked

16  for Dr. Fishman in your capacity?

17  A.  It was actually lower at one point.  It was 15 percent and

18  then it moved up to 17 percent.

19  Q.  Okay.  And when you received this money from Dr. Fishman,

20  did you have expenses related to your work at Equestology?

21  A.  Yes, I did.

22  Q.  Were those expenses that Dr. Fishman paid, or were those

23  expenses that you paid out of this revenue?

24  A.  I paid out of this revenue.

25  Q.  What were the expenses related to your work that was paid

1  out of this revenue?

2  A.  Related to my work, my vehicle.  I went through three

3  vehicles.

4  Q.  Just list, please.

5  A.  My vehicle, my gas, tolls, my phone, health insurance,

6  taxes.

7  Q.  And in terms of direct costs, meaning the cost of shipping,

8  for example, UPS costs, FedEx costs, where did those expenses

9  get charged off?  Did they come out of this number, or did they

10  come out of the account that Dr. Fishman --

11  A.  Dr. Fishman paid for the shipping.

12  Q.  You didn't pay any of those expenses?

13  A.  No, I did not.

14  Q.  And we're looking at 2015 through 2019.  Just focusing on

15  what's in front of us there, can you tell me what your day was

16  like?  Was your day similar from 2015 to 2019, your workday?

17  A.  Fairly similar, yes.

18  Q.  Okay.  And what were the hours that you were working during

19  that period of time on a weekly basis, would you say?

20  A.  The hours could range anywhere from eight-hour days to a

21  16-hour day.  It was all over the place, but usually it was

22  closer to 16.

23  Q.  Okay.  And when you say 16 hours, it's a lot of time.  What

24  was involved in your day-to-day work with Dr. Fishman when you

25  received this revenue from 2015 through 2019?

1    A.  My daily work would be to answer the phone when the clients

2    called for the order fulfillment.  It would be to unpack

3    anything that was ordered the day before, to have the supplies

4    in stock, to make sure that everything came intact, nothing was

5    broken.  If something was broken, I needed to contact the

6    vendor and get a credit for Dr. Fishman and have it resent.

7            To input the invoice of the product that was coming in

8    to make sure it was exactly what was ordered in the quantity it

9    was ordered.  That would go into the Avimark system.

10   Originally, it was just the inventory, then along the way I

11   learned how to do a purchase order, so I did the purchase order

12   and put the inventory on the shelf, put the inventory that just

13   came in.  I would put it in back.  The older inventory moved to

14   the front so it always had good expiration dates.  Let's see

15   what else did I do?

16           Checks would come in the mail for Dr. Fishman.  I had

17   to input those and credit the clients account for those checks.

18   I had to keep a tally off to the side of what came in.  I had

19   to clean the office, I had to -- there were -- I can go on for

20   a long time about this.

21           (Continued on next page)

22

23

24

25

1  Q.  And during the time of your day to day, did you have

2  contact with Dr. Fishman?

3  A.  Yes, I did.

4  Q.  How did you have contact with Dr. Fishman on a day-to-day

5  or a week-to-week basis?

6  A.  It varied.  Some days, if it was a client of his called in

7  and had a question, I would call Dr. Fishman or tell him that

8  he needed to talk to this client or a text, e-mail.

9  Q.  What was your understanding of what you were allowed or not

10  allowed to speak to clients about regarding the orders that

11  they were making?

12  A.  It was my understanding I was just to take the order.  It

13  was my understanding that any order that went out could not be

14  broken up.  In other words, it could not draw out something

15  from the injectable bottle.  The bottle itself had to go to the

16  client, and they went from there.  It was my understanding I

17  could not give medical advice, diagnose, act as a veterinarian.

18  Q.  Where did you get that understanding from?

19  A.  Dr. Fishman told me.

20  Q.  Just before we move on to these pictures, I'd like you to

21  look at, I think it's Government Exhibit 1318.  At the end of

22  it I think there is a list of some checks, I believe.

23          MR. FASULO:  If you can just highlight this one here

24  and this here.  Let's start with the top.  That one.

25  Q.  Can you see that.  I know it's on an angle.  Can you see

1  that?

2  A.  Yes, I can.

3  Q.  What was this?

4  A.  This was a deposit ticket for the first national bank of

5  Wyoming.  It was Equestology account, Dr. Fishman's account.

6  It was clients that sent checks in that were credited to their

7  accounts.

8  Q.  If we highlight this area, the names here, would those be

9  the names of the clients that were associated with those

10 payments?

11 A.  Yes.

12        MR. FASULO:  Can we highlight that for the jury.

13 Q.  Those names would be the names associated with those

14 accounts, correct?

15 A.  Correct.

16        MR. FASULO:  If we can look -- we can take that one

17 down.

18        If we can look at this one right there.

19 Q.  Would that be one of the things that you did, was dealing

20 with these deposits into the checking account?

21 A.  Yes.  I'm not really sure what this is, but yes.

22        MR. FASULO:  We will move on.  Let's go to the next

23 check.

24 Q.  Here is a check made out to Lisa Ranger at the time in

25 November of 2009.  You see that?

1  A.  Yes, I do.

2  Q.  Who signed that check?

3  A.  I did.

4  Q.  What does the number $6,570.70 reflect?

5  A.  That is a 15-day period that I did collections for

6  Dr. Fishman and that was the 17 percent percentage.

7  Q.  When you talked on direct examination that you paid

8  yourself and made checks out on yourself, is this the practice

9  that you engaged in on an ongoing basis?

10  A.  This is what Dr. Fishman had me do, yes.

11  Q.  Does this check reflect the types of checks that were made

12  out from the account with your signature relating to your pay?

13  A.  Yes, it does.

14  Q.  That occurred from that time, 2009, right to the time that

15  you were arrested, correct?

16  A.  Correct.

17  Q.  Thank you.

18          MR. FASULO:  I'd like now to turn to Government

19  Exhibit 5007.

20  Q.  During the course of your exam, about a minute ago, you

21  were talking about your responsibilities.  Do you remember

22  that?

23  A.  Yes, I do.

24  Q.  What are we seeing in Government Exhibit 5007 here?

25  A.  That is a medicine cabinet that Dr. Fishman purchased for

1   the supplies to go in.  It did lock.

2   Q.  That's great.  Where was this medicine cabinet?

3   A.  In the garage bay next to my vehicle.

4   Q.  When you say the garage bay, what state was it in?

5   A.  Delaware.

6   Q.  What location was it in?

7   A.  Delaware.

8   Q.  What was the address of the location?

9   A.  125 Jennifer Lane.

10  Q.  I just want the record to be clear.  Thank you.

11          This was in your garage.  Is this the way this supply

12  cabinet looked on the day that you were arrested, if you

13  recall?

14  A.  I believe it did, yes.

15  Q.  I am going to go through the supply cabinet with you.

16          I know it's a little blurry, but can you see what's

17  been expanded here on the top shelf of the supply cabinet?

18  A.  Yes, I can.

19  Q.  Can you see there is tape, marking in blue?

20  A.  Um-hum.

21  Q.  Do you see the tape there?

22  A.  Yes.

23  Q.  What is that?

24  A.  It was my organization system to know where those supplies

25  went on that shelf.

1   Q.  On the bottom there what did it reflect?

2   A.  On the bottom.

3   Q.  It says -- this one says --

4   A.  The product itself, yes.

5   Q.  You would put the item above where you put the label?

6   A.  Correct.

7   Q.  Is that fair to say?

8   A.  Um-hum.

9   Q.  What was the items, as far as you knew, that were on this

10  shelf at that time?

11  A.  They were items that Dr. Fishman's clients would call in

12  for and needed.

13  Q.  Let's start with this item.  What was that item?

14  A.  It was a product called Dormosedan.

15  Q.  Where did that Dormosedan come from?

16  A.  It could have come from Henry Schein Animal Health or

17  Midwest.  They both carried the same thing.

18  Q.  The next product here, you see this product there?

19  A.  Yes.

20  Q.  You see a name underneath it?

21  A.  Ace.

22  Q.  What was that product, as far as you know?

23  A.  It was a supply product that would be fulfilled for

24  Dr. Fishman's clients.

25  Q.  Where did this product come from?  Do you know can you tell

1   from the jars?

2   A.  Henry Schein Animal Health.

3   Q.  If we go to the next, do you see this product here?

4   A.  Yes, I do.

5   Q.  Do you see the name underneath?

6   A.  Xylazine.

7   Q.  What was that?

8   A.  What was that?  I am not sure what it was.  It is a Henry

9   Schein Animal Health product.

10  Q.  We will do this one shelf and then we will generally talk

11  about the rest.  The next product.

12  A.  GPE.

13  Q.  Do you know where that product originated from?

14  A.  Horse Necessities Pharmacy.

15  Q.  Do you know what that product was?

16  A.  I do not know what that product was.

17  Q.  This product right here, the next one.

18  A.  Adrenal cortex.

19  Q.  Where did you get that product from?

20  A.  That would be Rapid Equine Pharmacy.

21  Q.  Finally, over here there is another product on the shelf.

22  Do you see the label on that product?

23  A.  Flucort.

24  Q.  Do you know what that is?

25  A.  I don't know what that is.

1    Q.   Where did that product come from?

2    A.   Rapid Equine.

3    Q.   If you know.

4    A.   It was Rapid Equine.  I have heard the name Flucort, but if

5    you are asking me if I know the ingredient, I do not.

6    Q.   If we can go back to the main shelf, would it be fair to

7    say, without going through every level of the shelf, that

8    similar products were on each of these levels of this cabinet?

9    A.   Correct.

10   Q.   Would it be fair to say that underneath the product there

11   was a label put on?

12   A.   Correct.

13   Q.   I just want to zone in here.  It's a different look on the

14   bottom.  What do you see here that was in your cabinet at

15   Jennifer Lane on the day you were arrested?

16   A.   You want me to list off what I see?

17   Q.   Yes.

18   A.   The box to the left, the brown cardboard box.

19   Q.   This one right here that I'm putting an X over?

20   A.   This is Gastrogard.

21   Q.   What was that?

22   A.   It was my understanding that that was for stomach ulcers.

23   Q.   Where was that received from?

24   A.   Could have been Henry Schein Animal Health.

25   Q.   If you don't know, don't guess.  Do you know?

1   A.  It's a manufactured product.

2   Q.  Above it I see there is a green tin.  Can you -- looks like

3   plastic to me.

4   A.  I can see the osteoform.

5   Q.  What was this, this one?

6   A.  Yes.

7   Q.  What was that?

8   A.  It's a product that the doctor needed for his clients.

9   Q.  Where did it come from?

10  A.  Henry Schein Animal Health, Midwest Veterinarian.

11  Q.  Underneath I see there is a bag there.  This right here?

12  A.  Yes.

13  Q.  What is that?

14  A.  That is Gastrogard.

15  Q.  How are they packaged, the Gastrogard?

16  A.  That's a paste form.

17          THE COURT:  So the jury can see it.

18  Q.  When I say this here, how was it packaged?

19  A.  It's a paste form in a pre-- it's a sealed little package.

20  Q.  Do you know where this Gastrogard came from?

21  A.  Henry Schein Animal Health, Midwest Veterinarian.

22  Q.  We can go back to the main picture.

23          There is also these bottles right here.  You see

24  those?

25  A.  Yes.

1    Q.  Do you know what they were?

2    A.  The one on top is sterile water.

3    Q.  Let me go back.  So this?

4    A.  Correct.

5    Q.  What is that?

6    A.  This is sterile water.

7    Q.  What kind of product was that, as far as you know?

8    A.  Sterile water.

9    Q.  I want to draw your attention to this right here.  These

10   lavender or purple labels.

11   A.  This is bacterial static water.

12   Q.  These jugs, are you able to determine what they are, down

13   on the bottom there?

14   A.  Not from this picture.

15   Q.  How about this, these products right here?

16   A.  That was Regu-Mate in the front.  I should say not from

17   this picture.

18              MR. FASULO:  I want you now to go to Government

19   Exhibit 5008.

20   Q.  Is this the same cabinet or is this another cabinet?

21   A.  This is another cabinet.

22   Q.  Is this the way that you would -- what does this reflect?

23   A.  Where I would put the supplies that came in on their

24   perspective shelf.

25   Q.  This is the way you kept the supplies on a daily basis?

1    A.  Yes.  Tried to.

2    Q.  Does it criminality --

3              THE COURT:  Did you say something, Ms. Mortazavi?

4              MS. MORTAZAVI:  No, your Honor.

5    Q.  Does it accurately reflect the way you were keeping your

6    supplies at your home in Jennifer Lane?

7    A.  Yes.

8    Q.  I want to draw your attention to these supplies here.

9    A.  Um-hum.

10   Q.  From the top, drawing your attention to where I'm putting

11   the blue, do you know what was kept there?

12   A.  That is -- I believe it's a Safelet catheter.

13   Q.  Underneath the 19-gauge, right there?

14   A.  That would be drawer that had 19-gauge needles.

15   Q.  Here?

16   A.  Drawer that had 18-gauge needles, boxes.

17             MR. FASULO:  If we can zone in on the bottom.

18   Q.  What was kept in this particular area?

19   A.  Jugging needles, spinal 14-gauge different sizes needles

20   boxes of them.

21             THE COURT:  Mr. Fasulo, if you find a convenient

22   breaking point, please.

23             MR. FASULO:  Actually, Judge, this is fine.

24             THE COURT:  I suspected.  We will take a break at this

25   point.

1          Ms. Giannelli, you remain under oath.  Please do not

2     discuss your testimony with anyone during the break.

3          THE WITNESS:  Yes, Judge.

4          THE COURT:  Ladies and gentlemen, we will take a break

5     now.  Please leave your notebooks and the transcript binders on

6     your seat.  I'll see everyone back at about 11:15.  Have a good

7     break.

8          Again, I remind you, please do not discuss the case

9     during the break.

10         (Jury not present)

11         THE COURT:  Is there anything you have, Mr. Fasulo?

12         MR. FASULO:  Nothing, Judge.

13         THE COURT:  You looked as though you wanted to talk,

14    Ms. Mortazavi.

15         MS. MORTAZAVI:  No, your Honor.  Thank you.

16         THE COURT:  Thank you.

17         Ms. Giannelli, you're excused.  I'll see everyone at

18    11:15.

19         (Recess)

20         THE COURT:  Are we ready for the jury?

21         Ms. Dempsey.

22         (Jury present)

23         THE COURT:  While the jury is getting settled, do you

24    have someone who can tell Ms. Giannelli we are ready for her,

25    please.

1            Please be seated, everyone.  Thank you, ladies and

2    gentlemen.  We will just wait for the witness.

3            Good morning, again, Ms. Giannelli.

4            THE WITNESS:  Good morning.

5            THE COURT:  Mr. Fasulo.

6            MR. FASULO:  Your Honor, at this time I would like to

7    read a stipulation that has been entered into by the government

8    and the defense.

9            THE COURT:  What is the exhibit number, please?

10           MR. FASULO:  It's going to be Exhibit 9019.

11           THE COURT:  Just to remind the jury, again, what Mr.

12   Fasulo is reading into the record is an agreement between the

13   parties.

14           MR. FASULO:  I am going to skip the beginning part of

15   it again, same as all the same beginning parts.

16           THE COURT:  Thank you.

17           MR. FASULO:  It states:  If called to testify at

18   trial, a law enforcement officer from the Federal Bureau of

19   Investigations would testify that the following government

20   exhibits are true and correct extractions of the electronic

21   Avimark's software records from a computer seized from Lisa

22   Giannelli's residence at 125 Jennifer Lane, Felton, Delaware,

23   19943 on or about March 9, 2020.  They would be Government

24   Exhibits 20004, 20006, 20007, 20001, 20008.

25           It is further stipulated and agreed by and between the

1  parties that this stipulation, which is Government Exhibit

2  9019, and the exhibits referenced herein may be received in

3  evidence at trial.

4          THE COURT:  The version I have you have not signed.

5  You so stipulate?

6          MR. FASULO:  I so stipulate, but I have the signed

7  version, Judge.

8          THE COURT:  I assume you're moving this, Mr. Fasulo?

9          MR. FASULO:  Yes, Judge.

10         THE COURT:  The stipulation, the agreement between the

11 parties is admitted into evidence as are the exhibits

12 referenced in Government Exhibit 9019.

13         (Government Exhibits 20004, 20006, 20007, 20001,

14 20008, and 9019 received in evidence)

15         MR. FASULO:  Thank you, Judge.

16         If I can ask Ms. Jung if we can put up Government

17 Exhibit 20001.  I would ask Ms. Giannelli to take a look at

18 what's on the screen.  I hope the jurors can see it.  Which is

19 Government Exhibit 20001.

20 Q.  Do you remember sometime this morning we talked about your

21 Avimark system?

22 A.  Yes.

23 Q.  Are you familiar with what's in front of you at this time,

24 Government Exhibit 20001?

25 A.  Yes.

1    Q.  Where did this come from?

2    A.  The Avimark veterinary software program.

3    Q.  Who would have put the data into the system that's

4    reflected on this exhibit?

5    A.  That was my job.

6    Q.  Let's just talk about this specific -- is this a typical

7    patient chart as it says on top?

8    A.  That I know of, yes.

9    Q.  When you say patient chart, what was the purpose of this

10   patient chart, as you understood it?

11   A.  It was just a system that kept track of the orders that the

12   clients called in.

13   Q.  On top there that information, you see the name Ross Cohen?

14   A.  Yes, I do.

15   Q.  That address, correct?

16   A.  His P.O., yes.  P.O. box.

17   Q.  What was that, if you know?

18   A.  That was the address that he requested if he had to bill

19   himself to be sent to.

20   Q.  Underneath it there is something called patient

21   information.  Do you see that?

22   A.  Yes, I do.

23   Q.  Who would have put that information into the Avimark

24   system?

25              THE COURT:  Are you asking who did?

1   Q.  Who put that information into the Avimark system?

2   A.  I did.

3   Q.  What information did you put in on this exhibit under

4   patient information?

5   A.  Under patient information, the horse's name, the sex of the

6   horse.

7   Q.  What was the name of the horse?

8   A.  Captain Serious.

9   Q.  Sex of the horse means gelding?

10  A.  Gelding.

11  Q.  What does that mean, female, male?

12          THE COURT:  Let her answer.

13  A.  Castrated male.

14  Q.  Birth date?

15  A.  5/12/12.

16  Q.  Whose birth date is that?

17  A.  That is the horse's birth date.

18  Q.  Next information.

19  A.  The color of the horse was brown.

20  Q.  Obviously, species?

21  A.  Equine.  Standard bred, nine years old, and his approximate

22  weight.

23  Q.  Once that was in, when you have medical history, what did

24  you understand that section to mean in relating to this

25  document you see the word medical history?

1    A.  I don't see medical history.  There it is, yes.

2    Q.  What did you understand that section to be?

3    A.  That would just be the orders that the clients called from

4    Dr. Fishman and what they received.

5    Q.  What was your understanding, as working for Dr. Fishman

6    during this time specifically as related to this particular

7    patient chart, what was your understanding of what the doctor

8    would do in relationship to the medical treatment of the

9    animal?

10   A.  It was my understanding.

11           MS. MORTAZAVI:  Objection.  Foundation.

12           THE COURT:  Please lay a foundation.

13   Q.  Did you have an understanding as to whether Dr. Fishman

14   kept any individual notes as to his work with the different

15   clients' horses?

16   A.  It was my understanding that Dr. Fishman kept the

17   medical --

18           THE COURT:  You were asked, did you have an

19   understanding?  That's a yes or no.

20           THE WITNESS:  I'm sorry.  Yes.

21   Q.  What was your understanding?

22   A.  Dr. Fishman would keep the medical records.

23   Q.  Would you be involved in that process at all?

24   A.  No, I would not.

25   Q.  And were you ever involved in that process from the time

1  that you started with Dr. Fishman throughout your time with

2  Dr. Fishman?

3  A.  No, I was not.

4  Q.  And here, when you have the date underneath here, 11/30/16,

5  right?

6  A.  Correct.

7  Q.  Next to it it says by.  What was CL?

8  A.  The office, the clinic.  That was the software, who

9  inputted that in.

10  Q.  Who was CL that inputted that in?

11  A.  That would be me.

12  Q.  Next to that there is a code.

13  A.  Um-hum.

14  Q.  What was that code?

15  A.  That was the code that the Avimark system had for that

16  particular product.

17  Q.  Next to it there is a description?

18  A.  Um-hum.

19  Q.  Where did that come from?

20  A.  The bottle.  The inventory.

21  Q.  Who would input that information into the system?

22  A.  Dr. Fishman or I.

23  Q.  And quantities, would that reflect what was ordered on that

24  particular day?

25  A.  Correct.

1    Q.  If we go down further, 10/31/16, is the type of information

2    the same under 10/31/16 like it is under 11/30/16?

3    A.  Inputted the same way, yes.

4    Q.  As you go through this document, what items -- let me ask

5    you, if we go to 8/3/16, correct, you see that, where I

6    highlighted in blue?

7    A.  Yes, I do.

8    Q.  What items were in that order?

9    A.  Vitamin B complex, Fort 250 MLs, P Block, glandular peptide

10   extract, HN, needles, Mono Jack 18 inch and a half, and a folic

11   five times hundred CCs.

12   Q.  You also see on the top here date and time, correct?

13   A.  Correct.

14   Q.  What was that date and time, as you remember it, in terms

15   of this report, the date of the report?

16   A.  Date of the report, yes.

17   Q.  It doesn't reflect the date that the information was

18   actually entered into the report, correct?

19   A.  Correct.

20   Q.  When was it that you would enter in the individual orders

21   that were placed by the patient -- when would you enter that

22   information into the Avimark system?

23   A.  Ideally, as soon as they came in.

24   Q.  Once you entered it into the system, do you have an

25   understanding that Dr. Fishman had access to that information?

 1  A.  Yes.

 2  Q.  How do you know that?  How do you have that understanding?

 3  A.  He told me.

 4          MR. FASULO:  If we can go to the next exhibit, 20006.

 5  Q.  You see this is a different type of report, correct?

 6  A.  Correct.

 7  Q.  Is this out of the same system?

 8  A.  Yes, it is.

 9  Q.  Is that the Avimark system?

10  A.  Yes, it is.

11  Q.  Again, on this report, is this typical of the reports that

12  would be considered who got report?

13  A.  If that report was drawn, yes.

14  Q.  What does it mean who got report?

15  A.  The client that received the supplies.

16  Q.  On the list here you see a list of names.  You see that?

17  A.  Yes, I do.

18  Q.  And a number next to it, right?

19  A.  Yes.

20  Q.  Can you tell us what that name was and what relationship

21  the number is to this report.

22  A.  The name was the client and the number was the client's

23  account number.

24  Q.  In the middle you see patient, right?

25  A.  Um-hum.

1    Q.  You see there is a certain -- on the top here Shady McCoy?

2    A.  Yes.

3    Q.  You see boys round here.  Do you see that?

4    A.  Yes.

5    Q.  Underneath it you see barn supplies?

6    A.  Um-hum.

7    Q.  Can you tell us what the difference was between Shady

8    McCoy, boys round, and barn supplies as it relates to this

9    category?

10   A.  Shady McCoy was the horse that the gentleman, the client

11   listed for those horses to be billed to and barn supplies was

12   the overall stable that paid for the supplies.

13   Q.  When it says barn supplies, did the invoice reflect the

14   items that were being delivered from Equestology to that

15   location?

16   A.  Yes, it did.

17   Q.  Did it have the same specificity as the items that were

18   being listed under the actual horses' names?

19   A.  Yes, it did.

20   Q.  What was your understanding of why you used the term barn

21   supplies instead of the name of an actual client there?

22   A.  It was my understanding that the horses were herd

23   management and that barn supplies were allowed to be listed as

24   a category.  Trainers tended to use -- have a routine.  They

25   used --

1            MS. MORTAZAVI:  Objection.

2   A.  My understanding --

3            THE COURT:  You have answered so far.  Mr. Fasulo can

4   follow up if it needs clarification.

5   Q.  Where did you get that understanding from?

6   A.  Dr. Fishman.

7   Q.  I see there is under the client list.  How many clients

8   were in the Avimark system, if you know?

9   A.  I believe 1,073.

10  Q.  Of those clients, how many clients -- was the system used

11  before you became an employee of Dr. Fishman?

12  A.  Yes, it was.

13  Q.  Were there names in the system before you began?

14  A.  Yes, there were.

15  Q.  And how many of those thousand or so clients were active

16  clients when you were arrested, during the time of say 2015 to

17  2019?

18  A.  Not all of them.  I would be guessing.

19            MR. FASULO:  If we can just go to one more exhibit

20  here, and that would be 20007, I think.  Thanks.

21  Q.  Under this exhibit this is a different type of report,

22  correct?

23  A.  Same type of report.  Different supply.

24  Q.  On this report you see up on the top here an item that's

25  listed, right?

 1   A.  Yes, I do.

 2   Q.  What item is that?

 3   A.  EPM double kill.

 4   Q.  Where did that item come from?

 5   A.  That is an item that Dr. Fishman shipped up to the office

 6   from Florida.

 7   Q.  When you say Dr. Fishman shipped it, where was it

 8   manufactured, if you know?

 9   A.  I do not know where it was manufactured.

10   Q.  Did it come from Henry Schein?

11           MS. MORTAZAVI:  Objection.

12           THE COURT:  Grounds.

13           MS. MORTAZAVI:  The witness just answered.

14           MR. FASULO:  I'll move on, Judge.

15   Q.  What did you understand this product to be?

16   A.  A treatment for EPM.

17   Q.  Did you understand it to be a proprietary product?

18   A.  Yes, I did.

19   Q.  What do you understand a proprietary product of

20   Dr. Fishman's to be?

21   A.  A product that Dr. Fishman did research on and designed

22   himself, a product that he was very protective of.

23   Q.  When you say protective, what was your understanding of why

24   Dr. Fishman was protective of the proprietary products?

25   A.  It was my understanding that he spent a large amount of

1    money on research and whatever goes into making a product, time

2    and money.

3    Q.  During the time you worked for Dr. Fishman, did you

4    understand that this was a concern of his as to the way you

5    would deal with clients on the proprietary products?

6    A.  Yes.  He had a concern.

7    Q.  What was your understanding of his concern as to these

8    proprietary products?

9    A.  It was my understanding that he did not want his

10   competition to get these products.  It was my understanding he

11   did not want them to reengineer these products, to duplicate

12   them, so he would not have the proprietary nature of it.  It

13   would be -- he would lose sales.

14   Q.  Prior to working for Dr. Fishman, were you aware or was it

15   known to you how his collection rate was regarding his

16   accounts?

17   A.  During the entire time?

18   Q.  Before you started working for him.

19   A.  That's why he hired me.  His collection rate was not good.

20   Q.  When you worked for him, how did you do in terms of your

21   role making sure that people were paying their bills?

22   A.  I did quite well.

23   Q.  What was your understanding about your success rate in

24   working for Dr. Fishman in that capacity collecting bills?

