UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

            v.                          20 Cr. 160 (MKV)

LISA GIANNELLI,

                Defendant.
                                        Trial
------------------------------x
                                        New York, N.Y.
                                        May 5, 2022
                                        9:55 a.m.

Before:

                HON. MARY KAY VYSKOCIL,

                                        District Judge
                                        -and a jury-

                        APPEARANCES

DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
BY:   SARAH MORTAZAVI
        BENJAMIN A. GIANFORTI
        Assistant United States Attorneys

FASULO, BRAVERMAN & DiMAGGIO, LLP
        Attorneys for Defendant Giannelli
BY:   LOUIS V. FASULO

Also Present:   Karline Jung, USDA Paralegal

M55MGIA1

| | |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | THE COURT:  Good morning, Ms. Dempsey.  Please be |
| 3 | seated, everyone. |
| 4 | I am going to talk to you in a moment, or after we |
| 5 | finish with the presentation of evidence, about the jury |
| 6 | charges and what's just been handed up to me.  I take it is a |
| 7 | revised verdict form.  Is that on consent? |
| 8 | MR. GIANFORTI:  Yes, your Honor. |
| 9 | MR. FASULO:  Yes, your Honor. |
| 10 | THE COURT:  You have given me two copies of the same |
| 11 | thing. |
| 12 | MR. GIANFORTI:  I thought maybe your law clerk would |
| 13 | like one. |
| 14 | THE COURT:  Yes.  I just wanted to confirm what that |
| 15 | is. |
| 16 | Is the government ready to proceed with its rebuttal? |
| 17 | MS. MORTAZAVI:  Your Honor, we after consideration, |
| 18 | have determined that we will be putting on a rebuttal case |
| 19 | today. |
| 20 | THE COURT:  The evidence is closed. |
| 21 | MS. MORTAZAVI:  That's correct. |
| 22 | THE COURT:  What I am going to do is call in the jury. |
| 23 | You can say that on the record in front of the jury.  I will |
| 24 | instruct them that evidence is closed, and then we will adjourn |
| 25 | to talk about the verdict form and the jury charges. |

1          I wish the government would have let me know that.  We

2    would have tried to reach out to the jurors to tell them not to

3    come until a little later.

4          MS. MORTAZAVI:  I apologize, your Honor.  This was the

5    result of much discussion and strategy.

6          THE COURT:  I understand.

7          MS. MORTAZAVI:  I appreciate that we don't want to

8    waste the jury's time, and we are conscious of that.

9          THE COURT:  I appreciate it.

10          Ms. Dempsey, you want to bring the jurors out, please.

11          As I say, I am going to call on you, and you can say

12    on the record that you determined whatever you have determined.

13          (Jury present)

14          THE COURT:  Good morning, ladies and gentlemen.  I

15    just want to make one comment on the record to our jury and,

16    frankly, to the parties to the case too.

17          You may observe that there are people who are coming

18    and going from the courtroom, that sometimes there are more

19    people in the gallery section on one day versus another day.

20    You need to be aware, obviously a courtroom is a public forum

21    and trials, court proceedings, are a matter of public record.

22    So anybody who wishes to is free to come into a courtroom.

23    Sometimes clerks from another judge's chambers who are new

24    might want to come to observe things.  There might be press in

25    the courtroom at any given time, assistants for some of the

1    litigants.  Counsel may come and go from the courtroom.  I have

2    told them that that's OK with me, so nothing should be drawn

3    from that.  That's a perfectly normal ebb and flow in the

4    courtroom during the course of a trial.

5            Is the government prepared -- you told me you have a

6    rebuttal case.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     MS. MORTAZAVI:  Your Honor, the government has

2  determined that we are not going to be putting on any further

3  witnesses, and so we rest our evidence.

4     THE COURT:  Oh, all right.  Thank you.  All right.

5  So, ladies and gentlemen, that means that the evidence in the

6  case is closed, and the next phase of the trial, as far as

7  you're concerned, will be to hear summations, or closing

8  arguments, from the lawyers for each side.  There are some

9  legal matters that I need to discuss with counsel before we

10  move into summations.  So I'm sorry we had you come back out.

11  But we're going to have to take a brief recess.  It may run

12  about 45 minutes or so, is my best guess.  So we'll take an

13  early morning break, even though you've just come back out.  I

14  apologize for that.

15     Why don't we say we'll resume with you at

16  11:00 o'clock?  That way if anybody wishes to run out for

17  coffee or something like that, you're free to do so.  And we'll

18  plan to resume at 11:00 a.m. and begin summations at that time.

19     All right, Ms. Dempsey.

20

21

22

23

24

25

1    (Jury not present)

2    THE COURT:  Please be seated.

3    We'll adjourn in a moment to go inside for the

4  charging conference, but in the meantime, let me just deal with

5  two things for the record.  One is, I want to advise the

6  parties that we had a call to chambers in which one of the

7  jurors left a message that some of the jurors have been talking

8  about the fact that some days there are people moving about in

9  the courtroom -- more people or less people on a given day,

10 which is why I made the comments that I did.

11   MR. FASULO:  No objection from the defense on that,

12 Judge.

13   MS. MORTAZAVI:  Nor from the government.

14   THE COURT:  All right.  Thank you.

15   Next, I received a letter very late last night from

16 Mr. Fasulo telling me that the defense does request that the

17 lesser included charge be submitted to the jury.  Correct,

18 Mr. Fasulo?

19   MR. FASULO:  Yes, it was late, and yes, I did get it

20 into the Court after we had that -- come to that conclusion,

21 Judge.

22   THE COURT:  Thank you.  And I understand it's an

23 important decision that you needed time to consider and talk

24 about, so I wasn't being critical about the time.

25   I now have received this revised proposed jury form

M55MGIA1

1    that is acceptable to both sides.

2            Ms. Mortazavi?

3            MS. MORTAZAVI:  It's acceptable to the government,

4    your Honor.

5            THE COURT:  Mr. Fasulo?

6            MR. FASULO:  Yes.  It is acceptable to the defense as

7    well.

8            THE COURT:  Okay.  And this is in response to the

9    defense's decision to ask that the lesser included charge be

10   submitted.

11           MR. FASULO:  Right.

12           THE COURT:  All right.

13           MR. FASULO:  Just for the record, Judge, I want to be

14   clear on the record:  We had a chance to talk with

15   Ms. Mortazavi and myself, and Mr.-- and the government about

16   the verdict form.  I also reviewed the arguments of the last

17   trial.  I've discussed pros and cons of the verdict forms.  I

18   understand it was given in the last trial as well.  After

19   consideration and discussion with Ms. Giannelli, we are

20   agreeing this is the best way for the jury to be given the case

21   and to ask to render a verdict.  So I had those discussions.  I

22   did review the law on it.  I do know there are alternative ways

23   to present it to the jury, but we have come up with this, and I

24   feel comfortable with it.

25           THE COURT:  All right.  Thank you.

1    Then I just have a few items that I need to talk to

2  counsel about with regard to the jury charges, and then we will

3  generate the black line version that I told you about, but

4  there are these few things I want to speak to you about ahead

5  of time.  I think we should -- give me one moment.  I just need

6  to look at one thing.  I just want to look at my notes for a

7  moment, please.

8    All right.  Obviously, Ms. Giannelli has a right to be

9  present for our charging conference.  I do not --

10    MR. FASULO:  Judge, we had discussed this before.  We

11  would -- this is a legal issue.  I've talked to -- I'll refer

12  back to Ms. Giannelli, she would waive her appearance at the

13  charging conference.

14    THE COURT:  All right.  Then I would propose that we

15  do this in the robing room but on the record.  Is that

16  acceptable?

17    MS. MORTAZAVI:  Acceptable to the government.

18    MR. FASULO:  That works for the defense.  And if

19  something comes up during the conference that I need to consult

20  Ms. Giannelli, she'll be here, if the Court will allow me to

21  come out if I need to.

22    THE COURT:  Of course.

23    MR. FASULO:  Otherwise, she doesn't need to be

24  present, and she'll waive her appearance.

25    THE COURT:  All right.  Why don't we meet -- we'll go

M55MGIA1

1    in the robing room in like five minutes.

2              (Recess)

1    (In the robing room)

2    THE COURT:  Okay.  So I told you all, I made very

3  minor edits throughout, and once we finish, we'll quickly run

4  the black line and give it to you.  But the edits really are

5  minor stylistic type of things, so I'll just give you one quick

6  example to give you a comfort level but you'll see the black

7  line itself.  So on request number one --

8    MR. FASULO:  Do you know the pages?

9    THE COURT:  I don't know the pages because there have

10 been so many versions you have given me, and I'm working from

11 my own black line.

12    So the first paragraph, you say over the course of the

13 trial, I have ruled on what testimony and evidence is relevant.

14 I added "and admissible."

15    You don't have to do this because I'm going to give

16 you the black line.  I'm just giving you a sense of -- they are

17 not substantive edits, really.

18    Under the law for your consideration, I took out in

19 deciding the facts.  There's a little bit of redundancy.  I'm

20 trying to make these a little more understandable.  We'll give

21 you that in a minute.

22    With respect to the substantives things that we should

23 talk about:

24    First, on charge 10, where you had competing good

25 faith charges.  That, in the Court's understanding, is now not

1    an issue really because the statement, even in the government's

2    proposed charge on the second page, second paragraph, a

3    defendant's good faith is a complete defense to the charges in

4    this case is not accurate any longer.

5              MR. FASULO:  Well, this is a defense to the charge in

6    the case as it relates to the top charge.

7              MS. MORTAZAVI:  But not the lesser included.

8              THE COURT:  Correct.

9              MR. FASULO:  Correct.

10             MS. MORTAZAVI:  Right.

11             THE COURT:  Correct.

12             MR. FASULO:  So it is relevant to one of the charges.

13             THE COURT:  Well, then we need to make that clear.

14   All right?

15             MR. FASULO:  Yeah.

16             THE COURT:  The way it's stated is misleading.

17             MR. FASULO:  Yes.

18             THE COURT:  The other thing on that particular charge,

19   the paragraph above it, intent to defraud or mislead.  I added

20   Custom and Border Patrol in there because there was some

21   testimony about Canada or something like that.

22             In that same paragraph, a defendant's good faith is a

23   complete defense, the last line before the authorities says a

24   defendant is under no burden to prove her good faith, rather

25   the government must prove bad faith or knowledge of falsity.

M55MGIA1

1    I'm changing that to must prove intent to defraud or mislead.

2    Doesn't have to prove bad faith.  Has to prove an intent to

3    defraud or mislead.

4            MR. FASULO:  Just for the record, I have an objection

5    to that.

6            THE COURT:  You object to that?

7            MR. FASULO:  Well, I understand what the Court is

8    doing, but under this charge, it is the government's -- the

9    defendant doesn't have the burden of proving --

10           THE COURT:  I'm leaving that.

11           MR. FASULO:  And the government must prove -- oh

12   you're leaving the beginning?

13           MS. MORTAZAVI:  Yes.

14           THE COURT:  Just changing that the government has to

15   prove bad faith.

16           MR. FASULO:  I withdraw my objection because I didn't

17   understand you were leaving the first sentence.

18           THE COURT:  Okay.  So at the Fishman trial, we had the

19   following paragraph, which I would propose to add after the

20   language about what it means -- I guess it's the paragraph at

21   the top where I told you I'm adding Custom and Border Patrol in

22   place of actually that paragraph that says it's a good -- is a

23   complete defense.  I'm going to use what we did in the Fishman

24   trial.  The defendant has argued that she acted in good

25   faith -- and you'll get a copy of this -- you could find that

M55MGIA1

1    the defendant believed in good faith that she was acting

2    properly, even if she was mistaken in that belief, and

3    therefore, that she did not act with an intent to defraud or

4    mislead.  The burden of establishing criminal intent rests on

5    the government.  The defendant is under no burden to prove her

6    good faith; rather the government must prove beyond a

7    reasonable doubt an intent to defraud or mislead.

8            MR. FASULO:  Consent.  I mean, I understand -- I don't

9    know if you're asking for consent or --

10           THE COURT:  Yes.  I'd like the record --

11           MR. FASULO:  Yes, I consent to the change of that

12   paragraph that currently is in this -- in the proposed charge

13   to what the Court will now instruct the jury on.

14           MS. MORTAZAVI:  And, of course, the government

15   contents.

16           THE COURT:  So we have consent on charge 10.

17           The next, overt acts is charge 12.  The question that

18   we had is you have a paragraph about overt acts in the

19   indictment, but we have agreed we're not giving the jury the

20   indictment.  So it seems that we need to cut that paragraph.

21   It's the third paragraph in the charge.

22           MR. FASULO:  Give me a moment, Judge.

23           THE COURT:  Yes.

24           MR. FASULO:  I see it.  Okay.

25           MS. MORTAZAVI:  No objection from the government.

1    MR. FASULO:  No objection from the defense.

2    THE COURT:  So that paragraph will be out.

3    Are you with us?

4    LAW CLERK:  Yes.

5    MR. FASULO:  I'm sorry.  I didn't hear you.

6    THE COURT:  Charge 13 will be the lesser included

7    offense charge, so we'll take out the words "if applicable."

8    But otherwise, that remain then part of the charge, correct?

9    MS. MORTAZAVI:  Correct.

10    MR. FASULO:  One moment, Judge.

11    THE COURT:  I think you already agreed to this

12    language because it's a joint request.  All I'm saying is "if

13    applicable" goes away because you are requesting the lesser

14    included.

15    MR. FASULO:  I just want to see.

16    THE COURT:  Fair enough.

17    MR. FASULO:  Just a chance to read it, but, yes, I'm

18    fine with that, Judge.

19    THE COURT:  Okay.  We added as I told you the

20    foreperson charge, or we will add a charge about.  We didn't

21    have it in there, somebody has to be the foreperson.

22    Now, the question I have for you all is do you have a

23    strong view on whether we let the jury select or do we assign

24    juror number 1?

25    MR. FASULO:  Whatever is -- I have no strong view on

1    that, Judge.  Whatever would move more efficiently.  In my

2    experience, if we select juror number 1 as the foreperson, they

3    then begin to start talking about their deliberations, and so I

4    would request -- actually, I would request juror number 1 be

5    appointed as the jury foreperson so we can move into the

6    deliberations.

7            THE COURT:  Assuming that she or -- I don't even

8    remember.  I think it's a she, that she agrees, and they don't

9    have to talk about that, which they might.

10           MS. MORTAZAVI:  No objection.

11           THE COURT:  So we'll include then the language that if

12   it will be jury number 1 unless that juror is unwilling.  Okay?

13           And as I said to you, we had a charge on

14   demonstratives.  Did I show that to you, or no?

15           MR. GIANFORTI:  We submitted one, your Honor.

16   Proposed one a couple days ago.

17           MS. MORTAZAVI:  Which I believe was the same version

18   we used in the prior trial.

19           LAW CLERK:  I think it's slightly different.  Can we

20   put it the red line?

21           THE COURT:  That's fine.

22           MR. FASULO:  That's fine.  Pretty much tracks this

23   with the --

24           THE COURT:  It is a little bit shorter.

25           Okay.  Request 28 in your proposal was immunity of a

1  government witness.  There were no immunized witnesses.  So

2  that charge should be deleted, correct?

3            MS. MORTAZAVI:  Correct.

4            THE COURT:  Mr. Fasulo?

5            MR. FASULO:  Yes, Judge.

6            THE COURT:  So 28 we'll delete.

7            Number 30 talks about statements of a defendant to law

8  enforcement, and I'm just unclear is that in or out.  Did we

9  have that in this case?

10            MR. FASULO:  I think this section should go out,

11  Judge, because I don't believe there were any statements

12  introduced in the government's direct case or in the

13  cross-examination of the defendant about statements that she

14  made to law enforcement agencies.

15            THE COURT:  That was my recollection.  That's why I'm

16  asking the question.  I don't have a view one way or the

17  another.

18            MS. MORTAZAVI:  That's right, your Honor.  There were

19  no -- there was no evidence on -- that's correct.

20            THE COURT:  The only thing I wasn't sure of is this

21  intended to cover the Delaware investigation, the statements

22  that were made to those law enforcement.

23            MS. MORTAZAVI:  So per the exhibit that we admitted,

24  that was a purely civil proceeding, so I don't know that the

25  Delaware authorities would be considered law enforcement.  I

1  think it might muddy the waters to suggest that.

2            MR. FASULO:  I would object it -- object to it for

3  that purpose.

4            THE COURT:  Object to including it?

5            MR. FASULO:  For that purpose.

6            THE COURT:  It seems the government is agreeing it

7  should be deleted.  So your proposed request number 30 will be

8  deleted.

9            MS. MORTAZAVI:  Right.

10            THE COURT:  All right.  I'm saving the big one for

11  last.

12            MR. FASULO:  Judge, is 31 out?

13            THE COURT:  Let me see what 31 is.

14            MR. FASULO:  In this form?

15            THE COURT:  Yes, correct.  The defendant's right --

16  let me just read it.  Yes, yes.  31 should come out.

17            MR. FASULO:  If I may your Honor?

18            THE COURT:  Yes.

19            MR. FASULO:  There's going to be a part of the charge

20  that you will remind the jury that there was no obligation for

21  the defendant to testify, though.

22            THE COURT:  Well, once she testified, I -- you know,

23  why do I need to keep reminding them?  So you want an

24  affirmative charge that she wasn't obligated to but she did.

25            MR. FASULO:  Well, I'm going to argue that in closing.

M55MGIA1

1          THE COURT:  That's fine.

2          MR. FASULO:  But I think with respect to the law, she

3     had no obligation to testify.

4          THE COURT:  I think we told them that.

5          MR. FASULO:  I think it was part of the general charge

6     that you have in --

7          THE COURT:  Correct.

8          MR. FASULO:  So I'm asking if it's still part of the

9     general charge that's in there about the burden the government

10    and --

11         THE COURT:  Yes.

12         MR. FASULO:  -- presumption of innocence, et cetera.

13    So if it's in there in the beginning, I don't need it repeated

14    again.  That's one of her rights as well.

15         THE COURT:  Of course.  So you need, Mr. Fasulo, to

16    take a look at charge number 3.

17         MR. FASULO:  I'll take a look at that.

18         THE COURT:  Presumption of innocence and burden of

19    proof.  And this is the revised.  The law does not require the

20    defendant to call any witness or produce any evidence.  If you

21    want to add "or testify herself."

22         MR. FASULO:  Or testify.

23         MS. MORTAZAVI:  That's fine, your Honor.

24         MR. FASULO:  And then I'm fine with deleting what we

25    just talked about, deleting the request.

1          THE COURT:  Request 31 will be deleted on consent,

2     right?

3          MS. MORTAZAVI:  Correct.

4          THE COURT:  Okay.  Page 42, I think it is of your

5     colored copy, which is about a previous trial.

6          MR. FASULO:  We decided we don't need that, we had no

7     mention of a previous trial.

8          MS. MORTAZAVI:  That's right.

9          THE COURT:  That was my impression.  Let me just find

10    that.

11         So that is on page 42 in request number 22.  There's a

12    paragraph:  You also heard testimony from a witness in a prior

13    proceeding -- oh, not that one.  I'm sorry.  That's a

14    different -- let me find where we are.

15         MS. MORTAZAVI:  I think the text in red, your Honor.

16         MR. GIANFORTI:  Page 41.

17         MR. FASULO:  What number charge?

18         MR. GIANFORTI:  Page 41.

19         MS. MORTAZAVI:  22.

20         LAW CLERK:  It was not a separately numbered request.

21    It was just I believe a defense --

22         MR. FASULO:  It's on page 41.  I see it.

23         THE COURT:  41.

24         MS. MORTAZAVI:  Request 22.

25         THE COURT:  Oh, you had it in red "if applicable" you

1    heard testimony about a previous trial in this case.

2              MR. FASULO:  Delete.

3              THE COURT:  So you're withdrawing your request,

4    Mr. Fasulo?

5              MR. FASULO:  I am.

6              THE COURT:  And just so the record is clear, that

7    begins:  You heard testimony about a previous trial in this

8    case that...and the following language proposed by the defense

9    on consent of Mr. Fasulo will be deleted.

10             Now, on that same page, though, in the joint request

11   on witness credibility, the second to last paragraph, I'm

12   inclined to delete this:  You've also heard testimony from a

13   witness in a prior proceeding read by an employee --

14             LAW CLERK:  That was my suggestion.  The parties

15   didn't see that -- I took it out.

16             THE COURT:  I'm sorry.  Because I already charged the

17   jury when you had whomever it was.

18             MR. FASULO:  Courtney Adams.

19             THE COURT:  Yes.  So I'm not going to add that.  All

20   right.  So that brings us to the cooperator charge.

21             MS. MORTAZAVI:  Your Honor, one quick point of

22   clarification.  Request number 34 is an "if applicable"

23   request, and the government would request that it be read to

24   the jury.

25             THE COURT:  If I didn't highlight something, it was

1   my --

2           LAW CLERK:  Is it --

3           THE COURT:  -- false exculpatory statements.

4           MS. MORTAZAVI:  I have an extra copy if the Court --

5           THE COURT:  No.  I have it here.

6           You heard testimony that the defendant made statements

7   in which she claimed that her conduct was consistent with

8   innocence and not with guilt.

9           This is in the joint request, right?

10          MS. MORTAZAVI:  I'm just asking that if the "if

11  applicable" portion --

12          THE COURT:  Oh, I see it.  On any of these, I'm going

13  to take out the "if applicable" language across the board

14  because if we're including it --

15          MR. FASULO:  This is something we talked about

16  earlier, we agreed upon, and consented to, so I have no

17  objection.

18          THE COURT:  Yes.  Ms. Mortazavi is just taking out the

19  "if applicable" language, and I'm telling you that across the

20  board I didn't go through every single one with you.  If I

21  didn't ask you are we deleting it, it means we're leaving it,

22  and I'm taking out the "if applicable" language.

23          MS. MORTAZAVI:  Thank you, your Honor.

24          THE COURT:  So that leaves us with charge 27 with

25  respect to cooperators.

1          I've carefully studied this, I've compared the two

2     back and forth.  My ruling is as follows:  I'm adopting with

3     minor edits the government's request.

4          So first I'm going to say that most or much of what is

5     requested in the defense request is covered sufficiently in the

6     government's request.

7          Second, I find that some of what's in the defense

8     request is either not accurate or just not appropriate in a

9     jury instruction.  So, for example, I'm not going to instruct

10    the jury that a cooperator has a motive to lie falsely.  That's

11    within the province of the jury to decide.

12         The government request does say that the jurors have

13    to ask themselves whether the cooperator has a motive to lie,

14    and that is sufficient.

15         Next, much of the government's proposed request is not

16    accomplices, and we never had any discussion about accomplices.

17    We had people who signed a noncooperation agreement -- I'm

18    sorry, none prosecution agreement, and we had people who signed

19    a cooperation agreement, but we didn't ever have somebody

20    who -- it's introducing a whole new concept that we never

21    talked about.  And I think some of it, again, is inaccurate, in

22    any event.

23         So for example, it's not appropriate for me to talk to

24    the jury about mandatory minimum sentences for cooperators when

25    at the same time, I'm saying with respect to the defendant you

1   can't consider punishment.  And the jury doesn't even know what

2   that means in any event, and I'm not certain it's a correct

3   statement of the law.

4           So as I say, I am going to give the -- largely the

5   government's requested charge with some minor edits, and you'll

6   see that in the black line version that we're going to give you

7   shortly.  All right?

8           Mr. Fasulo, I'll give you an opportunity to review the

9   black line, and then, you know, make whatever records you want.

10          MR. FASULO:  Just so we're clear here, I understand

11  the issue on page 52 beginning with the statement:  Like the

12  testimony of any other witness, accomplice witness testimony

13  should be given the weight it deserves in light of the facts

14  and circumstances -- from that point to the end of that page

15  which is on her testimony.

