M4TAAGIA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          20 Cr. 160 (MKV)

5   LISA GIANNELLI,

6              Defendant.
                                          Jury Trial
7   ------------------------------x
                                          New York, N.Y.
8                                         April 29, 2022
                                          9:30 a.m.
9   Before:

10
                        HON. MARY KAY VYSKOCIL,
11
                                          District Judge
12                        APPEARANCES

13  DAMIAN WILLIAMS
         United States Attorney for the
14       Southern District of New York
    BY:  BENJAMIN GIANFORTI
15       SARAH MORTAZAVI
         Assistant United States Attorneys
16

17  FASULO, BRAVERMAN & DiMAGGIO, LLP
         Attorneys for Defendant Giannelli
18  BY:  LOUIS V. FASULO

19

20

21

22

23

24

25

1              (Trial resumed; Jury not present)

2              THE COURT:  Please be seated.

3              Before we bring in the jury, I just wanted to give you

4      my reaction about this proposed instruction about how you are

5      going to handle Courtney Adams's testimony.

6              First of all, who is Christine Ruscigno?

7              MS. MORTAZAVI:  She is a contractor with the U.S.

8      Attorneys' Office, your Honor.  She was in the courtroom but

9      she is no longer in the courtroom.  If you had questions for

10     her, she's available.

11             THE COURT:  My comments and reactions are the

12     following.  Then I am going to leave those with you and you can

13     talk to each other about it and we can regroup after lunch.  I

14     don't see any purpose in giving her name.  She's not a witness.

15     She's simply standing-in for.  So I would propose to say they

16     jointly agreed to have an employee or a representative from the

17     Office of the United States Attorney read out loud portions of

18     a government exhibit which is sworn testimony given by Courtney

19     Adams at a prior trial, not proceeding.

20             MS. MORTAZAVI:  I can finish, your Honor, or react to

21     what --

22             THE COURT:  Let me give you my comments and then you

23     can talk to each other and come back.

24             Jumping down two lines, "you may carefully scrutinize

25     this testimony and all evidence".  I don't know what it means

1    any other matters in evidence.  All other evidence.  You might

2    want to say somewhere that "this testimony is evidence".  I do

3    not agree with the sentence that begins you are to give no more

4    or less weight to the manner in which this testimony is

5    presented.  I just don't agree with that.  The jury has the

6    right to say, I can't assess the credibility of the actual

7    witness, Courtney Adams.  And so if the jury in their

8    determination thinks that that testimony is entitled to less

9    weight because of how it was presented, that is their

10   prerogative.  So I would propose, I am going to delete that

11   sentence.

12         And then the final sentence, again, I would take out

13   Ms. Ruscigno's name and say "have jointly agreed to have this

14   particular testimony read into the record", and leave it at

15   that.

16         Those are my proposed edits.  Why don't you speak to

17   each other about them.  I'll hear from you about them at lunch

18   but since you are telling me we're not going to get to this

19   this morning and the jurors are all here and ready to go, I'd

20   like to have the jurors come out and pick up where we left off.

21         MS. MORTAZAVI:  Certainly, your Honor.  Could we have

22   Mr. Cohen then retake the witness stand.

23         THE COURT:  Yes, please.

24         (Jury present)

25         THE COURT:  Please be seated, everyone.

M4TAAGIA1                         Cohen – Direct

<table>
<tr><td>1</td><td>Good morning to our jurors.  Thank you very much for</td></tr>
<tr><td>2</td><td>being so punctual.  Mr. Cohen is still on the stand.</td></tr>
<tr><td>3</td><td>I remind you, Mr. Cohen, that you remain under oath.</td></tr>
<tr><td>4</td><td>Ms. Mortazavi.</td></tr>
<tr><td>5</td><td>MS. MORTAZAVI:  Thank you, your Honor.</td></tr>
<tr><td>6</td><td>ROSS COHEN, resumed.</td></tr>
<tr><td>7</td><td>DIRECT EXAMINATION CONTINUED</td></tr>
<tr><td>8</td><td>BY MS. MORTAZAVI:</td></tr>
<tr><td>9</td><td>Q.  Good morning, Mr. Cohen.</td></tr>
<tr><td>10</td><td>A.  Good morning.</td></tr>
<tr><td>11</td><td>Q.  I am going to ask you once again, as I did yesterday, to</td></tr>
<tr><td>12</td><td>please speak into the microphone and speak loudly and clearly</td></tr>
<tr><td>13</td><td>for the benefit of our court reporter.</td></tr>
<tr><td>14</td><td>A.  Okay.</td></tr>
<tr><td>15</td><td>Q.  Mr. Cohen, I just want to remind everyone of where we left</td></tr>
<tr><td>16</td><td>things off with your testimony yesterday.</td></tr>
<tr><td>17</td><td>You testified about blood builders.  Do you recall</td></tr>
<tr><td>18</td><td>that?</td></tr>
<tr><td>19</td><td>A.  Yes.</td></tr>
<tr><td>20</td><td>Q.  And you'd testified yesterday that Epogen was a blood</td></tr>
<tr><td>21</td><td>builder?</td></tr>
<tr><td>22</td><td>A.  Correct.</td></tr>
<tr><td>23</td><td>Q.  Are you familiar with the term (inaudible)?</td></tr>
<tr><td>24</td><td>A.  Yes.</td></tr>
<tr><td>25</td><td>Q.  What is that?</td></tr>
</table>

1    A.  That's Epogen.

2    Q.  And you testified yesterday that's sometimes referred to as

3    "EPO"; is that correct?

4    A.  Correct.

5    Q.  What penalties could you face in the state of New York if

6    as a racehorse trainer you injected a horse with Epogen?

7    A.  I do not know what the penalties are at this time.  They

8    changed since I was training horses.

9    Q.  Could you give examples of some of the penalties you could

10   face?

11          MR. FASULO:  Objection.

12          THE COURT:  Sustained.

13   Q.  You testified --

14          THE COURT:  You are asking about at this time what he

15   could face?

16   Q.  Over the course of time, Mr. Cohen, did you become familiar

17   with the penalties that a racehorse trainer would face if they

18   administered Epogen to a horse?

19          THE COURT:  You can answer just "yes" or "no".

20   A.  Yes.

21   Q.  Focusing on the time when, the 30-year-old period when you

22   were a racehorse trainer did those penalties change?

23   A.  Yes.

24   Q.  What possible penalties are aware of that a trainer could

25   face?

1          MR. FASULO:  Objection.

2          THE COURT:  Grounds.

3          MR. FASULO:  When, judge?  Possible when?

4          THE COURT:  Can you pin it down time-wise, Ms.

5    Mortazavi?  He said he doesn't know what the penalties are

6    today.

7    Q.  At the time you were a racehorse trainer focusing on 2010

8    to pick a point in time, do you have a sense of what penalties

9    you could have faced around that time if you had administered

10   Epogen to a racehorse?

11   A.  I don't recall the exact penalties.

12   Q.  Okay.  Now when we left off yesterday you had testified

13   that you had administered performance enhancing drugs to your

14   racehorses; do you remember that?

15   A.  Yes.

16   Q.  You also testified that you had bought an sold performance

17   enhancing drugs; is that correct?

18   A.  Correct.

19   Q.  Was it also your testimony, Mr. Cohen, that you had

20   administered bleeding pills the day of a race?

21   A.  Correct.

22   Q.  I believe yesterday you testified that you administered

23   that via a drench, correct?

24   A.  Correct.

25   Q.  What other methods had you used to administer performance

1   enhancing drugs to racehorses that you trained?

2   A.  Intravenously, intramuscularly.

3   Q.  Does that mean by injection?

4   A.  Yes.

5   Q.  Approximately, how many times over the course of your

6   career have your horses tested positive on drug tests for

7   performance enhancing drugs?

8   A.  I'd say seven to ten times.

9   Q.  In, approximately, how many states?

10  A.  Three.

11  Q.  Are you familiar with baking soda in the context of

12  performance enhancing drugs?

13  A.  Yes.

14  Q.  Have you ever administered baking soda to your racehorses?

15  A.  Yes.

16  Q.  What effect does baking soda have on the body of a

17  racehorse?

18  A.  It helps get lactic acid out of the horse's muscles so that

19  they don't cramp up and get tired as easily.

20  Q.  How did you administer baking soda to you racehorses?

21  A.  Orally either through a dose syringe or through a

22  nasogastric tube.

23  Q.  Is that the process of drenching that you testified to

24  yesterday?

25  A.  Yes.

1    Q.  What's your understanding of whether you are permitted to

2    administer baking soda to your racehorses?

3    A.  You were not.

4    Q.  Mr. Cohen, have you ever been disciplined for that conduct?

5    A.  Yes.

6    Q.  Approximately, how many times?

7    A.  Three or four.

8    Q.  As far as you're aware, Mr. Cohen, how would the racing

9    commission find out that you had engaged in this conduct?

10   A.  The horses tested positive either high TC02 or a base

11   access test depends on the state.  Each state does their own

12   testing.

13   Q.  The instances in which your horses tested positive were

14   those other the only times you had administered drugs to your

15   racing horses?

16   A.  No.

17   Q.  Did there come a time when you learned a horse had tested

18   positive on a drug test for Epogen?

19   A.  I had positive tests for Epogen antibodies, not the drug.

20   Q.  How long had you been training horse that tested positive

21   before the drug test results came out?

22   A.  A week.

23   Q.  What consequences, if any, did you receive as a result of

24   that positive drug test?

25   A.  Only a warning and the horse had a clear test the following

1    week for antibodies.

2    Q.  Had you administered Epogen to that racehorse?

3    A.  No.

4    Q.  At that time did you have personal knowledge of who

5    administered Epogen to that racehorse?

6    A.  No.

7    Q.  Apart from that instance, have you ever administered Epogen

8    to your horses?

9    A.  Yes.

10   Q.  How do you administer Epogen?

11   A.  Intravenously.

12   Q.  When was the last time you had administered Epogen to a

13   racehorse that you had trained?

14   A.  Maybe, 15 years ago.

15   Q.  Did there come a time when you learned a horse of yours had

16   tested positive for Percocet and Vicodin?

17   A.  Yes.

18   Q.  Had you administered those drugs to your racehorse before

19   the positive test?

20   A.  No.

21   Q.  Did you have personal knowledge of who administered those

22   drugs to your racehorse?

23   A.  No.  Only hearsay.

24   Q.  You previously testified about a trainer's

25   responsibilities; do you remember all that?

M4TAAGIA1                    Cohen - Direct

1    A.  Yes.

2    Q.  And I believe you testified yesterday that trainers have

3    staff that help train racehorses; is that connect?

4    A.  Correct.

5    Q.  You mentioned "grooms"?

6    A.  Yes.

7    Q.  And you mentioned "assistant trainers"; is that right?

8    A.  Yes.

9    Q.  What kind of access do those people have to racehorses?

10   A.  Full access.

11   Q.  Returning back to the positive drug test that you just

12   mentioned, were you disciplined?

13   A.  Yes.

14   Q.  What penalty did you receive?

15   A.  One year and a $2500 fine.

16   Q.  One year of what?

17   A.  One-year suspension from training and a loss of my license

18   for that time.

19   Q.  In connection with the positive drug tests that we just

20   spoke of, did you have your license suspended on multiple

21   occasions?

22   A.  Can you be more clear?

23   Q.  Sure.  Over the course of your career as a racehorse

24   trainer, has your license been suspended on multiple occasions?

25   A.  Why he.

1    Q.  Did you continue to train racehorses even though your

2    license was suspended?

3    A.  Yes.

4    Q.  Did you train them under your name or someone else'?

5    A.  Somebody else's.

6    Q.  Mr. Cohen, did there come a time when you were charged with

7    crimes relating to conduct that you've just described?

8    A.  Which conduct.

9    Q.  I'll ask the question a different way.

10   A.  Okay.  Please.

11   Q.  Did there come a time when you were charged with crimes

12   relating to your distribution and use of drugs for the purpose

13   of enhancing the performance of racehorses?

14   A.  Yes.

15   Q.  When was that?

16   A.  March 9th of 2020.

17   Q.  Were you arrested at that time?

18   A.  Yes.

19   Q.  What did you decide to do after you were arrested and

20   charged?

21   A.  I decided to cooperate.

22   Q.  As part of your cooperation, did you meet with members of

23   the U.S. Attorney Office?

24   A.  Yes.

25   Q.  Had you met with me briefly?

1    A.  Yes.

2    Q.  After those meetings did you enter in any sort of

3    agreements with U.S. Attorney's Office?

4    A.  I entered into a cooperation agreement.

5            MS. MORTAZAVI:  Ms. Jung, could you please pull up for

6    the witness only, not for the jury, Government Exhibit 1102,

7    which is not in evidence.

8    Q.  Mr. Cohen, do you recognize this document?

9    A.  Yes.

10   Q.  What is this it?

11   A.  That's my cooperation agreement.

12           MS. MORTAZAVI:  Could we turn to the last page of this

13   exhibit.

14           (Pause)

15   Q.  Mr. Cohen, is that your signature on the final page of this

16   document?

17   A.  Yes, it is.

18   Q.  Did you plead guilty to any crimes after you signed this

19   agreement?

20   A.  Yes.

21   Q.  Which crimes?

22   A.  Mislabeling, misbranding and selling performance enhancing

23   drugs in racehorses.

24   Q.  What did you do that makes you guilty of that crime?

25   A.  I sold performance enhancing drugs to people.

1   Q.  Sitting here today, have you been sentenced for that crime?

2   A.  No, I have not.

3   Q.  Under the terms of this agreement with the U.S. Attorney's

4   Office, what are you required to do?

5   A.  I am required to tell the truth.  I am required to testify

6   when asked and be available for any sort of questioning at any

7   time.

8   Q.  And if you hold up your obligations under the agreement,

9   what is your understanding of what the government will do?

10  A.  I would hope for a 5K letter.

11  Q.  What is a 5K letter as you understand it?

12  A.  It's a letter stating my cooperation, level of cooperation

13  and what I've done to help, tell the truth in any situation.

14  Q.  Apart from your sale of misbranded and mislabeled drugs,

15  have you also participated in bribery related to horseracing?

16  A.  Yes.

17  Q.  What did you do?

18  A.  I paid drivers to hold their horses back in races.

19  Q.  Approximately, when did you do those things?

20  A.  Over 14 years ago.

21  Q.  Did you stand to gain financially from that arrangement?

22  A.  Yes.

23  Q.  Have you also delivered marijuana to people on occasion?

24  A.  Small doses, yes.

25  Q.  Approximately, how often?

M4TAAGIA1                          Cohen - Direct

1    A.   Maybe ten times.

2    Q.   Were you paid for that?

3    A.   Small amount of money, yes.

4    Q.   Have you ever been charged with committing those crimes?

5    A.   No.

6    Q.   Are those crimes included in this cooperation agreement?

7    A.   Yes.

8    Q.   Did you voluntarily tell the government about those crimes?

9    A.   Yes, I did.

10   Q.   If you live up to your obligations under the agreement,

11   what's your understanding of what the government will do with

12   respect to those crimes that you just described?

13   A.   That I will not be prosecuted for those crimes.

14   Q.   Even if you are not prosecuted for those crimes, what's

15   your understanding of whether the sentencing judge will be made

16   aware of those crimes?

17   A.   The judge will be made aware.

18   Q.   As you sit here today, have you been guaranteed that letter

19   from the government that you described earlier?

20   A.   No, I have not.

21   Q.   Under this agreement does the outcome of this trial matter

22   in determining whether or not you get a letter?

23            MR. FASULO:   Objection.

24   A.   No, it does not.

25            THE COURT:   Sustained.   The jury should disregard that

1    answer.

2              THE WITNESS:  Sorry.

3    Q.  As you sit here today, Mr. Cohen, have you been promised

4    any particular sentence by the government?

5    A.  No, I have not.

6    Q.  What is the maximum sentence you could face?

7    A.  Five years in prison.

8    Q.  What happens to this agreement if you lie on the stand?

9    A.  It's null and void.

10   Q.  Will you get a letter from the government?

11   A.  No.

12   Q.  Could you be prosecuted for any additional crimes?

13   A.  Yes.

14   Q.  If you lie on the stand do you get to take back your guilty

15   plea?

16   A.  No, I do not.

17             MS. MORTAZAVI:  No further questions.

18             THE COURT:  Thank you, Ms. Mortazavi.

19             Mr. Fasulo, cross?

20             MR. FASULO:  Yes.  Thank you, your Honor.

21   CROSS-EXAMINATION

22   BY MR. FASULO:

23   Q.  Good morning, Mr. Cohen.

24   A.  Good morning, sir.

25   Q.  Mr. Cohen, tell us again about your educational experience.

1   A.  I have a high school diploma but I have an animal science

2   degree, associates degree from the State University of New

3   York, in Morris ville.

4   Q.  And in that degree can you give the Court and the jury here

5   an understanding of what it is that you studied in getting that

6   degree, what kind of classes?

7   A.  I took anatomy and physical horse nutrition.  I took

8   farrier, shoeing courses, horseshoeing.  I also took accounting

9   classes, took harness racing classes, as well.

10  Q.  All of this was in your anticipation of entering into the

11  horseracing industry or --

12  A.  Into the industry I also applied to Cornell University

13  possibly to go to vet school and also applied to University of

14  Arizona for abstract management.

15  Q.  There came a time that you did enter in the industry?

16  A.  Yes, sir.

17  Q.  If what portion did you begin?

18  A.  I was an assistant trainer/groom.

19  Q.  As an assistant trainer/groomer you worked under the

20  authority off the trainer, right?

21  A.  Yes, sir.

22  Q.  Would it be fair to say that in the preparation of horses

23  for races, you had a different role that worked with you?  The

24  trainers had one role, assistant trainer had another role.  The

25  groomsmen had another role?

1   A.  Yes, sir.

2   Q.  Those were pretty defined roles, correct?

3   A.  Each stable defined them differently, but yes.

4   Q.  At the end of the day the trainer was responsible,

5   ultimately response for the preparation of a horse for races,

6   correct?

7   A.  It was the trainer's barn.  They were final say.

8   Q.  And in terms of the care of horses, the trainer worked with

9   the vets regarding the care of the horses; is that fair to say?

10  A.  Sometimes, not directly.  Sometimes the trainer would

11  authorize the assistant trainers or delegate some sort of

12  duties.

13  Q.  When you say "delegate", you would still oversee the

14  actions of the assistant trainer or anybody else that was

15  working with you, correct?  Cause you were ultimately

16  responsible as a trainer; is that fair to say?

17  A.  Yes, sir.

18  Q.  You did this in an effort to optimize your horses and to

19  win races?

20  A.  Did what?

21  Q.  Did your job, as a trainer your goal was to win races?

22  A.  Yes, sir.

23  Q.  In fact, at some point in your life you said you also

24  bought horses, right?

25  A.  Yes, sir.

1    Q.  You bought in groups or individually or both?

2    A.  Both.

3    Q.  During the time that you actually owned horses, were you

4    also the trainer of those horses?

5    A.  Yes, sir.

6    Q.  And at that time when you were owning the horses, how many

7    horses did you own?

8    A.  I couldn't tell you off the top of my head.  Sorry.

9    Q.  At the time that you owned any of those horses during the

10   period of your ownership, you engaged in giving those horses

11   performance enhancing drugs to win races?

12   A.  Yes, sir.

13   Q.  And you did that knowing that that was not fair?

14   A.  Yes, sir.

15   Q.  It was against the track rules?

16   A.  Against the commission rules.

17   Q.  But it put money in your pocket?

18   A.  Correct.

19   Q.  You did it because you wanted the money it in your pocket,

20   right?

21   A.  Yes, sir.

22   Q.  And you lied when you did it, right?

23   A.  Yes, sir.

24   Q.  And you had no problem lying because it benefited you; is

25   that fair to say?

1   A.  Benefited me and others, yes.

2   Q.  Benefited you and others, correct?

3   A.  Yes, sir.

4   Q.  And in fact, you were also asked by many at the track

5   during the time that you worked in the track to fix races,

6   correct?

7   A.  I wasn't asked by many, no.

8   Q.  Well, you fixed many races, didn't you?

9   A.  I did, yes, but not asked by many people to do it.

10  Q.  You decided to do it just by yourself?

11  A.  No.  I had one person that asked me.

12  Q.  Who was that person?

13          MS. MORTAZAVI:  Objection; relevance.

14          THE COURT:  I am going to allow it.

15  A.  Who was the person that asked me?

16          THE COURT:  Yes.  That's the question.

17  A.  Bob Grove.

18  Q.  What was his position in relationship to your position?

19  A.  He owned a couple of racehorses.

20          THE COURT:  I am going to instruct both of you to let

21  Mr. Fasulo finish the question and Mr. Fasulo, please, let

22  Mr. Cohen finish his answer so we get a clear record.  Okay?

23  Q.  He was the horse owner, correct?

24  A.  Yes, sir.

25  Q.  He asked you to fix races on behalf of his horses, correct?

Cross – Cohen

1    A.  On behalf of him, not always his horses.

2    Q.  So that he would win money, correct?

3    A.  Correct.

4    Q.  And when you went to fix races you went to talk to other

5    trainers and other riders, correct?

6    A.  Drivers.

7    Q.  Was that in thoroughbred or standardbred?

8    A.  Standardbred.

9    Q.  When with you talked to drivers, you told them that you

10   wanted them to either slow their horses up or do something to

11   affect the ultimate outcome of those races, correct?

12   A.  Correct.

13   Q.  You had discussions with them, right?

14   A.  Correct.

15   Q.  And these would be secret discussions, right?

16   A.  Correct.

17   Q.  You would publicize that around the racetrack?

18   A.  Correct.

19   Q.  You made a decision based on a relationship you had built

20   with these drivers, correct?

21   A.  Yes, sir.

22   Q.  Some of them never participated in such activity until

23   approached by you?

24           MS. MORTAZAVI:  Objection; foundation.

25   Q.  If you know.

M4TAAGIA1                          Cross - Cohen

1          THE COURT:  Sustained.  Rephrase the question.

2          MR. FASULO:  I'll move on.

3   Q.  If, and in fact, that you did in the beginning of your

4   career, correct, somewhere in the 2010 around that time?

5   A.  Middle of my career.

6   Q.  Middle of your career.  At the end of your career in 2019

7   you became, you had an opportunity to become an authority at

8   one of the racetracks, is that right, assistant director?

9   A.  I was assistant director of racing at Goshen Historic

10  Track.

11  Q.  Where is that?

12  A.  In Goshen, New York.

13  Q.  When did you become the assistant director at Goshen

14  Historic Park?

15  A.  Approximately, 2019.

16  Q.  And prior to that time you had been juicing horses?

17  A.  Yes.

18  Q.  And in fact, as the director you had a responsibility and

19  authority at that track, correct?

20  A.  I don't recall having authority.

21  Q.  You did well.  You were assistant director of the track up

22  there?

23  A.  Not of the track.  Just of the meet that was going on.  I

24  just helped the director of racing who was in charge but I

25  didn't really have much authority.

M4TAAGIA1                          Cross - Cohen

1    Q.  But you had, you were seen in an administrative role to

2    ensure the integrity of racing and the meets, as well as

3    everybody else up at that time at the track, correct?

4              MS. MORTAZAVI:  Objection, compound.

5              MR. FASULO:  I'll withdraw.

6    Q.  As the assistant director of meets -- is that what your

7    title was?

8    A.  I could not really say that I had a title but we could

9    assume that the title is assistant director.

10   Q.  I'm not asking you to assume anything.  What was your job?

11   A.  I helped organize the race meets.  I did media, public

12   relations.  I called trainers to see if they could enter their

13   horses to race.  We had fund raisers, just different

14   promotions.  I wasn't really in an authoritative role.

15   Q.  You did that on behalf of the Goshen track, correct?

16   A.  They paid me a salary to do that.

17   Q.  Correct.  And they had expectations that you were going to

18   act ethically and professionally as you did that, correct?

19   A.  Correct.

20   Q.  They didn't have expectations that you were engaging, you

21   would engage in activity that would change outcomes of

22   horseraces?

23             MS. MORTAZAVI:  Objection.

24             THE COURT:  Sustained.

25   Q.  During the time that you had this position, you did do

M4TAAGIA1                          Cross - Cohen

```
1    activities that were not permitted at the track; isn't that
2    fair to say?  Were you involved with any performance enhancing
3    drugs at that time?
4    A.  Yes.
5    Q.  And you did see the administration or administer those
6    drugs to horses at that time?
7    A.  Correct.
8    Q.  And it affected races in the same place where you had this
9    paid position; is that fair to say?
10   A.  No.
11   Q.  At the same track?
12   A.  I didn't racehorses at Goshen.
13   Q.  You had no affect on any of the races in Goshen when you
14   were working there?  You did nothing to affect the races there?
15   A.  No, nothing.
16   Q.  You were selling PEDs?
17   A.  Correct.
18   Q.  You were selling them for Dr. Grasso; is that correct?
19   A.  No.
20   Q.  For Mr. Skelton?
21   A.  Dr. Skelton.
22   Q.  Right.  Who was Dr. Skelton?
23   A.  Veterinarian in Illinois.
24   Q.  When were you selling these PEDs for Dr. Skelton?
25   A.  From about 2017 to 20 -- till I got arrested 2020.
```

M4TAAGIA1                          Cross - Cohen

1    Q.  You were selling them -- where were you selling them?

2    A.  New York, Pennsylvania, jersey.

3    Q.  Who were you selling them to?

4    A.  Trainers and owners of racehorses.

5    Q.  When you were selling these PEDs, you were selling them

6    with the understanding that they were going to enhance and

7    affect the races, correct?

8    A.  Correct.

9    Q.  In the hope of enhancing the horse's performance on the

10   track?

11   A.  Correct.

12   Q.  And you also had a relationship with Dr. Grasso, the vet?

13   A.  Correct.

14   Q.  And in that relationship, tell me about that relationship

15   with Dr. Grasso.  What is your relationship with Grasso as it

16   relates to PEDs and other substance that were given to horses?

17   A.  He did some work on some of my horses and I had bought some

18   products from him to try on some of my horses and I had in

19   times called him for advice on some horses.

20   Q.  When you say "products", those were performance enhancing

21   drugs many of them?

22   A.  Yes.

23   Q.  And there came a time that you met Lisa Ranger you said

24   sometime in the 90s, late 90s; is that correct?

25   A.  Yes, sir.

M4TAAGIA1                          Cross – Cohen

1   Q.  But you had no dealings with her until sometime in 2009 or

2   2010?

3             I'll withdraw that question.

4   Q.  What year did you have dealings with Lisa Ranger?

5   A.  I can't pinpoint the exact time.  2001 I got introduced to

6   her to start purchasing products, approximately.

7   Q.  Could it have been 2005?

8   A.  No.  It was definitely in the 2001 range.

9   Q.  Okay.  And when you met her you had already met Dr.

10  Fishman; isn't that fair to say?

11  A.  I had been introduced to him a few years earlier, just a

12  basic hello, nice to meet you.

13  Q.  And in fact, you had many conversations with Dr. Fishman

14  about the products that he was producing or prescribing to your

15  horses, correct?

16  A.  I don't know about "many".  He's a tough person to get on

17  phone.

18  Q.  I think you said on direct-examination you talked about

19  once a month?

20  A.  No.  I talked to Lisa about once a month.

21  Q.  How many times did you talk to Dr. Fishman.

22  A.  A few.  I couldn't pinpoint exactly how many times, sir.

23  Q.  And it was Dr. Fishman that suggested to you what would be

24  good products to administer to your horses; is that correct?

