

Louis V. Fasulo, Esq.– NY & NJ
Samuel M. Braverman, Esq.– NY & NJ
Charles Di Maggio, Esq.– NY

www.FBDMLaw.com

August 25, 2022

Hon. Mary Kay Vyskocil
United States District Court for the
Southern District of New York
500 Pearl Street
New York, New York 10007

*Re:*   *United States v. Lisa Giannelli*
        *Case No.: 20 Cr. 160 (MKV)*

Dear Judge Vyskocil,

      This letter is submitted in advance of Lisa Giannelli's sentencing to assist the Court in determining a sentence that complies with the goals set forth in 18 U.S.C. § 3553(a). The maximum term of incarceration that Ms. Giannelli can be sentenced to for her crime is 60 months. Probation has recommended a sentence of 48 months. There is no mandatory minimum sentence. For the reasons discussed below, it is requested that the Court sentence Ms. Giannelli to a term of probation. Ms. Giannelli has no criminal history, she has complied with all terms of her pretrial release, and she is a critical asset to so many in her community, as demonstrated in the 53 letters of support filed on her behalf. A sentence of probation with conditions of supervised release is sufficient for this individual defendant in this particular case.

**Procedural Background**

      Lisa Giannelli was arrested on March 9, 2020, at her family home in Delaware. Lisa was arraigned on the original indictment, filed February 26, 2020, in the District of Delaware and released on bail the same day.

      On April 2, 2020, Ms. Giannelli made her initial appearance in the Southern District of New York where her release was continued. It was at this appearance Ms. Giannelli entered her plea of not guilty.

      On November 5, 2020, the Government filed a superseding indictment. On November 12, 2020, Ms. Giannelli waived her personal appearance and on November 17, 2020, the court entered her plea of not guilty to the superseding indictment.

On January 19, 2022, Ms. Giannelli and Dr. Seth Fishman, her co-conspirator, began their initial trial. The court entered a mistrial against Ms. Giannelli when counsel tested positive for coronavirus. After a full trial, Dr. Fishman was found guilty.

On April 27, 2022, Ms. Giannelli began trial. After an 8-day trial, the jury returned a verdict of guilty to Count 2 of the Indictment, the only charge.

Lisa Giannelli is now scheduled to be sentenced by this Court on September 8, 2022.

**Personal History of Lisa Giannelli**

Lisa wanted a horse when she was 13 years old. Her mother told her that if she wanted a horse, she was going to have to pay for it. Determined to save up enough money, Lisa got a job as a busboy in a kitchen. She was the youngest employee, working with mostly men aged 16 through 24. Lisa's abusive alcoholic father had already been gone for two years, her mother worked a few jobs, and Lisa believed that she was working with men who were her friends. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌. She woke up alone in an abandoned warehouse the following day with no friends left in her life. She did not report it to the police, and she did not tell her mother until years later. As a young teenage girl, Lisa was left to pick up the pieces.

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌. Five and a half pounds were removed, leaving her with a lot of loose skin and discomfort. There was no medical need to do this, there was no cancer or anything. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ Lisa trusted her mother and she trusted the doctor, but when it was all said and done, she didn't feel like herself anymore.

Lisa needed an escape and longed to have a horse more than ever. She saved up $1,000 and was finally able to get one when she was 15. The horse's name was Ariel's Promise. Lisa was not social at all anymore, but the horse kept her from feeling alone in the world. Her mother would take her to see the horse often, and once she had her driver's license, Lisa drove to the farm to see him every day.

Spending time with her horse, Lisa began to feel comfortable in her own skin. She remained shy but started to branch out and connect with people again.  All alone again, Lisa completed her education with a high school diploma in 1985.

Lisa took a job as a coffee waitress at Foxboro racetrack in Massachusetts. She met Bruce Ranger there a year after graduating high school and started dating him. Bruce was addicted to drugs. He did cocaine and drank a lot. Lisa did not like this and as she saw the relationship getting more serious, she knew something had to change. Lisa gave Bruce an ultimatum; it was either her or the drugs. Bruce chose Lisa. She went through detox with him in her home. Once clean, Lisa started traveling with Bruce.

