

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 1, 2022

**VIA ECF & E-MAIL**
The Honorable Mary Kay Vyskocil
United States District Court
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

Re:    United States v. Lisa Giannelli, S6 20 Cr. 160 (MKV)

Dear Judge Vyskocil:

For almost two decades, Lisa Giannelli ("Giannelli" or the "defendant") marketed and sold illegal performance-enhancing drugs ("PEDs") and illegally distributed prescription drugs targeted specifically at racehorse trainers looking to cheat. The defendant earned hundreds of thousands of dollars in commission payments and helped generate millions of dollars of revenue for Equestology, the company for which she worked. The defendant was on notice, on multiple occasions, that her sales of unsafe, medically unnecessary, prohibited PEDs were illegal. There is no doubt that the defendant – having worked in the racehorse industry for most of her adult life – knew these practices were wrong and dangerous. The defendant boosted sales of illegal drugs not to improve racehorses' health, but to line her own pockets by drumming up drug sales to unscrupulous trainers. She did so with the overarching aim of deceiving the drug and racing regulators who could, and almost did, put a stop to her crimes.

Among the myriad of drugs the defendant offered for sale were the most potent PEDs Equestology manufactured: blood builders designed to mimic Epogen to improve cardiovascular performance; injectable drugs designed to be used on race day; and pain killers to numb horses, all of which were intended to compel a racehorse to perform beyond its natural abilities. The defendant also used her co-conspirator's veterinary license to obtain scores of prescription drugs in bulk, with the intention of disseminating them among racehorse trainers with no valid prescriptions.

The applicable sentence under the Sentencing Guidelines is the statutory maximum sentence of 60 months' imprisonment ("Guidelines Sentence"). For the reasons argued herein, this Court should impose the Guidelines Sentence.

## I. **Offense Conduct**

For nearly two decades, the defendant promoted, sold, and delivered adulterated and misbranded drugs, with the intent to defraud or mislead—at times, successfully— multiple state and federal agencies and entities through various deceptive tactics. Giannelli was keenly aware of the types of illegal PEDs trainers would administer to their horses, and the racing regulations that prohibited the use of such drugs by dint of her background in the racing industry, spanning almost thirty years of work across multiple states. *See* Trial Tr. at 1029:17-1030:25; *see also* GX 139A-T ("The crime is not that you do it in the gas station, the crime is you doing it period"). The defendant's intimate knowledge of the racing industry enabled her to better cater to the corrupt needs of trainers looking to gain a competitive edge.

The defendant's contention in her letter to the Court, *see* Def. Sent. Subm. Exhibit A, that she was under the belief that the drugs she was selling were permissible, defies reason. The defendant undoubtedly knew that race-day drugs were impermissible, and she sold several drugs marketed as race-day medications. *See, e.g.*, GX 711. Moreover, the defendant joked with Seth Fishman about the absurdity of sending the drugs she sold directly to the racetrack, or to the racing commissions, further reflecting her knowledge that her drug sales were prohibited. GX 320FA (LG: "I already had to kind of snap on her she wanted me to send this to the racetrack stable gate I said absolutely not" / SF: "Ask her why not send it to race Commission office?" / LG: "Lol.. I know.."). The defendant knew that secrecy and deception were of paramount importance given the illegality of her practices. *See id.*; GX 139C-T ("we're not looking to put a spotlight on us either"); GX 1915 (description of Equifactor: "the labs could never detect unless a snitch tuned [sic] a bottle in and the racing authorities decided to make a test."); GX 309 ("BB3 . . . would only let trusted clients have this"); GX 319J ("B[B]3 . . . I would really stay low key on this one"). To that end, the defendant marketed the drugs she sold by assuring her buyers that the drugs would not test positive on current drug screens employed by racing authorities, *see, e.g.*, Trial Tr. 189:7-25 (Cohen testimony), Trial Tr. 1071:2-17 (Giannelli testimony); GX 320FI, 320FC, a notion repeated in the defendant's marketing material, GX 1915, 711 (HP Bleeder Plus; Equifactor; EGH).