25   A.  Dr. Fishman did not have many past-due bills.  He had less

1  than 2 percent owed to him.

2  Q.  What did you do to help to ensure yourself that you would

3  be successful in attaining a high collection rate for

4  Dr. Fishman?

5  A.  What did I do myself?

6  Q.  Yes.

7  A.  Organization, coordinating, streamlining.

8  Q.  And you had worked in the horse industry for a significant

9  period of time during your life, correct?

10 A.  Yes.

11 Q.  Did you know a lot of the players within the industry?

12 A.  Yes.

13 Q.  Was that a consideration in terms of who you would deal

14 with in terms of the product sales?

15 A.  It factored in.

16 Q.  How did it factor in?

17 A.  My personal knowledge of the character.  If a trainer would

18 not pay his bills, everybody kind of knew everybody in the

19 business as far as who paid and who didn't, whether that person

20 would lie to you and say that they couldn't pay the bill when

21 they actually could, stuff like that.

22 Q.  Now, you said you got some products from Florida, is that

23 right?

24 A.  Yes.

25 Q.  And you said you got those products from Dr. Fishman.  Is

1    that what you just testified to?

2    A.   Correct.

3    Q.   So drawing your attention to that, have you ever been to

4    Dr. Fishman's location in Florida?

5    A.   No, I have not.

6    Q.   Have you ever been involved in the compounding or the

7    creation of any products?

8    A.   No, I have not.

9    Q.   You heard the testimony of Courtney Adams here in court.

10   Do you remember that?

11   A.   Yes, I have.

12   Q.   You heard her talking about a role that she had in the

13   Equestology.  You remember that?

14   A.   Yes, I do.

15   Q.   You heard her talk about the fact that she was involved in

16   actually mixing the product.  Do you remember hearing that?

17   A.   Yes, I do.

18   Q.   Did you have any role with Dr. Fishman in mixing products?

19   A.   No, I did not.

20   Q.   Were you ever paid to do that?

21   A.   No, I was not.

22   Q.   Were you ever instructed as to what ingredients go into a

23   product or why ingredients were going into a product?

24   A.   No, I have not.

25   Q.   In terms of the Florida location, you also heard that there

1    was a storage facility in Florida different than where

2    Dr. Fishman had a place on the beach?  I think it was an island

3    beach.

4    A.  I did hear that.

5    Q.  Were you ever in that storage facility?

6    A.  No, I was not.

7    Q.  Did you ever inspect the way Dr. Fishman was handling the

8    products that he had in Florida?

9         MS. MORTAZAVI:  Objection.  Leading.

10        THE COURT:  No.  That's not leading.

11   A.  Can you repeat the question again.

12   Q.  Did you ever inspect the storage facility that Dr. Fishman

13   had in Florida?

14   A.  No, I did not.

15   Q.  When you said you received a commission on collections,

16   what was your understanding of sales that Dr. Fishman would

17   make unrelated to sales that you were involved in?

18   A.  If I didn't collect for it, I did not get paid for it.

19   Q.  Did Dr. Fishman separately collect monies from individuals,

20   as far as you know?

21        MS. MORTAZAVI:  Objection.  Foundation.

22   A.  As far as I know --

23        THE COURT:  Can you lay a foundation, please.

24   Q.  Let me ask about Delaware and Florida.  What was your

25   understanding of the operation in Delaware?

1   A.  My understanding is, I was the satellite office for

2   Dr. Fishman.

3   Q.  Did you have an understanding of what was happening in

4   Florida?

5   A.  I understood Dr. Fishman was a veterinarian, and he had

6   multiple businesses outside of what I -- my purview.

7   Q.  Did you have anything to do with any of those multiple

8   businesses that were located in Florida?

9   A.  No, I did not.

10  Q.  And were you aware -- you said there was a big Avimark

11  client list, correct?

12  A.  It was presented here, yes.

13  Q.  Were there certain clients on that list that only

14  Dr. Fishman dealt with?

15  A.  Yes.  At times, yes.

16  Q.  If Dr. Fishman dealt with those clients, was it your

17  understanding that you would not be included in making money if

18  he was to make collections on those clients' bills?

19  A.  If he made the collections, correct.

20  Q.  That is your understanding?

21  A.  Yes.

22  Q.  Did that exist throughout the time that you worked with

23  Dr. Fishman?

24  A.  Yes, it did.

25  Q.  Now, let me draw your attention to Courtney Adams.  Did you

1   ever physically meet her while you were working for

2   Dr. Fishman?

3   A.  No, I did not.

4   Q.  What was your contact with Courtney Adams?

5   A.  E-mail.  My contact was e-mail or maybe a text or a phone

6   call.

7   Q.  And do you remember some discussion about labeling of items

8   in Florida?

9   A.  Yes.

10          MR. FASULO:  Can I have 3321 put on.  I think it's

11  easier.  Government Exhibit 332J.  It's easier.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  During the course of the trial, do you remember seeing this

2   posted on the screen?

3   A.  Yes, I do.

4   Q.  And this was -- and what is this?

5   A.  This was an e-mail from Dr. Fishman to Courtney Adams, I

6   was cc'd on it along with Mary Fox.

7   Q.  Okay.  And if we start with the -- you see the part here,

8   it says on January 8, Courtney Adams wrote, correct?

9   A.  Yes, I do.

10  Q.  She wrote to you.  She said, Lisa, please see the attached

11  file and let me know if that color is okay with you.  The vial

12  cap will be sapphire blue.  We also changed the horse head

13  logo.

14  A.  Mm-hmm.

15  Q.  Right?

16  A.  Mm-hmm.

17  Q.  And you respond, looks good to me -- I'm sorry.  And Seth

18  responded to Courtney, looks good to me.  Just call Lisa so we

19  can get it done today.  Let's print 200 labels for now and see

20  how sales go, correct?

21  A.  Correct.

22  Q.  Did you have an opinion as to this particular label?

23  A.  Not here.

24  Q.  But do you remember seeing this?

25  A.  Yes.

1  Q.  Do you remember being consulted at times about colors of

2  labels?

3  A.  Yes.

4  Q.  And other than colors of labels and the way it appeared,

5  did you have any other participation in the labeling of any of

6  the items that Dr. Fishman would label down in Florida?

7  A.  No, I did not.

8  Q.  Did you decide what the ingredients -- what ingredients

9  went on those labels?

10 A.  No, I did not.

11 Q.  Did you decide how those labels would be set up?

12 A.  No, I did not.

13 Q.  Have you ever studied the FDA rules as to what needs to be

14 included or not included in those labels?

15 A.  No, I did not.

16 Q.  What are you relying on in terms of those labels being in

17 conformance with whatever regulation existed?

18         MS. MORTAZAVI:  Objection.  Witness stated she wasn't

19 aware of regulations.

20         THE COURT:  No.  I don't think that's what she said.

21 The objection is overruled.  You can answer.

22 A.  My employer, the veterinarian.

23 Q.  Excuse me?

24 A.  My employer, the veterinarian.

25 Q.  Who was that?

1   A.  Dr. Seth Fishman.

2   Q.  Who had the final say as to how those labels would look,

3   what's going on those labels, and what those labels imported to

4   be?

5   A.  Dr. Fishman.

6   Q.  And when Courtney Adams contacted you, why did you -- what

7   was your understanding why Courtney Adams would seek out your

8   input on this product?

9   A.  Dr. Fishman was color-blind.  And -- oh.

10  Q.  Thank you.

11         MR. FASULO:  We can take that down.  I want to go to

12  exhibit number 168T, transcript of a call between Seth Fishman

13  and Lisa Giannelli.  168AT.  I'm sorry.  Thank you.

14  Q.  Do you remember seeing this before?

15  A.  Yes.

16         MR. FASULO:  Government Exhibit 168AT between

17  Lisa Giannelli and Seth Fishman, this is the transcript, if we

18  can go to the transcript?

19  Q.  Without reading it to the Court, have you had a chance to

20  look at what Seth Fishman was saying in line 2?

21  A.  Okay.

22  Q.  Do you understand what he was talking about here?

23  A.  Not really.

24  Q.  How many times were conversations had between you and

25  Seth Fishman where Fishman would talk about things that you

1    didn't understand?

2    A.   A lot.

3    Q.   And in this conversation, what is it -- what is it that you

4    don't understand from this conversation or didn't understand at

5    the time from this conversation?

6    A.   I didn't -- I don't have any knowledge of any client having

7    anything to do with stem cells.  I did not see that.

8    Q.   When he says, so it's about four times more effective than

9    stem cells, did you have any idea what that meant?

10   A.   No, I did not.

11   Q.   So I said, again, if you were committed to spending money

12   and using what is not even on the market now for anyone else

13   and is being tested in the Emirates with great success and it's

14   being used by the U.S. Olympic vet, and you're going to get it

15   for a third of the price of what everyone is paying, so yes.

16   If not, don't worry about it.

17          Do you understand what this was about?

18   A.   No, I did not.

19   Q.   But, Lisa, on line 3, what is your response?

20   A.   "Yeah."

21   Q.   What did you mean by that, and why did you respond "yeah"?

22   A.   Basically I -- if it didn't apply to my job, it was my

23   understanding at this point I was just -- he was rambling, and

24   I was like, yeah, there was no understanding of the

25   conversation.  Dr. Fishman rambled a lot.

1  Q.  If we go to line 5 here.  Can we go to line 5 here on this

2  exhibit?

3  A.  Yes.

4  Q.  What did you say what was being said in line 5 here?

5  A.  There was a response to what Dr. Fishman said in line 4.

6  He said, I don't want to teach this guy medicine from overseas.

7  And I --

8              THE COURT:  Go ahead.

9  Q.  So what did you mean in your response to that?

10 A.  Dr. Fishman explained to me that it's very costly for him

11 minute-wise, whatever, wherever he was from.  And it was

12 something that time-wise, he would prefer to do it back in the

13 states.  That was my understanding.

14             THE COURT:  The question is what did you mean by what

15 you said in number 5.

16 A.  "No.  And absolutely not.  Let's start out with baby

17 steps."

18 Q.  What did you mean by that?

19 A.  It was a client that did not commit to Dr. Fishman's

20 program.  I don't really know at this point to be honest with

21 you.  I'm sorry.

22 Q.  When you say baby steps, you don't have any idea what you

23 meant by that?

24 A.  Baby steps was collecting money.  As far as this gentleman,

25 if I remember correctly, was a check-only person.  He did not

1  have a credit card.

2  Q.  Okay.  Let me go to the next exhibit.

3          MR. FASULO:  If we can put up Exhibit Number GX503 --

4  Government Exhibit 5036, please?

5  Q.  Looking at 5036, do you know what Specialized Performance

6  Compound is?

7  A.  The company that made that product.

8  Q.  Do you know whose company that was?

9  A.  At the time, no, I did not, but it was a product

10 Dr. Fishman sent up from Florida.

11 Q.  Okay.  And is this a product that you held in your place in

12 Delaware?

13 A.  Yes, it was.

14 Q.  And where it says keep refrigerated once reconstituted, did

15 you keep it refrigerated?  Was it necessary to keep it

16 refrigerated?

17 A.  Yes, it was.

18 Q.  Did you keep it refrigerated in Delaware?

19 A.  Yes, I did.

20         MR. FASULO:  I want to go to Government Exhibit 320FE,

21 which has been entered into evidence reflecting a text message

22 between Lisa Giannelli and Seth Fishman.

23 Q.  Do you remember reading this and seeing this on direct

24 examination?

25         MR. FASULO:  Can we maybe make it a little bigger, the

1  top, Ms. Jung?  Thank you.

2  A.  Okay.

3  Q.  The beginning of this, it says please remind me Monday and

4  I will check with Mary what was sent.  Thank you for

5  remembering.  Do you see that?

6  A.  Yes, I do.

7  Q.  Who was Mary?

8  A.  That would be Mary Fox, an employee of Dr. Fishman.

9  Q.  Where did Mary Fox work?

10 A.  With Dr. Fishman in Florida.

11 Q.  What was her role as it related to you at Equestology?

12 A.  She was the woman Dr. Fishman had me call to replace the

13 supplies from Dr. Fishman up into the Delaware address.

14 Q.  Okay.  And if you look through this further, you see right

15 here?

16 A.  Mm-hmm.

17 Q.  That's on your cell, right?

18 A.  Correct.

19 Q.  Is this a message you're sending?

20 A.  That's a message from a client that I'm forwarding.

21 Q.  Right.  And who are you forwarding this to?

22 A.  To Dr. Fishman.

23 Q.  And what is it that you are forwarding to Dr. Fishman?

24 A.  A question from Dr. Fishman's client on how to use lactated

25 ringers.  Can I use lactated ringers to the ACTH powder and how

1   many 10CCs.

2   Q.  What was the purpose of your forwarding this message to

3   Dr. Fishman?

4   A.  It was a medical question that Dr. Fishman needed to answer

5   from his client.

6              MR. FASULO:  Bring it down further.

7   Q.  See also down here on 5-19-2016, this exhibit is marked in

8   evidence.  There's another cell message from you.  Do you see

9   that?

10  A.  Correct.

11  Q.  And who was this cell message directed to?

12  A.  To Dr. Fishman.

13  Q.  And you see this word here?  What was that?  How would you

14  say that?

15  A.  I have no idea.  A product, a supply.

16  Q.  Propantheline bromide.  And I'm sure I messed up the

17  pronunciation.  Ross Cohen is asking about it.  You see

18  underneath Dr. Fishman's response to you in text, right?

19  A.  Mm-hmm.

20             THE COURT:  Excuse me one second.

21             You have to say yes or no.  The court reporter can't

22  take it down.

23  Q.  You see a response there?

24  A.  Yes, I did.

25  Q.  The response:  Have but it tests?

 1   A.  Correct.

 2   Q.  What was your understanding of that?

 3   A.  My understanding was that Dr. Fishman could get that

 4   particular product, and he was informing that there is a test

 5   that the client needed to abide by, there were withdraw times

 6   that they needed to be aware of.

 7   Q.  So let me ask you a little bit about that.

 8           As a trainer and a grooms person, were you aware of

 9   their concept of withdraw times as it related to medications?

10   A.  Yes, I was.

11   Q.  And what was your understanding of the term withdraw time?

12   A.  My understanding was it was a supply that a product that

13   you could use in your daily work, but there was a time out that

14   you could not use it if you were a standardbred racehorse

15   trainer -- if you signed the contract with the racetrack.

16   Q.  And was it also your understanding that if you failed to

17   adhere to the withdraw time, something would happen?

18   A.  Not to me.  To the person using it, yes.

19   Q.  I'm saying, when you're a trainer or grooms person,

20   correct?

21   A.  Correct.

22   Q.  What was your understanding if it happened if, in fact, you

23   failed to adhere to the withdraw time and the animals testing?

24   A.  That would show up on a test, and the person using the

25   product made -- you know, that was made at the time, would be

1   responsible, get a fine, and a suspension from the racetrack.

2   Q.  Was it important for you as a trainer at that time to know

3   whether products were testable or not testable?

4   A.  100 percent, yes.

5   Q.  Was it also important to know what the time period was that

6   you would be able to give the test -- give the product to

7   adhere to the withdraw time?

8   A.  Yes.

9   Q.  And to your understanding, were there products that you

10  sold that were testable?

11  A.  The products of Dr. Fishman?

12  Q.  Yes.

13  A.  Yes, I believe.

14  Q.  And were there also products where he indicated to you that

15  they were not testable?

16  A.  Yes.

17  Q.  And did that affect your decision to sell or not sell or

18  participate in the sale or not sale of those products?

19  A.  No, they were order fulfillments, no.

20  Q.  Who decided what would be on your inventory list of

21  products that would be sold under the brand of Equestology?

22  A.  Dr. Fishman.

23  Q.  And any time that you work for Dr. Fishman, did you have

24  any conversation with anyone regarding the use of the -- let me

25  withdraw.

1          At any time you worked for Dr. Fishman, did you have

2     any conversations in which you encouraged someone to use the

3     product on the day of a race?

4     A.   Encourage?  No, not -- no.

5     Q.   At any time that you worked for Dr. Fishman, were you --

6     had any financial interest in a trainer or a horse winning a

7     horse?

8     A.   No, I did not.

9     Q.   Was your salary based on the success of the horses or the

10    owners that were buying product from you?

11    A.   No, it was not.

12    Q.   At any time that you worked for Dr. Fishman, did you have

13    any personal interests in any horses yourself?

14    A.   I had a riding horse.

15    Q.   In terms of standardbred racing horses or thoroughbred

16    horses?

17    A.   No, I did not.

18    Q.   Did you have any partial ownerships?

19    A.   No, I did not.

20    Q.   Any fractured ownerships?

21    A.   No, I did not.

22    Q.   Any complete ownerships?

23    A.   No, I did not.

24    Q.   Now, at any time that you were involved in establishing the

25    inventory for Dr. Fishman's products, did you personally decide

1    to add new products to that list?

2    A.   Personally decide?  No.

3    Q.   Who made that decision?

4    A.   Dr. Fishman.

5    Q.   Okay.  I want to draw your attention to Government Exhibit

6    5019.

7            MR. FASULO:  If we can go past this?  I think it's --

8    keep going.  Sorry.  The evidence collected item line, I think

9    it's part of the same exhibit, next page, another page.

10   Q.   Let me draw your attention to the day that you were

11   arrested.  There was a number of materials that were in your

12   home, correct?

13   A.   Correct.

14   Q.   And at some point during direct examination, you were able

15   to view a list of the items that were taken from the home?

16   A.   Correct.

17   Q.   Let me just cut to the chase.  Do you remember seeing an

18   inventory list, travel sheet, which is Government 709 -- I'll

19   just go to that.  It's simpler.

20   A.   Yes, I do.

21           MR. FASULO:  You can highlight that.

22   Q.   What are the items on this list?

23   A.   These are --

24   Q.   First of all, are you familiar with it?

25   A.   Yes, I am.

1   Q.  How are you familiar with this list?

2   A.  These are supplies that Dr. Fishman either had stored at my

3   residence or they were orders that -- supplies that could be

4   ordered from a vendor.

5   Q.  And who created the inventory travel list?

6   A.  The Avimark system did.

7   Q.  Next to the items there's a price structure, correct?

8   A.  Yes.

9   Q.  Who decided the prices of these items?

10  A.  Dr. Fishman.

11  Q.  Okay.  And are you familiar with this particular version of

12  the list?

13  A.  Yes.

14  Q.  And if you look through it --

15          MR. FASULO:  If we can just page through, I think it's

16  11 pages.

17  A.  Mm-hmm.

18          MR. FASULO:  Give you a -- may I give the witness a

19  hard copy so she can page through?

20          THE COURT:  Sure.

21  Q.  When you're finished, if you can look up?

22  A.  Mm-hmm.

23  Q.  Okay.  And you're familiar with it?

24  A.  Yes.

25  Q.  What type of products, as far as you knew, were on this

 1  list?

 2  A.  There were vitamins, there were antibiotics, hydration

 3  fluids, stomach medicine, medicine for EPM, whatever came in

 4  for orders.

 5  Q.  And did you hear -- and would it be fair there were

 6  prescription drugs on that list?

 7  A.  I would say.  He was a veterinarian, yes.

 8  Q.  And also nonprescriptive items?

 9  A.  Yes.

10  Q.  And are there homeopathic items on that list?

11  A.  Yes.

12  Q.  Vitamins on that list?

13  A.  Yes.

14  Q.  Does that list reflect what you were -- you understood you

15  were allowed to sell on behalf of Dr. Fishman?

16  A.  In the order fulfillments, it was my understanding that,

17  yes, if it was on this list -- it was order fulfillments.  If

18  it was on this list, it was allowed to go to the clients.

19          MR. FASULO:  Can I retrieve?

20          THE COURT:  Yes.

21  Q.  All right.  You heard about something called a

22  veterinarian-client-patient relationship, VCPR.  Do you

23  remember hearing that during the course of this trial?

24  A.  Yes, I do.

25  Q.  And who did you understand needed to have a relationship

1    with the clients?

2    A.   The veterinarian.

3    Q.   And what was your understanding of Dr. Fishman's role in

4    Equestology?

5    A.   He was the veterinarian.

6    Q.   And what did you understand his relationship was with the

7    clients?

8    A.   He was their veterinarian.

9    Q.   And how did you make that determination?  What did you

10   understand -- how did you come to that conclusion?

11   A.   Because he was their veterinarian.  They -- I don't

12   understand the question.

13   Q.   How did you -- you just said that he was their vet.  What

14   went into that determination by you that he was the vet?

15   A.   Because the client -- I mean, I don't know how to describe

16   that.  I'm sorry.

17   Q.   Okay.  What did you have in your possession regarding

18   Dr. Fishman's licenses?

19   A.   That he was licensed in each state.

20   Q.   When you say each state, do you remember every state?

21   A.   No.

22   Q.   Which states was Dr. Fishman licensed in the time that you

23   were working for him that you were aware?

24   A.   He was licensed in Delaware, New Jersey, New York, Florida,

25   Indiana, Ohio, Pennsylvania.

1    Q.  And how did you know that?

2    A.  Because the license came either in the mail, or Dr. Fishman

3    would send it up, and it said in good standing in that state,

4    and it had the date and time.

5    Q.  And, in fact, what was the -- was there any need for you to

6    have that license as it related to the vendors that you were

7    dealing with?

8    A.  Yes.  The vendors required it to be on file.

9    Q.  On file with who?

10   A.  With their business.

11   Q.  Okay.  And what was your understanding from Dr. Fishman

12   about how you were to facilitate that license being on file

13   with the vendors?

14   A.  It was part of my office work.

15   Q.  And what do you mean by that?

16   A.  You know, just the general organization of things, the

17   followthrough to make sure, you know, the -- the -- if the

18   vendor requested it, I requested it from Dr. Fishman.

19   Q.  Now, I want to pull up Government Exhibit 5026.

20   A.  Mm-hmm.  Yes.  Sorry.

21   Q.  Do you remember seeing --

22          THE COURT:  Thank you.

23          MR. FASULO:  Sorry.

24   Q.  Are you familiar with this document?

25   A.  Yes, I am.

1  Q.  And what was your understanding of where this document came

2  from?

3  A.  I created it.

4  Q.  Okay.  And how did you get the information that was then

5  put into this document?

6  A.  From my time working for Doc.

7  Q.  And if we go piece by piece, the first part is orders come

8  in, correct?

9  A.  Yes.

10  Q.  And then you listed what -- what do you list under there,

11  not specifically?  What was the type of information you put

12  there.

13  A.  The clients' information.

14  Q.  And manufactured products under there?

15  A.  Yes.

16  Q.  What did you list?

17  A.  How to address if an order was coming in, how to address if

18  it was a manufactured product.

19  Q.  And the next thing you see here is compounded items.  Do

20  you see that?

21  A.  Yes, I do.

22          MR. FASULO:  If you can zoom in on that?

23  Q.  When you say my go-to compounder is Boothwyn, what did you

24  mean by that?

25  A.  It was my preference.  It was a vendor that Dr. Fishman had

1  set up, and it was a -- you know a vendor that I used quite

2  often to fulfill Doc's orders.

3  Q.  When you say compounded product, were there other vendors

4  that dealt with the same compounded products?

5  A.  Yes, there was.

6  Q.  When you say I can text over to Geoff, who was Geoff?

7  A.  Geoff was the pharmacist at Boothwyn Pharmacy.

8  Q.  And who was this written for, this whole document that

9  we're looking at?  Who was this document written for?

10  A.  This document was written by me for my husband's daughter,

11  if she chose to take over my position -- you know, if something

12  happened to me or I retired.

13          MR. FASULO:  Okay.  And if we go to the second page of

14  the document, if we may?

15  Q.  Do you see up here it says, if specifically asked for

16  certain Rapid Equine products -- can you read that section to

17  yourself, please?

18  A.  Yes.

19  Q.  The first sentence, what did you mean by that sentence?

20  Obviously it says "ti," did you mean that to be "it"?

21  A.  It.  Yes.

22  Q.  So what did that sentence mean to you, and what was the

23  purpose of you putting the sentence here that specifically asks

24  for --

25  A.  What it meant for me is if a client had called in and they

1    specifically asked for Rapid Equine version of acetylcysteine,

2    then you would go to that vendor and get it.

3    Q.   And what was Rapid Equine products?

4    A.   They were pharmacy compounded.

5    Q.   Okay.  And there's a lot of information on shipping costs.

6    A.   Correct.

7    Q.   Was that a concern of yours or an issue of yours as you

8    dealt with the clients of Dr. Fishman?

9    A.   Yes, it was.

10   Q.   And how did that play -- what role did that have in you

11   dealing with the clients?

12   A.   It didn't -- it dealt with where the order would be pulled

13   from, where the vendor -- that it would come from.

14   Q.   And were there different shipping fees charged to the

15   clients based on the volume of items that they would order?

16   A.   Yes.

17   Q.   Would you have conversations about those shipping fees with

18   clients?

19   A.   Yes.

20   Q.   And what was the purpose of those conversations?

21   A.   To save them money.

22           MR. FASULO:  Okay.  If you can go just to the end of

23   this?

24           There was a couple of areas here.  Let's go from the

25   top here.

1   Q.  Right here it says, deciding where to pull and how to send

2   takes time.  Do you see that on the top, deciding where to pull

3   and how to send takes time?

4   A.  Correct.

5   Q.  What did you mean by that?

6   A.  That was just part of the office internal work.  You know,

7   to know the shipping costs from different -- it didn't affect

8   the order.  It just affected where the order came from.

9   Q.  And specifically, you have examples here, can you explain

10  to us what you meant by these examples?

11  A.  Well, the orders that came in had different needs and came

12  from different locations.  So it was just basically a

13  coordinating -- how to get the least amount of shipping to save

14  the client money and also save Dr. Fishman money.

15  Q.  Okay.  So under number 2, if they need syringes, bute,

16  Predef -- what is that?

17  A.  It's just a product that -- manufactured product.

18  Q.  And needles and 4 EPM.  Then send all you can from Midwest,

19  what was meant by that statement?

20  A.  Everything you just listed there is -- comes from a

21  manufacturer distributor, and Midwest was a manufacturer

22  distributor, so pull from that vendor.

23  Q.  Would Midwest send it directly to the client?

24  A.  At times, yes.

25  Q.  And just EPM from the office.  What did you mean by EPM

1   there?

2   A.  That was Dr. Fishman's EPM Doublekill.

3   Q.  Okay.  And what do you mean from the office?

4   A.  It would either be the office I was located, or if I didn't

5   have any in stock, it would be the office down in Florida.

6   Q.  And then you said try to limit size of box and cost from

7   the office.

8   A.  Correct.

9   Q.  It's administrative -- would that be an administrative

10  decision?

11  A.  Absolutely.

12          MR. FASULO:  Next page.

13  Q.  I'm going to go to the bottom of this page.  I'm going to

14  draw your attention to the last two examples.  These are also

15  examples?