16          THE COURT:  No.  If you could go back further.  Go

17  back further.  The paragraph before that begins:  For these

18  very reasons the law allows the use of accomplice testimony.

19          MR. FASULO:  Right.  I'm sorry, Judge.  Starting

20  there, and to the end, which ends with "accordingly."

21          THE COURT:  Yes.

22          MR. FASULO:  I would agree with the Court in this case

23  that it would be appropriate not to include that part of the

24  testimony.

25          THE COURT:  Let me find where the "accordingly" is.

1    It's at the very end.

2              MR. FASULO:  The second to last paragraph.

3              THE COURT:  So you withdraw your requested charge

4    beginning:  For these very reasons, the law allows the use of

5    accomplice testimony...through to the word "accordingly".

6              MR. FASULO:  Correct.

7              THE COURT:  Which is the penultimate paragraph?

8              MR. FASULO:  And as to the rest, I stand by the

9    submission.

10              THE COURT:  So let's go through it your very final

11    paragraph:  As with witness, let me emphasize the issue of

12    credibility need not be decided in an all or nothing fashion.

13    Even if you find that a witness testified falsely in one part,

14    you may still accept his or her testimony in other parts or may

15    disregard all of it.  This determination is entirely for you,

16    the jury.

17              That is included in full, I believe, verbatim, while

18    with the exception of the words as with any witness, that is

19    included until the government's charge.  Okay?

20              Your proposed first paragraph is not objectionable,

21    but is covered by what the government has proposed.  You have

22    heard testimony from one or more government witnesses.  Does

23    the government object to inserting the word "government"?

24              MS. MORTAZAVI:  No objection.

25              THE COURT:  It's government charge 27 on the first

line.  Witnesses who have pleaded guilty to charges arising out

of similar facts to those in the case.  You are instructed that

you are to draw no conclusions or inferences of any kind about

the guilt of the defendant on trial from the fact that any

prosecution witness pled guilty to criminal charges.  The

decision of that witness to plead guilty was a personal

decision that the witness made about his own guilt.  It may not

be used by you in any way as evidence against or unfavorable to

the defendant here on trial.

Does the government object to that?

MS. MORTAZAVI:  If I could review it, your Honor?

THE COURT:  Yes.

MS. MORTAZAVI:  I struggle with the wording, your

Honor, of saying a decision of a witness to plead guilty may

not be used in any way as evidence against or unfavorable to

the defendant.  The cooperation -- it suggests that the jury is

not able to evaluate as evidence the fact of a witness'

testimony regarding their cooperation agreement and their

guilty plea.  I think it raises the specter that they are to

disregard that, and that's simply not correct.  It's part of

their evaluation of the witness' credibility.

THE COURT:  I don't think that's correct.  I don't

think there's anything objectionable in the first paragraph of

the defendant's proposed charge.  My only comment about that

coupled with the third paragraph -- well, let me take it

1 paragraph by paragraph.

2 So I believe, in substance, what remains of the

3 defendant's proposed charge after we get rid of what I said is

4 incorrect and improper about talking about mandatory minimum

5 sentences for cooperators and talking about the next paragraph,

6 the possibility of a reduced sentence gives them a personal

7 stake in the defendant's conviction is simply incorrect. It's

8 simply incorrect. I do think the concept that follows is

9 correct, but I do think it's covered by the government's

10 charge.

11 MR. FASULO: Judge, I respect the Court's analysis and

12 decision on that; however, I just want to be clear this is a

13 charge that's taken from another judge's charge that I felt is

14 appropriate, and so when you -- it was incorrect -- it was

15 incorrect, the Court is not going to give it, I understand;

16 that's this Court's ruling. But there was a basis for me to

17 make the --

18 THE COURT: I'm not questioning your good faith.

19 MR. FASULO: I wanted to be clear why I put it there.

20 I didn't put it in because I thought it was going to help the

21 case --

22 THE COURT: No, no, no. I understand that. You're

23 more experienced than I am --

24 MR. FASULO: No, no, no.

25 THE COURT: -- criminal lawyers, so you know that's

M55MGIA1

1    just not --

2            MR. FASULO:  I'm fine with the Court's -- the Court's

3    going to make the ruling, and I understand.

4            THE COURT:  So that is my ruling that I'm going to

5    use, with the edits that I'm going to give you, the

6    government's charge.

7            MR. FASULO:  Okay.

8            THE COURT:  And I think that's all of the issues on

9    the charges, unless there's anything else anybody wants to call

10    to my attention.

11           So we'll, as quickly as we can, turn this around and

12    we'll be back down with a copy, and then we'll give you a few

13    minutes to look at it.  I think you'll see the edits are not

14    really substantive, and we'll be ready to go into summations.

15           All right.  Now, it's 10:30.  I told the jury

16    11:00 o'clock.  How long do you think you expect to be with

17    your summation?

18           MS. MORTAZAVI:  I think approximately an hour.  It may

19    be a few minutes over that.

20           THE COURT:  Okay.  And Mr. Fasulo?

21           MR. FASULO:  Probably half of that.

22           THE COURT:  About a half hour, so is it your

23    preference to do it before lunch?  We're coming back at 11:00.

24           MR. FASULO:  Whatever the Court feels to move the

25    jury.  I'm fine doing it whenever --

1    THE COURT:  I'd like to keep moving.

2    MR. FASULO:  I have no problem jumping into my

3 closing.

4    THE COURT:  That's what we'll do, and the government

5 will do a rebuttal after lunch.

6    MR. FASULO:  Oh, so lucky.  Off the record.  Off the

7 record.  That's so lucky.

8    THE COURT:  That's exactly why I asked.  I don't want

9 to --

10    MR. FASULO:  Judge, just for the record, I do think

11 it's important the jury have adequate time to start thinking

12 about the case and deliberating on the case and delay a -- I

13 don't think a delay benefits the process, and it is Thursday,

14 then we have Friday, and you know what happens on Fridays.

15    THE COURT:  That's exactly my point.

16    MR. FASULO:  My preference is the jury have the case

17 as soon as they can get it, so even though -- that's all I have

18 to say.

19    THE COURT:  That will be the plan, then.  And then the

20 length of the rebuttal, obviously we don't know, but I want to

21 the charge the jury and get this case to the jury today.

22    MS. MORTAZAVI:  As do I.

23    THE COURT:  All right.  Thank you very much.

24    (Recess)

25    (Continued on next page)

1   (In open court)

2   THE COURT:  Are we ready to proceed with summations?

3   MS. MORTAZAVI:  Yes, your Honor.

4   THE COURT:  Thank you.  Ms. Dempsey, will you bring in

5   the jury?

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  Please be seated, everyone.

3    Thank you for your patience.  I'm sorry it took us a

4    little longer than we thought.  We were dealing with technology

5    issues upstairs.  So I had promised you at the outset I would

6    keep you updated about the progress of the case, and I realized

7    this morning I neglected to do that.  But as you might have

8    gathered, we are moving faster than we had projected we would

9    be, and we are ready for you to hear the closing arguments of

10    counsel.

11    So with that, Ms. Mortizavi, on behalf of the

12    government.

13    MS. MORTAZAVI:  Thank you, your Honor.

14    Trainers wanted to break the rules, and the defendant

15    sold them the drugs to do it.  She knew the drugs would be used

16    by trainers to dope horses, including within hours of a race.

17    She knew the drugs were untestable.  And she knew the trainers

18    were violating the racing rules, and she helped them do it.

19    That is the crime.  And that is how you know the defendant is

20    guilty beyond a reasonable doubt.

21    Ladies and gentlemen, you've heard from all the

22    evidence presented at this trial exactly what the business of

23    Equestology is.  It's not providing medical advice.  It's not

24    treating animals.  It's about selling untestable, illegal,

25    performance enhancing drugs to dope racehorses, to fool racing

1    commissions, to win money.  It's about helping trainers cheat

2    and not getting caught.

3         The defendant knew all that.  And she agreed with

4    others to help trainers violate state racing rules by selling

5    them the drugs, the needles, the syringes, the nasogastric

6    tubes, knowing that they would be used to enhance the

7    performance of racehorses, knowing that was prohibited, and

8    knowing there were risks if she was caught.  She thought she

9    could get away with her crimes, and for almost 20 years up

10   until her arrest, she did.

11        In a moment, ladies and gentlemen, you're going to be

12   asked to consider whether the defendant is guilty of the crimes

13   she's been charged with.  Most of the elements of the crime are

14   not seriously in dispute between the parties.  And

15   Judge Vyskocil is going to instruct you on the law in this

16   case.  And remember, her instructions control.  What I say here

17   today, it's not evidence, and it's not the law, it's just

18   argument.

19        But I expect that the Court will instruct you that

20   this crime has the following elements:  First, that there was

21   an unlawful agreement; second, that the defendant joined in

22   that agreement; and third, that somebody took some act to

23   further that agreement.

24        Here, the goal of the conspiracy, the agreement

25   between the defendant and others, was to distribute drugs,

1    drugs that were adulterated or misbranded drugs that were sent

2    across state lines, drugs that were sent with the intent to

3    defraud or mislead.  Those are the elements.  And you know the

4    defendant entered into an agreement with other coconspirators.

5    You know the defendant and others took steps to further that

6    agreement.  And you know over the course of this trial the

7    basics of that agreement.

8              First of all, you know these products are drugs -- not

9    vitamins, not powders.  That's all irrelevant.  That's all a

10   distraction.  What we're talking about are injectable

11   medications that were sold by the defendant to enhance

12   racehorse performance.

13             You heard the testimony from Dr. Bowman, the

14   government's expert, the FDA considers a substance either a

15   food or a drug, and what we're talking about today are

16   obviously drugs.  You know that because of what they were

17   intended to do, to affect the body of an animal.  You know that

18   from the product description the defendant gave to clients,

19   Government Exhibit 711.  It's plain as day what these drugs

20   were intended to do.

21             MR. FASULO:  Objection to that, Judge.

22             THE COURT:  Sustained.

23             MS. MORTAZAVI:  You can find these are drugs because

24   they are injectable drugs.

25             Now, remember, Dr. Bowman's testimony on this point,

1   you don't need to conduct a chemical analysis for the drugs the

2   defendant sold.  You don't need to actually find what they said

3   they would do.  The drug is based on its intended use.  And you

4   can tell its intended use by the description of the drug that

5   the defendant put together and distributed to other trainers.

6   And, second, these drugs were adulterated or misbranded.

7           Judge Vyskocil is going to explain to you what those

8   terms mean, and I suspect it can happen in one way or it can

9   happen in multiple ways, but you only need to find one.

10          An adulterated drug is one that is not approved by the

11  FDA and not generally recognized as safe and effective.  You

12  heard Dr. Bowman's testimony on that.  She took just a handful

13  of the many drugs that the defendant sold.  She went through

14  them, and she concluded they were not FDA approved, and they

15  were not generally recognized as safe and effective, so they

16  were adulterated.  But you could also separately find that

17  these drugs were mislabeled, and therefore, they were

18  misbranded.

19          There can be no real dispute about this either.

20  Dr. Bowman talked about what's missing on the labels of the

21  drugs.  No correct manufacturer name or company name, no

22  contact information, no indications, no list of ingredients or

23  APIs, and no adequate directions for use, among many other

24  things missing with these labels.

25          And, of course, some of those drugs, they had barely

1    any label at all.  And it doesn't take an expert to see what's

2    wrong with this bottle of BB3, the BB3 that the defendant sold

3    to her clients, the BB3 that she kept selling even after her

4    partner Seth Fishman's supply of drugs had been seized, even

5    after he had been detained, and even after he had been called

6    into court over those very drugs.

7              MR. FASULO:  Objection.  There's no evidence to that

8    before the Court.

9              THE COURT:  That's sustained.

10             MS. MORTAZAVI:  Your Honor, Government Exhibit 430C.

11             THE COURT:  There was testimony that he had to show up

12   at court.

13             MS. MORTAZAVI:  And in addition to all that, the

14   creators of these drugs and the companies that appeared on

15   these labels were not registered with the FDA to manufacture

16   drugs.  The parties agreed to that in a stipulation.  So every

17   custom-made Equestology product the defendant sold, even if it

18   had been approved by the FDA, even if it had been properly

19   labeled, well, it would still be misbranded.  It would still

20   have been produced by companies and people that never

21   registered with the FDA.  These drugs were misbranded, and

22   because of that, you can find that they were illegal.

23             There's also no serious dispute that these drugs were

24   sent across state lines.  They were sent across the

25   United States by the defendant and her coconspirators.  You

1   know the defendant lived in Delaware and shipped drugs from

2   Delaware.  She received these drugs from Florida where

3   Equestology's warehouse was located, and you know from the

4   evidence that the laboratory where the drugs were made was in

5   Massachusetts.

6          You can tell from the evidence that the defendant sent

7   these drugs all across the country, including right here in the

8   Southern District of New York, the district that we're sitting

9   in today.

10         You can tell from the evidence that the drugs the

11  defendant sold or gave away as samples were found at racehorse

12  training centers in New York in this district; the Golden Shoe

13  Racehorse Training Facility and the Mount Hope Racehorse

14  Training Facility.  So you know these drugs moved across state

15  lines.

16         So like I said a moment ago, there's no serious

17  dispute about most of this conspiracy.  The only point in

18  serious dispute is whether the defendant did all that with the

19  intent to defraud or mislead.

20         Now, there are two questions you have to ask yourself

21  in your deliberations.  First, did the defendant know that part

22  of the conspiracy involved deception of someone or some agency.

23  And, second, did the defendant agree with others to further the

24  conspiracy knowing that it involved deceit, because the crime

25  here is the agreement.  It's the defendant knowing the purpose

1   of the conspiracy, knowing what others were going to do, and

2   agreeing to help.  That's the crime.

3        The defendant was incredibly involved in the business.

4   For years, it was just the defendant and Seth Fishman, and they

5   were successful because they kept a lot off the books.  And you

6   know that Seth Fishman trusted the defendant, he trusted her to

7   run her end of his business.  He trusted her not to turn him

8   in.  The defendant was the only person Seth Fishman trusted.

9        From all the evidence you've heard over the course of

10  this trial from the very statements the defendant made in her

11  own private phone calls and text messages and e-mails, you can

12  tell, ladies and gentlemen, the record is clear:  She joined in

13  this unlawful agreement to distribute Equestology's illegal

14  drugs, and she knew the very foundation of that agreement was

15  built on deceit.  That's what I'm going to spend most of my

16  time on today.  How do you know the defendant's intent?

17       First, I'm going to talk about all the ways in which

18  the defendant was a crucial part of Equestology.  And like I

19  said, I'm going to walk you through how you know what was in

20  the defendant's mind.

21       First, I'll talk about the nature of Equestology's

22  business, the business of creating untestable drugs; second,

23  we'll look at some of those misleading labels, how they were

24  designed to shield Equestology and the people behind the

25  company; third, avoiding snitches, vetting clients, asking

1   around to see if they were trustworthy, to make sure that no

2   one turned them in; fourth, lying when caught.  That's exactly

3   what the defendant did when she was investigated by the state

4   of Delaware; and, finally, hiding behind the vet's license.

5          So, first, let's begin by talking a little bit about

6   the defendant's role at Equestology.  The company she helped or

7   organize and build and grow for years and years.

8          Now, make no mistake the defendant was no small-time

9   player when it came to Equestology.  She didn't just take

10  orders.  She wasn't a secretary or a delivery person.  You've

11  heard a lot about how the defendant wasn't the boss.  That may

12  be true, but it also doesn't matter.  The defendant knew what

13  she was doing, and she did a lot.  The defendant incorporated

14  Equestology.  She listed her address as the company's address.

15         The defendant was a co-signer on Equestology's bank

16  account, and, once again, listed her address as the account

17  mailing address.  She even cut herself checks from that same

18  account.  The defendant controlled the Equestology e-mail

19  account, and she used it to conduct Equestology business.  The

20  defendant proposed ideas for new products that Equestology

21  should make, and, in fact, she did that a lot.

22         She stockpiled thousands of bottles of Equestology's

23  custom-made drugs in the garage that she had converted into an

24  office.  She had a whole storeroom of drugs that she kept so

25  she could send them out when she decided, not when she had

1   prescriptions, not when she was told, but when she made a sale.

2   And she maintained an inventory system to keep track of her end

3   of the business, the part of the business that she ran, the

4   part of the business that she controlled.

5        The defendant asked for descriptions for the drugs

6   that she was selling so that she could sell even more of them.

7   And you know she read these descriptions.  The record is clear

8   that she read these descriptions because she asked for very

9   specific information for each drug.  Seth Fishman may have

10  written these, but it was the defendant who asked for them, and

11  it was the defendant who put them together, and it was the

12  defendant would send them to trainers.  And she was very clear;

13  she was doing it to help sales.

14       The defendant also kept a list of cold calls,

15  customers that she would follow up with, like what

16  telemarketers have, like what salespeople have when they're

17  trying to make a quota, like people working on sales

18  commissions.  It's a list of people you maintain when you're

19  trying to push product.

20       The defendant called and she texted trainers to see if

21  they wanted to buy drugs.  The defendant even offered people

22  free samples of these customized performance enhancing drugs.

23  The thing is, ladies and gentlemen, this is entirely backwards.

24  This is not how you distribute drugs.

25       When you are collecting prescriptions, you call the

1    vet, you get the prescription, then you fulfill it.  That's not

2    what the defendant did.  She talked to the clients first.  She

3    got their orders first.  She agreed to fulfill those orders

4    first.  And she sold them those drugs.  No prescription, no

5    direction from a vet, just selling drugs for profit.

6           Ladies and gentlemen, you heard the defendant testify

7    at this trial, and she admitted that she engaged in a lot of

8    what I just described.  She admitted that she solicited

9    clients, that she came up with ideas for new drugs, that she

10   maintained the inventory, that she ordered supply from

11   Seth Fishman, but she also stated that she thought every drug

12   she sold had a prescription because that's what she was told,

13   that there was an open prescription for any client, any drug,

14   any horse, at any time.  And she was told all that in private,

15   in person, in a conversation over a decade ago with no one else

16   around.

17          Ladies and gentlemen, that explanation is simply not

18   credible.

19          Now, I want to be clear:  The Court has already told

20   you, and the Court will tell you again, the defendant has no

21   burden in this case whatsoever.  The burden is always on the

22   government, and we embrace that.  The defendant was not

23   obligated to testify.  She didn't have to put on any evidence,

24   but she did testify.  And because she testified, you are

25   entitled -- in fact, you are required -- to scrutinize her

1   testimony, just as you would with any other witness, and ask

2   yourselves which parts of her testimony were truthful, which

3   parts of her testimony line up with the other evidence in this

4   case; with the e-mails, with the text messages, with the

5   intercepted calls, and which portions of her testimony are

6   totally uncorroborated, totally self interested, totally

7   implausible.

8           The defendant dealt with prescription drugs.  She

9   ordered prescription drugs from others.  She got bottles and

10  bottles of prescription drugs for others.  She knew what a

11  prescription drug was.  She knew what it meant to need a

12  prescription, issued to a client, issued for a particular

13  patient.  There was no open prescription, but there was a

14  conspiracy; a commitment to selling drugs and to do it with the

15  intent to defraud or mislead others.

16          Now, all of that shows you just how involved the

17  defendant was in Equestology.  So now let's go back to talking

18  a little bit about the business of Equestology and the ways in

19  which that company, the company that the defendant helped to

20  run day in and day out for years, how that company was built on

21  deception.

22          The core idea of Equestology was creating performance

23  enhancing drugs that would not test positive on drug tests.

24  You know that from the sworn testimony of Courtney Adams.

25  That's Government Exhibit 17001.  Equestology specialized in

1    making performance products for horses that were untestable.

2    Now, remember, unlike Courtney Adams who only worked at the

3    business for a few years, the defendant worked at the business

4    for 15 to 20.  Even Courtney Adams knew what they were doing:

5    Selling untestable performance enhancing drugs.

6         Courtney Adams was not a racehorse trainer, she didn't

7    grow up in the industry, she didn't work as a groom, she didn't

8    work as an assistant trainer.  But even Courtney Adams knew it

9    was important that these drugs be untestable, undetectable on

10   the drug tests imposed by state racing commissions.

11        Why was it important?  So the corrupt trainers could

12   dope their horses without getting caught, and it was important

13   to those trainers that they not get caught.  You've heard that

14   from the trainers that testified at this trial.

15        Adrienne Hall told you the testability was important

16   to her; that if her horse tested positive, she could face

17   consequences, fines, suspensions, disqualification.  Ross Cohen

18   told you he asked the defendant about the testability of a drug

19   every time the defendant brought up a new drug she wanted to

20   sell, which was about once a month.  And Ross Cohen, those

21   conversations about testability, those happened.

22        Look at the defendant's text messages with

23   Seth Fishman.  In May 2016, the defendant asked Seth Fishman,

24   her coconspirator, about a drug for Ross Cohen and she was told

25   "have, but it tests."  She knew it mattered to trainers.  She

1    knew trainers cared.  And she already testified that she talked

2    to trainers about testability.  And it wasn't the only time the

3    defendant discussed positive tests.  It was even on the

4    promotional material the defendant gave to trainers right there

5    in black and white.  The labs could never detect unless a

6    snitch "tuned" a bottle in, and the racing authorities decided

7    to make a test.  Plain as day.  The defendant helping others

8    deceive the racing commissions.

9         The defendant knew the untestability was crucial to

10   clients who were looking to buy Equestology's custom-made

11   performance enhancing drugs so they can deceive racing

12   commissions so their horses would not test positive.  It was

13   important that the defendant's buyers, corrupt trainers, not

14   get caught, and so that was important to the defendant too.

15   And the defendant already admitted in her testimony that

16   Equestology sold untestable drugs, and that she talked about

17   that with trainers.

18        Ladies and gentlemen, on the basis of this alone, you

19   can find that the defendant joined in an agreement to sell

20   untestable drugs intending to mislead state racing commissions.

21        Let's be clear about what the word "untestable" means.

22   It doesn't mean it was okay to sell these drugs to trainers.

23   Untestable did not mean legal.  Untestable meant these banned

24   substances will not show up on a drug test.  And to explain

25   that, I'm going to walk through just two examples of the drugs

1    that Equestology made and sold.

2         Blood builders, like Epogen, that build a horse's

3    blood and various drugs injected on the day of a race.  You

4    heard during this trial about blood builders, how important

5    they are to any sport, including for improving a racehorse's

6    performance.  You heard that from multiple witnesses, trainers

7    who are licensed in different states.  The government's expert

8    witness, Dr. Cole, you heard that blood builders are not

9    allowed.  Can't use them at any time.

10        (Audio played)

11        MS. MORTAZAVI:  Dr. Cole testified that Epogen is a

12   class of drugs known as a blood builder, and she's aware of no

13   jurisdiction that permits Epogen or anything like Epogen to be

14   administered to a racehorse at any time.

15        Adrienne Hall testified that blood builders are not

16   allowed.  You can get in big trouble for using it.  Now keep in

17   mind, Adrienne Hall only became licensed as a racehorse trainer

18   in 2017.  She was new to the industry, she spent less time

19   doing this than the defendant, but even Adrienne Hall knows you

20   can not give blood builders to your racehorse.  And your common

21   sense can tell you:  If Adrienne Hall knows that, then the

22   defendant, she knew that as well.  And, of course, the

23   defendant knew.

24        Look at how she and Seth Fishman discussed their most

25   powerful blood builder drug, BB3.  The drug with no label.  The

drug Adrienne Hall used to build her horse's blood.
Seth Fishman described it in an e-mail to the defendant as a
long acting blood builder and made sure the defendant knew
would only let trusted clients have this.

        In another e-mail that was sent to the defendant by
Seth Fishman describing BB3 -- what's like likely BB3 -- he
writes, I would really stay low key on this one.  Why BB3 more
than anything else?  Because it's a blood builder.  Because
it's banned.  And the defendant listens.  You know that she
listens.  You know that because you can tell that from the
record because BB3 is not listed on the product sheet that the
defendant handed out to trainers.