25  A.  Lisa had recommended some and Dr. Fishman had recommended

1    some.

2    Q.  Now when you say Lisa had recommended some, you bought a

3    lot of products from Lisa Ranger, Lisa Giannelli, correct?

4    A.  Yes, sir.

5    Q.  And a lot of those products had to do with vitamins,

6    correct?

7    A.  Correct.

8    Q.  A lot of those products were not PEDs in fact?

9    A.  Honestly, at this point, I don't know what the definition

10   of "PED" is.

11   Q.  You would be invoiced for these products depending on where

12   you were working to either yourself or to the stables that you

13   were working at, correct?

14   A.  Yes, sir.

15   Q.  And in those invoices it would indicate to you and to the

16   owners what was being sold to you, correct?

17   A.  Yes, sir.

18   Q.  The product names, correct?

19   A.  Yes, sir.

20   Q.  And also the cost of products, correct?

21   A.  Yes, sir.

22   Q.  Shipping costs, et cetera?

23   A.  Yes, sir.

24   Q.  It would be pretty detailed, right?

25   A.  Yes, sir.

1  Q.  And those bills weren't paid directly by you; wouldn't that

2  be fair to say?

3  A.  Some were.

4  Q.  Okay.  If you owned the horse?

5  A.  At first I'd actually pay for them all and then bill my

6  owners direct, then we'd switch.

7  Q.  At the end of the day your owners had to pay for the bill?

8  A.  Correct.

9  Q.  You weren't financing the horses that you were training?

10 A.  No.

11 Q.  So at the end of the day, the owners would have to pay

12 those bills based on those invoices?

13 A.  Correct.

14 Q.  And in fact as a trainer you're training not only the

15 horses that are going to race tomorrow but you are training

16 horses that may race a year from now, six months from now, nine

17 months from now, correct?

18 A.  Correct.

19 Q.  Depends on the horse and what stage they are in their

20 development, correct?

21 A.  Correct.

22 Q.  You would agree that some of the drugs that you purchased

23 could to be used outside the track without any problem or

24 without any violation as you trained those horses, correct?

25 A.  Could you be more specific?

```
 1   Q.  For example, using PED performance enhancing drugs on a
 2   horse that is not racing or is not going to race within the
 3   next six months, would not be a violation of any of the racing
 4   rules that you are aware of; is that fair to say?
 5   A.  I don't really think that -- you can administer anything to
 6   a racehorse -- prescription or authorization.  Most things must
 7   be administered by a veterinarian.
 8   Q.  Right.  But under the veterinarians and your agreement that
 9   the horse is in need of those particular drugs or you've
10   discussed it with your vet, correct?
11   A.  That's correct.
12   Q.  There's a discussion with the vet as to how the horse is
13   reacting, what the horse's needs are and the vet prescribes
14   medications or drugs that they will optimize the horse's
15   performance, correct?
16           MS. MORTAZAVI:  Objection.
17   Q.  Is that what your understanding is?
18           THE COURT:  Hold on.
19           MS. MORTAZAVI:  Compound.
20           THE COURT:  Can you rephrase?
21           MR. FASULO:  I will.
22   Q.  So when you said that it's with a prescription from the
23   vet, what I am asking you is you have a discussion with the vet
24   about the needs of your horse; is that true?
25   A.  Yes, sir.
```

M4TAAGIA1                    Cross - Cohen

Q.  And the vet then discusses different alternative treatments

that can be engaged with that particular horse, correct?

A.  Yes, sir.

Q.  And at times you as a trainer make certain suggestions as

to what you believe the horse needs to optimize their

performances?

A.  Correct.

Q.  To alleviate their pain?

A.  A lot of different things, not just too --

Q.  And you have that ongoing conversation with the vet,

correct?

A.  Yes, sir.

Q.  And after you have had that conversation, those drugs can

be legally administered as far as you know to the horse as long

as the horse isn't racing within a framework that would be

prohibited by any state racing commission?

            MS. MORTAZAVI:  Objection.

            THE COURT:  Sustained.  Lay a better foundation.

Q.  And in getting this information from the vet and making

these decisions on the horses, you can administer those drugs,

the vet can administer those drugs to the horses or in cases

you can administer some of those supplements to the horses as

well, correct?

            MS. MORTAZAVI:  Objection.

            THE COURT:  Sustained.

1   Q.  Let me ask you, you worked with horses that are not going

2   to race within the next, within a short period of time assuming

3   your horse is going to raceway in the future?

4   A.  When I trained?

5   Q.  Yeah.  When you trained, going back to when --

6   A.  Yes.

7   Q.  And in those situations would it be okay for you to

8   administer drugs to enhance that horse's performance, as far as

9   you know?

10  A.  No, it's not okay to administer performance enhancing

11  drugs.

12  Q.  Is it illegal to buy performance enhancing drugs from a

13  vet?

14  A.  If the vet gives you a prescription.

15  Q.  Right.

16  A.  No.

17  Q.  And if the vet gives you a prescription those drugs could

18  be administered to the horse prior to racing as long as it's

19  within --

20  A.  But you said --

21          THE COURT:  Wait a minute.  Let him finish.

22  Q.  And those for performance enhancing drugs could be

23  administered to the horse as long as the horse isn't racing

24  within a prescribed period of time as per the racing

25  commissions.

1          MS. MORTAZAVI:  Objection.

2          THE COURT:  Sustained.  You need to lay a foundation.

3     Q.  What's the term "hard training".  Do you understand that

4     term?

5     A.  It can be used in many different ways saying that.

6     Q.  How about the term "breeds horses"?

7     A.  That's more of a thoroughbred term.

8     Q.  You worked with mostly standardbreds, correct?

9     A.  Correct.

10    Q.  What I'd like to know is you're in the development of

11    horses not only the day of the race, the week of the race but

12    in preparation for future races; is that right?

13    A.  Correct.

14    Q.  And in preparing for future races, do you have to assess

15    the horse's needs as it relates to pain, as it relates to their

16    breathing, and as it relates to their performance?  Do you

17    assess that as a trainer as you are preparing your horses?

18    A.  You evaluate an athlete whether it's human or equine as a

19    trainer.

20    Q.  And you can do it as far out as a year before that horse

21    will ever get on a track; is that fair to say?

22    A.  That's fair to say.

23    Q.  All right.  And you can be with a horse for a year before

24    that horse will actually run in a track here or in any track?

25    A.  Sometimes.

1   Q.  All right.  And as a trainer you have to be concerned about

2   those horses during that time; isn't that fair to say?

3   A.  Absolutely.

4   Q.  Those assessments we talked about before where you're

5   talking to the vet and you are making a decision on care and

6   the optimization of the horse's potential are done at that

7   time, as well as later when they're racing, correct?

8   A.  Correct.  You can evaluate health, different situations.

9   Q.  Right.  At any time when you are evaluating health there

10  will be medications, vitamins and supplements that may be

11  prescribed for the horse, correct?

12  A.  That is correct.

13  Q.  And you would agree with me that some of those medications

14  or supplements are permitted to be administered to the horse as

15  long as the horse is not on the racetrack; is that fair to say?

16  A.  Correct.

17  Q.  And you would agree with me that it is the track rules

18  which guide when, what drugs may be administered to a horse

19  prior to racing and what drugs are not permitted to be

20  administered to a horse prior to racing, right?

21          MS. MORTAZAVI:  Objection.  It misstates the witness's

22  testimony.

23          THE COURT:  Overruled.

24          But you can answer it to the extent of your

25  understanding.

1    A.  It is not the racetrack rules.  It is the commission's

2    rules.

3    Q.  Right.  The commission's rulings, correct?

4    A.  Correct.

5    Q.  And in fact, many of the items that you bought from Lisa

6    Giannelli were vitamins and supplements; is that fair to say?

7    A.  Yes, sir.

8    Q.  And that's the bulk of what you bought from her, correct?

9    A.  Yes, sir.

10   Q.  And it was Skelton and Grasso that you bought your PEDs

11   from; isn't that fair to say?

12   A.  A bought a large amount of them from them.

13   Q.  And then not only did you buy the PEDs, you began to sell

14   them, correct?

15   A.  For Dr. Skelton.

16   Q.  And when you bought them, when you bought those PEDs that

17   you then sold, you didn't buy those from Lisa Ranger or Lisa

18   Giannelli; isn't that fair to say?

19   A.  Correct.

20   Q.  Cause you had your own network where you would be buying

21   those items, correct?

22   A.  Correct.

23   Q.  And you bought them with the purpose of selling them to

24   people who you knew were going to use them to win horseraces;

25   is that fair to say?

1    A.  Yes, sir.

2    Q.  And that's because you had conversations with those people

3    about their intent, about their reason for wanting to use those

4    drugs; is that fair to say?

5            MS. MORTAZAVI:  Objection; calls for hearsay.

6            THE COURT:  No.  Just ask did he have conversations.

7    A.  Yes.

8    Q.  Now, you talked about -- I'd like you to look at what's

9    been marked as Government Exhibit 11002.  It's on your screen?

10           THE COURT:  It's not on the screen for the jurors,

11   right?  Thank you.

12   Q.  Now you entered into this agreement in June of 2020,

13   correct?

14   A.  Correct.

15   Q.  And prior to entering this agreement you were aware that

16   you were facing federal felony charges, correct?

17   A.  Correct.

18   Q.  You were aware that those are pretty serious charges,

19   correct?

20   A.  Yes, sir.

21   Q.  You were aware that for the crimes that you were charged

22   with that you could face up to five years in jail, correct?

23   A.  Yes, sir.

24   Q.  And you were also aware that you yourself had engaged in

25   other criminal activity unrelated to the charge in that federal

1  court indictment; isn't that true?

2  A.  Yes, sir.

3  Q.  And the other charges that you were aware that you were

4  involved in, had to do with bribery, correct?

5  A.  Yes, sir.

6  Q.  When you say "bribery", that is that you paid somebody,

7  right?  Somebody paid you or you paid somebody to do something

8  illegal, correct?

9  A.  Someone gave me money to pay people, yes.

10  Q.  When you say somebody gave you money to pay people, what

11  did they give you money to pay in those bribery cases?  For

12  what reason did they give you money to be paid out to others?

13          MS. MORTAZAVI:  Objection; speculation.

14          THE COURT:  Overruled.

15  A.  To hold their horses back, fix races.

16  Q.  So you took money and then you paid the money to others to

17  hold horses back, correct?

18  A.  Correct.

19  Q.  And that's not even part of this plea agreement in terms of

20  the maximum sentence that you could face here in court today;

21  is that fair to say?

22  A.  Yes, sir.

23  Q.  Because the government has said that they will not pursue

24  those charges against you on bribery, correct?

25  A.  Correct.

M4TAAGIA1                          Cross - Cohen

1    Q.   And how many times were you involved in an act of bribery

2    during the last ten years or during the time that you were a

3    trainer?

4    A.   The last ten years.

5    Q.   During the time that you were a trainer?

6    A.   I couldn't tell you the amount of times.

7    Q.   Five?

8    A.   I, honestly, sir, I couldn't tell you.

9    Q.   Well, you would know if it was once?

10   A.   It was more than five.  I don't think it was over 20.

11   Q.   Okay.

12   A.   That's an approximation.

13   Q.   Somewhere between five and 20; would that be fair to say?

14   A.   Yes, sir.

15   Q.   Of separate bribery instances, correct?

16   A.   Correct.

17   Q.   How many riders of horses did you pay during the time that

18   you were involved in this bribery scheme?

19   A.   I couldn't tell you the amount.  I don't know.  I don't

20   know.

21   Q.   Was it one, two, 10?

22   A.   Maybe 10.

23   Q.   And you realize that if you had those charges of bribery

24   against you, your potential sentence in any case, if convicted,

25   would be far substantially higher than five years, correct?

1              MS. MORTAZAVI:  Objection.

2              THE COURT:  Sustained.

3    Q.  Did you have a discussion -- do you have any understanding

4    about what being charged with bribery -- Let me rephrase that,

5    judge.

6              If you were charged with bribery -- Withdrawn.

7              Prior to signing this agreement you had an

8    understanding that you had other criminal activity that you can

9    be held accountable for.

10             You understand that, correct?

11   A.  That's what I willfully admitted about before any

12   agreement.

13   Q.  You entered into that agreement knowing that you had other

14   criminal activity that you could be held accountable for, other

15   than the one charged in this federal court indictment, right?

16   A.  Correct.

17   Q.  Could you admitted to a lot, correct?

18   A.  I admitted to it, yes.

19   Q.  Right.  And you knew that by having other criminal conduct

20   that that would expose you to potential other criminal

21   penalties for that conduct; did you know that?

22   A.  Yes.

23   Q.  And so one of the criteria for you to sign this agreement

24   was the fact that you weren't going to face any additional

25   penalties other than what's in that agreement, correct, that

M4T6GIA2                          Cohen – Cross

1   the maximum penalty you can face is up to five years in jail?

2   A.  No.  The judge will be notified what my crimes were and

3   could sentence me to more than that.

4   Q.  That's your understanding, the judge can sentence you to

5   more than the five years?

6   A.  Correct.

7   Q.  And you've read this agreement, correct?

8   A.  Yes, sir.

9   Q.  And at the end of day it is up to the judge to determine

10  what your sentence is, correct?

11  A.  Absolutely.

12  Q.  And when you say the judge can use those factors in her

13  sentencing, that's what you are talking about, right?

14  A.  Yes.

15  Q.  But there's no additional charges that are against you for

16  those additional criminal acts; isn't that fair to say?

17  A.  Correct.

18  Q.  You didn't plead guilty to bribery, right?

19  A.  No, sir.

20            (Continued on next page)

21

22

23

24

25

1   Q.  And you didn't plead guilty to selling drugs without a

2   license, correct?

3   A.  Correct.

4   Q.  And you didn't plead guilty to fixing races, correct?

5   A.  Correct.

6   Q.  So none of that you can't -- you were not going to be held

7   accountable in any other court for those criminal acts as far

8   as you know based on this agreement you have with the

9   government?

10          MS. MORTAZAVI:  Objection.

11          THE COURT:  He can say what his understanding is.

12  A.  My understanding is that I won't be prosecuted for those

13  crimes.

14  Q.  And that was an incentive for to you enter into this

15  agreement, correct?

16  A.  No.  That wasn't necessarily an incentive.  Incentive was

17  to try and make right from my wrongs and tell the truth.

18  Q.  Sir, are you telling us here today that incentive -- that

19  was not an incentive, for you to enter into this agreement to

20  avoid prosecution for those other crimes?

21  A.  At the time, I didn't think of it as that.  But if you

22  phrase it that way, I don't -- I don't -- honestly, sir, I

23  don't know.  I don't know off the top of my head how I feel.

24  Q.  So you don't know whether it was an incentive; is that what

25  you're saying?

1    A.  I guess it could have been.  I'm not -- I don't know right

2    now.  I really don't.  If it was an inventive in my mind or not

3    an incentive at the time when I entered into it.

4    Q.  But was it an incentive in the agreement the hope that you

5    would get a 5K letter from the government?  Was that an

6    incentive?

7    A.  Yes.

8    Q.  And was it an incentive entering into this agreement once

9    you got that 5K letter, which is a letter by the prosecutor to

10   the judge, that your sentence would be substantially less than

11   it would be if you didn't have that 5K letter?

12   A.  Sentence is up to the judge.  They could write a letter

13   just expressing my cooperation, but the final say is the judge

14   makes my sentence.

15   Q.  Absolutely.  What did you want to happen when you signed

16   this agreement, sir?

17   A.  I would hope my cooperation would help me move forward with

18   my life, and -- and possibly a lighter sentence, yes.  But

19   more, more than anything, sir, to just move forward and not

20   backwards.

21             MR. FASULO:  No further questions, Judge.

22             THE COURT:  Thank you.  Any redirect?

23             MS. MORTAZAVI:  Yes, your Honor.

24

25

M4T6GIA2                        Cohen – Redirect

1    REDIRECT EXAMINATION

2    BY MS. MORTAZAVI:

3    Q.  Hello, again, Mr. Cohen?

4    A.  Hello.  Sorry, hello.

5    Q.  You were asked a few questions by Mr. Fasulo, and I'd just

6    like to follow up on some of those, if I may.

7              You mentioned a moment ago when you were being

8    questioned that you bought products from Lisa Ranger, as you

9    knew her, that were vitamins or supplements; is that right?

10   A.  Correct.

11   Q.  Did you also buy equipment from her?  So, for example,

12   needles --

13             MR. FASULO:  Objection, Judge.  Leading.

14             THE COURT:  The "for example" is leading.

15   Q.  Was there anything else you bought from her -- what, if

16   anything, did you buy from her that wasn't intended to enter

17   the body of a horse?

18   A.  I bought needles and syringes, yes.  But needles can enter

19   the body of a horse, so a little lost on clarity there.  Sorry.

20   Q.  Thank you for clarifying.

21             What, if any, drugs did you purchase from Lisa Ranger,

22   as you knew her?

23   A.  I had bought, like we said yesterday, phenylbutazon,

24   flunixin, collateral ACTH, iron sucrose, vitamin B12, folic

25   acid, electrolyte jugs, vitamin C.  That's just off the top of

M4T6GIA2                        Cohen – Redirect

1    my head.

2    Q.  All right.  And yesterday you testified, and I believe this

3    morning you testified, that you received bleeding pills from

4    her as well, correct?

5    A.  Yes, sir.

6    Q.  Fair to say that you bought vitamin supplements and drugs

7    from her?

8    A.  Correct.

9    Q.  At one point, Mr. Cohen, you stated that you don't know at

10   this point the definition of a performance enhancing drug; is

11   that right?

12   A.  I just lost clarity over it over the course of the two

13   years now of what the real definition is at this point,

14   honestly.

15   Q.  Apart from the technical definition, what's your

16   understanding?  Do you have an understanding of what's

17   prohibited under the racing rules in New York State?

18           MR. FASULO:  Objection.  Time, Judge.

19           THE COURT:  You can put a time frame on it, please.

20   Q.  Mr. Cohen, before your arrest in this case, before March 9,

21   2020, focusing on that time period, did you have an idea of

22   what sorts of substances you're not allowed to use on a

23   racehorse in New York State?

24   A.  Yes.

25   Q.  And you testified yesterday that you were licensed as a

M4T6GIA2                        Cohen - Redirect

1  trainer in multiple states; is that correct?

2  A.  Correct.

3  Q.  And what did you tell us in your testimony yesterday about

4  whether or not you had to be familiar with the racing rules?

5  A.  You needed to know withdrawal periods for drugs.

6  Q.  You were also asked by Mr. Fasulo about administering drugs

7  to horses that won't race for several months or even a year.

8  Do you recall those questions?

9  A.  Yes.

10 Q.  And you testified that if you have no valid prescription,

11 you cannot administer those drugs; is that correct?

12 A.  The veterinarian can.

13 Q.  As a trainer?

14 A.  I cannot.

15 Q.  You were also asked some questions by Mr. Fasulo about the

16 course of training a racehorse.  Do you recall those questions?

17 A.  Yes.

18 Q.  What's the most stressful event a racehorse will

19 experience?

20         MR. FASULO:  Objection.

21         THE COURT:  He can testify to his understanding, if he

22 has one.  You better lay a foundation, actually.

23 Q.  You've trained your horses, Mr. Cohen?

24 A.  Yes.

25 Q.  And what's the term of art that you use for training a

M4T6GIA2                          Cohen – Redirect

1    horse?

2    A.   Train.

3    Q.   Have you heard of the terms jogging, breezing?

4    A.   Jogging, yes.  Breezing is more of a thoroughbred term.

5    Q.   So you're familiar with various steps that a trainer would

6    take to train a racehorse before a race?

7    A.   Correct.

8    Q.   And you've raced your racehorses, correct?

9    A.   Yes.

10   Q.   Okay.  Based on your experience over the 30 years that you

11   spent as a racehorse trainer, what's the most stressful event a

12   racehorse endures?

13   A.   The race itself.

14   Q.   Do racehorses win purse money on days they train?

15              MR. FASULO:  Objection.

16              THE COURT:  Overruled.

17   A.   No.

18   Q.   And you testified yesterday that horses that place at the

19   end of a race earn purse money, correct?

20   A.   Correct.

21   Q.   You were also asked about your cooperation agreement by

22   both myself and Mr. Fasulo.  Do you recall those questions?

23   A.   Yes.

24   Q.   And, specifically, the questions related to bribery or race

25   fixing, correct?

M4T6GIA2                    Cohen - Redirect

1    A.  Correct.

2    Q.  Were you charged with those crimes at the time you told the

3    government about those crimes?

4    A.  No, I was not.

5    Q.  And at that time, at the time you first told the government

6    about those crimes, were any promises made to you?

7    A.  No.  None were made.

8    Q.  And that cooperation agreement between you and the U.S.

9    Attorney's Office, is any other prosecutor's office part of

10   that agreement?

11   A.  No.

12   Q.  And once again, that was an agreement between and you which

13   party?

14   A.  The U.S. Attorney's Office.

15   Q.  What's the maximum sentence you could face for the crime

16   that you pled guilty to?

17   A.  Five years in prison.

18   Q.  And, sir, you were also asked some questions about

19   trainers' responsibility over racehorses.  Do you recall those

20   questions?

21   A.  Yes.

22   Q.  As far as you know, was that a defense to the crime you

23   were charged with?

24           MR. FASULO:  Objection.

25           THE COURT:  Sustained.

1    Q.  You were also asked questions, Mr. Cohen, about your

2    interactions with several veterinarians.  Do you recall those

3    questions?

4    A.  Yes.

5    Q.  The ones about Dr. Skelton?

6    A.  Yes.

7    Q.  Dr. Grasso?

8    A.  Yes.

9    Q.  Dr. Fishman?

10   A.  Yes.

11   Q.  Did you consider any of those individuals the veterinarian

12   for your racehorses?

13   A.  Dr. Skelton and Dr. Grasso.

14   Q.  Not Dr. Fishman?

15   A.  No.

16            MS. MORTAZAVI:  No further questions.

17            THE COURT:  Anything further, Mr. Fasulo?

18            MR. FASULO:  No, your Honor.

19            THE COURT:  All right.  Mr. Cohen, you're excused with

20   the thanks of the Court.

21            THE WITNESS:  Thank you, your Honor.

22            THE COURT:  Sir, please put your mask back on.

23            THE WITNESS:  Yes.

24            THE COURT:  Thank you.

25            (Witness steps down)

M4T6GIA2                         Eichsteadt - Direct

1            Mr. Gianforti, the government's next witness.

2            MR. GIANFORTI:  Your Honor, the government calls

3    Lenny Eichsteadt.

4            THE COURT:  Is he here with us?

5            MR. GIANFORTI:  Yes.

6            (Pause)

7            DEPUTY CLERK:  Good morning.  Please raise your right

8    hand.

9     LENNY EICHSTEADT,

10        called as a witness by the Government, having been duly

11    sworn, testified as follows:

12            DEPUTY CLERK:  Please state and spell your name for

13    the record.

14            THE WITNESS:  Lenny Eichsteadt, L-E-N-N-Y,

15    E-I-C-H-S-T-E-A-D-T.

16            DEPUTY CLERK:  Thank you.  You may be seated.  Move

17    the mic so you can speak into it.

18            THE COURT:  All right.  Mr. Gianforti, please.

19            MR. GIANFORTI:  Thank you.

20    DIRECT EXAMINATION

21    BY MR. GIANFORTI:

22    Q.  Good morning, Mr. Eichsteadt.

23    A.  Good morning.

24    Q.  Sir, where do you work?

25    A.  I work for the Food and Drug Administration, Office of

M4T6GIA2                        Eichsteadt – Direct

1    Criminal Investigation.

2    Q.  And what is your position, there?

3    A.  I'm an investigative analyst.

4    Q.  How long have you been an investigative analyst with the

5    FDA?

6    A.  Four years.

7    Q.  What did you do before that?

8    A.  I was a special agent and special agent in charge for the

9    U.S. Office of Personnel Management, Federal Investigative

10   Services.

11   Q.  How long did you do that for?

12   A.  I did that for about nine years.

13   Q.  And what did you do before that, sir?

14   A.  I was in the Air Force for 20 year.

15   Q.  During your time at the FDA, had you participated in the

16   execution of search warrants at physical locations?

17   A.  Yes.

18   Q.  Approximately how many times?

19   A.  Approximately 15 to 18 times.

20   Q.  Sir, directing your attention to October 27, 2019, did you

21   participate in any searches on that day?

22   A.  Yes, I did.

23   Q.  Which locations did you search?

24   A.  We searched a storage unit at 189 Linton Boulevard in

25   757 Delray Beach, Florida, a condo at 2565 South Ocean

M4T6GIA2                            Eichsteadt - Direct

1   Boulevard, 412 North in Highland Avenue, and a business at 3500

2   Northwest Boca Raton Boulevard.  I think it was unit 723 in

3   Boca Raton.

4   Q.  Thank you, sir.  Who were those locations associated with?

5   A.  Mr. Seth Fishman.

6   Q.  How do you know that?

7   A.  I was briefed that as part of the search warrant

8   preparation.

9   Q.  Prior to the searches you conducted that day, had you been

10  involved in any way in the investigation of Seth Fishman?

11  A.  No, I was not.

12  Q.  Had you had any involvement in the investigation with

13  someone known as Lisa Giannelli or Lisa Ranger?

14  A.  No, I was not.

15  Q.  What were you searching for that day?

16  A.  We were searching for unapproved animal medications,

17  anything used to process, make, or package that type of

18  medications, along with any documents or anything affiliated

19  with the unapproved manufacturing of those products.

20  Q.  How did you know what to search for?

21  A.  We were briefed and shown the search warrant prior to

22  searching.

23  Q.  So, let's focus on the storage unit search.  That's the one

24  I believe you said 189 Linton Boulevard, right?

25  A.  Yes.

M4T6GIA2                          Eichsteadt - Direct

1   Q.  Which law enforcements agencies were involved in the search
2   of that storage unit?
3   A.  The Food and Drug Administration and the Federal Bureau of
4   Investigation.
5   Q.  How many agents would you approximate were at the storage
6   unit that day?
7   A.  I would say about 15.
8   Q.  What was your assigned role for the search?
9   A.  I was the site evidence custodian.  I was there to document
10  any evidence that was seized on site.
11  Q.  What time did the search begin, approximately?
12  A.  I think it was like 9:30.
13  Q.  In the morning or the evening?
14  A.  In the evening.
15  Q.  How long did the search take, approximately?
16  A.  Approximately two hours.
17  Q.  All right.  Sir, I'm going to show you a collection of
18  photographs that have been marked for identification as
19  Government Exhibits 1300 through 1317 and 1319 through 1323.
20          MR. GIANFORTI:  If I may approach, your Honor?
21          THE COURT:  Sure.
22  Q.  Mr. Eichsteadt, do you recognize the photographs I just
23  handed you?
24  A.  Yes.
25  Q.  What are they?

1  A.  Well, this first photo is a graph of what appears to be

2  package materials that were taken out of the unit, and we

3  photographed that.  I don't believe we took any of that.

4  Q.  What are those photos in general?

5  A.  They're just general of the search warrant site and the

6  evidence that was on site.

7  Q.  At the storage unit?

8  A.  Yes.

9        MR. GIANFORTI:  Your Honor, the government offers

10 Government Exhibits 1300 through 1317 and 1319 through 1323.

11       THE COURT:  Have you shown them to Mr. Fasulo?

12       MR. GIANFORTI:  I have.

13       MR. FASULO:  Yes, your Honor.  No objection.

14       THE COURT:  They'll be received in evidence.

15       (Government's Exhibits 1300-1317 and 1319-1323

16 received in evidence)

17       MR. GIANFORTI:  Ms. Jung, can you please pull up for

18 the jury Government Exhibit 1310?  And could you just zoom in a

19 bit on the center of the frame?  Thank you.