Their first stop together was in Maine where the races were at fairgrounds. There was not much

3

money to be won, you could win a race and just get a blueberry pie. Lisa took a few jobs while in Maine to help, she worked at a Sheridan Inn as a line cook, and she worked at Tool and Dye, an assembly line, making buckles for army boots and flashing lights that go in caution road closed signs. She went to races with Bruce just to watch, she didn't sit in the paddock. After a race is complete, the driver had to submit a bill to the owner. Bruce was horrible at keeping track of it, so Lisa suggested that she could track it for him, and she did so. They remained in Maine for six months.

During the winter racing shuts down in Maine, so Lisa and Bruce went to Florida. Lisa worked as a cocktail waitress at Sirones and Bruce drove horses. At some point, Bruce started training horses again, and this is when he began teaching Lisa the business. Lisa already knew how to clean a stall and care for a horse, but Bruce taught her how to put a harness on, and how to put on the proper boots and bridle. He taught her how to jog a horse too. Bruce had second trainers and employees that he worked with, but Lisa was out there following him around and took on a more active role. Lisa and Bruce were married when she was around 20 years old.

Lisa got her groom license in Florida first. Five years after arriving in Florida, she got her trainer license. As the years went on, Bruce added employees and Lisa handled the payroll and billing of owners. Lisa interacted with vets at barns and at the track during this time. Lisa would occasionally be asked to hold a horse the vet worked on it. She would notice things in their horses, like green snot after a race, and report her observations to the vet. She was taught by the vet how to run a jug. She saw the vet instruct trainers on how to perform injections on their own horses.

Lisa and Bruce lived like this for 10 or 11 years before divorcing. On July 25, 1997, when Lisa was down as trainer, but Bruce was the one who treated the horse, a horse was scratched from a race. On this instance the horse came up high on the bicarbonate. Bruce told Lisa that baking soda helps ease inflammation and that it helped the horse. She was fined $100 and wanted nothing to do with that sort of behavior again. Looking back now, Lisa describes her relationship with Bruce as "just playing house, not like a marriage." She was already thinking about leaving Bruce before the fine, and she left him two months after that incident.

The next stop for Lisa was Brielle, New Jersey. She lived with Kevin and Diane Hewitt, who she knew from winters in Florida. She was good friends with them, and they had an extra room. It was a good place for Lisa to go and start fresh.

Lisa never drank during her time with Bruce because of his prior alcoholism. Now, back on her own, she went out to a bar where she met Peter Fusco. He too was in the horse industry. Lisa developed a relationship with Fusco and also worked for him as a groom. She left him several times because he was abusive, but she would always go back.

Fusco was allowed to charge grain and other horse products to her credit card and said that he would pay her back for it. He went to the bank with Lisa one day and was sweet with the teller. The next thing Lisa knew, he was withdrawing money from her account. He started using her credit cards until all her credit cards were maxed out. Lisa was able to pay off one credit card and she hid the card in her house. Fusco found it and maxed it out again. He got a toll violation in her car while out with three other women. He took money from Lisa and blew it in Atlantic City.

Around 2002, Lisa was at the Jersey shore with friends, Fusco was there as well, he made a big scene and spit on Lisa. The next day police came to her home and served her with a restraining order. Lisa explained what happened, the police told her that what Fusco did was assault and issued restraining order protecting her from Fusco. There were other horsemen present when Fusco spit on Lisa, plenty of people who she thought were her friends witnessed the assault, but nobody would stand up for her because they were all afraid of Fusco. Lisa asked some of the more reputable harness drivers who were present to say something, but they told her they could not because they were worried what he would do. After leaving and returning to Fusco so many times, this was the last straw and Lisa left him for good.

Joe was blacksmith at the paddock in Freehold, New Jersey. He was the person who put a shoe back on the horse if it came off during the race. He was just an acquaintance, but he knew that Fusco had been abusing Lisa and that she was in a desperate situation. Like her childhood, none of the people she thought were her friends helped her. Joe came up to her while she was in her vehicle and gave her money. He told her to use it to get a lawyer to file bankruptcy and get out of New Jersey. That is exactly what Lisa did, her bankruptcy was official on February 11, 2002. Years later, once back on her feet, Lisa sent Joe money to pay him back for his act of kindness, along with a heartfelt note thanking him.