The defendant further discussed with others the trustworthiness of certain clients in order to ensure that the defendant's buyers would be discreet and would not risk detection. *See, e.g.*, GX 1915 (reference to risk of "a snitch [turning] a bottle in"); 119A-T (discussing whether a buyer could be trusted); 320FK (same); 320FA (same); 319I (same); 320FJ (describing Adrienne Hall as "a referral" of another individual); 320FH (offering to "ask around" about a particular buyer to determine if he can be trusted).

The PEDs the defendant sold were adulterated and/or misbranded for a number of reasons, including because: (1) they were not manufactured in facilities registered with the U.S. Food and Drug Administration ("FDA"); (2) were labeled with deficient or misleading information, and omitted (among other things) manufacturer information, directions for use, ingredients, or other details required of all lawfully distributed drugs; (3) were not dispensed pursuant to valid veterinary prescriptions; and (4) lacked requisite FDA approval. Those drugs were described as having a performance-enhancing effect on racehorses *and* were likewise promoted as untestable under typical drug screens. More to the point, most of these medications were medically

unnecessary injectables that would cause a horse pain, and that could have lethal effects if administered incorrectly. *See* GX 139A-T (Fishman and Giannelli discussing the "pain" caused by race-day injections and the risk of a "nasty" infection). Many of those injectable drugs were intended to be administered within hours of a race, in clear violation of applicable racing prohibitions against the use of "race-day drugs," which apply in most, if not all, racing jurisdictions in the United States. *See* GX 711 at 1 (HP Bleeder Plus to be administered "4-6 hours prior to strenuous exercise"); *id.* at 2 (VO2 Max to be administered "4-5 fors [hours] prior to race"); *id.* at 2-3 (PSDS to be administered "4-6 hours prior to strenuous exercise"); *id.* at 3 (GNRH to be administered "4-6 hours prior to strenuous exercise"); *id.* at 3 (ITTP Plus to be administered "4-5 hours before event"); *id.* at 4-5 (ACTH to be administered within "4-6 hours prior to strenuous exercise"); *id.* at 4 (Oxygenator to be administered "4 hours prior to event"); *id.* at 7 (Serenity to be administered "4-6 hours before event"); GX 319J (Fishman emailing Giannelli that VO2 Max should be used "4-5 fors [hours] prior to race"); GX 320FN (Fishman texting Giannelli directions for HP bleeder plus: "10 mLs IV 4-6 hours prior to race"); GX 403M (Giannelli forwarding instructions from the defendant indicating that bleeder pills should be used within "8 hrs" of race); GX 105D-T (Fishman call with Hall in which Hall stated she injected a horse with VO2 Max the day of a race).

On February 26, 2020, a federal grand jury sitting in the Southern District of New York returned the Indictment charging the defendant with conspiring to manufacture, distribute, and sell PEDs to racehorse trainers through Equestology. *United States v. Navarro et al.*, 20 Cr. 160 (MKV) (S.D.N.Y.). The Indictment was unsealed on March 9, 2020.

In January 2022, Giannelli proceeded to trial with co-defendant Fishman; after defense counsel contracted COVID mid-trial, this Court granted the defendant's motion for a mistrial. (Jan. 24, 2022 Minute Order). Giannelli's re-trial commenced on April 27, 2022. The defendant was ultimately convicted of Count Two of the Indictment.

## II.  **The Presentence Report**

The PSR calculates the defendant's offense level as 28, and her criminal history category as I, PSR ¶¶ 124-130, yielding a Guidelines calculation of 78 to 97 months' imprisonment, which is adjusted in accordance with the defendant's statutory maximum sentence to determine the total applicable Guidelines Sentence of 60 months' imprisonment. PSR ¶¶ 174-75.[1] The defendant has lodged several objections to the PSR, to which the Government has responded, as reflected in the PSR. *See* PSR Pages 39-45.

---

[1] The PSR's Guidelines calculation is predicated upon Equestology's gains, which result in a 20-point enhancement to the 6-point base offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(K). PSR ¶ 116. Assuming this enhancement applies, the application of the additional two-point enhancements for employing sophisticated means and obstruction of justice, respectively, do not alter the ultimate Guidelines Sentence, as a 26-point offense level yields a Guidelines Range that exceeds the statutory maximum sentence.