16  A.  Correct.

17  Q.  Okay.  If client wants lactated ringer bottles, then pull

18  from Midwest.

19          What were lactated ringer bottles?

20  A.  Lactated hydration fluids, but they were in bottles.

21  Q.  What was your understanding about your ability to send a

22  client lactated ringer bottles?

23  A.  It would -- fell under the open script, and Dr. Fishman

24  approved it.

25  Q.  You used the word open script.  What does that mean?

1   A.  Dr. Fishman explained it to me that it was in the Avimark

2   system.  You know, his clients were allowed to get it and also

3   receive repeat orders of it.

4   Q.  So what would be different of having an open script or not

5   having a script?  Can you explain?

6   A.  I don't -- I mean as -- it was something Dr. Fishman

7   approved or didn't approve.

8   Q.  And what physically do you mean by open script, when you

9   use that term of art?

10  A.  It was the Avimark -- the inventory.

11  Q.  And if it was an open script, what was your understanding

12  about your ability to send these products?

13  A.  Dr. Fishman said to send it.

14  Q.  And at any time after you sent a product under this open

15  script system, did Dr. Fishman ever indicate to you that you

16  had done the wrong thing?

17  A.  No, he did not.

18  Q.  Had he ever told you you were not permitted to do what you

19  did, following this open script system?

20  A.  No, he did not.

21  Q.  And other than Dr. Fishman, did you have any other training

22  or expertise in delivering or helping to transact these orders?

23  A.  No, I did not.

24  Q.  And was your sole basis of understanding, your

25  understanding, from Dr. Fishman?

1    A.   Absolutely.

2    Q.   And let me go to the last part here.

3           When pulling orders from the office, take pictures of

4    the orders before you pack it or print it out.  Protect us from

5    mistakes or clients' ignorance.

6           What did you mean by that?

7    A.   It was basically to show what was in that package.  If a

8    client called two or three days later or even two weeks later

9    and said they did not receive an item, then you would have

10   verifiable proof.

11          MR. FASULO:  I'd like to go -- you can take this down.

12   I'd like to go to government 319, Government Exhibit 319O, I

13   think.

14   Q.   Ms. Giannelli, you just talked about who set the prices,

15   correct?

16   A.   Correct.

17   Q.   Do you remember talking about that?

18   A.   Mm-hmm.

19   Q.   Did you have a chance to read this -- what is this?

20   A.   I believe it's an e-mail.

21   Q.   Okay.  Did you have a chance to read this e-mail?

22   A.   Yes.

23   Q.   This is in evidence as Government Exhibit 319O.

24          It says on February 23, 2018, Lisa, when you have a

25   chance, please send me the current prices we are charging for

1   the stuff I make.

2           Can you explain that e-mail as far as you understand

3   it?

4   A.  As far as I understood it, Dr. Fishman -- he worked all

5   over.  He had different prices at different locations, as far

6   as, like, overseas -- I don't know exactly what his prices

7   were.  I just know the prices that were in the Avimark system.

8   Q.  And when he says please send me the current prices, what

9   was your understanding of why he was asking you to send these

10  prices?  Do you have an understanding of why he was asking you

11  to send those prices?

12  A.  Because I was the easy button.

13  Q.  What do you mean by the easy button?

14  A.  You know, I could go to the Avimark system, you know, print

15  it out or tell him verbally over the phone instead of him

16  looking it up himself.

17  Q.  In any way, did you understand this e-mail to mean that you

18  were setting these prices?

19  A.  No, I did not.

20  Q.  Okay.  I'm going to go now to Government Exhibit 202,

21  section 211.

22          MR. FASULO:  Thanks.  Section 211.  Perfect.  Thank

23  you.

24  Q.  Do you see the name listed on this government exhibit here

25  right there?

 1   A.  Yes, I do.

 2   Q.  Who is Jessica Dowse?

 3   A.  She was a client of Dr. Fishman's.

 4           MR. FASULO:  If you can go down a little bit?  Thanks.

 5   Q.  Do you understand this was a text message -- what was what

 6   this?

 7   A.  Yes.  This was a text message.

 8   Q.  And would you receive orders via text message?

 9   A.  Yes, I would.

10   Q.  How else would you receive orders?

11   A.  They would either call the office phone, they would call my

12   personal cell phone -- on the office phone, my personal cell

13   phone, or an e-mail.

14   Q.  And when you received this order, what was the first thing

15   that you did in relationship to this order?

16   A.  I would go to the Avimark system.

17           THE COURT:  Are you asking about this particular order

18   or generally?

19           MR. FASULO:  This particular order.

20           THE COURT:  Not what did you do generally,

21   Ms. Giannelli, what did you do about this order.

22   A.  I don't see my response, but I put the order in the Avimark

23   system.

24   Q.  Okay.  So when you say you put it in the Avimark system,

25   what would you enter into the system?  The name of the client?

1   A.  Yes.

2   Q.  Would the client's name already be in the system?

3   A.  Yes, it was.

4   Q.  How do you know that?

5   A.  Because I could find it.

6   Q.  Okay.  And what information was given here that relates to

7   the information we saw a minute ago that was in the Avimark

8   system?  Is the horse's name given here?

9   A.  No, it's not.

10  Q.  Is an address given here?

11  A.  No, it's not.

12  Q.  Is information about whether the horse is gelded or not

13  given here?

14  A.  No, it's not.

15  Q.  I want to draw your attention to Government Exhibit 4020.

16          Do you remember seeing this on direct examination?

17  A.  Yes, I do.

18  Q.  And do you remember the agent testifying that this was a

19  photo of a container that was recovered during the search of

20  Seth Fishman's office; do you recall that?

21  A.  Yes, I do.

22  Q.  And that was Seth Fishman's office in Florida, right?

23  A.  Correct.

24  Q.  And you see here that there's a destination here, correct?

25  A.  Yes.

1   Q.  Felton, Delaware, USA?

2   A.  Yes.

3   Q.  Does that relate to the place where your home is in

4   Delaware?

5   A.  Yes.

6   Q.  Okay.  Can you tell me, if you know, what this was -- what

7   the product was?

8   A.  I've seen the name, it's diclazuril.

9   Q.  And do you know how this product, which the destination

10  what Delaware, ended up in Florida?

11  A.  I know how that bin ended up down there.

12  Q.  Can you tell me how that bin got down there?  For what

13  purpose?

14  A.  Dr. Fishman asked for some supplies back to his office that

15  he had originally sent up and I -- this was just an empty bin,

16  and I put those supplies in that bin and sent it back down to

17  Florida with packing material.

18  Q.  When you say a bin, how big was this bin, approximately?

19  A.  Like a small trash can.

20  Q.  Okay.  And so are you saying you used this bin for

21  transportation purposes?

22  A.  Correct.

23  Q.  Okay.  And so where it says manufacture date and expiration

24  date, did that have anything to do with what you packed into

25  this bin at that time?

1    A.  No, it did not.

2    Q.  I want to go to Government Exhibit 4022.

3            Do you remember seeing this exhibit, correct?

4    A.  In court, yes.

5    Q.  And these were labels that were recovered from

6    Seth Fishman's office.  Do you remember hearing that in court?

7    A.  Yes.

8            MR. FASULO:  Let's just highlight, if we can, the top

9    ones.

10   Q.  If we look at the top label first, Ms. Giannelli?

11   A.  Mm-hmm.  Yes.

12   Q.  Have you received product with this label on it when you

13   were working for Dr. Fishman?

14   A.  I have not seen that label before.

15   Q.  Okay.  We'll go to the second --

16   A.  I have not seen that label before.

17   Q.  When you say not before, we're talking about the time frame

18   that you were working with Dr. Fishman, correct?  Because you

19   did see that during the course of preparation for trial here

20   today, correct?

21   A.  Yes.

22   Q.  Okay.  And I'll go down to the next label here.

23           Had you seen this label before?

24   A.  Yes, I have.

25   Q.  Okay.  And when did you see this label?

1   A.  When Dr. Fishman sent up from Florida for orders.

2           MR. FASULO:  And can you -- can you make it a little

3   bigger?  Thank you.

4   Q.  You see this logo there?

5   A.  Yes.

6   Q.  Are you involved at all in the design -- the making of this

7   logo?

8   A.  No, I was not.

9   Q.  Were you involved in the compounding or the making of this

10  product?

11  A.  No, I was not.

12  Q.  And were you involved in any way in the directions or

13  listing of the ingredients in this particular product?

14  A.  No, I was not.

15  Q.  And who did you understand -- what was your understanding

16  of where this was done and who did it?

17  A.  It was my understanding it was from Dr. Fishman, and he did

18  all that.

19          MR. FASULO:  And if we go to the top, if we can, just

20  see this part here?  I'm sorry.  There we go.

21  Q.  You see under the words there, it says proprietary blend of

22  homeopathic and complex amino acid structures.  Is that fair to

23  say?

24  A.  Yes, it is.

25  Q.  Proprietary blend.  Do you know what they were talking

1   about in the idea of what a proprietary blend was?

2   A.   Proprietary relating to Dr. Fishman.

3   Q.   Okay.  And is that the proprietary interest that you talked

4   about earlier today?

5   A.   Yes.

6   Q.   And where it says homeopathic and complex amino acid

7   structures, do you know what that is?

8   A.   Homeopathic.  I know the word.

9   Q.   Do you know what those complex amino --

10  A.   No.

11  Q.   Did you have any input into what ingredients would go into

12  this product?

13  A.   No, I did not.

14  Q.   What the representations of the use of this product were?

15  A.   Only from what Dr. Fishman told me.

16  Q.   Okay.  And in your time as a trainer, are you familiar with

17  bleeders?

18  A.   Yes, I am.

19  Q.   And how are you familiar with bleeders during your time as

20  a trainer as it informed your work at Equestology?

21  A.   As a trainer, I was aware that horses do bleed, which means

22  when they're stressed, there is a possibility that they can

23  bleed in their lungs.  I was aware that, you know, this is a

24  common occurrence to the majority of horses, not necessarily

25  young once but older ones.  But if you did not treat that, it

1   was my experience that it would turn into a lung infection.

2   Q.  Did you have experience in treating horses that were --

3   that bled?

4   A.  Over my time period, yes.

5   Q.  And would you treat it with medications or items that were

6   called bleeders?

7   A.  Yes.

8            MR. FASULO:  I'm going to take that down.  Thank you.

9   Now, I'm going to go to Government Exhibit 4028.

10  Q.  Ms. Giannelli, do you see what's pictured in Government

11  Exhibit 4028?

12  A.  Yes, I do.

13  Q.  And have you ever seen this product before?

14  A.  Yes, I have.

15  Q.  And where have you seen it?

16  A.  Dr. Fishman sent it up for his clients.

17  Q.  When you say Dr. Fishman sent it up, was this a product

18  that Dr. Fishman sent to you from Florida?

19  A.  Correct.

20  Q.  Is that different than products you ordered from other

21  vendors?

22  A.  Correct.

23  Q.  And in terms of this product and this label, you had

24  nothing to do with the labeling of this product?

25  A.  Correct.

1   Q.  And let's zone in on here.  Did you become familiar with

2   the logo here?

3   A.  I've seen it on bottles, yes.

4   Q.  What did you understand that logo to indicate as to the

5   origin of the product?

6   A.  It was a Dr. Fishman proprietary product.

7           MR. FASULO:  Okay.  And if we can look at one of the

8   jars there, that would be great.

9           Thanks a lot, Ms. Jung.  I appreciate it.

10  Q.  And here it says keep refrigerated.  Do you see that?

11  A.  Yes.

12  Q.  And did you follow that instruction when you had it in the

13  Delaware location?

14  A.  Yes.

15  Q.  Thank you.  And did you actually fulfill orders on this

16  prescription during the time that you worked for Equestology?

17          MS. MORTAZAVI:  Objection.

18          MR. FASULO:  I'll rephrase it, Judge.

19          THE COURT:  Yes, please.

20  Q.  Are you familiar with what you see here?

21  A.  Yes.

22  Q.  And during the time you worked for Equestology, were you

23  asked to fulfill orders that requested this particular product?

24  A.  Yes, I was.

25  Q.  And did you fulfill such orders?

1   A.  Yes, I did.

2   Q.  Okay.  And did you enter them into the Avimark system?

3   A.  Yes, I did.

4   Q.  And was the doctor aware you were fulfilling these orders,

5   as far as you knew?

6            MS. MORTAZAVI:  Objection.

7            THE COURT:  Sustained.

8   Q.  What was your understanding about the doctor's knowledge

9   that you were fulfilling these orders?

10           THE COURT:  Which orders?

11           MR. FASULO:  The orders relating to this product.

12           MS. MORTAZAVI:  Objection.

13           THE COURT:  Sustained.  You need to break it down.

14  Q.  When you fulfilled these orders, you would enter them into

15  the Avimark system?

16  A.  Correct.

17  Q.  And is that system a system you spoke about that

18  Dr. Fishman had access to?

19  A.  Yes.

20  Q.  And was it your understanding that Dr. Fishman had access

21  to the orders that you fulfilled regarding all of the products

22  that you were fulfilling?

23  A.  Yes.  It was my understanding.

24  Q.  Okay.  Next I'd like to move to Government Exhibit 307.

25  This was an e-mail, I believe, correct?

1    A.  Yes.

2              MR. FASULO:  And if we can just highlight the top of

3    it, it would be easier to see it.

4    Q.  And you're cc'd on this e-mail.  Do you see that, Lisa?

5    A.  Yes, I do.

6              MR. FASULO:  And if we can go down into the e-mail --

7    into the message?

8    Q.  Do you see it's from a person, Mary Fox.  Is that the same

9    Mary Fox you spoke about a minute ago?

10   A.  Yes, it is.

11   Q.  And it's sent to Seth Fishman, correct?

12   A.  Correct.

13   Q.  And if you can look at the -- that part of the subject

14   matter, do you see that?

15   A.  Mm-hmm.  Yes.  Sorry.

16   Q.  Who was it that was asking for a short explanation in

17   horsemen terms about his new products?

18   A.  In this e-mail, it was Mary, but originally it was

19   Dr. Fishman's clients.

20   Q.  Right.  But who was asking to create that explanation?

21   A.  I was.

22   Q.  And who, when it says you need a description, who did you

23   need that description from?

24   A.  I needed it from Dr. Fishman.

25   Q.  Okay.  And would you write that description yourself at any

1   time that you worked for Dr. Fishman?

2   A.  No, I would not.

3   Q.  Why would you not do that?

4   A.  Because he was the veterinarian.

5   Q.  Let me go on now to another thing the government put into

6   evidence, and that would be -- let's go back to 307 again.

7   There's another part of that e-mail that's important.

8           MR. FASULO:  If you can just highlight the information

9   here?

10  Q.  You see this information on this e-mail?

11  A.  Yes, I do.

12  Q.  As far as you know, where did this information come from?

13  A.  As far as I know, Dr. Fishman.

14  Q.  Okay.

15          MR. FASULO:  Nothing further with this document.

16          I'm going to go Government Exhibit 133AT, which is a

17  call between Seth Fishman and Richard Silverman dated April 17,

18  2017.

19  Q.  Do you remember seeing this call and the government playing

20  this call in court?

21  A.  Yes, I do.

22  Q.  Okay.  And would it be fair to say that on this call, you

23  were not on this call?

24  A.  Correct.

25  Q.  After this call or before this call, do you recall any

1    conversation with either Seth Fishman or Richard Silverman

2    regarding what was discussed on this call?

3    A.  No, I do not.

4    Q.  Do you recall having any conversation with either of them?

5    A.  Not that I can recall.

6    Q.  Did Dr. Fishman call you and report on what he had said in

7    this call?

8    A.  Not that I can recall.

9    Q.  And prior to you sitting in court and hearing it prior to

10   prepping for trial here, were you even aware this call was ever

11   made?

12   A.  No, I was not.

13   Q.  Okay.  I want to go call 143CT.  Before we get to this

14   call, do you know who Richard Silverman is?

15   A.  He was a client of Dr. Fishman's.

16   Q.  And do you know what his role was?

17   A.  He was a trainer.

18   Q.  And you see this call here, correct?

19   A.  Yes.

20   Q.  And you see Seth Fishman, John Pundyk, and Geoff Vernon,

21   correct?

22   A.  Correct.

23   Q.  Are you familiar with the name John Pundyk?

24   A.  I was not.

25   Q.  Okay.  And how about Geoff Vernon?

1    A.  Dr. Fishman mentioned his name at one point.

2    Q.  Was he a client of yours?

3    A.  No, he was not.

4    Q.  When you say he wasn't a client of yours, what does that

5    mean?

6    A.  I didn't do any collections for him.

7    Q.  And do you know whether he ordered product from Dr. Fishman

8    or didn't order product from Dr. Fishman?

9    A.  I don't know.

10        MR. FASULO:  Okay.  And if we turn to the contents of

11   this call?

12   Q.  After the date of this call between John Pundyk,

13   Geoff Vernon, and Seth Fishman, did you have any conversation

14   with Seth Fishman regarding the context of this call?

15   A.  No, I did not.

16   Q.  Did you have any conversations during the time you worked

17   with Seth Fishman where he informed you what he was speaking

18   about here to Geoff Vernon?

19   A.  No.

20   Q.  Okay.  Thank you.  Government Exhibit Number 406.  It's a

21   photo of a label.  I'll move on to Government Exhibit 136AT

22   while she pulls it up -- while the paralegal pulls it up.

23        Do you know a person named Nicholas Devita?

24   A.  I do.

25   Q.  Who was Nicholas Devita?

1  A.  He was a client of Dr. Fishman's.

2  Q.  And when you say he was a client of -- did he ever order

3  from you directly?

4  A.  He called in orders I fulfilled, yes.

5  Q.  And what role did he have in the racing world?

6  A.  He was a trainer.

7  Q.  Okay.  I'm going to skip this and go on to Government

8  Exhibit 332A.  Do you see this e-mail between and you and

9  Mary Fox, right?

10  A.  Yes, I do.

11  Q.  Do you remember -- it's been entered into evidence, I

12  believe it's 333A.  This is you initiating the e-mail, correct?

13  A.  Correct.

14  Q.  What was the purpose of this e-mail that you initiated to

15  Mary Fox?

16  A.  It was -- the purpose was to remind Mary Fox of a few

17  things; when would the arrival be, these were all Dr. Fishman's

18  products, this order fulfillments -- they were in stock in the

19  office in Delaware.

20  Q.  On the second line, it says where is he on the powdered

21  ACTH?  I will need that whenever you have it available.

22          What was it you were requesting, and why were you

23  requesting it?

24  A.  Dr. Fishman required that I have certain products in stock

25  at all times, and part of my job was to make sure those

1   products were there.  So that's what I was requesting.

2   Q.  Now, there's a reference in the next section of a silver

3   top EQ order.  Do you see that?

4   A.  Yes.

5   Q.  Can you give us -- what is the significance of this idea of

6   a silver top?  What did that mean?

7   A.  That's what the cap was -- the top.

8   Q.  And EQ order, do you know that was?

9   A.  That was a product of Dr. Fishman's.

10  Q.  What was EQ?

11  A.  It fell under the category of anti-inflammatory.

12  Q.  Okay.  You then talk about 134FHS, iron sucrose, and you

13  say I will need a label for that; do you see that?

14  A.  Correct.

15  Q.  What did you mean by that, and what was your intent there?

16  A.  Iron sucrose was a bottle that Dr. Fishman sent up that did

17  not have labels on them.

18  Q.  When you said Dr. Fishman sent them up, where did it come

19  from?

20  A.  A lab that he had them made in, you know.

21  Q.  But where was it shipped from; did you know?

22  A.  At this particular order, I don't know.  But it shipped

23  from somewhere.

24         MS. MORTAZAVI:  Objection.

25  Q.  If you don't know --

1          THE COURT:  You said I don't know, so that's the end

2     of your answer.  Thank you.

3     Q.  When it was shipped to you, did it have a label on it?

4     A.  This particular one, no.

5     Q.  And how many times did that happen during the course of

6     time that you were working for Dr. Fishman?

7     A.  It wasn't a regular thing.  You know, this particular

8     order, I believe the labels were being made in Florida, and I

9     guess when the time they shipped them, they weren't on them

10    so --

11         MS. MORTAZAVI:  Objection.  Move to strike.

12         THE WITNESS:  I'm sorry.

13         THE COURT:  Hold on.  The part after "I guess" is

14    stricken, and you should not consider it.

15         MR. FASULO:  If I may?

16         THE COURT:  Yes.

17    Q.  In the e-mail, you say I will need labels for please, who

18    are you asking that of?

19    A.  Mary Fox.

20    Q.  Where was Mary Fox?

21    A.  Florida.

22    Q.  Did you have labels at your residence in Delaware?

23    A.  Not at this particular time.

24    Q.  You also talk about NPX, new and old version.  Do you see

25    that?

1   A.  Yes, I do.

2   Q.  And what did you mean by that; if you recall?

3   A.  That was a product of Dr. Fishman that needed to be in

4   stock.

5   Q.  What did you mean by new and old version?

6   A.  Occasionally he changed things.  So there -- you know, he

7   had both of them on the required list to have it.  It would be

8   there.

9   Q.  And who would make the decision for changing products?

10  A.  Dr. Fishman.

11  Q.  And you say here as many bleeder pills as he can get.  Who

12  is "he"?  Who did you intend "he" to be?

13  A.  Dr. Fishman.

14  Q.  Okay.  Again, mind as well send it to me versus storage

15  down there.  What did you mean by that?

16  A.  It was all Dr. Fishman, whether it was stored in Florida or

17  stored in the satellite office.  It's all Dr. Fishman.

18  Q.  But it says as well send to me versus storage down there.

19  A.  Well, what I meant was -- you know, it was required to be

20  in Delaware, and it would take longer to ship from Florida, you

21  know, me being in Delaware.  It was a central location.  The

22  client received the order quicker that Florida.

23  Q.  Okay.  I'm going to turn now to Government Exhibit 319E.

24          Lisa, this is another -- do you recognize this?

25  A.  Yes, I do.

1    Q.  And this is another e-mail from you to Seth Fishman that

2    the government has introduced into evidence, correct?

3    A.  Yes, it is.

4    Q.  I want you to look at the content of this e-mail.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  I want you to look at the content of this e-mail.  When

2    you're familiar with it, just look up so I know you're ready.

3         We start on the bottom of the e-mail, which is the

4    first date, which is Wednesday, June 21, 2017?  Do you see

5    that?

6    A.  Yes, I do.

7    Q.  You sent this e-mail to who?

8    A.  To Mary Fox and Seth Fishman.

9    Q.  When you say -- first sentence there.

10   A.  Yes.

11   Q.  What was the intent of that sentence and what did you mean

12   by that, as you e-mailed this to Seth Fishman and Mary Fox?

13   A.  They were supposed to do something and they were not

14   following through.

15   Q.  What was it that they were supposed to do?

16   A.  The labels for Dr. Fishman's product.

17   Q.  What labels were you looking for?

18   A.  Pentasan and acetylcystine.

19   Q.  When you were say you were looking for labels, did you have

20   the product itself?

21   A.  Yes.

22   Q.  How was the product sent to you?

23   A.  Unlabeled.

24   Q.  And where would you get these labels from?

25   A.  Dr. Fishman down in Florida.

1   Q.  Now, you look here.  It says:  I also need PG-2 and

2   Serenity on the list from the purchase order I sent you on May

3   26?

4   A.  Yes.

5   Q.  Is Serenity one of the items that Dr. Fishman --

6   proprietary item of Dr. Fishman, as far as you know?

7   A.  Yes, it was.

8   Q.  You said that you also list 20 more regular Omeprazole.

9   A.  Omeprazole is for stomach ulcers.

10  Q.  I want to go specifically to number 5 here.  Send whatever

11  else doc is working on and might want this area to have.

12  A.  Um-hum.  Yes.

13  Q.  Tell me about what was your intent when you wrote that and

14  what -- why did you write that?

15  A.  My intent was to have the supplies in stock, and why I

16  wrote it was Dr. Fishman would speak to clients at times and

17  recommend a product that he had, which I did not have in stock.

18  It was just to facilitate what his needs for his clients.

19  Q.  During the time you worked for Dr. Fishman, were you aware

20  of all the products he was working on?

21  A.  No, I was not.

22  Q.  When you say this area might -- might want this area to

23  have it, what do you mean by that?

24  A.  Like I said previously, Delaware was centrally located to

25  many of his clients, so it would be a one-day ship to, say, a

 1  different state that he was licensed in.

 2  Q.  You'll see on the top of the e-mail there was also a date

 3  of June 28, 2017?

 4  A.  Yes.

 5  Q.  Do you see that?

 6  A.  Yes, I do.

 7  Q.  That's from you to Dr. Fishman, right?

 8  A.  Correct.

 9  Q.  In that what were you telling Dr. Fishman?

10  A.  I was telling Dr. Fishman that Mary Fox was not doing her

11  job.  It was a reminder that supplies that he required me to

12  have in stock were not there, or they were getting there late.

13  It wasn't efficient and smooth running.

14          MR. FASULO:  Judge, I don't know what time you are

15  going to break.  This is a good --

16          THE COURT:  If this is a convenient breaking point --

17          MR. FASULO:  This is a convenient breaking point.

18          THE COURT:  Ladies and gentlemen, we will take our

19  break now.

20          Ms. Giannelli, you remain under oath.  Please don't

21  talk about your testimony to anybody over the lunch recess.

22          THE WITNESS:  Understood.

23          THE COURT:  Please leave your notepads and the

24  transcript binders on your seats or on the floor next to your

25  seats.  Please do not discuss the case during your lunch break.

1            I hope everyone has a good lunch break.  I'll see you

2    back here as close to say 1:45 as we can.  Thank you.

3            (Jury not present)

4            THE COURT:  Ms. Giannelli, you're excused.  You can

5    step down.  Thank you.

6            Is there anything we need to go over, Ms. Mortazavi?

7            MS. MORTAZAVI:  Nothing from the government.

8            THE COURT:  Mr. Fasulo, hold on one second until Ms.

9    Giannelli leaves.

10           Mr. Fasulo, do you have a sense of how much longer you

11   have with Ms. Giannelli?  I am just trying to get a sense of

12   timing.

13           MR. FASULO:  I understand, Judge.

14           THE COURT:  I'm not holding you, obviously.

15           MR. FASULO:  There are a number of government exhibits

16   that I am going to go through again.  That's taking more time

17   than I anticipated.

18           THE COURT:  You are going to be all of the afternoon,

19   a bit of the afternoon?

20           MR. FASULO:  I am just looking at the clock and just

21   trying to figure out.

22           THE COURT:  We are coming back at 1:45.

23           MR. FASULO:  Based on what I did this morning, I can

24   figure out from there.  I would say, Judge, that in about two

25   hours and a half, at most, I can be done with -- I would like

1   to be done with Ms. Giannelli, at the outset.