        Take a look at Government Exhibit 711, the product
sheet the defendant saved to her computer, and Government
Exhibit 1915, the product sheet that the defendant e-mailed to
Adrienne Hall.  You find a number of Equestology's drugs on
there, but you won't find BB3.

        And at times, the defendant kept BB3 off a bill
because she knew the drug was different.  She didn't question
why a client would want to keep it out.  Look at these two
calls between Seth Fishman and a buyer, February 21, 2019, at
11:12 a.m., and then Seth Fishman and the defendant, 2:57 p.m.,
that same day mere hours later.  Defendant talking to a client
about how EPM was on a bill, not BB3.

        Remember EPM, that paste that was found in the

1    defendant's residence when it was searched during her arrest?

2    It was only a paste, not an injectable, not a blood builder,

3    and that's what they listed on the bill.  And in the next call

4    between Seth Fishman and the defendant, Seth Fishman confirms,

5    the defendant had put EPM on the bill, intended to charge a

6    client for BB3.  You also heard the defendant testify that she

7    got unlabeled bottles of BB3, and she sold them anyway.  She

8    didn't last for labels.  She wasn't surprised.  It wasn't a

9    mistake.

10        And as we'll discuss in a moment, the fact those drugs

11   was unlabeled was deliberate.  It was unlabeled to be

12   untraceable.  And because the defendant knew that, she didn't

13   ask any questions.  Questions that you would expect someone to

14   ask if they just got an unlabeled vial of some drug.  And the

15   defendant didn't just sell blood builders, she sold drugs that

16   would be used the day of a race.  She sold it directly to

17   trainers.  You heard testimony that's not allowed in pretty

18   much every jurisdiction.

19        That's something the defendant talked about with her

20   coconspirator, Seth Fishman.  The crime is hitting the horses

21   right before they pull on to a track.  That's what he's

22   explaining to her on this call.  You heard Adrienne Hall

23   testify to that.  She knows the rules, and like I said, she

24   wasn't a trainer very long.  But the defendant still sold

25   injectable drugs, knowing that trainers would use them race

1  day.

2          Let's take an example of one drug, VO2 Max.

3  Seth Fishman told the defendant in an e-mail that VO2 Max was

4  meant to be used within four to five "fors," meaning hours,

5  prior to a race.  That's exactly what the defendant put in the

6  promotional sheet she prepared.  The description the defendant

7  read and compiled and distributed, and she already testified

8  that she read this document, and she read this highlighted

9  language.  She knew what VO2 Max was and when it was supposed

10  to be administered to racehorses.

11          Other products on the defendant's sheet were listed as

12  being used within hours before an event.  ITPP Plus, within

13  four to five hours before an event, oxygenator within just four

14  hours prior to event.  Serenity, four to six hours before

15  event.

16          And in a text message, you see that the defendant told

17  buyers to use bleeding pills the day of a race six hours out.

18  And when Ross Cohen, that trainer, that buyer of the

19  defendant's, he testified she gave him the same instructions

20  for bleeding pills too.  And that's not the only drug the

21  defendant sold that she knew was going to be administered to

22  racehorses on race day in violation of racing rules.

23          Equestology had code words on its labels and its

24  product sheet.  Use within a few hours of exercise or strenuous

25  exercise, but it was obvious to everyone how these drugs would

1  be used.  The defendant was peddling performance enhancing

2  drugs to racehorse trainers who are trying to win races.  They

3  wanted to win money.  And a horse doesn't win money if it is

4  drugged during training; a horse wins money if it is drugged

5  before a race.  So that code word, "exercise," well, that's

6  more deception.  Everyone knew what exercise meant.

7           And let's look at an example.  Remember how the

8  defendant's product sheet said VO2 Max should be used within

9  four to five hours prior to race?  Well, that wasn't on this

10 label for this drug.  One to four hours prior to strenuous

11 exercise; four to six hours before strenuous exercise.  The

12 words are used interchangeably because everyone knows it's a

13 race day drug.

14          Let's look at another example.  The first product on

15 the defendant's product sheet, HP Bleeder Plus, is described as

16 test-free, and use four to six hours prior to strenuous

17 exercise.  But when the defendant couldn't remember the

18 instructions for this drug one day in 2015, she texted

19 Seth Fishman, and what did he write back?  HP Bleeder Plus is

20 10MLS, IV four to six hours prior to race.  Defendant was told

21 right there:  These are race day drugs she's selling.

22          Look through Government Exhibit 711.  There are lots

23 of products that were listed as being used for strenuous

24 exercise or exercise.  And don't let that fool you.  That was

25 exactly the point.  The defendant knew that labels mattered.

1   She knew that because as she testified at some point, at some

2   point in her career when she was licensed, she was searched by

3   the gaming commission.  They found a nasogastric tube in her

4   truck, and she was penalized.  So she knew commissions

5   conducted searches and she knew there were consequences for

6   trainers that had contraband, and if a label said race on it

7   instead of exercise, instead of event, well, then, it would be

8   there in black and white.  No way to deny it.

9          Now, ladies and gentlemen, I want to pause here for a

10   moment.  Before I continue with my presentation, because in

11   your deliberations, if you find that the defendant agreed with

12   others to sell untestable, banned drugs to mislead racing

13   commissions, then you must find that she acted with intent to

14   defraud or mislead.

15          MR. FASULO:  Objection.

16          THE COURT:  Ladies and gentlemen, I'm going to

17   instruct you on what the law is.  I remind you what

18   Ms. Mortazavi says is not the law; it is her argument to you.

19          Ms. Mortazavi, you have the charges.

20          MS. MORTAZAVI:  Thank you, your Honor.

21          In fact, ladies and gentlemen, if you find that she

22   agreed with others to sell just one of the prohibited drugs

23   that we discussed, just one time, then you can find in your

24   deliberations that she acted with intent to defraud or mislead.

25          MR. FASULO:  Judge, again, objection.

1    THE COURT:  Overruled.  That is one is overruled.

2    MS. MORTAZAVI:  Just BB3, just VO2 Max, just

3 oxygenator, just Equifactor, just one of the many drugs that

4 you have heard about and seen over the course of this trial.

5    But I'm still going to walk you through the many other

6 ways you know the defendant's intent here, not just these

7 untestable drugs, but the many ways that she intended to

8 defraud or mislead others.  The next reason you know is because

9 of the labels on the drugs the defendant sold.

10    We talked about some of this already.  Labels that

11 said exercise or strenuous exercise when they should have said

12 race, drugs like VO2 Max and many other labels that had the

13 same code word; exercise, strenuous exercise, all misdirection,

14 all deception.

15    And at this trial, you heard the name Equestology over

16 and over.  That was the company the defendant worked under, the

17 name of the bank account, the name on the invoices e-mailed to

18 trusted clients, the name used in her e-mail address, but not

19 the name on the drugs the defendant sold.  Look at the labels

20 in this case.  Photographs, files on seized electronic devices,

21 the Equestology Dropbox account, the stickers seized from

22 Equestology's warehouse, almost none of them contain the

23 company name Equestology.  Equitech, Equi-Science, SPC,

24 SP Brands, or no name at all.  Those labels were deeply

25 misleading.

1    And, of course, there were the drugs that had no label

2  whatsoever, like BB3, which we also talked about.  Across these

3  labels, no manufacturer's address, no contact information, no

4  way of tracing these drugs back to Equestology, or to the

5  defendant, if they were ever found.

6    The person who found these drugs, who picked up one of

7  the bottles that the defendant sold, would not be able to tell

8  that it came from Equestology, that it was a drug to be used on

9  race day, that they could contact someone if they had

10  questions.  They wouldn't know what to test for, they may not

11  even know what these drugs were intended to do.  And that,

12  ladies and gentlemen, was the point.  The labeling shows you

13  that it's not just that these drugs were misbranded or

14  adulterated, they were also deceptive.

15    Now, during the defendant's testimony, you recall her

16  saying that she had no hand in designing the contents of these

17  labels.  That statement, well, that's a distraction.  The

18  defendant read the labels.  The defendant could see what

19  information was missing.  The defendant agreed to sell the

20  drugs anyway.  She knew what was written on those labels.  She

21  had to read them because she was organizing them.  She knew

22  which were the unlabeled drugs, and she requested them.  She

23  even asked for labels.  She requested hundreds of labels so

24  that she could label the bottles herself.  At one point, the

25  defendant even tried to get her own labeler so that she could

1   create labels.

2          The defendant testified that she did not create the

3   labels, but she knew what was on them.  She knew the language

4   was misleading, she knew information was missing, she knew when

5   she was sending out unlabeled bottles that there was a purpose

6   behind keeping those bottles unlabeled.

7          Now, remember, the defendant told you about her search

8   and the nasogastric tube and how she needed to keep herself out

9   of trouble, and remember also the defendant was dealing with

10  people in the industry all the time, every day; calls, texts,

11  in-person meetings, small talk.  She was responsive to her

12  buyers.  She knew what they were concerned with, and she knew

13  that if these labels were honest, that would cause them

14  problems.

15         That's why when a particular buyer wanted the

16  defendant to send drugs to the racetrack stable gate, the

17  defendant and Seth Fishman left.  They joked about sending the

18  drugs to the race commission office.  Why was it a joke?  Well,

19  because it was obvious that it was not allowed.  It was so

20  obvious that they had to do everything they could to keep it

21  away from the racing commissions.

22         Now, how else do you know the defendant was trying to

23  mislead and deceive others?  How else do you know she was not

24  operating out in the open?  Well, because she was careful about

25  who she sold products to.  She wanted to make sure the people

1    buying her products wouldn't get caught and wouldn't turn her

2    in.  And that takes us to our next point:  The steps the

3    defendant took to avoid snitches.

4           That's not my word.  That's the word on the product

5    sheet that the defendant handed out to trainers.  We've already

6    gone over this.  The labs could never detect unless a snitch

7    "tuned" a bottle in and the racing authorities decided to make

8    a test.

9           The defendant's coconspirator, Seth Fishman, well, he

10   talked about snitches, and specifically, the number of snitches

11   among standardbred racehorse trainers.  At any given time, you

12   know 10 percent of the equine population racing standardbreds

13   will snitch.

14          So what did the two of them talk about when they

15   talked about potential buyers?  They asked around to see if the

16   buyer could be trusted to keep their mouth shut.  They vetted

17   people.  They got referrals from existing buyers.  They started

18   new buyers on small everyday stuff, and then they crept them up

19   to the more serious PEDs that Equestology was known for.

20          On a call between Seth Fishman and the defendant, they

21   talk about one of these buyers, and Seth Fishman says, I didn't

22   want to talk to him because I didn't know if he was

23   trustworthy.  And listen to the defendant's response.

24          (Audio played)

25          MS. MORTAZAVI:  Look carefully what's said here.  They

M556GIA2                    Summation - Ms. Mortazavi

1    don't say they're worried about selling to someone.

2    Seth Fishman said he's worried about talking to someone.  This

3    conversation doesn't mention debt, bills, collections, credit.

4    Just a conversation.  And the defendant tells Seth Fishman, go

5    ahead, talk to him, he can be trusted because he's a friend of

6    a trusted client.  That's how they talked about a lot of

7    people.  Seth Fishman:  Can you trust Corey?  The defendant:

8    Yes.  The defendant refers to someone who's asking for blood

9    builders and Seth Fishman writes:  Can we -- as in he, the

10   buyer -- be trusted?  The defendant writes back; eh, kind of.

11          Remember Adrienne Hall, the trainer who testified?

12   Well, even she was a referral from someone else, from an

13   existing customer, Daniel Maier.  Only after that did the

14   defendant send Adrienne Hall the product sheet with

15   Equestology's new products, and only then did Seth Fishman

16   start to engage with Adrienne Hall.  Ross Cohen and Conor

17   Flynn, well, remember, they were referrals of Richie Banca,

18   another existing client of the defendant's.

19          The defendant talked to Seth Fishman about starting

20   off someone slowly, get the everyday supplies before opening

21   the door to bigger stuff.  Those are the defendant's words.

22   That's the defendant's plan to protect herself and to protect

23   the conspiracy.  Not debt collection.  Not lost commissions.

24   Trusting someone to be discreet.

25          On another intercepted call, the defendant, again

1    talking to Seth Fishman, tells him again she'll start out with

2    baby steps with a particular client, put in a couple orders,

3    and we will go from there, and then the defendant will handle

4    him.

5         And all these calls and texts, you know that it had

6    nothing to do about collection.  It had nothing to do with

7    someone's ability to pay their bills.  How do you know that?

8    Your common sense.

9         If the defendant was worried about payments, she could

10   just take it up front, like every other store, every other vet,

11   every other pharmacy.  She could refuse to advance people

12   drugs.  This had nothing to do with whether money was

13   creditworthy.  Even when the defendant had someone's credit

14   card information, their payment information on file, she still

15   talked about whether or not they were trustworthy.

16        Let's go back to Government Exhibit 320FA.  Look at

17   what the defendant and Seth Fishman are talking about here,

18   about this buyer, and whether he can be trusted.  The defendant

19   already says he pays.  But then they keep talking about whether

20   he's trustworthy because they aren't talking about payment;

21   they wanted to know if they could trust someone with their most

22   sensitive, most powerful, most secret drug:  Blood builder.

23        Look at this text message.  The defendant tells

24   Seth Fishman that she has credit card information on file, and

25   Seth Fishman still asks can he be trusted.  And the defendant

1  agrees to ask around.

2              (Continued on next page)

1          MS. MORTAZAVI:  In an e-mail.  The defendant and Seth

2     Fishman talk about what to sell a particular client.  Seth

3     Fishman asks:  If you trust him, we can use blood builder.  And

4     he later asks again:  You trust him.  The defendant writes:  70

5     percent.

6          What does Seth Fishman say?  Get payment up front.

7     Get cash.  Don't front him any drugs.  No.  He writes back:  We

8     sell him some products.  We sell him TB7 and PEG-2 Equimass and

9     avoid blood builder for now.  And the defendant says:  OK.

10    Because it's clear.  Blood builders are banned.  Keep it under

11    wraps.  Find out if you can trust someone to keep their mouth

12    shut before you sell that drug to them.

13         In yet another text message the defendant refers to

14    someone to Seth Fishman and writes:  He is OK to talk to.  They

15    don't talk about payment here either, it's just a conversation,

16    but talking about what scares them, because they are scared of

17    getting caught.

18         You heard in this trial about how the defendant is

19    organized.  She was.  She kept credit card information on file.

20    She billed buyer's credit cards.  If the payment didn't go

21    through, well, she followed up.  She got payment.  She could

22    always do that before she fulfilled an order.  If someone

23    didn't have payment, she didn't sell to them.  Just like any

24    other seller.  That's because trusting customers had nothing to

25    do with payment information.  Trusting customers is how people

1   talk when they have something to hide.

2          Now, how else do you know that the defendant -- how

3   else can you find from all the evidence that you have heard

4   over the course of this trial that the defendant was deceiving

5   people?  Well, because the defendant outright lied.

6          Remember the complaint that was lodged against the

7   defendant by the State of Delaware in 2011, that complaint

8   filed against the defendant after she had sold the drug that

9   was not approved by the FDA.  The complaint accused her of

10  selling medications, needles, syringes from the back of her

11  vehicle, of selling drugs when there was no valid vet

12  client/patient relationship of being in the medication sales

13  business strictly for profit.

14         The complaint even said, in no uncertain terms, by

15  sealing an approved drug the defendant may be committing

16  violations against the FDA and the DEA.  The defendant was

17  told, as of 2011, this type of conduct could be a violation of

18  federal law.  Selling an unapproved drug could violate federal

19  law.  Selling a drug if you're not a veterinarian could violate

20  federal law.  When the defendant was caught, she lied.  She put

21  in a response that said, it would be professionally

22  irresponsible to say she was selling drugs.  But of course

23  that's what she was doing.  Of course she was selling drugs.

24  Seth Fishman was making them.  She was selling them.  She was

25  earning a commission on her sales.  And she categorically

1  definitively denied it.

2          Remember, the defendant attested that the facts in

3  that letter that she submitted were true and correct.  She

4  reviewed it.  She could have corrected it.  If she really had

5  nothing to hide, she would have corrected it.  Because that

6  letter, those statements, saying that the defendant has nothing

7  to do with sales, that's deeply misleading.

8          It wasn't just the letter.  The defendant was also

9  interviewed.  Even though there were no criminal charges that

10 would be filed against her, she lied.  Even though she was told

11 this was a purely civil matter, she lied.  She said she was

12 just a delivery person, the UPS driver.  She doesn't even check

13 the bottle for prescriptions.  She just takes Orders.  When she

14 was asked if a box was marked with a prescription on it, she

15 said she couldn't remember, and then she repeated the lie.  I'm

16 just a delivery driver.  I'm just the UPS guy.  I don't even

17 look at the boxes.

18         The defendant was not telling the truth.  The record

19 that's been presented at this trial makes that clear.  She

20 incorporated Equestology.  She cosigned the bank account.  She

21 was earning a commission for her sales.  She was the one asking

22 if Seth Fishman could come up with new drugs.  She was the one

23 cold-calling clients.  She was the one stockpiling hundreds and

24 hundreds of bottles of drugs that she could sell, unapproved

25 drugs that Equestology was making.  She was the one ordering

1    prescription drugs in bulk from pharmacies and compounders.

2    She was the one who mailed packages and used an actual UPS

3    driver to deliver them.  But those lies that the defendant told

4    eventually worked.

5         Now, you heard the defendant's testimony on this

6    point.  Let's say for a minute, we believe that the defendant's

7    trusted partner did not tell her about the fact that he got the

8    case dismissed by calling in a political favor.

9         Let's pretend for a moment that Seth Fishman told

10   Adrienne Hall, a person he'd only known for a few weeks, that

11   he had called in a political favor to get an inquiry into him

12   dismissed, but that he said nothing about this to the

13   defendant, whom he had known for years, who he talked to all

14   the time.  Let's say we believe that Seth Fishman kept this to

15   himself and never told the defendant.  Well even then, as far

16   as the defendant knew, she lied to the Delaware Division of

17   Professional Responsibility and the complaint was dropped.

18   That meant that the defendant could keep selling drugs.

19        Which brings us to the last reason you know the

20   defendant's intent.  Because of how she used Seth Fishman's

21   veterinary license as a shield.  She used his license to order

22   drugs.  If anyone asked questions, she could always just point

23   to the vet.  It's his license.  It's his practice.  I was just

24   doing what I was told.

25        Seth Fishman didn't treat animals.  You know that from

1    the transcript.  You can tell that from the record.  The

2    transcript of Courtney Adams testimony, Government Exhibit

3    17001.  Seth Fishman himself said it in a recorded call in

4    2018.  He had only touched one horse in the last four years.

5    The defendant claimed in her testimony that she had no idea the

6    defendant didn't examine horses.

7         But ask yourselves, ladies and gentlemen, does that

8    make sense to you?  The two of them were in regular contact.

9    Does your common sense tell you that they would never talk

10   about it, one way or the other?  Never mention a client visit.

11   Never mention running into the defendant's buyers.  Never

12   mention traveling to go to these barns to examine horses.

13   Listen to the calls between the defendant and her buyers, calls

14   where Seth Fishman's name is never mentioned.  No horse name is

15   ever mentioned.  No prescriptions are ever mentioned.  Then

16   also consider the testimony of the trainers who testified at

17   this trial that Seth Fishman never examined their horses, and

18   the defendant knew it.

19        Adrienne Hall, when she asked to be put in touch with

20   Dr. Seth Fishman because she needed a vet to examine her

21   horses, Adrienne Hall was told by the defendant he did not do

22   that type of work anymore because he had a bad back.

23        Ross Cohen, who dealt with the defendant all the time.

24   He saw the defendant constantly, but not Seth Fishman.  Seth

25   Fishman came by once so that he could say that he did it.  And

1  during that one visit, well he didn't even examine any of Ross

2  Cohen's horses.

3          Sometimes even the defendant had a hard time getting a

4  hold of Seth Fishman, but that didn't stop her from selling

5  drugs.

6          In fact, the defendant didn't like it when people

7  talked to Seth Fishman, so she tried to keep him away from

8  clients.

9          (Audio played)

10          MS. MORTAZAVI:  You have also heard that Seth Fishman

11  left the country a lot, and the defendant knew that too.

12          Seth Fishman can't be in two places at once because

13  there is a difference between practicing medicine and having a

14  veterinary license.  A veterinary license helps you get drugs.

15  A veterinary license gives you cover for selling drugs.  But a

16  veterinary license doesn't mean that you are practicing

17  veterinary medicine.  The defendant used Seth Fishman's vet

18  license when it was convenient for her, and the defendant used

19  Seth Fishman's signature when she wanted that too.

20          Ladies and gentlemen, there is one more reason you

21  know that the defendant was not acting in good faith.  You know

22  that because of what the defendant did.  You can find that in

23  your deliberations because of what the defendant did after she

24  learned that her employer's drugs were seized, after Seth

25  Fishman had been detained, after he had to go to court.  The

1   defendant continued to sell Equestology's drugs.

2           Look at what she says in this text message:  We'll get

3   through this.  Don't worry about me on my side.  I will keep

4   things rolling.

5           That's exactly what the defendant does.  The defendant

6   doesn't stop when her supplier gets in legal trouble, when her

7   supplier has his drugs confiscated.  She goes back to doing

8   what she was doing, soliciting clients, trying to boost sales.

9   It's Lisa from Equestology, just checking in to see if you need

10  any vet supplies each week or if you wish for me to take you

11  off the list.  It's Lisa from Equestology.  Just checking in to

12  see if you need any supplies.  Hello.  Just checking in to see

13  if you are going to need any supplies.  All messages that were

14  sent after the fall of 2019 and after the defendant had learned

15  that Seth Fishman had had his drugs confiscated, had been

16  detained, had showed up to court.

17          The defendant actually sold Equestology's drugs, which

18  you can tell from the records in the Avimark system.

19          That, ladies and gentlemen, is not the behavior of

20  someone who is trying to follow the law.

21          Based on how the defendant talked about her end of

22  Equestology, her product, her clients, from the lies she told

23  Delaware, she knew what she was doing was wrong.  She knew if

24  she were caught she would get in trouble, so she entered into a

25  conspiracy that was built on deceit.

1   For all those reasons, ladies and gentlemen, we ask

2   you to reach the only verdict that is supported by the law and

3   the evidence, and that is that the defendant, Lisa Giannelli,

4   is guilty.

5   THE COURT:  Thank you, Ms. Mortazavi.

6   Mr. Fasulo, do you wish to proceed now?

7   MR. FASULO:  I am, Judge.  Can we have five minutes so

8   I can --

9   THE COURT:  Why don't we take a short stretch break,

10  everyone.

11  We are going to press ahead so that Mr. Fasulo gets

12  his closing statement in.  Then we will come back for a brief

13  rebuttal by the government after our lunch break, I will charge

14  you, and the case will be submitted to you at that point.

15  Please, one last time, leave your note pads here.  It

16  is very important that you not talk about the case, that you

17  keep an open mind until you hear -- the evidence is closed, but

18  that you do not talk about the case until it is submitted to

19  you and you go inside to deliberate.

20  Thank you.  We are just taking a very short break.

21  (Jury not present)

22  THE COURT:  Please be seated, everyone.

23  Is there anything we need to talk about?

24  MS. MORTAZAVI:  Not from the government.

25  MR. FASULO:  I just need five minutes.

1      (Recess)

2           THE COURT:  Mr. Fasulo, you are ready to proceed?

3           MR. FASULO:  I am, Judge.

4           THE COURT:  Ms. Dempsey will bring the jurors in.

5           (Jury present).

6           THE COURT:  We are going to see what we can do about

7      the temperature in here.  It is a little chilly I noticed.

8           Mr. Fasulo, please.

9           MR. FASULO:  Thank you, your Honor.  Can I take my

10     mask off?