20 Q.  Mr. Eichsteadt, what's depicted here?

21 A.  It looks like packaging materials that were seized on site.

22 Q.  And can you make out any of the text on these packaging

23 materials?

24 A.  It looks like it says SP Brands.

25 Q.  And do you see a logo on this packaging material?

1   A.  Yes.  There's a logo of, like, a horse in -- in the red

2   packaging on the left.

3   Q.  Thank you.

4        MR. GIANFORTI:  Ms. Jung, can you please pull up

5   Government Exhibit 1313?

6   Q.  All right.  Mr. Eichsteadt, what does this appear to be?

7   A.  This looks like the same thing, boxing or packaging

8   materials.

9   Q.  Directing your attention to the upper right-hand corner of

10  the box at the bottom of the frame, do you see a logo there?

11  A.  Yes.  It's similar to a logo on the other ones.  It's

12  another horse logo.

13  Q.  What is the brand name that appears to be associated with

14  this product here?

15  A.  The Lornoxicam or the QUI-cam.

16  Q.  Above where it says Lornoxicam, what's the name there?

17  A.  It looks like UI-cam.  The first letter is like an upside

18  down C.  I'm not really sure what that is.

19  Q.  And do you see the white text that appears at the bottom of

20  that label?

21  A.  Yes, for R&D and clinical trial use only.

22  Q.  What's in white text next to that?

23  A.  Www.EQUI-science.com.

24        MR. GIANFORTI:  Ms. Jung, can you go back to the full

25  paragraph, please?

M4T6GIA2                          Eichsteadt - Direct

1  Q.  Mr. Eichsteadt, do you see a logo in the middle of these

2  boxes?

3  A.  Yes.  It appears to be almost medical-like, but it looks

4  like it's with a snake.

5  Q.  Okay.  And below that, do you -- what text do you see?

6  A.  Logo of SPC.  That says Specialized Performance Compounds.

7         MR. GIANFORTI:  Okay.  And Ms. Jung can you please --

8  thank you.

9  Q.  Do you see the name Equestology anywhere on this product?

10  A.  No, I do not.

11  Q.  Do you see the name Seth Fishman anywhere on this product?

12  A.  No, I do not.

13  Q.  Thank you.

14         MR. GIANFORTI:  Ms. Jung, can you please pull up

15  Government Exhibit 1318 which is in evidence?  And could you

16  please zoom in on the top third?  Thank you.

17  Q.  Mr. Eichsteadt, this is a set of hard copy documents that

18  was seized from the storage unit at 189 Linton Boulevard that's

19  in evidence.  What do these documents appear to be?

20  A.  This appears to be a bank statement.

21  Q.  From which bank?

22  A.  The First National Bank of Wyoming.

23  Q.  What date is this account associated with?

24  A.  It starts with Equestology, Inc.  And it says Seth I.

25  Fishman, Lisa M. Ranger.

M4T6GIA2                        Eichsteadt – Direct

1   Q.   Is there an address associated with this account?

2   A.   Yes.  It is 125 Jennifer Lane, Felton, Delaware.

3          MR. GIANFORTI:  Thank you.  You can take that down,

4   Ms. Jung.

5   Q.   Mr. Eichsteadt, what happened at the end of the search of

6   the storage unit?

7   A.   Once everything is completed, we make sure we have

8   documented everything on the inventory, and then we box it up

9   and we place it in the van that I drive, along with anything I

10  use to prep, like computer, table, so forth.

11  Q.   Did you personally fill out the inventory?

12  A.   Yes, I did.

13  Q.   Did you personally help load the van with items seized from

14  the storage unit?

15  A.   I would help once everything was done, yes.

16  Q.   Where did you go after you were at the storage unit?

17  A.   We then went to the condo unit.

18  Q.   What was your role there?

19  A.   I was, again, the same as the storage unit.  I was the

20  evidence custodian on site.

21  Q.   I believe you referred to a business earlier; is that

22  right?

23  A.   Yes.  The one on Boca Raton.

24  Q.   Yes.  Did you go there some point that evening?

25  A.   I did go there after we completed the condo unit.

1    Q.  What was your role at the business?

2    A.  I was there as more of an assistant.  I wasn't the primary

3    evidence custodian there.

4    Q.  Do you recall what kinds of evidence were seized from the

5    business?

6    A.  They seized a lot of vials of medications.

7    Q.  Did there come a time when you inventoried the contents of

8    certain freezers?

9    A.  Yes.  There was two freezers that were later taken from

10   that business that were stored at the off-site storage location

11   for my facility.

12   Q.  Okay.  And did anybody help you with inventorying those

13   freezers?

14   A.  Yes.

15   Q.  Who was that?

16   A.  Special Agent Jonathan Frick.

17   Q.  What was your role in inventorying the freezers?

18   A.  I helped count, I documented the stuff on the inventory

19   document, I helped take photos, helped package it up, and so

20   forth.

21   Q.  All right.  I'm going to hand you what's been marked for

22   identification as Government Exhibits 4048, 4049, and 4050.

23           Sir, do you recognize the exhibits that I just handed

24   you?

25   A.  Yes, I do.

M4T6GIA2                          Eichsteadt – Direct

1    Q.  Excuse me.  What are they?

2    A.  The first one is a picture of what would be an evidence tag

3    of when we wrote down the description of what it was in and the

4    quantities.

5    Q.  What are these photographs, generally?

6    A.  These are generally just pictures we take of the evidence

7    that we seize.

8    Q.  Did you take these photographs?

9    A.  I don't know if I took these specific photos.

10   Q.  Okay.  Do you know which search that these photos are

11   associated with?

12   A.  These are associated with the business.

13              MR. GIANFORTI:  Okay.  All right.  Your Honor, the

14   government offers Government Exhibit 4048, 4049 and 4050.

15              MR. FASULO:  No objection.

16              THE COURT:  They'll be admitted into evidence.

17              (Government's Exhibits 4048, 4049 and 4050 received in

18   evidence)

19              MR. GIANFORTI:  Ms. Jung, can you please pull up all

20   three of those, 4048, 4049, and 4050, please?  Thank you.

21   Q.  Mr. Eichsteadt, directing your attention to Government

22   Exhibit 4048 on the left.  Do you see the label sort of at the

23   top of the frame there?

24   A.  Yes, I do.

25   Q.  Can you make out the text there?

1    A.  It says EMP/BB3.

2              MR. GIANFORTI:  Ms. Jung, if you could zoom in on the

3    red piece of paper in 4049, please?

4    Q.  Mr. Eichsteadt, can you make out the text that's reflected

5    here -- any of the text that's reflected here?

6    A.  At the top it says EMP BB3, and then it says 3M, and I

7    can't really read the handwriting.

8    Q.  Okay.

9    A.  It looks like -- at the bottom, it says Nancy, dark blue.

10   I'm not a hundred percent sure.

11             MR. GIANFORTI:  If you can go back to 4049, Ms. Jung?

12   If you could zoom in on the vials at the bottom?

13   Q.  Okay.  Mr. Eichsteadt, what color is the cap on these

14   vials, if you can make it out?

15   A.  It looks like it's dark blue.

16             MR. GIANFORTI:  Ms. Jung, if you could go back out

17   again and blow up 4050?

18   Q.  What's depicted here, Mr. Eichsteadt?

19   A.  It looks -- it's a vial.  It looks like it's got a white

20   powder in -- a dark blue cap.

21   Q.  Does it look like one of the ones we were just looking at?

22   A.  Yes, sir.

23             MR. GIANFORTI:  Actually, could we go back to 4049?

24   Q.  I think I neglected to ask you:  What are we looking at?

25   A.  These were vials that were in the freezer.

1              MR. GIANFORTI:  All right.  Ms. Jung, could you please

2       pull up Government Exhibit 403J, as in jack, which is in

3       evidence?

4              Thank you.

5       Q.  Mr. Eichsteadt, this is a text message exchange from

6       October 2nd, 2019, between Lisa Giannelli and an individual

7       using a phone number ending in 7577, which was extracted from a

8       cell phone belonging to Ms. Giannelli that's in evidence.  Can

9       you please read into the record by working your way from the

10      bottom to the top and indicating who the parties are, you know,

11      who's sending it and who's receiving it?

12      A.  Well, this is being sent to 7577.  It states:  I was just

13      informed the ventipulmin is on back order.  I do have one here

14      at the office.  I will ship to you.  Do you need anything else

15      while I'm sending this?  Folic, VO2 max, bleeding pills, iron,

16      BB3?

17             And then the response from 7577 is:  What color top is

18      the BB3?

19             Sent back to 7577:  Purple.

20             The response was:  I'll get some of those soon, but

21      not yet.

22             And sent back to 7577:  Okay.

23             THE COURT:  All right.  Mr. Gianforti, please find a

24      convenient place for our morning break.

25             MR. GIANFORTI:  Just a few more questions, your Honor.

M4T6GIA2                    Eichsteadt - Direct

1          You can take that down Ms. Jung.

2     Q.  What happened to the evidence that was seized in connection

3     with the three searches you were involved in October 27th and

4     28th, 2019?

5     A.  After all the searches were completed, the items were

6     transported to either -- the bulk items were transported to a

7     contractor storage facility.  Anything that we seized at the

8     sites that was small and refrigerated was taken to my facility

9     in my office, and the two freezers that were taken from the

10    business were taken to out offsite storage so they could be

11    plugged in and maintained.

12    Q.  Mr. Eichsteadt, apart from the searches and the

13    inventorying the freezers you mentioned, did you have any other

14    participation in this investigation?

15    A.  I helped package up those frozen items that were in the

16    freezer so they could be moved up to Boston.  I think I shipped

17    some other evidence up to Boston at one point.  And then that

18    was all as far as evidence.  The only other thing was in

19    December when I assisted the FBI with destroying some products

20    from Mr. Fishman.

21    Q.  And in your experience with the FDA, is it routine to

22    destroy products?

23          MR. FASULO:  Objection.

24    A.  After it is done.

25          THE COURT:  Overruled.  You can finish your answer.

M4T6GIA2                          Eichsteadt - Direct

1              THE WITNESS:  Thank you.

2    A.  We don't destroy until -- as far as, like, if the case is

3    active --

4              MR. FASULO:  Objection, Judge.  Based on the --

5              MR. GIANFORTI:  He's answering.

6              MR. FASULO:  Objection.

7              THE COURT:  Grounds?

8              MR. FASULO:  May we approach quickly?  I anticipate

9    the answer to indicate a reason for doing it.

10             THE COURT:  All right.  Let's talk at sidebar quickly,

11   and then we're going to take our morning break after we resolve

12   this.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. FASULO:  I'm overly cautious.  My understanding is

3     that he was going to say the case was over or that the case

4     ended up in a conviction or the case was concluded as to

5     Dr. Fishman, and I don't want that referenced in this case.

6          MR. GIANFORTI:  Can I ask more general questions

7     about -- I could ask it more generally.  You know --

8          MR. FASULO:  I'm not objecting that --

9          MR. GIANFORTI:  Is that in?  Is that answer in, if

10    it's something that's done routinely?  Did that come in?

11         MR. FASULO:  I couldn't --

12         MR. GIANFORTI:  I just wanted to ask if the actual

13    answer came in.

14         (Record read)

15         MR. GIANFORTI:  What I would propose to do is simply

16    ask whether it is routine in the course of FDA business to

17    destroy evidence that is no longer needed.

18         MR. FASULO:  I'll allow the question because I think

19    it's a better question.

20         THE COURT:  All right.

21         MR. FASULO:  I have one question for this witness on

22    cross.

23         THE COURT:  All right.  Then we'll do that before --

24         MR. GIANFORTI:  And I think after this, I'm done.

25         THE COURT:  That's your last question?

M4T6GIA2                           Eichsteadt – Direct

1          MR. GIANFORTI:  Yes.

2          MS. MORTAZAVI:  Your Honor, one thought I had.  I

3     don't want the jurors to be left with the impression that

4     evidence is routinely destroyed, that it is unlawfully

5     destroyed.  Could we have an instruction to that effect?

6          MR. FASULO:  It doesn't matter to me.  I think it's

7     unnecessary.

8          MS. MORTAZAVI:  Could Mr. Gianforti ask a question --

9          THE COURT:  You think the jury cares one bit about the

10    destruction of the evidence?

11         MR. FASULO:  There's no argument in this case that the

12    government destroyed evidence and we're not able to --

13         THE COURT:  You can ask a question about was it done

14    in compliance with routine policies or procedures, the law.

15         MR. FASULO:  That's fine.

16         MS. MORTAZAVI:  If he's allowed to ask that, I think

17    that answers the question.

18         THE COURT:  Fine.

19         (Continued on next page)

20

21

22

23

24

25

1             (In open court)

2             THE COURT:  Ladies and gentlemen, I'm going to ask you

3    to bear with us a couple more minutes beyond our normal time

4    for a morning break because the parties think they can move

5    along.

6    Q.  Mr. Eichsteadt, is it routine based on your experience with

7    the FDA to destroy evidence when it's no longer needed?

8    A.  If it is no longer needed, we'll destroy it.

9             Let me get to the mic.

10            When it is no longer needed, we'll destroy it.

11   Q.  As far as you're aware, that's consistent with the law?

12   A.  Yes.

13   Q.  And as far as you're aware, that's consistent with any

14   internal FDA rules and regulations?

15   A.  As far as I'm aware, yes.

16   Q.  Apart from all the other actions you took in connection

17   with this investigation, have you had any further involvement

18   with this investigation?

19   A.  No, I have not.

20            MR. GIANFORTI:  No more questions.

21            MR. FASULO:  Briefly, your Honor?

22            Can I have 403J put up, please?

23   CROSS-EXAMINATION

24   BY MR. FASULO:

25   Q.  Good morning, Agent.

1         You remember reading these text messages, correct?

2    A.  Yes.

3    Q.  Other than reading those text messages here, you have no

4    association with these messages; is that fair to say?

5    A.  You are correct.

6    Q.  And you were just asked to read it because it was put in

7    front of you, correct?

8    A.  Yes, sir.

9    Q.  You don't know anything else about these messages or the

10   content, correct?

11   A.  No, sir.

12        MR. FASULO:  No further questions.

13        THE COURT:  All right.  Thank you.

14        I assume no redirect?

15        MR. GIANFORTI:  No redirect.

16        THE COURT:  You're excused with the thanks of the

17   Court.  If you could put your mask back on and leave the

18   courtroom.  Thank you.

19        (Witness steps down)

20        THE COURT:  All right.  We're going to take our break

21   now, ladies and gentlemen.  Please leave your notebooks on your

22   chairs along with the transcript binders.  Please do not --

23   have a seat until we're ready.  Do not discuss the case while

24   you're on your break.  Don't do any research about the case.

25   I'll see you back here at 11:25 at the very latest.  Okay?

M4T6GIA2

1    Thank you -- or in the jury assembly room.

2              Thank you.  All rise.

M4T6GIA2

1              (Jury not present)

2              THE COURT:  All right.  Is there anything we need to

3    discuss right now?

4              MR. FASULO:  Judge, we're going to review your

5    changes, and we'll get those to you before you come on the

6    bench.

7              THE COURT:  Ms. Mortizavi, you were going to say

8    something?

9              MS. MORTAZAVI:  Well, I was going to refer to the

10   instruction.  And I believe the parties are in agreement,

11   there's one point that I wanted to raise.  And I think that our

12   next witness is going to be short, and then we'll then go

13   into --

14             THE COURT:  Let's do this when we come back from our

15   break.  Why don't we try to come back in about 10 minutes?

16             MS. MORTAZAVI:  Certainly.

17             THE COURT:  Thank you.

18             (Recess)

19             THE COURT:  You wanted to speak about this proposed

20   charge?

21             MR. FASULO:  Yes, Judge.

22             MR. GIANFORTI:  So, your Honor, I think we're

23   comfortable with all of your edits, say one, which is where you

24   wanted to swap in trial instead of prior proceeding.  You know,

25   I think we've been all trying on -- both on the government's

M4T6GIA2

```
1    side and the defense side not to make reference to there having
2    been an earlier criminal trial here for fear of just raising
3    questions in the jury's mind or contaminating.
4              THE COURT:  I am okay with that.  Is that your view,
5    Mr. Fasulo?
6              MR. FASULO:  Yes, Judge.
7              THE COURT:  Otherwise, we're making the edits that
8    I --
9              MR. GIANFORTI:  Yes, indeed.
10             THE COURT:  -- told you on the record.
11             MR. GIANFORTI:  Ms. Mortizavi actually went down to
12   input those edits and then she will come back.
13             MR. FASULO:  Consent, Judge.
14             THE COURT:  Consent, did you say?
15             MR. FASULO:  Yes.
16             THE COURT:  Yes.  Thank you.  All right.  So we'll
17   wait for Ms. Mortizavi and then bring the jurors out.
18             Here she is.
19             MS. MORTAZAVI:  Your Honor, on the instruction, I was
20   printing off new versions.  Do you want me to hand it up?
21             THE COURT:  Sure.  Thank you.  You can give it to
22   Ms. Popper.  If you have two copies, that would be great.
23   She'll have one.
24
25
```

M4T6GIA2

 1              (Jury present)

 2              THE COURT:  All right.  Please be seated.

 3              Mr. Gianforti.

 4              MR. GIANFORTI:  Thank you, your Honor.

 5         The government calls Special Agent Jonathan Frick.

 6              DEPUTY CLERK:  Please enter the witness box.

 7         Thank you.

 8              Raise the microphone so you can -- you can remove your

 9    mask.

10              Raise your right hand.

11    JONATHAN FRICK,

12         called as a witness by the Government,

13         having been duly sworn, testified as follows:

14              DEPUTY CLERK:  Thank you.

15              Please state and spell your name for the record.

16              THE COURT:  Hold on.  Please, gentlemen.  Can you

17    please let the jury pay attention to what's happening up here?

18              MR. GIANFORTI:  Apologies.

19              THE COURT:  I'm sorry.  Go ahead, sir.

20              THE WITNESS:  Jonathan Conrad Frick, J-O-N-A-T-H-A-N,

21    C-O-N-R-A-D, F-R-I-C-K.

22              DEPUTY CLERK:  Thank you.  Please be seated.

23              THE COURT:  You can resume.

24              MR. GIANFORTI:  I apologize.  I was trying to be

25    efficient.  Apologies.

M4T6GIA2                          Frick- Direct

1    DIRECT EXAMINATION

2    BY MR. GIANFORTI:

3    Q.   Good morning, Special Agent Frick.

4    A.   Good morning.

5    Q.   Where do you work?

6    A.   I work for the Food and Drug Administration's Office of

7    Criminal Investigations.

8    Q.   What's your title there?

9    A.   I'm a special agent.

10   Q.   Can you describe your general responsibilities as a special

11   agent with the FDA?

12   A.   Yes, sir.  Our responsibilities are to investigate possible

13   violations of products that the Food and Drug Administration

14   regulates to include drugs, biologics, veterinarian medicines,

15   tobacco, pharmaceuticals, and food.

16   Q.   How long have you been a special agent with the FDA?

17   A.   Approximately eight years.

18   Q.   What did you do before that?

19   A.   I was a special agent with the U.S. Secret Service.

20   Q.   During your time at the FDA, have you participated in the

21   execution of searches warrant in physical locations?

22   A.   I have.

23   Q.   Approximately how many times?

24   A.   Approximately 40.

25   Q.   Directing your attention to October 27 and 28th, 2019, did

M4T6GIA2                        Frick- Direct

1   you participate in any searches on that date?

2   A.  I did.

3   Q.  Which locations did you search?

4   A.  I assisted with searching a self-storage warehouse that was

5   located in Delray Beach, Florida.  I was also present on scene

6   when they searched a residential condo that's located in

7   Highland Avenue, Florida, and I assisted with a search at a

8   business location located in Boca Raton, Florida.

9   Q.  Who were these locations associated with?

10  A.  Seth Fishman.

11  Q.  How do you know that?

12  A.  Based on operational paperwork that was completed ahead of

13  time.

14  Q.  Special Agent Frick, are you familiar with the term case

15  agent?

16  A.  Yes, sir.

17  Q.  What does that term mean to you?

18  A.  Case agent is the primary agent responsible for an

19  investigation.  They should have a comprehensive knowledge of

20  all aspects of the case.

21  Q.  Were you the case agent in this particular investigation?

22  A.  I was not.

23  Q.  Prior to the searches that you conducted on October 27 and

24  28th, 2019, had you been involved in any way in the

25  investigation of Seth Fishman?

1    A.  Yes, sir.

2    Q.  How so?

3    A.  At the request of the case agent, I participated in a

4    surveillance on October 22 of 2019 at the business location.

5    Q.  Prior to your searches, had you been involved in any way in

6    an investigation of someone named Lisa Giannelli or

7    Lisa Ranger?

8    A.  No, sir.

9    Q.  All right.  Just one moment.  Okay.

10            Sir, what were you searching for at the three

11   locations that you searched on those days?

12   A.  Evidence of violations of FDA law related to veterinary

13   medicines.

14   Q.  Were you looking for any particular items?

15   A.  Items that were listed in the attachment on the search

16   warrant.

17   Q.  Can you give some examples in general; if you recall?

18   A.  I don't recall.

19            (Continued on next page)

20

21

22

23

24

25

M4TAAGIA3                          Frick - Direct

1   Q.   How did you know what to search for?

2   A.   There were multiple agents there who were more familiar

3   with the investigation and we also had personnel there that

4   were trained in veterinary medicine.

5   Q.   Were you briefed prior to the searches?

6   A.   Yes, sir.

7   Q.   Did you come to understand from that briefing what you were

8   looking for?

9   A.   I did.

10  Q.   What time did you -- where did you go fist?

11  A.   The first site we went to was the self-storage unit in Del

12  Ray Beach.

13  Q.   What time was that, approximately?

14  A.   Approximately, seven P.M.

15  Q.   How long were you there?

16  A.   I'd say an hour and a half.

17  Q.   Okay.  Which law enforcement agencies were involved with

18  that?

19  A.   The Food and Drug Administration, also criminal

20  investigation add Federal Bureau of Investigation.

21  Q.   What was your role at the storage unit?

22  A.   I was assisting with the search and inventory of products.

23  Q.   Let's focus on the search of the business that you were

24  involved in.

25            What time did you get there, approximately?

M4TAAGIA3                        Frick - Direct

1    A.  Approximately, 10 P.M.

2    Q.  How long were you there, approximately?

3    A.  I left at approximately 7 A.M. on the morning of the 28th.

4    Q.  When you left, were there agents still at the scene?

5    A.  Yes, sir.

6    Q.  Focusing again on that business, how would you describe the

7    premises that you searched?

8    A.   It was a commercial area that consisted of multiple large

9    warehouse building structures that were divided into smaller

10   spaces where different businesses operate.

11   Q.  Skipping forward in time, did there come a time when you

12   inventoried certain freezers that were seized from the

13   business?

14   A.  Yes, sir.

15   Q.  And when did that occur, approximately?

16   A.  Approximately, two weeks after the search warrant was

17   executed.

18   Q.  What were inside -- what, if anything, were inside of those

19   freezers?

20   A.  There were multiple items that appeared to be veterinary

21   medicine products similar to that.

22            MR. FASULO:  Objection.

23            THE COURT:  What's the objection?

24            MR. FASULO:  What "appeared to be".

25            THE COURT:  Overruled.

1    Q.  Special Agent Frick, I have on the table in front of me a

2    number of items.  Do you recognize these?

3    A.  Yes, sir.

4    Q.  What they?

5    A.  Those are items that were seized at the search warrant.

6    Q.  The search warrant of what?

7    A.  Of the business location at Boca Raton.

8    Q.  Okay.  Were some of these items seized from the freezer?

9    A.  They were located in the freezer, yes, sir.  They were all

10   seized from the business location.

11   Q.  But some of them were outside the freezer; is that what you

12   are saying?

13   A.  Yes, sir.

14   Q.  For the record, these items include items marked for

15   identification as Government Exhibits 9040, 9044, 9051, 9056,

16   9065, 9066, 9068, 9070, 9072, 9074, 9075, 9077 and 9078.

17            MR. GIANFORTI:  Your Honor, the government moves to

18   admit the exhibits that I just mentioned.

19            MR. FASULO:  Without objection.

20            THE COURT:  Thank you, Mr. Fasulo.

21            They are received in evidence.

22            (Government's Exhibits 9040, 9044, 9051, 9056, 9065,

23   9066, 9068, 9070, 9072, 9074, 9075, 9077, 9078 received in

24   evidence)

25            MR. GIANFORTI:  All right.

1    Q.  Special Agent Frick, apart from the searches that you were

2    involved in in 2019 in the inventorying of freezers that you

3    mentioned that took place after that, did you have any other

4    involvement in this investigation?

5    A.  I did.

6    Q.  What was that?

7    A.  At the request of the case agent I conducted the search

8    warrant return to the judge.

9    Q.  Okay.  Anything else beyond that?

10   A.  No, sir.

11        MR. GIANFORTI:  No further questions.

12        THE COURT:  Mr. Fasulo?

13        MR. FASULO:  No questions.

14        THE COURT:  Thank you very much, sir.  You can step

15   down.  Put your mask back on.  Thank you.

16        (Witness excused)

17        THE COURT:  The government's next witness.

18        MR. GIANFORTI:  Before the government calls its next

19   witness, we would ask to play a few of the recorded calls.

20        THE COURT:  All of which are in evidence?

21        MR. GIANFORTI:  Yes.

22        THE COURT:  All right.

23        MR. GIANFORTI:  Ms. Jung, could you please pull up

24   Government Exhibit 141-B and 141-BT which the jury can follow

25   along to in their binders and again, that's 141-B as in "boy",

1    "T".

2              And for the record this is a call that was intercepted

3    over Seth Fishman's phone from June 6, 2019, between Seth

4    Fishman and John Pundyk.

5              Please go ahead and play the call, Ms. Jung.

6              (Audio played)

7              MR. GIANFORTI:  Thank you.

8              Just one moment, your Honor.

9              (Pause)

10             MR. GIANFORTI:  Ms. Jung, if you could please pull up

11   Government Exhibit 141-F as in "frank" and Government Exhibit

12   141-F as in "frank-T".  These are also in evidence.

13             For the record, this is another call intercepted over

14   Seth Fishman's line between Seth Fishman and John Pundyk from

15   June 6, 2019.

16             (Audio played)

17             MR. GIANFORTI:  Ms. Jung, if you could pull up

18   Government Exhibit 142-C as in "cat" and Government Exhibit

19   142-C as in "cat-T", which is also in evidence as well.

20             For the record, this is another intercepted call

21   between Seth Fishman and John Pundyk from June 9, 2019.

22             (Audio played)

23             MR. GIANFORTI:  Ms. Jung, if you could please pull up

24   Government Exhibit 119-A as in "apple" and the corresponding

25   transcript 119-A-T, both of which are in evidence.

1              For the record, this is a February 26, 2019 call

2      intercepted between Seth Fishman and Lisa Giannelli.

3              (Audio played)

4              MR. GIANFORTI:  Thank you.

5              Ms. Jung, if you could please pull up Government

6      Exhibit 119-B as in "boy" and 119-B as in "boy-T", which are

7      both in evidence.

8              For the record, this is a February 26, 2019 call

9      intercepted between Seth Fishman and Lisa Giannelli.