The next stop for Lisa was Harrington, Delaware working for trainer Kevin Lare. He approached Lisa one night, they got together, and she later found out he was married. Kevin had met her in New Jersey one time and told her if she ever wanted a job to come work for him, so she did. He had a big stable, some horses on a farm, and some at Harrington raceway. Lisa worked as groom at the racetrack.

Lisa's conscience about the affair became too much, and Kevin started cheating on Lisa too, so Lisa stopped working for Kevin and went to work for another horseman, Steve Leblanc. Kevin was still buzzing around, and Lisa needed to clear her head and get away, so she went down to Florida just for the winter.

Carl Conte was stabled at a farm with Steve Leblanc in Delaware, he was going to Florida to train baby horses. Lisa thought this seemed like a nice little vacation and she went to work with the babies in the mornings and made a little bit of money for her work. Lisa still had her apartment in Delaware and did not want to lose it, so she looked for help finding a renter. Conte was friends with Dr. Seth Fishman, Lisa did not know Dr. Fishman at that time. Dr. Fishman needed short term housing for a vet who worked for him named Dr. Elaine Gillis, and he rented Lisa's apartment for her around 2004.

In Florida, Lisa was living in a room at the end of the barn. She cleaned it up into a little apartment and did not have to pay rent. Lisa worked for Conte in the mornings but got bored in the afternoons. Dr. Fishman was Conte's vet, and he would come by the stable two or three times a week. One day Lisa overheard Dr. Fishman tell Conte that he was having trouble collecting money from horsemen. Lisa stepped in and asked if she could help. That day after finishing her morning work for Conte, she went to Dr. Fishman's office to help with billing. Dr. Fishman would give her a few hundred dollars here and there as payment.

Lisa worked for Conte in the mornings and Dr. Fishman in the afternoons until around the Summer of 2005. At that time, she went to New Jersey with Dr. Fishman. Lisa was still doing billing, but she also began driving Dr. Fishman around to different farms. She saw him examine horses, inject horses, scope horses, etc. She also saw him drop off products to people at the farms. Sometimes Dr.

Fishman would be talking to someone, and he would call over to Lisa and ask her to get something from the car. Lisa drove Dr. Fishman around for that Summer. In the Fall, Dr. Fishman went back to Florida. Lisa told him that she wanted to move back to Delaware.

On May 13, 2005, Lisa's father passed away. He had been estranged from Lisa for almost her entire life. Her mother left the home with Lisa and her brother when Lisa was just 11 years old because her father was an alcoholic and was abusive towards everyone in the household. Lisa had to testify against her father in a legal proceeding at that young age. Lisa and her father finally made amends while he was on his deathbed. She was still going by the name Lisa Ranger, but after her father's death, her forgiveness of him, and her new outlook on life, she changed her name back to Lisa Giannelli to honor her family. Lisa inherited around $150,000 from her father. She could afford the taxes in Delaware and wanted to move there. She found a beautiful log cabin that cost $240,000 and put down around $65,000 to make the purchase. After so many years on the road, bouncing from state to state, roommate to roommate, and having little to no stability in her life, Lisa finally had a place she could call home.

Lisa continued doing collections for Dr. Fishman during the afternoons from Delaware. In the mornings she performed groom work for Brad Hanners. Lisa was friends with his wife, and they needed help. They had small children and around 8 horses stabled at Dovington Racetrack in Felton, Delaware. If they had a horse in a race at night, Lisa paddocked the horse if his wife couldn't. Lisa put the equipment on the horse, bathed it after it warmed up, bathed it again after the race, got it home and fed it. The work paid $30 a night at first and was eventually increased to $50. If Lisa was feeling really ambitious on a particular night, she could paddock a horse in the first race and in the last race, bringing in around $100 total.

In 2006 Lisa started working for Dr. Fishman full time. He offered her 15% on the collections she made as payment. Lisa didn't just accept the offer, she jumped at it. Concerned about paying her mortgage, this was much more money than she had ever made. As a groom she made about $300 a week. She only had a high school education. This new role was a big step up for her. It was exciting. One of her goals was to pay off her mortgage, and she took great pride in accomplishing that goal in 2011.