### III. <u>Sentencing Factors</u>

#### A. Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant; and
(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

#### B. Discussion

As the Court is aware, the Government has carefully considered its view of the relative culpability of the defendants who have been sentenced thus far, and has endeavored to reach dispositions with Guidelines calculations that accurately and appropriately reflect the defendants' individual offense conduct and personal characteristics, their culpability relative to one another, as well as the quality of their acceptance of responsibility relative to the timing of their decisions to plead guilty. The defendants who have been sentenced thus far in this matter and their applicable Guidelines ranges are listed below.[2] This summary is provided for the Court's

---

[2] The Government has omitted from this discussion convicted defendants Michael Tannuzzo and Erica Garcia, given that those defendants are awaiting sentencing, and given the number of remaining defendants who have been sentenced by this Court.

reference, but it of course does not capture the totality of the relevant sentencing considerations for each defendant.

- Jordan Fishman (Guidelines Range of 12 to 18 months' imprisonment): Jordan Fishman, a drug manufacturer, assisted Seth Fishman in creating and manufacturing adulterated and misbranded performance-enhancing drugs in his Massachusetts-based laboratory, for further distribution by Seth Fishman and Lisa Giannelli. Jordan Fishman personally produced the illegal drugs for later distribution, created new drugs entirely at Seth Fishman's direction, and was involved in the manufacture of a variety of drugs. Jordan Fishman was not involved in the labeling, marketing, or sale (to consumers) of the illicit drugs he created, nor did he solicit customers or otherwise engage with customers, and did not otherwise promote the drugs that he created and produced. Jordan Fishman's offense conduct spanned approximately three years. Jordan Fishman also was not a veterinarian, did not have any animals under his care and/or control, and was not involved in the marketing and sale of the drugs he was creating for Seth Fishman. On February 8, 2022, this Court sentenced Jordan Fishman to a term of fifteen months' imprisonment, and one year of supervised release.

- Michael Kegley Jr. (Guidelines Range of 30 to 37 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines sentence correspondingly adjusted to 30 to 36 months' imprisonment): Kegley, the Director of Sales of Medivet, held no medical license, and did not have any duty of care to racehorses as part of his profession. Kegley did not engage in efforts to directly mislead state racing commissions. Further, Kegley's criminal activity was predominantly confined to the marketing and distribution of a discrete set of adulterated and misbranded drugs. Kegley's offense conduct spanned approximately four years. On January 6, 2022, this Court sentenced Kegley to a term of thirty months' imprisonment, and one year of supervised release.

- Marcos Zulueta (Guidelines Range of 30 to 37 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines Range correspondingly adjusted to 30 to 36 months' imprisonment): Zulueta, a racehorse trainer, assisted Navarro in obtaining and administering performance-enhancing drugs for the purpose of doping horses, and exchanged tips with Navarro regarding new illicit drugs to administer to horses, and different methods of administration. Zulueta not only procured illicit drugs, he personally administered them to the racehorses under his care and control, and stood to personally profit from the improved performance of the racehorses he doped. Zulueta was not involved in the creation or marketing of adulterated and misbranded drugs, and his offense conduct spanned approximately one year. On February 24, 2022, this Court sentenced Zulueta to a term of 33 months' imprisonment, and one year of supervised release.

- Christopher Oakes (Guidelines Range of 46 to 57 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines sentence

corresponding adjusted to 36 months' imprisonment): Oakes, a racehorse trainer, procured adulterated and misbranded performance-enhancing drugs from Seth Fishman, re-distributed those drugs to Navarro, and produced his own drench that was purportedly untestable even when administered the day of a race, which Oakes administered to his own racehorses (those he owned and trained) and provided to Navarro. Oakes assisted Navarro in surreptitiously administering drugs to one of Navarro's racehorses, "XY Jet," the day that horse was scheduled to race, by sneaking past racetrack security officials and concealing from those same officials the true purpose of his entry into the racetrack and barn area where "XY Jet" was housed. Oakes was licensed—and was thus proficient in various racing rules prohibiting the use of PEDs—and personally administered drugs to the horses under his care and control. Oakes was convicted for offense conduct that spanned approximately one year. On March 3, 2022, this Court sentenced Oakes to a term of thirty-six months' imprisonment, and one year of supervised release.