2            THE COURT:  All right.

3            MR. FASULO:  It could be quicker.

4            THE COURT:  You'll go from there.

5            MS. MORTAZAVI:  Yes.

6            THE COURT:  Everyone, have a good lunch recess, and

7   I'll see everyone shortly before 1:45.

8            (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          AFTERNOON SESSION

                              1:55 p.m.

1          THE COURT:  Mr. Fasulo, I think Ms. Giannelli should

2   be here in the courtroom.  She has a right to be here for

3   conversations we are having.  Not about her testimony, but

4   about other things.

5          MR. FASULO:  I will go get her.

6          THE COURT:  Great.

7          MR. FASULO:  I did realize at the end we did excuse

8   her.  We were only dealing with administrative matters.

9          THE COURT:  We didn't deal with anything.  I just

10  asked if you had anything.

11         Ms. Giannelli, why don't you have a seat at counsel

12  table.  Since you are the defendant, you have a right to hear

13  our conversations, including outside the presence of the jury,

14  so I asked Mr. Fasulo to invite you back in.

15         I just want to talk briefly about a couple of

16  logistical things before we bring the jury back.

17         The first is exhibits.  One of you asked about what we

18  are going to do with exhibits.  The idea about putting all the

19  exhibits on the flash drive, that was a COVID measure.  In the

20  early days of COVID we weren't letting the jury touch physical

21  hard copies of things and pass it around because at that point

22  people thought that's how COVID was transmitted.  We are not

23  doing that any longer.  Although I suppose at the end of the

1    case we will want them all on a flash drive for the files.

2          In terms of the jury, you all, at the conclusion of

3    the case, need to agree on the list of exhibits that were

4    admitted and put together a binder so that if the jurors ask

5    for an exhibit, we can readily pull it and get it back to them,

6    but it's not my intent to send back a binder full of exhibits.

7          MS. MORTAZAVI:  I think our only question was whether

8    we have to prepare a thumb drive at all so that we could get in

9    touch with our IT folks.

10          THE COURT:  You don't really have to, right, Ms.

11   Dempsey?  Do we need it?  No.

12          MS. MORTAZAVI:  The Court referenced making one just

13   for the record, and we are happy to do that, but we wanted to

14   clarify what the expectation was.

15          THE COURT:  It is really not our expectation.  It's

16   more your expectation, should there be further proceedings and

17   the need.  It's really not for us or even for the record.  The

18   Southern District does not keep copies of admitted exhibits.

19          The second thing I just want to talk to you about is

20   the jury instructions.  I went through your revised set over

21   lunch.  The edits, they are fine.  They are all pretty

22   straightforward.

23          Did you give me the new charge on demonstratives or

24   was that ours?

25          MS. MORTAZAVI:  We gave a charge up to the Court, your

1    Honor.

2           THE COURT:  So the line that says, it is clearly

3    easier, I am going to change to, it may be easier.  I am not

4    going to tell the jury that it's clearly better for them to use

5    the summary.  So I am going to change it to read, it may be

6    easier, but otherwise that one is fine too.

7           MR. FASULO:  No objection.

8           MS. MORTAZAVI:  No objection.

9           THE COURT:  Then there are just a handful of things

10   that we need to talk about, the good-faith issue and the

11   cooperating witness charge.  There are one or two where you

12   have, if applicable.

13          So, for example, so far there are no immunized

14   witnesses, so that charge would fall away, but we are not

15   finished with the trial yet.  We will see where we are at.  So

16   I will talk to you about those areas of disagreement when we

17   have the charging conference.  Then, as I said to you, I made a

18   few, I'd call them minor stylistic type of edits in a couple of

19   places.  I tried to keep them to a minimum because you agreed

20   on all but those two charges, and I really didn't want to

21   introduce any more discussion or need to make a record, but

22   will tomorrow give you a blackline so you can see those minor

23   edits that we made to a couple of the charges along the way.

24          One thing that I'm remembering is, you have one place

25   where you say you can believe part of a witness' testimony or

1     all of it or none of it.  You're missing the kind of standard

2     charge about, conversely, if you find a witness testified

3     falsely, you are free to disregard the entirety of a witness'

4     testimony.  I'm proposing to put that in right there and then

5     saying, it's entirely up to you.  That's one of, I'd call that

6     the more substantive, maybe the most substantive edit that I

7     made.  You'll see the blackline tomorrow, and you can consider

8     it.  You don't need to answer right now.

9              Anything else we should talk about?

10             MS. MORTAZAVI:  Does the Court have an idea of when we

11    might hold the charging conference?  Mr. Fasulo and I discussed

12    the possibility of doing it after today.

13             THE COURT:  The problem is, the evidence won't be

14    concluded.

15             MR. FASULO:  I think we should have a blackline copy,

16    Judge, so maybe tomorrow morning.

17             THE COURT:  That's why I asked before we broke how

18    long you thought we would be.  I'm not doing it until the

19    evidence is finished.  Then we will do it.  My hope and

20    expectation is that some point early in the day tomorrow we

21    will get to it.  I don't know if you're putting on a rebuttal

22    case or not.  We will give you a blackline before we do it,

23    give you a short amount of time to take a look at it because,

24    as I say, they are not very substantive changes, and then we

25    need to talk about those two charges, where there are

1   substantive differences.

2               MS. MORTAZAVI:  We will plan for tomorrow.

3               THE COURT:  Our hope is, we will do summations

4    tomorrow, we will charge the jury, and the case will go to the

5    jury.  I don't know if that will happen tomorrow or Friday.  It

6    depends on how long you all are.

7               Are we ready?

8               MR. FASULO:  Ready, Judge.

9               THE COURT:  Ms. Dempsey will retrieve our jurors.

10              MR. FASULO:  Can I ask Ms. Giannelli to get on the

11   witness stand.

12              THE COURT:  I'll call her up once the jurors are back.

13              (Jury present)

14              THE COURT:  Please be seated, everyone.  Good

15   afternoon, ladies and gentlemen.  I'm sorry that we kept you

16   waiting.  There were just a few legal issues that I had to talk

17   about with the lawyers outside your presence.  I apologize for

18   the delay.

19              We are ready to continue with the testimony from Ms.

20   Giannelli.

21              Ms. Giannelli, if you would please come back up to the

22   witness stand.

23              Thank you.

24              THE COURT:  Mr. Fasulo.

25              MR. FASULO:  Thank you, your Honor.

1    BY MR. FASULO:

2    Q.  Good afternoon.

3           MR. FASULO:  If I can ask the government to put up

4    Government Exhibit 1910.

5    Q.  Ms. Giannelli, do you remember seeing this exhibit during

6    the government's case?

7    A.  Yes, I do.

8    Q.  This is a Gmail account -- e-mail transmission between Seth

9    Fishman and Courtney Adams and Mary Fox, correct?

10   A.  Correct.

11          MR. FASULO:  If we can go to the middle here, please.

12   Q.  You were not cc'd on this particular e-mail, as far as you

13   know?

14   A.  I was not.

15   Q.  And this is a discussion about the Pain Shot LC and the

16   label, correct?

17   A.  Correct.

18   Q.  And what did you understand that Courtney's job was in

19   terms of labeling the items for Dr. Fishman, if you had one?

20   A.  It was my understanding that Dr. Fishman had her design and

21   print them.

22          MR. FASULO:  Can I get 1913, Government Exhibit 1913.

23   Q.  Just for clarity, you also saw this government exhibit,

24   correct?

25   A.  Correct.

 1  Q.  And it looks like an e-mail or a text message or e-mail?

 2  A.  Correct.

 3  Q.  And it was from Courtney to Dr. Fishman, correct?

 4  A.  Yes.

 5  Q.  It's dated September 10, 2015, correct?

 6  A.  Yes.

 7  Q.  On this order here, would you have received any money for

 8  collection on the items that Ms. Adams is talking to

 9  Mr. Fishman about, Dr. Fishman about?

10  A.  Not that I'm aware of.

11          MR. FASULO:  Can we go to GX-401-V, please.

12  Q.  This was a set of text messages between Seth Fishman and

13  Courtney Adams.  Do you see that, on 401-V?

14  A.  Yes.

15          MR. FASULO:  If we can just highlight the first part

16  and we can go down from there.

17  Q.  Have you had a chance to read this e-mail?

18  A.  Now I have, yes.

19  Q.  At the time in approximately 2015, were you aware of any of

20  the substance of the nature of the conversations that are

21  contained in the body of this e-mail?

22  A.  No, I was not.

23          MR. FASULO:  Next.

24  Q.  Did you know a person Pam at Schein?

25  A.  That was the inside sales rep for Henry Schein Animal

 1  Health.

 2  Q.  And this e-mail between Seth Fishman and Courtney Adams,

 3  were you aware of the body of this e-mail during the course of

 4  your employment there?

 5  A.  No, I was not.

 6  Q.  This e-mail, again was from Seth Fishman to Courtney Adams,

 7  right?

 8  A.  Correct.

 9  Q.  Or this text or -- I think it's a text, actually, right?

10  A.  Correct, it's a text.

11  Q.  You see the body of this text here sent on July 3, 2015?

12  A.  Yes, I do.

13  Q.  Had you received this text from either Seth Fishman or

14  Courtney Adams?

15  A.  No, I did not.

16  Q.  Did you receive any text in your time that you worked for

17  Seth Fishman that was similar to the content of this text, if

18  you know?

19  A.  Not that I can recall, no.

20          MR. FASULO:  Can we move down.

21  Q.  You see this part of this text message, right, that's been

22  entered into evidence?

23  A.  Yes.

24  Q.  It's between Seth Fishman and Courtney Adams, correct?

25  A.  Correct.

1  Q.  Did you know a person named Kelly?

2  A.  Not in this reference.  I don't know who Kelly is, but no.

3  Q.  Any of the contents of this e-mail, do you have any idea

4  what this was about?

5  A.  No, I do not.

6  Q.  Again, this was, again, through Seth to Courtney Adams,

7  correct?

8  A.  Correct.

9  Q.  As far as you know, the word HP Bleeder Plus, was that a

10 product that Seth had, Dr. Fishman had?

11 A.  Yes, it was.

12 Q.  Was this about that -- nothing further on this.

13        Did you know anything about Courtney Adams' individual

14 business that she had in Idaho?

15 A.  No, I did not.

16 Q.  You remember hearing Courtney Adams testify through the

17 transcript that was read?

18 A.  Yes, I do.

19 Q.  During the course of her testimony, do you remember

20 anything about her saying that she wanted to be like Lisa or

21 that Dr. Fishman said you could be like Lisa and make a lot of

22 money.  Do you remember that?

23 A.  I remember that.

24 Q.  Did you ever give Courtney Adams any instructions or

25 direction on how to do the job that you do?

1    A.  Instructions on how to do the job.  Dr. Fishman at one

2    point asked me to give Courtney Adams the phone number for a

3    vendor that he used, office things like that.

4    Q.  Did you ever work jointly with Courtney Adams in developing

5    her client?

6    A.  No, I did not.

7    Q.  Were you involved in any of the revenue that Courtney Adams

8    generated, if any, from Dr. Fishman?

9    A.  No, I was not.

10   Q.  You also saw that at one point there was a conversation

11   about a website that was being set up.  Do you remember hearing

12   that during the government's case?

13   A.  Yes, I do.

14   Q.  Were you involved in setting up the website, either the

15   content or the technical end, for Dr. Fishman?

16   A.  No, I was not.

17   Q.  To your knowledge, were you involved in a website that was

18   being set up?  Were you aware that a website was being set up?

19   A.  At the time, no, I was not.

20          MR. FASULO:  Let's take a look at Government Exhibit

21   319A, please.

22   Q.  This is an e-mail from Courtney Adams to Lisa Ranger dated

23   January 8, 2016.  Do you remember seeing this e-mail?

24   A.  Yes, I do.

25          MR. FASULO:  Can I see 912B.

1    Q.   Do you remember this conversation was played during the

2    government's case?

3    A.   Yes.

4    Q.   This conversation between Seth Fishman and Bambang?

5    A.   Yes.

6    Q.   Do you know who Bambang was?

7    A.   I have no idea.

8         MR. FASULO:   Can we turn to the content of the

9    conversation.

10        THE COURT:   What's the date of this?

11        MR. FASULO:   If we can go back to the front page.  I'm

12   sorry.  November 18, 2018.

13   Q.   What is your familiarity with the content of this

14   conversation at the time that it was happening?

15   A.   I am not aware of any of this.

16   Q.   Did you ever have any conversation with this person Bambang

17   or Seth Fishman about this conversation?

18   A.   No, I did not.

19        MR. FASULO:   Number 195, please, Government Exhibit

20   195.

21   Q.   You see this conversation, 195-T, is dated 5/9/2019.  It

22   says:  Lisa Giannelli and then an unknown female.

23        MR. FASULO:   Can we turn to the content of this

24   conversation.

25   Q.   Do you remember seeing this on the government's direct

1  case?

2  A.  Yes.

3  Q.  Do you know who this unidentified female was at this time?

4  A.  Yes, I do.

5  Q.  Who was that?

6  A.  That was my husband's daughter.

7  Q.  Do you see there is a conversation between her and you,

8  correct?

9  A.  Correct.

10  Q.  And you see the date of this conversation?

11          MR. FASULO:  Just show the date again.  Sorry.

12  Q.  May 9, 2019.  Where were you on May 9, 2019, if you

13  remember?

14  A.  I believe I was in Roatan.

15  Q.  Roatan is where?

16  A.  Honduras.

17  Q.  What were you doing in Roatan, Honduras?

18          MS. MORTAZAVI:  Objection.  403.

19          MR. FASULO:  Let me rephrase it, Judge.

20          THE COURT:  Go slowly and let me hear the question

21  before you answer.  Don't jump in.

22  Q.  Was your purpose to Roatan pleasure or business?

23  A.  Pleasure.

24  Q.  When you're in Roatan, you have this conversation, correct?

25  A.  Can I see the conversation again?

1   Q.  Yes.

2          MR. FASULO:  Can you turn to the conversation.

3   Q.  Can you tell us here what you understood this conversation

4   to be, being party to this conversation, starting with line 2.

5   A.  My husband's daughter was telling me what packages UPS

6   dropped off that day.

7   Q.  Then you responded?

8   A.  Yeah.  That's from the Compound Pharmacy.  Apparently,

9   that's not what I was looking for.

10  Q.  What did you understand from what the response was?

11  A.  That's my husband's daughter.

12  Q.  No.  What did you understand that response to be?

13         THE COURT:  Which response?

14         MR. FASULO:  I'm sorry.

15  A.  Again, that's my husband's daughter.

16  Q.  What did you understand the content of that response to be?

17  A.  She was telling me what arrived.

18  Q.  And then under the next, number 5, what was your

19  instructions to her?

20  A.  This was a client called in and was changing their address

21  to an existing account, and she was doing an internal change of

22  address.

23  Q.  And you say here, you are going to have to scribble Seth

24  Fishman's name, but you'll see where I've scribbled it on

25  previous ones.  What did you mean by that and what were you

1    instructing her to do in that conversation?

2    A.  Dr. Fishman gave me permission to sign his name.

3    Q.  On what kind of documents?

4    A.  Internal documents, not medical documents, like an internal

5    change of address form, financial maybe.

6    Q.  When you say they are not going to question it, number 7,

7    what did you mean?  Who was not going to question it?

8    A.  The vendor that she was sending it to, they were aware that

9    I was signing Dr. Fishman's name.  They knew I was the office

10   employee.

11   Q.  What was the purpose of you having her do it for you at

12   this time?

13   A.  I was in Roatan.

14           MR. FASULO:  We can take that exhibit down.  Thanks.

15           Government Exhibit 900.  I am going to show Government

16   Exhibit 900D.  If we can show the top, please.

17   Q.  This was Adrian Hall.  You saw Adrian Hall here in court at

18   this trial, correct?

19   A.  Correct.

20   Q.  Prior to seeing her, had you ever met her before?

21   A.  No, I did not.

22   Q.  Were you a party to this conversation between Adrian Hall

23   and Seth Fishman, this text message exchange?

24   A.  No, I was not.

25           MR. FASULO:  Can we go down a little bit.  Thanks.

1  Just highlight the three blue boxes.  That would be great.

2  Q.  When this text message, this blue text message, were you a

3  party to this statement from Adrian Hall that says:  You know I

4  heard he was a rat also, a lot of people stopped buying from

5  him?

6  A.  I was not aware of that.

7  Q.  Did you know who they were speaking about?

8  A.  No, I do not.

9  Q.  Did you know this Tony who is referenced in Dr. Fishman's

10 text message in the front?

11 A.  I don't know who they are speaking about.

12 Q.  In the next statement it seems like Adrian Hall wrote:

13 That's how I found Lisa, because Danny stopped buying from him.

14         Do you know from this text message who she was

15 referring to as Danny?

16 A.  Daniel Mayer.

17 Q.  Who is Daniel Mayer?

18 A.  He is a trainer and a client of Dr. Fishman's.

19 Q.  Was he in the Avimark system?

20 A.  Yes, he was.

21 Q.  Had he purchased items from Equestology?

22 A.  Yes.

23 Q.  When Adrian Hall called you, what reference, if any, did

24 she make to this person named Danny?

25         MS. MORTAZAVI:  Objection.  Vague.

1          THE COURT:  Objection to form is sustained.

2    Q.  At any time when Adrian Hall contacted you, did she make

3    reference to any other individuals in the context of her

4    communication with you?

5    A.  Daniel Mayer's name came up at some point.  I don't recall

6    exactly when.  But, yes.

7    Q.  What did you understand the relationship was between Daniel

8    Mayer and Adrian Hall?

9    A.  That she was in his barn.

10   Q.  What did that mean to you in terms of you dealing with

11   Adrian Hall at that time, if anything?

12   A.  She was in Daniel Mayer's barn.  That was an existing

13   client of Dr. Fishman's.

14          MR. FASULO:  Thank you.

15          Can I see Government Exhibit 161, please.

16   Q.  You see this conversation between a Brian Malone and

17   yourself that occurred on April 22, 2019?

18   A.  Yes, I do.

19   Q.  The government entered this into evidence, right?  You

20   remember seeing this before?

21   A.  Yes.

22   Q.  Who is Brian Malone?

23   A.  He is a client of Dr. Fishman's.

24          MR. FASULO:  If we can turn to the next page, please.

25   Q.  Who called who here?

1   A.  Mr. Malone called me.

2   Q.  When Mr. Malone says under here -- what is it that he's

3   asking for there, number 5?

4   A.  It would have been a repeat order or an order that he was

5   placing.

6   Q.  If you remember at this time, was he already in the Avimark

7   system?

8   A.  Yes, he was.

9   Q.  Was he an existing client?

10  A.  Yes, he was.

11  Q.  Had he ordered from Dr. Fishman before?

12  A.  Yes, he did.

13  Q.  Had you fulfilled these types of items for him on a prior

14  occasion?

15  A.  Yes, I have.

16          MR. FASULO:  If we can go down further.

17  Q.  It says here, under number 8:  Am I mailing it or are you

18  picking it up?  What do you mean by that?

19  A.  Brian Malone was located in Delaware, and he would drive by

20  where my home was so he could pick it up.  If he was too busy,

21  I could mail it down to him and he could have it the next

22  morning.

23  Q.  Other than him picking it up, other than an item picked up

24  by a client or that you delivered by mail, is there any other

25  way that items were transported to clients?

1   A.  Pickup or UPS.  Am I understanding the question?

2   Q.  Right.

3   A.  Yes.

4   Q.  Any other ways, other than picking you up from you or UPS?

5   A.  I could deliver to them.

6   Q.  Did you deliver items to the barns?

7   A.  Yes, I did.

8   Q.  When you delivered items to the barns, did you deliver

9   items on -- you heard about Mt. Hope, correct?

10  A.  Correct.

11  Q.  That's in New York, right?

12  A.  Correct.

13  Q.  Had you visited that barn before?

14  A.  Yes, I had.

15  Q.  Did you make deliveries to that barn?

16  A.  There is multiple barns there, yes.

17  Q.  Did you visit multiple barns there?

18  A.  Yes.

19  Q.  And did you make multiple deliveries there?

20  A.  Yes.

21  Q.  Other than delivering -- what would you deliver?  Would it

22  be the product of Equestology?

23  A.  Yes.

24  Q.  Other than delivering products, did you ever pick things up

25  from those locations?

1   A.  I pick up checks.

2   Q.  Do you know a person Tyler Bittinger?

3           MR. FASULO:  171A, please.  Government put this

4   171A-T, which is a transcript of a conversation had between

5   Lisa Giannelli and Tyler Buter on 5/1/2019.

6   Q.  Do you know who that person is that's listed in this

7   conversation?

8   A.  Yes.  He is a client of Dr. Fishman's.

9   Q.  Was he a client of Dr. Fishman prior to you having this

10  conversation with him?

11  A.  Yes, he was.

12  Q.  Under number 6 here, he says:  Dad would have ordered it.

13          Who did you understand he was talking about?

14  A.  That would be his father.

15  Q.  Was he also a client of Dr. Fishman?

16  A.  Yes, he was.

17  Q.  Did you also fulfill orders for his father?

18  A.  Yes, I did.

19          MR. FASULO:  If we can go down a little bit more.

20  Q.  When it says here:  TB, now that you got Rob's card, do you

21  understand what that meant at the time, right here?

22  A.  Yes, I do.

23  Q.  What did you understand that part of the conversation to

24  mean to you at the time?

25  A.  It was actually a joke.

1    Q.  What was the joke?

2    A.  This gentleman actually was training or working for another

3    gentleman who was also a client of Dr. Fishman's.  That card

4    was on file.  He was making a joke as if he could pay for his

5    too.  But that didn't happen.

6            MR. FASULO:  If we can just highlight this.

7    Q.  When you say Pete here, who are you referring to?

8    A.  Peter Simpson, I believe.

9    Q.  Who was Peter Simpson?

10   A.  He was -- he worked for another client of Dr. Fishman's.

11   Q.  Was he an owner, trainer?

12   A.  Trainer.

13   Q.  And here TB says under 16:  Like I said, the bottle doesn't

14   have a label on it and -- you respond:  What's the cap look

15   like?

16           What was your understanding of that part of that

17   conversation?

18   A.  My understanding, he was trying to explain the product that

19   he wanted.  He couldn't remember the name of it.  So I was

20   trying to get information to see exactly what he needed.  I

21   wasn't.

22   Q.  Were there products that you distributed at your time

23   working for Equestology that had absolutely no label on it?

24   A.  Occasionally.

25   Q.  What products were they?

1   A.  Dr. Fishman's products.

2   Q.  How would you identify those products when you sent them?

3   A.  The color of the cap.

4   Q.  Who was it who told you that you can distribute those

5   products in that way?

6   A.  Dr. Fishman.

7   Q.  Did you know what the ingredients or the compound for those

8   products actually were?

9   A.  No, I did not.

10  Q.  Did you know whether they were drugs or vitamins?

11  A.  I did not.

12  Q.  Did you ever have a conversation with Dr. Fishman regarding

13  the reason why those products were not labeled?

14  A.  No, I did not.

15  Q.  Did you ever have a conversation with a client or did you

16  have an understanding -- withdrawn.

17       Did you ever have any understanding about why it was

18  that Dr. Fishman was sending products out that had absolutely

19  no labels?

20  A.  That was a decision my boss made, and I was his employee.

21  So it was what it was.

22  Q.  Did you ever question Dr. Fishman about the reasons why he

23  would send a product out without any label?

24  A.  Not that I can recall.

25  Q.  Did you ever give instructions to clients that ordered

1    those products about how they were to use those products or

2    what the ingredients in those products were?

3    A.  When Dr. Fishman would tell me, I would tell them,

4    according to Dr. Fishman, this is what he said.

5    Q.  Were those products directly ordered from you or were they

6    ordered from Dr. Fishman, to the best of your knowledge?

7    A.  Which products?

8    Q.  The ones without any label.

9             MS. MORTAZAVI:  Objection.  Vague.

10            THE COURT:  Sustained.

11   Q.  When you fulfilled orders regarding products with no

12   labels, where did those orders initiate from?

13   A.  Dr. Fishman's clients.

14   Q.  To who did they initiate from to?

15            MS. MORTAZAVI:  Objection.

16   Q.  From the client to who?

17            THE COURT:  Rephrase the question.  You lost me.

18   Q.  You said it was initiated from Dr. Fishman's client,

19   correct?

20   A.  Correct.

21   Q.  Who would Dr. Fishman's clients initiate it to at

22   Equestology, yourself or Dr. Fishman, or anybody else?

23   A.  Who would they call?

24   Q.  Yes.

25   A.  Either one of us.

1    Q.  Would they call you?

2    A.  Yes.

3    Q.  And would you fulfill those orders?

4    A.  Yes.

5    Q.  Thank you.

6         MR. FASULO:  Can we see 127B.

7    Q.  Nick Devita, do you know who that is?

8    A.  Yes, I do.

9    Q.  What did he do?

10   A.  He was a trainer.

11   Q.  You remember seeing this call when the government put it up

12   before?

13   A.  Yes.

14        MR. FASULO:  Can we get to the content of the call.

15   Q.  Were you a party to this call?

16   A.  No, I was not.

17   Q.  After this call occurred, do you have any recollection of

18   having any conversation with Seth Fishman or Nick Devita about

19   what is stated in this call?

20   A.  No, I did not.

21        MR. FASULO:  Thank you.

22        I want to turn to Government Exhibit 319R, I believe

23   it, June 8, 2017 e-mail.

24   Q.  Did you ever get a response to this request from Seth

25   Fishman?  Did you ever get a response from Seth Fishman on this

1   request that you made?

2   A.  Yes, I did.

3   Q.  What did you do once you got that response?

4   A.  I copied it and pasted it onto a document.

5   Q.  I'd like to bring your attention to what's been entered

6   into evidence as Government Exhibit number 711.

7           MR. FASULO:  If we can go to number 19, which is on

8   the last page of this document.

9   Q.  First of all, are you familiar with this document?

10  A.  I think we all are at this point.

11  Q.  Are you familiar with this document as of the day you were

12  working -- as of the days you were working at Equestology?

13  A.  Yes.

14  Q.  Just answer the questions.

15  A.  Sorry.

16  Q.  Number 19, is that the Serenity that was spoken about in

17  the last e-mail that we just saw?

18  A.  Yes.

19  Q.  When you said you cut and paste, is this the information

20  that you cut and paste and put onto this document?

21  A.  Yes, it is.

22          MR. FASULO:  I want to go through this document in a

23  little more detail right now, if we can turn to the first page

24  of this document.

25  Q.  You're familiar with it?

1   A.   Yes.

2   Q.   With this document.  You had it, right?

3   A.   Um-hum.

4            THE COURT:  That's yes?

5            THE WITNESS:  Yes.  I'm sorry.

6   Q.   You see that it lists a number of products, correct?

7   A.   Correct.

8   Q.   Who made the determination of what products were to be

9   listed on this document?

10  A.   They were Dr. Fishman's products.

11  Q.   As we go through the products, if we go number 1, HP

12  Bleeder Plus.  Do you see that?

13  A.   Yes, I do.

14  Q.   What is your understanding of the use of this document?

15  Why did you have it?

16  A.   The clients requested it.  They wanted information.  It was

17  to provide them information.