11          THE COURT:  Yes.

12          MR. FASULO:  When I came to you in the beginning of

13     this case, I told you this case was about one thing that I'd

14     like you to focus in on.  The judge is going to give you a full

15     instruction on the law, and you are to follow that law as the

16     judge gives it to you.

17          This case is about intent.  What was Lisa Giannelli's

18     intent when she worked for Dr. Fishman and the company called

19     Equestology?  Let me start with the company, Equestology.  You

20     heard a lot about the company and the fact that Lisa Giannelli,

21     my client, who this case is about, who you are going to render

22     a verdict on in just a few minutes, or how long it takes you to

23     do after you deliberate, you are going to judge whether or not

24     the government has met its burden of proof as to the crime

25     charged in this indictment against Ms. Giannelli.

1      It goes to -- what I want to focus on this morning

2  with you is the word intent.  I want to focus on Equestology.

3  What was it.  We heard that Equestology was incorporated by Ms.

4  Giannelli.  We also heard that it was Seth Fishman's company.

5  How do we know that?  There was a letter submitted in 2011

6  which you saw from Benjamin Schwartz which specifically said:

7  It is Seth Fishman's company and Lisa Giannelli worked for Seth

8  Fishman.

9      Let's not be unclear about that.  There is nothing

10  else in the evidence here that indicates that Equestology was

11  anything other than Seth Fishman's company, not Lisa

12  Giannelli's company.  You also know it's Seth Fishman's

13  company, because Lisa Giannelli was paid a portion of the

14  collectibles that she was able to make as her compensation for

15  working for Seth Fishman.  She told you that.  You saw checks

16  that were made out from her to herself reflecting that

17  commission based -- commission based on recoverables versus

18  commission based on sales.  However you want to look at it, she

19  was paid based on what monies were recovered in relation to the

20  sales that she was involved in, and you see that.

21      And you see that over the course of the year the

22  government put up a demonstrative that you were able to see.

23  You were also able to look at the bank statements, and the bank

24  statements will show you that over the course of a time that

25  the government picked out, which was a five-year period,

1 approximately, there is about $4.5 million that was taken in

2 revenue.  Of the $4.5 million, the portion that was allocated

3 to Lisa came out to 140, $150,000 a year during that period of

4 time.  You could see that that that was a small percentage and

5 a percentage that is consistent with her testimony on the

6 witness stand.  Lisa Giannelli was an employee of Dr. Seth

7 Fishman.

8         We use the word Seth Fishman in the trial, but let's

9 not be confused.  Seth Fishman was a licensed vet.  Lisa

10 Giannelli was never a licensed vet.  As a matter of fact, of

11 all the witnesses that testified here in the courtroom, whether

12 it be Cohen, whether it be Flynn, whether it be Adrienne Hall,

13 whether it be Cole, whether it be Bowman, any of those

14 witnesses, their education and background far exceeded the high

15 school educational background that my client, Lisa Giannelli,

16 attained.  College graduates, advanced degrees, and Seth

17 Fishman, a doctor.  Not only a doctor, but a doctor of

18 veterinarian medicine.

19         He was licensed in certain states.  He had certain

20 responsibilities as to that license and it was his

21 responsibility to deal with the -- heard it before -- the VCPR,

22 veterinarian client patient relationship, between himself and

23 his patients.  That was his obligation.  She was his employee.

24         Let's also be clear about another fact.  This case is

25 not about whether or not Lisa Giannelli engaged in the sale of

1     items.  That's not what this case is about.  This case is not

2     about whether or not she had the basis to be able to distribute

3     those items or ship those items overseas.

4          This case is about what the judge is going to charge

5     you about, which is the misbranded adulterated drugs with the

6     intent to defraud the racing commission.  That's what this case

7     is about.  It's not about any of those other things.  It's not

8     anything about whether some drugs were on the FDA approved

9     list, were over-the-counter drugs, were special proprietary

10    drugs of Dr. Seth Fishman that he created.  It's about whether

11    or not they were misbranded, they were adulterated and, most

12    importantly, whether they were distributed with the intent to

13    defraud the racing commission.

14         One thing that was interesting in all the testimony,

15    you heard the experts in this case, and you heard that the

16    experts in this case came to the witness stand, and they

17    testified as to the various drugs that the government put in

18    front of them, the compounding -- the compounds that were in

19    those drugs, the chemical composition of those drugs.  Not from

20    a lab report, but actually just from the labels.  And you heard

21    the trainers testify that they knew what those labels were and

22    what those drugs would do.

23         Everyone knows, is what the government said in their

24    closing statement, everyone knows what was going on, and that's

25    true.  Everybody knows what those drugs were.  They weren't

1    hidden.  Take a look at all of the labels that were submitted

2    in this evidence, and you saw during the course of the trial

3    that we had testimony.  We had stipulations.  We had documents

4    introduced.  We had physical evidence, as the government has

5    right here.  Physical evidence.

6          Some of the physical evidence, what you saw earlier in

7    the case, was a whole tray of evidence that the government

8    brought in with all different labeled items, photographs of

9    items that were taken from the Delaware residence of Lisa.  All

10   of that is in evidence.

11         And when you look at those labels you will clearly see

12   there are names on those labels, and they clearly identify

13   names of those products, and they clearly, from the testimony

14   of Cole and Bowman, two experts in their field, one with the

15   FDA, one with an advanced degree that studies the horse drug

16   industry and studies it down in Florida, is a professor, writes

17   a number of articles, she testified here.  And she told you

18   that just by looking at the labels that these are the things

19   that are in the items, these are the intended use of the items,

20   and this is what they were used for.

21         So you say to me, why is that important?  Well, it's

22   important because if they know it and everybody knows it, who

23   are we deceiving?  Who is Ms. Giannelli deceiving?  If the

24   track, the racing commission, saw those labels, they would have

25   the same labels that the government asked these witnesses to

1  look at and to assess as to what they were and when and if they

2  can be used at the track.  It's all there.

3          How else do we know it's not deception?  Where did

4  this happen?  Where was Lisa working from?  Her home in

5  Delaware.  How do we know that?  She testified to that.  The

6  government told you that they recovered items from there.  And

7  in fact she shipped items via UPS, via Fed Ex from that

8  location.  It was all over the place.  It's not hidden.  It was

9  clearly all over the place.  Those items then went to barns,

10  they went to trainers, they went to owners, and they all

11  indicated Delaware, Lisa's home.

12          What else do we know?  We know that there were

13  invoices.  We know there were invoices.  You saw the invoices

14  here at trial.  What did the invoice say on it?  The invoice

15  said on the top of it, Equestology.  Anything I am speaking

16  about during my closing argument you have the right to see.

17  Any piece of evidence you can request while you're in the jury

18  room.  Anything you can see.  It's not what I say that counts.

19          Because all this is is my closing argument.  It's my

20  chance to have the last word with you to tell you what the

21  defense believed was and wasn't proved in this case.  But the

22  evidence all came from the witness stand and the evidence was

23  all admitted before the both parties rested in this case, and

24  you are welcome to see all of that evidence.  One of the pieces

25  of evidence -- you can take a look at this -- it's a sample of

1    the invoices.  There is a bunch of those invoices in evidence.

2    You can see in this invoice, this secreted, deceptive,

3    practice.

4         What do we see?  The name of the company, Equestology.

5    What else do we see?  125 Jennifer Lane.  Why is that

6    important?  If Lisa Giannelli was seeking to defraud and keep

7    this secretive, would it make any sense for her to put her home

8    address on an invoice that's being sent out to thousands of

9    clients that Equestology worked with?  It's right here, right

10   here.  Not only on the invoice is the same of Equestology and

11   her address, it also lists the products, not in summation form,

12   not in some sort of secret form.  It lists exactly what was

13   bought, exactly for that particular barn, that particular

14   horse, right here.  You will see, also, the payment.  These

15   invoices are here.  You can look at them.  But this is what the

16   government says showed you that Lisa is being deceptive to

17   defraud the racing commission.  It's right here.  Right here.

18        Also, right here in evidence, Government Exhibit 5107.

19   What's that?  On top, Lisa Ranger.  Her phone number,

20   Equestology, 125 Jennifer Lane, Felton, Delaware 19943.  We can

21   say that was deceptive, except that we know the government went

22   to that location, and what did they find?  They found Lisa

23   Ranger.  They found that's where she was.  They found a product

24   at that location, the same location that is on this Fed Ex

25   statement, where was it sent, who it was sent to, all through

1    UPS.

2           Government Exhibit 5016.  Again, Rick Dane.  Barn

3    supplies.  4950.  Where is it coming from?  Equestology.  Where

4    is it?  124 Jennifer Lane.  This is in evidence.  So everybody

5    knew that Equestology was selling products.  Everybody knew

6    that Seth Fishman was the vet and everyone knew, and Lisa told

7    you when she took the witness stand that if a medical question

8    came up, she would refer to Seth Fishman.

9           Now, am I saying to you here in my closing argument

10   that everything Equestology did was great, that it was the best

11   practices of a physician or that it was the best practices for

12   selling medications?  No, I'm not saying that.  But that is not

13   what's being charged here.

14          What's being charged here -- and if we look at the key

15   word here, what was Lisa's intent?  And we know that from not

16   only the evidence, but the conversations.  What do the

17   conversations say?  The conversations say that Seth Fishman was

18   a pretty shrewd individual, that Seth Fishman was a rambler.

19   You heard that from Adrienne Hall when she testified, saying

20   that Seth would go on about things that were unrelated.  I

21   would just say yes.  He would just ramble on.  You heard that

22   even Lisa said that Seth Fishman could lose clients because

23   they would talk to Seth Fishman.  And once they talked to Seth

24   Fishman, they didn't to be his clients anymore.  But that's

25   Seth Fishman.

1    How did Lisa meet Seth Fishman?  What was she doing?

2    She was a grooms person.  She was a trainer, 20 some years ago,

3    30 some years ago.  She was involved in the internal part of

4    the horse racing.  She is involved with horses.  She is married

5    to a trainer.  You heard, I believe, it was Conor Flynn who

6    talked about her first husband, Mr. Ranger, who was a trainer

7    and a rider, pretty well respected, and he kind of showed her

8    the way of the track.  She graduated high school.  She loved

9    working with animals.  She loved animals.  So did Adrienne

10   Hall, as you heard from her testimony.

11       During the time that Lisa worked, you heard that even

12   herself and trainer Ranger, her husband, they got caught up in

13   giving baking soda to the horse and they were suspended for a

14   period of time.  What is this?  This is about winning, right.

15   Everybody wants to win races.  Everybody is pushing the limits.

16       What do we know that happens.  We know these

17   substances are banned because you heard that from the FDA

18   person, and you heard it from other witnesses on the witness

19   stand, and some substances were not allowed to be given to

20   horses within a certain prescribed time by the racing

21   commission.

22       And you heard the term withdrawal, right, that there

23   were certain withdrawal periods that you would be allowed to

24   give medications to the horse, but that after that period of

25   time, whether it be 72 hours, 48 hours, whatever it was, at

1    that period of time you had to cease giving those medications

2    because at that time it would be a violation of the racing

3    commissions in the individual tracks or the individual states

4    where people were racing horses.

5          Let's be clear.  As Dr. Cole told us, that the

6    medications and the substances that Lisa had in her closet in

7    Delaware had legitimate uses for horses.  If you go through

8    Cole's testimony, I asked her specifically on many of the

9    medications whether or not there were legitimate uses for these

10   horses in the treatment of the animal.  She said yes.  But

11   there were some substances that needed to have a 48-hour

12   waiting period, some substances that needed a 72-hour waiting

13   period, etc.

14         And there was the whole idea that no substance should

15   be given on the day of a race, no substance should be given on

16   a day of the race.  I think that's the testimony that you heard

17   here in the courtroom.

18         So who is giving the substances?  Who makes that

19   decision and who takes that responsibility to push the limits?

20         Remember when I came up to you in opening statement

21   and I talked to you about boxing gloves.  I hate to use sports

22   analogies for anybody, but for me it works, so if you will

23   defer and listen to my sports analogy.  A boxer receives a

24   trainer, a trainer and a boxer are training for a ring, a

25   fight, and the boxer has not strong arms, and the trainer wants

1   to increase the strength of the boxer's punch.

2           One of the things that the trainer can do is he can

3   order what's called weighted gloves.  What weighted gloves are,

4   not just you have the glove, which is of normal boxing weight,

5   and each boxing class has different weights, but it is a glove

6   that has an additional weight to it so that when the trainer

7   actually punches, it's like a five-pound weight or a little bit

8   more than what's normal when you don't have the weighted glove,

9   and you are practicing and you are shrinking in your arm by

10  having that additional weight.

11          The trainer orders this.  He practices with the boxer

12  with those gloves.  The boxer has a big match, maybe in the

13  local facility, maybe at the Garden, wherever it may be.  The

14  trainer doesn't feel the boxer is up to par.  The trainer can

15  go in, act fairly and let the boxer take his punches and see

16  what the results are.

17          But this trainer decides, I am going to let him use

18  the weighed gloves.  That wasn't the intent of the person

19  selling those gloves, that they would be used in the ring, even

20  though there is nothing to believe that that can't be used that

21  way.  But it wasn't the intent.  Who has that responsibility?

22  Who has that responsibility?  The trainer made that thought.

23  The boxer followed the trainer's advice and used the gloves in

24  the ring.  And if they were not permissible, the boxer could

25  lose that and be defaulted in that fight.  That's the trainer's

1    responsibility.  That's boxing.

2         What did we learn about horse racing here?  We learned

3    about the ultimate rule that existed.  You heard the trainers,

4    both Cohen, Flynn, and you heard Ms. Giannelli speak about the

5    ultimate trainer rule.  That is, that the trainer has the

6    ultimate responsibility as to when and how to care for their

7    horses.  The trainer has the responsibility to know the rules

8    and regulations of the track, and the trainer has the

9    responsibility to adhere to those regulations.  And if they

10   don't, as you heard, it is the trainer or maybe even the

11   assistant trainer at times that will suffer the consequences of

12   that.  And what were the consequences from the racing

13   commission?  Suspension, 30 days, 15 days, you heard about

14   longer suspensions of six months, a fine of $500, and the horse

15   was not permitted to race for a period of time.  That's the

16   trainer's responsibility.

17        Lisa sold these drugs to owners and trainers of

18   horses.  They have the ultimate responsibility.  They make the

19   decision as to whether they are going to use the product or not

20   use the product.

21        Lisa Giannelli took the witness stand here in the

22   courtroom, and you will hear and have heard that in a criminal

23   case, and this is a criminal case -- this isn't a Delaware

24   corporation.  This is a federal criminal case in the Southern

25   District of New York.  In a criminal case the defendant, as she

1    sits there, is presumed innocent and will remain with her until

2    you go into the jury room and unless you decide otherwise.

3          The defendant, as she sits there, has no obligation to

4    present any evidence and, consistent with that, the defendant

5    need not testify at her own trial.  Here she took the witness

6    stand, and she told you about the ultimate trainer rule and she

7    told you, as she listened to calls, what those calls meant to

8    her.

9          You will be instructed by this judge, and you need to

10   follow that instruction, about credibility.  You will be able

11   to assess all the witnesses' credibility.  The judge will give

12   you guidelines that you will use in assessing credibility.  But

13   no matter what you do, you can't lose your common sense.  We

14   expect that you will use your common sense when you go in the

15   jury room, when you look at the totality of the evidence, all

16   the evidence and the words that are being said, who they are

17   being said from, and assess whether the testimony was credible.

18   When Ms. Giannelli tells you that she never instructed anybody

19   to use a substance on race day, that's what she said.  It's

20   right in the minutes.

21         The government will point to one instance of

22   Mr. Cohen -- let's talk about Cohen -- where Mr. Cohen got on

23   the witness stand, and you saw him testify.  If you remember,

24   he was one of the trainers.  And he testifies that sometime, I

25   think he said 2001, he purchased certain blood builder from

1   Lisa Giannelli, BB3.

2          What's really interesting about that is, you heard

3   Lisa testify as to when she began to work for Seth Fishman, and

4   in fact she wasn't even working for Seth Fishman.  And there is

5   no other corroborating information other than his words that he

6   had that conversation.

7          Why do I suggest to you that that's not credible?

8   Here is why.  Ms. Cohen also took the witness stand, and he

9   said that he entered into a deal with the government.  You saw

10  he was questioned about something called a cooperation

11  agreement.  There is nothing wrong with a cooperation agreement

12  and the Court will tell you that.  The government can choose

13  their witnesses and they can choose who to give a cooperation

14  agreement to, who to give a nonprosecution agreement to.

15  That's within the government's discretion.

16          But they gave him a deal.  As part of the deal he knew

17  that if he was convicted of this crime that's charged here and

18  he was charged against, that he was facing up to five years in

19  jail.  And he says that none of that, none of that cooperation

20  deal, was a consideration for his testimony here today.

21          Did he at any time before he was arrested on this case

22  give a call to the U.S. Government or to the arresting

23  commission and say, by the way, I just want to help you guys

24  out, here is what I want to do for you.  No.  When does he do

25  it?  He does it when he's crushed, when he is completely in a

1    bind, when he knows what he did in giving performance-enhancing

2    drugs at the racetrack, in violation of racing commission

3    rules.  He knew he was guilty because he pled guilty.

4            And he knew that if he came here and testified and he

5    testifies truthfully that the government will write a letter

6    for him and that that letter will be used by the judge in his

7    sentencing and a big consideration as to -- it will be a

8    consideration as to what his sentence will be.  When I asked

9    him whether he was hopeful that that would be a lighter

10   sentence, he refused to say that.

11           You know what else he refused, this witness, that

12   wants to have this one statement, which is contrary to what

13   Lisa testifies to, when I asked him, when he was involved in

14   buying drugs from others and selling them, who did you buy them

15   from?  I had that part read back.  And he said:  Do I have to

16   answer that question?  And you will see the judge instructed

17   him to answer the question, and then he gave the name of the

18   person he was selling drugs with.

19           Is this a voluntary witness who just wants to clean up

20   the horse racing industry, or is this a witness who is still

21   hiding facts?  It is up to you to judge.  It is up to you to

22   judge, many violations, suspensions of the racehorse.  But what

23   was the motive and reason for him to come here?  The government

24   will argue, you know what, if he doesn't tell the truth, that

25   can be used against him.  But who is to say what that truth is.

You are.  Because you are to evaluate that evidence, you are to

listen to his testimony, and you are to look at that testimony

in the context of what you heard from Ms. Giannelli as well.

There is no other evidence indicating in this case that Ms.

Giannelli instructed anyone to use these drugs on race day.

Now, were the drugs on the label, did they have, as

the government said, instructions?  He used strenuous activity,

four to six hours before the event.  You saw all that during

the presentation of evidence.  And you're welcome to look at

all the photographs again.  So, in fact, there were

instructions on these bottles when they could be used.

What's important about that?  Those instructions were

on the bottle.  And if the bottle was in the trainer's hand and

the horse had used that bottle, guess what, the trainer would

be held responsible, because it wasn't supposed to be used on

the track at the time that the horse raced.

What else was on the bottle of many of these labels?

Let's look at Government Exhibit 102A, VO2.  I think the

government talked a lot about -- you see this horse's head on

many of the items that were produced by Seth Fishman on what he

would call proprietary blend of amino acids or proprietary

blend.

What else was on this label?  I don't know if we can

see it as well from here.  It also indicates what it is.  VO2

Max.  You remember the witnesses' testimony about VO2 Max, both

1   Cole and Bowman, and you also remember seeing -- you also

2   remember seeing Government 711.

3            Maybe we can put 711 up.  That would be great.

4            THE COURT:  I don't think you can have it up while you

5   have something on the Elmo.

6            MR. FASULO:  I'm sorry.  Maybe it is easier for me to

7   refer to it.

8            You also remember seeing this document, which is

9   Government Exhibit 711.  You're welcome to look at this in the

10  jury room.  This was a document that Ms. Giannelli asked

11  Dr. Fishman to put together.  Why?  What did she say?  I didn't

12  give medical advice.  She must have said a hundred times, I

13  wasn't the vet, I'm not the vet, I work for the vet, I work for

14  the vet.

15           In her understanding of that relationship she

16  indicated to you that there were medical conditions asked, and

17  she was not the person to answer those questions.  So she asked

18  the doctor to put together information for clients so that they

19  can see what the doctor said these proprietary brands of his

20  would do and what value they have.

21           You can see that this document -- you're welcome to

22  look at all the 18 items that are listed on the document.

23  You'll see that the name is there, what it is.  Strong

24  painkiller and sedative.  An antiinflammatory for joints in

25  small doses will act as natural antiinflammatory.  Large doses

1  will act as a sedation.  Muscle growth factor.

2          This is something that Lisa had.  Where did she have

3  it?  She had it in her computer.  Put her name on top because

4  that's what she thought was the right thing to do.  She put her

5  phone number on top and she sent it out to clients, defrauding

6  the racing commission, hiding from race fixing.

7          How do we know that these are not Lisa's words?  One,

8  she told you.  But, more importantly, if you look at what's the

9  content of what's on these papers and the way these are

10  written, and you compare it to what Lisa says she did prepare

11  and did have available in her computer, this is how she would

12  write it.  This is what she would write about.

13          What is this about?  This is about administrative

14  duties where products were bought from, how to deliver

15  products, what companies she would order from, why she would

16  order from some companies versus other.  These are her words.

17  These are Dr. Fishman's words.  These are words of a vet.

18          Now, looking back, was it a good decision of Lisa

19  Giannelli to trust Dr. Fishman?  He gave her an opportunity.

20  He gave her an opportunity.  She was cleaning stalls of horses.

21  She was working and traveling with horses and trainers in

22  low-level jobs at the track.  He gave her an opportunity to

23  work with him.  And she had two jobs at one time, she explained

24  to you.

25          If we go back to 2011, we heard a lot about 2011,

1   right.  Let's be clear.  Lisa Giannelli is not charged in this

2   indictment with the acts that were committed in 2011.

3           MS. MORTAZAVI:  Objection.  Misstates the indictment.

4           THE COURT:  Let me see you both at sidebar.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At sidebar)

2    MS. MORTAZAVI:  Your Honor, the defendant has in fact

3    been charged with the conduct that underlies the acts alleged

4    in the 2011 Delaware state complaint.  She is charged with

5    distributing adulterated misbranded drugs.  The events that led

6    to the Delaware complaint are within the time period of the

7    conspiracy.  The nature of the conduct is within the time

8    period of the conspiracy.  And her deception to the Delaware

9    Division of Professional Responsibility is her deception to the

10   state board regulatory agency which is alleged in the

11   indictment.

12   It's incorrect for Mr. Fasulo to suggest that that

13   conduct is not charged.  It is direct proof.

14   THE COURT:  He doesn't say the conduct isn't charged.

15   I need to see the exact language, but I think his words were,

16   she is not being charged with the crime, and you yourself made

17   a point that Delaware was not a criminal matter.  It is a civil

18   matter.

19   MS. MORTAZAVI:  She is not charged under Delaware

20   criminal law.  The suggestion that that conduct is not part of

21   the indictment is an incorrect statement by Mr. Fasulo.

22   THE COURT:  Give me a moment.

23   MR. FASULO:  Can I just respond to this for a second?

24   THE COURT:  Sure.

25   MR. FASULO:  I am also going to say that the Delaware

1    commission, as we have stipulated to, agreed there was

2    insufficient evidence.  I don't want to mislead the jury that

3    in fact that in some way that that means that the charged acts

4    here are insufficient evidence.  So it's inconsistent for the

5    government to say that those are the same acts.  There is no

6    way to clarify this in front of the jury.

7            THE COURT:  I don't think that's correct.  I don't

8    think that's correct.

9            MR. FASULO:  I am going to make that argument.

10           THE COURT:  Let me look at what you said exactly.

11           What you say is she is not charged in this indictment

12   with the acts.  It doesn't say she is not charged with the

13   offense.