10             (Audio played)

11             MR. GIANFORTI:  Ms. Jung, if you could please pull up

12     Government Exhibit 119-D as in "dog" and the corresponding

13     transcript 119-D as in "dog-T".

14             For the record, this is another intercepted call

15     between Seth Fishman and Lisa Giannelli on February 26, 2019.

16             (Audio played)

17             MR. GIANFORTI:  All right, your Honor.  Now we'll

18     proceed with the next item.

19             THE COURT:  Which is?

20             MS. MORTAZAVI:  Your Honor, if we could begin by

21     reading a stipulation into the record?

22             THE COURT:  Sure.  You are going to be handling this,

23     Ms. Mortazavi?

24             MS. MORTAZAVI:  Yes, your Honor.

25             THE COURT:  If you could do it from the podium,

1    please.  Thank you.

2              MS. MORTAZAVI:  The stipulation has been marked as

3    Government Exhibit 9017, your Honor.

4              THE COURT:  Thank you.

5              MS. MORTAZAVI:  I am going to skip the introductory

6    sentences because the Court noted it's identical to prior

7    stipulation.

8              Government Exhibit 1701 is a true and correct

9    transcript of sworn testimony given by Courtney Adams at a

10   prior proceeding on or about January 20 and 21, 2022, during

11   which she was questioned by counsel for the United States of

12   America and counsel for Lisa Giannelli.

13             The parties stipulate and agree that for the purposes

14   of this proceeding, Ms. Adams is unavailable and need not

15   provide live testimony.

16             It is further stipulated and agreed by and between the

17   parties that the aforementioned government exhibit and this

18   stipulation which is Government Exhibit 9017 may be received in

19   evidence at trial.

20             And the government offers the stipulation and

21   Government Exhibit 17001.

22             THE COURT:  All right.  The stipulation is an

23   agreement between the parties and is evidence in this case, as

24   is Government Exhibit 17001.

25             (Government's Exhibits 17001 received in evidence)

1            THE COURT:  Are we proceeding to that at this point?

2            MS. MORTAZAVI:  Yes.

3            THE COURT:  Let me talk to you for a moment about

4    17001.  The parties have also agreed jointly that they're going

5    to have an employee from the United States Attorney's Office

6    read out loud portions of that Government Exhibit 17001, which

7    is a transcript of sworn testimony given by an individual named

8    Courtney Adams at a prior proceeding.

9            You are being provided or you will be provided with

10   copies of that exhibit, which is in evidence pursuant to the

11   stipulation that you just heard.  You're being given that

12   exhibit so that you may follow the transcript as it is read

13   into the record.  You may carefully scrutinize this testimony

14   and all other evidence in this case as I mentioned.  The

15   parties have jointly stipulated to the admission of this

16   exhibit and they jointly agree to have this particular

17   testimony read into the record.

18           All right.  You may proceed, Ms. Mortazavi.

19           MS. MORTAZAVI:  I would ask my colleagues to

20   distribute copies of Government Exhibit 17001 and at that time

21   if we could have Ms. Ruscigno take the witness stand.

22           THE COURT:  Thank you.

23           Mr. Gianforti, do you have a copy for the Court?

24           MR. GIANFORTI:  I do indeed.

25           (Pause)

M4TAAGIA3                          Frick - Direct

1           THE COURT:  Do you have this electronically as well?

2           MS. MORTAZAVI:  No, your Honor.  For the fact that we

3    have exhibits that are referred to in the testimony.

4           THE COURT:  Do you have another copy that you can give

5    to my clerk and courtroom deputy?

6           MS. MORTAZAVI:  We should, your Honor.

7           THE COURT:  Thank you.

8           Before we proceed, may I see counsel for a moment at

9    side bar?

10          (Continued on next page)

1          (side bar)

2          THE COURT:  I just want to confirm for the record that

3     since she is not a witness providing evidence, she does not

4     need to be sworn.

5          MS. MORTAZAVI:  That's our understanding.

6          MR. FASULO:  That's our understanding.

7          MS. MORTAZAVI:  Is there any objection from Mr. Fasulo

8     if I have her say her name and her occupation?

9          THE COURT:  You've already said she's a representative

10    of your office.

11         MS. MORTAZAVI:  Very good, your Honor.  We'll start

12    reading the exhibit.

13         MR. FASULO:  Judge, just so you know the process, I

14    believe Ms. Mortazavi is going to read the question and the

15    witness is going to read the answer throughout the whole.

16         THE COURT:  Even when it's you?

17         MR. FASULO:  Then she wants me to read the cross.

18         THE COURT:  I would think you would want to read --

19         MR. FASULO:  Right.  I do.

20         THE COURT:  They are what they are.  Sometimes it's

21    humbling.

22         (Continued on next page)

23

24

25

1          (In Open Court)

2          THE COURT:  Ms. Mortazavi, I'd suggest you begin

3    reading what's on the very first page.

4          MS. MORTAZAVI:  Certainly, your Honor.

5          Courtney Adams was called as a witness by the

6    government having been duly sworn testified as follows:

7          Just for the record, for purposes of reading this

8    exhibit into the record, I plan to read the questions and my

9    colleague will plan to read the answers into the record.

10         THE COURT:  Right.  And just so the jury understands,

11   we told you this is prior testimony given by Courtney Adams who

12   was cross-examined by Mr. Fasulo on behalf of Ms. Giannelli in

13   the prior proceeding.  So when we get to the part that was the

14   cross-examination, Mr. Fasulo will read the questions that will

15   be answered then.

16         MS. MORTAZAVI:  Thank you, your Honor.

17         THE COURT:  Thank you.

18   "Q.  Could you please tell us first hold are you?

19   "A.  34-years-old.

20   "Q.  And directing you to approximately 2012, did there come

21   that time that you moved to south Florida?

22   "A.  Yes.

23   "Q.  When you moved to south Florida, why did you move there

24   originally?

25   "A.  I moved back from Australia and I didn't want to go back.

M4TAAGIA3                    "Courtney Adams"

1    I'm here where my grandmother was in search of a job.

2    "Q.  At the time that you move to Australia, what was your

3    education?  When you move to south Florida, what was your

4    educational background at that time?

5    "A.  I had a bachelor's degree in conservation and ecology.

6              MS. MORTAZAVI:  Ma'am, I'm going to ask you to raise

7    your voice to the extent you can and lean in the microphone?

8              THE COURT:  Thank you, Ms. Mortazavi.

9    "Q.  When you arrived in south Florida, did there come a time

10   when you met an individual name "Seth Fishman"?

11   "A.  Yes.

12   "Q.  Ms. Adams, how did you meet Mr. Fishman originally?

13   "A.  We were introduced from a mutual friend.

14   "Q.  And when he was introduced to you, how was he introduced

15   to you?

16   "A.  He was introduced as a friend of the friend that needed

17   help.  He needed assistant work.  So like personal assistant

18   type work and then possibly with his business.

19   "Q.  And at that time, did you come to learn what sort of

20   business he was running?

21   "A.  In the beginning it was pretty vague.  It was just horse

22   medicine.  My friend thought that I would be interested since I

23   like annals.

24   "Q.  Di you eventually learn what that business was called?

25   "A.  Yes?

M4TAAGIA3                         "Courtney Adams"

1    "Q.   What was the business called?

2    "A.   Equestology.

3    "Q.   Did there come a point whether you began to work for

4    Equestology?

5    "A.   Yes.

6    "Q.   And approximately how long after you originally arrived in

7    south Florida did you begin working with Equestology?

8    "A.   A few months.

9    "Q.   So focusing you still at the time of 2012, had you begun

10   working at Equestology by the end of 2012?

11   "A.   Yes.

12   "Q.   At that time when you began working with the Equestology,

13   can you describe the physical workspace?

14   "A.   I had my office in the spare bedroom in Seth's condo.

15   "Q.   Was anybody living in that same workspace?

16   "A.   Do you mean in that office or in the unit.

17   "Q.   In the unit please.

18   "A.   Yes.  Seth was living in the other bedroom.

19   "Q.   At that time when you were working out of the condo, did

20   Fishman maintain any other physical space related to the

21   business?

22   "A.   He had a storage unit that was used to store his things

23   in.

24   "Q.   Through the course of time that you worked with

25   Equestology, was additional physical space obtained?

M4TAAGIA3                    "Courtney Adams"

1    "A.    Yes.

2    "Q.    Can you describe what kind of space was obtained?

3    "A.    Years later we attained an office space in another

4    building that was being run by another business.  They extra

5    room with its own interest and so Seth rented it out and we

6    turned that into my office.

7    "Q.    When you mentioned the part of your job was acting as a

8    personal assistant, can you describe the kinds of tasks that

9    you undertook as part of that role?

10   "A.    Yeah.  Picking up dry cleaning, grocery shopping, general

11   errands, picking him up, taking him to the airport, that kind

12   of thing.

13   "Q.    With respect to your role at the business, at the time

14   that you began work, what were your typical day-to-day duties?

15   "A.    Tracking e-mails.  He wanted me to start an inventory

16   system of everything that he had.  Basically, organizing

17   everything to do with Equestology and then my main role besides

18   inventory was to create labels for all of his products.

19   "Q.    Let me still focus on the early days working at

20   Equestology.  At that time did you come to learn what kind of

21   products Equestology was selling?

22   "A.    Yes.  I had a general idea in the beginning.

23   "Q.    And in the beginning, what was your general idea of what

24   was being sold?

25   "A.    Equine pharmaceutical products to enhance performance.

M4TAAGIA3                    "Courtney Adams"

1    "Q.  Who was manufacturing these performance enhancing products

2    at the time that you began?

3    "A.  One of his labs Numera Pharmacy, I believe.

4    "Q.  Could you repeat the name?

5    "A.  I believe it was called Numera Pharmacy.

6    "Q.  Do you know where that lab was located?

7    "A.  Somewhere in south Florida.

8    "Q.  To your knowledge, who was giving directions with the

9    content of the drugs to be manufactured?

10   "A.  Seth Fishman did.

11   "Q.  Ms. Adams, you mentioned a moment ago an inventory system.

12   Was there an inventory system for Equestology when you began in

13   2012?

14   "A.  Not that I was aware of.

15   "Q.  When with you began working at Equestology, what were you

16   asked to do with respect an inventory system?

17   "A.  He wanted me to inventory all the products that he

18   currently had, and then also inventory anything ordered, create

19   an inventory system for the lab as well.  So anything that he

20   would order and send to the lab, whether it be vials or raw

21   product, I was to keep track of everything.

22   "Q.  Did you develop an inventory system?

23   "A.  Yes.

24   "Q.  When you arrived, before you developed the inventory

25   system what did you learn about how Equestology was keeping

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   track of what drugs it had in stock?

2   "A.  I wasn't aware of any kind of inventory system besides

3   maybe an email or an invoice of the product being ordered in

4   first place.

5   "Q.  What system, if any, was there to keep track of which

6   drugs had expired or not?

7   "A.  There was none that I was aware of.

8   "Q.  Who was the owner of Equestology?

9   "A.  Seth.

10  "Q.  To your knowledge did anybody else is have an ownership

11  interest in the business?

12  "A.  Not that I was aware of, no.

13  "Q.  And can you describe what Seth Fishman's role at

14  Equestology was when you began working there?

15  "A.  He is the owner operator veterinarian.

16  "Q.  Let me ask about the last portion.  To your knowledge, did

17  Fishman maintain a veterinarian license during your time at

18  Equestology?

19  "A.  Yes.

20  "Q.  How often was Fishman treating annals when you worked at

21  the company?

22  "A.  Maybe once or twice.

23  "Q.  And for how many, for how long did you work at the

24  company?

25  "A.  From 2012 to 2016.

M4TAAGIA3                        "Courtney Adams"

1    "Q.  You mentioned a moment ago that you assisted Fishman with

2    travel as well?

3    "A.  Yes.

4    "Q.  Ms. Adams, during your time at Equestology, are you aware

5    of Dr. Fishman traveling at any point for the purpose of

6    treating annals?

7    "A.  No.

8    "Q.  Does that include with respect to trips that you were

9    aware of?  Sorry.  Let me rephrase.

10          Given that, are you aware of any time that Dr. Fishman

11   traveled to the state of New York for the purpose of treating

12   animals?

13   "A.  No.

14   "Q.  Are you ware of any time that Dr. Fishman traveled to the

15   state of Delaware for the purpose of treating animals?

16   "A.  No.

17   "Q.  Was it among your duties at Equestology to maintain any

18   patient files?

19   "A.  Can you elaborate on what you mean as "patient files"?

20   "Q.  Did you maintain any documents relating to health of

21   particular horses at Equestology?

22   "A.  No.  I did not.

23   "Q.  When you began working for Equestology was anybody else

24   working at the company?

25   "A.  Yes.

1    "Q.  And who was that?

2    "A.  Lisa Ranger.

3    "Q.  What was Lisa Ranger's role when you began working at

4    Equestology?

5    "A.  She was a sales rep, as far as I know.

6    "Q.  Have you had an opportunity to review what's been marked

7    for identification as Government Exhibits 1900 through 1905 and

8    1907 through 1913?

9    "A.  Yes.

10   "Q.  Can you tell me, without describing the substance, can you

11   tell me in general what are those documents?

12   "A.  Emails either between Seth and I or Mary and I about

13   orders and other inventory related items.

14   "Q.  And who is Mary?

15   "A.  Mary was my replacement when I decided to leave the

16   company.

17   "Q.  Are each of those documents related to your work at

18   Equestology?

19   "A.  Yes.  I'm involved in them.

20   "Q.  Ms. Adams, if you could please turn to Government Exhibit

21   1907.

22   "A.  All right.

23        MS. MORTAZAVI:  Your Honor, at this time I'm stepping

24   way from the government exhibit and I would like to ask

25   Ms. Jung to please pull up Government Exhibit 1907, which

1    should appear on the jurors' screen.

2              THE COURT:  This is in evidence?

3              MS. MORTAZAVI:  This is in evidence through Government

4    Exhibit 9006.

5              THE COURT:  Thank you.

6              That's the stipulation, right?

7              MS. MORTAZAVI:  Correct, your Honor.  I am returning

8    back to the exhibit, your Honor.

9    "Q.  Ms. Adams, do you recognize this document?

10   "A.  Yes, I do.

11   "Q.  First, can you note the date for the record please on the

12   email at the top of the document?

13   "A.  Monday, May 13, 2013.

14   "Q.  In May of 2013, what was your role at Equestology?

15   "A.  I was the office manager in charge of everything office

16   related, taking orders, shipping them out, that kind of thing.

17   "Q.  Do you recognize the email address and names at the top of

18   the document?

19   "A.  Yes.

20   "Q.  Who controlled email address Equestology@GMail.com?

21   "A.  Lisa Ranger.

22   "Q.  Below that, is that your email address?

23   "A.  Yes, it is.

24   "Q.  Looking at the forwarded message where it begins "I would

25   keep the lower name", can you describe what you understood this

1   message to be about?

2   "A.  It's instructions on the difference in the labeling

3   between the products that are photographed in the email and

4   basically asking me to change parts of it.

5   "Q.  And on the forwarded message whose name appears in the

6   "from" line?

7   "A.  Lisa Ranger.

8   "Q.  Who is it sent to?

9   "A.  Seth Fishman.

10  "Q.  And is that Seth Fishman's email account ending in Hotmail

11  that appears there?

12  "A.  Yes.

13  "Q.  If you would, please, just read the content beginning with

14  "I would keep the lower"?

15  "A.  You want me to read it out loud?

16  "Q.  Yes, please.

17  "A.  I would keep the lower name in white with black letters,

18  i.e. methocarbamol, at this point the client needs to know that

19  equobacin is Robaxin.  As you have it now with the lower name

20  in blue or any other color it will fade into the bottle and the

21  client's eye won't see it.  They need to get used to the new

22  name first.  Then slowly fade it into the background of main

23  label color.

24  "Q.  Let me ask you to stop there.  Do you have an

25  understanding of what equobacin is?

M4TAAGIA3                    "Courtney Adams"

1   "A.  I don't know.

2   "Q.  I'm sorry, Ms. Adams.  Your answer was, no, you do not?

3   "A.  Correct.  I do not know what that product is for

4   specifically.

5   "Q.  Ms. Adams, what was Lisa Range's role with respect to

6   creating labels for Equestology?

7   "A.  She would suggest edits so the customer could better

8   understand what the product was.

9   "Q.  And on this document where it refers to at this point "the

10  client needs to know." what's your understanding of who's

11  clients are being referred to here?

12  "A.  Lisa's client.

13  "Q.  Did you, in 2013 did you have clients at Equestology?

14  "A.  No.

15  "Q.  In your role at Equestology did you become familiar with

16  the identity of the Equestology clients?

17  "A.  I knew their names when I would get shipped like order

18  requests, but I was not familiar with the client in more ways

19  than that.

20  "Q.  Did you have conversations at any point with Seth Fishman

21  regarding the nature of the business of the Equestology

22  clients?

23  "A.  Yes.

24  "Q.  What did Seth Fishman tell you about the nature of the

25  business of the Equestology clients?

M4TAAGIA3                    "Courtney Adams"

1   "A.   That we specialized in making performance products.

2   "Q.   For what products for what purpose?

3   "A.   For horses that were untestable.

4   "Q.   You testified a moment ago that at this time you did not

5   have clients.  Were you familiar with who at Equestology did

6   have clients associated with their own business?

7   "A.   Yes.

8   "Q.   Apart from Ms. Ranger, who else at Equestology had

9   clients?

10  "A.   Lisa was the only one working for Equestology that had

11  clients.

12  "Q.   At any point did Seth Fishman have his own clients at

13  Equestology?

14  "A.   Yes.

15  "Q.   In the course of your time at Equestology, did you become

16  familiar with whose clients were associated with Fishman and

17  whose clients were associated with Ranger?

18  "A.   For most part, yes.

19  "Q.   From your time the Equestology did you become familiar

20  with the address associated with Equestology clients?

21  "A.   Yes.

22  "Q.   Did you participate in preparing shipments to Equestology

23  clients?

24  "A.   Yes, I did.

25  "Q.   Did that include preparing statement shipments for Lisa

1    Ranger's clients?

2    "A.  Yes.

3    "Q.  Did you personally assist in shipping products to Lisa

4    Ranger's clients?

5    "A.  Yes, I did.

6    "Q.  From that part of your business in Equestology did you

7    become familiar with where Lisa Ranger's clients were located?

8    "A.  Yes.

9    "Q.  And in general what part of the world were they located

10   in?

11   A.  They were in the northeast of the United States.

12   "Q.  Ms. Adams, now if I could ask you to look again at the

13   some exhibits in front of you, and specifically, if you could

14   lease look at what has been marked for identification as

15   Government Exhibits 401-S.

16   "A.  Okay.

17   "Q.  Through 401-FF and 401-II?

18   "A.  Okay.

19   "Q.  Do you recognize those documents?

20   "A.  Yes, I do.

21   "Q.  Without referring to substance, can you tell us what are

22   those?

23   "A.  They are text messages between Seth and I.

24   "Q.  Do these messages relate to your business at Equestology?

25   "A.  Yes, they do.

M4TAAGIA3                    "Courtney Adams"

1    "Q.  And in the exhibit it states the following:

2            MS. MORTAZAVI:  Ms. Jung, if we could please pull put

3    up what's now in evidence as 401-T please.

4            And, your Honor, stepping away from the exhibit, I'll

5    ask Ms. Jung to please pull up Government Exhibit 401-T which

6    is in evidence through stipulation of Government Exhibit 9008.

7            (Pause)

8            MS. MORTAZAVI:  Turning back to Government Exhibit

9    1701.

10    "Q.  If you could look at 401 D could you describe more,

11    specifically, what is this document?

12    "A.  It's text between Seth and I about the message I received

13    from Lisa about his vet license.

14    "Q.  Who is Lisa?

15    "A.  Lisa is the sales rep.

16    "Q.  Is that he same "Lisa Ranger" you mentioned a moment ago?

17    "A.  Yes.

18    "Q.  On this document the number ending in "2600", whose number

19    is that?

20    "A.  That is mine.

21    "Q.  And the phone number ending in "9286", whose number is

22    that?

23    "A.  Seth's.

24    "Q.  Who sent this message to him?

25    "A.  I sent it to Seth.

M4TAAGIA3                    "Courtney Adams"

1    "Q.  Could you note the date for us please?

2    "A.  June 10, 2015.

3    "Q.  By June 2015, had your role at Equestology changed in

4    away?

5    "A.  I may have started trying to like training on how to do

6    sales at this point.  I can't be sure of the exact timeline.

7    "Q.  Okay.  Did there come a time that you were asked to engage

8    in sales of Equestology products?

9    "A.  Yes.

10   "Q.  Did you agree to do that?

11   "A.  To a certain extent, yes.

12   "Q.  Did you yourself have clients when you began operating

13   with sales?

14   "A.  Yes.

15   "Q.  In this document can you describe what you're relying to

16   Seth?

17   "A.  I'm saying that Lisa told me that she does not have a vet

18   license.  She only has a business license but she's sending me

19   a link that shows all the information on it basically.

20   "Q.  Who's vet license did you understand Lisa to be referring

21   to?

22   "A.  To Seth's.

23   "Q.  In your work at Equestology, were you familiar with the

24   use of Seth Fishman's veterinary license with respect to that

25   business?

M4TAAGIA3                    "Courtney Adams"

1    "A.   Yes.

2    "Q.   What was the nature of how Seth Fishman's veterinary

3    license was used by Equestology?

4    "A.   Yes.  It was used, we had many different companies that we

5    would order what we call API or pharmaceutical products from

6    that required his vet license to be on file in order to get

7    them.  It was used for that and then it was also used for him

8    to be able that legally practice veterinary medicine.

9    "Q.   Ms. Adams, if you could also look at 401-W.

10   "A.   Okay.

11        MS. MORTAZAVI:  And stepping away from this exhibit, I

12   am going to ask Ms. Jung to please put up Government Exhibit

13   401-W on the screens and this is an item in evidence.

14        THE COURT:  Through the same stipulation, 9008?

15        MS. MORTAZAVI:  Correct, your Honor.  This is an

16   extraction from Seth Fishman's cellphone.

17        THE COURT:  Thank you.

18        MS. MORTAZAVI:  Turning back to Government Exhibit

19   17001.

20   "Q.   Do you recognize this document?

21   "A.   Yes.

22   "Q.   What is this document?

23   "A.   This is a text between Seth and I.

24   "Q.   And can you describe the content of the document?

25   "A.   Yep.  I'm forwarding a message from Lisa asking, she's

M4TAAGIA3                    "Courtney Adams"

1    asking me, doc needs to send blood builder to one of her

2    clients that she names.

3    "Q.  What was your understanding of who "doc" was?

4    "A.  "Doc" is Seth Fishman.

5    "Q.  And what's your understanding of what was meant by "blood

6    builders"?

7    "A.  I'm not -- it's product we have.  I'm not sure what it is.

8    I just know that's what it's referred to.

9    "Q.  Did you participate in any away in developing thing the

10    chemical makeup of any of the Equestology products?

11    "A.  Not -- can you rephrase the question?

12    "Q.  Sure.  Did you assist in any way in designing Equestology

13    products?

14    "A.  Only the labels.

15    "Q.  Are you familiar with who "Paul Ministrelli" is?

16    "A.  I have heard the name.  I don't know anything more about

17    him.

18    "Q.  Beginning of this says "from Lisa".  Did you receive a

19    message were Lisa Ranger before sending this message?

20    "A.  Yes.

21    "Q.  How was that message from Lisa conveyed to you?

22    "A.  Exactly as I copied and pasted it.  Exactly as it shows.

23    "Q.  If we could -- well, let me ask.  Your role at Equestology

24    by 2015, had you developed any kind of inventory system?

25    "A.  Yes.

M4TAAGIA3                         "Courtney Adams"

1    "Q.  Were you maintaining Equestology records electronically or

2    in hard copy by 2015?

3    "A.  Electronically, yes.

4    "Q.  Did you maintain any prescription records on file at

5    Equestology?

6    "A.  Can you be more specific?

7    "Q.  Did you maintain any prescription records for Lisa

8    Ranger's clients at Equestology?

9    "A.  No.

10   "Q.  Did you ever ask Lisa Ranger to send a request for written

11   prescription?

12   "A.  No.

13   "Q.  When, if ever, did Lisa Ranger ask you to schedule an

14   appointment for Dr. Fishman to examine horse reforming to her

15   clients?

16   "A.  Never.

17   "Q.  Let me ask you to turn in the exhibit binder in front of

18   you to what has been marked are identification as 402-H.

19   "A.  Okay.

20   "Q.  Do you recognize that document?

21   "A.  Yes.

22   "Q.  What is it?

23   "A.  It's a series of texts between Seth and I.

24   "Q.  Do these texts relate to your work at Equestology?

25   "A.  Yes, they do.

M4TAAGIA3                    "Courtney Adams"

1           MS. MORTAZAVI:  And for the record Ms. Jung has just

2    displayed for the jurors that Government Exhibit 402-H.

3           THE COURT:  That is in evidence?

4           MS. MORTAZAVI:  Correct, your Honor, pursuant to the

5    same stipulation.  For the record, this is an extraction from

6    Seth Fishman's cellular phone.

7    "Q.  Ms. Adams, if you could now look at 402-H.  In particular,

8    focus on the first two lines here, can you tell me the date

9    that appears on those messages?

10   "A.  January 1, 2013.

11   "Q.  And what is the discussion in these two lines relating to?

12   "A.  Labels for products.

13   "Q.  Which products are those?

14   "A.  The products that Seth was make going.

15           What was being could be conveyed to you about the

16   labels at that time?

17   "A.  That a person named "Ryan" messed something up or that he

18   was angry with him because he did not understand the

19   conversation they had about designing the labels.

20   "Q.  With respect to the second message in text reading, ask

21   him about cleaning up logos and if he has any memory of

22   Equestology logo and manipulating at "E".

23           what did you understand Fishman to be referring to

24   here?

25   "A.  On the Equestology logo the "E" is larger.  And that is

M4TAAGIA3                      "Courtney Adams"

1    kind of like the one letter that stands out in the logo.  And

2    he wanted him to make it cleaner so it was more pronounced.  It

3    wasn't lost in the logo.  It was bold so the customer would see

4    that first so it would look nice.

5    "Q.  In general, what was Fishman's role in designing logos for

6    Equestology?

7    "A.  He would give me or anyone else designing them all the

8    information to go on the logo and then from there I would take

9    it and edit it so it looked clean, orderly, professional

10   looking.

11   "Q.  The logo itself, was that on a label or on some other part

12   of the product?

13   "A.  It was on the label.

14   "Q.  Ms. Adams, did you participate in designing one label or

15   multiple labels?

16   "A.  Multiple labels.

17   "Q.  Did you design those label at Fishman's direction or on

18   your own initiative?

19   "A.  Fishman's direction.

20   "Q.  Did you include information relating to the contents of

21   the products on all of the labels or only on some of the

22   labels?

23   "A.  Kind of hard to answer.  So they would always have

24   ingredients, but sometimes it wouldn't list exactly what was in

25   it.  It would say "proprietary blend".

1    "Q.  Did you ever ask Fishman what was in the proprietary blend

2    for any Equestology product?

3    "A.  A few times, yes.

4    "Q.  What was his response?

5    "A.  That was protected information and he was allowed to put

6    that on the label because it was his formula.  He didn't have

7    to disclose every single thing in it.

8    "Q.  Were there some products that had no label so, whatsoever?

9    "A.  Yes.