In 2007, Lisa became the registered agent of Equestology. Dr. Fishman told her someone living in Delaware had to be down as the agent, since the business was in Delaware. Soon after starting the Delaware office, Dr. Fishman broached the idea of order fulfillment with Lisa. He explained what this would entail, and who could get what medications. Her actions in this role are the subject of the charges Lisa has been convicted of. Lisa understands and accepts that she broke the law while working for Dr. Fishman in this capacity.

Looking back on it now, Lisa sees the red flags that she should have seen earlier. She had come so far from the trauma of her first job. She had spent years bouncing around from unreliable boss to abusive boss and trying all kinds of unstable employments in between. These prior work experiences put blinders on Lisa when she was working for Dr. Fishman. He was a licensed veterinarian who carried himself with great confidence, and she trusted him. His practices seemed in line with, if not better than other vets she had experience dealing with. She got comfortable in the job, believed what she was told, and did not ask questions; regretfully, even when she should have.

225 Broadway, Suite 715  
New York, New York 10007  
Tel (212) 566-6213  
Fax (212) 566-8165

505 Eighth Avenue, Suite 300  
New York, New York 10018  
Tel (212) 967-0352  
Fax (201) 596-2724

1086 Teaneck Rd, Ste 3A  
Teaneck, New Jersey 07666  
Tel (201) 569-1595  
Fax (201) 596-2724

Exhibit A is Lisa's letter to the court. It reflects on her life experiences, things she is proud of and things she wishes she did differently. She knows what she did was wrong and accepts responsibility for her actions:

> *I see now, that what my employer had me do was illegal. What I did was illegal. I should have seen something that made me investigate further. I am a high school graduate with only life experience as my guide. My experience or knowledge as far as horse medications and their protocols is in an industry that for over 2 decades was loose to say the least. My own past experiences in life should have given me insight to what was wrong or off. I should have educated myself to be able to know this was wrong. I thought I knew right from wrong. I thought I was doing right. The industry standard that I witnessed for 30 years was my knowledge and it was sorely lacking. Perhaps I am guilty of wanting to believe everything was above board and for the third time in my life, I hold my head down in shame again.*

**Letters of Support**

When Lisa was arrested, she was engaged to be married to Fredrick "Gusty" Voshell. Lisa and Gusty planned to get married in Italy, but her arrest ended that dream. They made the best of it and got married at their home in Delaware with all their family and friends present.

Gusty had been married for 21 years when his wife tragically passed away in 2011. She had no known health problems and suffered an acute thrombosis of the coronary artery, killing her.

> *Myself and my children's lives had been changed terribly in a moment. I now was a single parent with one child in high school and the other in her first year of college. I also have an older son by my previous marriage while I was in the military, but he was grown and working.*
>
> *I was sure I would never love again other than my children. It was some time before I found out my wife had a sizeable death benefit, (she handled that stuff, I was clueless) so I worked a lot for a while making all the extra money I could. What else can you do but carry on for your kids.*
>
> *When I met Lisa on that Easter Sunday, I felt lighter somehow just from the couple minutes we got to talk. After a while I got her number from my sister to call her and see if she wanted to walk our dogs together at the state park. I had heard about her relationship with her dog Pup. She took her everywhere. Pup and my dog Dakota hit it off well. Those were our first outings; it was a while before there was a date.*

Exhibit B, Letter from Gusty Voshell.

As their relationship progressed, Gusty and his children moved in with Lisa. Lisa cared for his kids as though they were her own. This is borne out in the letters of support they each submitted for Lisa. Remarkably, Lisa also developed a great relationship with Gusty's mother-in-law and sister-in-law from his prior marriage. They too have submitted letters on Lisa's behalf detailing all the help and

support she has provided their family.

Lisa is a generous, selfless, hard-working woman who puts the needs of others above her own. She is not the picture of greed that was painted at her trial. Lisa has received letters of support from people who knew her at every point of her life. Whether it be horsemen she worked with years ago, friends from church, people she has done volunteer work for since her arrest, or any of the other dozens of friends and family who have written; they are all consistent in their glowing accounts of Lisa's character. Below are just a few excerpts from some of the 52 letters of support that are attached as exhibits to this submission.