- Kristian Rhein (Guidelines Range of 135 to 168 months' but, given the statutorily authorized maximum sentence, the Guidelines Sentence correspondingly adjusted to 36 months' imprisonment): Rhein was a veterinarian and Medivet-affiliate who conspired with Kegley and others to market, distribute, sell, and administer SGF-1000, and further illicitly distributed unprescribed clenbuterol. Rhein, like Fishman, was a licensed veterinarian, thus was well-acquainted with the various legal regimes governing the sale and distribution of adulterated and misbranded drugs. Rhein generated false invoices for customers, using misleading billing codes for SGF-1000 and the illicit clenbuterol he provided to racehorse trainers. Rhein's offense conduct was limited to a handful of adulterated and misbranded PEDs, and Rhein was involved in the marketing and administration of those drugs, but not the creation and manufacture of those drugs. Rhein participated in the offense conduct for approximately four years. On January 5, 2022, this Court sentenced Rhein to a term of three years' imprisonment, and one year of supervised release.

- Jorge Navarro (Guidelines Range of 168 to 210 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines sentence is correspondingly adjusted to 60 months' imprisonment): Navarro, a thoroughbred racehorse trainer, was a prolific doper of racehorses, utilizing multiple sources of supply for the PEDs he used, drawing from foreign and domestic sources, and soliciting drugs from both non-veterinarians and veterinarians alike. Navarro is notable for his aggressive pursuit of novel drugs to administer to the racehorses under his care and control. As a trainer, Navarro personally profited from the improved performance of the racehorses he had surreptitiously and corruptly doped. Navarro's offense conduct spanned approximately four years. On December 17, 2021, this Court sentenced Navarro to a term of 60 months' imprisonment, and three years' supervised release.

- Seth Fishman (Guidelines Range of 210 to 240 months' imprisonment, automatically adjusting the high end of the calculated Guidelines range to the statutory maximum sentence of twenty years' imprisonment): Fishman owned and operated Equestology, through which he created, manufactured, marketed, and distributed drugs, including those supplied to the defendant for future sales. For approximately twenty years, Fishman generated millions of dollars in profit; created hundreds of novel adulterated and misbranded drugs; and enabled the doping practices of hundreds of trainers through his crimes. Further, Fishman was undeterred by his arrest or his subsequent indictment: he continued to commit crimes until a few weeks before his criminal trial commenced. Fishman was convicted at trial, after which this Court sentenced him to a term of eleven years' imprisonment.

Turning to Lisa Giannelli, the 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to protect the public, and to afford adequate general and specific deterrence. The Government acknowledges Giannelli's troubled upbringing and background. Nonetheless, in light of the longevity and scope of Giannelli's offense conduct and her false testimony during trial, the Government respectfully contends that a Guidelines Sentence of 60 months' imprisonment is warranted here.

*First*, a Guidelines Sentence is necessary to reflect the nature and seriousness of the offense. 18 U.S.C. § 3553(a)(1). The defendant engaged in the offense conduct for almost two decades, longer than almost every other defendant charged in this matter. Further, unlike the trainer-defendants charged and sentenced in this matter whose actions impacted a single barn, the defendant supplied hundreds of trainers with illegal PEDs, and brainstormed efforts to expand her customer base and boost drug sales. Giannelli not only supplied hundreds of trainers, she also offered for sale hundreds of drugs over the lifetime of the conspiracy. As discussed above, these drugs were dangerous, illegal, and unnecessary. Any concerns about the morality or legality of the defendant's conduct were secondary to the defendant's goal of enriching herself and her co-conspirators by giving corrupt trainers the tools to cheat and avoid getting caught. The seriousness of the defendant's offense conduct demonstrates the need for a Guidelines Sentence.