18  Q.   And the information that's listed here under HP Bleeder

19  Plus, where did this information come from?

20  A.   Dr. Fishman.

21  Q.   Did you write any of this information yourself?

22  A.   No, I did not.

23  Q.   Did you know if any of this information is accurate or not

24  accurate?

25  A.   No, I do not.

1  Q.  Is there any degree that would give you an idea of whether

2  or not the claims made here were true or not true?

3  A.  No, I do not.

4  Q.  Is there any reason when you saw this that you were to

5  question it yourself?

6  A.  No, not -- no.

7  Q.  Who created the language again, Dr. Fishman?

8  A.  Dr. Fishman.

9        MR. FASULO:  Let's go to number 2, bleeding pills.

10  Q.  Is this another product that you had available at

11  Equestology.

12  A.  Yes.

13  Q.  Again, here, who created the language here?

14  A.  Dr. Fishman.

15  Q.  In terms of the content of it, did you know whether the

16  content was true or not true?

17  A.  I did not know.

18  Q.  Did you have any reason to believe that the content was not

19  true?

20  A.  No, I did not.

21        MR. FASULO:  Number 3.  Let's look at 3, 4, and 5, if

22  we can kind of look at it together.

23  Q.  Again, let me ask you again, these products listed as

24  number 3, number 4, and number 5, were those products that were

25  held in the business of Equestology when you were working

1    there?

2    A.  Yes, they are.

3    Q.  And they are products that you used to fulfill orders that

4    people made?

5    A.  Yes.

6    Q.  In fact, in the descriptions here, would it be fair to

7    say -- who wrote these descriptions under 3, 4, and 5?

8    A.  Dr. Fishman.

9    Q.  Again, did you know whether any of the details of any of

10   those descriptions were accurate or not accurate?

11   A.  I did not know.

12   Q.  And did you have any reason to question what was written in

13   this document?

14   A.  No, I did not.

15   Q.  Based on your experience of working with Dr. Fishman.

16   A.  No, I did not.

17            MR. FASULO:  Next page, please.

18   Q.  Again, I'd like to you look at number 6 and number 7 and

19   number 8 here.

20            Again, are you familiar with what the products are in

21   6, 7, and 8?

22   A.  They are Dr. Fishman products.

23   Q.  Were they available through you at Equestology?

24   A.  Yes, they were there.

25   Q.  In fact, the descriptions that are listed here under 6, 7,

1   and 8, do you know where those descriptions came from?

2   A.  Dr. Fishman.

3   Q.  Did you write any of these descriptions at all?

4   A.  No, I did not.

5           MR. FASULO:  Can we go to the next page.  If we can go

6   down one more to move quicker.  Sorry.  Thanks.  Great.

7   Q.  So you see three more products here.  Again, are you

8   familiar with these products?

9   A.  Yes.

10  Q.  How are you familiar with these products?

11  A.  They are Dr. Fishman products.

12  Q.  Were these available to the clients of Equestology?

13  A.  Yes, they were.

14  Q.  And did you facilitate the transaction with these products?

15  A.  I fulfilled the orders, yes.

16  Q.  In fact, the descriptions again, did you have anything to

17  do with the writing of any of these descriptions?

18  A.  The wording, no, I did not.

19  Q.  Did you know who Dr. Brennan was?

20  A.  I do not know.  I don't see that.  There it is.  No, I do

21  not know who Dr. Brennan is.

22          MR. FASULO:  Next page, please.

23  Q.  Here, looking at 14, 15, and 16, what are those items

24  listed as 14, 15, and 16?

25  A.  More of Dr. Fishman's products.

1    Q.   When you say his products, were they products that were

2    bought from a pharmacy, or were they products developed by

3    Dr. Fishman himself?

4    A.   They were developed by Dr. Fishman.

5    Q.   Would those be considered proprietary products, as you

6    testified earlier?

7    A.   Yes, they are.

8    Q.   Under 14, 15, and 16, were those available through you at

9    Equestology?

10   A.   Yes, they were.

11   Q.   Did you fulfill orders of these products?

12   A.   Yes, I did.

13   Q.   Again, the content and the descriptions as written below

14   each of these products, did you have anything to do with the

15   writing of the contents or the claims made in this area?

16   A.   No.  I just copied and paste.

17   Q.   When you say copy and paste, from where?

18   A.   From an e-mail Dr. Fishman submitted with it.

19             MR. FASULO:   There are two more pages.

20   Q.   Again, are you familiar Equifactor, number 7?

21   A.   Not particularly, but it was a product of Dr. Fishman's.

22   Q.   Are you familiar with LC-200 blood buffer?

23   A.   Yes.  That was a product of Doc's.

24   Q.   Are those products, to the best of your knowledge, the time

25   you worked for Equestology that were available through

1   Equestology?

2   A.   They were available, yes.

3   Q.   Did you fulfill orders with these products?

4   A.   I don't recall the Equifactor, but yes on the LC-200.

5   Q.   Again, in terms of the content and the representations that

6   are made underneath each those products, had you had anything

7   to do with the writing or the content of those descriptions?

8   A.   No, I did not.

9   Q.   Finally, right here Serenity, it says sedation, right?

10  A.   Correct.

11  Q.   Was that a product of Dr. Fishman's?

12  A.   Yes, it was.

13  Q.   Again, did you have anything to do with the writing of the

14  description or the representations made underneath the drug as

15  to its effectiveness?

16  A.   No, I did not.

17  Q.   Who did write that description?

18  A.   Dr. Fishman.

19          MR. FASULO:   Thank you.   You can take that down now.

20  Q.   Now, during the time that you worked for Dr. Fishman, how

21  would you describe the relationship you had as employee and

22  employer?

23  A.   It evolved over time.

24  Q.   What do you mean by that?

25  A.   Originally, when I was hired, it was for collections.   And

1    then it went to me driving Dr. Fishman around from farm to farm

2    to visit his clients.  From there it went to me being a

3    satellite office for Dr. Fishman order fulfillments.  And there

4    was a time there was more driving, deliveries, and then there

5    was a time there was more shipping.

6    Q.  You talked about driving with Dr. Fishman.  Did that occur

7    all throughout the time that you worked from 2000 -- say 2005

8    to 2019?

9    A.  Not all.  In the beginning, yes.

10   Q.  What happened in the later years, between say 2015 to 2019?

11   A.  Dr. Fishman went to the farms and the clients directly.

12   Q.  Did you go with him at those times?

13   A.  Not that I can recall.

14   Q.  As you sit here today, do you know whether Dr. Fishman ever

15   went to see each of those clients on that Avimark list?

16   A.  I only know what the clients -- they would call and say

17   they just saw Dr. Fishman, or Dr. Fishman would call and say I

18   just spoke to so and so, so that's what I knew.

19   Q.  Other than that, do you know if he ever had a relationship

20   with any of those patients or any of those clients?

21   A.  I believed he did.

22   Q.  I'm not asking you what you believe, Ms. Giannelli.  I'm

23   asking you whether you know he had any relationship with any of

24   clients.

25   A.  Yes.

1    Q.  Did you know that he had a relationship with all of the

2    clients?

3    A.  From what he told me, yes.

4    Q.  Other than what he told you, did you personally see him

5    during the years of 2015, 2020 actually examine any horses?

6    A.  I wasn't there, so I didn't see that.

7    Q.  The answer is no?

8    A.  No.

9    Q.  Was there any reason for you to believe during the time you

10   worked for Dr. Fishman that he wasn't examining the animals or

11   serving as a veterinarian under his license?

12   A.  There was nothing that would lead me to believe that.

13   Q.  During the time that you worked for Dr. Fishman, had you

14   ever received a warning letter from any racing commission

15   regarding Dr. -- let me stop here.  Equestology was based in

16   Delaware, correct?

17   A.  Correct.

18   Q.  And Delaware, we saw in the incorporation papers, was the

19   official incorporated address for that company.  Do you

20   remember seeing that?

21   A.  Yes.

22   Q.  You were the incorporator, right?

23   A.  Registered agent, yes.

24   Q.  Were you a shareholder in that company?

25   A.  No, I was not.

1    Q.  At times you would get the mail regarding Equestology.

2    Would that be fair to say?

3    A.  Correct.

4    Q.  And it would come to the Delaware office, correct?

5    A.  Yes.

6    Q.  At any time you were receiving mail on behalf of

7    Equestology, did you receive any mail from any racing

8    commissions or any authorities indicating that it was not

9    operating under the regulations of any state or racing

10   commission?

11   A.  No, I did not.

12   Q.  Did you personally receive any inquiries regarding your

13   role as an assistant at Equestology over the 18 years that you

14   worked with Dr. Fishman from a racing commissions regarding

15   your work?

16   A.  No, I did not.

17   Q.  Did there come a time that you were aware of an incident

18   that happened in Delaware?

19   A.  Yes.

20   Q.  In regard to that incident did you become aware of a

21   complaint made against Dr. Fishman?

22   A.  Yes.

23   Q.  Were you named in that complaint as well?

24   A.  Yes.

25   Q.  When was that about?

1  A.  Sometime in 2011.

2  Q.  To your knowledge, based on the information you received,

3  what did you understand was the result of that complaint?

4  A.  It was dismissed.

5  Q.  How did you learn that?

6  A.  I am not sure if it came by e-mail.  I think it came

7  physical mail.

8  Q.  And you saw an e-mail -- do you remember seeing a text

9  message during the government's case where --

10          MR. FASULO:  One minute, Judge.

11          Can I pull up 900D, just so we can have it in front of

12  us.  It's better.

13          I want you to take a look at what's been marked as

14  900D, Government's Exhibit 900D.  I want to highlight each part

15  of this, if you don't mind.  This, again, is the same e-mail we

16  looked at before, but the beginning of it from Adrian Hall to

17  Seth Fishman.  If we can go to the next response.

18  Q.  You remember seeing this e-mail, Ms. Giannelli?

19  A.  Yes I do.

20          MR. FASULO:  If we could go to the next response, the

21  next three.  If we can go to the green box.

22  Q.  Again, you weren't a participant in this text message

23  exchange, right?

24  A.  No, I was not.

25  Q.  Can you read to yourself what was written here from Seth

1    Fishman to Adrian Hall at that time?

2    A.   OK.

3    Q.   Did you see this line here?

4    A.   Yes, I do.

5    Q.   Where Seth says:  I spent $25,000 in legal fees and had a

6    personal political favor called in to end the BS.  Were you

7    ever made aware of this conversation or this statement from

8    anybody -- let me rephrase that -- from Seth Fishman prior to

9    seeing it here in the discovery in this case?

10   A.   No, I was not.

11   Q.   Did Seth Fishman ever state to you what's been stated here,

12   that he had to call for personal political favors called to end

13   the BS?

14   A.   He did not tell me that.

15   Q.   Did you ever believe that there was a reason, other than

16   the case being dismissed for insufficient evidence, that there

17   was a political favor called in to end that case?

18   A.   No, I was not.

19   Q.   When Seth says here, I voluntarily gave up my license and

20   the veterinarian board had me investigated for BS, they even

21   accused Lisa of practicing veterinary medicine, did you know,

22   after this date, which is 3/11/2019, did Seth Fishman ever have

23   his license back, if you know?

24   A.   He -- I believe that's his racing commission license

25   because it wasn't a veterinary board thing.  I'm sorry.

1    Rephrase the question.

2    Q.  Where it says here about -- that he had to give up.

3    A.  It's like a football field.

4    Q.  It says:  I voluntarily gave up my license and then the vet

5    board had me investigated for BS.

6            Do you have an understanding of what he meant by that,

7    if you know?

8    A.  No.  Because he had a license.  I am not really sure what

9    he's talking about there.

10   Q.  As far as you know, this conversation never happened with

11   you?

12   A.  Never happened with me.

13   Q.  Ms. Giannelli, when you worked for Seth Fishman and you

14   worked in the racing industry, what was your understanding that

15   the participants in the racing industry, the trainers and

16   owners, were interested in when they ran their horses?

17   A.  To keep their horses healthy and make their barn

18   successful.

19   Q.  By making the barn successful, what would that mean,

20   winning races?

21   A.  Absolutely.

22   Q.  When you were a trainer, is that something you were

23   interested in in the horses that you worked with?

24   A.  When I worked for Dr. Fishman?

25   Q.  No.  When you were a trainer.

1    A.  Yes.  I wanted to win races.

2    Q.  Was it your understanding when you worked for Dr. Fishman

3    that by -- actually.  Let me just -- I'll withdraw that

4    question.

5          Ms. Giannelli, at any time that you were working for

6    Dr. Fishman, was it your intent to defraud in any way the

7    racing commission?

8    A.  No, it was not.

9    Q.  Did you benefit in any way whatsoever by trainers who

10   decided to break the rules and win races?

11   A.  No, I did not.

12   Q.  As you dispensed and worked with Dr. Fishman in fulfilling

13   orders, was it ever your agreement with Dr. Fishman that you

14   would engage in that in order for you and him to engage in an

15   agreement to defraud the racing commission?

16   A.  It was not my intention.

17   Q.  And when you were arrested in this case, what did you do in

18   regards to the work that you were doing at Equestology?

19   A.  After I was arrested?

20   Q.  Yes.

21   A.  I immediately resigned when I found out there was -- I

22   didn't want anything to do with this.  It was -- it was not my

23   intention to.

24          THE COURT:  You've answered the question.

25          THE WITNESS:  Let me slow down.  I apologize.

1   Q.  Ms. Giannelli, you understood before you took the witness

2   stand here today that you didn't have to testify, correct?

3   A.  Correct.

4   Q.  And you have an absolute right not to say anything,

5   correct?

6   A.  Correct.

7   Q.  Why is it that you wanted to testify here today?  What's

8   the purpose of your testimony?

9   A.  To tell my story.

10          MR. FASULO:  Nothing further, your Honor.

11          THE COURT:  Thank you.

12          MS. MORTAZAVI:  Thank you, your Honor.

13  CROSS-EXAMINATION

14  BY MS. MORTAZAVI:

15  Q.  Ma'am, I am going to refer to you as Ms. Giannelli,

16  consistent with what your attorney just did.

17          Let me ask you, Ms. Giannelli, you spoke about your

18  background and training.  Do you recall that?

19  A.  Yes.

20  Q.  You worked as a trainer and driver?

21  A.  Not a driver.

22  Q.  You worked as a trainer.  Your husband worked as a

23  trainer/driver, correct?

24  A.  Correct.

25  Q.  Your former husband, I should say.

1    A.   Yes.

2    Q.   You also work as a groom?

3    A.   Yes, I did.

4    Q.   In which states did you work as a groom?

5    A.   If I remember correctly, it was Florida, New Jersey, New

6    York, Ohio.  It was 30 years ago, but there was --

7    Q.   Delaware?

8    A.   Not at that time, to be honest.

9    Q.   At any point?

10   A.   Was I grooming in Delaware, yes.

11   Q.   Did you ever work in the racehorse industry in Delaware?

12   A.   Yes.

13   Q.   So you worked in some capacity, either as trainer,

14   assistant trainer, groom, to race horses in a number of states,

15   correct?

16   A.   Yes.

17   Q.   And you've done that for a number of years, right?

18   A.   Yes.

19   Q.   And even when you started working for Equestology you

20   catered to racehorse trainers, right?

21   A.   Cater?

22   Q.   You would fulfill orders for people in the racehorse

23   industry?

24   A.   When I worked for Dr. Fishman, yes.

25   Q.   All right.  So you've been in the racehorse industry for

1   decades, right?

2   A.  Yes.

3   Q.  And that's in multiple states, correct?

4   A.  Correct.

5   Q.  And while you worked at Equestology, you had clients in

6   each of those states that you just listed, correct?

7   A.  Dr. Fishman did, yes.

8   Q.  You fulfilled orders for people in each of those states,

9   right?

10  A.  Yes.

11  Q.  For trainers in each of those states specifically?

12  A.  Yes.

13  Q.  As a result of working in the racehorse industry, you

14  became familiar with the racing rules, isn't that right?

15  A.  The rules from 30 years ago, yes.

16  Q.  You spoke to racehorse trainers up until your arrest in

17  2020, didn't you?

18  A.  Correct.

19          THE COURT:  You answered.  Don't argue.

20          THE WITNESS:  Sorry.

21  Q.  You fulfilled orders for trainers up until 2020, correct?

22  A.  As a part of my job responsibility, yes.

23  Q.  You made small talk with those trainers up until 2020,

24  correct?

25  A.  Yes.

1  Q.  In fact, while you were licensed as a trainer, you were

2  disciplined a few times.  Do you recall that?

3  A.  From 30 years ago, yes.

4  Q.  You recall being disciplined for violating racing rules,

5  isn't that right?

6  A.  Yes.

7  Q.  At some point do you recall being disciplined because you

8  were found with a nasogastric tube?

9  A.  I was in the vehicle, yes.

10  Q.  A nasogastric tube was found in a vehicle that you were in,

11  correct?

12  A.  Correct.

13  Q.  The vehicle was searched?

14  A.  Yes.

15  Q.  The nasogastric tube was found, correct?

16  A.  Yes.

17  Q.  And your license was suspended?

18  A.  Both licenses.

19  Q.  Which licenses?

20  A.  Myself and my husband's.

21  Q.  When you refer to the license, that is your trainer's

22  license, correct?

23  A.  Correct.

24  Q.  It was suspended for 60 days, is that right?

25  A.  Can I back that up for a minute.  I am not sure if I was

1    trainer at that time.  I might have been a groom.

2    Q.  You held a license at some point and that license with the

3    commission was suspended?

4    A.  The license for the commission was suspended.

5    Q.  Whether it was in your capacity as a groom or trainer.

6    A.  Correct.

7    Q.  You understood that you, as the trainer, were not supposed

8    to have a nasogastric tube, correct?

9    A.  On the racetrack facility, yes.

10   Q.  And nasogastric tube is not a drug, is it?

11   A.  No, it's not.

12   Q.  You still were not supposed to have it on the racetrack

13   grounds, isn't that right?

14   A.  Correct.

15   Q.  You also were disciplined when a horse that you trained

16   tested positive for TCO2.  Do you recall that?

17   A.  It was bicarb.

18   Q.  Bicarbonate, meaning baking soda?

19   A.  Bicarb, whatever bicarb is.

20   Q.  You don't know whether bicarb is baking soda or not?

21   A.  I believe it is.

22   Q.  So baking soda?

23   A.  OK.

24   Q.  That horse was not allowed to race after it tested

25   positive, is that right?

1    A.  Correct.

2    Q.  So you understood that giving bicarb to a horse just before

3    a race could violate state racing rules, correct?

4    A.  Yes.

5    Q.  And bicarb is not a drug, is it?

6    A.  I don't know.  Is it?  I don't think so.

7    Q.  You were generally aware that racing commissions conducted

8    drug tests?

9    A.  Yes.

10   Q.  You were aware that they could inspect barns?

11   A.  Yes.

12   Q.  That they could inspect vans on the racetrack premises?

13   A.  Yes.

14   Q.  In fact that's exactly what happened to you, correct?

15   A.  Correct.

16   Q.  So you knew that they could oversee conduct of anyone

17   licensed with that particular commission, correct?

18   A.  Yes.

19   Q.  You were aware of withdrawal times for certain drugs?

20   A.  At that time when I was trainer, yes.

21   Q.  After that point, are you stating that you not aware of the

22   existence of withdrawal times?

23   A.  The existence, yes.  They changed all the time.

24   Q.  But you're aware of the concept of withdrawal times,

25   correct?

1   A.  Correct.

2   Q.  And you continue to be aware of that concept -- you

3   continued to be aware of that concept up until your arrest in

4   2020?

5   A.  I was aware it was trainer responsibility, yes.

6   Q.  I didn't ask about that rule, Ms. Giannelli.  I asked about

7   withdrawal times.  Were you familiar with the concept of

8   withdrawal times?

9   A.  Yes.

10  Q.  That concept generally means there are some drugs you

11  cannot give to a horse in the days or hours leading up to a

12  race.  Is that fair?

13  A.  That's fair.

14  Q.  When you were being questioned by Mr. Fasulo, you stated

15  that you never encouraged someone to use a drug the day of a

16  race.  Do you recall saying that?

17  A.  Yes, I did.

18  Q.  And you never encouraged someone to do it because this

19  would be violating the rules.

20  A.  Correct.

21  Q.  That's why you answered in the manner that you did, right?

22  A.  Correct.

23  Q.  You understand that if you give a horse a drug the day of a

24  race, that's a violation of the racing rules in most states,

25  correct?

1   A.   If the trainer does, yes.

2   Q.   And you knew the consequences of violating antidrug rules

3   in a particular state?

4   A.   Consequences with the racetrack, yes.

5   Q.   You understood that someone with a license could get fined?

6   A.   Yes.

7   Q.   The horse could be disqualified from a race?

8   A.   Correct.

9   Q.   It could be scratched from a race?

10  A.   Correct.

11  Q.   And scratched means that the horse would never be allowed

12  to race at all, right?

13  A.   During that suspension period.

14  Q.   Correct.  That's what happened to the horse that you had

15  that tested positive for bicarb, isn't that right?

16  A.   No, it's not.

17  Q.   Your horse was allowed to race, even though it tested

18  positive?

19  A.   Not that night.  It was allowed to race -- there was no

20  suspension of days.

21  Q.   But you're generally familiar with this concept of

22  scratching a horse?

23  A.   The judges scratch it, yes.

24  Q.   Which can come along after a horse tests positive on a drug

25  test, correct?

1  A.  Sometimes, yes.

2  Q.  And you're also aware that one of the consequences is that

3  a trainer's license could get suspended, correct?

4  A.  Correct.

5  Q.  Now, you referred to a number of items that you sold.  Do

6  you recall going over those with Mr. Fasulo?

7  A.  Yes.

8  Q.  You sold needles?

9  A.  I fulfilled orders for needles, yes.

10 Q.  Ms. Giannelli, is there a difference between fulfilling

11 orders and selling something?

12 A.  It was Dr. Fishman.  I worked -- I was an employee of

13 Dr. Fishman, so I don't --

14       THE COURT:  Do you have an understanding that there is

15 a difference between selling something and fulfilling an order

16 for something?  That's the question.

17       THE WITNESS:  Selling something -- yeah, OK.  I'm

18 sorry.  I'm confused.

19 Q.  I want to understand, Ms. Giannelli, you corrected me when

20 I asked you if you sold needles.  Did you sell needles?

21 A.  For Dr. Fishman, yes.

22 Q.  You sold needles and you sold other equipment, correct?

23 A.  Correct.

24 Q.  And those were not drugs?

25 A.  Not that I'm aware of.

1  Q.  But you also sold drugs, correct?

2  A.  Correct.

3  Q.  You sold a number of drugs.

4  A.  OK, yes.

5  Q.  Did you also sell prescription drugs?

6  A.  I am not aware which was prescription and which was not.

7  Q.  You did not understand which of the drugs you sold required

8  a prescription?

9  A.  I worked for a veterinarian.  He understood.  I filled the

10  order.

11  Q.  Let me ask you, Ms. Giannelli, you testified about a

12  conversation regarding open script.

13  A.  Correct.

14  Q.  What is open script?

15  A.  It was a term Dr. Fishman explained how to do my job.

16  Q.  What did he explain?

17  A.  He told me that his clients would be calling in, and if it

18  was in the Avimark system, then I could fulfill that order.

19  Q.  There was no time limit that he explained to you?

20  A.  Not that he explained to me, no.

21  Q.  There was no limit on the particular drug?

22  A.  Not that he explained to me, no.

23  Q.  There is no limit on which horse had an open prescription?

24  A.  He did explain these things to me.

25  Q.  Ms. Giannelli, you just testified that he did not.

1    A.  I would like to slow you down.  I don't want to get -- can

2    I answer the question?

3    Q.  Ms. Giannelli, let me reask my last question.  Was there a

4    limit on which horses had an open prescription?

5    A.  Was there a limit on which horses?

6    Q.  Did every horse for every client have an open prescription

7    for every drug?

8    A.  If it was in the Avimark system, yes.

9    Q.  What about new drugs?

10   A.  When Dr. Fishman presented them, they became part of the

11   Avimark system.

12   Q.  When Dr. Fishman presented them to you, they became part of

13   the Avimark system?

14   A.  If an order -- if Dr. Fishman had an order say leave

15   Florida and he had me collect for that order, it was entered

16   into the Avimark system.  If that was not -- if that inventory

17   item was not in the Avimark system at that point, it now became

18   part of the Avimark system, so the Avimark software did it

19   automatically.

20   Q.  And he explained this concept to you that you could rely on

21   the Avimark system for any drug, for any horse, for any client

22   at any time.  Is that right?

23   A.  No.  It's when they were in the system for his clients,

24   preexisting clients, yes.

25   Q.  For any client, for any horse, for any drug, for any time,

1   as long as it was in the Avimark system.  Is that what you are

2   testifying to?

3   A.   That's what he told me.

4   Q.   That's what he told you.

5           Did he tell you this in a text message?

6   A.   No.  It was -- he was verbally at my house.

7   Q.   He told you this in an in-person meeting?

8   A.   Correct.

9   Q.   This was at your house?

10  A.   Correct.

11  Q.   When was this?

12  A.   Back in 2006 or 7.

13  Q.   Was anyone else at that meeting?

14  A.   No, there was not.

15  Q.   Just the two of you alone in your house?

16  A.   Yes.

17  Q.   So to go back to your original answer, Ms. Giannelli,

18  before I asked you about the open script system, were you

19  telling us that you didn't know which of the drugs you sold

20  were prescription drugs and which ones were not?

21  A.   My employer did.

22  Q.   The question is, did you?

23  A.   I'm sorry.  No, I did not.

24  Q.   You had no understanding of what required a prescription

25  and what didn't?

1  A.  I did not, no.

2  Q.  You ordered from various distributors, correct?

3  A.  Correct.

4  Q.  Including some pharmacist, right?

5  A.  Correct.

6  Q.  When you ordered from them you needed to use Seth Fishman's

7  license, correct?

8  A.  Correct.

9  Q.  You couldn't purchase those drugs yourself without his vet

10 license, correct?

11 A.  Correct.

12 Q.  Did that give you an understanding of whether those drugs

13 required a prescription?

14 A.  That was my understanding, that I worked for a veterinarian

15 and I was doing my job, yes.

16 Q.  Ms. Giannelli, that wasn't my question.  My question was

17 whether you had an understanding of which drugs required a

18 prescription.  I asked you, given that you obtained certain

19 drugs using a veterinary license, did that give you an idea

20 that those drugs required a prescription?

21 A.  Yes.

22 Q.  OK.  So there were some drugs where you had an idea that

23 they required a prescription, correct?

24 A.  I do now.

25          (Continued on next page)

1    BY MS. MORTAZAVI:

2    Q.  But you didn't at the time?

3    A.  I only know what Dr. Fishman told me.

4         THE COURT:  Ms. Mortazavi, why don't we find a

5    convenient breaking point?