14           Actually, Ms. Mortazavi is right, that the acts are

15   charged in the indictment.  The offense is not.

16           MR. FASULO:  I'll clarify that, Judge.

17           THE COURT:  Either you clear it up or I will.

18           MR. FASULO:  I will.

19           (Continued on next page)

20

21

22

23

24

25

1    (In open court)

2         THE COURT:  You need to begin by clarifying the point

3    we just talked about.

4         MR. FASULO:  That case is not the case that existed in

5    Delaware.  The charges in Delaware are not the charges you as

6    jurors are going to determine here.

7         MS. MORTAZAVI:  Objection.

8         THE COURT:  No, that's permissible.

9         MR. FASULO:  And in fact, what do we know about the

10   Delaware charges in 2011?  First of all it was 2011, and

11   Ms. Giannelli submitted a statement as to what she was doing in

12   2011.  And there's nothing in the testimony here that's

13   inconsistent with the things she was saying in 2011.  And she

14   told you her role increased and changed from 2011 to the day

15   she was arrested in this case.

16        She went to farms and, in fact, there was a

17   conversation with Adrienne Hall where she says that the doctor

18   doesn't do that anymore.  Remember, he has a bad back, he

19   doesn't visit horses anymore.  That was in 2015.  And

20   Adrienne Hall, when questioned, she said -- you'll see in the

21   testimony that Lisa says that he doesn't do that anymore.

22        So in 2011, she indicated what she was doing, and what

23   was indicated was what she submitted.

24        And what else do we  know about 2011?  We know that

25   the end of that investigation, by stipulation, that there was

1    no action taken.

2            THE COURT:  Wait a minute.  We know it by stipulation.

3    Not by stipulation no action was taken.

4            MR. FASULO:  No, we know it by stipulation that no

5    action was taken.  And this stipulation was read into the

6    record.  You have a record of it.  It will indicate that there

7    was insufficient evidence.  That's what both parties stipulated

8    to, was the end result of the Delaware incident.  And what else

9    do we know?  We know that according to Ms. Giannelli, and

10   there's no other testimony in the record from that point

11   forward, no one, no one, ever contacted Lisa Giannelli to tell

12   her what she was doing was wrong, not in 2012, not in 2013, not

13   in 2014, '15, '16, '17, '18, '19.  Heard about Dr. Fishman

14   having been detained at some point and some items being seized.

15   Lisa didn't know what that was about.

16           And even from that point in 2019 to the time she was

17   arrested, no one from the FDA, from the racing commissions,

18   from the federal government, from the state government, ever

19   sent a letter or inquired of Ms. Giannelli what was going on

20   with Equestology.  Why is that important?  It doesn't mean they

21   had to.  It doesn't mean that their failure is monumental.  But

22   it does mean what was her state of mind.  What was she doing

23   every day?  What was she thinking?  Nobody says it's wrong.

24   Why would she think it was wrong?

25           And in addition to not anybody telling her it was

M556GIA4                    Summation - Mr. Fasulo

1    wrong, Dr. Fishman knew exactly what was happening.  And

2    Dr. Fishman had the Avimark system that you heard about here,

3    and Dr. Fishman had simultaneous connection to whatever Lisa

4    put into that Avimark system -- he knew what products were

5    being distributed, he knew who was buying those products, he

6    knew what the products were, and he knew the costs of those

7    products.  And nowhere during the term of her employment did

8    Dr. Fishman ever say to Lisa Giannelli, you can't do that.

9         If you're a doctor, you may know that.  If you work

10   for the FDA, you might know that.  If you have some idea of the

11   track and you have some sort of medical knowledge, you might

12   know that.  For a high school graduate relying on your boss,

13   showing up every day, doing your job as you're instructed, and

14   no one tells you it's wrong, no one from the outside, and no

15   one from the inside.  What was her intent?  What was her

16   intent?  Was she acting in good faith?

17        And you'll see that in the judge's charge, and I ask

18   you to pay specific attention to that part of the charge.  Look

19   at the way the judge defines good faith and the role it plays

20   in your deliberations.  Was she acting in good faith, that what

21   she was doing was the right thing to do, based on the doctor's

22   license?

23        Now, during cross-examination, the government asked a

24   lot about all the products that Lisa was involved in

25   distributing, offering for sale, who can get it, and you heard

1  her talk about open scripts.  That was her understanding.  Is

2  there such a thing as open scripts?  There's no testimony about

3  it.  That was her understanding.  If the person was in the

4  Avimark system or it was related to a barn that was in the

5  Avimark system, she was able to deal with that particular

6  client.

7          Let's go to trustworthy, and let's go to really what

8  was on Lisa's mind.  You heard that when she took over and

9  worked with the doctor in the practice that he had a lot of

10 uncollectibles.  He wasn't a really good business person,

11 wasn't really organized.  Lisa was very organized.  You saw the

12 way she kept cabinets in her home, saw the labels she put

13 underneath here, saw how she organized the items, saw how she

14 kept track of the people in the system.  You saw the invoices

15 that she produced, right?  She was organized.  And she also

16 knew that she would be paid on how well she was able to collect

17 from people.

18         So, yes, trustworthy has many different reasons and

19 many different definitions.  But one thing Lisa will tell you,

20 as she did here, that she was concerned about:  Would people

21 pay their bills.  Were they trustworthy to pay their bills.

22 The government said, well, you had credit cards on file, well,

23 use your common sense.  Just because a credit card is on file

24 doesn't the mean that credit card can't be denied, doesn't mean

25 you're going to get payment, right?

1   So Lisa was concerned about getting her money that was

2   owed on the products that were invoiced from her because, quite

3   frankly, if that money came in, she would make that money.  She

4   would make that money.  Baby steps.  Well, you can look at that

5   as baby steps, and then all of a sudden let's give them the

6   stuff that's illegal and go to the track.  That's one inference

7   that can be drawn from that for sure.  It's another inference

8   that can be drawn from that.  Use your common sense.

9   You go to the bank and say I need a million dollars.

10  The bank looks at your creditworthiness.  Maybe they'll give

11  you $100,000, you're good with $100,000, maybe you get a

12  $120,000, and then your credit line will expand as you show

13  that you're creditworthy, trustworthy.  Creditworthy.  Lisa

14  talked about that.  She talked about what she was concerned

15  about, and what she was concerned about was would people pay

16  their bills.

17  Seth Fishman had a lot of conversations.  And you saw

18  the government play many of them with many different trainers,

19  many owners.  And you saw those conversations, and you also saw

20  who was not a party to those conversations:  Lisa Ranger,

21  Lisa Giannelli.  Was not a party to those conversations.  And

22  none of those conversations came in where Lisa Giannelli was

23  the third party on those conversations.  It didn't exist.

24  Further, we know that Lisa had conversations, a lot of

25  them.  A lot of them with different people that were -- had

1     different horses.  And you could see from her conversations,

2     and you'll look at them, and I would urge you to look at them,

3     and to see that it was business for her, it was about getting

4     the items out to people, getting them on time, saving them

5     money on shipping, and then collecting the money that's owed.

6     That was her intent.  That was her intent.

7          It's from her words, from her actions, and from the

8     evidence that's produced in this courtroom.  And what were the

9     products?  There were various products.  Some of them you heard

10    were from Henry Schein.  Henry Schein was another pharmacy,

11    another distributor.  There were some from pharmacies, right?

12    Lisa ordered from pharmacies, and they'd be delivered to her,

13    and she'd send them out to clients.  Some of them produced by

14    Merck were vitamins in the inventory that she had.

15         Matter of fact, her inventory, if you remember -- at

16    least from the traveling inventory put into evidence, which is

17    Exhibit 709, there are 11 pages of different products that at

18    different times were available through Equestology.  And who

19    knew about these products and who said they should be

20    available?  Well, who paid for them?  Seth Fishman.  Who knew

21    they were available?  Seth Fishman.  Under whose license were

22    they available?  Seth Fishman's.

23         Did he ever have a VCPR relationship with a horse?

24    Not here to defend that.  I'm not here to say he did or did

25    not.  But I am here to say it wasn't Lisa's responsibility to

1   have that relationship with the horse.  It was the doctor's

2   responsibility.  He was the professional; she was the employee.

3        You'll also hear about a charge during the judge's

4   charge of conscious avoidance.  That pretty much -- the judge

5   will describe it.  But what I want to say to you is there's

6   nothing in the facts of this case that says Lisa consciously

7   avoided finding out.  She relied on the doctor.  He gave her

8   the medications.  He put those into the inventory at

9   Equestology.  He actually created the proprietary brand.

10       And when you talk about trustworthiness, one of the

11  things that came up was why it was important, and in the

12  conversation you can see it, what was important to Seth Fishman

13  as well.  What was important to Seth Fishman -- and you can

14  read into the evidence itself, was this idea of a proprietary

15  nature.  Because, quite frankly, some of the barns had their

16  own labels, wanted their own products.

17       They didn't want other people to know what they were

18  using, right?  Because they wanted to use the products that

19  they felt were going to best serve their needs.  And if other

20  people knew, that would not give them that slight advantage.

21  And Dr. Fishman had pro priority brands, as did other vets.

22  And you'll see other products by Dr. Crock.  It's not made by

23  Dr. Fishman, and it says proprietary.  Each of these doctors

24  created compounds that they believed were proprietary to

25  themselves and would have a value in the marketplace.

1    Now, what was in those products?  Whether they were

2  prescription drugs not prescription drugs regulated by the FDA,

3  not regulated by the FDA, that doesn't fall on Lisa.  That

4  falls on the producer of those products.  That falls on

5  Seth Fishman, the vet who produced those products.

6    You also see in Government Exhibit 5012,

7  Boothwyn Pharmacy, put this in, Seth Canaco Star, Seth Fishman

8  Vet, the name, intended to be used by a licensed professional

9  for resale.  See an expiration date, a lot number.  This was in

10  Lisa's cabinet.  This was delivered, as was the other products

11  that were on the shelves.  Did she pay attention to the

12  difference between this and any other product?  She did not.

13  She didn't believe it was her responsibility.  And you heard

14  her say that a number of times that it was the vet's

15  responsibility.

16    Another product that was on her shelf, Banamine,

17  produced by Merck, animal health, only for intravenous use in

18  beef or dairy cattle, not for use in dry dairy cows, veal cows.

19  For intravenous and intramuscular use in horses.  She received

20  it.  She distributed it.  If you look at this, what is on this

21  label that Lisa Giannelli would have questioned?  Ask yourself

22  that.

23    And, ladies and gentlemen, you're welcome to look at

24  all the products that the government put into evidence,

25  including the BB3, where it's labeled as BB3.  What's curious

1    about the BB3 is that Dr. Cole knew what it was.  Bowman knew

2    what it was.  The trainers knew what it was.  Just by the label

3    of BB3, blood builders and bleeders, sounds really bad, right?

4    But we heard why bleeders are used.  Horses, after strenuous

5    activities, will bleed, and these blood builders help to

6    sustain and reduce the bleeding of the horse.  Legitimate use

7    for the product.

8          Who made decisions to use those products when they

9    were to use?  That was the trainers and the vets.  What do I

10   mean by vets?  Well, you heard that from both Conor Flynn --

11   well, Conor Flynn, he said Dr. Fishman wasn't their vet.  They

12   had their own vet.

13         So, in fact, these items would be delivered to barns,

14   horses, as Conor Flynn said, would be under the care of other

15   vets, and these products would be available.

16         You know, we live in New York City here, or in the

17   Southern District of New York, because you're all from the

18   Southern District of New York.  It's very different than being

19   out in a barn in a farm out in Kentucky, in Pennsylvania, in

20   Delaware, right?  You have a barn.  You want to make sure you

21   have your products available, you can't just run downstairs to

22   your CVS or your Duane Reade.  You knew that these products

23   were available so that they would be available for the use on

24   horses.  And who decided how they were being used?  That would

25   be in the discretion of the people that had these drugs.

1       Finally, we're not here to tell you that trainers

2  didn't use these drugs in inappropriate ways and in ways that

3  are in violation of the racing commission.  I'm not here to say

4  that.  Because you heard from the trainers that took the

5  witness stand here that they did it.  And you even heard from

6  Adrienne Hall who says all she cared about were her horses.

7  They were like her children.  She cared about those horses, and

8  yet she used performance enhancing drugs on the horses before

9  they raced because she said she needed to do that to sustain

10  their ability to keep racing.  She testified to that, and she

11  cared about horses, right?

12       These are the people that were charged with when they

13  would be giving these medications and these drugs to the

14  horses.  It was their decision; not Lisa Giannelli's decision.

15  And she wasn't in a conspiracy with them, because at the end of

16  the day, one of the benefits of being in the conspiracy is you

17  get a benefit.  There was no benefit for Lisa Giannelli.

18       If a horse won the race, and if he took home $60,000

19  in purse winnings, she didn't get any of that money.  None of

20  the witnesses or none of the evidence in this case indicates

21  that she got any of that money.  None of the evidence in this

22  case indicates that she bet on horses or that she bet on the

23  horses from the barns where she was selling products.  None of

24  the evidence in this case indicates that she knew whether or

25  not the horse trainers were successful by using the products

1   and racing and winning.  None of the evidence.  None of it.

2           What's the benefit?  The benefit was that she sold

3   them, she got the money paid, and that was the extent of her

4   involvement.  What she wanted to do was to do a good job for

5   Seth Fishman, sell his products, collect money, and work her

6   16-hour days.  And she made good money doing it.  She made a

7   decent amount of money in what she did.  Should that in and of

8   itself -- you work hard, shouldn't be embarrassed about.  Don't

9   use that against Lisa Giannelli, the fact that she made money

10  for the hard work that she put in.

11          I ask you to look very closely at whether the

12  government can prove intent, and I think that after you look at

13  Lisa Giannelli's testimony in context with every other piece of

14  evidence that is introduced in this case, that you will see

15  that it was not her intent to defraud the racing commission,

16  not her intent to defraud the racing commission.

17          Ladies and gentlemen, you're about to engage in a very

18  important part of this case.  That's deliberations.  And before

19  you do that, the government, who has the burden of proof, will

20  have an opportunity to give you the last word.  I don't get a

21  chance to come up here and talk to you again.  Not happy about

22  that, but I don't get a chance to do that, but I'm not worried

23  about that because what I know is everything you need to

24  consider in this case you've heard.  Every piece of evidence

25  you need to think about when you do your deliberations is in

1    evidence.

2          And when the government says something to you, you can

3    call upon any of the evidence to question whether or not their

4    argument is viable or not viable.  And with all arguments,

5    you're welcome to accept part of it, reject part of it.  It's

6    only argument.  The evidence is what you've heard.

7          This is a serious case.  It is a serious case for the

8    government, it is a serious case for Ms. Giannelli, and the

9    only person on trial here today is Lisa Giannelli.

10   Dr. Seth Fishman is not on trial here today.  Dr. Seth Fishman

11   is not on trial here today.  The only person on trial is his

12   employee, Lisa Giannelli.  Do not speculate about that.  She's

13   the person you're asked to deliberate on, and you're going to

14   find that your experience of deliberating is probably going to

15   be the highest and the most valuable experience you have as a

16   citizen.

17         We believe in the system.  Ms. Giannelli believes in

18   the system.  The government believes in the system.  The Court

19   believes in the system.  It's an opportunity for people with

20   common sense, peers of people charged in crimes, to be judged

21   in a fair and impartial way.

22         I'm confident by the attention you've given to this

23   case, by your ability to look at the evidence, and the time,

24   the days that you've already put in, that you are going to give

25   that same attention when you go into the jury room, and that

1    you give the attention necessary to render a just and fair

2    verdict.

3           And it's our belief that at the end of this case, and

4    at the end of your deliberations, you will find that the

5    government, which has the burden of proof, has failed to prove

6    the element of intent beyond a reasonable doubt.  Beyond a

7    reasonable doubt.  And you will return that verdict in this

8    courtroom.

9           Thank you for your attention.

10          THE COURT:  All right.  Thank you, Mr. Fasulo.

11          So one thing I just want to comment on, Mr. Fasulo

12   said as he was concluding, what I know is everything that you

13   need to consider in this case you've heard.  The one thing you

14   haven't heard is my instruction to you on the law.

15          So at this point, we're going to break for lunch.  I'm

16   sorry that it's a bit later than we normally take lunch.  I

17   hope you're all doing okay.  If you can be back in 45 minutes,

18   that would be very helpful.  Because, as Mr. Fasulo, forecasted

19   for you, you will hear one more time from the government and

20   then I will charge you on the law after you get back from

21   lunch.

22          So please have a good lunch.  Leave everything here in

23   the courtroom.  Please continue not to discuss the case until

24   you retire to deliberate.

25          Thank you.

1        (Jury not present)

2        THE COURT:  All right.  Please be seated, everyone.

3        Is there anything for the record?

4        MS. MORTAZAVI:  Not from the government.

5        MR. FASULO:  Just to apologize.  I thought it was

6   going to be a little shorter.  I didn't anticipate that.

7        THE COURT:  All right.  I told the jurors 45 minutes.

8   There are two quick things on the jury charges that I want to

9   talk to counsel about, maybe we can do that before you leave to

10  go to lunch because I'd like to print the charges.  It's my

11  intent to give the jurors a copy of the charge, just so you

12  know that.

13        MR. FASULO:  No objection.

14        THE COURT:  So they can follow along.

15        MS. MORTAZAVI:  No objection.

16        MR. FASULO:  No objection from the defense.

17        THE COURT:  So I want to clarify these points and hear

18  whether any of you have anything further.  All right.  So can I

19  see Ms. Mortazavi and Mr. Fasulo and the court reporter in the

20  robing room?

21

22

23

24

25

1       (In the robing room)

2       THE COURT:  I'm sorry to keep you all waiting.  The

3   two edits that I missed earlier are the following:  One is on

4   charge number 10, which is intent.  I don't have the black

5   line --

6       MR. FASULO:  I think I have it.

7       THE COURT:  I think it's the 7th paragraph or so.

8   Intent to defraud or mislead can be demonstrated.  This is

9   where I told you before I added Custom and Border Patrol.

10      MR. FASULO:  Yes.

11      MS. MORTAZAVI:  Yes.

12      THE COURT:  It says, consumers, state racing or drug

13  regulators, and the Food and Drug Administration or other

14  federal drug enforcement, I think it should be "or," not "and."

15      MS. MORTAZAVI:  Correct, or at least I agree with

16  that.

17      MR. FASULO:  I think "or" is proper.

18      THE COURT:  Okay.  So we're going to change it to "or"

19  on consent of both sides.

20      Then the other edit that I've made is on the charge

21  number 34, the foreperson -- you don't even need to look at

22  this.  It says when the jury has reached a verdict, he or she

23  will notify the Marshal.  I'm inserting they'll fill out the

24  verdict form that I'm going to give you and you'll notify the

25  Marshal.

1        MR. FASULO:  Consent.

2        THE COURT:  And this is not part of the charge I'm

3   going to hand out, but obviously before they retire to

4   deliberate, I will tell the alternates that we're just charging

5   them, or we're releasing them but they need to stay on call.

6        MS. MORTAZAVI:  Okay.

7        THE COURT:  Okay?

8        MR. FASULO:  No objection to this as well.

9        THE COURT:  So I think we have consensual set of jury

10  charges subject only to your objection with respect to the

11  cooperation witness charge, correct?

12        MS. MORTAZAVI:  Correct.

13        THE COURT:  All right.  Thank you, everybody.

14        Have a good lunch.

15        (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

                            AFTERNOON SESSION

1                              2:30 p.m.

2

3           THE COURT:  Ms. Mortazavi, are you ready to proceed?

4           MS. MORTAZAVI:  Yes, your Honor.

5           THE COURT:  Ms. Dempsey, you want to retrieve the

6    jurors.  Thank you.

7           (Jury present)

8           THE COURT:  Thank you, ladies and gentlemen.  We are

9    in the home stretch.  You'll hear from Ms. Mortazavi at this

10   point.

11          MS. MORTAZAVI:  Thank you, your Honor.

12          Ladies and gentlemen, this is my last opportunity to

13   address you at this trial, and I'm only going to take a few

14   minutes of your time.

15          I am not going to be able to respond to every single

16   point my colleague, Mr. Fasulo, made in his remarks to you, but

17   I don't have to.  You've seen all the evidence.  You've been

18   attentive throughout this trial.  You've heard the testimony.

19   You've looked at the records.

20          And the evidence presented at trial says more than my

21   words ever could, so I am just going to address the few points

22   in the few minutes that we have together as this trial comes to

23   a close.

24          I want to make clear, as I make these arguments, the

25   defendant has no burden whatsoever.  It is the government's

1    burden from beginning to end, and we have more than met it at

2    this trial.

3        When the defense chooses to make arguments, we are

4    entitled to respond.  When they make arguments, you are

5    entitled to scrutinize it and ask yourself if it comports with

6    your common sense and if it aligns with all of the evidence.

7        You should ask yourselves, why is the defense spending

8    so much time talking about things that don't matter, things

9    that have no basis in the facts and things that have no basis

10   in the law?

11       First, why are we hearing from the defense about the

12   trainer responsibility rule?  It's total misdirection, a total

13   distraction.  Let me tell you, when you hear your instructions

14   from Judge Vyskocil in a few minutes, you are not going to hear

15   the trainer responsibility rule.  That rule just means that the

16   defendant knew that if she got caught, her buyer would get

17   punished by the racing commission.  It doesn't mean she didn't

18   commit a crime.  It doesn't mean that she wasn't trying not to

19   get caught.  It doesn't mean she was operating out in the open.

20   The defendant didn't want anyone to get caught.  She didn't

21   want her trainer buyers to get caught.  That was the whole

22   point of the conspiracy, keep the trainers out of trouble, give

23   them untestable drugs, keep them buying those untestable drugs,

24   keep them doping their racehorses.  That's all the trainer

25   responsibility rule means.

1    You are going to hear instructions from the Court in a

2  minute.  One thing you are going to hear is that in a

3  conspiracy different people play different roles.  They perform

4  different functions.  Some people have more of a role than

5  others.  It doesn't matter.  Everyone who is part of a criminal

6  conspiracy is liable for the criminal acts that they engaged

7  in.  They are still guilty.  And that doesn't change, whether

8  or not the defendant was a 1099 contractor, whether or not she

9  wrote the words that she put together and sent out to people

10 and asked her partner to write.  It doesn't matter what role

11 the defendant played if you find that she in fact played a role

12 in the conspiracy.  So all this talk, all this discussion about

13 who was leading Equestology, who was the vet, who made more

14 money, it is all a distraction.  Everyone in that conspiracy

15 can be held guilty.

16    Ms. Giannelli is the only one on trial today.  And

17 make no mistake, she is guilty.

18    MR. FASULO:  Objection.

19    THE COURT:  Overruled.  This is argument.

20    MS. MORTAZAVI:  What else is misdirection?  What about

21 the notion that the defendant never instructed someone to

22 administer a drug on race day?

23    First of all, it doesn't matter.  You are going to

24 hear from the judge everyone can play a different role in a

25 conspiracy and they would still be guilty.  The defendant

1    handed the trainers the needles and the drugs and the

2    instructions telling them what to do, telling them how to break

3    the racing rules, and reassuring them that they wouldn't get

4    caught.  And she did tell them.  She did tell them to use these

5    drugs on race day.

6           Ms. Jung, can we please pull up Government Exhibit

7    711, an exhibit that the defendant did not even touch.

8           That description is a VO2 Max that is Government

9    Exhibit 711.  That description that says it should be used

10   within hours of a race, that description of Equifactor that

11   appears later in this document that said it is untestable, the

12   defense didn't deal with it.

13          Ladies and gentlemen, Mr. Fasulo mentioned this.  I

14   will mention this as well.  I apologize your screens are not

15   working.  You are welcome when you are deliberating -- I will

16   cut myself off, but remember, ladies and gentlemen, you can

17   request any exhibit while you are in your deliberations.  If

18   Government Exhibit 711 is one you want to review, you're

19   welcome to do that as you're deliberating here today.