10   "Q.  What kind of products were those?

11   "A.  I'm not really sure what they were.

12   "Q.  Did you ever ask Fishman what those products were?

13   "A.  Yes.

14   "Q.  And what was his response to that?

15   "A.  That I didn't need to know the details.

16   "Q.  Those product, the unlabeled products, were those shipped

17   outside of Equestology with no label on it?

18   "A.  Yes.

19   "Q.  Who directed you to ship the unlabeled products?

20   "A.  Seth would or I would get an order from Lisa, but then

21   Seth would confirm that the items that Lisa Ranger had asked

22   for, were indeed the unlabeled products.

23   "Q.  Ms. Adams, focusing on the first two lines from Fishman to

24   you, what did you understand him to be conveying to you here?

25   "A.  That he was angry I was not working more and that in the

M4TAAGIA3                          "Courtney Adams"

1    second message he is referencing to Lisa Ranger making a

2    certain amount of money and that if I put more time and

3    initiative, I could do the same thing.

4            MS. MORTAZAVI:  I'm going to step away from this

5    exhibit, Government Exhibit 17001 and ask Ms. Jung to go back

6    to the main image ever Government Exhibit 402 H.

7            (Pause)

8            MS. MORTAZAVI:  Ms. Jung, if you could focus on the

9    green portions, just the top two columns and we'll give the

10   jurors a moment to read those messages.

11           (Pause)

12           MS. MORTAZAVI:  Turning back to Government Exhibit

13   17001.

14   "Q.  What kind of work did you understand Fishman to be

15   incentivizing you to perform?

16   "A.  Sales.

17   "Q.  Sales of what kinds product?

18   "A.  Sales of all of the product that he made.

19   "Q.  In 2013 were you engaged in sales of Equestology products?

20   "A.  Not by myself, no.

21   "Q.  With other people?

22   "A.  No.  What I mean is I didn't have clients of my own.  So I

23   would talk to clients of Seth's.  Sometimes they would send me

24   their orders directly but I was not their salesperson.

25   "Q.  Ms. Adams, do you see what's marked as line 4325?

M4TAAGIA3                    "Courtney Adams"

1    "A.  Yes.

2            MS. MORTAZAVI:  I'm going to direct Ms. Jung so focus

3    founds that guideline in Government Exhibit 402-H.

4            (Pause)

5            MS. MORTAZAVI:  We'll give the jurors a moment to view

6    that portion of the exhibits.

7    "Q.  If you could look at that and then the text on the next

8    page and let us know what that conversation is about please?

9    "A.  Okay.  It is me asking Seth about what we want.

10           MS. MORTAZAVI:  Ms. Jung, you can take down the

11   blown-up portion of this exhibit.

12   "Q.  Ms. Adams, if you could start with the top line "4325".

13   "A.  That is remembering to how much he wants me to put on a

14   customs form for shipping product, how much he wants the

15   product to be labeled as.

16   "Q.  What did you mean when you wrote "bleeder".

17   "A.  That's the name of one of the products.

18   "Q.  Your name at Equestology, are you familiar with the

19   purpose of "bleeder"?

20   "A.  No.

21   "Q.  Did you ever ask Seth what the purpose of "bleeder" was?

22   "A.  Yes.

23   "Q.  What was his response?

24   "A.  To be honest, I don't remember.  There was a lot of

25   descriptions of things that I didn't really understand what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M4TAAGIA3                    "Courtney Adams"

1     exactly they did.

2     "Q.  You mentioned yesterday your educational background.  What

3     was your field of study?

4     "A.  Ecology and conversation biology.

5     "Q.  Have you ever studied veterinarian med?

6     "A.  No.

7     "Q.  Have you ever studied pharmacology?

8     "A.  No.

9     "Q.  When you refer to customs forms, to where was Equestology

10    shipping product?

11    "A.  For the most part, to the UAE.

12    "Q.  The United Arab Emirates?

13    "A.  Yes.

14    "Q.  Were there any other countries outside of the United

15    States to which Equestology shipped its products?

16    "A.  Yes.

17    "Q.  What countries were those?

18    "A.  Singapore.  I know there's Saudi Arabia and there may have

19    been one or two others randomly but I can't remember what they

20    were.

21    "Q.  On this line when you refer to having 970 ready to ship,

22    that's 970 what?

23    "A.  Vials.

24    "Q.  Vials of what?

25    "A.  Of bleeder.

M4TAAGIA3                    "Courtney Adams"

1  "Q.  And focusing you go here on top three lines, Ms. Adams --

2          MS. MORTAZAVI:  For the record, I'll ask Ms. Jung to

3  focus on those top three lines, the top three lines the

4  Government Exhibit 402-H.

5          THE COURT:  Thank you.

6          (Pause)

7          MS. MORTAZAVI:  Turning back to Government Exhibit

8  17001.  Focusing here, I am going to restate the question.

9  "Q.  Focus here on the top three lines, Ms. Adams, what did you

10  understand Fishman's response to you to mean?

11  "A.  He says like 75 cents each, which means I would put each

12  vial at a value of 75 cents.

13  "Q.  Were vials of the bleeder product sold for 75 cents?

14  "A.  No.

15  "Q.  Were they sold for more than 75 cents?

16  "A.  Yes.

17  "Q.  What was your understanding of why 75 cents was to be used

18  on this customs form?

19  "A.  To keep the total commercial value under a certain limit.

20  "Q.  What was your understanding of what the purpose of that

21  false information to be?

22  "A.  I don't know for sure.

23  "Q.  Thank you.

24          Could you look at this block of communications that

25  tells you what the conversation is about?

M4TAAGIA3                    "Courtney Adams"

1  "A.  It is about us all being somewhere together and that it

2  was going to meet with Dr. Vernon, and Seth would be there as

3  well.  But I had invited a friend that they did not know and he

4  was not comfortable talking about anything in front of this

5  person.

6  "Q.  So let me walk through --

7          MS. MORTAZAVI:  And, Ms. Jung, for the record, you can

8  take this exhibit down.  .

9  "Q.  Again turning back to Government Exhibit 17001.  So let me

10 walk through some of that and clarify exactly who you are

11 talking about?  Who was meeting together around that time?

12 "A.  Seth Fishman, Geoff Vernon, myself and my friend referred

13 to as Jeff.

14 "Q.  Your friend Jeff, does he spell his name with a "J" or

15 "G"?

16 "A.  "J".

17 "Q.  Who is Geoff Vernon?

18 "A.  Geoff Vernon is a vet.

19 "Q.  Did Geoff Vernon have any relationship with Equestology?

20 "A.  He brought products from us.

21 "Q.  And Geoff Vernon, does he spell his name with a "G" or

22 "J"?

23 "A.  A "G".

24 "Q.  As you reviewed this conversation, what, if anything, was

25 Fishman conveying to you in this conversation?

M4TAAGIA3                        "Courtney Adams"

1   "A.   That no business was going to be discussed as long as my

2   friend, Jeff, was sitting there.

3   "Q.   And your friend Jeff is not Geoff Vernon the vet; is that

4   correct?

5   "A.   Correct.

6   "Q.   Ms. Adams, did you know what the business was that would

7   be discussed but for the presence of your friend?

8   "A.   Yes.

9   "Q.   Did Seth Fishman tell you what the business that would

10  have been discussed but for the presence of your friend, Jeff

11  was?

12  "A.   Is this a yes or no question?  It's little more not as

13  black and white.

14  "Q.   Did Seth Fishman explain to you the business that would be

15  discussed but for the presence of your friend?

16  "A.   Yes.

17  "Q.   And what did he explain to you?

18  "A.   They were to be discussing future products, development of

19  product, use of products we already had, basically, ongoing

20  business and future business.

21  "Q.   If we could scroll down to the second to last line here.

22  "A.   Okay.

23  "Q.   On the second to last line where Fishman writes, no, you

24  were talking to U.S. Olympic vet and theoretically have an NDA.

25  What is your understanding of what he meant by an NDA?

M4TAAGIA3                     "Courtney Adams"

1    "A.    "Nondisclosure agreement".

2    "Q.    Did you in fact have a nondisclosure agreement with

3    Fishman?

4    "A.    No.

5    "Q.    Were you ever asked to enter into a nondisclosure

6    agreement?

7    "A.    Yes.

8    "Q.    Who asked you to do that?

9    "A.    Seth did.

10   "Q.    And did he explain the purpose for having you sign an NDA?

11   "A.    Yes.

12   "Q.    What did he tell you?

13   "A.    That it would protect him and I against me having to

14   answer questions to anyone else about his business.

15   "Q.    Did he discuss who might be asking questions about his

16   business?

17   "A.    Yes.

18   "Q.    And who were among the people that Fishman told you he was

19   concerned would ask questions about his business?

20   "A.    There was quite a few people.  The FDA, any regulatory

21   person, basically, any authority that has to do with horses.

22   "Q.    Ms. Adams, a question about the organization at

23   Equestology.  With respect to the labels that were that you

24   were assisting and designing, would you store electronic copies

25   of those labels?

M4TAAGIA3                    "Courtney Adams"

1    "A.  Yes.

2    "Q.  Where do you store electronic copies of those labels?

3    "A.  In our Drop Box account.

4    "Q.  What is a Drop Box account?

5    "A.  It is a cloud-based system where you can store all kinds

6    of files and pictures.

7    "Q.  Who, if you know, setup the Drop Box account for

8    Equestology?

9    "A.  I did.

10   "Q.  Who asked you to do that?

11   "A.  Seth Fishman.

12   "Q.  Apart from labels, did you maintain any other kinds

13   documents or records on the Equestology Drop Box account?

14   "A.  Yes.

15   "Q.  Did the Drop Box account contain solely records relating

16   to Equestology business?

17   "A.  No.

18   "Q.  What other kinds documents were found on the Drop Box

19   account?

20   "A.  I had personal pictures and other items on there that were

21   mine.

22   "Q.  Who had access to the Equestology Drop Box account?

23   "A.  Seth and I.

24   "Q.  Did anyone else have access to the Equestology account so

25   far as you know?

M4TAAGIA3                    "Courtney Adams"

1    "A.    Mary Fox did at one point later down the road.

2    "Q.    If you wouldn't mainly pulling up what's in evidence from

3    yesterday as Government Exhibit 1908 please.

4              MS. MORTAZAVI:    And I would ask Ms. Jung to please

5    pull up that exhibit or jurors.

6              Your Honor, this is in evidence pursuant to

7    stipulation, this is a record from Equestology.

8    "Q.    Ms. Adams, when you have that can you tell what this email

9    chain is referring to?

10   "A.    Okay.  It's an email from Lisa Ranger to me asking me to

11   send product to person called Richard Banca.

12   "Q.    Below that, the second email on the chain, what was your

13   response?

14   "A.    Okay.  What did you need sent?  I will send it on Monday.

15   "Q.    What was your understanding first of who Doc was?

16   "A.    Doc is Seth Fishman.

17   "Q.    Do you know a person named "Richard Banca"?

18   "A.    No.

19   "Q.    Was Richard Banca ever a client of yours?

20   "A.    No.

21   "Q.    Where Ranger says you can send them that me or them

22   directly, what did you understand her to be directing you to

23   do?

24   "A.    I can either send the order directly to Richard or to her.

25   "Q.    And from this email, did you know what "stuff" referred

M4TAAGIA3                    "Courtney Adams"

1   to?

2   "A.  Product that we made.  It didn't specify.

3   "Q.  Before you would send product to a client of Ranger, how

4   would you verify which products to send?

5   "A.  If she would, if there was a list with names on them, then

6   I would know exactly what to send.  Otherwise, I would have to

7   confirm with Seth if it was just generalized.

8   "Q.  Did Equestology employ sales representatives?

9   "A.  On the books.

10  "Q.  At all.

11  "A.  Lisa was our sells rep as far as I know.

12  "Q.  Could I ask you now to turn to the next exhibit in

13  evidence.  It's 1909.

14  "A.  Okay.

15          MS. MORTAZAVI:  I'm going to ask Ms. Jung to please

16  pull up Government Exhibit 1909.

17  "Q.  Going back to Government Exhibit 1701.  Do you recognize

18  this document?

19  "A.  Yes.

20  "Q.  What is this document?

21  "A.  This is a document that Lisa had with her of all the

22  products that she sold.

23  "Q.  At the top inventory travel sheet where it reads

24  "inventory travel sheet", Ms. Adams, did you travel for purpose

25  of selling Equestology products?

M4TAAGIA3                    "Courtney Adams"

1    "A.   No.

2    "Q.   Does this document contain a full inventory of all

3    Equestology products?

4    "A.   No.

5    "Q.   Did you maintain a base of clients in Delaware at any

6    point?

7    "A.   No, I did not.

8    "Q.   Who among the people at Equestology maintains Delaware

9    clients?

10   "A.   Lisa Ranger.

11            THE COURT:  Ms. Mortazavi, we are not going to get

12   through all of this before the lunch break.  So please find a

13   point soon that's a convenient breaking point.  I am asking you

14   to do that a little bit early today because just to remind

15   everyone we said we are going to break for day at three

16   o'clock.  So we'll take lunch slightly earlier today.

17            MS. MORTAZAVI:  Your Honor, there are a few lines

18   discussing this exhibit if we can?

19            THE COURT:  Sure.

20            MS. MORTAZAVI:  It's through not quite the end of next

21   page.

22            THE COURT:  That's fine.  You find where it makes

23   sense to break.

24            MS. MORTAZAVI:  Thank you, your Honor.

25            Before I turn back to Government Exhibit 1701,

M4TAAGIA3                         "Courtney Adams"

1    Ms. Jung, if you could please focus down the middle of page

2    DEGH, EGH.  Thank you

3    "Q.  Turning back to Government Exhibit 1701.

4              Ms. Adams, do you see that line?

5    "A.  Yes.

6    "Q.  Are you familiar with the acronym EGH?

7    "A.  Yes.

8    "Q.  What did EGH stand for?

9    "A.  "Equine growth hormone".

10   "Q.  Just below EGH where it reads "endurance", from your time

11   at Equestology, did you have an understanding of what

12   "endurance" is?

13   "A.  No.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

MR76GIA4                    "Courtney Adams"

1   "Q.  Did you ever ask Seth Fishman what endurance is?

2   "A.  Not to my knowledge, no.

3   "Q.  If we could go over to the -- pardon me.  If we could go

4   to the right-hand column on the top and on the line reading

5   hormone therapy pack.  Did you ever discuss with Fishman the

6   purpose of the hormone therapy pack?

7   "A.  No.

8   "Q.  It's in the middle of the screen, oxytocin.  Did

9   Equestology sell oxytocin?

10  "A.  Yes."

11          MS. MORTAZAVI:  Your Honor, we should probably break

12  at this point before pulling up the next exhibit.

13          THE COURT:  Ladies and gentlemen, please leave the

14  exhibit as well as your notepad and the transcript binder on

15  your chairs.  We'll break for lunch, and if everyone can be

16  back by 1:15.  Please do not discuss the case with one another

17  or do any research or talking about the case outside of what

18  you hear in the courtroom.  The witness, in effect, remains

19  under oath.  All right.  We'll recess now for lunch.

20          MS. MORTAZAVI:  Pardon me, your Honor.  The witness

21  was never placed under oath.

22          THE COURT:  Not this witness.  Ms. Adams.

23          MS. MORTAZAVI:  Understood.

24          THE COURT:  All right.  Thank you.  Just so the jury

25  is clear, this person in the witness stand is not a witness.

MR76GIA4                     "Courtney Adams"

1    She's simply reading from an exhibit.  Do you all understand

2    that?

3              Thank you.  All right.

4              All rise for the jury, please.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MR76GIA4                    "Courtney Adams"

1              (Jury not present)

2              THE COURT:  Is there anything we need to discuss?

3              MS. MORTAZAVI:  Not from the government.

4              MR. FASULO:  Not from the defense.

5              THE COURT:  I'll see everyone be back a little before

6    1:15 so we can promptly resume at 1:15.

7              (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MR76GIA4                    "Courtney Adams"

1                        AFTERNOON SESSION

2                            1:15 p.m.

3            THE COURT:  Are we ready to resume?

4            MS. MORTAZAVI:  Yes, your Honor.  If we could please

5    have Ms. Ruscigno  approach the stand?

6            THE COURT:  Yes, ma'am.  And Ms. Dempsey will retrieve

7    our jurors.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MR76GIA4                    "Courtney Adams"

```
 1              (Jury present)
 2              THE COURT:  Please be seated, everyone.
 3         Thank you very much.  Everyone set?
 4         All right.  Ms. Mortizavi, please.
 5              MS. MORTAZAVI:  Thank you, your Honor.
 6         And for any jurors who need to find their place, it's
 7    Government Exhibit 17001, Page 120, Line 22.
 8    "Q.  I'm going to begin reading from the exhibit.
 9              If we can pull up now what's in evidence Government
10    Exhibit 1910?
11              Ms. Adams, what is this conversation about?
12              MS. MORTAZAVI:  And before you continue, Ms. Jung, if
13    you could pull up Government Exhibit 1910, which, again, is in
14    evidence by stipulation?
15              I'll return to Government Exhibit 17001.
16    "Q.  What is this conversation about?
17    "A.  It's about labels for certain products in making them
18    easier to read.  Changing a few things on them.
19    "Q. What was the product that you were discussing?
20    "A. Pain shot.
21    "Q. And from your time at Equestology, do you have an
22    understanding of what pain shot is?
23    "A. Not exactly, no.
24    "Q. Did you ever discuss pain shot with Seth Fishman?
25    "A. Possibly.
```

MR76GIA4                          "Courtney Adams"

1    "Q. Do you have a clear recollection of whether you did or not?

2    "A. I know I asked him about almost everything, but the answers

3    I do not remember.

4    "Q. Could you tell us the date of the top e-mail here?

5    "A. November 22, 2015.

6    "Q. By November of 2015, had your role changed at Equestology?

7    "A. Yes.

8    "Q. Where were you living at this time?

9    "A. I might have been back in Idaho at this time.

10   "Q. Did there come a time when you left Florida while you were

11   still working for Equestology?

12   "A. Yes.

13   "Q. And at that time, when you left Florida, what role did you

14   play in the company?

15   "A. I was doing sales.

16   "Q. One of the participants on the e-mail, Mary Fox -- who is

17   Mary Fox?

18   "A. Mary Fox was the new office manager.  She took over my old

19   position.

20   "Q. Let's go to the bottom of this exhibit.  The last -- it's

21   last e-mail in the chain.

22   "A. Okay.

23   "Q. What was -- what were you being asked or provided in this

24   e-mail?

25   "A. The directions for the label for pain shot LC.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MR76GIA4                         "Courtney Adams"

1    "Q. And who drafted those directions?

2    "A. Seth, I believe.  Yes, Seth.

3    "Q. Did you have any discussions with Fishman regarding what

4    information should not appear on Equestology labels?

5    "A. Yes.

6    "Q. Ms. Adams, were you ever told by Fishman not to include any

7    information about the ingredients of Equestology products?

8    "A. Yes.

9    "Q. Can you describe what Fishman told you when he gave you

10   that direction?

11   "A. Yes.  In general, on certain products, he would tell me to

12   not list the ingredients.

13   "Q. Did he tell you why he wanted you not to list ingredients?

14   "A. There was a few reasons.  One was they did not need to be

15   listed, and two, in the case of proprietary blend, which we did

16   not always put on the label, that he was entitled to keep his

17   formula secret, so to say, and that you didn't -- legally he

18   didn't have to put them there.

19   "Q.  If we could turn to what's in evidence as Government

20   Exhibit 1912?"

21        MS. MORTAZAVI:  And I'll ask Ms. Jung to pull it up

22   and display it for the jurors.

23   "Q.  Ms. Adams, what's the e-mail about?

24   "A. Asking me to pay a certain bill for chemicals that were

25   ordered.

MR76GIA4                          "Courtney Adams"

1    "Q. And who gave you that direction?

2    "A. Seth.

3    "Q. And how were you directed to pay bills for chemicals being

4    ordered?

5    "A. With his credit card.

6    "Q. The second e-mail reading Robert H at LGM Pharma, what is

7    LGM Pharma?

8    "A. One of the suppliers for the chemicals for API.

9    "Q. Do you know where Pharma is based?

10   "A. I do not.

11   "Q.  If we could look at Government Exhibit 1913 in evidence?"

12           MS. MORTAZAVI:  I'll ask Ms. Jung to display it for

13   the jurors as well.

14   "Q.  Ms. Adams, do you recognize this document?

15   "A. Yes, I do.

16   "Q. What is this?

17   "A. It as list of products that I sent to a Josh Marks.

18   "Q. The list that appears below, what is that list?

19   "A. You want me to read it?

20   "Q. In general, what were you listing?

21   "A. The specific quantities that I shipped to this customer.

22   "Q. Do you know this customer?

23   "A. No.

24   "Q. Was Josh Marks ever a client of yours?

25   "A. I don't remember.

MR76GIA4                    "Courtney Adams"

1   "Q. Have you ever meant Josh Marks or a person named

2   Josh Marks?

3   "A. No, no.

4   "Q. 5x green cap.  What is green cap?  What is 5x green cap?

5   What is green cap?

6   "A. Green cap is an unknown product that is stored and has a

7   green cap.

8   "Q. And when you say it's an unknown product, do you know

9   what's in that product?

10  "A. No.

11  "Q. Did you ever discuss the contents of that product with

12  Fishman?

13  "A. I may have asked him about it, but I do not remember what

14  he said.

15  "Q. How is green cap labeled on the bottle?

16  "A. It was not labeled.

17  "Q. Was it not labeled when it was shipped out of Equestology?

18  "A. No.

19  "Q. Below that, where it reads 4x IT plus, what is IT plus?

20  "A. One of the other products that we made.

21  "Q. And from your time at Equestology, do you understand what

22  IT plus's purpose is?

23  "A. No.  I don't know what it does.

24  "Q. At your time at Equestology, did you ever receive any

25  customer complaints about IT plus?

MR76GIA4                        "Courtney Adams"

1    "A. About that one in particular?  I don't remember.

2    "Q. Did you ever receive any customer complaints about

3    Equestology products generally?

4    "A. Yes.

5    "Q. At your time at Equestology, did you receive any customer

6    complaints about products in general?

7    "A. Yes, I did.

8    "Q. Ms. Adams did you learn of the nature of the complaints

9    during your time at Equestology?

10   "A. Yes.

11   "Q. Ms. Adams, did you receive customer complaints about the

12   stability of products at Equestology?

13   "A. Yes, I did.

14   "Q. Can you describe what you learned about the stability of

15   Equestology products?

16   "A. Certain products would -- if the customer had ordered them

17   multiple times, they know what they should look like.  And,

18   occasionally, they would receive something that did not look

19   the same as it did before.  For example, it would be one color

20   one time and slightly off another, or what we call the matrix.

21   If it's freeze-dried or dried inside the vial, sometimes it

22   would look like it was exploded or splattered all over the

23   inside of the a vial.  And the customer would question, you

24   know, if there's something wrong with it.

25   "Q. Are you familiar with a company called 21st Century?

MR76GIA4                    "Courtney Adams"

1    "A. Yes.

2    "Q. What is 21st Century?

3    "A. That was one of the labs where we had the majority of or

4    products made.

5    "Q. Who at 21st Century did you interact with, if anybody?

6    "A. Jordan Fishman, Pam Crowley, Michael Sheha I think is the

7    last name.  There may have been one other tech.

8    "Q. Did you receive any complaints regarding products from

9    21st Century in particular?

10   "A. Yes.

11   "Q.  Can you describe the nature of those complaints?

12   "A. They were the complaints I had just referred to.  The

13   inside of the products did not look the same from one batch to

14   the other.  Something was -- you know, one had crystals -- was

15   crystallizing in it, different colors, that kind of thing.

16   "Q. Did you ever discuss with Fishman whether Fishman had any

17   financial interest in 21st Century?

18   "A. No.

19   "Q. What, if any, equipment did Equestology provide to

20   21st Century?

21   "A. He had paid for a few of the equipment pieces to be used

22   because we needed them for our stuff.

23   "Q. By our stuff, what do you mean?

24   "A. All the products that we were making.

25   "Q. Did you have discussions about the need for providing

MR76GIA4                    "Courtney Adams"

1   specialized equipment for Equestology products?

2   "A. Do you -- can you rephrase that?

3   "Q. Yes.  You said there were devices provided to 21st Century

4   for the purpose of manufacturing Equestology products; is that

5   correct?

6   "A. Sorry.  It froze for a second.

7           Seth had purchased several pieces of equipment to be

8   used to make his products and the lab was also allowed to use

9   that equipment.

10  "Q.  If we could turn to what's in evidence as 401X, please?"

11          MS. MORTAZAVI:  And I'm going to ask Ms. Jung to pull

12  that up for the jury.

13          Your Honor, this is in evidence pursuant to

14  stipulation.  This is an extraction from Seth Fishman's

15  cellular phone.

16  "Q. Ms. Adams, what's this conversation regarding?

17  "A. It's between Seth and I.  And it's clarifying exactly what

18  I need to send.  It's asking about blood builder, and I'm

19  asking if it's a certain product, and he's correcting me and

20  telling me the proper things it is.

21  "Q. Do you know anyone named Brian Malone personally?

22  "A. Personally, no.

23  "Q. Was Brian Malone ever a client of yours?

24  "A. Not that I remember, no.

25  "Q. What were you referring to when you wrote NPX?

MR76GIA4                      "Courtney Adams"

"A. That is the name that we call one of the products.  That's
what I knew it as.

"Q. Was that in fact the blood builder?

"A. No.

"Q. What was NPX?

"A. I don't -- I don't know.  It says it in the text message,
but I don't know what that means.

"Q. You're referring to the line reading, "NPX is
analgesic/sedative"?

"A. Yes.

"Q. Above that line where Seth writes, "no, it's orange cap,
3CC amber," what is orange cap?

"A. That is one of the unlabeled products that was kept in the
fridge or freezer.

"Q. When you say unlabeled, was it shipped with no label?

"A. Yes.

"Q. How did you recognize which drug to pick out if it had no
label on it?

"A. We went by cap color.

"Q. And what were some of the common cap colors that you would
refer to at Equestology?

"A. Orange, magenta, amber, not -- not amber because that is
glass -- green, red, blue.

"Q. And you mentioned glass a minute ago.  What is your
understanding that amber refers to?

MR76GIA4                    "Courtney Adams"

1    "A. Amber is the color of the glass vial.

2    "Q. Were there different color glasses referred to at

3    Equestology?

4    "A. Yes.

5    "Q. And how would you refer to different color glasses?

6    "A. Clear or amber.

7    "Q.  All right.  If we could turn to what's in evidence as

8    1900, please?"

9    "A. Okay.

10        MS. MORTAZAVI:  For the record, Ms. Jung is displaying

11   this for the jurors, and this is also in evidence by

12   stipulation.

13   "Q.  Ms. Adams, can you describe the conversation that is going

14   on in this series of e-mails?

15   "A. So it is between Mary Fox and I.  It's about a shipment to

16   the UAE for a customer, and Adel is the gentleman that we'd go

17   back and forth with that puts the orders in.

18   "Q.  All right.  If we could flip back to 401U in evidence."

19        MS. MORTAZAVI:  And at this point, I'm going to ask

20   Ms. Jung to pull up Government Exhibit 401U to display for the

21   jurors.

22        For the record this is an extraction from one of

23   Seth Fishman's cellular phones and is already in evidence by

24   stipulation.

25   "Q.  And on the second row where you write "also found a

MR76GIA4                        "Courtney Adams"

1    fridge/freezer at Home Depot," what were you conveying to Seth

2    in this message?