Sheila Dennis – Mother (Exhibit C).

> *When the Roatan Animal Rescue reached out to Lisa for help, she set out to find a way to help a man in the village that desperately needed to make money to feed his family, and a way to feed the horses. She made a few phone calls and had that man go out into the jungle with his kids to cut long grass. They brought that grass out of the jungle and loaded it onto a boat to bring to the horses. She and her husband did this while their own life was falling apart and the stress of a federal trial was looming near…The horses got the nourishment they so desperately needed and the gentleman and his family made enough money to eat for the month. Those are the solutions that my daughter tries to live by. She has a kind heart and always tries to help the less fortunate.*

Anne Touchard – Gusty Voshell's Sister-in-law (Exhibit D)

> *After my sister's death Lisa took on three older children with grace and love. When Lisa sees a problem, she will move heaven and earth to fix it. If she sees someone that needs help or something that needs fixing, she immediately jumps in without hesitation. Over the past two years, Lisa has relentlessly worked to help Gusty's oldest son, Tyler, through some dependency and personal issues. She will not give up.*

> *A few years ago, my daughter was going through a very bad break up and had to move out of her home immediately. Although Lisa was relatively new to the family, when she found out that I needed help, she was right there to lend a helping hand. No questions asked. She knew the situation was critical and she worked tirelessly to help me get her moved out in a matter of hours.*

Elizabeth Martin – Friend (Exhibit E)

> *My younger son always had an affinity and love for horses. I met Lisa because he wanted to take riding lessons at the age of five, so Lisa helped him secure those lessons. Lisa's encouragement for his love of all creatures helped him realize he wanted to work with animals. Therefore, he earned a full academic scholarship at the University of Kentucky and is a sophomore majoring in natural resources. He intends to be a wildlife biologist upon graduation.*

Christine Trivits – Friend (Exhibit F)

> *We had a gentleman in our church that had been wheelchair bound since he was a teenager. It came to our attention that the vehicle he was being transferred in was in bad shape. The family learned of a newer vehicle that was already customized, but it was a bit out of their price range. Lisa came into my office with a financial gift for the family, but asked that they not know where the money came from.*

Letters of support from the following family and friends are also attached as exhibits:

Bruno John Giannelli – Brother (Exhibit G)

Joyce Voshell – Mother-in-law (Exhibit H)

Pauline Jackson – Gusty Voshell's Mother-in-law (Exhibit I)

Valerie Sard – Sister-in-law (Exhibit J)

Dennis Voshell – Brother-in-law (Exhibit K)

Kali Voshell – Stepdaughter (Exhibit L)

Andrew Voshell – Stepson (Exhibit M)

Tyler Voshell – Stepson (Exhibit N)

Michelle Stephens – Mother of Tyler Voshell (Exhibit O)

Ashley Mogle – Family friend (Exhibit P)

Bonnie Bayard – Family friend (Exhibit Q)

José F. Echeverri – Friend (Exhibit R)

Gira Casarano Wassman – Friend (Exhibit S)

Heather Darling – Friend (Exhibit T)

Pastor Jack Diehl – Friend (Exhibit U)

Kimberlee Diehl – Friend (Exhibit V)

Reverend Kenneth Figgs – Friend (Exhibit W)

Pastor Kenneth Wagner – Friend (Exhibit X)

Pastor Barry Cauthren – Friend (Exhibit Y)

Sarah Starkey – Friend (Exhibit Z)

Steve and Sue Kessler – Friends (Exhibit AA)

Eric Collins – Friend (Exhibit BB)

David Melvin – Friend, owner of produce farm where Lisa volunteers (Exhibit CC)

Dorothy Hopkins – Friend (Exhibit DD)

Art Mintz – Friend (Exhibit EE)

Brian and Carol Rains – Friends (Exhibit FF)

Isobel M. Montgomery and Leslie C. Hill – Friends (Exhibit GG)

Elizabeth Picard – Friend (Exhibit HH)

Larry Hughes – Friend (Exhibit II)

Del Richards Jr. – Friend (Exhibit JJ)

Bruce Ranger – Ex-husband (Exhibit KK)