*Second*, a Guidelines Sentence is necessary to provide just punishment in light of the scope and nature of the defendant's role in the offense. The defendant was not blindly following Fishman's lead. The evidence produced at trial demonstrated that Giannelli was an independent and trusted member of the conspiracy.[3] She autonomously catered to her own book of clients, without direction or interference from Seth Fishman. *See* GX 163A-T ("I don't have [Fishman] talk to too many people because they are usually ex-clients after they talk to him[.]"); 119D-T

---

[3] The defendant likens her "level of intent" to that of trial witness Courtney Adams, who, for a period of time, was employed as a personal assistant to Seth Fishman. Def. Sent. Subm. at 11. Adams' and Giannelli's roles, responsibilities, oversight, compensation, and longevity were markedly different, making any such comparison inapt. Giannelli was a trusted member of Equestology for well over a decade; Adams worked at Fishman's direction in a limited capacity for a few years.

("There is a reason why our numbers are the way they are and we don't have a lot on the books because I trust my gut and my instinct[.]"); GX 331 ("I can not stress enough to have [Courtney Adams] stay far far away from *my end of your business*" (emphasis added)). Giannelli independently placed orders for supplies from pharmacies utilizing Fishman's license, and even signed documents on Fishman's behalf, GX 195-T. Giannelli monitored her own supplies of bulk drugs, ordered drugs from various compounding pharmacies and pharmaceutical suppliers using Fishman's license, tracked Fishman's various state licenses, created marketing materials, cold called clients to boost sales, and arranged for deliveries and shipments of drugs to clients across the United States. GX 329, 332A, 332F, 332H, 3460, 332U, 329, 707. Not only was Giannelli empowered to operate independently and separately from Seth Fishman, she likewise served a crucial function in Equestology's overall operations. Giannelli incorporated Equestology, GX 3700, opened a bank account for Equestology, for which she was a co-signatory with Seth Fishman, *id.*, and suggested new products for Equestology to manufacture on the basis of what her buyers requested and what legitimate competitors were charging. *See* GX 314H, 319FF, 332Q, 319HH. She further pressed for descriptions of each of the products Equestology offered for sale in order to generate sales, and created a pamphlet of those descriptions for distribution to potential buyers. GX 319G ("Write a short description of each of the new products below- in understandable layman's terms- it would help his sales tremendously"); 319M (same); 319U ("I also need a "SHORT" explanation in horseman's terms about his new products..If he wants to open the door to them he needs them to be able to ask and understand the product.."); 309 ("I need a one word blip to catch their attention").

*Third*, a significant term of imprisonment is further warranted because the defendant persisted in her crimes despite clear knowledge over the course of her conspiracy that what she was doing was wrong, illegal, and dangerous. The defendant's contention that Giannelli "was never properly instructed on relevant standards" is baseless. Def. Sent. Subm. at 11. The defendant was previously licensed by dint of the various positions she held in the racehorse industry. The notion that the defendant was oblivious to the applicable regulatory regime banning her conduct is spurious. Giannelli's long background in the racing industry, and the 2011 investigation into her conduct, refute the defense's suggestion. As the Court is aware, in 2011, the defendant was investigated by the Delaware Division of Professional Responsibility after a groom for racehorse trainer Les Givens mis-administered Pentosan, an unapproved drug that the defendant had sold to Givens, resulting in the horse's death. GX 3001. It is self-evident that the defendant's sales of injectable medications to trainers risked that such trainers would be reckless in administering those drugs to the horses under their care, and that serious, even fatal, consequences may follow. The complaint against the defendant explicitly raised the possibility of an FDA violation. The defendant, unchastened, lied to the Delaware Division of Professional Regulation to thwart their investigation into her illegal drug distribution, stating that the defendant "does not sell drugs for Dr. Fishman," and that it would be "incorrect and professionally irresponsible to claim" otherwise, and that Giannelli was "nothing more than a delivery person for Dr. Fishman's practice." GX 3000. Those lies were repeated during the defendant's interview in connection with the investigation, in which she told investigators that she was merely a "delivery person" for Fishman. GX 3100A-T. Later in the interview, when asked whether the drug sold had a prescription attached, Giannelli, again, demurred and responded that she was "just a delivery person" who did not examine what she delivered: "I'm like the UPS driver. I just don't know." GX 3100B-T. That statement, too, was false.