6         MS. MORTAZAVI:  It might be now, your Honor.  I'm

7    about to move on to a new topic.

8         THE COURT:  Ms. Giannelli, you remain under oath.

9    Please don't talk to anybody about the substance of your

10   testimony or the fact you are testifying.

11        Ladies and gentlemen, please leave your notepads and

12   binders at your places.

13        Have a good break.  We'll reconvene at about 3:15,

14   3:20.  And please do not talk about the case, about the

15   testimony, during the break.  And I'll see you shortly, then.

16   All right?  Have a good break.

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  All right.  You may step down, and we'll

3    reconvene at 13:15.

4          (Recess)

5          THE COURT:  Please be seated.

6          MR. FASULO:  I'll get Ms. Giannelli.

7          THE COURT:  Yes.  Thank you.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  Please be seated, everyone.

3    Ms. Giannelli, you remain under oath.

4    Ms. Mortazavi, please.

5    BY MS. MORTAZAVI:

6    Q.  Ms. Giannelli, to remind you about where we were before the

7    break, I was reminding you about prescription drugs you sold;

8    do you recall that?

9    A.  Yes.

10   Q.  Do you recall testifying you didn't know which drugs were

11   prescription drugs?

12   A.  At the time, yes.

13   Q.  At the time, you did not know?

14   A.  I did not know.

15   MS. MORTAZAVI:  Ms. Jung, could we please display

16   Government Exhibit 5011?

17   Q.  Ms. Giannelli, you recognize this as a series of products

18   from the shelf in your garage the day of the search on March 9,

19   2020, correct?

20   A.  Correct.

21   MS. MORTAZAVI:  And, Ms. Jung, can you focus on the

22   bottle on the left?

23   Q.  Ms. Giannelli, are you telling us you don't recognize this

24   as a prescription?

25   A.  I do recognize it as a prescription.

1   Q.   Okay.   Did you see prescription labels like this on certain

2   of the drugs that you sold?

3   A.   I see it now, yes.

4   Q.   Did you see it at the time?

5   A.   To be honest, no.

6   Q.   So you didn't pay attention to whether or not a drug you

7   sold had a prescription label on it at the time you were

8   selling it?

9   A.   It was a product that Dr. Fishman required to be --

10           THE COURT:   That's not the question that was asked.

11   Please answer the question.

12           THE WITNESS:   I apologize.   Can we have it read back?

13           (Record read)

14           THE WITNESS:   Didn't pay attention?   I knew this

15   product, yes.

16   Q.   Ms. Giannelli, I'll restate my question.   That wasn't quite

17   it.

18   A.   I'm sorry.

19   Q.   At the time you were selling drugs, did you notice bottles

20   that had prescription labels on it like the one you're looking

21   at?

22   A.   Yes.

23   Q.   Okay.   Did you observe various bottles like that that

24   appeared to have prescription labels on them?

25   A.   Yes.

1  Q.  Did that give you a sense that those were prescription

2  drugs?

3  A.  Yes.

4  Q.  Okay.  And that was your understanding at that time?

5  A.  Yes.

6  Q.  So you did know that you sold some prescription drugs; is

7  that fair to say?

8  A.  Yes.

9  Q.  All right.  You sold Banamine, correct?

10 A.  Correct.

11 Q.  You sold flunixin?

12 A.  Correct.

13 Q.  You sold dexamethasone?

14 A.  Correct.

15 Q.  You sold phenylbutazone?

16 A.  Correct.

17 Q.  At the time, did you recognize any of those were

18 prescription drugs?

19 A.  Yes.

20 Q.  So at the time, you knew they were prescription drugs?

21 A.  I learned in court here, yes.

22 Q.  Ms. Giannelli, did you learn it as a result of these

23 proceedings or, at the time, did you know you were selling

24 prescription drugs?

25 A.  I worked for a veterinarian.

1    THE COURT:  The question was:  Did you know at the

2  time that you were selling that those drugs were prescription

3  drugs?

4    THE WITNESS:  Yes.

5  Q.  Okay.  And those prescription drugs, you were not getting

6  from Florida from Seth Fishman, correct?

7  A.  Correct.

8  Q.  And in order to obtain those drugs, you needed to use

9  Seth Fishman's veterinary license, correct?

10 A.  Correct.

11 Q.  And you obtained them from pharmacies?

12 A.  Correct.

13 Q.  And you obtained them from manufacturers, correct?

14 A.  Correct.

15 Q.  So you had multiple places for the various drugs that you

16 sold; is that fair to say?

17 A.  Correct.

18 Q.  And, again, just to be clear, Ms. Giannelli, because I want

19 to make sure the record is clear on this, you knew at the time

20 they were prescription drugs?

21 A.  Yes.

22 Q.  Now, you mentioned, Ms. Giannelli, that you incorporated

23 Equestology; is that right?

24 A.  It was incorporated, yes.

25 Q.  You incorporated it, correct?

1  A.  Yes.

2  Q.  In 2006?

3  A.  '6 or '7, yes.

4  Q.  Do you recall opening a bank account for Equestology in

5  February 2008?

6  A.  Yes.

7  Q.  As of 2011, you were a co-signer on that bank account,

8  correct?

9  A.  Yes.

10 Q.  You and Seth Fishman were co-signers on that bank account

11 specifically, correct?

12 A.  Correct.

13 Q.  And you testified that you wrote checks from that account?

14 A.  Yes.

15 Q.  You wrote checks to yourself?

16 A.  Yes.

17 Q.  And you also used the e-mail address Equestology@gmail.com,

18 correct?

19 A.  Correct.

20 Q.  And Seth Fishman did not use that e-mail address, correct?

21 A.  Not regularly, no.

22 Q.  Okay.  He used his personal e-mail address, right?

23 A.  Correct.

24 Q.  You also suggested new products for Seth Fishman to make

25 through Equestology; isn't that right?

1    A.  Can you repeat the question?

2    Q.  You suggested new products for Seth Fishman to make through

3    Equestology, correct?

4    A.  Yes.

5    Q.  And you sometimes based that on existing products from your

6    other suppliers, correct?

7    A.  Yes.

8    Q.  You would base a recommendation that you made to

9    Seth Fishman based on something that was already on the market;

10   is that fair to say?

11   A.  Yes.

12   Q.  Do you recall testifying on direct that you didn't have any

13   role in creating new products?

14   A.  Yes.

15   Q.  Okay.  But now you're clarifying your testimony that you,

16   in fact, did suggest new products for Seth Fishman to make,

17   right?

18   A.  I didn't -- is that a yes or no or --

19             THE COURT:  That was a yes-or-no.

20             MS. MORTAZAVI:  Could we have the question read back,

21   please?

22             (Record read)

23   A.  Correct.

24   Q.  And the drugs that you're receiving from Florida had

25   custom-made labels on them, right?

1   A.   Yes.

2   Q.   And some of those labels didn't have any labels at all,

3   correct?

4   A.   Yes.

5   Q.   And at times you were consulted on the labels; is that not

6   right?

7   A.   The color, yes.

8   Q.   And at times, you requested to have labels sent up to you

9   in Delaware, correct?

10  A.   Yes.

11  Q.   That was so that you could label the drugs yourself?

12  A.   Yes.

13  Q.   And you even discuss at one point getting a labeler so you

14  could label the drugs yourself, correct?

15  A.   Yes.

16  Q.   And so in order to label the drugs you had to be familiar

17  with the products, right?

18  A.   Correct.

19  Q.   Is it fair to say that you knew what products you were

20  labeling?

21  A.   Yes.

22  Q.   And you actually had to read the labels in order to know

23  what label to apply to which bottle?

24  A.   I guess, yes.

25  Q.   And you had an inventory system in your garage, correct?

1    A.   Yes.

2    Q.   You organized the bottles?

3    A.   Yes.

4    Q.   And you kept stockpiles of Equestology's drugs in your

5    garage; isn't that right?

6    A.   Yes.

7    Q.   You would sometimes order inventory for an entire year; is

8    that right?

9    A.   Yes.

10   Q.   And you sometimes ordered inventory with no limit to the

11   number of bottles or pills, correct?

12   A.   Yes.

13   Q.   And you ordered hundreds of bottles at a time; is that not

14   right?

15   A.   Occasionally, yes.

16   Q.   You would sometimes order supplies for a year in advance;

17   is that fair to say?

18   A.   Yes.

19   Q.   And you also participated in labeling the products that you

20   received?

21   A.   Yes.

22   Q.   Now, you also mentioned that you collected your income

23   based off payments, right?

24   A.   Payments, is that what you said?

25   Q.   Yes.

1    A.  Yes.

2    Q.  All right.  So you got a percentage of whatever a client

3    paid, right?

4    A.  Collections.  Yes.

5    Q.  Now, Ms. Giannelli, you used the term collections a few

6    times.  Were you getting a commission on debt collection, or

7    were you getting a commission on payments?

8    A.  Payments that came in for Dr. Fishman, collections.

9    Q.  Is that sometimes referred to as a commission, where you

10   get a percentage of a payment?

11   A.  It was on commission, 17 percent, yes.

12   Q.  All right.  So you worked on commission, which means

13   that --

14          THE COURT:  Was that a question, so you worked on

15   commission?

16          MS. MORTAZAVI:  It was intended to be, and I thought

17   there was an answer.

18          THE COURT:  It's not on the record.  Sorry.

19   Ms. Giannelli, you worked on commission?

20          THE WITNESS:  Yes.

21          THE COURT:  Thank you, both.

22   Q.  So the higher your sales, the higher you were paid, right?

23   A.  No.

24   Q.  The more people paid for products, the more you were paid;

25   is that fair to say?

1    A.  Fair to say.

2    Q.  Okay.  So the more people spent, the more you made?

3    A.  Yes.

4    Q.  So if people spent more money, you made more money?

5    A.  Yes.

6    Q.  And you also took steps to increase the amount of sales

7    that were generated through the clients that you collected

8    commissions on, correct?

9    A.  Yes.

10   Q.  You cold called customers?

11   A.  Yes.

12   Q.  You solicited customers?

13   A.  Don't recall, but --

14   Q.  Well, let me ask you this:  Did you contact customers

15   randomly just to see if they wanted to buy something?

16   A.  Yes.

17   Q.  And cold calling, that's generally what that means, right?

18   A.  Yes.

19   Q.  And you texted customers to see if they wanted to place

20   orders, right?

21   A.  Correct.

22   Q.  And you would do that without the customers coming to you

23   first, right?

24   A.  Sometimes both, yes.

25   Q.  Okay.  But that's what a cold call is, Ms. Giannelli.  Do

1   you understand that term?

2   A.  Yes.

3   Q.  And so you would unprompted reach out to customers to see

4   if they wanted a product, fair to say?

5   A.  I would not say unprompted, but yes.

6   Q.  You also gave out free samples to clients, correct?

7   A.  Yes.

8   Q.  And that was your decision to give those clients those free

9   samples, right?

10  A.  Dr. Fishman's.

11  Q.  Well, Ms. Giannelli, you reached out to clients to give

12  them free samples, correct?

13  A.  Yes.

14  Q.  And the course of dealing with a customer, would you give

15  them a sample?

16  A.  Yes.

17  Q.  And you gave them a sample so they could try a new drug; is

18  that fair to say?

19  A.  Yes.

20  Q.  All right.  And that new drug, that didn't fall under the

21  open script understanding that you had, correct?

22  A.  It did.

23  Q.  Well, if it was a sample of a new drug, it wouldn't be in

24  the Avimark system, would it?

25  A.  It was in the Avimark system.

1   Q.  But, Ms. Giannelli, if a client had not received a drug

2   before, if you had given them a free sample, that would not

3   appear in the Avimark system; would it?

4   A.  It was in the Avimark system.

5   Q.  Ms. Giannelli, let me go back to my original question.

6   A.  Okay.

7   Q.  You stated earlier that you would give clients free

8   samples.

9   A.  Correct.

10  Q.  And you also testified that you would give them samples of

11  new drugs, correct?

12  A.  Correct.

13  Q.  And so a new drug would not already be in the Avimark

14  system; is that fair to say?

15  A.  I don't want to argue.  It was in the system.

16          THE COURT:  If that's your answer, that's fine.

17          THE WITNESS:  Okay.

18  Q.  And you also put together descriptions in a Word document

19  to pass out to potential buyers.  Do you recall Mr. Fasulo

20  asking you about that?

21  A.  Yes.

22  Q.  Do you recall looking at Government Exhibit 711?

23  A.  Yes.

24          MS. MORTAZAVI:  And, Ms. Jung, please display that

25  exhibit just to make sure the witness has an opportunity to see

1    it so there's no confusion.

2    Q.  Ms. Giannelli, you put this document together, correct?

3    A.  Yes.  Correct.

4    Q.  And you stored this on your computer, right?

5    A.  The office computer, yes.

6    Q.  And you sent it out to potential buyers, correct?

7    A.  Correct.

8    Q.  You were the one who prompted Seth Fishman to put together

9    the descriptions in this document; fair to say?

10   A.  Yes, yes.

11   Q.  You not only asked him to put together this lengthy

12   description you also asked him to put together a short blip to

13   catch people's attention; is that fair to say?

14   A.  Yes.

15   Q.  And he didn't ask you to do that, did he?

16   A.  No.

17   Q.  You did that on your own, correct?

18   A.  Prompted by his clients calling in, yes.

19   Q.  So clients would call in and then you decided to put

20   together this document, correct?

21         THE COURT:  We don't have an answer to the last one.

22         MS. MORTAZAVI:  Oh, I thought I heard one.  Apologies,

23   your Honor.

24   A.  Yes.

25   Q.  Okay.  On this document that you put together, this did not

1    include everything that you received from Seth Fishman,

2    correct?

3    A.   Correct.

4    Q.   And this did not include everything that was a Seth Fishman

5    product that you offered for sale to clients, correct?

6    A.   Correct.

7         MS. MORTAZAVI:   Okay.   Could we turn, please, to the

8    second page of this document, Ms. Jung?   Could we focus on

9    number 3?

10   Q.   Ms. Giannelli, you see the highlighted text here, correct?

11   A.   Yes.

12   Q.   And you testified earlier that giving a drug to a racehorse

13   the day of a race would be a violation of the rules, correct?

14   A.   Correct.

15   Q.   Okay.   And you, again, put together this document, right?

16   A.   Yes.

17   Q.   And in order to put together this document, you had to read

18   the e-mail to figure out what drug went with which description,

19   correct?

20   A.   Copied and paste, yes.

21   Q.   You had to read an e-mail that Seth Fishman sent you and

22   then create a brand new document; fair to say?

23   A.   I didn't read this, but yes.

24   Q.   So you're saying that you did not read the descriptions in

25   this document that you handed out?

1   A.  Not always, no.  I just copied and pasted what the Doc

2   wanted.

3   Q.  Did you read the description for VO2 Max?

4   A.  Yes.

5   Q.  Okay.  And you read the highlighted portion?

6   A.  Yes.

7       MS. MORTAZAVI:  Ms. Jung, if we could please turn to

8   page 5, I believe?

9       Your Honor, we'll just give our paralegal a moment.  I

10  think there might be a technical issue.

11      (Pause)

12  Q.  Ms. Giannelli, in the interest of time, I'm going to move

13  on to another line of questioning, and then we're going to

14  return -- oh, all right.  I spoke too soon.

15      MS. MORTAZAVI:  Thank you, Ms. Jung.

16      Ms. Jung, if you can go one additional page forward to

17  page 6 and focus on number 17 on this list?

18  Q.  Ms. Giannelli, do you recall receiving this description

19  from Seth Fishman?

20  A.  Yes.

21  Q.  Do you recall putting it into this document?

22  A.  Yes.

23  Q.  And so you're aware of the text within it, correct?

24  A.  I am now, yes.

25  Q.  Were you at the time?

1    A.  It was a long -- yes.

2    Q.  So at the time you were aware of what was contained within

3    Government Exhibit 711 below item 17?

4    A.  Yes.

5    Q.  Okay.  And you didn't talk about this description with

6    Mr. Fasulo, correct?

7    A.  I did or didn't?

8    Q.  You did not talk about this description with Mr. Fasulo,

9    correct?

10          THE COURT:  You're asking on her direct?

11          MS. MORTAZAVI:  Yes.

12          THE COURT:  When Mr. Fasulo was questioning you on

13   direct.

14          THE WITNESS:  He -- I think he brought up this one,

15   I'm --

16          MS. MORTAZAVI:  Okay.  Ms. Jung, we can take down this

17   exhibit.

18   Q.  And let me ask you, Ms. Giannelli, you used UPS to mail

19   your packages, correct?

20   A.  Correct.

21   Q.  There was a point in time when you were delivering packages

22   in person?

23   A.  Yes.

24   Q.  But you also mailed packages, right?

25   A.  Correct.

1    Q.  You mailed them across the country?

2    A.  Yes.

3    Q.  You mailed them to Virginia?

4    A.  Yes.

5    Q.  Mailed them to Maryland?

6    A.  Maybe.  Yes.

7    Q.  To Texas?

8    A.  Not that I'm aware of.

9    Q.  To Illinois?

10   A.  I don't recall every one.

11   Q.  You had clients all over the United States, correct?

12   A.  Dr. Fishman had clients, yes.

13   Q.  You had buyers all over the United States; is that fair to

14   say?

15   A.  No.  Yes.  I mean, they were in the Avimark system.  I

16   don't have them all memorized.

17   Q.  Do you generally understand that you had clients in

18   multiple states?

19   A.  Yes.

20   Q.  And that includes Florida, right?

21   A.  Yes.

22   Q.  And Seth Fishman was located in Florida himself, correct?

23   A.  Correct.

24   Q.  And you stated that he had a portion of the business that

25   he also handled himself that you didn't get involved in; is

1    that fair to say?

2    A.   Correct.

3    Q.   And, Ms. Giannelli, let me ask you about UPS shipping.  Do

4    you recall testifying about decisions that you made to try to

5    reduce the cost of shipping?

6    A.   Yes.

7    Q.   Does it cost more to ship a drug to two different places or

8    to one place.

9         Let me ask the question again.

10        Does it cost more to ship a drug from Florida to

11   Delaware back to Florida, or just ship it within Florida?

12   A.   I wasn't in Florida.  I'm not aware of the Florida --

13   Q.   That's not my question, Ms. Giannelli.

14   A.   I'm sorry.

15   Q.   Let me go ahead and ask it again.

16        Does it cost more in UPS fees to ship a drug from

17   Florida up to you in Delaware and then back down to a buyer in

18   Florida?

19        THE COURT:  Than what?

20   Q.   Than to just ship it within the state of Florida?

21   A.   I'm not aware of that.  I don't have an answer for that.  I

22   apologize.

23   Q.   You sold BB3, correct?

24   A.   Yes.

25   Q.   You sold TB7?

1   A.   Yes.

2   Q.   You sold oxygenator?

3   A.   Yes.

4   Q.   You understood that BB3 was a blood builder, correct?

5   A.   Yes.

6   Q.   And those items that I just listed, you did not get from

7   compounders, correct?

8   A.   Correct.

9   Q.   You got those from Seth Fishman?

10  A.   Correct.

11  Q.   And the BB3 blood builder in particular, that was one of

12  the drugs you received that was not labeled, right?

13  A.   Correct.

14  Q.   And you had seen labels from compounders in the course of

15  your work, right?

16  A.   Yes.

17  Q.   And you understood that those labels had certain

18  information on them, right?

19  A.   Yes.

20  Q.   And you understood that a drug with no label was missing

21  all of that information, right?

22  A.   Correct.

23  Q.   How did you know when you were receiving a bottle of BB3 as

24  opposed to any other drug?

25  A.   Dr. Fishman or Mary Fox told me.

1    Q.  How did your clients know that they were receiving BB3 as

2    opposed to any other drug?

3    A.  Dr. Fishman told them.

4    Q.  You never told someone that you were sending them BB3?

5    A.  If they requested it, yes.

6    Q.  All right.  So you discussed BB3 with clients?

7    A.  Discussed is a -- yes.

8    Q.  And you sent out unlabeled bottles of blood builder,

9    correct?

10   A.  Yes.

11   Q.  You understood if those trainers had been searched, they

12   would have been found with that bottle -- if they had been

13   searched on the racetrack, correct?

14   A.  If they were on the racetrack, yes.

15   Q.  Ms. Giannelli, I want to ask you a few questions about the

16   work you did with collections, as you put it.  You kept credit

17   cards on file for clients; is that right?

18   A.  Correct.

19   Q.  You had their payment information saved?

20   A.  Correct.

21   Q.  You could charge their credit cards before you fulfilled an

22   order, correct?

23   A.  With permission, yes.

24   Q.  And nothing was stopping you from charging you a customer

25   before you mailed out a drug for that customer; fair to say?

1          MR. FASULO:  Objection.

2          THE COURT:  Basis?

3          MR. FASULO:  Vague.

4          THE COURT:  Overruled.

5          MS. MORTAZAVI:  Could we have the question read back,

6    please.

7          (Record read)

8    A.   It was simultaneously, but yes.

9    Q.   You can always charge a customer, make sure the payment

10   went through, and then send them the drug, right?

11   A.   Not always.

12   Q.   I'm asking what you could do.  Could you have?

13   A.   Could have, yes.

14   Q.   Could you have said that you were not going to advance

15   anybody orders of drugs?

16   A.   Based upon --

17   Q.   I'm asking if it was possible for you to hold back an order

18   of drugs until a payment cleared?

19         MR. FASULO:  Objection.  Asking the witness to

20   speculate.

21         THE COURT:  Overruled.

22   A.   Yes.

23   Q.   You could have refused to accept personal checks, correct?

24   A.   Yes.

25   Q.   You could have waited for a credit card charge to clear,

1  correct.

2  A.  Yes.

3  Q.  When you go to a pharmacy and you buy something, you pay

4  before you receive the item, right?

5  A.  Yes.

6  Q.  And when you go to a grocery store and you buy something,

7  you pay before you receive the item, right?

8  A.  Yes.

9  Q.  And, in fact, you did exactly that in your line of work;

10  isn't that right?

11          MR. FASULO:  Objection, Judge.

12          THE COURT:  Sustained.  Did exactly what?

13  Q.  You collected payment before you would fulfill an order for

14  a number of clients; fair to say?

15  A.  On occasion.

16  Q.  Okay.  And you already mentioned that you kept a credit

17  card on file, correct?

18  A.  For some, yes.

19  Q.  And you sometimes refused to fulfill an order if someone

20  wanted you to advance them the order without the payment going

21  through; is that fair to say?

22  A.  Yes.

23  Q.  So you had ways of making sure that people would pay you

24  for the drugs you sold; fair to say?

25  A.  Yes.

1  Q.  And, in fact, you used some of those tools to make sure

2  that you were paid before you fulfilled an order, correct?

3  A.  Yes.

4  Q.  Ms. Giannelli, were you worried about snitches in your line

5  of work?

6  A.  That was Dr. Fishman.  No.

7  Q.  Could you repeat that, Ms. Giannelli?

8  A.  Snitches?

9  Q.  Snitches.

10  A.  I was not worried about snitches.

11  Q.  You were not worried about snitches, Ms. Giannelli?

12  A.  I don't recall being worried about snitches.

13        MS. MORTAZAVI:  Okay.  Ms. Jung, can we please display

14  Government Exhibit 711 and turn to page 6, number 17?  And if

15  we could focus on that paragraph?

16  Q.  You see this portion of the description, Ms. Giannelli that

17  refers to a snitch that turns a bottle in?

18  A.  Yes.

19  Q.  And you testified already that you had read this

20  description, correct?

21  A.  Correct.

22  Q.  And you're testifying you weren't actually worried about

23  snitches?

24  A.  That's Dr. Fishman.

25  Q.  Ms. Giannelli, you can answer my question.  Are you

1   testifying that you were not worried about snitches?

2   A.   In the course of my job, yes.

3   Q.   Okay.

4   A.   I'm sorry.  Go ahead.

5   Q.   All right.  But you're familiar with this language?

6   A.   Yes.

7   Q.   You knew that Seth Fishman put this together?

8   A.   Yes.

9   Q.   And you, in fact, distributed this to trainers, correct?

10  A.   Yes.

11  Q.   And you assumed that they would read this, right?

12  A.   Yes.

13  Q.   So you assumed they would be familiar with the language

14  here in the description for Equifactor; fair to say?

15  A.   Fair to say.

16  Q.   Have you heard of EPM, Ms. Giannelli?

17            MS. MORTAZAVI:  Ms. Jung, we can take this exhibit

18  down.

19  A.   EPM?

20  Q.   Yes.

21  A.   Yes.

22  Q.   You referenced EPM Doublekill before, correct?

23  A.   Correct.

24  Q.   EPM is an ulcer medication; is that right?

25  A.   No.

1  Q.  What is it?

2  A.  It's a -- something a horse gets -- a -- I don't know what

3  the EPM stands for, but it is a disease that the horse gets

4  inflicted by.  I don't really know.  I'm not a veterinarian.

5  Q.  You sold EPM, right?

6  A.  Yes.

7  Q.  You had in your garage area tubes and tubes of EPM; do you

8  recall that?

9  A.  Yes.

10  Q.  Do you recall seeing the physical exhibits that were

11  brought into trial?

12  A.  Yes.

13  Q.  And they were labeled EPM Doublekill?

14  A.  Correct.

15  Q.  And you sold EPM Doublekill?

16  A.  Yes.

17  Q.  And you had a general idea of what it was before you sold

18  it; fair to say?

19  A.  Yes.

20  Q.  Okay.  So why don't you tell us, what did you understand

21  EPM Doublekill to be?

22  A.  It was a product of Dr. Fishman's to treat or prevent --

23  not prevent because it's not a -- it doesn't get cured.  It's a

24  disease that a horse gets.  I think it's from -- you know, it

25  is from an animal's feces.

1   Q.  So it's a treatment for a disease?

2   A.  I don't know if it's a disease or not, but yes.

3   Q.  It comes in a paste format?

4   A.  Yes.

5   Q.  So it's oral?

6   A.  Yes.

7   Q.  That's not a blood builder?

8   A.  No.

9   Q.  It's not like the BB3 that you sold, correct?

10  A.  Not that I'm aware of.

11  Q.  The BB3 that you sold was injectable, right?

12  A.  Yes.

13  Q.  And many of the products that you sold from Seth Fishman

14  were injectables, correct?

15  A.  Yes.

16  Q.  Meaning you needed to administer them with a needle and

17  syringe?

18  A.  Some of them, yes.

19          MS. MORTAZAVI:  Your Honor, if I could just have a

20  moment?

21          THE COURT:  Sure.

22  Q.  Ms. Giannelli, even though you gave up your license as a

23  trainer or a groom or assistant trainer, as we were discussing

24  earlier, you were familiar with others in the racehorse

25  industry, correct?

1    A.   Yes.

2    Q.   And you were responsive to the people that you sold drugs

3    to, right?