20          The defense didn't deal with the highlighted language

21   in Government Exhibit 711 because it is devastating.  It is

22   devastating proof that the defendant knew what these drugs

23   were, gave these drugs to trainers, sold these drugs, made a

24   commission off of these drugs that she had the state of mind

25   that the government has argued that she had that makes her

1    guilty of this crime.

2         The defendant testified yesterday that she was the

3    easy button and she was.  She was the easy button for trainers

4    who were looking to cheat.  She made it easy for them to get

5    the tools to deceive the racing commission.

6         What else is total misdirection?  Well, this notion

7    that Equestology operated out in the open because they had

8    their names on bank accounts and on invoices and on e-mails.

9    Remember, I told you that in my closing argument.  That's not

10   something that the government is running away from.  We

11   absolutely know that Equestology used its name on certain

12   records, but not on their bottles, not on the bottle of BB3,

13   the blood builder that you heard so much about.

14        Equestology's name isn't here and that's the point.

15   Because, as you heard over the course of this trial, there are

16   two ways that the racing commission catches people.  They do

17   drug tests and they do searches.  The drug tests are covered

18   because, as you have heard, Seth Fishman made the untestable

19   drugs that this defendant sold, so they were worried about

20   searches, the same search that led to the defendant years ago

21   getting a suspension because she was found with contraband by

22   the racing commission.  If someone from the racing commission

23   finds this bottle, they won't know who to go to.  They won't

24   know to go to the defendant.  They won't know to go to

25   Equestology.  They won't know that this is a blood builder.

1    Mr. Fasulo told you that everyone who testified at

2 this trial knew what BB3 was and, frankly, that's just plain

3 wrong.  Many witnesses there, including trainers, didn't talk

4 about BB3.  Adrienne Hall did because she actually received it

5 from Seth Fishman, but you remember what she said.  She said it

6 was unlabeled.  She referred to it by cap color, and she

7 couldn't even remember, is it a blue cap, is it a green cap.

8    The government's experts, they are the government's

9 experts, of course they knew what BB3 was.  They had been

10 working with the government.  It is not correct to say that

11 everybody knew what BB3 was.  It is not correct to say that

12 this was out in the open.  And the defense tried to tell you

13 that only an expert would know what was wrong with the labels

14 that Equestology slapped on their products.  No expert needs to

15 describe what's wrong with an injectable unlabeled, untestable

16 performance-enhancing drug that is being handed to trainers.

17    And you don't need me to tell you that, ladies and

18 gentlemen.  You know that.  You know that from your common

19 sense.  You know that from the evidence.

20    And the defense also said that the defendant didn't

21 have any benefit from buyers winning races.  She had no stake

22 in the purse money.  She had no interest whatsoever.  Of course

23 she did.  Of course she did.  Trainers who win races buy more

24 drugs.  Trainers who don't get caught keep racing, and they buy

25 more drugs.  Remember, the more drugs the defendant sold, the

1   more money she made.  She worked off commission, and you can't

2   earn a commission if you don't make sales, and you can't make

3   sales if your buyers keep getting caught by the arresting

4   commission.  You can't get sales if your buyers keep getting

5   their trainers license suspended.  You can't make sales if the

6   drugs don't work and the buyers stop buying.  So she had a

7   stake.  She had a stake in making sure that her buyers were

8   happy and making sure that they weren't caught.

9           Finally, ladies and gentlemen, I'd like to talk to you

10  about the Delaware complaint.  Why is that?  Why are the

11  defense's statements about that misdirection?  Well, for all

12  the reasons you've already heard throughout this trial, you

13  know from the stipulation, Government Exhibit 9013, a complaint

14  was filed in the State of Delaware against the defendant for

15  selling an unapproved drug in 2011.  The defendant was

16  interviewed in 2012.  The matter was then referred to a

17  prosecutor's office for prosecution that year, and only in 2013

18  did they determine no criminal charges would be filed, in part,

19  on the basis of the lies that the defendant told.

20          Two years.  Two years between the time that complaint

21  was filed stating that the defendant and her actions may have

22  been violating federal law.  What did the defendant say on the

23  stand when she was asked about that?  She was asked whether she

24  did anything to get herself training, to educate herself, to

25  find out more about these federal regulations that she was

1    violating.  In those two years between the time the complaint

2    was filed and the time it went away, she didn't do anything.

3         Why?  Because she wasn't operating in good faith.  She

4    wasn't operating in good faith then, she wasn't operating in

5    good faith before then, and she wasn't operating in good faith

6    up to the time she found out that her partner's drugs were

7    seized, that he had to go to court, that he was detained.  And

8    she certainly was not operating in good faith between 2019, the

9    fall of 2019, where she found out all that, and the date of her

10   arrest, March 9, 2020.  She kept trying to sell drugs.  She

11   kept trying to make her buyers those corrupt trainers happy.

12   That's what the defendant cared about.  And you know that from

13   the evidence.  Again, you don't need me to tell you.

14        You know how I said earlier that if you found that

15   there was an agreement between two people to sell just one of

16   these untestable, adulterated, and misbranded drugs, to sell it

17   across state lines, just BB3, just VO2 Max, just Equifactor,

18   well, that would be a basis for you to return a verdict of

19   guilty.

20        MR. FASULO:  Objection.

21        THE COURT:  Ladies and gentlemen, it's going to be

22   your decision whether the evidence supports a verdict of guilty

23   or not.  This is argument by Ms. Mortazavi.

24        You may continue, Ms. Mortazavi.

25        MS. MORTAZAVI:  Thank you, your Honor.

1    Here is something else I expect you are going to hear

2  in the Court's instructions.  The time period of the conspiracy

3  doesn't matter.  You can find that the defendant participated

4  in the conspiracy just from 2011 up to the date of her arrest.

5  You can find that she participated in the conspiracy just from

6  the fall of 2019 up to her arrest.  And that would be enough.

7  The government doesn't have to prove that she was violating the

8  law the entire time it was charged.  The government only has to

9  prove that she joined in this conspiracy, she joined in this

10  unlawful agreement, and she did it with the intent to defraud

11  or mislead, and the government has proven that throughout the

12  course of this trial.

13    Why misdirect you, ladies and gentlemen?  Well,

14  because the evidence against the defendant is devastating.  It

15  is devastating evidence of her guilt.  It's misdirection from

16  texts like this, texts where the defendant texts her partner

17  talking about a client asking to have something sent to the

18  racetrack stable gate and having Seth Fishman, the defendant's

19  partner, respond, ask her why not send it to race commission

20  office and have the defendant respond LOL.  To distract you

21  from her words, to distract you from the proof, to distract you

22  from the record, to distract you from the drugs.

23    Ladies and gentlemen, you've been attentive and

24  patient throughout this trial.  I want to thank you for your

25  time and for your consideration.  I am going to ask you once

1    more, once you conclude your deliberations, to return the only

2    verdict that is supported by the evidence in this case, the

3    record that's been presented, and by the law, which you'll be

4    instructed on in a moment.  The only verdict supported by the

5    law and the facts is the verdict of guilty.

6              THE COURT:  Thank you, Ms. Mortazavi.

7              Ladies and gentlemen, in a moment I am going to begin

8    to give you instructions on the law that you must follow in

9    rendering a verdict in this case.

10             If people want, you can take a stretch break for a

11   minute or two.  I do need to tell you the instructions are a

12   little bit lengthy.  We are going to go straight through.

13             The courtroom at this point, anybody who wishes to

14   leave the courtroom needs to do so now.  People cannot come in

15   and out during the charging of the jury.

16             We will just take a couple-minute stretch break and

17   I'll be back in a moment.

18             (Recess)

19             THE COURT:  Ladies and gentlemen, at this point I am

20   going to ask Ms. Dempsey and my clerk, Ms. Popper, to give you

21   a copy of the instructions on the law that I am going to

22   deliver in case -- you don't have to, but in case you wish to

23   follow along.  These are for your reference.  You may take

24   these instructions back with you into the jury room, but they

25   are not to leave the courthouse.

1    JUROR:  Can we write on them?

2    THE COURT:  You should not write on them.  During your

3    deliberations you can make whatever notes you want or anything

4    like that, but please do not take them out of the courthouse,

5    not tonight and whenever it is that you render your verdict.

6    Does everyone have a copy?

7    Ladies and gentlemen, my duty at this point is to

8    instruct you as to the law.  It is your duty to accept these

9    instructions of the law and to apply them to the facts as you

10   determine them.  Over the course of the trial, I have ruled on

11   what testimony and evidence is relevant and admissible under

12   the law for your consideration.  You must take the law as I

13   give it to you.  If any attorney has stated a principle, a

14   legal principle, different from any that I state to you in

15   these instructions, it is my instructions that you must follow.

16   You shouldn't single out any instruction as alone stating the

17   law, but you should consider my instructions as a whole when

18   you retire to deliberate in the jury room.  You should not, any

19   of you, be concerned about the wisdom of any rule that I state,

20   regardless of any opinion that you may have as to what the law

21   may be or ought to be.  It would violate your sworn duty to

22   base a verdict upon any view of the law other than that which I

23   give you.

24   Your final role is to pass upon and decide the fact

25   issues that are in this case.

1    You, the members of the jury, are the sole and

2    exclusive judges of the facts. You pass on the weight of the

3    evidence. You determine the credibility of the witnesses. You

4    resolve such conflicts as there may be in the testimony. And

5    you draw whatever reasonable inferences you decide to draw from

6    the facts as you have determined them.

7    I'll discuss with you later how to pass upon the

8    credibility or believability of witnesses.

9    In determining the facts, you must rely on your own

10   recollection of the evidence. The evidence before you consists

11   of the answers given by witnesses from the witness stand, the

12   testimony they gave, as you recall it, and the exhibits that

13   were received in evidence. The stipulations of the parties are

14   also evidence and so are the exhibits received pursuant to

15   those stipulations, including the audio recordings, the

16   photographs, and the physical evidence. You may also consider

17   the exhibits that were admitted as demonstratives.

18   What the lawyers said in their opening statements, in

19   their closing arguments to you today, in their objections or in

20   their questions is not evidence. You should bear in mind that

21   a question put to a witness is never evidence. It's only the

22   answer that is evidence. But you may not consider any answer

23   that I directed you to disregard or that I directed be stricken

24   from the record.

25   Nothing I may have said during the trial or may say

1    during these instructions with respect to a fact issue should

2    be taken in substitution for your own independent recollection.

3    What I say is not evidence.  Since you are the sole and

4    exclusive judges of the facts, I do not mean to indicate any

5    opinions as to the facts or what your verdict should be.  The

6    rulings I had made during the trial are not any indication of

7    my views of what your decision should be as to whether or not

8    the guilt of the defendant has been proven beyond a reasonable

9    doubt.

10           I also ask you to draw no inference from the fact that

11   upon occasion I may have interacted with certain witnesses.

12   Anything that I said was only intended for clarification or to

13   expedite matters and certainly was not intended to suggest any

14   opinion on my part as to the verdict you should render or

15   whether any of the witnesses may have been more credible than

16   any other witness.  You are expressly to understand that the

17   Court has no opinion as to the verdict you should render in

18   this case.

19           You are to perform the duty of finding the facts

20   without bias or prejudice as to any party.  You must have an

21   attitude of complete fairness and impartiality.  The case is

22   important to the government for the enforcement of criminal

23   laws as a matter of prime concern to the community.  Equally,

24   it is important to the defendant who is charged with a serious

25   crime.

1    The fact that the prosecution is brought in the name

2    of the United States of America entitles the government to no

3    greater consideration than that accorded to any other party to

4    a litigation.  By the same token, it is entitled to no less

5    consideration.  All parties, whether government or individuals,

6    stand as equals at the bar of justice.

7    The defendant has pleaded not guilty to the charge in

8    the indictment.  To convict the defendant, the burden is on the

9    prosecution, the government, to prove the defendant's guilt of

10   each element of the charge beyond a reasonable doubt.  The

11   burden never shifts to the defendant.  The law does not require

12   the defendant to call any witness or to produce any evidence or

13   to testify at trial.  The defendant starts with a clean slate

14   and is presumed innocent of the charge until such time, if

15   ever, that you, as a jury, are satisfied that the government

16   has proven the defendant guilty of the charge beyond a

17   reasonable doubt.

18   So what is reasonable doubt?  It is a doubt based upon

19   reason.  It's a doubt that a reasonable person has after

20   carefully weighing all of the evidence.  It's a doubt that

21   would cause a reasonable person to hesitate to act in a matter

22   of importance in his or her own life.  Proof beyond a

23   reasonable doubt must, therefore, be proof of a convincing

24   character that a reasonable person would not hesitate to rely

25   upon in making an important decision.

1    A reasonable doubt is not a caprice or a whim.  It is

2  not speculation or suspicion.  It is not an excuse to avoid the

3  performance of an unpleasant duty.  The law does not require

4  that the government prove guilt beyond all possible doubt.

5  Proof beyond a reasonable doubt is sufficient to convict.  If,

6  after fair and impartial consideration of the evidence, you

7  have a reasonable doubt as to the defendant's guilt with

8  respect to the charge in this case, you must find the defendant

9  not guilty.  On the other hand, if, after fair and impartial

10  consideration of all of the evidence, you are satisfied beyond

11  a reasonable doubt of the defendant's guilt with respect to the

12  charge, you should find the defendant guilty of the charge.

13    The defendant, Lisa Giannelli, was formally charged

14  with a federal crime by a grand jury in an indictment.  As I

15  instructed you at the outset of the case, the indictment is a

16  charge or accusation.  It is not evidence.  The defendant is

17  not charged with committing any crime other than the offense in

18  the indictment.

19    The indictment charges that from at least in or about

20  2002 through at least in or about March 2020, Lisa Giannelli,

21  the defendant, conspired with others, that is, agreed with

22  others to violate the federal criminal law prohibiting what is

23  known as drug adulteration or misbranding with the intent to

24  defraud or mislead.

25    A conspiracy is a kind of criminal partnership, a

1  combination or agreement of two or more persons to join

2  together to accomplish an unlawful purpose.  The crime of

3  conspiracy to violate a federal law is an independent offense.

4  It is separate and distinct from the actual violation of any

5  specific federal law, which the law refers to as a substantive

6  crime.  The crime of conspiracy is complete once the unlawful

7  agreement is made, the defendant enters into it, and an overt

8  act occurs.  If a conspiracy exists, it is punishable as a

9  crime, even if it should fail in its purpose.  That is, you may

10 find the defendant guilty of conspiracy to commit an offense

11 even though the substantive crime or crimes which were the

12 object of the conspiracy were not actually committed, were not

13 successful, or were impossible to achieve.  Congress has deemed

14 it appropriate to make conspiracy standing alone a separate

15 crime because collective criminal activity is believed to pose

16 a greater threat to the public safety and welfare than

17 individual conduct.

18        To sustain its burden of proof with respect to the

19 charged conspiracy, the government must establish beyond a

20 reasonable doubt the following three elements:  First, the

21 existence of the conspiracy charged, that is, an agreement or

22 understanding to violate one or more laws of the United States;

23 second, that the defendant knowingly and willfully became a

24 member of the conspiracy that you are considering; and, third,

25 that any one of the conspirators, not necessarily Ms.

1   Giannelli, but any one of the parties involved in the

2   conspiracy, knowingly committed at least one overt act in

3   furtherance of the conspiracy that you are considering during

4   the life of that conspiracy.

5        Now, I'll explain to you each of these elements in

6   more detail, and I'll start with the first element, the

7   existence of the charged conspiracy.

8        A conspiracy is a combination or agreement or

9   understanding of two or more people to accomplish by concerted

10  or collective action a criminal or unlawful purpose.  The gist

11  or the essence of the crime of conspiracy is the unlawful

12  combination or agreement to do something that violates the law.

13       As I mentioned earlier, the ultimate success of the

14  conspiracy or the actual commission of the criminal act, which

15  is the object of the conspiracy, is not relevant to the

16  question of whether the conspiracy existed.  The conspiracy

17  alleged here in this case is an agreement to engage in certain

18  kinds of acts that the law refers to as misbranding or

19  adulteration, whether or not those acts actually occurred.

20       To prove a conspiracy the government is not required

21  to show that individuals sat around a table and entered into a

22  solemn pact, orally or in writing, or had any express or formal

23  agreement stating that they have formed a conspiracy to do

24  something that violates the law.  You need not find that the

25  alleged conspirators stated in words or in writing what the

scheme was, its object or purpose, or every precise detail of

the scheme, or the means by which its objects or purpose was to

be accomplished.  Indeed, it would be extraordinary if there

were such a formal document or specific agreement.  Common

sense tells you that when people in fact undertake to enter

into a criminal conspiracy, a great deal is left to unexpressed

understanding.  From its very nature, a conspiracy is almost

invariably secret in its origin and execution.  Thus, you may

infer the existence of a conspiracy from the circumstances of

the case, the acts, conduct, and declaration of the alleged

conspirators, and the reasonable inferences to be drawn from

such evidence.

        To show that a conspiracy existed then, it is

sufficient if the evidence shows that two or more persons, in

some way or manner, through any contrivance, explicitly or

implicitly, came to an understanding to violate the law and to

establish an unlawful plan.  Express language or specific words

are not required to indicate assent or attachment to a

conspiracy.

        In determining whether there has been an unlawful

agreement, the adage actions speak louder than words applies.

Often, the only evidence available with respect to the

existence of a conspiracy is that of disconnected acts on the

part of the alleged individual coconspirators.  When taken

together and considered as a whole, however, those acts are

1    capable of showing a conspiracy or an agreement.

2            Of course proof concerning the accomplishment of the

3    objects of a conspiracy may be the most persuasive evidence of

4    the existence of the conspiracy itself, but it is not necessary

5    that the conspiracy actually succeeded in its purpose in order

6    for you to conclude that the conspiracy existed.

7            In short, as the first element of the conspiracy -- in

8    short, as far as the first element of the conspiracy is

9    concerned, the government must prove beyond a reasonable doubt

10   that at least two alleged conspirators came to a mutual

11   understanding, either spoken or unspoken, to violate the law in

12   the manner charged in the indictment.

13           An object of a conspiracy is an illegal goal that the

14   coconspirators agree or hope to achieve.  The indictment in

15   this case charges that the conspiracy alleged had three

16   objects.  Those objects are:  Object 1, the introduction of

17   misbranded and adulterated drugs into interstate commerce;

18   object 2, the misbranding or adulteration of drugs while they

19   were held for sale after they traveled in interstate commerce;

20   and object 3, the receipt of misbranded or adulterated drugs

21   shipped in spate commerce.

22           The indictment further alleges that the objects were

23   undertaken with the intent to defraud or mislead.  I'll define

24   the elements of these criminal objects in a moment.

25           Although the indictment alleges that the conspiracy in

1    this case had three objects or goals, the government does need

2    to prove that the conspiracy had all three objects.  You do not

3    need to find that there was a conspiracy to do all three of

4    these things.  It is sufficient if you find that the conspiracy

5    had just one of the charged goals.

6            However, you must be unanimous that one or more of

7    these goals existed, and you must be unanimous as to which goal

8    existed.  In other words, you may find that the conspiracy

9    charge existed as to all three objects of the conspiracy, but

10   you need only to unanimously find one such objective.

11           If you conclude that the government has proven beyond

12   a reasonable doubt that the conspiracy you are considering

13   existed, then you must next determine the second question,

14   whether the defendant participated in that conspiracy with

15   knowledge of its unlawful purpose and in furtherance of its

16   unlawful objective.

17           I will now describe the law with respect to the three

18   alleged objects of the charged conspiracy.  The first object of

19   the conspiracy is the introduction of misbranded drugs into

20   interstate commerce with the intent to defraud or mislead.

21           That offense has three elements:  First, the defendant

22   introduced or delivered for introduction into interstate

23   commerce or caused to be introduced or delivered into

24   interstate commerce a drug; second, at the time the defendant

25   introduced or delivered for introduction or caused the

1  introduction or delivery of that product into state commerce,

2  the drug was misbranded or adulterated in at least one way;

3  and, three, the defendant had the intent to defraud or mislead.

4        Interstate commerce means commerce between any state

5  and any place outside of that state.  To deliver something for

6  introduction into interstate commerce means to deliver it to a

7  place or service, such as the United States Postal Service, so

8  that the thing may then be put into interstate commerce with

9  the knowledge that that is what will occur.

10        It is not necessary for the government to prove that

11  the defendant herself carried the drug interstate or to prove

12  who carried the drug or how it was transported.  The term drug

13  means anything other than food intended for the use and the

14  diagnosis, cure, mitigation, treatment, or prevention of

15  disease in any animal, or intended to affect the structure or

16  any function of the body of an animal.  If an article is a

17  drug, then any and all substances or ingredients that are

18  intended to be used as a component of that article are also

19  considered drugs

20        To determine whether a product is either intended for

21  use in the diagnosis, cure, mitigation, treatment, or

22  prevention of disease in animals, or is intended to affect the

23  structure or any function of the body of an animal, you should

24  consider the product's intended use.  A product's intended use

25  is what a reasonable person would conclude the manufacturer,

1    seller, or dispenser of the product intended the product to be

2    used for based on all relevant information.

3         You can determine the intended use of a product by

4    considering the label and oral representations made about the

5    product, and any information from any other source which

6    discloses its intended use.  If there is no label accompanying

7    labeling promotional material, advertising, or oral

8    representation made about the product on a particular occasion,

9    you may still find that the product was intended for use as a

10   drug by looking at any other source.

11        A drug is misbranded if prior to being dispensed:  (1)

12   its labeling fails to contain any required information, which

13   includes a list of active ingredients, adequate directions for

14   use, and manufacturer information; (2) its labeling is false or

15   misleading in any particular way; (3) the drug is a

16   "prescription animal drug" and its labeling lacks the statement

17   "caution.  Federal law restricts this drug to use by or on the

18   order of a licensed veterinarian;" Or (4) the drug is a

19   description animal drug and it is dispensed without a valid

20   prescription or other order authorized by law in the course of

21   a veterinarian's professional practice.  A drug is adulterated

22   if it is an unsafe, new animal drug.

23        I'll now define for you the terms unsafe and new

24   animal drug.  A new animal drug is defined as a drug intended

25   for use in animals, the composition of which is such that the

drug is not generally recognized among experts qualified by

scientific training and experience to evaluate the safety and

effectiveness of animal drugs as safe and effective for use

under the conditions prescribed, recommended, or suggested in

the labeling thereof.

A new animal drug is unsafe and thus adulterated if

the U.S. FDA has not approved or conditionally approved a new

animal drug application for that drug.  The indictment here

charges that the first object of the conspiracy was to

introduce into, deliver for introduction into, interstate

commerce drugs that were misbranded or adulterated in one or

more of these ways.

You need not find that the conspiracy was to introduce

drugs that were each misbranded or adulterated in all of the

ways I have just described.  It would be sufficient if you

found beyond a reasonable doubt that a conspiracy existed to

introduce drugs that were misbranded in one or more of these

ways.

To assist you in determining whether that was so, I am

going to provide you with some additional definitions.  The

term adequate directions for use means directions under which a

person administrating or using the drug can do so safely and

for the purpose for which it is intended.  A product is a

prescription animal drug if it is a drug intended for use in

animals, other than man, and because of its toxicity or other

1   potentiality for harmful effect or the method of its use or the

2   collateral measures necessary to its use, is not safe for

3   animal use except under the professional supervision of a

4   licensed veterinarian.  A prescription animal drug is a drug

5   that can either be administered by a license veterinarian in

6   the course of the veterinarian's professional practice or can

7   be dispensed only upon the lawful, written, or oral order of a

8   licensed veterinarian in the course of the veterinarian's

9   professional practice.