3    "A. That we had been looking for some fridges and freezers for

4    the office to store products in, and so I found one on sale and

5    I was letting him know.

6    "Q. Yesterday, you testified about the physical work space when

7    you first began working at Equestology.  Did there come a time

8    when Equestology expanded?

9    "A. Yes.

10   "Q. And into what kind of space did Equestology expand?

11   "A. We rented out an office space in another building where we

12   had a lot more room, and it was an actual office.

13   "Q. And did you, in fact, obtain fridges and freezers for that

14   office space?

15   "A. Yes.

16   "Q. Approximately how many?

17   "A. We had one large freezer and then another fridge/freezer.

18   "Q. When you said large freezer, can you approximate how tall?

19   "A. 5 and a half, 6 feet, the full size freezers that you would

20   have in your house or your garage.

21   "Q. And what would be stored in the Equestology freezers?

22   "A. Any product that required refrigeration or freezing.

23   "Q. Did that include orange cap?

24   "A. I believe so.  It went in either the fridge or the freezer.

25   I can't remember which one.

MR76GIA4                    "Courtney Adams"

1   "Q. Were there certain products that required that they be kept

2   under freezing temperatures?

3   "A. Yes.

4   "Q. Do you recall which products were required to be kept

5   frozen?

6   "A. No.

7   "Q. Then let's look at 401V, please.

8          I'm sorry, before we leave this, the last line on

9   401U, Seth, there's a list that appears beginning with "blast

10  off"?

11  "A. Mm-hmm.

12  "Q. "Blast off 1286."  What was your understanding of what was

13  being sent to you in this list?

14  "A. That is the list of products that I needed to ship to Adel.

15  "Q. The number that appears after blast off 1286, what does the

16  number refer to?

17  "A. The quantity of vials that needed to be sent.

18  "Q. Did Equestology ever send drug samples to clients or

19  potential clients?

20  "A. Occasionally they would send them, yes.

21  "Q. Did the quantities listed here reflect a sample size?

22  "A. No.

23  "Q. What's your understanding of HP bleeder?  What does that

24  mean?

25  "A. It's one of our products.  I'm not sure what it does.

MR76GIA4                        "Courtney Adams"

1   "Q.  Thank you.  And now to 401V, please."

2              MS. MORTAZAVI:  And I'll ask Ms. Jung to display that

3   for the jurors.

4              And for the record, this is another extraction from

5   Seth Fishman in evidence pursuant to stipulation.

6   "Q.  If you could describe what you are talking about in this

7   conversation?

8   "A. Between Seth and I?  He's angry at me for ordering certain

9   things on the account that's getting him possibly flagged.

10  "Q. What kind of account was that?

11  "A. The account was Bayer, which is where he would buy certain

12  products that we didn't make or were wrong with chemicals.

13  "Q. And were you placing orders directly through them?

14  "A. Yes.  I would call the sales rep or have Lisa ask for them

15  to be ordered as well.

16  "Q. And what kind of products were you ordering?

17  "A. By the looks of this message, these are some of the orders

18  for some of the people that were my friends that had horses.

19  So they're most likely, like, pain medication or heartworm

20  stuff for some of our friends' dogs.  In this instance, I don't

21  know exactly what it's referring to.

22  "Q. Would you order prescription medication from Bayer?

23  "A. Yes.

24  "Q. And whose veterinary license would you use to order the

25  prescription medication?

MR76GIA4                    "Courtney Adams"

1    "A. Seth's.

2    "Q. Did Seth Fishman have any sort of relationship with the

3    animals for whom you were ordering medication?

4    "A. No.

5    "Q. And at the very bottom of this chain where you write -- I'm

6    sorry.  I'm sorry.  Where you say it reads O-D-E-R.  O-D-E-R

7    "for Adel, was never supposed to have HP bleeder plus."  What

8    did you understand that to mean?

9    "A. That one of the orders I sent to Adel, he's saying that it

10   had HP bleeder plus in it.

11   "Q. Was there a difference between HP bleeder and HP bleeder

12   plus?

13   "A. Yes.

14   "Q. Do you understand what the difference between those two

15   products was?

16   "A. One of them had an added ingredient for which I was unaware

17   of what it did.

18   "Q.  If we could get Government Exhibit 1901, please?"

19           MS. MORTAZAVI:  And I'll ask Ms. Jung to display that

20   for the jurors.  And this is in evidence through stipulation.

21   "Q.  Ms. Adams, do you recognize this e-mail?"

22   "A. Yes.

23   "Q. What's happening in this e-mail chain?

24   "A. I'm asking Mary to send out specific products to a

25   customer.

MR76GIA4                    "Courtney Adams"

1    "Q. Who is that customer?

2    "A. Brandie Holloway.

3    "Q. Do you know a person named Brandie Holloway?

4    "A. I do not know.

5    "Q. And looking at the bottom e-mail on this chain, last in

6    time from Courtney to John Pundyk, who is John Pundyk?

7    "A. John was the person on the ground in front of the people

8    getting these orders.

9    "Q. What relationship, if any, does John Pundyk have to

10   Equestology?

11   "A. He's not directly related.  He worked with Geoff Vernon who

12   then was my client.  So he was down the chain of people.

13   "Q. Did John Pundyk ever ask as a sales rep for Equestology?

14   "A. Yes.  He wasn't officially a sales rep, but he was under

15   me, so to speak.  I was a sales rep, and he was my person that

16   was out and about.

17   "Q. Would you ship drugs at John Pundyk's direction?

18   "A. Yes.

19   "Q. To whom?

20   "A. To his clients.

21   "Q. In instances when John Pundyk had clients that would

22   receive orders from Equestology how would you learn of the

23   request to send a shipment?

24   "A. John would always e-mail me the order, and then I would --

25   if I was okay with the order, if it's something I knew we had,

MR76GIA4                              "Courtney Adams"

1    I would forward it to Mary, and Mary would ship it to the

2    customer.

3    "Q. Ms. Adams, we were discussing complaints about Equestology

4    products from customers previously.  Did you discuss those

5    complaints with Seth Fishman?

6    "A. Yes.

7    "Q. What did you tell Fishman about the complaints that you

8    were aware of?

9            One moment.

10   "A. I would tell Seth what the customer had told me in regards

11   to exactly what was wrong.

12   "Q. What was Seth's reaction to hearing those complaints?

13   "A. He was worried about that.  And then he would check back

14   with the lab to figure out what the problem was.

15   "Q. Okay.  Did there come a time when those complaints stopped

16   coming into Equestology?

17   "A. I don't -- I wouldn't say stopped.  They were very few and

18   far between.  It happened very sporadically.

19   "Q. Okay.  When that happened, to your knowledge, was any

20   direction given to 21st Century about changing its

21   manufacturing process?

22   "A. Yes.

23   "Q. And what were the directions to 21st Century?

24   "A. I don't know exactly what direction -- what Seth said

25   specifically.  But they were instructed to figure out what the

MR76GIA4                    "Courtney Adams"

1    problem was and fix it.

2    "Q.  Let me ask you to look at Government Exhibit 1905 in

3    evidence."

4            MS. MORTAZAVI:  I'll have Ms. Jung please pull up this

5    e-mail, which is in evidence by stipulation.

6    "Q.  What were you conveying in this e-mail?

7    "A. That an order was being sent to Geoff Vernon.  Needed to

8    get to the address in that e-mail as soon as possible by a

9    certain date so it could make it onto a horse trailer that was

10   going across the border to Canada.

11   "Q. You refer to Geoff.  Is this is the Geoff Vernon you

12   referred to earlier?

13   "A. Yes.

14   "Q. And why was the shipment being sent to a trailer before

15   going to Canada?

16   "A. As far as I understood, Geoff was with those horses or

17   associated with them, and that it needed to -- it had to

18   physically be with him to cross the border.

19   "Q. And did you have an understanding of why Geoff Vernon

20   needed to be physically with those drugs to cross the border?

21   "A. Because he is a vet and he can't -- they need to be in his

22   possession or with some prescription or something.  I'm not

23   really sure.

24   "Q.  Okay.  And now looking at 401II in evidence."

25           MS. MORTAZAVI:  And I'll ask Ms. Jung to please

MR76GIA4                    "Courtney Adams"

1    display that for the jury.

2            For the record, this is another extraction from

3    Seth Fishman's cellular phone admitted by stipulation.

4    "Q.  Can you describe what you were asking when you wrote,

5    "Geoff wants to know if our EGH is testable"?

6    "A. Geoff was requesting if the equine drug hormone was

7    testable to any body like the horseracing commission or anyone,

8    any other test that was done on the horses.

9    "Q. Did you have conversations with Seth Fishman about the

10   testability of Equestology products?

11   "A. Yes.

12   "Q. From your conversations with Fishman, did you have an

13   understanding as to why the testability was an important

14   feature of Equestology products?

15   "A. Yes.

16   "Q. What was your understanding on the basis of your

17   conversations with Fishman?

18   "A. That that was our biggest selling point, that we

19   specialized in making products that were not testable.

20   "Q. Did he discuss with you the potential risk if an

21   Equestology product were to become testable by a governing

22   body?

23   "A. Yes.

24   "Q. And what did he tell you about that risk?

25   "A. The risk was if someone was to get their hands on one of

MR76GIA4                    "Courtney Adams"

1    our products, you know, that they could make a test for it, and

2    then that product would no longer be useful to us.  We'd have

3    to make something else.

4    "Q. Why would you have to make something else if an Equestology

5    product became testable?

6    "A. Because that was the whole point of that product, was to be

7    not testable.

8    "Q. And reading here from 401II, the sent message from Seth to

9    you, for the record, "listen, Geoff, needs to talk to me.

10   Things are not black and white and itself no.  But too much can

11   raise testosterone.  Also, he should be using the modified MGF

12   more than EGH."

13          Ms. Adams do you have an understanding of what

14   modified MGF is?

15   "A. No.  I'm not familiar with what that acronym is.

16   "Q.  Can we go to Government Exhibit 1902 in evidence, please?"

17          MS. MORTAZAVI:  I'll ask Ms. Jung to please display

18   that for the jurors.

19   "Q.  Ms. Adams, what's happening in this e-mail chain?

20   "A. This is an e-mail chain between Seth and Adel -- Adel,

21   excuse me, in the UAE with Mary and I copied on it about

22   ordering more product and the timeline that it's on.

23   "Q. From your review of this e-mail, can you identify the

24   product that was to be shipped?

25   "A. Yes.  A thousand vials of equine growth hormone.

MR76GIA4                    "Courtney Adams"

1    "Q. Is that EGH?

2    "A. Yes.

3    "Q. Is a thousand vials a sample size of EGH?

4    "A. No.

5    "Q. Below that where it reads "please, if you can ship to DEH

6    at the earliest possible on IP services," do you have you an

7    understanding of what DEH stands for?

8    "A. Yes.  Dubai Equine Hospital.

9    "Q.  If we can go to 401BB as in boy, boy?"

10            MS. MORTAZAVI:  And for the record, Ms. Jung is

11   displaying that for the jurors.

12            Once again, an extraction from Seth Fishman's cellular

13   phone already in evidence by stipulation.

14   "Q.  What did you understand this message to convey to?

15   "A.  That Adel had decided to go with 500 vials of EGH.  And he

16   wants everything to be sent as one package.

17   "Q. Is this the same Adel that we've discussed previously?

18   "A. Yes, it is.

19   "Q.  If we could look at 401CC, please, the next one?"

20            MS. MORTAZAVI:  And I'll have Ms. Jung display that

21   for the jurors as well; again another extraction from Seth

22   Fishman's cellular phone.

23   "Q.  Okay.  Can you describe what's happening in this

24   conversation?

25   "A. Between Seth and I, he's asking me -- or I'm asking that I

MR76GIA4                    "Courtney Adams"

1  cannot find the 200 vials of PSDS and wondering if maybe Lisa

2  can send some back to us.  And he is upset that I didn't take

3  care of this a few weeks prior to this.

4  "Q. Who is the Lisa that you're referring to?

5  "A. Lisa Ranger.

6  "Q. What have you sent to Lisa?

7  "A. The product, PSDS.

8  "Q. What was PSDS?

9  "A. A pain shot double strength.

10 "Q. What's your understanding of the purpose of pain shot

11 double strength?

12 "A. A double strength product that blocks pain.

13 "Q. What was your understanding of what the "big drama" would

14 be as a result of not having set aside the vials that had been

15 sent to Lisa?

16 "A. That whoever we were sending it to is going to be very

17 upset that we don't have what Seth told him that we had.

18 "Q.  Let's go now please to what's in evidence as 1903."

19          MS. MORTAZAVI:  And I'll ask Ms. Jung to please

20 display that.  Again, another record in evidence by

21 stipulation.

22 "Q.  What were you conveying in 1903?

23 "A. Make sure I'm on the right one.  Sorry.  03.  I'm conveying

24 to Mary at the office to send products to Lisa that she had

25 requested.

MR76GIA4                         "Courtney Adams"

1    "Q. When you say "she had requested," who had requested the

2    products?

3    "A. Lisa Ranger had asked me.

4    "Q. In your role at Equestology, would you decide on your own

5    initiative what products Lisa should receive?

6    "A. No.

7    "Q. How did you learn what products to send to Lisa?

8    "A. Lisa would either request them or Seth would tell me to

9    send them to her.

10   "Q. Looking on this e-mail on the line reading "HP bleeder

11   plus," is that the same product we discussed a moment ago with

12   respect to shipments to Adel?

13   "A. I don't -- no.  We were talking about EGH before.

14   "Q. Do you recall my question earlier about the difference

15   between HB bleeder and HB bleeder plus?

16   "A. Oh, yes.  A few shipments ago with the photos in the

17   exhibit.  Yes.  That was HB bleeder plus.

18   "Q. On this line where it says "send version with horse head

19   logo not SPC," what's your understanding of what -- what did

20   you intend to convey in writing that?

21   "A. So some of the products are -- have different brands that

22   are on them depending on where they're being sold.  So some of

23   the HB bleeder plus has the Equestology logo on it, some of

24   them would have SPC logos, and some of them would have other --

25   we have multiple other logos or brands.  So I'm specifying

MR76GIA4                    "Courtney Adams"

1   exactly which one needs to be sent.

2   "Q. Ms. Adams, are you aware of any reason that one brand would

3   be used to label a vial as opposed to a different brand?

4   "A. Yes.

5   "Q. Did you become aware of that reason from your work at

6   Equestology?

7   "A. Yes.

8   "Q. Did you discuss the reasons for differentiation with

9   Seth Fishman?

10  "A. Yes.

11  "Q. Did you discuss the reasons for that differentiation with

12  Lisa Ranger?

13  "A. Yes.

14  "Q. Okay.  What was the reason for the differentiation?

15  "A. Certain regions or areas or clients would request their own

16  brand.  So do you want me to give you an example?

17  "Q. Certainly.

18  "A. Adel in the UAE, he requested that he have his own logo and

19  that logo not be used on any other products.  So all of his

20  things would have specific logos, and that would not be then

21  sold to Lisa Ranger or Geoff Vernon.  It was only his.

22  "Q. Okay.  What does SPC stand for?

23  "A. Specialized performance compound.

24  "Q.  Thank you.  Let's look at 401Z also."

25          MS. MORTAZAVI:  And I'll ask Ms. Jung to please

MR76GIA4                      "Courtney Adams"

1    display that exhibit for the jurors; once again an extraction

2    from Seth Fishman's cellular phone already in evidence.

3    "Q.  Ms. Adams, what is this text chain about?

4    "A. It's between Seth and I about the product called GNHR and

5    what the quantity is and the price for a customer named

6    Lisette.

7    "Q. What is GNRH?

8    "A. I do not know.

9    "Q. Did you ever talk to Seth Fishman about GNRH?

10   "A. Yes, briefly.

11   "Q. And what do you recall him telling you about GNRH?

12   "A. I don't recall the details.

13   "Q. Who is Lisette?

14   "A. Lisette is one of his customers in South Florida.

15   "Q. To your knowledge, did Lisette have clients to whom she was

16   reselling Equestology products?

17   "A. Yes.

18   "Q. Where were those clients based?

19   "A. South America.

20   "Q. Do you know in this chain where it reads "MOQ of 25" and

21   later "minimum order quantity," what was a minimum order

22   quantity?

23   "A. Seth was saying that Lisette set had to order a minimum

24   order of 25 if she wanted to get that product.

25   "Q. Who decided what minimum order quantifies would be ordered

MR76GIA4                    "Courtney Adams"

1    by Equestology?

2    "A. Seth did.

3    "Q.  And can we go 401EE, please?"

4    "A. Okay.

5            MS. MORTAZAVI:  And I'll ask Ms. Jung to please

6    display that; once again, an extraction from Seth Fishman's

7    phone already in evidence.

8    "Q.  Can you tell us what's happening in this text chain?

9    "A. Between Seth and I, and letting him know that Lisette

10   wanted 50 of the EGH, but I already had a pack to ship to Adel,

11   so he's taking -- to take the 50 vials from Adel's shipment,

12   and that he'll deal with Adel in telling him that we don't have

13   those 50 anymore.

14   "Q. Okay.  Seth writes to you "got to tell Adel the label was

15   off and I credit him."  Was there, in fact, an issue with the

16   label for the shipment intended for Adel?

17   "A. No.

18   "Q. What was your understanding of why Seth would tell you

19   that?

20   "A. It was just a reason to say something was wrong with the

21   label.  And so we don't have as many as we thought we did.  An

22   excuse.

23   "Q. Okay.  And the EGH that was packed for Adel, was that the

24   same product and the same vials that were also intended to go

25   to Lisette?

MR76GIA4                    "Courtney Adams"

1    "A. Yes.

2    "Q. Can you remind -- can you say again where Lisette was

3    based?

4    "A. South America.  She was out of Miami, but her products were

5    being forwarded or shipped to South America.

6    "Q. Where were they being shipped initially from?

7            Ms. Adams, did Seth talk to you about particular horse

8    trainers to whom Equestology products were being sold?

9    "A. No, he did not.

10   "Q. Did he talk about the use of Equestology products by

11   racehorse trainers?

12   "A. Yes.  In very general terms.

13   "Q. And understanding that they're in general terms, what do

14   you recall Seth Fishman telling you about the use of

15   Equestology products by racehorse trainers?

16   "A. He would describe to me what they were, why they were using

17   them, what they did in general, very basic descriptions of

18   where they were going, how they were being used, and why.

19   "Q. And when you say why they were being used, what did he

20   describe to you about why they were being used?

21   "A. They were being used because they were -- had requested

22   untestable products.

23   "Q. Untestable products for what purpose?

24   "A. To enhance performance.

25   "Q. Did there come a time that you moved out of South Florida

MR76GIA4                    "Courtney Adams"

 1  while you were still working for Equestology?

 2  "A. Yes.

 3  "Q. Where did you go?

 4  "A. Idaho.

 5  "Q. Did your role at Equestology change in any way when you

 6  moved to Idaho?

 7  "A. Yes, it did?

 8  "Q. How did it change?

 9  "A. I was no longer the office manager.  I was doing more

10  sales.  I did, however, help still designing some labels and

11  general help in the office if Mary needed it.

12  "Q. Okay.  And in connection with changing your role to sales,

13  did there come a time that you set up a payment processing

14  account?

15  "A. Yes.

16  "Q. And why did you set up the payment processing account?

17  "A. Because I had to take payment for the sales.

18  "Q. And was that payment -- the money for those sales, did that

19  all go to you?

20  "A. Yes, I would collect all the money.

21  "Q. Okay.  Would you get to keep all that money as your own

22  revenue?

23  "A. No.

24  "Q. What would you do with a portion of that money?

25  "A. I would keep commissions off of it, and the rest I would

MR76GIA4                    "Courtney Adams"

1    pay to Seth at the end of each month.

2    "Q. What was your commission?

3    "A. I believe it was 8 to 10 percent.  It varied between

4    products, so in that range.

5    "Q. And during the course of time that you worked at

6    Equestology, approximately how much did you make per year?

7    "A. Around 50,000.

8    "Q. When you began sales, did you have conversations with Seth

9    about the number of your clients and the number of your sales?

10   "A. Yes.

11   "Q. And what did Seth tell you, if anything, about those

12   numbers?

13   "A. That they could be significantly greater if I was to follow

14   Lisa Ranger's footsteps.

15   "Q. And what was your reaction to that?

16   "A. I didn't really -- I wasn't really interested in sales.  I

17   don't like pushing things on people, and I don't like being out

18   and about in front of them.  So I was kind of hesitant.  It

19   was -- I told him it was easy for me to take care of

20   Geoff Vernon and, under him, John, and all the people they

21   knew, but I was note interested in going and finding new

22   clients.

23   "Q. Did there come a time that you returned to Florida from

24   Idaho?

25   "A. Yes.

MR76GIA4                    "Courtney Adams"

1    "Q. Let me direct you to the year 2016.

2            Were you -- had you returned to Florida by 2016?

3    A.  Yes.  At the end to mid of 2016.

4            MS. MORTAZAVI:  I'm going to ask that that line just

5    be read again for the record so it's clear.

6    "A. Yes.  At the mid to end of 2016.

7    "Q. And did you continue making sales for Equestology when you

8    returned?

9    "A. Yes.

10   "Q. Did your role change again when you returned to Florida?

11   "A. Kind of.  I would come physically into the office every

12   once in a while to assist Mary.  But for the most part, it was

13   still just sales.

14   "Q. Did Equestology engage in any advertising that you're aware

15   of?

16   "A. Not that I'm aware of, no.

17   "Q. Did Equestology maintain a website so far as you're aware?

18   "A. We had created one.  But I was not aware of if it launched

19   to the public.

20   "Q. Did you participate in any way in planning the website?

21   "A. Yes.

22   "Q. Can you describe your role in planning the website?

23   "A. I was helping design the website, not on the back end, but

24   helping the web designer; what we wanted displayed, the content

25   we wanted on it, the look that we were trying to achieve.  Just

MR76GIA4                    "Courtney Adams"

basic artistic direction.

"Q. Did you discuss the content and the appearance of the

website with Fishman?

"A. Yes.

"Q. Was the website intended to be publicly accessible?

"A. No.

"Q. Can you describe to whom the website was intended to be

accessible?

"A. Specific people would be given a user name and password to

log in, and only those people would then be able to access what

the website had.  There would be a general landing page for the

public, but they would not be able to get to anything.

"Q. Would you need any particular information to get past the

landing page?

"A. Yes.

"Q. What?

"A. Yes.  You would have to have a password.

"Q. Did there ever come a point where passwords were provided

to anybody for the website?

"A. Not that I was aware.

"Q. Did there come a time when you stopped working for

Equestology?

"A. Yes.

"Q. Approximately when did you stop?

"A. Early 2017 I believe.  I don't remember exactly.

MR76GIA4                    "Courtney Adams"

1    "Q. Why did you stop working at Equestology?

2    "A. I was just over it, to be honest.  I didn't want to do it

3    anymore, and -- yeah.

4    "Q. What, if anything, did Fishman ask you about talking to

5    others about your work at Equestology when you left?

6    "A. He asked me not to discuss the business that we conducted

7    with anyone.

8    "Q. What was your response?

9    "A. I said okay.

10   "Q. Did there come a time when you were approached by agents of

11   the Food and Drug Administration?

12   "A. Yes.

13   "Q. Was that before or after you had stopped working at

14   Equestology?

15   "A. After.

16   "Q. Where did that approach happen?

17   "A. At Nanny's Donut Shop.

18   "Q. Why were you there?

19   "A. I was working there.

20   "Q. What, if anything, were you asked by the FDA at that time?

21   "A. I do not remember exactly what they asked me.

22   "Q. Did you tell Seth Fishman about that incident?

23   "A. Not that I recall.  No.

24   "Q. And did the FDA come back and ask you anything further

25   after they approached you?

MR76GIA4                    "Courtney Adams"

1    "A. No, they did not.

2    "Q. Did there later come a time that you reached out to law

3    enforcement about your time at Equestology?

4    "A. Yes.

5    "Q. Why did you do that?

6    "A. I was made aware from a friend about all the arrests, and I

7    read the article that was published about it and realized that

8    they didn't have the whole story, and I felt obligated to give

9    them more details.

10   "Q. Ms. Adams, do you have a copy of Government Exhibit 11000

11   in front of you?

12   "A.  Yes."

13              MS. MORTAZAVI:  For the record, your Honor, this item

14   is not evidence before this jury, and so we will not be

15   displaying it.

16   "Q.  Do you recognize that document?

17   "A. Yes, I do.

18   "Q. What is it?

19   "A. It is my nonprosecution agreement.

20   "Q. Under the terms of this agreement, what are you required to

21   do.

22   "A. Tell the truth about any questions asked.

23   "Q. Are you required to testify here today?

24   "A. Yes.

25   "Q. If you live up to your obligations under that agreement,

MR76GIA4                    "Courtney Adams"

1   has the government promised you anything in return?

2   "A. No.  Well, nonprosecution.

3   "Q. And nonprosecution from what?

4   "A. From anything I did while working for Seth.

5   "Q. If you lie on the stand today, do you get that protection?

6   "A. No, I do not.

7   "Q.  Can you please look at what's in evidence as Government

8   Exhibit 401AA?"

9           MS. MORTAZAVI:  And I'll ask Ms. Jung to display that

10  exhibit for the jury as it is in evidence.

11  "A.  Okay.

12  "Q. Ms. Adams can you describe what this conversation was

13  about?

14  "A. This was about me doing an interview for my replacement in

15  the beginning when I was thinking about leaving.

16  "Q. And scrolling to the bottom of this conversation where you

17  write "seems to me he was very calm.  Didn't seem like the kind

18  to go talking about details to anyone."  What were you

19  conveying to Seth in that?

20  "A. That he was not going to go out with friends or anyone that

21  was not related to the business and talk about what he did,

22  what we did in Equestology.

23  "Q. From your conversations with Fishman, was that kind of

24  discretion an important requirement for having your job?

25  "A.  Yes."

MR76GIA4                    "Courtney Adams"

1          MS. MORTAZAVI:  I'm going to skip some portions of

2    this, your Honor, and go to the questions in the middle of page

3    167 in this exhibit.

4    "Q. Ms. Adams, can you please read the last thing you wrote to

5    Seth Fishman?

6    A.  I told him the job requires discretion and possible ND"A.

7    "Q. What was the possible NDA you were referring to?

8    "A. That he may need to sign a nondisclosure agreement.

9    "Q.  Thank you, Ms. Adams."

10         MS. MORTAZAVI:  Thank you, your Honor.  No further

11   questions.

12         THE COURT:  We'll turn to what is the cross by

13   Mr. Fasulo.

14         MR. FASULO:  If we may begin; it's on page 233.

15   BY MR. FASULO:

16   "Q. Good afternoon, Ms. Adams.

17   "A. Hello.

18   "Q. I have a few questions for you.  I represent Ms. Giannelli,

19   Lisa Ranger, and I have a few questions for you.

20   "A. Okay.

21   "Q. First of all, you worked for Equestology for approximately

22   five years; is that fair to say?

23   "A. Yes.

24   "Q. And you talked about during both your examinations up to

25   this point that you started in a more administrative role and

MR76GIA4                        "Courtney Adams"

1    went into sales a little bit, then you left the company,

2    correct?

3    "A. Correct.

4    "Q. And when you went into sales role, and you said that you

5    had a gentleman, John, I think P-U-R-D-Y-K, work under you; is

6    that correct?

7    "A. His name is John Pundyk, yes.