John H. Lare – Friend (Exhibit LL)

Steven J. Leblanc – Former employer (Exhibit MM)

Scott Perdue – Friend (Exhibit NN)

Sam Belote – Friend (Exhibit OO)

Carol Jamieson Parker – Friend (Exhibit PP)

Karen and Eddie Dennis – Friends (Exhibit QQ)

Julie Wolfe – Friend (Exhibit RR)

Sandra Mullett – Friend (Exhibit SS)

Roger Allen – Friend (Exhibit TT)

Cynthia Rust – Friend (Exhibit UU)

Gary L. Anthony – Friend (Exhibit VV)

Diane Hewitt – Friend (Exhibit WW)

Christopher Hall – Friend (Exhibit XX)

Vickie L. Fisher – Friend (Exhibit YY)

Pamela Shanehsaz – Friend (Exhibit ZZ)

Sharon Webb – Friend (Exhibit AAA)

**Sentencing Factors and Relevant Jurisprudence**

The Supreme Court held in *United States v. Booker*, 543 US 220, 258 (2005), that the district court has the duty to 'consider' the recommended guideline range along with the other factors listed in §3553(a)[1]. However, in *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005), the Second Circuit held that "a District Court may not presume that a Guideline sentence is reasonable, it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District judges are, as a result, generally free to impose sentences outside the recommended range. District judges may exercise discretion in fitting sentences to a defendant's individual characteristics." In 2009, the Supreme Court went further in *Nelson v. United States*, 129 S.Ct. 890 (2009) by bluntly stating "The Guidelines are not only not mandatory on sentencing courts, they are also not presumed reasonable." [Emphasis in original] Our Circuit has supported this downward pressure on sentencing by reiterating that the duty of the sentencing court is to impose the lowest sentence available that satisfies all the criteria of §3553(a). See, e.g., *United States v. Dorvee*, 616 F.3d 174, 183-184 (2nd Cir., 2010) ("In conducting this review, a district court needs to be mindful of the fact that it is 'emphatically clear' that the 'Guidelines are guidelines that is, they are truly advisory.'", citing to *United States v. Cavera*, 550 F.3d 180, 189 (2nd Cir., 2008) (en banc); See also *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir.2006) (declining to establish "any presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable"); and also *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("Plainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not ... impose the higher.")

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 128 S.Ct. 586, 597 (2007), citing *Koon v. United States*, 518 U.S. 81, 113 (1996). Gall reinforced

---

[1] 18 USC § 3553(a) sets forth the criteria for a sentencing court to use in evaluating what a District Court should consider in imposing a sentence is sufficient but not greater than necessary to achieve all the goals of sentencing, including: The nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553 (a)(l)); and the need for the sentence imposed to: Reflect the seriousness of the offense, Promote respect for the law and to provide just punishment for the offense, To afford adequate deterrence to criminal conduct; Be aware of the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; And to protect the public from further crimes of the defendant (18 U.S.C. § 3553 (a)(2)). Finally, the Court has the duty to impose a sentence that is sufficient, but not greater than necessary, to accomplish all the above goals.

the historical and essential role that district judges play in personally assessing a person and his offense and fashioning an appropriate sentence, as opposed to being beholden to some arbitrary or impersonal standard. "We reject, however, an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range. We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Gall*, 128 S.Ct 586 at 597.

Thus, a sentencing court, after considering the advisory Guidelines, is free to fashion whatever reasonable sentence that it deems appropriate based upon the §3553(a) factors. Any sentence by a court will stand as long as (1) the record is clear that the district court considered the §3553(a) factors and (2) the sentence imposed is supported with a rationale based on the record.

**The Need to Avoid Unwarranted Sentence Disparities Among Defendants**

Seth Fishman and Jordan Fishman have also been convicted and sentenced for their role in the Count 2 conspiracy that Lisa is being sentenced for. Rick Dane has not been sentenced yet. A significant distinguishing factor between Lisa and her co-conspirators is that she is the only one who is not a licensed professional in their field. She is the only defendant who was never properly instructed on relevant standards. Lisa relied on what she was told about the rules and standards from people she worked for. Her level of intent was different than that of her co-conspirators. They knew what they were doing was wrong. She did not. Lisa's role and level of intent was much more similar to Courtney Adams than it was to any of her charged co-conspirators.