Almost a decade later, and in connection with this case, Giannelli again was placed on notice that her drug sales violated applicable federal laws governing the dissemination of drugs. On October 28, 2019, Giannelli's co-conspirator, Seth Fishman, was arrested and his cache of illegal drugs were seized by federal law enforcement agents. Fishman informed Giannelli that he had an issue related to the FDA that had resulted in the drug seizure, required him to litigate the matter in court, and that would temporarily slow his future production of drugs. *See* GX 403C. Despite the disruption, Giannelli was undeterred and continued to sell and offer to sell drugs to her existing buyers. *See* GX 403B ("Don't worry about me on my side I will keep things rolling. Running low on your stuff though..any chance of them returning the equine products?"); 403E (soliciting customers), 403D (same) (403M (same); Trial Tr. at 1092:2-9 (Giannelli testimony). Giannelli explicitly recognized that the labeling on the drugs she received and sold did not comply with the law; she nonetheless continued to sell those very drugs. *See* GX 332I (Dec. 6, 2019 email in which Giannelli places an order and writes: "Labels need to meet or exceed whats [sic] required before you send to me"); GX 403C (Giannelli directing co-conspirator to send Giannelli an Equestology drug "with the old label at this point" because Fishman had promised the order to a client). The defendant's persistent violations of law merit a significant sentence.

*Fourth*, a significant sentence is warranted in light of the defendant's false testimony at trial, during which the defendant set forth a number of demonstrably false claims in an unsuccessful attempt to sway the jury. Giannelli stated when questioned on cross-examination that she "never encouraged someone to use a drug the day of a race." Trial Tr. at 1035:14-25. Yet the defendant circulated promotional material instructing trainers to use race day drugs, and the defendant directly told trainers to administer certain drugs the day of a race. *See, e.g.*, GX 711; GX 319J (Fishman emailing Giannelli that VO2 Max should be used "4-5 fors [hours] prior to race"); GX 320FN (Fishman texting Giannelli directions for HP bleeder plus: "10 mLs IV 4-6 hours prior to race"); GX 403M (Giannelli forwarding instructions from the defendant indicating that bleeder pills should be used within "8 hrs" of race). Further, the defendant repeatedly testified that she was "not aware which" of the drugs she sold "was prescription and which was not," claiming that she relied on Seth Fishman's representation that any client had an "open prescription" or "open script," such that anyone was authorized to purchase any drug for any horse, with no time limitation, including for clients whom Giannelli herself input into Equestology's internal AVIMark system designed to track buyers. Trial Tr. at 1038:1-1038:7; *see also* Trial Tr. at 1040:24-1041:24; Trial Tr. 1044:6-14; Trial Tr. at 1077:1-25. The notion that the defendant, who routinely placed orders with drug manufacturers for FDA-approved prescription drugs, had no understanding of which drugs required a prescription is patently false. The defendant's obfuscation on this score was self-serving, and calculated at minimizing the defendant's knowledge and culpability. The defendant further testified falsely that she had no "role in creating new products," on direct examination, which she retracted when questioned on cross-examination. Trial Tr. at 1049:12-17. More than a decade after she lied to Delaware investigators to avoid accountability, she attempted the same ploy, disregarding the sanctity of her oath as a witness, and the integrity of the judicial system.

*Finally*, a Guidelines sentence is necessary to afford adequate general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). Opportunistic distributors, like the defendant, have enabled the hazardous and illegal administration of unnecessary medications to performance animals with the goal of

enriching themselves, and under the assumption that no serious consequences will follow if they are ever caught. As the Government has argued in prior submissions, many actors in the racehorse industry like the defendant have grown indifferent to, and dismissive of, the notion of obtaining illegal drugs to dope racehorses for profit. Many, like the defendant, believe that—if caught—they will face only a slap on the wrist. Imposing a substantial sentence here would send a strong signal to others thinking of engaging in such criminality that there will be consequences for their crimes. It will likewise counter the view that selling and administering PEDs is inconsequential, and is not subject to serious punishment.

## **Conclusion**

The Government respectfully submits that a Guidelines Sentence is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by:  _____
Sarah Mortazavi
Benjamin A. Gianforti
Assistant United States Attorneys
212-637-2520 / 2490

cc:    Louis Fasulo, Esq. (via ECF)