4    A.   Can you rephrase that?

5    Q.   You were -- well, you cared about the needs of the people

6    that you were selling to?

7    A.   Yes.

8    Q.   Fair to say?

9    A.   Yes.

10   Q.   And you sold primarily to trainers?

11   A.   Yes.

12   Q.   And you testified earlier that you put together Government

13   Exhibit 711 because you wanted to be responsive to your clients

14   and give them some kind of product sheet; do you recall that

15   testimony?

16   A.   Yes.

17   Q.   And you testified earlier that you suggested new products

18   to make, again, because you were responsive to your clients,

19   correct?

20   A.   Rephrase the question again.

21   Q.   You suggested new products for Seth Fishman to make because

22   you were trying to be a responsive to your clients, correct?

23   A.   Yes.

24   Q.   So you knew that your clients were concerned about

25   potential positive tests, right?

1   A.   Among other things.

2   Q.   Okay.  And you also testified on direct that you understood

3   that some of Seth Fishman's products that he was supplying you

4   with were untestable; do you recall that testimony?

5   A.   Yes.

6   Q.   And you knew that that was something that your clients were

7   interested in; fair to say?

8   A.   On occasion, yes.

9   Q.   You knew that untestability for certain of these drugs was

10  important to your clients, correct?

11  A.   Yes.

12  Q.   And you understood that from your conversations with those

13  clients, right?

14  A.   Yes.

15  Q.   And you understood that from your general knowledge in the

16  racehorse industry, correct?

17  A.   Yes.

18  Q.   Including the two times that you were disciplined as a

19  trainer or groom, correct?

20  A.   Yes.

21  Q.   And, Ms. Giannelli, you testified about the Trainer

22  Responsibility Rule; do you recall that?

23  A.   Yes.

24  Q.   That was a state racing rule, correct?

25  A.   Correct.

1  Q.  That was you testified on direct that that was a contract

2  between the trainer and the state; do you recall those words?

3  A.  Yes.

4  Q.  And by state, you meant the state racing commission, right?

5  A.  Yes.

6  Q.  You didn't mean any veterinary boards?

7  A.  No.

8  Q.  You didn't mean any pharmaceutical boards?

9  A.  No.

10  Q.  You didn't mean any contract between someone in the FDA?

11  A.  No.

12  Q.  You didn't mean any contract between someone in any federal

13  agency, right?

14  A.  Correct.

15  Q.  Now, Ms. Giannelli, there came a time, as you testified on

16  direct, that you were investigated by the Delaware Division of

17  Professional Responsibility.  Do you recall being asked

18  questions about that?

19  A.  Yes.

20  Q.  That was in 2011, correct?

21  A.  Yes.

22  Q.  And you reviewed the complaint that was filed against you

23  and Seth Fishman, right?

24  A.  Correct.

25          MS. MORTAZAVI:  Ms. Jung, can we please display

1  Government Exhibit 3001?

2  Q.  Ms. Giannelli, I'm going to go over certain phrases in this

3  complaint.  States here:  I am suspicious this veterinarian

4  does not have a client-patient relationship.

5          THE COURT:  Can we make this larger?  I can't read

6  this.

7          MS. MORTAZAVI:  Ms. Jung, if we can focus on the

8  bottom half of the screen, please?

9          THE COURT:  Thank you.

10          MS. MORTAZAVI:  I'm sorry, Ms. Jung -- oh, actually,

11  you have the right portion.  Thank you.

12  Q.  He had just returned stateside from being out of the

13  country, I believe he said Brazil, for an extended period of

14  time.  So once again, I am suspicious he does not have a stable

15  patient-client relationship.

16          Do you see those words in the complaint,

17  Ms. Giannelli?

18  A.  Yes.

19  Q.  Fair to say that is suggesting that the fact that

20  Seth Fishman is out of the country means that he has no stable

21  patient-client relationship?

22  A.  I believe the word is stateside.

23          Oh, I'm sorry.  I apologize.  Stable.  Yes.

24  Q.  Okay.  So the suggestion here is because Seth Fishman is

25  not in the United States, he may not have a stable

1   patient-client relationship; is that a fair reading of this

2   statement?

3   A.  Yes.

4   Q.  Now you testified earlier that there was nothing to

5   indicate to you that Seth Fishman was not examining animals; do

6   you recall testifying to that?

7   A.  Correct.

8   Q.  What about Seth Fishman's foreign travel, did that suggest

9   to you that he was not examining animals?

10  A.  Dr. Fishman -- his foreign -- can you repeat the question,

11  please?

12  Q.  Did his foreign travel suggest to you that he did not have

13  a stable client-patient relationship with the horses of the

14  clients you were selling to?

15  A.  No, it did not.

16  Q.  There was nothing about his foreign travel that suggested

17  to you that he was not conducting physical examinations?

18  A.  When he was out of the country, he was not.

19  Q.  And if he was out of the country frequently, that didn't

20  suggest to you that perhaps he was not conducting physical

21  examinations?

22  A.  No, it did not.

23  Q.  Did you know him to be out of the country frequently?

24  A.  Yes.

25  Q.  Did you know him to travel to Dubai frequently?

1   A.   Yes.

2   Q.   In Hong Kong?

3   A.   Yes.

4   Q.   And Singapore?

5   A.   Yes.

6   Q.   And as it states here, Brazil?

7   A.   Yes.

8   Q.   And other countries?

9   A.   Correct.

10  Q.   Okay.  And in this complaint, it also states:  I am

11  concerned this veterinarian is not physically examining these

12  animals, and is in this medication sale situation strictly for

13  profit.

14       Did that suggest something to you about whether or not

15  Seth Fishman had to physically examine animals in order to have

16  a relationship with them?

17  A.   The wording suggests that.

18  Q.   All right.  And is it your understanding, Ms. Giannelli,

19  that he examined every animal of clients that you sold to?

20  A.   I cannot answer that.

21  Q.   Ms. Giannelli, you can answer as to your understanding.

22  A.   To my understanding, Dr. Fishman had a relationship with

23  these people.

24  Q.   Well, Ms. Giannelli, that wasn't quite my question.  My

25  question was, was it your understanding that he was physically

1   examining each of the horses of the clients you sold to?

2   A.  No, it was not.

3   Q.  So you didn't think he was conducting physical examinations

4   of every racehorse, correct?

5   A.  Correct.

6   Q.  You sold to clients irrespective of that, correct?

7   A.  I'm sorry.  Repeat again.

8   Q.  You sold to clients even if you weren't sure that their

9   horses had ever been examined by Seth Fishman?

10          MR. FASULO:  Objection.  Misleading.  The last

11  question does not match the question.

12          THE COURT:  It doesn't have to match.  She can ask a

13  freestanding --

14          MR. FASULO:  She's referring --

15          THE COURT:  Overruled, Mr. Fasulo.

16          Madam Reporter, could you please read it back?

17          (Record read)

18  Q.  -- had ever been physically examined by Seth Fishman?

19  A.  Physically examined, yes.

20  Q.  Okay.  In your mind, did it matter whether or not he had

21  physically examined those horses?

22  A.  No.

23  Q.  In your mind, did it matter whether or not you designated a

24  horse to receive a particular drug?

25  A.  No.

1   Q.  In your mind, was there any limitation to who you could

2   sell a drug to?

3   A.  Yes.

4   Q.  As long as it was in the Avimark system?

5   A.  Correct.

6   Q.  You could add clients to the Avimark system, correct?

7   A.  Yes.

8   Q.  Okay.  So if you or Seth Fishman added someone to the

9   Avimark system, they were in the system for all time; fair to

10  say?

11  A.  Yes.

12  Q.  And, in fact, you generated a list of all of Equestology's

13  clients for all time, correct?

14  A.  Old and new ones, yes.

15  Q.  That was Government Exhibit 715 that we looked at?

16  A.  Correct.

17  Q.  So as long as a name was in the Avimark system, they could

18  get any drug for any horse.

19  A.  That was my understanding.

20  Q.  And it didn't matter whether or not Seth Fishman had ever

21  examined that horse, correct?

22  A.  That was my understanding.

23  Q.  And it didn't matter whether or not the horse was

24  identified in the Avimark system, correct?

25  A.  That was my understanding.

1   Q.  And clients were listed -- or information was listed based

2   on the client name, not the patient name, correct?

3   A.  Sometimes, yes.

4   Q.  Because sometimes the patient was just listed as barn

5   supplies, correct?

6   A.  Correct.

7   Q.  And you went over that with Mr. Fasulo; do you recall that?

8   A.  Yes.

9   Q.  So it was more important to list the client in the Avimark

10  system, correct?

11  A.  Yes.

12  Q.  And as long as a client appeared in the Avimark system, at

13  any point, you could sell any drug to that client, correct?

14  A.  That was my understanding.

15  Q.  Okay.  And you had operated for approximately 20 years,

16  give or take a few years?

17  A.  Approximately.

18  Q.  And you testified that you had over a thousand clients?

19  A.  In the Avimark system, yes.

20  Q.  And Seth Fishman was constantly coming up with new drugs;

21  fair to say?

22  A.  Fair to say.

23  Q.  And you sometimes suggested new drugs for him to create;

24  fair to say?

25  A.  Upon prompting, yes.

Q.  And any of those drugs could be sold to any of the

thousand-plus clients in the Avimark system, correct?

A.  Yes.

Q.  And it didn't matter whether they had a horse listed in the

system or not, correct?

A.  Barn supplies, yes.

          (Continued on next page)

1    Q.  It also states here in this complaint --

2          MS. MORTAZAVI:  Ms. Jung, if we could turn to -- I'm

3    sorry.  Let's focus on the same bottom page that's listed here.

4    Q.  I'm concerned this veterinarian is not physically examining

5    these animals and is in this medication sales situation

6    strictly for profit.

7          Ms. Giannelli, you were profiting from the commissions

8    that you made, correct?

9    A.  In my job, yes.

10   Q.  You mentioned some expenses, right?

11   A.  I mentioned --

12   Q.  You mentioned that you had some expenses?

13   A.  Expenses, yes.

14   Q.  But you ultimately profited from your arrangement with Seth

15   Fishman, correct?

16   A.  As an employee, yes.

17   Q.  And apart from the actions that you have described through

18   Equestology, did you have any other means of income?

19   A.  No.

20   Q.  I am going to read out another portion of this.  My biggest

21   concern with this case is that Lisa M. ranger is not a licensed

22   veterinarian, and she is driving around this state selling

23   medications, needles, syringes, and prescription drugs without

24   a license and no professional training in regards to the

25   medications she is dispensing.

1    Ms. Giannelli, you testified today that you have had

2  no professional training whatsoever, correct?

3  A.  Correct.

4  Q.  After receiving this complaint, did you try to get

5  professionally trained?

6  A.  Dr. Fishman did not tell me to.

7  Q.  Ms. Giannelli, that's not my question.  My question was,

8  did you ever get any professional training after you read this

9  complaint?

10  A.  No, I did not.

11  Q.  Did you ever seek to find out more information after you

12  read this complaint?

13  A.  No, I did not.

14  Q.  Did you seek to educate yourself on the industry that you

15  were participating in after you got this complaint?

16  A.  No, I did not.

17  Q.  Did you take any steps whatsoever to try to inform yourself

18  of participating in the -- in drug sales strictly for profit?

19  A.  No, I did not.

20  Q.  It also states here, Ms. Giannelli, she is also dispensing

21  medications that are not approved in the U.S., which is also an

22  FDA and potentially a DEA violation.

23    Ms. Giannelli, you're familiar with the FDA?

24  A.  Yes.

25  Q.  At the time -- excuse me -- you were familiar with the FDA?

1   A.  Just by that, yes.

2   Q.  And you were familiar with the DEA, the Drug Enforcement

3   Administration?

4   A.  Yes.

5   Q.  Again the FDA is a Food and Drug Administration, correct?

6   A.  Correct.

7   Q.  So you understood that this was accusing you of selling

8   unapproved drugs that constituted an FDA violation, correct?

9   A.  It was the accusation, yes.

10  Q.  Once again, after you received this complaint, you didn't

11  take any steps to educate yourself, did you?

12  A.  No.

13  Q.  You didn't take any steps to have any training?

14  A.  No.

15  Q.  Ms. Giannelli, you submitted a letter through an attorney

16  that represented you.  Do you recall that?

17  A.  Yes.

18  Q.  And you attached a notarized statement stating that the

19  facts in the letter were accurate, correct?

20  A.  Correct.

21  Q.  And you also participated in an interview by the Delaware

22  Division of Professional Responsibility, correct?

23  A.  Yes.

24          MS. MORTAZAVI:  Ms. Jung, can please take this down

25  and pull up Government Exhibit 3000 and focus on page 1.

1   Q.  You recognize the name Benjamin Schwartz, correct, Ms.

2   Giannelli?

3   A.  Yes.

4   Q.  This was the attorney who represented you?

5   A.  Yes.

6   Q.  And turning to page 5 of this exhibit, this is your

7   notarized statement, correct?

8   A.  Yes.

9   Q.  And you attested that the facts concerning you as set forth

10  in this letter response were true and correct?

11  A.  The facts concerning me, yes.

12  Q.  Right.

13      MS. MORTAZAVI:  Ms. Jung, if we could please go back

14  now to page 2 of Government Exhibit 3000.

15  Q.  Here it states, Ms. Giannelli:  Lisa Ranger does not sell

16  drugs for Dr. Fishman.  It is incorrect and professionally

17  irresponsible to claim that she sells drugs for Seth I.

18  Fishman.

19      Do you see that there in the response?

20  A.  I do.

21  Q.  That's a fact concerning you, right, Ms. Giannelli?

22  A.  Yes, it is.

23  Q.  You attested that was true?

24  A.  Yes.

25  Q.  And you also, as you testified to a moment ago,

1  participated in an interview with someone from the Delaware

2  Division of Professional Responsibility, correct?

3  A.  Yes.

4  Q.  And you understood that was not a criminal proceeding,

5  right?

6  A.  Correct.

7  Q.  That was a civil proceeding?

8  A.  Correct.

9  Q.  By the professional regulations, correct?

10  A.  Yes.

11  Q.  And they regulate licenses in the State of Delaware, right?

12  A.  Yes.

13  Q.  You did not hold a license a veterinary license in the

14  State of Delaware, correct?

15  A.  Correct.

16  Q.  So you couldn't have had a license revoked?

17          MR. FASULO:  Objection.

18          THE COURT:  Basis.

19          MR. FASULO:  It's hypothetical, Judge.

20          THE COURT:  Overruled.

21  Q.  As to your understanding, there was no license you had that

22  could be revoked by this division, correct?

23  A.  Correct.

24  Q.  And you were asked questions about what you did for

25  Dr. Fishman.  Do you recall that?

1   A.   Yes.

2   Q.   Do you recall telling them that you were a delivery person?

3   A.   Yes.

4   Q.   Do you recall telling them that you were a UPS driver?

5   A.   Like a UPS driver, yes.

6          MS. MORTAZAVI:  Ms. Jung, can we please display

7   Government Exhibit 3100B-T, which is a transcript of a portion

8   of that interview.

9   Q.   Ms. Giannelli, before I turn to the next page, do you see

10  here that the participants in this conversation include you?

11  A.   Yes.

12         MS. MORTAZAVI:  Ms. Jung, if we could turn to the next

13  page.

14  Q.   Ms. Giannelli, do you recall being asked by the

15  investigator whether a box of a drug that you sold was marked

16  with a prescription?

17  A.   Yes.

18  Q.   Do you recall responding that you couldn't recall, but you

19  really just deliver things, you were like the UPS driver?

20  A.   Yes.

21  Q.   Ms. Giannelli, are UPS drivers typically cosigners on

22  corporate bank accounts --

23         MR. FASULO:  Objection.  Time and place, Judge.  This

24  is 2011.

25         THE COURT:  You want to ask a time.

1    Q.   As of 2011, Ms. Giannelli, you were a cosigner of the

2    Equestology bank account, correct?

3    A.   Correct.

4    Q.   And as of 2011, you had incorporated Equestology, correct?

5    A.   Yes.

6    Q.   And as of 2011, that bank account that you were a cosigner

7    on, you had yourself opened being check?

8    A.   Dr. Fishman and I opened.

9    Q.   You and Dr. Fishman opened an account together, correct?

10   A.   Yes.

11   Q.   Are those activities that a UPS driver engages in?

12   A.   I'm not aware of what they engage in.  No, I guess.

13   Q.   Is your answer, no, Ms. Giannelli or I guess?

14   A.   No.

15   Q.   So UPS driver doesn't do the things that I just mentioned,

16   right?

17   A.   Not that I'm aware of.

18   Q.   Does a UPS driver work on commission?

19   A.   I don't know what their --

20          MR. FASULO:  Objection, Judge.

21          THE COURT:  She has answered.  She has already

22   answered.  She said I don't know.

23   A.   As.

24   Q.   As of 2011, you worked on commission, right?

25   A.   Yes.

1  Q.  And you weren't paid a commission based on your deliveries,

2  were you?

3  A.  On my deliveries.

4  Q.  Your commission had nothing to do with your physically

5  delivering drugs, correct?

6  A.  No.

7  Q.  Your commission was not based on whether you drove around

8  to a certain number of locations, correct?

9  A.  It was part of my job.  No.

10 Q.  Your commission in fact was entirely separate from whether

11 or not you acted as a delivery person, correct?

12 A.  They are one in the same, correct.  I'm confused.

13 Q.  Ms. Giannelli, let me clarify for you.  You worked on

14 commission by 2011, correct?

15 A.  Yes.

16 Q.  And you testified that that commission was based on the

17 number of sales that you made, correct?

18           MR. FASULO:  Objection.

19           THE COURT:  Grounds.

20           MR. FASULO:  Misstating the testimony.

21           THE COURT:  Just ask it as a question.  Ask if that's

22 correct.

23 Q.  All right.  Is it correct that you made a commission based

24 on the number of payments the clients made?

25 A.  Collections, yes.

1   Q.  And that had nothing to do with whether or not you

2   delivered products to them, right?

3   A.  It was all part of my job.

4   Q.  That's not what I'm asking, Ms. Giannelli.  I'm asking if

5   your compensation was tied to the fact that you made

6   deliveries.

7   A.  In order to get payment, yes.

8   Q.  Ms. Giannelli, you testified earlier that you were paid

9   based on what client paid.  Do you recall that?

10  A.  Yes.

11  Q.  And in that arrangement that has nothing to do with whether

12  you mail a product through a UPS driver, deliver a product

13  yourself in your van, or leave it at your residence for pickup.

14  Is that fair to say?

15  A.  I guess, yes.

16  Q.  You got a commission regardless of how a drug ended up in a

17  buyer's hands, correct?

18  A.  Yes.

19  Q.  So your compensation was not tied to the fact that you were

20  a delivery person, correct?

21  A.  Correct.

22  Q.  Because you were a salesperson, correct?

23  A.  I guess, yes.

24  Q.  You didn't say that in the interview, did you?

25  A.  No, I did not.

1    Q.   You did not mention that you were a salesperson, correct?

2    A.   No, I did not.

3    Q.   You did not mention the open script system that you

4    described in court today, correct?

5    A.   No, I did not.

6              MR. FASULO:  Objection, Judge.  The question is

7    misleading.

8              THE COURT:  Excuse me?

9              MR. FASULO:  What was the question that elicited that

10   answer that she is asking for?

11             THE COURT:  You didn't mention the open script system.

12             MR. FASULO:  May we approach?

13             THE COURT:  Yes.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              MR. FASULO:  Judge, this is improper impeachment by

3    omission.

4              THE COURT:  That's an objection to the form.  You said

5    it was misleading.

6              MR. FASULO:  It's misleading because there is no

7    question here which would have elicited the answer that counsel

8    is trying to say that she didn't give.  If she was never asked

9    that question, she couldn't give that answer.

10             THE COURT:  You can ask that on redirect.

11             MR. FASULO:  It's misleading the jury at this time.

12             THE COURT:  It's not misleading.

13             MR. FASULO:  I'll go into it on my redirect.  Then I

14   have an objection as to form.  She has to rephrase that last

15   question.

16             THE COURT:  The last question was, you didn't mention

17   the open script system.

18             MR. FASULO:  To who, where?

19             THE COURT:  You interrupted.

20             MS. MORTAZAVI:  I'll restate the question.

21             THE COURT:  Put the full question on the record.

22             (Continued on next page)

23

24

25

1        (In open court)

2        THE COURT:  The record reflects a question and an

3   answer and then an objection.  There is no question pending.

4   Q.  Ms. Giannelli, in the letter that you submitted in response

5   to the complaint, you didn't mention the Avimark system,

6   correct?

7   A.  Correct.

8   Q.  And you didn't mention that you work on commission?

9   A.  Correct.

10  Q.  And you didn't mention many of the details that you have

11  talked about today, correct?

12  A.  Correct.

13       MS. MORTAZAVI:  Ms. Jung, you can take this down.

14  Q.  Ms. Giannelli, did there come a time when you learned that

15  Seth Fishman had been arrested?

16  A.  I learned that he had been detained.

17  Q.  You learned that he had been detained.  You learned that he

18  had some legal issues, correct?

19       MR. FASULO:  Objection.  She stated what she learned.

20       THE COURT:  Yes.  That's fair.

21  Q.  When did you learn that he had been detained?

22  A.  Approximately end of October, beginning of November.

23  Q.  What year?

24  A.  I'm thinking.  2019.

25  Q.  That was before you were arrested in March 2020, correct?

1   A.   Correct.

2   Q.   And you also learned that the drugs he was keeping in his

3   warehouse in Florida had been confiscated, correct?

4   A.   Yes.

5   Q.   And that disrupted your supply of drugs, right?

6   A.   From Dr. Fishman, yes.

7   Q.   You had trouble fulfilling order for clients as a result of

8   that seizure, correct?

9   A.   Correct.

10  Q.   Did you know at the time who or what had seized those

11  drugs?

12  A.   I know somebody came in and got them.  Mary Fox, the

13  employee down there, said that they were taking -- I'm sorry.

14  I forgot the question again.

15  Q.   That meant that you had difficulty fulfilling orders for

16  those drugs.

17  A.   Yes.

18  Q.   For your existing clients, correct?

19  A.   Yes.

20  Q.   You also learned that Seth Fishman had show up in court,

21  right?

22  A.   At some point, yes.

23  Q.   At some point meaning in that same time period, the fall of

24  2019?

25  A.   I wasn't aware of when things transpired.  Eventually was

1    made aware.

2    Q.  At the time were you aware that he had to show up to court

3    proceedings?

4    A.  What time?

5    Q.  At the time that you heard that he was detained, which was

6    end of October, beginning of November 2019, were you also aware

7    that he had to show up to court proceedings?

8    A.  Not that I can recall.

9    Q.  Is there anything that would refresh you?

10   A.  Anything that would refresh --

11   Q.  That would refresh your recollection; for example, text

12   messages.

13   A.  Text messages with Dr. Fishman?

14           THE COURT:  If you don't know, your answer is, I don't

15   know.

16   A.  I don't know.

17           THE COURT:  You don't get to ask questions.

18           THE WITNESS:  I'm sorry.

19           MS. MORTAZAVI:  Your Honor, can we please display

20   Government Exhibit 403C.

21           THE COURT:  Yes, you may.

22           MS. MORTAZAVI:  Ms. Jung, I'd like you to go to the

23   messages dated November 12, 2019.  I believe you may have to go

24   a few pages ahead.  Focus on line 52, please.

25   Q.  Ms. Giannelli, Government Exhibit 403C, for the record, is

1   an extraction from your cellular phone that was seized from you

2   on March 9, 2020.

3   A.   OK.

4   Q.   Do you recognize this contact, Seth, number 3 Mary?

5   A.   Yes.

6   Q.   That's the Mary that you were talking about who worked with

7   Seth Fishman?

8   A.   Yes.

9   Q.   She writes here:  All I've heard is he supposedly had court

10  today.

11  A.   OK.

12  Q.   Do you recall seeing that message from her?

13  A.   In 2019, yes.

14  Q.   So at the time, 2019, you learned that Seth Fishman was

15  detained and that he had court and his drugs had been seized,

16  correct?

17  A.   Correct.

18  Q.   And at that point you continued to sell Seth Fishman's

19  products, right?

20  A.   Yes.

21  Q.   You had stockpiled your own product, right?

22  A.   Yes.

23  Q.   And you continued to sell those, correct?

24  A.   Correct.

25  Q.   And you asked him to send you new drugs, fair to say?

1   A.   Yes.

2   Q.   You asked him to replenish your supply, correct?

3   A.   Yes.

4   Q.   Even though you knew that he had had these legal issues,

5   correct?

6   A.   Yes.

7   Q.   And at that time you were not only selling the products

8   from Seth Fishman, you also continued to sell drugs that you

9   received from other compounders, correct?

10  A.   Yes.

11  Q.   And you continued to sell BB3 from Seth Fishman, correct?

12  A.   I don't have the Avimark in front of me.  I can't tell you

13  what was sold.

14          MS. MORTAZAVI:  Why don't we pull up the Avimark.

15          If I could have a moment, your Honor.

16          THE COURT:  Sure.

17          MS. MORTAZAVI:  Ms. Jung, can we please display

18  Government Exhibit 20004.

19  Q.   Do you see at the top next to item it says D-BB3?

20  A.   Yes.

21  Q.   That refers to the BB3 blood builder that's unlabeled,

22  correct?

23  A.   OK.  Yes.

24  Q.   I'm asking you if that's correct.

25  A.   Yes.

1   Q.  Do you see here a date -- pardon me -- second line,

2   December 4, 2019?

3   A.  Yes.

4   Q.  You sold two bottles of BB3 to an Eric Abbatello.  Do you

5   see that?

6   A.  Yes.

7   Q.  Does that refresh you whether you continued to sell BB3

8   after you learned that Seth Fishman's products had been seized,

9   after you learned that he had been detained, after you learned

10  that he had issues with Court?

11  A.  Yes.

12  Q.  What about TB7.  Did you continue to sell that after you

13  learned of Seth Fishman's legal issues?

14  A.  If an order came in, yes.

15  Q.  So you continued to sell TB7?

16  A.  Yes.

17  Q.  You continued to sell oxygenator?

18  A.  If an order came in for it, yes.

19  Q.  Let's check.

20          MS. MORTAZAVI:  Ms. Jung, could you please pull up

21  Government Exhibit 20008.

22  Q.  You see up there beside item, oxygenator?

23  A.  Yes.

24  Q.  Do you see at the bottom of the page that there was an

25  order fulfilled January 8, 2020?

1   A.  Yes.

2           MS. MORTAZAVI:  If we could turn to the next page,

3   Ms. Jung.

4   Q.  At the very top of the page do you see that there was

5   another order fulfilled January 8, 2020?

6   A.  Yes.

7   Q.  That was all after you learned about Seth Fishman's legal

8   issues, correct?

9   A.  Yes.

10  Q.  And at the point, when you learned about Seth Fishman's

11  legal issues, he directed you to talk to somebody else to help

12  explain what was going on.  Do you recall that?