10          A prescription or other order authorized by law is one

11  issued in the usual course of professional practice by a

12  license veterinarian for a legitimate medical purpose based

13  upon a bona fide veterinarian client patient relationship,

14  VCPR.

15          Prescription animal drugs are misbranded if they are

16  not administered by a license veterinarian in the course of his

17  professional practice.  Prescription animal drugs are also

18  misbranded if they are not dispensed pursuant to a valid

19  prescription or other order authorized by law issued in the

20  course of the veterinarian's professional practice.

21          To dispense a prescription drug without a valid

22  prescription or other authorized by law, as I just defined,

23  means to provide a person with a prescription drug to

24  administer to an animal with no oral or written prescription or

25  order at all or pursuant to a prescription or order that was

not issued for a legitimate medical purpose and not based upon

a bona fide veterinarian client patient relationship.

The terms label and labeling have specific meanings.

Label means any written printed or graphic matter upon the

immediate container of a product.  The term labeling is broader

than the term label.  Labeling means all labels, as well as any

other written, printed, or graphic matter that appears on any

product or on any of its containers or wrappers or that

accompanies the product.

Labeling may include promotional material or

literature, including package inserts, pamphlets, mailing

pieces, and all other literature that supplements, explains, or

is texturally related to the product.  It is not necessary for

the written, printed, or graphic matter to have been physically

attached to the product to constitute labeling.  It is also

unnecessary for the written, printed, or graphic material to

have been shipped at the same time as or with the product to

constitute labeling.  The focus is whether the written printed

or graphic matter is part of an integrated transaction to

market the product.

Turning to object 2., the second object of the

conspiracy charged is the misbranding of drugs while they were

held for sale with the intent to defraud or mislead.  The

defense has the following elements:  (1) the defendant did or

caused another to do some act with respect to a drug that

1 caused the drug to be misbranded or adulterated in at least one

2 way;  (2) prior to the misbranding or adulteration of the

3 product, the product or a component of the product had moved or

4 been shipped in interstate commerce; and (3) the defendant had

5 the intent to defraud or mislead.

6         Now, the definitions that I gave you with respect to

7 the first object of the conspiracy apply equally here.

8         Turning to the third object, the third object of the

9 conspiracy charged is the receipt of misbranded or adulterated

10 drugs after they were shipped in interstate commerce with the

11 intent to defraud or mislead.  That offense has the following

12 elements:  (1) the defendant received or caused another to

13 receive a drug in interstate commerce; (2) at the time the

14 defendant received or caused the receipt of the drug in

15 interstate commerce, the drug was misbranded or adulterated in

16 at least one way; (3) the defendant delivered or proffered for

17 delivery the drug received in interstate commerce for pay or

18 otherwise after it was received; and (4) the defendant had the

19 intent to defraud or mislead.  And, again, the definitions that

20 I gave you with respect to the first object of the conspiracy

21 apply equally here.

22         For each of the objects to be considered in connection

23 with the conspiracy charged, one of the elements is that the

24 defendant engaged in any of those objects I described earlier

25 with an intent to defraud or mislead.  To act with intent to

1 defraud means to act with the specific intent to deceive or to

2 cheat, ordinarily for the purpose of either causing some

3 financial loss to another or bringing about some financial gain

4 to oneself.  To act with intent to mislead means to act with

5 the specific intent to create a false impression by misstating,

6 omitting, or concealing facts.  It is not necessary, however,

7 for the government to prove that anyone was in fact defrauded

8 or misled, as long as it proves beyond a reasonable doubt that

9 the defendant acted with the intent to defraud or mislead.

10        The intent to defraud or intent to mislead must be

11 connected, related in time, causation, or logic to the

12 commission of the misbranding or adulteration offense that is

13 the subject of the charged conspiracy.  Intent need not be

14 proved directly.  You may infer the defendant's intent from the

15 surrounding circumstances.  You may consider any statement made

16 or omitted by the defendant and all other facts and

17 circumstances in evidence, which indicate state of mind.  The

18 element of intent to defraud or mislead is written in the

19 disjunctive, meaning with the word or.  Thus, you can find

20 either that the defendant had the intent to defraud or the

21 intent to mislead.

22        Intent to defraud or mislead can be demonstrated by

23 evidence of intent to defraud or mislead consumers, state

24 racing or drug regulators, or the Food and Drug Administration,

25 or other federal drug enforcement authorities, including the

1    FBI, the DEA, and the CBP.  Just to be clear, by CBP, we mean

2    Customs Border Patrol.

3         The defendant has argued that she acted in good faith.

4    You could find that the defendant believed in good faith that

5    she was acting properly, even if she was mistaken in that

6    belief and, therefore, that she did not act with an intent to

7    defraud or mislead.

8         The burden of establishing criminal intent rests on

9    the government.  The defendant is under no burden to prove her

10   good faith.  Rather, the government must prove beyond a

11   reasonable doubt an intent to defraud or mislead.

12        Turning to the element of membership in the charged

13   conspiracy, the government must prove beyond a reasonable doubt

14   that the defendant unlawfully, willfully, and knowingly entered

15   into the conspiracy.  That is, the government must prove that

16   the defendant agreed to take part in the conspiracy with

17   knowledge of its unlawful purpose, and she agreed to take part

18   in the conspiracy to promote and cooperate in the furtherance

19   of one or more of its unlawful objectives.

20        Now, as to this element, the term unlawfully,

21   willfully, and knowingly means that you must be satisfied that

22   in joining the conspiracy, assuming you find that the defendant

23   did join the conspiracy in which she is charged, that the

24   defendant knew what she was doing.  That is, that she took the

25   actions in question, deliberately and voluntarily, not as the

1   product of mistake, extent, mere negligence, or some other

2   innocent reason.  The key question is whether the defendant

3   joined the relevant conspiracy with an awareness of at least

4   some of the basic aims and purposes of the unlawful agreement.

5           The defendant need not have known that she was

6   breaking any particular law or any particular rule, but she

7   must have been aware of the generally unlawful nature of her

8   acts.  Knowledge is a matter of inference from the proven

9   facts.  You have before you evidence of certain acts and

10  conversations alleged to have taken place involving the

11  defendant or in her presence.  You may consider this evidence

12  in determining whether the government has proven beyond a

13  reasonable doubt the defendant's knowledge of the unlawful

14  purpose of the charged conspiracy.

15          It is not necessary for the government to show that

16  the defendant was fully informed as to all of the details of

17  the conspiracy in order for you to infer knowledge on her part.

18  To have guilty knowledge, a defendant need not have known the

19  full extent of a conspiracy or all of the activities of all of

20  its participants.  It is not even necessary for a defendant to

21  know every other member of a conspiracy.

22          In fact, a defendant may know only one other member of

23  a conspiracy and still be a coconspirator.  If she knowingly

24  joined the conspiracy with knowledge of its unlawful purpose,

25  she is responsible for the acts of her coconspirators, even if

1    she was not aware of those specific acts.

2         The duration and extent of a defendant's participation

3    has no bearing on the issue of her guilt.  She need not have

4    joined the conspiracy at the outset.  The defendant may have

5    joined it for any purpose at any time in its progress, and she

6    will be held responsible for all that was done before she

7    joined and all that was done during the conspiracy's existence

8    while she was a member.  Nor is it necessary that the defendant

9    receive any monetary benefit from her participation in the

10   conspiracy that you are considering or had a financial stake in

11   the outcome.

12        However, although proof of financial interest in the

13   outcome of a scheme is not an essential or determinative, if

14   you find that the defendant had a financial interest, or other

15   interest, that is a factor you may properly consider in

16   determining whether the defendant was a member of the

17   conspiracy.

18        Each member of the conspiracy may perform separate and

19   distinct acts and may perform them at different times.  Some

20   conspirators may play major roles, while others play minor

21   roles, in the scheme.  An equal role or an important role is

22   not what the law requires.  In fact, even a single act can be

23   sufficient to make a defendant a participant in its illegal

24   conspiracy.

25        However, a person's mere association with a member of

1    a conspiracy does not make that person a member of that

2    conspiracy even when that association is coupled with knowledge

3    that a conspiracy is taking place.  Mere presence at the scene

4    of a crime, even coupled with knowledge that a crime is taking

5    place, is not sufficient to support a conviction.  In other

6    words, knowledge without agreement and participation is not

7    sufficient.  What is necessary is that a defendant participate

8    in the conspiracy that you are considering with knowledge of

9    its unlawful purpose and with an intent to aid in the

10   accomplishment of its unlawful objectives.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  It is not required that the government

2    show that the coconspirators also knew that they were violating

3    some particular federal statute.  The question of a

4    coconspirator's intent is a question of fact that you are

5    called upon to decide, just as you determine any other fact at

6    issue.

7    The ultimate facts of knowledge and criminal intent,

8    though subjective, may be established by circumstantial

9    evidence based upon a person's outward manifestations, her

10   words, her conduct, her acts, and all the surrounding

11   circumstances disclosed by the evidence, and the rational or

12   logical inferences that may be drawn therefrom.

13   Circumstantial evidence, if believed, is of no less

14   value than direct evidence.  In sum, a defendant with an

15   understanding of the unlawful nature of a conspiracy may have

16   intentionally engaged, advised, or assisted in the conspiracy

17   for the purpose of furthering an illegal undertaking.  A

18   defendant thereby becomes a knowing and willing participant in

19   the unlawful agreement; that is to say, she becomes a

20   conspirator.

21   A conspiracy, once formed, is presumed to continue

22   until its objective is accomplished, or until there's some

23   affirmative act of termination by its members.

24   So to, once a person is found to be a participant in

25   the conspiracy, that person is presumed to continue being a

1    participant in the venture until the venture is terminated,

2    unless it is shown by some affirmative proof that the person

3    withdrew and disassociated herself from it.

4         Turning to the third element:  Overt act.  The third

5    element of the conspiracy charged is the requirement of an

6    overt act.

7         To sustain its burden of proof, the government must

8    show beyond a reasonable doubt that at least one overt act was

9    committed in furtherance of the conspiracy that you're

10   considering by at least one of the coconspirators.  Not

11   necessarily by Ms. Giannelli.  The purpose of the overt act

12   requirement is that there must have been something more than a

13   mere agreement.  Some overt step or action must have been taken

14   by at least one of the coconspirators in furtherance of the

15   conspiracy.

16        You need not reach unanimous agreement on whether a

17   particular overt act was committed in furtherance of the

18   conspiracy.  You just need to all agree that at least one overt

19   act was so committed.

20        In addition, you should bear in mind that the overt

21   act standing alone may be an innocent, lawful act.  Frequently,

22   however, an apparently innocent act sheds its harmless

23   character if it is a step in carrying out, promoting, aiding,

24   or assisting the conspiratorial scheme.  You're therefore

25   instructed that the overt act does not have to be an act which

1    in and of itself is criminal or an objective of the conspiracy.

2              Now, in some cases, the law that a defendant is

3    charged with breaking actually covers two separate crimes.  One

4    is more serious than the second.  And the second is generally

5    called a lesser included offense.  The indictment in this case

6    charges the defendant with participating in conspiracy to

7    adulterate and misbrand drugs with the intent to defraud or

8    mislead.  And I've explained to you the elements that the

9    government must prove beyond a reasonable doubt before you may

10   convict her of that crime.  You must first consider whether the

11   government has satisfied its burden of proof as to all the

12   evidence except intent to defraud or mislead.  If you find the

13   government has done so, you must render a verdict of guilty.

14             If you find the defendant guilty, you must then

15   proceed to determine whether the government has proven beyond a

16   reasonable doubt that the defendant committed that offense with

17   the intent to defraud or mislead.  If the government has

18   satisfied its burden as to all of the elements, including the

19   intent to defraud or mislead, you must select yes on the

20   verdict form that I will give you.

21             In your consideration of whether the defendant acted

22   knowingly with respect to any object of the conspiracy charged,

23   you may consider whether the defendant deliberately closed her

24   eyes to what otherwise would have been obvious.  If you find

25   beyond a reasonable doubt that the defendant acted with a

1    conscious purpose to avoid learning the truth, then the

2    requirements that she acted knowingly may be satisfied.  One

3    may not willfully and intentionally remain ignorant of a fact

4    material and important to his or her conduct to escape the

5    consequences of criminal law.

6        If you find beyond a reasonable doubt that the

7    defendant intentionally participated in the conspiracy, but

8    that the defendant deliberately and consciously avoided

9    confirming certain facts about the specific objective of the

10   conspiracy, then such conscious avoidance may support a finding

11   that the government has proven the defendant's knowledge of the

12   objectives or goals of a conspiracy.

13       However, guilty knowledge may not be established by

14   demonstrating that the defendant was merely negligent, foolish,

15   or mistaken.  Keep in mind that you cannot rely on conscious

16   avoidance to support a finding that the defendant intentionally

17   joined a conspiracy.  Conscious avoidance may only apply to a

18   defendant's knowledge to the specific objective of a

19   conspiracy, not to whether the defendant joined that conspiracy

20   in the first place.  It is logically impossible for a defendant

21   to intend and agree to join a conspiracy if he or she did not

22   actually know that it exists.

23       If you find that the defendant was aware of a high

24   probability that a fact regarding object of conspiracy was so,

25   and that the defendant acted deliberately to avoid confirming

1    that fact, you may find that the defendant had knowledge of the

2    fact.  However, if you find that the defendant actually

3    believed the fact was not so, then she may not have acted

4    knowingly with respect to the fact.

5         When people enter into a conspiracy to accomplish in

6    an unlawful end, they become agents or partners of one another

7    in carrying out the conspiracy.  In determining the factual

8    issues before you, you may consider against the defendant any

9    acts or statements made by any of the people who you find under

10   the standards I've already described to you have been her

11   coconspirators, even though such acts or statements were not

12   made in her presence or were made without her knowledge.

13        The indictment alleges that the conspiracy in this

14   case existed from in or about 2002 through in or about March of

15   2020.  It is not essential that the government prove that the

16   conspiracy started and ended at these specific times.  The

17   government is not required to prove that the conduct took place

18   on the precise dates alleged in the indictment.  The law only

19   requires a substantial similarity between the dates alleged in

20   the indictment and the dates established through evidence at

21   trial.

22        In addition to all the elements of each of the charges

23   that I've just described for you, you must decide separately

24   with respect to the count charged in the indictment whether any

25   act in furtherance of the crime you are considering occurred

1  within the Southern District of New York.  The

2  Southern District of New York includes Manhattan, the Bronx,

3  Westchester, Dutchess, Putnam, Orange, Sullivan, and Rockland

4  Counties.

5          Venue is proven if any act in furtherance of the crime

6  you are considering occurred in the Southern District of

7  New York, regardless of whether it was the act of the

8  defendant.

9          I should note that on this issue, and this issue

10  alone, the government need not prove venue beyond a reasonable

11  doubt, but only by a mere preponderance of the evidence.  A

12  preponderance of the evidence means that the government must

13  prove that it is more likely than not that any act in

14  furtherance of the crime occurred in the Southern District of

15  New York.

16          In deciding whether or not the government has met its

17  burden of proof, you may consider both direct and

18  circumstantial evidence.  Direct evidence is evidence that

19  proves a disputed fact directly; for example, when a witness

20  testifies to what he or she saw, heard, or observed, that is

21  called direct evidence.  Circumstantial evidence is evidence

22  that tends to prove a disputed fact by proof of other facts.

23          To give you a simple example, suppose that when you

24  came into the courthouse today, the sun was shining and it was

25  a nice day, but the courtroom blinds were drawn, and you could

1  not look outside.  Then, later, as you were sitting here,

2  someone walked in with a dripping wet umbrella, and soon

3  afterwards, someone else walked in with a dripping wet

4  raincoat.  Now, on our assumed facts, you can't look outside

5  the courtroom, and you can't see whether or not it's raining,

6  so you have no direct evidence of that fact.  But on the

7  combination of facts about the umbrella and the raincoat, it

8  would be reasonable for you to infer that it had begun to rain.

9  And that is all there is to circumstantial evidence.  Using

10  your reason, experience, and commence, you infer from

11  established facts the existence or nonexistence of some other

12  fact.

13          The law makes no distinction between direct and

14  circumstantial evidence.  Circumstantial evidence is of no less

15  value than direct evidence, and you may consider either or both

16  and may give them such weight as you consider is warranted.

17          Now, I just used the term inference.  I said that you

18  can infer on the basis of your reason, experience, and common

19  sense, from one or more established facts the existence of some

20  other fact.  An inference is not a suspicion or a guess.  It is

21  a reasoned, logical decision to conclude that a disputed fact

22  exists on the basis of another fact that you know exists.

23  There are times when inferences may be drawn from facts,

24  whether proved by direct or circumstantial evidence.

25          The government asks you to draw one set of inferences

1   while the defense asks you to draw another.  It is for you, and

2   you alone, to decide what inferences you will draw.

3            You heard evidence in this case in the form of

4   stipulations.  As I told you, a stipulation of fact is an

5   agreement among the parties that a certain fact is true.  You

6   should regard such agreed facts as true.  A stipulation of

7   testimony is an agreement among the parties that if called as a

8   witness, the person would have given certain testimony.  You

9   must accept as true the fact that the witness would have given

10  that testimony.  It is for you, however, to determine the

11  effect to be given to that testimony.

12           During the course of the trial, there were charts and

13  summaries shown to you in order to make other evidence more

14  meaningful and aid you in considering that evidence.  The

15  charts and summaries are not evidence themselves; they are

16  summaries of evidence.  These exhibits were admitted as

17  demonstratives only.

18           It may be convenient for you to use the charts and

19  summaries instead of reviewing all of the underlying evidence.

20  It is for you to decide whether the charts and summaries

21  correctly present the testimony and documents on which they're

22  based.  To the extent that demonstratives confirm to what you

23  determine the underlying evidence to show, you may consider

24  them if you find they are of assistance to you.

25           It must be clear to you by now that the government and

1   the defense are asking you to draw very different conclusions

2   about various factual issues in the case.  Deciding these

3   issues will involve making judgments about the testimony of

4   witnesses you have listened to and observed.

5        In making these judgments, you should carefully

6   scrutinize all of the testimony of each witness, the

7   circumstances under which witness testified, and any other

8   matter and evidence that may help you decide the truth and the

9   importance of each witness' testimony.

10       Your decision whether or not to believe a witness may

11  depend on how the witness impressed you.  How did the witness

12  appear?  Was the witness candid, frank, and forthright?  Or did

13  the witness seem to be evasive or suspect in some way?  How did

14  the way in which the witness testified on direct examination

15  compare with how the witness testified on cross-examination?

16  Was the witness consistent or contradictory?  Did the witness

17  appear to know what he or she was talking about?  Did the

18  witness strike you as someone who was trying to report his or

19  her knowledge truthfully?  These are examples of the kind of

20  commonsense questions you should ask yourselves in deciding

21  whether a witness is or is not truthful.

22       How much you choose to believe a witness may also be

23  influenced by the witness' bias.  Does the witness have a

24  relationship with the government or the defendant that may

25  affect how he or she testified?  Does the witness have some

 1    incentive, loyalty, or motive that might cause him or her to

 2    shade the truth?  Does the witness have some bias, prejudice,

 3    or hostility that may cause the witness to give you something

 4    other than a completely accurate account of the facts he or she

 5    testified to?

 6          You should also consider whether a witness had an

 7    opportunity to observe the facts he or she testified about.

 8    Also, you should consider whether the witness' recollection of

 9    the facts stands up in light of the other evidence in the case.

10    In other words, what you must try to do in deciding credibility

11    is to size up a person, just as you would in any important

12    matter when you are trying to decide if a person is truthful,

13    straightforward, and accurate in his or her recollection.

14          You've heard testimony in this case from law

15    enforcement officials and employees of government.  The fact a

16    witness may be employed by the government as a law enforcement

17    official or as an employee of the government does not mean that

18    his or her testimony is necessarily deserving of more or less

19    consideration or greater or lesser weight than that of an

20    ordinary witness.

21          In this context, defense counsel is allowed to try to

22    attack the credibility of such a witness on the ground that his

23    or her testimony may be colored by a personal or professional

24    interest in the outcome of the case.  It is your decision after

25    reviewing all the evidence whether to accept the testimony of a

1   law enforcement or government employee witness and to give that

2   testimony whatever weight, if any, you find it deserves.

3        You've also heard testimony from what we call expert

4   witnesses.  An expert is someone who, by education or

5   experience, has acquired learning or experience in a science or

6   specialized area of knowledge.  Such a witness is permitted to

7   give his or her opinions as to relevant matters in which he or

8   she professes to be expert and give his or her reasons for

9   those opinions.  Expert testimony is presented to you on the

10  theory that someone who is experienced in the field can assist

11  you in understanding the evidence or in reaching an independent

12  decision on the facts.

13       Now, your role in judging the credibility applies to

14  experts as well as to the other witnesses.  You should consider

15  the expert opinions that were received in evidence in this case

16  and give them as much or as little weight as you think they

17  deserve.  If you should decide that the opinion of an expert

18  was not based on sufficient education or experience or on

19  sufficient data, or if you should conclude that the

20  trustworthiness or credibility of an expert is questionable for

21  any reason, or if the opinion of the expert was outweighed in

22  your judgment by other evidence in the case, then you might

23  disregard the opinion of the expert entirely or in part.

24       On the other hand, if you find that the opinion of an

25  expert is based on sufficient data, education, and experience,

1   and the other evidence does not give you reason to doubt the

2   expert's conclusions, you would be justified in placing great

3   reliance on his or her testimony.

4        You've heard evidence during the trial that witnesses

5   have discussed the facts of the case and their testimony with

6   lawyers before the witness appeared in court.  Although you may

7   consider that fact when you're evaluating a witness'

8   credibility, I should tell you that there is nothing either

9   unusual or improper about a witness meeting with lawyers before

10  testifying so that the witness can be aware of the subjects he

11  or she will be questioned about, focus on those subjects, and

12  have the opportunity to review relevant exhibits before being

13  questioned about them.  Such consultation helps conserve your

14  time and the Court's time.  In fact, it would be unusual for a

15  lawyer to call a witness without such a consultation.

16       The weight you give to the fact or the nature of the

17  witness' preparation for his or her testimony and what

18  inferences you draw from such preparation are matters

19  completely within your discretion.  Some of the people who may

20  have been involved in the events leading to this trial are not

21  on trial in this case.  This does not matter.  There is no

22  requirement that all members of a conspiracy be charged and

23  prosecuted or tried together in the same proceeding.

24       You may not draw any inference favorable or

25  unfavorable towards the government or the defendant from the

1    fact that certain persons other than the defendant were not

2    named as defendants in the indictment, nor may you speculate as

3    to the reasons why other persons are not on trial.  Those

4    matters are wholly outside your concern and have no bearing on

5    your function as jurors.

6         Whether a person should be named as a coconspirator or

7    indicted as a defendant in this case or another separate case

8    is a matter within the sole discretion of the United States

9    Attorney and the grand jury.  Therefore, you may not consider

10   it in any way in reaching your verdict as to the defendant.

11        You heard testimony from one or more government

12   witnesses who have testified that they were involved in

13   criminal conduct and who subsequently pled guilty to their

14   criminal conduct pursuant to what's called a cooperation

15   agreement with the government.  You've also heard from one or

16   more witnesses who testified that they were involved in

17   potential criminal conduct and who subsequently entered into

18   what's called a non-prosecution agreement with the government.

19        The government frequently relies on the testimony of

20   cooperating witnesses and other witnesses who have admitted to

21   participating in crimes because, otherwise, it would be

22   difficult or impossible to detect and prosecute wrongdoers.

23        The testimony of such witnesses is properly considered

24   by you the jury.  If these witnesses could not be used, there

25   would be many cases in which there was real guilt and

1   convictions should be had, but in which convictions would be

2   unattainable.  For these reasons, the law allows the use of

3   such witness testimony.

4           Indeed, it is the law in federal courts that the

5   testimony of a single cooperating witness may be enough in

6   itself for conviction if the jury believes that the testimony

7   establishes guilt beyond a reasonable doubt.