8    "Q. And he was working with you, correct?

9    "A. You could say that, yes.

10   "Q. And he would go out to the barns or to the trainers, et

11   cetera, and work the field, and you didn't like that part of

12   the job; is that what you're saying?

13   "A. Yes.

14   "Q. And when he went out to the field, he would have a list of

15   products that were products of Equestology, correct?

16   "A. No.  I didn't provide him with a list.

17   "Q. Did you have a list of the products that Equestology had in

18   stock at the time that you were in the sales end of the

19   business?

20   "A. No, I did not have the list.

21   "Q. But did you keep an inventory of all the products that

22   existed in Equestology at that time, correct?

23   "A. Yes.

24   "Q. So you were aware of what the inventory was and what the

25   products were; is that fair to say?

MR76GIA4                    "Courtney Adams"

1   "A. Yes.

2   "Q. I want to go through some of the Government Exhibits with

3   you.  Government Exhibit 401T in your file, please.  If could

4   you let me know when you have the exhibit.

5   "A. Okay.

6   "Q. On direct examination, you had a chance to talk about this

7   exhibit; do you remember that?

8   "A. Yes.

9   "Q. In this exhibit, it indicates that Lisa, which you

10  identified as Lisa Ranger, had said that she does not have the

11  vet's license, correct?

12  "A.  Correct."

13          MR. FASULO:  Can I have this on the screen, Judge?

14          THE COURT:  Are you able to help, Ms. Jung?

15          MS. JUNG:  Yes.  Give us one minute.

16          MR. FASULO:  I'm going to go back to Line 19.  Answer?

17  "A.  Correct.

18  "Q. And by that, you meant she didn't have a copy of

19  Dr. Fishman's license, correct?

20  "A. Yes.

21  "Q. And she was asking for a copy of that license, correct?

22  "A. I don't believe that's what she was asking.

23  "Q. So she wasn't asking for a copy of the license?

24  "A. No.  This was me writing the message -- this message.

25  "Q. Okay.  So she was just indicating to you that she did not

MR76GIA4                         "Courtney Adams"

1   have a copy on file in her place in Delaware, correct?

2   "A.  Yes."

3           MR. FASULO:  You can take it down.

4   "Q.  Now, you ordered many products from different vendors; is

5   that fair to say?

6   "A. Yes.

7   "Q. And those vendors included vendors of raw materials as well

8   as vendors with materials that have already been composed,

9   correct?

10  "A. Correct.

11  "Q. And you did that only because you had the authority of

12  Dr. Fishman to do such orders; isn't that correct?

13  "A. Yes.

14  "Q. And it was under his license that allowed you as an

15  administrator to make those orders; is that fair to say?

16  "A. Yes.

17  "Q. And had you not been working for Dr. Fishman, these vendors

18  would not have just sold you these products that were

19  drug-related products that needed a veterinarian, correct?

20  "A. Correct.

21  "Q. And as far as you know, that's how Lisa would get her

22  products as well, if you know?

23  "A. Some of them, yes.

24  "Q. Some of them would be sent from you in Florida, up to

25  Delaware, and others would be sent directly from vendors to

MR76GIA4                    "Courtney Adams"

1   Delaware; is that fair to say?

2   "A. Yes.

3   "Q. Additionally, some products would go directly to an

4   individual client or customer; is that fair to say?

5   "A. Yes.

6   "Q. Now, during the time that you worked for the doctor, both

7   in an administrative capacity and in your sales role, you had a

8   number of interactions with the doctor in terms of text

9   messages and e-mails on a daily basis; is that fair to say?

10  "A. Yes.

11  "Q. Would it be fair to say that Dr. Fishman was very much

12  involved in the running of his practice?

13  "A. Yes.

14  "Q. He was involved in the time that you got to work, he was

15  involved in when you left, he was involved in whether you

16  should take a vacation day, he was involved in the daily

17  responsibilities that he expected you to do, correct?

18  "A. Yes.  Outside of maybe the vacation day part.

19  "Q. Well, you did text him about taking a day off and him

20  arguing with you about not taking a day off and that you had

21  just been off for a couple of weeks, and you explained to him

22  that you just -- that you needed the time off for whatever

23  reason, right?  You had those kinds of text messages back and

24  forth; do you remember that?

25  "A. I don't remember that.

MR76GIA4                    "Courtney Adams"

1    "Q. In any event, he was very involved, and he was involved in

2    all parts of the practice; is that fair to say?

3    "A. Yes.

4    "Q. And before you sent anything to Ms. Ranger in Delaware,

5    before you sent anything out, would you check with the doctor,

6    especially on products that he made himself in Florida; is that

7    fair to say?

8    "A. Yes.

9    "Q. And in Florida, that was the location that not only the

10   products were sent from, that's where the paste or the products

11   or the compounds were actually manufactured; is that fair to

12   say?

13   "A. The pastes were made there, yes.

14   "Q. And you actually participated in helping to put together

15   the pastes; is that fair to say?

16   "A. Yes.

17   "Q. And that happened in Florida, and that did not happen in

18   Delaware, is that correct, to your knowledge during the time

19   that you worked there?

20   "A. Correct.

21   "Q. And, in fact, when you talked about labels, was also that

22   you, under the direction of Dr. Fishman, started to design

23   labels for his products; is that fair to say?

24   "A. Yes.

25   "Q. And it was with the direction of Dr. Fishman that you were

MR76GIA4                    "Courtney Adams"

1    able to figure out what had to go on these labels, right?

2    "A. Yes.

3    "Q. You didn't all the sudden decide this should be a label

4    that says X if Dr. Fishman didn't agree with that, correct?

5    "A. Could you rephrase that?

6    "Q. You didn't decide what the ingredients were on an

7    individual product and decide to put them on the labels without

8    talking to Dr. Fishman and ascertaining those were the

9    ingredients in the product, correct?

10   "A. Correct.

11   "Q. That was him, that was not you, who made those decisions,

12   correct?

13   "A. Yes.

14   "Q. And you're involved in the artistic and creative

15   presentation of those products; would that be fair to say?

16   "A. Yes.

17   "Q. And the ultimate person who was involved in labeling the

18   products, putting the ingredients on the labels of those

19   products, was Dr. Fishman?

20   "A. Maybe rephrase that.

21   "Q. Sure.  Let me ask you:  Who had input into putting the

22   ingredients lists on the product?

23   "A. Dr. Fishman.

24   "Q. And other than Dr. Fishman, did you not have input on that,

25   correct?

MR76GIA4                    "Courtney Adams"

1    "A. Correct.

2    "Q. Nor did anyone else, to your knowledge?

3    "A. To my knowledge, no.

4    "Q. And in terms of the names of the products, although

5    Dr. Fishman may ask you about those names, which he did,

6    correct?

7    "A. Yes.

8    "Q. It was up to him to decide how to name those products, not

9    you nor anyone else at Equestology; is that correct?

10   "A. Yes.

11   "Q. And that was your experience in working with Dr. Fishman

12   during your five years, correct?

13   "A. With regards to labeling, yes.

14   "Q. With regards to labeling and with regards to the --

15   actually making the pastes, correct?

16   "A. Can you rephrase that?

17   "Q. You're directed what to do, what ingredients went into what

18   paste, correct?

19   "A. Correct.

20   "Q. In fact, as was stated earlier, you don't have any advanced

21   degrees in pharmacology or in biology that would give you an

22   understanding of what those ingredients were, correct?

23   "A. Correct.

24   "Q. And you took the ingredients that Dr. Fishman told you to

25   take and you mixed them in a way that he told you to mix them,

MR76GIA4                    "Courtney Adams"

1    and you made the compounds, correct?

2    "A.  Yes."

3    "Q. And then you put labels --

4         MS. MORTAZAVI:  I'm sorry.  Let me withdraw.

5    "Q.  And then you put them into jars and you would either label

6    them or not label them, correct, depending on what the product

7    was?

8    "A. They were put into tubes not jars, but, yeah.

9    "Q. These were glass tubes?

10   "A. No.

11   "Q. What kind of tubes were they?

12   "A. The tubes were plastic tubes that were specifically made

13   for paste.

14   "Q. And each tube had a different color cap you were talking

15   about before; is that right?

16   "A. No.

17   "Q. How would that work?  How would they be capped, and how

18   would they be identified before they would be stored?

19   "A. In reference to the paste that was made in Florida, those

20   were all put into a certain sized tube that was white with a

21   white cap.  And then it was labeled as soon as they were all

22   filled and packaged, and then they would be stored.

23   "Q. Now, after they were labeled, some of them required storage

24   and refrigeration and some didn't require refrigeration; is

25   that fair to say?

MR76GIA4                    "Courtney Adams"

1   "A. Yes.

2   "Q. And you were made aware of which ones had to go where by

3   Dr. Fishman?

4   "A. Yes.

5   "Q. Now, let me bring your attention to the next exhibit I'd

6   like to talk about, which is 401W.  If you can get into your

7   book and open that up, and we can show that on the screen.

8   "A. Okay.

9   "Q. This was a text message or e-mail?

10  "A. A text.

11  "Q. And it was a text message from you to Dr. Fishman or from

12  Dr. Fishman to you?

13  "A. From me to Dr. Fishman.

14  "Q. And in this text message, it does say that the doc needs to

15  send one of his blood builders to Paul Minastrelli.  Please

16  remind him.  And you said you cut and pasted that message; is

17  that correct?

18  "A. Yes.  The "from Lisa" part I wrote, and the rest is a copy

19  and paste.

20  "Q. And so from this message, was it your understanding that

21  the doctor already knew that Lisa needed these blood builders?

22  "A. Yes.

23  "Q. And was it your understanding that the doctor already knew

24  that Lisa was going to distribute these blood builders to a

25  Paul Minastrelli?

MR76GIA4                    "Courtney Adams"

1   "A. Yes.

2   "Q. I would like to move you now to Government Exhibit number

3   401FF.

4           Now, you worked at Equestology five years, right?

5   "A. A little bit more than that, yes.

6   "Q. And as you worked there, you were comfortable with your job

7   in terms of understanding what you were to do, and you felt

8   like what you were doing was right; is that fair to say?

9   "A. Yes.

10  "Q. Did you ever believe you were breaking the law in the

11  things you were doing in labeling products or selling Fishman

12  products?

13  "A. I did not believe that I was breaking the law.

14  "Q. Did you understand that Dr.- -- did you understand that

15  Dr. Fishman has a veterinarian license in more than one state?

16  "A. Yes.

17  "Q. And were you aware what states he actually had his license

18  in?

19  "A. At the time, yes.

20  "Q. And at this time, you don't remember?

21  "A. Not all of them, no.

22  "Q. But you were aware that he was licensed in multiple states;

23  is that fair to say?

24  "A. Yes, it is.

25  "Q. Did it also seem to you -- was it your understanding that

MR76GIA4                      "Courtney Adams"

1    he had a working knowledge of the products that he was

2    producing?

3    "A. Yes.

4    "Q. And a working knowledge of the goals and gains of those

5    products?

6    "A. Yes.

7    "Q. And would it be your understanding that he was pretty

8    confident in the products he was developing and their

9    likelihood of success?  Was that your understanding?

10   "A. Yes.

11   "Q. And that was one of the reasons why you remained and worked

12   with him for five years, right?

13   "A. I'm not sure how to answer that.

14   "Q. Well, you're around horses during the time, not only with

15   Dr. Fishman and the practice, but you had friends that played

16   polo, and you were a pretty much a horse lover, right?  You

17   liked horses?

18   "A. Yes.

19   "Q. And you wouldn't be working somewhere where you thought

20   there was a danger presented to the wellbeing of horses; were

21   you?

22   "A. Correct.

23   "Q. So during the time that you worked for Dr. Fishman, if you

24   could look at this exhibit, did you do -- you remember reading

25   this exhibit earlier.  Could you quickly glance over it?

MR76GIA4                    "Courtney Adams"

1          In the first line, it says John is with Geoff in

2     Canada.  Was that the John that was working with you?

3     "A. Yes.

4     "Q. And this happened in 2016, correct?

5     "A. Correct.

6     "Q. And it was your understanding that John indicated that

7     there was an order, but the order was too big to cross the

8     border.  Is that what your understanding here was?

9     "A. I'm not sure.

10    "Q. What was your understanding of this e-mail?

11    "A. That it was -- well, this text -- that it was either too

12    big or it didn't get there in time.  I'm not -- besides that,

13    it's a guess.

14    "Q. So it wasn't your understanding that anything was wrong

15    that was happening in terms of transferring of this item into

16    Canada; is that your understanding?

17    "A. Can you repeat that?  Sorry.

18    "Q. Did you believe there was anything illegal or anything

19    wrong with the way that the shipment was being transferred into

20    Canada based on this e-mail?

21    "A. According to this text, no.

22    "Q.  Okay.  I would like to go to exhibit number 402H."

23          MR. FASULO:  Ms. Jung, if you may?

24    "Q.  If we could have that exhibit up, and bring us to the

25    green section of that exhibit, I think it is?

MR76GIA4                    "Courtney Adams"

1  "A. What was the exhibit number?

2  "Q. 402H.

3  "A.  Okay."

4          MR. FASULO:  And could I ask Ms. Jung to please

5  highlight the green section?

6          Thank you.

7  "Q.  You see in number 334 on the left, if you look all the way

8  over you will see the text of that message?

9  "A. Yes.

10  "Q. Now, this was a message from Dr. Fishman to you, correct?

11  "A. Yes.

12  "Q. And Lisa Ranger, Lisa Giannelli, was not on this message,

13  correct?

14  "A. No.

15  "Q. And this was where Dr. Fishman says to you that Lisa made

16  over $250,000 last year, correct?

17  "A. Correct.

18  "Q. Now, you don't know if that was true or not true, correct?

19  "A. Correct.

20  "Q. Because you didn't have any idea of a Lisa -- of what Lisa

21  was making or not making; isn't that fair to say?

22  "A. Yes.

23  "Q. And, in fact, the Delaware books were kept separate from

24  the Florida books; would that be fair to say?

25  "A. I don't know.

MR76GIA4                    "Courtney Adams"

1  "Q. You weren't keeping track of the Delaware income or the

2  Delaware expenses, correct?

3  "A. No.  Sorry.  Correct.  No.  I don't know.

4  "Q. During the time you were working, were you keeping track of

5  any of the income or expenses on the Delaware sales from

6  Lisa Ranger?

7  "A. No.

8  "Q. And you were talking about a system that you used.  You did

9  not use the Avimark system; is that correct?

10  "A. I don't believe so, no.

11  "Q. So you weren't familiar with the system -- with that

12  system, correct?

13  "A. No.

14  "Q. I now move to Government Exhibit 1900, Government Exhibit

15  1900, GX1900.  And I would like to draw your attention to the

16  photographs that are listed as attachments on the first page

17  and on the second page.  I don't know if we could get those a

18  little bigger.

19  "A. Okay.

20  "Q. The labels put on these products in Government

21  Exhibit 1900, were these labels that you designed for the

22  doctor?

23  "A. Yes, they are.

24  "Q. And when you say you designed them, you put on the product

25  name, correct?

MR76GIA4                    "Courtney Adams"

1    "A. Yes.

2    "Q. And in these, do you know if these labels had the

3    ingredients on them?

4    "A. I don't recall.

5    "Q. And when you were -- when it was decided to put the

6    ingredients on, were there any conversations that took place

7    between you and Dr. Fishman regarding putting on the

8    ingredients or not putting on the ingredients on these

9    products?

10   "A. Yes.  Certain products, yes, we talk about.

11   "Q. And was it your understanding that some products he wanted

12   the ingredients on and some he didn't want the ingredients on?

13   "A. Yes.

14   "Q. And sometimes that would be based on his own -- solely on

15   his own opinion and sometimes it was based on what the

16   customers requested, correct?

17   "A. I'm not sure.

18   "Q. Okay.  And, in fact, you had no training in whether or not

19   these products needed to have ingredients on them or not on

20   them, correct?

21   "A. Correct.

22   "Q. And you didn't even know whether or not there was a

23   requirement to put the ingredients on these products, correct?

24   "A. Correct.

25   "Q. Now, go to exhibit -- now go to Government Exhibit 1901.

MR76GIA4                    "Courtney Adams"

1          If you look at the beginning of this exhibit, it says

2     Wednesday, September 21, 2016, at about 156.  You sent a

3     message to Mary Fox; is that right?

4     "A. Yes.

5     "Q. And you said you needed an order to go out, correct?

6     "A. Yes.

7     "Q. In 2016, you were a part of the sales -- sales helper or

8     sales administrator for Dr. Fishman, correct?

9     "A. Yes.

10    "Q. And you were selling these products in this e-mail,

11    correct?

12    "A. Can you rephrase that?

13    "Q. You said, Mary, I have an order that needs to go out.  When

14    you say you have an order, what did you understand that to be?

15    "A. That I received an order from John to send out.

16    "Q. And when you say John, who was John?

17    "A. John Pundyk.  He was the person on the ground, the actual

18    salesperson in front of the customers.

19    "Q. Working with you, correct?

20    "A. Correct.

21    "Q. And your customers, correct?

22    "A. Technically, yes.

23    "Q. And there's a list of products here.  10 XTB7, correct?

24    "A. Yes.

25    "Q. What was that?

MR76GIA4                    "Courtney Adams"

1    "A. I'm not sure exactly what it does.  Dineson-something.  I

2    can't remember the full name.

3    "Q. The second one is 3X Zolequine, 10 packs.  Were you aware

4    of what was in that product or what it was?

5    "A. At the time, yes.  Now, I don't remember.

6    "Q. Okay.  42 waters, is that water?

7    "A. Yes.

8    "Q. Okay.  And these are products that the customer wanted --

9    put the order in, and you processed that order.  Correct?

10   "A. Yes.

11   "Q. And it went to Brandie Holloway, correct?

12   "A. Correct.

13   "Q. And that was in Kansas?

14   "A. Yep.

15   "Q. Is that somebody that you knew?

16   "A. No.

17   "Q. Is it somebody who just decided to order through your

18   company and put these -- and wanted these items, correct?

19   "A. Yes.

20   "Q. And you fulfilled the order?

21   "A. Yes.

22   "Q. Okay.  Let me move on to Government Exhibit number GX1908,

23   if I may.  I'm trying to go through in order.  This is the

24   easiest way.

25   "A. Okay.

MR76GIA4                    "Courtney Adams"

1    "Q. I just want to be clear:  This was an e-mail that you

2    received from Lisa Ranger to you, correct, on Saturday,

3    December 21, 2013?

4    "Q. Yes.  And this was early on in your work experience with

5    Dr. Fishman, correct?

6    "A. Yeah, I had been working for him for a little bit.

7    "Q. How long were you working for him when you received this

8    e-mail?

9    "A. About a little over a year.

10   "Q. And?

11   "A. And?

12   "Q. All right.  And when you got this e-mail, Ms. Ranger said

13   to you that the doctor said, "the doctor said to send you an

14   e-mail.  Stuff for Richard Banca.  You can send to me or them

15   directly."  When she said the doctor said to send you an

16   e-mail, in your understanding, was that a common practice that

17   you work with Lisa Ranger and with Dr. Fishman, that she would

18   indicate that the doctor has already told -- had a discussion

19   with her and told her to e-mail you?

20   "A. Yes.

21   "Q. Okay.  And then you sent it out, correct?

22   "A. Correct.

23   "Q. And when it says stuff for Richard Banca, how were you able

24   to identify what the stuff for Richard Banca was?

25   "A. So I answered a little too fast in the first one.

MR76GIA4                         "Courtney Adams"

1           It was sent out eventually.  After she described or

2     informed me what was needed to be sent.

3     "Q. Okay.  So that was another conversation somewhere where she

4     described to you what it was that she needed?

5     "A. Yes.

6     "Q. And that was following up on this e-mail, correct?

7     "A. Possibly.  It could have been a text message as well.

8     "Q. Okay.  I want to go to government exhibit 1909.

9           Now you had a chance on direct examination to look at

10    some of the names of the products listed on the page called

11    inventory travel sheet; is that correct?

12    "A. Yes.

13    "Q. And these were products that Dr. Fishman had available

14    through Equestology; is that fair to say?

15    "A. I'm not sure.

16    "Q. Okay.  Do you know when this list was made up?

17    "A. No.

18    "Q. I'm sorry.  Let me withdraw that question.

19          Do you know when this list was comprised and composed?

20    "A. No.

21    "Q. Okay.  Was it composed during the time that you worked with

22    the doctor?

23    "A. I'm not sure.  I'm not sure.  I saw it during that time.  I

24    can't say to when it was originally created.

25    "Q. On the list labeled Government Exhibit 1909, the one you're

MR76GIA4                    "Courtney Adams"

1  looking at, are you aware whether or not all of these products

2  were products that Dr. Fishman had at the time that you were

3  working at Equestology?

4  "A. They were.  We did not have all these -- all those

5  products.

6  "Q. And were you -- and therefore, were you not involved in the

7  organization of this list, the composing of this list, or the

8  setting of the prices of this list?

9  "A. I was not involved in any of that.

10  "Q. And you don't know, actually, where this inventory travel

11  sheet came from, then?

12  "A. Correct.

13  "Q. And you don't know who composed it?

14  "A. Correct.

15  "Q. Okay.  Just a few more questions, Ms. Adams.  A couple more

16  questions, and then we'll be through.

17         Now, when you met Dr. Fishman, you began your work.

18  You understood that you were working for a veterinarian, a

19  doctor, correct?

20  "A. Yes.

21  "Q. And the idea of confidentiality between doctors and

22  patients and doctors and clients is important, and that was

23  explained to you when you went to work with Dr. Fishman; is

24  that fair to say?

25  "A. Yes.

MR76GIA4                        "Courtney Adams"

1    "Q. So you understood the importance of that confidentiality,

2    correct?

3    "A. Yes.

4    "Q. You also said that at some point, you were questioned by

5    the FDA; is that correct?

6    "A. Yes.

7    "Q. And do you remember what year that was that you were

8    questioned by the FDA originally?

9    "A. I believe -- I believe it was 2020.

10   "Q. Okay.  And you also stated, I think, that you didn't speak

11   with them at that time, correct?

12   "A. Correct.  I met with them but did not have a conversation

13   with them about anything.

14   "Q. And after you met with them and didn't have a conversation

15   about anything, did they just tell you we're part of the FDA

16   or?  What was your understanding of the reason why they

17   appeared in front of you at that time?

18   "A. They approached me at work.  They identified themselves,

19   told me what they wanted to ask me about.  And I said that I

20   was not comfortable answering their questions without a

21   subpoena or my attorney present, and that was the end of it.

22   "Q. And what was the subject matter that you were advised, or

23   that you understand that -- at the time that they wanted to

24   talk to you about?

25   "A. About Seth.

MR76GIA4                         "Courtney Adams"

1    "Q. About Dr. Fishman?

2    "A. Yes.

3    "Q. Prior to that time, had you had any question in your mind

4    about talking to the FDA or any government officials about any

5    of the activities or actions that you had taken during your

6    time at Equestology?

7    "A. No.

8    Q.  And it's only once you get this newspaper or this newsflash

9    about this case --

10              MR. FASULO:  I'd like to repeat that, Judge.  I'm

11   sorry.

12              THE COURT:  No problem.

13   "Q.  It's only once you get this newspaper or this newsflash

14   about the case, this horse doping case, that that got your

15   interest in speaking with the government; is that right?

16   "A. Correct.

17   "Q. That was the first time that you believed that it was

18   important for you to speak to the government about activities

19   that you had conducted while you were at Equestology?

20   "A. Correct.

21   "Q. And prior to that, you had never believed -- I'm sorry.

22   And prior to that, you had never believed that you needed to

23   speak to the government about any of your activities; is that

24   fair to say?

25   "A. Yes.

MR76GIA4                          "Courtney Adams"

1    "Q. Because you didn't believe you were doing anything wrong?

2    "A. Correct.

3    "Q. Finally, you said that you -- there came a time that you

4    ordered some raw products; is that right, from -- from API?

5    "A. I frequently ordered API for Seth, yes.

6    "Q. Yes.  And prior to ordering the products or simultaneously

7    with ordering the products, would you advise Dr. Fishman that

8    you made such orders?

9    "A. Yes.

10   "Q. Would he know the volume of the orders that you were

11   making -- the quantity?

12   "A. Yes.

13   "Q. Would he know the costs associated with those orders?

14   "A. I'm not sure.

15   "Q. Well, was it your decision to make the purchases at any

16   price, or were there prices that you had to work within based

17   on the fact that you were working for Dr. Fishman?

18   "A. It depends on the circumstance of the purchase.

19   "Q. Okay.  Did you have parameters to work within as you made

20   these orders?

21   "A. I'm not sure how to answer the question.  Can you be more

22   direct?

23   "Q. Would you just pick up -- what would you base -- let me ask

24   this:  During the time that you worked with Dr. Fishman, what

25   would you base the necessity to place these orders on?  How

MR76GIA4                    "Courtney Adams"

1    would you make these -- those orders?

2    "A. For most of the raw API, I was instructed by Seth to order

3    that specifically for orders that needed to be made, and then

4    from other companies if I was ordering, say, for John Pundyk or

5    one of the other customers -- some companies sold raw API and

6    precomposed products.  Those products that were already made

7    and ready to be used as long as we didn't mark them up, Seth

8    did not know or care what the price was because they were just

9    being resold.

10   "Q. But as to the API and raw products, you made sure that Seth

11   knew what products were being ordered from?

12   "A. Absolutely.

13   "Q. And as to the other products, there came a time where Seth

14   had to pay the bills for the purchase of those products,

15   correct?

16   "A. Yes.

17   "Q. And Dr. Fishman would know what products were purchased or

18   not purchased, correct?

19   "A. Correct.

20   "Q. And, in fact, you actually -- well, let me withdraw that.

21         And, finally, you traveled to Dubai with Dr. Fishman;

22   is that correct?

23   "A. Yes.

24   "Q. And you traveled to Dubai.  And how many nights were you in

25   Dubai with Dr. Fishman?

MR76GIA4                    "Courtney Adams"

1   "A. Repeat that.

2   "Q. How many -- how long was that trip?

3   "A. A week or two.

4   "Q. Okay.  And Lisa Ranger wasn't a member of the team that

5   went to Dubai; is that correct?

6   "A. Correct.

7   "Q. And, in fact, Lisa Ranger had nothing to do with the

8   international sales of Dr. Fishman during the time you worked

9   for Dr. Fishman; isn't that correct?

10  "A.  To my knowledge, correct."

11          MR. FASULO:  Okay.  And that's it.  Thank you very

12  much.

13          THE COURT:  Thank you, Mr. Fasulo.  And you have

14  redirect?

15          MS. MORTAZAVI:  Yes, your Honor.

16  BY MS. MORTAZAVI:

17  "Q. Good afternoon, Ms. Adams.

18          Have you ever worked with a horse trainer?

19  "A. Have I ever?  Sorry.  Have I ever worked?

20  "Q. Have you ever worked as a racehorse trainer?

21  "A. No.

22  "Q. Did you visit racing stables to sell drugs for Dr. Fishman?

23  "A. No.

24  "Q. You were asked questions about Brandie Holloway a moment

25  ago in connection with an order that you fulfilled.  What was

MR76GIA4                    "Courtney Adams"

1    the relationship between Brandie Holloway and John Pundyk?

2    "A. They were a client of his.

3    "Q. What was the relationship between John Pundyk and

4    Geoff Vernon?

5    "A. That John was selling under Geoff.

6    "Q. And what was Geoff Vernon's profession?

7    "A. He was a vet.