Dr. Fishman received a sentence of 60 months on the Count 2 conspiracy. He was also convicted of the Count 1 conspiracy, which Lisa had no role in, and sentenced to 60 months, but to run concurrently. He was sentenced to an additional 72 months for his violation of 18 USC § 3147, which does not apply to Lisa. The Court ordered Dr. Fishman to pay restitution for the Count 1 conspiracy, but the Court did not find it appropriate to order restitution on Count 2. The Government is not seeking restitution against Lisa. (PSR ¶ 109).

Jordan Fishman received a sentence of 15 months for his role. Jordan Fishman manufactured the PEDs. All documentation surrounding the manufacturing was maintained out of Dr. Fishman's Florida office by Courtney Adams in a drop box that Lisa did not have access to or anything to do with. Jordan Fishman knew exactly what he was making, and he was aware that his actions were illegal.

Sentencing Lisa to a term of probation would not create unwarranted disparities among the defendants, it would be a sentence appropriately in line with the varying degrees of culpability. If the Court is inclined to issue a fine against Lisa, it should be a minimal amount.

**Deterrence, Rehabilitation and Future Plans**

Deterrence and rehabilitation are not issues for Lisa, there is no risk of recidivism. As the Court can see in her letter (Exhibit A), Lisa has no intention of ever returning to this industry:

> *I want nothing to do with this industry ever again. I have never wanted to ever be on the wrong side of the law. I can honestly say once I have satisfied the courts punishment for*

225 Broadway, Suite 715
New York, New York 10007
Tel (212) 566-6213
Fax (212) 566-8165

505 Eighth Avenue, Suite 300
New York, New York 10018
Tel (212) 967-0352
Fax (201) 596-2724

1086 Teaneck Rd, Ste 3A
Teaneck, New Jersey 07666
Tel (201) 569-1595
Fax (201) 596-2724

*my past actions, I will be ever vigilant in the future to ensure that pledge to myself and to this Court.*

Since her arrest, Lisa has complied with all conditions of her pretrial release. She has been able to find a few short-term jobs and applied for countless others. She took the initiative to take several online courses and get certifications that could help her find work. She completed multiple Red Cross certifications; an alcohol serving training certification from a local Delaware restaurant and completed an online bookkeeping course with Bookkeeper Launch.

Lisa worked for UPS as a pre-loader on the 5am shift in September of 2021. At the end of that September, she was hired as a temporary employee by Walmart, where she worked until shortly before her first trial. From November of 2021 through August 4, 2022, she worked for Claws & Paws pet-sitting service. Lisa has also been a volunteer at Indian Point Farms, a local produce farm since May of 2022.

When Lisa is finished with this chapter of her life, she hopes to put her bookkeeping certification to use and to start her own pet-sitting business. She also hopes to continue to volunteer at Indian Point Farms.

## Conclusion

Lisa had a traumatic childhood. She was taken advantage of in every way possible by people she trusted throughout her life. Despite these hardships, Lisa has never wavered in her care for others or her willingness to help anyone. Many people would have been broken by what Lisa has been through, but Lisa has proven resilient. In light of the personal circumstances of Lisa, and the critical part she plays in the lives of so many family members, a sentence of probation is sufficient but not greater than necessary.

Your consideration is greatly appreciated.

Respectfully Submitted,

s/Louis V. Fasulo
Louis Fasulo, Esq.
Alex Huot, Esq.

Fasulo Braverman & DiMaggio, LLP.
225 Broadway, Suite 715
New York, New York 10007
Tel: (212) 566 6213
Email: LFasulo@FBDMLaw.com

Cc: AUSA

**225 Broadway, Suite 715**             **505 Eighth Avenue, Suite 300**            **1086 Teaneck Rd, Ste 3A**
**New York, New York 10007**            **New York, New York 10018**                **Teaneck, New Jersey 07666**
**Tel (212) 566-6213**                  **Tel (212) 967-0352**                      **Tel (201) 569-1595**
**Fax (212) 566-8165**                  **Fax (201) 596-2724**                      **Fax (201) 596-2724**