13  A.  His lawyer?

14  Q.  Who was his lawyer?

15  A.  One of his lawyers, Howard Taylor.

16  Q.  You in fact talked to Howard Taylor, correct?

17          MR. FASULO:  Objection, Judge.  Can we approach?

18          THE COURT:  Let her answer yes or no to this question.

19  Q.  Without going into the substance, you in fact talked to

20  Howard Taylor, correct?

21          THE COURT:  Just yes or no.

22  A.  Yes.

23          THE COURT:  You may approach.

24          MR. FASULO:  I'm OK right now.

25          THE COURT:  Let's go slowly here.

1    Ms. Mortazavi, you'll ask a question.

2    If you can pause, in case Mr. Fasulo needs to be

3    heard, before you answer.  Thank you.

4    Q.  After that conversation -- I'm sorry.  After you learned

5    about those issues you continued to sell drugs, correct?

6    A.  Yes.

7    Q.  You continued to sell Seth Fishman's drugs specifically,

8    correct?

9    A.  Amongst the orders, yes.

10   Q.  You in fact asked him to send you additional products,

11   correct?

12   A.  Yes.

13   Q.  And at that point you didn't try to educate yourself on

14   what was going on, correct?

15   A.  Yes.

16          MS. MORTAZAVI:  Your Honor, may I have a moment?

17          THE COURT:  Sure.

18          MS. MORTAZAVI:  Nothing further, your Honor.

19          THE COURT:  Thank you.

20          Mr. Fasulo, redirect.

21          MR. FASULO:  Just a few questions.

22          THE COURT:  Sure.

23   REDIRECT EXAMINATION

24   BY MR. FASULO:

25   Q.  Ms. Giannelli, you just were asked a line of questions

1   about Seth Fishman and a legal matter he had in 2019, October

2   of 2019.

3   A.   Yes.

4   Q.   Did Seth Fishman ever discuss with you that legal matter

5   that he had in 2019?

6   A.   No, he did not.

7   Q.   The U.S. Attorney asked you about the fact that he was

8   detained, correct?

9   A.   Correct.

10  Q.   Was he detained from that point to the time that you were

11  arrested or, as far as you know, was he not detained after a

12  certain point in time?

13  A.   As far as I know, he was not detained.

14  Q.   How did you know that?

15  A.   He spoke to me.

16  Q.   From the date of October 2019, until the date of your

17  arrest, were you contacted by the FDA in any way?

18  A.   No, I was not.

19  Q.   Were you contacted by the DEA?

20  A.   No, I was not.

21  Q.   Were you contacted by the U.S. Attorney's Office?

22  A.   No, I was not.

23  Q.   Did you receive any contact from any law enforcement

24  regarding the activity that you were engaged in at Equestology

25  between October 2019 until your arrest date?

1    A.  No, I was not.

2            MR. FASULO:  And if we can put the exhibit up.  The

3    conversation, I think it was -- 3000B-T.

4            THE COURT:  Do you want the interview?

5            MR. FASULO:  Yes.

6            THE COURT:  I think it's 3100.  Is this what you're

7    looking for?

8            MR. FASULO:  I have this on my list.  3100.  This is

9    3100B-T.

10   Q.  Do you remember seeing this?

11   A.  Yes.

12   Q.  This is an interview that took place, it's dated sometime

13   in 2012, is that right?

14   A.  Yes.

15   Q.  In the transcripts that's presented here, WS, was that the

16   person that you were in the room talking with?

17   A.  Yes.

18   Q.  And he said to you:  To the best of your knowledge, do you

19   remember if this box was marked at all with a prescription for

20   that horse.  Correct?

21   A.  Correct.

22   Q.  And in that time you responded:  I can't recall.  I mean,

23   I'm just a delivery person.  So whatever he tells me to

24   deliver, I deliver.  I don't really look at it.  I'm like the

25   UPS driver.  I just don't know.

1          Is that the question that was asked?

2    A.   Yes.

3    Q.   That was the answer you gave?

4    A.   Yes.

5    Q.   Was there a question about the other roles and

6    responsibilities that you had in this question right here and

7    answer?  Is there any question about the other roles and

8    responsibilities that you had when you were working with

9    Dr. Fishman?

10   A.   On the screen right now, no.

11   Q.   Were there any questions in this transcription, were there

12   any questions regarding your role as signer on a bank account?

13   A.   No, there was not.

14   Q.   Was there any question about you being an incorporator?

15   A.   No, there was not.

16   Q.   Did you believe when you answered this question that that

17   would have been an appropriate response to the question that

18   was posed to you by WS?

19   A.   Yes.

20   Q.   Did you believe that the answer you gave was appropriate?

21   A.   I didn't have an answer, so, yes.

22   Q.   This is your answer, isn't it, number 3?

23   A.   Yes.

24   Q.   Other than number 3, did you believe that anything else

25   needed to be included, based on the question that was presented

1   to you by WS in this transcription?

2   A.  I answered the question.

3   Q.  Now, I want to draw your attention to Government Exhibit

4   3000.

5           MR. FASULO:  I'm sorry, Judge, to jump around.

6           THE COURT:  That's fine.

7   Q.  Before we get to 3000, I would like to go back to

8   Government Exhibit 403C.

9           Do you remember looking at this a minute ago?

10  A.  Yes.

11          MR. FASULO:  If we can just zone in on the same part,

12  the crickets.

13  Q.  Here it says inbox from Seth, number 3, Mary.

14          Was that from Mary's number?

15  A.  Mary Fox, yes.

16  Q.  That was on November 12, 2019, correct?

17  A.  Yes.

18  Q.  And Mary was sending you this message, correct?

19  A.  Yes.

20  Q.  And Mary sent you the message that said, all I've heard is

21  he is supposed to -- supposedly had court today, is that right?

22  A.  Yes.

23  Q.  Then she says:  Crickets here too.  I'll give you a call

24  tomorrow and update you if I hear anything.

25  A.  Yes.

1   Q.  Did you learn anything else about the items that were

2   seized, the reasons they were seized, or anything about Seth

3   Fishman's being detained after you received this text message?

4   A.  No, not that I recall.

5   Q.  From that date until the time you were arrested?

6   A.  No, not that I recall.

7   Q.  When you heard the word crickets here too, what did that

8   mean?

9   A.  She had no understanding of what was going on either.

10  Q.  And had you given her any understanding that's not

11  reflected in this exchange regarding what happened with Seth

12  Fishman at that time?

13  A.  No, I did not.

14  Q.  And did anybody tell you -- I'll withdraw that.  Let me go

15  to the letter.  You also had an incident early in 2011.  Do you

16  remember that that we just talked about?

17  A.  Yes.

18  Q.  That was with the Delaware State Division of Professional

19  Regulation, correct?

20  A.  Correct.

21  Q.  You were asked some questions about whether or not your

22  license was suspended, correct?

23  A.  Correct.

24  Q.  You didn't have any license to work for Dr. Fishman.  Is

25  that fair to say?

1  A.  That's fair to say.

2  Q.  Were you ever under the impression -- did you understand

3  that you needed a license to engage in the role that you

4  fulfilled for Dr. Fishman at Equestology?

5  A.  I was not under that impression.

6  Q.  I want to draw your attention to Government Exhibit 3000

7  now.

8          Do you remember seeing this letter?

9  A.  Yes, I do.

10 Q.  You remember looking at page 3, if we may?

11 A.  Yes.

12         MR. FASULO:  No.  The next page.  I'm sorry.

13 Q.  Do you remember seeing this notary stamp, correct?

14 A.  Yes.

15 Q.  And you stated that what was in this letter was true, is

16 that right?

17 A.  Yes.

18 Q.  And you read this before you signed it?

19 A.  Yes.

20 Q.  I want to turn to page 1 of the letter.  Do you see the

21 second line starting right here?

22 A.  Yes.

23 Q.  And it says that the complaint against Lisa Ranger alleges

24 that she practiced unlicensed veterinary medicine.  Do you see

25 that?

1   A.  Yes.

2   Q.  You see the response:  This is categorically false.

3   Correct?

4   A.  Yes.

5   Q.  You see a statement:  Lisa has not presented and is not

6   practicing veterinary medicine, and she has not acted and is

7   not currently acting as an unlicensed vet technician.  Did you

8   read that before you signed it?

9   A.  Yes.

10  Q.  Did you understand that to be true?

11  A.  Yes.

12  Q.  Ms. Ranger is employed by Seth Fishman.  You see that?

13  A.  Yes.

14  Q.  Did it indicate that you employed yourself or did it

15  indicate that Seth Fishman was your employer?

16  A.  Seth Fishman was my employer.

17  Q.  And that was the time that you were working for

18  Equestology, correct?

19  A.  Correct.

20  Q.  And did it indicate in this letter that it was his

21  business, Equestology?

22  A.  Yes.

23  Q.  Not your business?

24  A.  Correct.

25  Q.  Was that true?

1    A.  Yes.

2    Q.  And did you swear to that?

3    A.  Yes.

4    Q.  And did you indicate later that your duties included but

5    not limited to collecting payments from clients.  Was that true

6    at that time?

7    A.  Yes.

8    Q.  Coordinating Dr. Fishman's visits.  Was that true at that

9    time?

10   A.  Yes.

11   Q.  And teleconferences with client, visits and teleconferences

12   with client.  Was that true?

13   A.  Yes.

14   Q.  Is it also true that you were delivering product to

15   medication prescribed by Dr. Fishman and acting as a reception

16   and secretary to Dr. Fishman.  Is that true?

17   A.  Yes.

18   Q.  Was it also true, the next statement, that you did not give

19   veterinary advice, as far as you understood?

20   A.  As far as I understood, yes.

21   Q.  Was it true that when client asked you questions that

22   required veterinary medical advice, you refused to answer in

23   often consternation of the client and arranges for the client

24   to speak directly to Dr. Fishman.  Was that true at that time?

25   A.  Yes, it was.

1        MR. FASULO:  Go to the next part of the letter,

2   please.  Next part.  Just highlight this paragraph right here,

3   if you may.

4        Ladies and gentlemen, this is in evidence.  You can

5   have it in the jury room when you're deliberating, as the judge

6   will so instruct you.

7        THE COURT:  You can have all exhibits and all evidence

8   in the jury room, but you will hear that in my instructions.

9        MR. FASULO:  I am just trying to point out part of it.

10        THE COURT:  I understand what you are trying to do.

11        MR. FASULO:  Thank you.

12  Q.  This was a statement made about you, this statement

13  starting here to this point, right?

14  A.  Yes.

15  Q.  And this statement:  Lisa Ranger does not sell drugs for

16  Dr. Fishman.  Mr. Ranger delivers supplies for Fishman.  She

17  collects and posts payments made to Dr. Fishman by

18  Dr. Fishman's clients incorrectly and professionally

19  irresponsible to claim that she sells drugs for Dr. Seth

20  Fishman.

21  A.  Yes.

22        MR. FASULO:  You can take this down.

23  Q.  That was in 2011, correct?

24  A.  Yes.

25        MR. FASULO:  And subsequent to that I'd like to read

1    what's been entered -- what's a government exhibit, which is a

2    stipulation, trial stipulation that's been entered into

3    evidence, stipulation 9013 at this time.

4              THE COURT:  Is this new or it is already in?

5              MR. FASULO:  It may have been entered in by the

6    government on their case.

7              THE COURT:  Once it's in, it's in.

8              MR. FASULO:  I want to read it at this point.

9              THE COURT:  That's fine.

10             MR. FASULO:  I believe it is in.  The answer, Judge,

11   directly, it's in.

12             MS. MORTAZAVI:  I do want to be clear on the record,

13   your Honor.  It's in.

14             THE COURT:  You may read it.

15             MR. FASULO:  Again, it has the same preamble part, as

16   the jurors can see.

17             It says:  If called as a witness, Benjamin Schwartz

18   would testify that Government Exhibit 3000 is a true and

19   correct copy of a letter, dated March 31, 2011, prepared and

20   signed by Mr. Schwartz in connection with an investigation and

21   complaint by the Delaware Division of Professional

22   Responsibility relating to Mr. Schwartz's client, the

23   defendant, Lisa Giannelli, then using the name Lisa Ranger, and

24   Seth Fishman.  Included with the letter contained in Government

25   Exhibit 3000 are true and correct copies of notarized

1  attestations by the defendant, Lisa Giannelli, and Seth

2  Fishman, submitted in connection with Schwartz's letter.

3        If you look at the next part, government Exhibit 3001

4  is a true and correct copy of a complaint filed by the Delaware

5  Division of Professional Responsibility.

6        3100 and 3100B are corrected copies of portions of an

7  interview of the defendant, Lisa Giannelli, then using the name

8  Lisa Ranger, conducted July 3, 2012.

9        Finally, number 2:  It is further stipulated and

10  agreed that on or about July 11, 2012, the Delaware Division of

11  Professional Responsibility referred the matter in Government

12  Exhibit 3000 to the Delaware State Attorney General's Office

13  for prosecution.

14        B.  On or about March 15, 2013, in a letter signed by

15  a Deputy Attorney General, the Delaware State Attorney

16  General's Office dismissed the matter in Government Exhibit

17  3000 based on insufficient evidence.

18        It further stipulated that this may be received in

19  evidence.  I'm paraphrasing.  But the document speaks for

20  itself.

21  Q.  Ms. Giannelli, were you made aware by a letter that the

22  case that you had testified in 2011, that that case had been

23  dismissed for insufficient evidence?

24  A.  Yes.

25  Q.  And other than that case, did anybody from the Delaware

1    Department of Regulation ever come and speak with you again

2    about this matter?

3    A.   No, they did not.

4    Q.   And from that day forward, until you were arrested in this

5    case approximately eight years later, did anybody from any

6    government agency, any regulatory agency ever come to you and

7    tell you that what you were doing was not allowed?

8    A.   No, they did not.

9    Q.   Did they tell you it was a violation of an FDA rule?

10   A.   No, they did not.

11   Q.   Were you ever made aware by Dr. Fishman that what you were

12   doing did not follow protocols under his veterinary license?

13   A.   I was not aware of that.

14   Q.   Had you been aware of that, would you have participated in

15   selling and working with Dr. Fishman?

16   A.   No.  I would have resigned.

17   Q.   When you said on cross-examination that you sold, you

18   participated, when the you word was used, was that you word

19   used in the way of Equestology or you personally making those

20   sales?

21            MS. MORTAZAVI:  Objection.

22            THE COURT:  Sustained.

23   Q.   Do you remember being asked questions by the prosecution on

24   cross-examination?

25   A.   Yes.

1  Q.  And questions where she said you sold certain items.  Do

2  you remember those questions?

3  A.  Yes.

4  Q.  When you answered that you sold those items, was it you

5  selling them in your personal capacity or as an employee for

6  Equestology?

7          MS. MORTAZAVI:  Objection.

8          THE COURT:  Sustained.  You need to a particular

9  question, Mr. Fasulo.

10  Q.  Ms. Ranger, you were asked about that you sold BB3.  Do you

11  remember being asked that question?

12  A.  Yes.

13  Q.  And that you sold BB3 during the course of your employment

14  with Dr. Fishman.  Do you remember being asked that?

15  A.  Yes.

16  Q.  And when you said you did sell BB3, when you used the word

17  you, who were you referring to?

18  A.  Me.

19  Q.  And were you referring to you in your personal capacity or

20  in your capacity as working for Dr. Fishman in that case?

21          MS. MORTAZAVI:  Objection.

22          THE COURT:  Overruled.

23  A.  Me as an employee.

24  Q.  Now, Ms. Giannelli, let me ask you just a few more

25  questions.

1     You remember on cross-examination being asked about

2  labeling, of you labeling certain items?

3  A.  Yes.

4  Q.  Do you remember being asked that you were -- that you had

5  requested labeling materials from Florida, correct?

6  A.  Yes.

7  Q.  And when you request the labeling materials, were you

8  requesting those labels to come blank, or did you request those

9  labels -- what did you expect those labels -- how did you

10 expect those labels to come?

11     MS. MORTAZAVI:  Objection.

12     THE COURT:  Sustained.

13 Q.  When you made the request for those labels, what was your

14 intent in requesting those labels?

15 A.  That Dr. Fishman would send them up with the name of the

16 product and whatever needed to be on it.

17 Q.  What was your understanding about the way those labels

18 would appear to you?

19 A.  He would send them, and I was required to put them on a

20 bottle.

21 Q.  When you say put them on a bottle, what would you do?

22 A.  I would peel it off and put it on the bottle.

23 Q.  How would you know what bottle to put what labels on?

24 A.  Dr. Fishman sent the bottles up, and he told me to put

25 these stickers on the bottle.

1   Q.  Other than putting the stickers on the bottle, did you

2   engage in any other activities regarding placing information on

3   those labels?

4   A.  No.

5   Q.  Ms. Giannelli, you were also asked questions about items

6   that Equestology sold during the time that you worked there.

7   Do you remember being asked those questions?

8   A.  Yes.

9   Q.  Let me ask you, where were those items?  Where did they

10  originate from?  What were the different sources of those

11  items?

12  A.  Henry Schein Animal Health, Midwest Veterinarian, Wedgewood

13  Pharmacy, Boothwyn Pharmacy, Rapid Equine Pharmacy, Horse

14  Necessities, and Dr. Fishman.

15  Q.  Of the items that you had, were you able to determine

16  whether some of those items were over-the-counter items or some

17  of those items were needed prescriptions at the time that you

18  were working there?

19  A.  I did see some of those items in a local feed store, in a

20  local tractor supply store.

21  Q.  How about the other items?

22  A.  I'm sorry.  Ask the question again.

23  Q.  You said you saw some items you would find at a local feed

24  store.  How about some of the other items, like the items that

25  you got from the pharmacies?

1          THE COURT:  What's the question?  You said how about

2     them.

3     Q.  Those items that you got from the pharmacy, did you know

4     whether those items actually needed a prescription or did not

5     need a prescription?

6     A.  The prescription -- the label was on the bottle.

7          THE COURT:  That's not the question.

8          THE WITNESS:  I'm sorry.

9          THE COURT:  Can you read the question back, please.

10         (Record read)

11    A.  Those items needed a prescription.  Sorry.  I

12    misunderstood.

13    Q.  Was it your understanding that the open script system --

14    that Dr. Fishman had access to that open script system?

15    A.  Yes.

16    Q.  And you were also asked a few questions about how you were

17    compensated during the time that you worked for Equestology.

18    Do you remember those questions?

19    A.  Yes.

20    Q.  And you were asked whether you were paid only commission,

21    is that right?

22    A.  Yes.

23    Q.  Was it your understanding that your work, which included

24    administrative work as well as the collection of monies for

25    orders that Dr. Fishman's Equestology made, that all of that

1   would be encompassed in your compensation package?

2   A.   Yes.

3   Q.   Was it your understanding from Dr. Fishman that your role

4   included delivering products at times?

5   A.   Yes.

6   Q.   Was it your understanding that it included putting products

7   in boxes and shipping them?

8   A.   Yes.

9   Q.   Was it your understanding that you were to be an

10  administrative assistant to Dr. Fishman in the Delaware office?

11  A.   Yes.

12  Q.   Was it your understanding that you were to take care of the

13  bookkeeping and the input into the Avimark system as part of

14  your role in Equestology?

15  A.   Yes.

16  Q.   Was it your understanding that when you received the 17

17  percent, based on collection, that it would include the work --

18  that that was for the work that we just spoke about, as well as

19  the collection?

20  A.   Yes.

21  Q.   Now, you were also asked about shipping fees.

22  A.   Yes.

23  Q.   Can you explain, were some of the shipping fees absorbed by

24  Equestology when they were ordered from the lab and then sent

25  to your place in Delaware?

1    A.  Yes.

2    Q.  And the other shipping fees, were there additional shipping

3    fees that were charged to the individual clients when they

4    wanted products to be sent to them from the Delaware location

5    or any other location to whatever address you had on file?

6    A.  Yes.

7    Q.  And were those two separate shipping fees?

8    A.  Yes.

9    Q.  And so, in fact, that if you had a shipping fee that was

10   direct to client, the client would pay that fee, correct?

11   A.  Correct.

12   Q.  That's different than the fees that you would absorb in

13   collecting products from vendors, correct?

14   A.  Correct.

15            MR. FASULO:  One moment.

16            Thank you, Ms. Giannelli.  I have no further

17   questions.

18            THE COURT:  Recross.

19            MS. MORTAZAVI:  No, your Honor.

20            THE COURT:  Thank you, Ms. Giannelli.  You are

21   excused.

22            (Witness excused)

23            THE COURT:  Does the defense have any further

24   witnesses?

25            MR. FASULO:  No.  At this time the defense rests.

1          THE COURT:  You can return to the table with counsel,

2     Ms. Giannelli, if that's what you wish.

3          Does the government have a rebuttal case?

4          MR. GIANFORTI:  Yes, your Honor.  We have a brief

5     rebuttal case.  We are happy to start now, if you'd like.

6          THE COURT:  How long are you going to be with that

7     witness?

8          MR. GIANFORTI:  This is probably a 10 or 15 minutes.

9          THE COURT:  Have you told Mr. Fasulo?

10         MR. FASULO:  They advised me that may have a rebuttal

11    witness.

12         THE COURT:  Can we talk at sidebar, please.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At sidebar)

2              THE COURT:  My only concern is, it's almost 5:00, and

3     I don't want to abuse the jurors by keeping them late.  On the

4     other hand, if we are going to finish today, we should close

5     out.

6              MR. GIANFORTI:  It's very quick.

7              THE COURT:  Mr. Fasulo has a right to cross.

8              MR. GIANFORTI:  Absolutely.

9              THE COURT:  Who is the witness?

10             MR. GIANFORTI:  He is a special agent from the FBI.

11    He is going to put in essentially it is just a map that

12    shows -- it's a map of the United States that shows which

13    states Dr. Fishman held licenses in, which ones he did not sell

14    licenses in but which Ms. Giannelli sent medication to, based

15    on the Avimark system.

16             MR. FASULO:  There will be a brief cross, but we

17    stipulated to the states where he was already licensed or where

18    he wasn't licensed.  There is a stipulation that we entered

19    into evidence with that information, so I don't anticipate that

20    will take long.  But I don't know the essence of the rest of

21    the testimony as it relates --

22             THE COURT:  I'll be perfectly honest.  I think it

23    makes more sense to wait until the morning, just because this

24    jury has been more than patient today.

25             MR. FASULO:  I think that's smart.

1           MR. GIANFORTI:  We defer to the Court.

2           THE COURT:  That's what I am going to do.

3           (Continued on next page)

1          (In open court)

2          THE COURT:  Ladies and gentlemen, we are going to

3    adjourn for the day.  It's just impossible for us to have a

4    clear sense of how long this witness will run.  I don't want to

5    abuse your patience.  We are going to adjourn at this point.

6          Please leave your notebooks and your binders there.  I

7    hope everyone has a pleasant evening.  Please do not talk about

8    the case with anyone, including family members.  Please don't

9    do any research about the case or about subject matters

10   involved in the case or about anything you may have heard or

11   read about during the course of the trial.  If anyone should

12   approach you, I just remind you that you need to let me know

13   about that through my courtroom deputy, Ms. Dempsey.

14         Thank you all very much.  Have a good evening.  Why

15   don't we resume -- I mentioned to people, I have another court

16   proceeding first thing tomorrow morning.  I'm hoping it won't

17   run too too long.  I think, to be safe, why don't we resume at

18   10:00.  I don't want you sitting around.  I'll see you at 10:00

19   tomorrow morning.  Have a good evening, everyone.

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  We will start tomorrow morning as soon as

3    I finish the hearing that I have first thing in the morning.

4    If you could all be available at 9:30 so that if there are

5    things that we can make progress on in terms of the jury

6    instructions, maybe we get started on that.  I don't think this

7    final rebuttal witness will impact that.

8              The other thing I am going to just remind you, this is

9    rebuttal.

10             MR. GIANFORTI:  Yes.

11             THE COURT:  OK.

12             MR. GIANFORTI:  It will be very brief.

13             THE COURT:  It's not the length that matters.  It is

14   what is a rebuttal.

15             MR. GIANFORTI:  It is responsive.

16             THE COURT:  Is there anything else we need to talk

17   about?

18             MS. MORTAZAVI:  Not from the government.

19             MR. FASULO:  Judge, just for clarity, I know the Court

20   mentioned we will get a blacklined sample of the charge.  Would

21   that be via e-mail tonight --

22             THE COURT:  As soon as we can get it done.  I honestly

23   don't know.  I have to finish getting ready for the hearing

24   tomorrow morning.

25             MR. FASULO:  Judge, I just want to have an idea when.

 1          THE COURT:  We will do the best we can.  Obviously --

 2    I told you, the changes are really not extensive.  What we

 3    mostly need to talk about is charge number, I think it's 10 and

 4    27, your competing charges on cooperating witnesses and the

 5    competing charge with respect to good faith.  I would need to

 6    know, are you intending to ask for the lesser-included offense

 7    charge?  Because there is no point in my spending a lot of time

 8    on something that would be inapplicable, depending on the

 9    answer.

10          MR. FASULO:  Can I e-mail chambers tonight?

11          THE COURT:  Sure.

12          MR. FASULO:  I will do that tonight.  I just want some

13    time to talk it over with my client.

14          THE COURT:  Absolutely.

15          MR. FASULO:  And come to a conclusion.

16          THE COURT:  Yes, of course.

17          Anything else then?

18          MR. FASULO:  Nothing.  We are almost done.

19          THE COURT:  Those will be the two items.

20          My plan will be, we will get you the blackline as fast

21    as we can on the earlier stuff.  We are not going to have

22    resolution on those two charges until we talk.

23          But I will just say, I tried to look at your competing

24    charges.  There is a lot of repetition.  There is a lot of

25    what's -- you both reprinted two charges, in effect, in full.

1   What's in the two competing charges, much of it is the same.

2   There are only pieces of it where you disagree with each other.

3   I've tried to sort of parse it out and figure out what is the

4   actual disagreement, and that's what we will be talking about.

5           MR. FASULO:  Actually, tonight we will have another

6   session on this.  Not that we haven't already had a session,

7   but we will try to have another session.

8           THE COURT:  Some of it, as I say, may or may not be

9   mooted, depending on what you tell me about whether you're

10  seeking a lesser-included charge.

11          Everyone have a good evening.  I will see you as close

12  to 9:30 tomorrow morning as I can.  Thank you.

13              (Adjourned to May 5, 2022, at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1       INDEX OF EXAMINATION

2   Examination of:                          Page

3    LISA VOSHELL

4   Direct By Mr. Fasulo . . . . . . . . . . . . . 884
    Cross By Ms. Mortazavi . . . . . . . . . . .1029
5   Redirect By Mr. Fasulo . . . . . . . . . . .1098

6                   GOVERNMENT EXHIBITS

7   Exhibit No.                            Received

8    20004, 20006, 20007, 20001, 20008, and  . . . 929
              9019

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25