8           Because of the possible interests a cooperating

9   witness may have in testifying, the cooperating witness's

10  testimony should be scrutinized with care and caution.  The

11  fact that a witness is a cooperating witness can be considered

12  by you in bearing upon his or her credibility.  It does not

13  follow, however, that simply because a person has admitted to

14  participating in one or more crimes that he or she is incapable

15  of giving truthful testimony.

16          Like the testimony of other witnesses, cooperating

17  witness testimony should be given the weight that it deserves

18  in light of the facts and circumstances before you taking into

19  account the witness' demeanor, candor, the strength, and

20  accuracy of a witness' recollection, background, and the extent

21  to which his or her testimony is or is not corroborated by

22  other evidence in the case.

23          You heard testimony about cooperation agreements

24  entered into between the government and certain cooperating

25  witnesses.  I must caution you that it is no concern of yours

1    why the government made an agreement with a particular witness.

2    Your sole concern is whether a witness has given truthful

3    testimony here in this courtroom before you.

4         In evaluating the testimony of a cooperating witness,

5    you should ask yourself whether this cooperating witness would

6    benefit more by lying or by telling the truth.  Was his or her

7    testimony made up in any way because he or she believed or

8    hoped that he or she would receive somehow favorable treatment

9    by testifying falsely?  Or did he or she believe that his or

10   her interests would be best served by testifying truthfully?

11   If you believe that the witness was motivated by hopes of

12   personal gain, was the motivation one that would cause him or

13   her to lie, or was it one that would cause him or her to tell

14   the truth?  Did this motivation color the witness' testimony?

15        If you find that the testimony was false, you should

16   reject it.  If, however, after a cautious and careful

17   examination of the cooperating witness' testimony and demeanor

18   upon the witness stand you are satisfied the witness told the

19   truth, you should accept it as credible and act upon it

20   accordingly.  But the issue of credibility need not be decided

21   in an all-or-nothing fashion.  If you find that a witness

22   testified falsely in one part, you may accept his testimony in

23   other parts, or you may disregard all of it.  That is a

24   determination entirely for you, the jury.

25        You've heard testimony about certain evidence that was

1  seized in searches of certain places, vehicles, electronic

2  devices and through the use of wiretaps on cellular phones.

3  Evidence obtained by those searches was properly admitted in

4  this case and may be considered by you.  Whether you approve or

5  disapprove of how the evidence was obtained should not enter

6  into your deliberations because I now instruct you that the

7  government's use of this evidence was entirely lawful.  You

8  must therefore, regardless of your personal opinions, give this

9  evidence full consideration along with all the other evidence

10 in this case in determining whether the government has proven

11 the guilt of the defendant beyond a reasonable doubt.

12        The government has introduced evidence in the form of

13 audio recordings and transcripts.  This is proper, and you can

14 consider this evidence along with other evidence.  If you wish

15 to hear any of the recordings again or see any of the

16 transcripts of those recordings, they will be made available to

17 you during deliberations.

18        We have, among the exhibits received in evidence, some

19 documents that are what we call redacted.  Redacted means that

20 part of the document or tape was taken out.  You are to concern

21 yourself only with the part of the item that has been admitted

22 into evidence.  You should not consider possible reasons why

23 the other parts of it has been deleted.

24        You've heard testimony that the defendant made

25 statements in which she claimed that her conduct was consistent

1    with innocence and not with guilt.  The government claims that

2    these statements in which the defendant exculpated herself are

3    false.  If you find that the defendant gave a false statement

4    in order to divert suspicion, you may infer the defendant

5    believed that she was guilty.  You may not, however, infer on

6    the basis of this alone that the defendant is, in fact, guilty

7    of the crimes for which the defendant's charged.

8         Whether or not the evidence as to the defendant's

9    statements show that the defendant believed that she was guilty

10   and the significance, if any, to be attached to such evidence

11   are matters for you, the jury, to decide.

12        You will soon go into the jury room to begin your

13   deliberations.  Juror number one, Ms. Carlin, you will be the

14   foreperson of the jury unless, for any reason, you prefer not

15   to act in that capacity.  In that event, the first order of

16   business for you, the jury, will be to elect a foreperson.

17        Please send me a note signed and dated identifying the

18   foreperson.  The foreperson will send out any notes to the

19   Court, which I will discuss more in a moment.

20        When the jury has reached a verdict, that foreperson

21   will fill out the verdict form that I'm going to give to you,

22   and then you will notify the Marshal that the jury has reached

23   a verdict.  When you come into open court, the foreperson will

24   be asked to state what the verdict is.

25        Now, if during your deliberations you want to see or

1  hear any of the exhibits upon request, they will be sent to you

2  in the jury room, or you'll be brought back into the courtroom

3  to examine them.  If you want any of the testimony read, that

4  can also be done.  But please remember it's not always easy to

5  locate what you might want, so please be as specific as you

6  possibly can in requesting any exhibits or portions of

7  testimony that you might want.

8         Your request for exhibits or testimony and any other

9  communications with the Court should always be made to me in

10 writing, signed by your foreperson, and then given to one of

11 the Marshals.  Notes must include the date and the time that

12 they were sent and that they should be as clear and as precise

13 as possible.  Notes from the jury will become part of the

14 record in this case.  I will respond to any questions or

15 requests you have as promptly as possible, either in writing or

16 by having you return to the courtroom so that I can speak to

17 you in person.

18        Please do not tell me or anyone else how the jury

19 stands on the issue of the defendant's guilt until after a

20 unanimous verdict is reached.

21        Now, during the trial, I permitted you to take notes.

22 Those notes are to be used solely to assist you, and they are

23 not to substitute for your recollection of the evidence in this

24 case.  The fact that a particular juror has taken a note

25 entitles that juror's view to no greater weight than those of

1    any other juror, and your notes are not to be shown to any

2    other juror during your deliberations.

3          As I just explained, if during your deliberations you

4    have any doubt as to any of the testimony, you will be

5    permitted to request that the official trial transcript, and

6    there's a whole stack of them here, which was made during the

7    course of these proceedings, be read to you.

8          Under your oath as jurors, you are not to be swayed by

9    sympathy.  You are to be guided solely by the evidence in this

10   case.  The crucial question you must ask yourself as you sift

11   through the evidence is:  Has the government proven the guilt

12   of the defendant beyond a reasonable doubt with respect to each

13   of the elements of the offense charged.  It is for you alone to

14   decide whether the government has proven beyond a reasonable

15   doubt that the defendant is guilty of the crime for which she

16   is charged solely based on the evidence, or lack of evidence,

17   and subject to the law as I explained it to you.

18         Once you let fear, prejudice, bias, or sympathy

19   interfere with your thinking, there is a risk that you would

20   not arrive at a true or just verdict.  If the government has

21   failed to establish the defendant's guilt beyond a reasonable

22   doubt, you must acquit her.  But on the other hand, if you

23   should find that the government has met its burden of proving

24   the defendant's guilt beyond a reasonable doubt, you should not

25   hesitate because of sympathy or any other reason to render a

1   verdict of guilty.

2          The question of possible punishment of the defendant

3   is of no concern to you, and it must not enter into or

4   influence your deliberations.  The duty of imposing sentence

5   rests exclusively upon the Court.  Under your oath as jurors,

6   you cannot allow consideration of the punishment that might be

7   imposed on the defendant if she is convicted to influence your

8   verdict in any way.  You are here to decide whether the

9   government has proven beyond a reasonable doubt that the

10  defendant is guilty of the crime charged.  The defendant is not

11  on trial for any act, conduct, or offense that is not charged

12  in the indictment, neither are you called upon to return a

13  verdict as to the guilt of any other person not on trial.

14         Your function now is to weigh the evidence in this

15  case and to determine whether the government has proven the

16  guilt of the defendant beyond a reasonable doubt with respect

17  to the charge in the indictment.  You must base your verdict

18  solely on the evidence, or lack of evidence, and these

19  instructions as to the law.  And you are obliged under your

20  oath as jurors to follow the law as I have instructed you,

21  whether you agree or disagree with the particular law in

22  question.

23         The verdict must represent the considered judgment of

24  each juror.  In order to return a verdict, it is necessary that

25  each juror agree to it.  Your verdict, whether guilty or not

1    guilty, must be unanimous.  It is your duty as jurors to

2    consult with each other and to deliberate with a view to

3    reaching an agreement, if you can possibly do so, without

4    violence to individual judgment.

5         Each of you must decide the case for herself or

6    himself, but only do so after an impartial discussion and

7    consideration of all the evidence in the case with your fellow

8    jurors.  In the course of your deliberations, do not hesitate

9    to re-examine your own views and change an opinion if convinced

10   it is erroneous.  But do not surrender your honest conviction

11   as to the weight or effective evidence solely because of the

12   opinion of your fellow jurors.

13        Remember at all times, you are not partisans, you are

14   judges, judges of the fact.  Your sole interest is to seek the

15   truth from the evidence in this case.  If you are divided, do

16   not report how the vote stands, and if you reach a verdict, do

17   not report what it is until you are asked in open court.

18        So, in conclusion, ladies and gentlemen, I am sure

19   that if you listen to the views of your fellow jurors, and if

20   you apply your own common sense, you will reach a fair verdict

21   here.  Remember, that your verdict must be rendered without

22   fear, without favor, and without prejudice, or sympathy.

23        So as I said, you can take these jury instructions

24   with you, and at this point, shortly, you're going to retire to

25   the jury room to begin your deliberations.  Before you retire

1    to the jury room, I must excuse our alternates with the thanks

2    of the Court.  You have, like your fellow jurors, been very

3    attentive and very patient, and I'm sorry that you will miss

4    the experience of deliberating with the jury, but the law

5    provides for a jury of 12 persons in this case.

6            So before you retire into the jury room, I would ask

7    our two alternates, and again, I say very much with the thanks

8    of the Court, to please give to Ms. Dempsey the placards that

9    she gave you that enabled you to have, hopefully, more

10   efficient access into the courthouse.  And if you have any

11   clothing or items in the jury room, you're asked to pick them

12   up and to withdraw before the jury starts its deliberations.

13           I would ask the two of you for the next few days to

14   please refrain from discussing the case with anyone or

15   conducting any research on anything you've heard about this

16   trial.  In the event that one of the jurors is unable to

17   complete the deliberation process, we may need to reach out to

18   you and call you back.  So please don't research, study, talk

19   about or read up on the case until you hear from us.  We will

20   let you know as well when there is a verdict and when you are

21   completely discharged.

22           So I thank you both very much, and we'll just pause

23   for a moment to let you retrieve your belongings and give

24   Ms. Dempsey your cards.

25           (Pause)

1          THE COURT:  Can I see Mr. Mortizavi and Mr. Fasulo at

2    the sidebar with the court reporter?

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At the sidebar)

2         THE COURT:  Okay.  So I wanted to give each of you the

3    opportunity to make any objections that you wish to to the

4    charges as given, bearing in mind that other than the

5    cooperating witness charge, they were fully consented to ahead

6    of time.

7         MS. MORTAZAVI:  No objection from the government.

8         MR. FASULO:  No objection from the defendant.

9    However, Judge, I do think that in the note-taking part -- and

10   I didn't realize this until the time that you articulated it,

11   you state about them having the right to have -- they shouldn't

12   rely on their notes as to the testimony, but it's also the

13   testimony or other evidence that was admitted, and if they --

14   you know, have another discrepancy as to what an exhibit was --

15        THE COURT:  You mean the number?

16        MR. FASULO:  The contents by stipulation.  It's not --

17   it's important enough to bring to the Court's attention.  I

18   didn't really realize it because the number of stipulations we

19   had, they could have made a note as to that stipulation.  And

20   they could be -- there could be a disagreement as to what that

21   stipulation is about or what's said.  It's not testimony.  It's

22   other evidence in the case.

23        THE COURT:  Do you want me to give a further

24   instruction on note-taking?  Let me grab my copy.

25        What number are you on?

1    MR. FASULO:  Page 106.

2    THE COURT:  I don't have the same number.

3    MR. FASULO:  It's jury charge number 35.

4    THE COURT:  Thank you.

5    MR. FASULO:  I have all different numbers in mine.  I

6    would just suggest that if you have any doubt as to any of the

7    testimony or any of the evidence, you will be permitted to

8    request an official transcript or evidence which was made in

9    these proceedings, and that's because we had so many

10   stipulations.

11   THE COURT:  Okay.  I'll give that clarification.

12   MR. FASULO:  No other objection.  No objection.

13   MS. MORTAZAVI:  No objection to that.

14   THE COURT:  All right.  Thank you.

15   (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  I've just been asked by counsel to clarify

3    one thing with you about note-taking.

4          So you'll recall that I said if you have any doubt as

5    to any of the testimony, you'll be permitted to request that

6    the transcripts be given back to you.  So that's equally true

7    with respect to any of the evidence that was admitted in this

8    case.  And you'll recall that I told you throughout the trial,

9    and I told you in the instructions I just gave you, that

10   stipulations are evidence, the photographs are evidence, the

11   physical evidence is evidence.  That instruction where I said

12   you can request evidence in the jury room applies to not only

13   testimony, but to all of the evidence that was admitted in this

14   case.

15         All right.  Okay.  With that, then, it is now time for

16   you to retire and to deliberate.

17         Ms. Dempsey will accompany you back to the

18   deliberation room.  There will be a Marshal outside your door

19   at all times. she'll give you a copy of the verdict form that

20   we would like you to return to us when you have a verdict, and

21   your first order of business is, as I instructed you, to decide

22   who your foreperson is if our juror number 1 is unwilling to

23   serve in that role.

24         I would ask you to send out a note once you have a

25   foreperson.  Remember, date and sign each note.  The foreperson

1   does that.

2          It is up to you how long you wish to remain today to

3   deliberate.  It is also up to you how early you wish to return

4   tomorrow to deliberate.  I'd ask you to please just let us know

5   when you are leaving for the day.  You can do that through the

6   Marshals or Ms. Dempsey, and let us know when you leave today

7   what time you plan to return tomorrow.  All right?

8          Ms. Dempsey is going to swear the Marshal who, from

9   this point forward, will be your point of contact.  Okay?

10          DEPUTY CLERK:  Could you come forward?

11          (Marshal sworn)

12          THE COURT:  Thank you, sir.

13          Ladies and gentlemen, thank you very much.  You may

14   retire.

15          JUROR:  Is it okay if we take one set of these?

16          THE COURT:  It's up to you.

17          (At 4:17 p.m., the jury retired to deliberate)

18

19

20

21

22

23

24

25

1    (Jury not present)

2    THE COURT:  All right.  Please be seated, ladies and

3    gentlemen.

4    Does Ms. Dempsey have contact information for each

5    side?

6    MS. MORTAZAVI:  I will write it down for the

7    government's side.

8    MR. FASULO:  She has mine.  Yes, your Honor.

9    THE COURT:  Needless to say, you need to be in the

10   vicinity of the courthouse, but should you step out for a cup

11   of coffee, she could reach you on your cell phone whenever

12   there's a note from the jury or obviously when we have a

13   verdict.

14   I suspect, but I don't know, obviously, that the

15   jurors will elect a foreperson, and we'll have that note before

16   they recess for the evening, but I have no way of knowing how

17   long they will stay.  But we'll let you know each time we

18   receive a note from the jurors.

19   Anything else for the record?

20   MS. MORTAZAVI:  Not from the government, your Honor.

21   MR. FASULO:  Not from the defense, Judge.

22   THE COURT:  Thank you, all, then.  We will be in

23   recess then until we hear from the jurors.

24   (Recess)

25   THE COURT:  As Ms. Dempsey was taking the jurors in,

 1    they said they would like a list of all the exhibits.  She's

 2    going to tell them they need to send a note out to that affect.

 3    It did remind me, I think what they were asking -- I thought

 4    they meant the jury instructions, but I think they meant the

 5    binder of the transcripts, and I don't believe that that's the

 6    way that should be handled.  They should be requesting exhibits

 7    if they want exhibits.  So Ms. Dempsey is going to tell them to

 8    give them back, and then if they want specific exhibits that

 9    they will ask them, and you will know that.

10              MR. FASULO:  I think it's probably though, Judge,

11    they're going to be able to get the exhibit list.

12              THE COURT:  If they ask for it.  You know --

13              MR. FASULO:  Oh, if they send a note.

14              THE COURT:  They can't just informally on their way

15    in, just say, oh, by the way.

16              MR. FASULO:  At this point, if they did ask it by

17    note, the defense would consent to the Court sending it.

18              MS. MORTAZAVI:  So would the government.

19              THE COURT:  Okay.  But with regard to retrieving the

20    binder of the testimony, any objection?

21              MR. FASULO:  No.  No objection.

22              MS. MORTAZAVI:  I think it's appropriate, your Honor.

23              THE COURT:  Okay.  So, Ms. Dempsey, if you would

24    please do that promptly.

25              Thank you, all.  I wanted that on the record.  Thank

1    you.

2              (Recess)

3              (At 4:37 p.m. a note was received from the jury)

4              THE COURT:  All right.  We have our first note from

5    the jurors.  Their first note should have been to tell us who

6    the foreperson was, but they communicated that orally to

7    Ms. Dempsey that juror number 1 has agreed to serve as the

8    foreperson.  Just for the sake of good order, I'm going to ask

9    them to memorialize that in a note to us, so it will be part of

10   the record because, as you know, all juror notes are part of

11   the record.  The note is simply about their plans.  There is

12   nothing substantive.

13             At 4:31 p.m. on May 5, the jury plans to finish today,

14   May 5, 2022, by or approximately at 5:00 p.m.  We will have

15   returned tomorrow morning, May 6, 2022, at 10:00 a.m.  And it

16   is signed by Ms. Carlin.  All right?

17             So, Ms. Dempsey --

18             MR. FASULO:  Yes.  I don't know if you want us to

19   respond.

20             THE COURT:  Thank you.  I appreciate it.

21             If you let them know they should formalize a note to

22   us as their first act who the foreperson is for the record just

23   because we need a written note for the record, and I'm going to

24   number this then note number two.

25             Is that without objection?

1    MR. FASULO:  Makes sense, Judge.

2    MS. MORTAZAVI:  No objection.

3    THE COURT:  All right, Ms. Dempsey.  So you can

4    communicate that to them and get that before they leave, that

5    would be helpful.  Thank you.

6    And I'll just wait for her to get that from her.  All

7    right?

8    (Pause)

9    (At 4:41 p.m. a note was received from the jury)

10   THE COURT:  Note number 1:  The jury has elected a

11   foreperson, Ms. Carlin, who is juror number 1.  All right.

12   Ms. Dempsey, I'll give you both of these notes.  Ms. Dempsey

13   will let us know when the jury leaves for the day or if we

14   receive any other notes before then.  All right?  And

15   otherwise, I'll see everyone around 10:00 o'clock.

16   Anyone who wishes to be in the courtroom, you're

17   welcome to be around 10:00 o'clock tomorrow, just what time the

18   jury told us they'll return.  If I don't see you, everyone,

19   have a good night.

20   (Recess)

21   (At 4:56 p.m. a note was received from the jury)

22   THE COURT:  All right.  You may be seated.

23   All right.  Juror note number 3 at 4:47 p.m.  On

24   5/5/22, the jury would like to request the following pieces of

25   evidence as indicated on the second page included and below,

1    and it's signed by Ms. Carlin:

2         Demonstrative documents, copy of the Delaware

3    complaint, incorporation document, sample bottles in evidence,

4    "patient chart," and then the following exhibits by number.

5    9013, 9117 --

6         MS. MORTAZAVI:  Pardon me, your Honor.  Did you say

7    9117?

8         THE COURT:  9117.

9         We're going to make a photocopy of the list after I

10   read them into the record, and then I'm going to leave it to

11   you all to assemble these.

12        11002, 3000, 9017, 711, 3701, 320FJ, 9018, 3190, 5026,

13   307, 900D, like David; 3001, 102A, 709, 139AT, 320F like Frank,

14   A like apple; 320F like Frank, N like Nancy; 114AT, 1910, 319A

15   like apple; 912BT.

16        I think the next one is 171AT, but honestly I'm having

17   a little trouble reading it.

18        403C, 320F like Frank, E like Edward; 309, 319J,

19   119AT, 17000- -- well they've written this wrong.  It should be

20   17001, I believe.  It says 170001.  It's got an extra zero.

21   They've written 1-7-0-0-0-1.

22        119B like boy; 1605AT, 320FK, 320FL, 319, 319AA, and

23   then they wrote Flynn testimony.

24        All right.  So that's the contents of the note.  We'll

25   make a photocopy of this and give it to each of you just so you

1  can get to work on assembling these.

2          The jurors have told us they plan to leave at or about

3  5:00 o'clock today.  I can either have them back in and tell

4  them that we will assemble these documents and have them early

5  in the day for them tomorrow, or Ms. Dempsey can just report

6  that.

7          MS. MORTAZAVI:  Fine for the government if Ms. Dempsey

8  reports that to them orally.

9          MR. FASULO:  Fine from the defendant.

10          DEPUTY CLERK:  The Marshal just asked if they could

11  leave.

12          THE COURT:  Oh, I guess this was their last order of

13  business before they left.

14          So the jurors are retiring for the evening.  We'll

15  make a copy of this note and give it to each of you.  The

16  original will stay here.  If you can each work on assembling

17  the documents, and the Court would like a set.

18          MS. MORTAZAVI:  Yes, your Honor.

19          THE COURT:  Thank you, everyone.  Have as good an

20  evening as you all can.

21          Ms. Dempsey, here you go.

22          MR. FASULO:  On the record, can we do one thing?  Just

23  so we're on the same page -- I know one of the requests was the

24  demonstrative.  It's my understanding this will not go into the

25  jury room.

1          THE COURT:  It should not, normally.

2          MR. FASULO:  Right.  So I wanted to know whether we

3   needed to have a conversation about that.  But I would object

4   to it going to the jury room.

5          THE COURT:  Well, Ms. Mortazavi.

6          MS. MORTAZAVI:  I mean, your Honor, I'd like an

7   opportunity to consider it, given defense counsel's objection.

8   We can --

9          THE COURT:  Why don't we reconvene a little before

10  10:00.  We'll talk about that.

11         In the charges, I recall saying if you are satisfied

12  that the demonstrative accurately reflects the exhibits on

13  which it is based, you may consider it.  I don't remember if

14  the word was you may review it.  Do you all have a copy of the

15  charge still?  I put mine away.  But in any event, you can

16  consider it, and we'll take it up in the morning.  Okay?

17         MS. MORTAZAVI:  Very good, your Honor.

18         MR. FASULO:  I think what I wanted to say is I'm

19  limiting it to what's happened during the evidentiary part of

20  the case.  Any other demonstratives that were used at any part

21  of the case would not be part of this request.

22         THE COURT:  I took the demonstratives to mean the two

23  charts that were prepared.

24         MR. FASULO:  That's what I would hope that we were

25  limiting it to.  That's what I want to make sure.

1    THE COURT:  That was my understanding.

2    MR. FASULO:  Okay.

3    MS. MORTAZAVI:  You know what?  Your Honor, why don't

4    I confer with Mr. Fasulo.  I think it's best for us to

5    reconvene tomorrow morning.

6    THE COURT:  That's what we're going to do.  But to the

7    extent you are -- I don't know what other demonstratives there

8    might be.  But if you mean the PowerPoint that Ms. Mortazavi

9    did during her summation, that absolutely is off limits.

10   Positively.

11   MS. MORTAZAVI:  No, of course.

12   MR. FASULO:  I wanted to make sure we're clear on

13   that.

14   MS. MORTAZAVI:  And, your Honor, I thought by

15   demonstratives they requested the two summary charts that had

16   been prepared.

17   THE COURT:  That's what I thought.

18   MR. FASULO:  We can discuss that.

19   THE COURT:  You do that, and we'll talk in the

20   morning.  I'll see you all at about 9:45.

21        (Adjourned to May 6, 2022 at 9:45 a.m.)

22                              * * *

23

24

25