8    "Q. Were you ever asked to explain the effect or purpose of a

9    particular drug to Geoff Vernon?

10   "A. Me?  No.

11   "Q. Did you ever explain to Geoff Vernon or John Pundyk what

12   dimisone beta 7 was?

13   "A. Not to my recollection.

14   "Q. Did either of them ever ask you to do that?

15   "A.  I'm not sure."

16        MS. MORTAZAVI:  Ms. Jung, if you could pull up please

17   Government Exhibit 910 in evidence?  And we can go to the last

18   page, please.  I'm sorry.  1910.  And if we could go to the

19   last page.

20        And, for the record, Ms. Jung is displaying that for

21   the jurors.

22   "Q.  At any point, did Seth Fishman discuss with you the risk

23   of laypeople injecting drugs into an animal's veins?

24   "A. Can you repeat that?

25   "Q. At any point, did Seth Fishman discuss with you the risk of

MR76GIA4                    "Courtney Adams"

1    laypeople injecting drugs into animal's veins?

2    "A. I'm not familiar with the term "laypeople."

3    "Q. Non-veterinarians.

4    "A. Yes.

5    "Q. And what did he say the risk of non-veterinarians injecting

6    drugs into animals veins would be?

7    "A. There's risk of severe side effects such, you know --

8    ranging from very mild to death.

9                 (Continued on next page)

M4TAAGIA5                         "Courtney Adams"

1    BY MS. MORTAZAVI:

2    "Q.  We discussed earlier and Mr. Fasulo a moment ago put up an

3    email referring to an individual name "Richard Banca".

4            Do you know Richard Banca?

5    "A.  No.

6    "Q.  Do you know whether Richard Banca is a horse trainer?

7    "A.  I do not.

8    "Q.  Do you know if Richard Banca is a veterinarian?

9    "A.  I do not.

10   "Q.  Do you know if Josh Marks is a veterinarian?

11   "A.  No.

12   "Q.  Do you know if an individual named "Ross Cohen" is a

13   veterinarian?

14   "A.  No.

15   "Q.  Ms. Adams, are you aware if Fishman and Giannelli or

16   Ms. Ranger had clients who are not veterinarians?

17   "A.  Can you repeat that?  Sorry.

18   "Q.  Yes.  Do you know one way or the other whether Seth

19   Fishman and Lisa Ranger had clients who are not veterinarians?

20   "A.  I can't say for sure.  No.

21           MS. MORTAZAVI:  No further questions, your Honor.

22           THE COURT:  All right.  Thank you.

23           MS. MORTAZAVI:  Your Honor, if I may before I excuse

24   this particular individual I'd like to display for the jury two

25   Government Exhibits.

M4TAAGIA5                    "Courtney Adams"

1          THE COURT:  Sure.

2          MS. MORTAZAVI:  Ms. Jung, if you could please display

3    Government Exhibits 319-A and 319-AA.

4          THE COURT:  I assume these are in evidence.

5          MS. MORTAZAVI:  These are in evidence, your Honor.

6    They are records of Equestology that have already been

7    stipulated and admitted.

8          Ms. Jung, if you could focus on Government Exhibit

9    319-A the text that appears in that email.  Thank you.

10          (Pause)

11          MS. MORTAZAVI:  For the record, this is an e-mail from

12    Courtney Adams, CourtneyAdams8467@GMail.com to Lisa

13    RangerEquestology@GMail.com, sent January 8, 2016, copying Mary

14    Fox and SethFishman@hotmail.com with the subject "acetyl

15    label".

16          I'm going to ask you, please, Ms. Ruscigno, could you

17    read the body of this e-mail starting with "Lisa please"?

18          MS. RUSCIGNO:  Lisa, please see attached --

19          MR. FASULO:  I am objecting.

20          THE COURT:  Sustained.

21          MS. MORTAZAVI:  All right.  Your Honor, I'll read this

22    exhibit into the record then.

23          THE COURT:  Are you putting them pack up?

24          The witness is excused.

25          MS. MORTAZAVI:  All right.  Thank you.

M4TAAGIA5                          "Courtney Adams"

1            THE COURT:  Or our assistant is excused.

2            MS. MORTAZAVI:  Certainly, your Honor.

3            THE COURT:  Why don't we give her a moment?

4            Thank you.

5            (Witness is excused)

6            MS. MORTAZAVI:  Ms. Jung, if we could please display

7    once more Government Exhibit 319-A and 319-AA.

8            (Pause)

9            MS. MORTAZAVI:  And if you could focus on the text in

10   Government Exhibit 319-A.  I'd already read the header

11   information into the record.  I am going to read the body into

12   the record.

13           "Lisa, please see attached file and let me know if

14   that color is okay with you?  The vial cap will be sapphire

15   blue.  We also changed the horse head logo."

16           Ms. Jung, if you could please focus in on a portion of

17   Government Exhibit 319-AA.  And I am going to read from this

18   exhibit under "directions".

19           "Administer 10 to 20 CC IV as needed".

20           And in black text "acetylcysteine".

21           Ms. Jung, if you could take down this exhibit and

22   please display Government Exhibit 331.

23           For the record, your Honor, this is a record of

24   Equestology that is already in evidence pursuant to

25   stipulation.

M4TAAGIA5                          "Courtney Adams"

1            THE COURT:  Okay.

2            MS. MORTAZAVI:  And I'm going to read the header

3    information on the bottom e-mail.  It is from Lisa

4    RangerEquestology@GMail.com to Seth Fishman at

5    SethFishman@Hotmail.com, sent December 5, 2016 with the header

6    Courtney's mess is now my mess.

7            I am going to read from the body, your Honor, in part

8    only.

9            Can you please stop Courtney from doing this?  She has

10   caused yet another problem for me.  I thought we talked about

11   this.  If you choose to keep her on as an employee, I cannot

12   stress enough to have her stay far, far away from my end of

13   your business.  Stopped her from ordering from Schein.

14           There are plenty of other distributors she can use.  I

15   had phone call and e-mails of disgust dealing with her.  Pam

16   was on vacation and Courtney put everybody involved in a

17   tailspin due to her lack of knowledge of what she wanted to

18   order and her incompetence of getting any job done correctly.

19   I can't put this in any other terms.  Keep her away from me.  I

20   cannot do my job correctly if she is over there blundering

21   through hers.

22           The other day she placed and canceled all these orders

23   I have the Intelligent Inventory program on my end which is now

24   all messed up due to her lack of clarity.

25           Also, the product she orders is not the same as mine.

M4TAAGIA5                      "Courtney Adams"

1    So I have no way of inputting the data into -- park, nor do I

2    care to.  It took me days to get that system up and running

3    correctly and now with her messing up, it is all F'ed.

4             Ms. Jung, if you could please take down this exhibit.

5             Your Honor, I'd like to read into the record two

6    stipulations.  That's Government Exhibit 9009 and Government

7    Exhibit 9010.  Starting with Government Exhibit 9009 I will not

8    read the preliminary matter.

9             The exhibits listed under Column B in the chart below

10   are true and accurate transactions of the audio recordings

11   listed under Column A which accurately reflect the contents

12   recorded in those audio recordings listed under Column A.

13            And just for the record, that's Government Exhibits

14   910, 910-T 911, 911-T, 912-A, 912-AT, 912-B, 912-BT, 3100-A,

15   3010-AT, 310-B, 3100-BT.

16            It is further stipulated and agreed by and between the

17   parties that the aforementioned government exhibits and this

18   stipulation which is Government Exhibit 9009, may be received

19   in evidence at trial.

20            THE COURT:  All right.  Stipulation 9009 is in

21   evidence, as are exhibits 910 through 912 and 3100-A and 3100-B

22   and the "T" versions which are the transcript versions of those

23   exhibits.  Those are all in evidence.

24            (Government's Exhibits 9009, 910-912, 3100-A, 3100-B,

25   3100AT, 3100-BT received in evidence)

M4TAAGIA5                        "Courtney Adams"

1          MS. MORTAZAVI:  Thank you, your Honor.

2          Can I Ms. Jung, to please play at this time Government

3    Exhibit 912-B and display Government Exhibit 912-BT and the

4    jurors can follow along on their screens rather than referring

5    to the binder.

6          For the record, this is a November 18, 2018 phone

7    call.  The participants are Seth Fishman and Ban Bang.

8          Ms. Jung, if you could please play this exhibit.

9          (Audio played)

10         THE COURT:  It's not coming up on their screens.  And

11   could you turn the volume down.

12         (Audio played)

13         MS. MORTAZAVI:  Ms. Jung, could you please play at

14   this time -- pardon me.  Could you please display at this time

15   Government Exhibit 163-AT and please play Government Exhibit

16   163-A.  This transcript is in the jurors' binders if they would

17   like to refer to it in hard copy.  For the record, this is an

18   April 23, 2019 call between Lisa Giannelli and Nicholas --

19         THE COURT:  And this is in evidence?

20         MS. MORTAZAVI:  Yes, your Honor.

21         MR. FASULO:  Objection, judge.  They played it

22   yesterday.  They're playing it again?

23         THE COURT:  Was this played yesterday?

24         MS. MORTAZAVI:  It was, your Honor.  We'll consult the

25   record and we can hold it back at this point.

M4TAAGIA5                    "Courtney Adams"

1          THE COURT:  We're not going to have cumulative

2     evidence.

3          MS. MORTAZAVI:  Understood, your Honor.  If it was

4     already played, there is no need to replay.

5          Ms. Jung, if you can please pull up Government Exhibit

6     195-T and play once again Government Exhibit 195.

7          Jurors are welcomed to follow along on their screens

8     or in their hard copy binders.

9          For the record, this is a May 9, 2019 call between

10    Lisa Giannelli and an unknown female.

11         Ms. Jung, if you could please play this exhibit.

12         (Audio played)

13         MS. MORTAZAVI:  Your Honor, rather than read into the

14    record Government Exhibit 9010, I'd like to read into the

15    record Government Exhibit 9013, which is another stipulation

16    between the parties.

17         THE COURT:  Okay.

18         MS. MORTAZAVI:  Once again, I will skip the preamble.

19         If called as a witness at trial, Benjamin Schwartz

20    would testify that A, Government Exhibit 3000 is a true and

21    correct copy of a letter dated March 31, 2011 prepared and sign

22    by Mr. Schwartz, in connection with an investigation and

23    complaint by the Delaware Division of Professional

24    Responsibility relating to Mr. Schwartz's client, the

25    defendant, Lisa Giannelli, then using the name "Lisa Ranger",

M4TAAGIA5                    "Courtney Adams"

1    and Seth Fishman.

2              Included with the letter contained in Government

3    Exhibit 3000 are true and correct copies of notarized

4    attestations by the defendant, Lisa Giannelli, and Seth

5    Fishman.

6              Submitted in connection with Mr. Schwartz's letter

7    contained in Government Exhibit 3000.

8              Your Honor, may I have a moment to consult with Mr.

9    Fasulo?

10             THE COURT:  Of course.

11             (Pause)

12             MS. MORTAZAVI:  "B", Government Exhibit 3001 is a true

13   and correct copy of the complaint filed by the Delaware

14   Division of Professional Responsibility referenced in

15   Government Exhibit 3000.

16             "C", Government Exhibit 3100-A and 3100-B are true and

17   correct copies of portions of an interview of the defendant,

18   Lisa Giannelli, then using the name "Lisa Ranger" conducted on

19   July 3, 2012, by an investigator employed by the Delaware

20   Division of Professional Responsibility in connection with the

21   investigation of the complaint contained in Government Exhibit

22   301.

23             Two.  It is further stipulated and agreed that, A, on

24   or about July 11, 2012, the Delaware Division of Professional

25   Responsibility referred the matter in Government Exhibit 3000

M4TAAGIA5                    "Courtney Adams"

1    to the Delaware State Attorney General's Office for

2    prosecution.

3            B, on or about March 15, 2013, in a letter signed by a

4    deputy attorney general, the Delaware State Attorney General's

5    Office dismissed the matter in Government Exhibit 3000 based on

6    insufficient evidence.

7            It is further stipulated and agreed by and between the

8    parties that the aforementioned government exhibit and this

9    stipulation which is Government Exhibit 9013, may be received

10   in evidence at trial.

11           Your Honor, there is a marked up version of Government

12   Exhibit 9013 that I have in hard copy that the parties have

13   agreed to.  I would ask that that be admitted into evidence

14   along with all the exhibits that were referenced in that

15   document.

16           THE COURT:  When you say "marked up", you mean

17   "edited"?

18           MS. MORTAZAVI:  Correct, your Honor.

19           MR. FASULO:  There was a clarity in the -- but we both

20   agreed.

21           MS. MORTAZAVI:  The parties are in agreement and we

22   will submit a revised document your Honor.  That's the version

23   we would offer.

24           THE COURT:  That's fine.  My only point is the jury

25   might have benefited from your clarification.  But that's fine.

M4TAAGIA5                         "Courtney Adams"

1    If the parties are in agreement we'll admit the corrected

2    version which you were telling me just has a comma for

3    clarity's sake and the exhibits referenced in Exhibit 9013.

4              MS. MORTAZAVI:  Correct.

5              One moment, your Honor, if I may consult with defense

6    counsel?

7              THE COURT:  Of course.

8              (Pause)

9              MS. MORTAZAVI:  Your Honor, for the record, it is more

10   than a comma.

11             MR. FASULO:  Could we just approach, judge?

12             THE COURT:  Sure.

13             MR. FASULO:  We both agree --

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M4TAAGIA5                     "Courtney Adams"

1          (side bar)

2          MR. FASULO:  When we read the stipulation I missed it.

3     I saw defendant, Lisa Giannelli, but I see Seth Fishman's name

4     is after the comma instead of Seth Fishman and then defendant

5     Lisa Giannelli but I just don't want the jury to speculate as

6     to --

7          THE COURT:  The only problem is it's in the record.

8     It was put on the board and it was read to them that way.

9          MS. MORTAZAVI:  But no, your Honor --

10         MR. GIANFORTI:  It wasn't published.

11         THE COURT:  I could see it.

12         MS. MORTAZAVI:  Correct.  But the attorneys and the

13    Court have access --

14         THE COURT:  And you read it the correct way?

15         MR. FASULO:  She did.

16         THE COURT:  I thought it was published all right.

17    Let's find out for clarification whether it was published.

18         MS. MORTAZAVI:  For the record, I did not know that it

19    was, I did not recognize an issue.

20         THE COURT:  Yeah.

21         MS. MORTAZAVI:  Then I -- and corrected it.

22         THE COURT:  That's fine.

23         MR. GIANFORTI:  Should we call Ms. Jung over for

24    backup over the white noise so we could confirm whether it was

25    published.

M4TAAGIA5                          "Courtney Adams"

1          THE COURT:  Was the stipulation shown just to me?

2          MS. MORTAZAVI:  We've confirmed with our paralegal

3  that this was not published to jurors and I read in the edited

4  version.

5          THE COURT:  Okay.  Perfect.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M4TAAGIA5                    "Courtney Adams"

1          (In Open Court)

2          THE COURT:  All right.  Let me just confirm with the

3   jurors, if you just nod your heads one way or the other as

4   Ms. Mortazavi was reading the stipulation, was the stipulation

5   on your screens?  No.  They're nodding their heads no which is

6   what we all thought.  When we spoke at side bar the version Ms.

7   Mortazavi read from which you heard is the corrected version

8   that's what the transcript will reflect and that corrected

9   version will be what is the stipulation which I've told you

10  before is evidence in this case.

11         All right.  Ms. Mortazavi, where are you planning to

12  go from here?  I should have asked you this at sidebar.  It's

13  about ten minutes to 3:00 and we had said we were ending at

14  three o'clock today.

15         MS. MORTAZAVI:  Yes, your Honor.  There are some

16  documents related to the stipulation that I just read that I

17  could review.  It may mean that we go a little passed 3:00 but

18  not much far passed 3:00 and a good chance we could finish by

19  then.

20         THE COURT:  Okay.  Thank you.

21         MS. MORTAZAVI:  Ms. Jung, if you could please display

22  Government Exhibit 3001 which is now in evidence pursuant to

23  the stipulation that I just read.

24         For the record, this is a complaint file with the

25  Delaware Division of Professional Responsibility.  Could you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M4TAAGIA5                    "Courtney Adams"

please blow up the portion in the middle starting with drug in

question up to the black box.  Thank you.

I'm just going to read this into the record.

THE COURT:  Again, this is in evidence.

Go ahead.

MS. MORTAZAVI:  "Asked about where the medication came

from because I did not dispense it.  They brought it from Lisa

M. Ranger who sells drugs or Seth I. Fishman.  I am suspicious

that veterinarian does not have a client/patient relation and I

am positive the individual driving around the farms selling

drugs behind/under Dr. Fishman's name is not a licensed

veterinarian."

Ms. Jung, if you could please folks on the bottom

partial of this first page of Government Exhibit 3001.

Your Honor, for the record, I am going to be reading

just portions of this section of this government exhibit.

I'm suspicious.  He does not have a stable

patient/client relationship.  I am concerned this veterinarian

is not physically examining these animals and in a medication

sales situation strictly for profit.  My biggest concern with

this case is that Lisa M. Ranger is not a licensed veterinarian

and she is driving this around this state selling medications,

needles, syringes and prescription drugs without a license, and

no professional training in regards to the medication she is

dispensing.

M4TAAGIA5                    "Courtney Adams"

1    I've observed her selling products out of her vehicle

2    at farms in Harrington -- Training Center, Gateway Farm and now

3    Seaford.  She is also dispensing medications that are not

4    approved in the U.S. which is also a FDA and potentially a DEA

5    violation.

6    It is to my belief that there are several infractions

7    occurring with this case according to the following....

8    And then there's an itemized list of three particular

9    provisions and I'll just read them and not -- I'll read the

10    initial parts of each item.

11    Veterinary Practice Act Law.

12    Veterinary Practice Act Regulations.

13    Control Substances Act Law.

14    Ms. Jung, if could you please now display Government

15    Exhibit 3000 again.  This is in evidence pursuant to the

16    stipulation I just read, and this is the response that's

17    submitted in response to the complaint.

18    Ms. Jung, if you could focus on the very first

19    paragraph starting with "please accept".

20    "Please accept this letter as Dr. Seth Fishman's and

21    Ms. Lisa Ranger's response to the board complaint file under

22    the complaint numbers listed above."

23    If we could take this down, and please focus on the

24    second paragraph, reading portions in the record.

25    THE COURT:  But the jury should keep in mind the

1    entire document is in evidence and available.

2              Go ahead, Ms. Mortazavi.

3              MS. MORTAZAVI:   Thank you.

4              Lisa has not practiced and is not practicing

5    veterinary medicine and she has not acted and is not currently

6    acting as an unlicensed veterinary technician.  Ms. Ranger is

7    employed by Dr. Seth Fishman in his business, Equestology.

8    Ms. Ranger's duties include, but are not limited to, collecting

9    payment also from clients, coordinating Dr. Fishman's visits

10   and teleconference with clients, driving products and

11   medications prescribed by Dr. Fishman and acting as

12   receptionist and secretary to Dr. Fishman.

13             Ms. Jung, if you could turn to the next page and could

14   you please blow up the portion starting with "Lisa Ranger does

15   not", and that paragraph only.

16             Thank you.

17             Lisa Ranger does not sell drugs for Dr. Fishman.

18   Ms. Ranger delivers supplies for Dr. Fishman.  She collects and

19   posts payments paid to Dr. Fishman by Dr. Fishman's clientele.

20   It is incorrect and professionally irresponsible to claim that

21   she "sells drugs for Seth I Fishman.

22             Ms. Jung, if you could focus on the last paragraph on

23   this page.

24             The complaint also alleges in Paragraph Number Six of

25   the medical record that "I am concerned this veterinarian is

M4TAAGIA5                          "Courtney Adams"

1   not physically examining these animals and is in the medication

2   sales situation strictly for profit."  Dr. Fishman physically

3   examines all animals he treats.

4          Ms. Jung, if you could turn to the next page, and

5   focus on the text there and I'll read the last line of this

6   paragraph.

7          "Again, in regards to selling product, Lisa Ranger is

8   nothing more than a delivery person for Dr. Fishman's

9   practice."

10         Ms. Jung, could you move forward two pages from where

11  we are now.  That would be page five of this exhibit.  I'll

12  just go ahead and read this text.

13         And now this 30th day of March 2011 appeared before me

14  a notary public in the state and county aforesaid, Lisa Ranger,

15  known by me personally to be such, and she did depose and say

16  that the facts concerning her as set forth in the foregoing

17  response to the board complaint are true and correct.

18         There's a signature block with the name "Lisa Ranger"

19  and a signature above it, as well as the signature block and

20  signature of the notary public.

21         Pardon me, your Honor, just one second.

22         Ms. Jung, you can take down this exhibit, and could

23  you please display Government Exhibit 3100-BT and please play

24  Government Exhibit 3100-B.  And while you are pulling that up,

25  I will say for the record, there's a portion of an interview

M4TAAGIA5                    "Courtney Adams"

1    took place July 3, 2012 of Lisa Ranger by an investigator

2    employed by the Delaware Division of Professional

3    Responsibility and that's in connection with the investigation

4    and complaint that we just saw on the last two exhibits.

5            Ms. Jung, if you could please play.

6            (Audio played)

7            MS. MORTAZAVI:  Your Honor, one moment.  This will be

8    the final exhibit that I look at today.

9            Ms. Jung, if you could please pull up Government

10    Exhibit 900-D.  For the record, this is in evidence pursuant to

11    Government Exhibit 9008.  It's an extraction from the

12    electronic device owned by Seth Fishman.

13            THE COURT:  Slow down, Ms. Mortazavi.

14            MS. MORTAZAVI:  Here is reality.  I was tortured so

15    much by race commissions without a client ever getting a single

16    positive other than stupid shit like bute given by another vet.

17    I voluntarily gave up my license and then the veterinary board

18    had me investigated for BS.  They even accused Lisa of

19    practicing veterinary medicine.  I spent $25,000 in legal fees

20    and had a personal political favor called in to end the BS.

21            Your Honor, I believe we're only a minute over three

22    o'clock and I have nothing further for today.

23            MR. FASULO:  Judge, just for completeness on this

24    document, I think it was important to see who, we just saw that

25    statement but we didn't see where that was in context.  I just

1    don't want the jury to have an impression as to who it was.

2              THE COURT:  Can you put the document back up please.

3              MS. MORTAZAVI:  Ms. Jung, could you please display

4    Government Exhibit 900-T.

5              For the record, the other party of this conversation,

6    if you could focus on one of blue bubbles.  It's listed here

7    next the number Adrienne Hall-FLA.

8              MR. FASULO:  Thank you.

9              THE COURT:  All right.  Ladies and gentlemen, we're

10   going to break, as I told you we would do a little bit early

11   today.  I hope everyone has a nice weekend.  Please leave your

12   notebooks in the jury room.  You can leave your binders on the

13   chairs and also that exhibit that was given to you.

14             Since we are a breaking for the weekend, I'm going to

15   remind you again in a little bit more detail to please not

16   discuss the case.  Please don't remain in the presence of

17   anyone else who may want to talk about the case or about any of

18   the issues that we're talking about here.  Please don't

19   research or read anything about the case or the issues here.

20   And I remind you again, that these rules apply to conversations

21   even with your own family and your own friends.  It's very,

22   very important that you decide this case based only on the

23   evidence that you hear in the courtroom and the instructions

24   that I am going to give you about the law.  All right?

25             So with that, I wish everyone a very good weekend and

M4TAAGIA5                          "Courtney Adams"

1   we will see you back here Monday morning.  Why don't we say at

2   about 9:45 we should be ready to start.  Okay?  I open everyone

3   has a good weekend.

4                (Jury not present)

5                THE COURT:  All right.  Please be seated.

6                All right.  Ms. Mortazavi, how are we doing on timing

7   here?

8                MS. MORTAZAVI:  We're doing well, your Honor.  And I

9   think a little bit ahead of where we thought we would be.

10               THE COURT:  That was my sense but I wasn't sure.

11               MS. MORTAZAVI:  Yes.

12               THE COURT:  Where are we going on Monday?

13               MS. MORTAZAVI:  We're going to be hearing from

14  Dr. Bowman Monday.

15               THE COURT:  Okay.

16               MS. MORTAZAVI:  And assuming she does not take up the

17  entire day, there's a possibility that we would call Conor

18  Flynn.

19               THE COURT:  Okay.  And that is whom?

20               MS. MORTAZAVI:  And that is a cooperating witness.

21               THE COURT:  Okay.  And you've disclosed all of this, I

22  assume.

23               MS. MORTAZAVI:  We had had initial discussions with

24  Mr. Fasulo and said that we would confirm once we had a chance

25  to on confer, meaning government counsel.  But this is my best

M4TAAGIA5                        "Courtney Adams"

1  probability given where we ended today and there's a

2  possibility that we would call John Rubino, who is an

3  investigative analyst with the FBI.

4          THE COURT:  Okay.  All right.  Anything else?

5          MR. FASULO:  No.  Just for the record, judge, the

6  government has, we have been in contact on a momentary daily

7  basis about the witnesses.  So the government has been telling

8  me, I understand the flexibility needed.  If there is an issue

9  I will raise it with the Court.  I appreciate the Court asking.

10          THE COURT:  I need to have some sense of where we're

11 going.  I promised the jurors I would let them know as well.

12          MR. FASULO:  They do indicate but they are unsure.  I

13 think we are moving very quickly.  We are likely to call just

14 one witness in terms of scheduling.  So in terms of the Court's

15 calendar --

16          THE COURT:  Okay.  I appreciate that.

17          MS. MORTAZAVI:  I am sorry.  Maybe I'm being obtuse

18 but when Mr. Fasulo refers to "one witness", is he referring to

19 the defendant or an additional witness?

20          MR. FASULO:  I am not going tell you.  Look at my

21 opening statement.

22          MS. MORTAZAVI:  Very good.  Thank you.

23          THE COURT:  Anything else then that we should talk

24 about before we adjourn?

25          MS. MORTAZAVI:  Nothing from the government.  Thank

M4TAAGIA5                    "Courtney Adams"

1    you.

2              MR. FASULO:  Nothing from the defense.

3              THE COURT:  All right.  I hope you all have a very

4    good weekend, Mr. Fasulo.  Enjoy the wedding.

5              MR. FASULO:  Appreciate that.  Thank you.

6              THE COURT:  Thank you everybody and thank you to our

7    court reporters.

8              (Adjourned to May 2, 2022, at 9:45 A.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                           INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    ROSS COHEN

 4    Direct By Ms. Mortazavi . . . . . . . . . . 219

 5    Cross By Mr. Fasulo . . . . . . . . . . . . 230

 6    Redirect By Ms. Mortazavi . . . . . . . . . 256

 7     LENNY EICHSTEADT

 8    Direct By Mr. Gianforti . . . . . . . . . . 262

 9    Cross By Mr. Fasulo . . . . . . . . . . . . 278

10     JONATHAN FRICK

11    Direct By Mr. Gianforti . . . . . . . . . . 284

12                           GOVERNMENT EXHIBITS

13    Exhibit No.                                Received

14     1300-1317 and 1319-1323  . . . . . . . . . 266

15     4048, 4049 and 4050  . . . . . . . . . . . 271

16     9040, 9044, 9051, 9056, 9065, 9066, . . . . 289

17               9068, 9070, 9072, 9074, 9075,

18               9077, 9078

19     17001  . . . . . . . . . . . . . . . . . . 293

20     9009, 910-912, 3100-A, 3100-B, 3100AT,  . . . 399

21               3100-BT

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300